Beth D. Jacob (BJ6415)
SCHIFF HARDIN LLP
900 Third Avenue
New York, New York 10022
Telephone: (212) 753-5000

*Attorneys for Defendant The Port Authority of New York and New Jersey*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                            :
IN RE SEPTEMBER 11 PROPERTY DAMAGE     :     21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION                      :
                                                            :
                                                            :
------------------------------------------------------------------X
                                                            :
CONSOLIDATED EDISON COMPANY OF         :     07 CV 10582 (AKH)
NEW YORK, INC., et al.,                                :
                                                            :     **DECLARATION OF BETH D. JACOB**
                                                            :     **IN SUPPORT OF MOTION BY**
                                 Plaintiffs,            :     **DEFENDANT THE PORT**
                                                            :     **AUTHORITY OF NEW YORK AND**
         - against -                                     :     **NEW JERSEY TO DISMISS THE**
                                                            :     **COMPLAINT**
THE PORT AUTHORITY OF NEW YORK AND   :
NEW JERSEY,                                            :
                                                            :
                                 Defendant.          :
------------------------------------------------------------------X

Beth D. Jacob, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a partner in the firm of Schiff Hardin LLP, attorneys for defendant the Port

Authority of New York and New Jersey (the "Port Authority") in this litigation.  I make this

declaration in support of the Port Authority's Motion to Dismiss the Complaint.

2.      Attached as Exhibit A is a copy of the complaint filed in this action.

3.      Attached as Exhibit B is a copy of the complaint filed in *Aegis Insurance*

*Services, Inc., et al., v. Port Authority of New York and New Jersey* (02 CV 7188) on September

10, 2002.

4.    Attached as Exhibit C is a copy of the Notice of Claim served on the Port Authority on June 11, 2002.

5.    Attached as Exhibit D is a copy of the amended complaint filed in *Aegis Insurance Services, Inc., et al., v. Port Authority of New York and New Jersey* (02 CV 7188) on December 9, 2003.

6.    In 2004, plaintiffs brought suit (04 CV 7272) against Citigroup Inc. and Citigroup Global Market Holdings, Inc. (together "Citigroup"). Citigroup moved to dismiss plaintiffs' complaint. Attached as Exhibit E is a copy of Citigroup Inc. and Citigroup Global Markets Holding Inc.'s Memorandum of Law in Support of Their Motion to Dismiss, dated November 23, 2004.

7.    Attached as Exhibit F is a copy of Plaintiffs' Brief in Opposition to Motion by Defendants Citigroup Inc. and Citigroup Global Market Holdings Inc. to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), dated January 26, 2005.

8.    With the Court's permission, the Port Authority made a supplemental submission in connection with Citigroup's motion to dismiss, although it was not a party to that action. Attached as Exhibit G is a copy of the Supplemental Submission of the Port Authority of New York and New Jersey on Motion to Dismiss of Defendant Citigroup, dated September 20, 2005.

9.    Attached as Exhibit H is an excerpt of the Memorandum of Law in Support of Motions by Defendant The Port Authority of New York and New Jersey to Dismiss Plaintiffs' Complaints, dated April 30, 2004.

10.    Attached as Exhibit I is a copy of plaintiffs' Memorandum of Law in Opposition to Notice of Motion by Defendant Port Authority of New York and New Jersey to Dismiss the Complaint, dated June 11, 2004.

11.     Attached as Exhibit J is a copy of the transcript of the oral argument held on November 30, 2004, in connection with the Port Authority's motion to dismiss the complaint in 02 CV 7188.

12.     Attached as Exhibit K is a copy of the proposed Supplemental Complaint, which plaintiffs annexed to the Declaration of Michael S. Leavy, made in support of their Motion for Permission to Supplement Amended Complaint to Assert Cause of Action in Breach of Contract.

13.     Attached as Exhibit L is a copy of the Affidavit of Joseph M. Lynch, made in support of plaintiffs' motion to supplement.

14.     Attached as Exhibit M is a copy of the Complaint (07 CIV 7969) filed by plaintiffs against the Port Authority on September 11, 2007.

15.     Attached as Exhibit N is a copy of the transcript of the oral argument held September 20, 2007, in connection with plaintiffs' motion to supplement.

16.     Attached as Exhibit O is a copy of the Notice of Claim (with attachments) served on the Port Authority on September 21, 2007.

17.     Since the commencement of this lawsuit on or about September 9, 2002, over 800,000 pages of documents have been produced in the WTC7 ground litigation, the parties have filed and briefed more than six motions and depositions have been taken of about twenty witnesses.

18.     Attached as Exhibit P is a copy of the lease entered into by the Port Authority and Con Ed in 1968.

19.    Attached as Exhibit Q is a copy of the unreported decision *Serko & Simon, LLP v.*

*The Port Authority of New York and New Jersey*, 02 Civ. 10052 (S.D.N.Y. May 6, 2003).

20.    I declare under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
           February 11, 2008


_____
                                  Beth D. Jacob

NY\50253285.2

4

# EXHIBIT
# A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
CONSOLIDATED EDISON COMPANY OF                          :
NEW YORK, INC., and;                                     :
AEGIS INSURANCE SERVICES, INC.,                          :
LIBERTY INSURANCE UNDERWRITERS, INC.,                    :
NATIONAL UNION INSURANCE COMPANY                         :
OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE               :
LIMITED and UNDERWRITERS AT LLOYDS                       :
as subrogees of CONSOLIDATED EDISON COMPANY             :
OF NEW YORK, INC.                                        :          **COMPLAINT**

                            Plaintiffs,

                - against-

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

                            Defendant.
-------------------------------------------------------------------x

Consolidated Edison Company of New York, Inc., and; Aegis Insurance Services, Inc.,

Liberty Insurance Underwriters, Inc., National Union Insurance Company of Pittsburgh, Nuclear

Electric Insurance Limited and Underwriters at Lloyds, all as subrogees of Consolidated Edison

Company of New York, Inc., by way of Complaint against defendant The Port Authority of New

York and New Jersey, upon information and belief set forth:

<u>**PARTIES**</u>

        Plaintiff, Consolidated Edison Company of New York, Inc. (hereinafter referred

to as "Con Edison"), is a New York corporation, with its principal place of business at 4 Irving

Place, New York, New York, and was a tenant of a substation structure located beneath 7 World

Trade Center, Washington and Barclay Streets, New York, New York, on and prior to September

11, 2001

        2       Plaintiff, Aegis Insurance Services, Inc. (hereinafter referred to as "Aegis

Insurance Services"), with a place of business at 10 Exchange Place, Jersey City, New Jersey 07302, is a business entity authorized to engage in the insurance business in the State of New York.

3.    Plaintiff, Liberty Insurance Underwriters Inc. (hereinafter referred to as "Liberty"), with a place of business at 61 Broadway, New York, New York 10006, is a business entity authorized to engage in the insurance business in the State of New York.

4.    Plaintiff, National Union Insurance Company of Pittsburgh (hereinafter referred to as "National"), with a place of business at 70 Pine Street, New York, New York 10270, is a business entity authorized to engage in the insurance business in the State of New York.

5.    Plaintiff, Nuclear Electric Insurance Limited (hereinafter referred to as "Nuclear"), with a place of business at 1201 Market Street, Suite 1200, Wilmington, DE 19801, is a business entity authorized to engage in the insurance business in the State of New York.

6.    Plaintiff, Underwriters at Lloyds (hereinafter referred to as "Lloyds"), with a place of business at Lime Street, London, England, is a business entity authorized to engage in the insurance business in the State of New York.

7.    Aegis Insurance Services, Liberty, National, Nuclear, and Lloyds (hereinafter referred to collectively as "Aegis") are suing herein as subrogees of Consolidated Edison Company of New York, Inc. as a result of property insurance payments made to Con Edison as their insured.

8.    Defendant, The Port Authority of New York and New Jersey (hereinafter referred to as "The Port Authority"), is a body, corporate and politic by virtue of a compact, agreement and by law, between the states of New York and New Jersey, with an office in the City, County and State of New York.

2

## JURISDICTION

9.     This Court has jurisdiction of this action pursuant to 49 U.S.C. 40101 § 408(b), which provides that the United States District Court of the Southern District of New York shall have the original and exclusive jurisdiction over all actions brought for any claim, including property damage, "resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."

## VENUE

10.     Venue is properly laid in this Court pursuant to 49 U.S.C. 40101 § 408(b).

## GENERAL ALLEGATIONS

11.     At all relevant times, Aegis issued policies of insurance to Con Edison for Con Edison's property, operations and business. Pursuant to the aforementioned policies of insurance, Aegis insured Con Edison for losses to business property, and various other coverages as more particularly set forth in the insurance policies issued to Con Edison.

12.     By common law and contract the Aegis insurers have subrogation rights against such third parties as have caused or contributed to damages for which the Aegis insurers were required to pay Con Edison.

13     At all relevant times, The Port Authority was the owner of the property located at Washington and Barclay Streets, New York, New York.

14.     On or about May 29, 1968, The Port Authority entered into a lease agreement with Con Edison.

15.     Pursuant to that lease, in or about 1970, a Con Edison substation (the "Substation"), containing nine transformers, ancillary equipment and fire protection, was built at Washington and Barclay Streets. It provided electricity to the World Trade Center complex and the surrounding area.

16.     Beginning in or about 1983, 7 World Trade Center (the "Building") was built upon

3

and around the Substation.

17.    Upon completion of construction of the Building, the Substation was located immediately and directly beneath it. The Substation was an enclosed space with no entrance to the Building and both the space and equipment were fire protected.

18.    The Port Authority retained and exercised ultimate control over all aspects of the design, construction, alteration, use and occupancy of the Building, including but not limited to its structure, modifications to the structure, and other components and systems of the building including but not limited to power generation and fuel distribution systems and fire protection.

19.    On September    , 2001, at 8:46 a.m., an airliner hijacked by terrorists crashed into the One World Trade Center (North) Tower, causing a fire therein.

20.    On September    , 2001, at 9:03 a.m., another airliner, hijacked by terrorists in concert with those who hijacked the first airliner, crashed into the Two World Trade Center (South) Tower, causing a fire therein.

21.    On September 11, 2001, at approximately 9:59 a.m., the Two World Trade Center (South) Tower collapsed.

22    On September 11, 2001, at approximately 10:28 a.m., the One World Trade Center (North) Tower collapsed.

23.    Due to one or both of the foregoing fires and collapses, the Building was set on fire and, on September    , 2001, at approximately 5:20 p.m., suffered a progressive global collapse.

24.    The collapse of the Building completely destroyed the Substation.

25    As a result of the collapse of the Building, Con Edison's substation, cables, equipment and other property were destroyed.

26.    Con Edison's substation, cables, equipment and other property would not have been

4

damaged, or would have sustained minor damage, absent the collapse of the Building.

27.    The Aegis insurers made payment to Con Edison for its insured losses and have become subrogated to the rights of Con Edison for the recovery of the same.

28.    Con Edison sustained damage, including, but not limited to, its deductible and substantial uninsured consequential losses.

## THE LEASE PROVISIONS

29.    The Port Authority's lease with Con Edison contained the following provision which permitted the Port Authority to construct the Building upon the substation:

Section 8        Air Space and Port Authority Construction

(a)    The Lessee recognizes that the Port Authority may construct wholly or partially on, above or about the Substation Building additional stories, structures, buildings or improvements of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine.  In connection therewith, the Port Authority may use the roof surface of the Substation Building for the base or floor of such additional construction or for a plaza thereof or for some other purpose and may also use side wall surfaces of the Substation Building for support or for attachment thereto of additional structures or for decorative treatment thereto.  The Port Authority agrees that no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee contemplated in Section 3 hereof.  Without limiting the generality of the foregoing or of any other provisions of this Agreement the Port Authority in performing such additional construction may, upon reasonable advance written notice given to the Lessee and subject to and in accordance with the reasonable safety and operating requirements of the Lessee, temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such construction and the Lessee hereby consents to such entry, use and construction by the Port Authority.

(b)    The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be or be construed to be an eviction of the Lessee nor made the grounds of

5

any abatement of rental nor any claim or demand for damages, consequential or otherwise.

30.    The Port Authority's lease with Con Edison contained the following provisions with

respect to care, maintenance and repair by the Lessee

Section 15.  Care, Maintenance and Repair by the Lessee

(a)    Except as otherwise provided in Section 16 of this Agreement, the Lessee shall throughout the term of this Agreement assume the entire responsibility and shall relieve the Port Authority from all responsibility for all care, repair, replacement, and rebuilding whatsoever in the premises whether such repair, maintenance, replacement or rebuilding be ordinary, extraordinary, partial or entire, structural or otherwise and without limiting the generality of the foregoing, the Lessee shall:

[listing of duties omitted]

31    The Port Authority's lease with Con Edison contained the following provision

obligating the Port Authority to indemnify Con Edison for damage arising from the Port Authority's

acts or omissions in connection with the construction or maintenance of the Building, regardless of

fault on the part of the Port Authority:

Section 16.    Responsibility for Other Uses of Premises

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors; further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction thereof is necessitated by act or fault of the Lessee. The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the

6

Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof. The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance.

32.     The Port Authority's lease with Con Edison contained the following provision which applies to damage due to the negligence or other fault on the part of the Port Authority, its employees or agents. The provision states that it does not relieve the Port from the "without fault" indemnification obligations of paragraph 16:

Section 40.    Premises

*

(b)     The Port Authority shall not be liable to the Lessee or to any person for injury or death to any person or persons whomsoever or damage to any property whatsoever at any time in or about the premises, including but not limited to any such injury, death or damage from falling material, water, rain, hail, snow, gas, steam, dampness, explosives, smoke, radiation or electricity, whether the same may leak, issue, fall or flow from any part of the Facility or from any other place or quarter unless said damage, injury or death shall be due to the negligence of the Port Authority, its employees or agents, provided, however, that nothing in this subparagraph (b) shall be deemed to relieve the Port Authority of its obligations under Section 16 hereof.

33     The Port Authority's lease with Con Edison also contained the following provision concerning debris removal in the event of damage or destruction of the Substation:

Section 18.    Damage or Destruction of Premises

(a)     Removal of Debris – If the premises or any part thereof, shall

7

be damaged by fire, the elements, the public enemy or any other casualty, the Lessee shall promptly remove all debris resulting from such damage from the premises, and to the extent, if any, that such removal is covered by insurance, the proceeds thereof shall thereafter be made available to the Lessee for such purposes.

34    The Port Authority's lease with Con Edison also contained the following provision which obligated the Port Authority to insure, or procure insurance for, the Substation building in return for the payment of insurance premiums by Con Edison to the Port Authority:

Section 17.    Fire Insurance

During the term of this Agreement the Port Authority, at the Lessee's expense, shall insure and keep insured the Substation Building to the extent of 100% of the replacement value thereof against such hazards or risks as may now or in the future be included under the standard form of fire insurance policy in use in New York from time to time during the letting and the standard form of extended coverage endorsement prescribed as of the effective date of such insurance by the rating organization having jurisdiction. All such policies of insurance and renewals thereof shall be taken out in the name of the Port Authority and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority. The proceeds of such insurance shall be applied by the Port Authority in accordance with the provisions of section 18 hereof. The Port Authority shall not be deemed to have warranted the solvency of any insurance company and shall not be liable for any losses resulting from such insolvency.

The Port Authority may from time to time and at any time voluntarily elect on not less than ten days' notice to the Lessee to become a self-insurer as to any part or all of the loss or damage resulting from the hazards or risks that would be insured against under the insurance policies described in paragraph (a) above; the Port Authority shall, if and to the extent that it has elected to self-insure, make available out of its funds, in the event of such loss or damage, an amount equivalent to that which would have been paid by an insurance carrier under the same circumstances.

The Lessee shall pay the Port Authority annually an amount equal to the insurance premium or premiums paid by the Port Authority allocable to the insurance coverage provided under paragraph (a) above and if the Port Authority shall elect to self-insure as to any part or all of such coverage, the Lessee shall pay annually an amount

8

equal to the allocable portion of such insurance premiums which would have been paid by the Port Authority if it had actually insured.

35.     Con Edison duly and fully paid all premiums due pursuant to the above provision.

## FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

36.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth at length herein.

37      The Port Authority, by act and omission in the design, approval, inspection, installation, alteration, maintenance, operation, conduct and control of the Building and its load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems, and fire protection systems, caused the destruction of the Building and Substation.

38.     Con Edison and the Aegis insurers suffered damage as a result of the destruction of the Substation.  Substantial sums were paid to replace the Substation, its functionality and its associated equipment, and to remove debris, and other expenses have been incurred related to those activities, all in the amount of $129,341,259.

39.     Such expenses were incurred by reason of damage to the Substation or its related equipment which damage is compensable in accordance with the lease provisions cited above.

40.     Plaintiffs submitted a Notice of Claim to The Port Authority on September 21, 2007, requesting adjustment and payment of the damage sustained by plaintiffs.

41      The Port Authority has acknowledged its obligation to make payment under certain of the lease provisions cited above by making partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability arising from the lease.

42.     Demand has been made to the Port Authority for the balance of payment of the

9

amounts due under all of the aforesaid lease provisions.

43    No response has been made to the demand, and no further payment has been made by the Port Authority to Con Edison or Aegis.

44    Failure to make payment on the part of the Port Authority constitutes breach of contract.

45.    As a result of the breach of the lease contract by the Port Authority, Con Edison and Aegis have been damaged in the amount of $129,341,259.00, together with interest from the date the expenses were incurred.

## SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT

46. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth at length herein.

47.    The Port Authority was negligent, careless and reckless by act and omission in the design, approval, inspection, installation, alteration, maintenance, operation, conduct and control of the Building and its load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems, and fire protection systems, leading to the destruction of the Building and Substation.

48.    The collapse of the Building and the destruction and damage to the Con Edison substation, the equipment located therein, and equipment connecting to and from the substation, including Con Edison's consequential losses, were caused by the negligence, carelessness and recklessness of The Port Authority, including its contractors, agents, servants and/or employees, in failing to properly supervise the conduct, activities and operations of its employees, in failing to provide and observe adequate safety rules and regulations, in failing to comply with applicable statutes, rules, regulations, ordinances and standards of good practice, in allowing unsafe conditions

to exist, and in the design, approval, inspection, installation, alteration, maintenance, operation, conduct and control of: the load bearing structural systems; structural modifications; diesel-fueled power generation systems and appurtenant fuel oil and distribution systems, and; fire protection systems within the Building.

49.     Con Edison and Aegis suffered damage as a result of the destruction of the substation, have expended substantial sums to replace the Substation, its functionality and its associated equipment, and to remove debris, and have incurred other expenses related to those activities, all in the amount of $129,341,259.

50.     Such expenses were incurred by reason of damage to the Substation or its related equipment and they are compensable from The Port Authority in accordance with the lease provisions cited above.

51.     Plaintiffs submitted a Notice of Claim to The Port Authority on September 21, 2007, requesting adjustment and payment of the damage sustained by plaintiffs.

52.     The Port Authority has acknowledged its obligation to make payment under the lease provisions by making partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability arising from the lease.

53.     Demand has been made to the Port Authority for the balance of payment of the amounts due under the aforesaid lease provisions.

54.     No response has been made to the demand, and no payment has been made by the Port Authority to Con Edison or Aegis.

55.     Failure to make payment on the part of the Port Authority constitutes breach of contract.

56.     As a result of the breach of the lease contract by the Port Authority, Con Edison and

1

Aegis have been damaged in the amount of $129,341,259, together with interest from the date the expenses were incurred.

WHEREFORE, Plaintiffs demand judgment on the first and second causes of action, in the amount of $129,341,259, together with fees, costs, disbursements and interest.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
        November 26, 2007

Yours, etc.,

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for plaintiffs Consolidated Edison Company of
New York, Inc., and; Aegis Insurance Services, Inc.,
Liberty International Underwriters, Inc., National Union
Insurance Company of Pittsburgh, Nuclear Electric
Insurance Limited, and Underwriters at Lloyds, as
subrogees of Consolidated Edison Company of New York,
Inc.
45 Broadway Atrium - Litman Suite
New York, New York 10006
(212) 406-1919
Our File No.: 02-5514:241/1-A

By:  _____
      MARK L. ANTIN (MA 0427)
      MICHAEL S. LEAVY (ML 6150)

FRANKLIN M. SACHS (FS 6036)
GREENBAUM, ROWE, SMITH & DAVIS, LLP
Attorneys for Plaintiffs
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988
(732) 549-5600

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC., and;
AEGIS INSURANCE SERVICES, INC.,
LIBERTY INTERNATIONAL UNDERWRITERS, INC.,           :  Civil Action No.
NATIONAL UNION INSURANCE COMPANY
OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE
LIMITED and UNDERWRITERS AT LLOYDS                   :  **DISCLOSURE OF**
as subrogees of CONSOLIDATED EDISON COMPANY         :  **INTERESTED**
OF NEW YORK, INC.                                    :  **PARTIES PURSUANT**
                                                     :  **TO CIVIL RULE 7.1(a)**

                                      Plaintiffs,

            - against-

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

                              Defendant.

---------------------------------------------------------------------x

1    Aegis Insurance Services, Inc. is a wholly owned subsidiary of Associated Electric and
     Gas Insurance Services Limited, which in turn is a mutual insurance company owned by
     its policyholders and is not a publicly traded entity.

2    Liberty International Underwriters, Inc. is a subsidiary of Liberty Mutual Holding
     Company, which in turn is a mutual insurance company owned by its policyholders and is
     not a publicly traded entity.

3.   National Union Insurance Company of Pittsburgh, is a member company of American
     International Group, Inc., traded as "AIG."

4.   Nuclear Electric Insurance Limited is a mutual insurance company owned by its
     policyholders and is not a publicly traded entity.

5.   The corporate parent of Certain Underwriters at Lloyds, Syndicate 1225, is Associated
     Electric and Gas Insurance Services Limited, which in turn is a mutual insurance
     company owned by its policyholders and is not a publicly traded entity.

# EXHIBIT
# B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge Hellerstein

----------------------------------------------------------------------x

09 cv 7188

AEGIS INSURANCE SERVICES, INC.;
LIBERTY INTERNATIONAL UNDERWRITERS, INC.;
NATIONAL UNION INSURANCE COMPANY
OF PITTSBURGH; NUCLEAR ELECTRIC INSURANCE
LIMITED; UNDERWRITERS AT LLOYDS,
a/s/o CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC. and CONSOLIDATED EDISON
COMPANY OF NEW YORK, INC.;

:    Civil Action No.
:
:
:
:
:    **COMPLAINT**
:

                                    Plaintiffs,

                     - against-

PORT AUTHORITY OF NEW YORK AND NEW JERSEY,

                                    Defendant.

RECEIVED
SEP 1 0 2002
U.S.D.C. S.D. N.Y.
CASHIERS

----------------------------------------------------------------------x

Aegis Insurance Services, Inc., Liberty International Underwriters, Inc., National Union
Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, Underwriters at Lloyds, a/s/o
Consolidated Edison Company of New York, Inc., and Consolidated Edison Company of New York,
Inc., by way of Complaint against defendant, respectfully set forth, upon information and belief:

## THE PARTIES

1.      Plaintiff Aegis Insurance Services, Inc. (hereinafter referred to as "Aegis") with a
place of business at 10 Exchange Place, Jersey City, New Jersey 07302; Plaintiff Liberty International
Underwriters Inc. (hereinafter referred to as "Liberty") with a place of business at 61 Broadway,
New York, New York 10006; Plaintiff National Union Insurance Company of Pittsburgh (hereinafter
referred to as "National") with a place of business at 70 Pine Street, New York, New York 10270;

Plaintiff Nuclear Electric Insurance Limited (hereinafter referred to as "Nuclear") with a place of business at 1201 Market Street, Suite 1200, Wilmington, DE 19801; and Plaintiff Underwriters at Lloyds (hereinafter referred to as "Lloyds") with a place of business at Lime Street, London, England, are business entities authorized to engage in the insurance business in the State of New York.

   2.  Collectively, Aegis, Liberty, National, Nuclear, and Lloyds (hereinafter referred to collectively as "Aegis") are suing herein as subrogee of Consolidated Edison Company of New York, Inc.

   3.  Plaintiff Consolidated Edison Company of New York, Inc. (hereinafter referred to as "Con Edison") is a New York corporation, with its principal place of business at 4 Irving Place, New York, New York, and was a tenant of a premises located under 7 World Trade Center.

   4.  Defendant The Port Authority of New York and New Jersey (hereinafter referred to as "The Port Authority") is a body, corporate and politic by virtue of a compact, agreement and by law, between the states of New York and New Jersey, with an office in the City, County and State of New York.

## JURISDICTION

   5.  This Court has jurisdiction of the action pursuant to 49 U.S.C. 40101 § 408(b), which provides that the United States District Court of the Southern District of New York shall have the original and exclusive jurisdiction over all actions brought for any claim, including property damage, "resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."

## VENUE

   6.  Venue is properly laid in this Court pursuant to 49 U.S.C. 40101 § 408(b). Venue is also proper in that defendant resides within the Southern District of New York.

## ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

7.    Upon information and belief, The Port Authority is the owner of the property located at Washington and Barclay Streets, New York, New York.

8.    On or about May 29, 1968, The Port Authority entered into an agreement of lease with Con Edison.

9.    Pursuant to that lease, in or about 1970 a Con Edison substation, together with cables and equipment to and from the substation, was built at Washington and Barclay Streets and provided electricity to the World Trade Center complex and the surrounding area.

10.    In or about 1983, 7 World Trade Center was built on top of and alongside the Con Edison substation.

11.    In or about 1999, the City of New York (hereinafter referred to as the "City") constructed a command bunker on the 23rd floor of 7 World Trade Center. Multiple diesel fuel tanks were positioned within 7 World Trade Center along with electricity generators for the bunker in the event of a power failure.

12.    At all relevant times, Aegis issued policies of insurance to Con Edison for its property, operation and business. Pursuant to the aforementioned policies of insurance, Aegis insured Con Edison for losses to real and personal property and various other coverages pursuant to the policies of insurance issued.

13.    By common law and contract Aegis has subrogation rights against such third parties as have caused or contributed to damages for which the insurer was required to pay their insured.

14.    Upon information and belief, The Port Authority at all relevant times retained final control over the design, use and occupancy of 7 WTC, including all tenant improvements, modifications and occupancy. Such control included the location and design of all diesel fuel storage tanks, pumps, generators and related systems.

15.    The Port Authority did not properly and adequately apply, interpret and enforce New York City and State fire safety codes, rules, regulations and practices.

16.    The Port Authority did not apply, interpret and enforce safe engineering practices and standards commonly known and utilized in high-rise office buildings throughout the City and State of New York.

17.    On September 11, 2001, at 8:46 a.m. and 9:03 a.m. respectively, airplanes hijacked by a number of terrorists crashed into the World Trade Center North Tower and World Trade Center South Tower.

18.    At approximately 9:59 a.m., the World Trade Center South Tower collapsed. At approximately 10:28 a.m., the World Trade Center North Tower collapsed.

19.    7 World Trade Center was set on fire and at approximately 5:20 p.m. collapsed.

20.    As a result of the collapse of 7 World Trade Center, Con Edison's substation and other cables and equipment were destroyed and Con Edison was required to incur other expenses to reestablish and maintain services to lower Manhattan.

21.    The substation, which included nine transformers, ancillary equipment and fire protection, was housed immediately beneath 7 World Trade Center. The substation was an enclosed space with no entrance to 7 World Trade Center and both the space and equipment were fire protected.

22. Con Edison's substation, equipment, and other facilities would not have been damaged, or would have sustained minor damage, absent the collapse of 7 World Trade Center and Con Edison would not have incurred its other expenses absent the collapse of 7 WTC.

23. The damage that was suffered was proximately caused by The Port Authority's negligence, recklessness and carelessness.

24. Plaintiffs submitted a Notice of Claim on June 11, 2002, incorporated herein, requesting adjustment and payment of the damage sustained by plaintiffs. The defendant has failed to take any action to date.

25. Aegis undertook to make payment to Con Edison for its insured losses and has been subrogated to the rights of its insured for the recovery of the same.

26. Con Edison sustained damage, including, but not limited to, its deductible and uninsured losses, that were not covered by insurance, and also incurred costs to re-establish and maintain services to lower Manhattan as a result of the collapse of 7 World Trade Center.

## AS AND FOR A FIRST CAUSE OF ACTION

27. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth at length herein.

28. The collapse of 7 World Trade Center and the destruction and damage to the Con Edison substation, the equipment located therein, and equipment connecting to and from the substation, were caused by the negligence, carelessness, recklessness and breach of contract of The Port Authority including its agents, servants and/or employees, which consisted of the following, without limitation:

(a)    in the negligent design, approval, inspection, installation, maintenance, operation, conduct and control of 7 World Trade Center, New York, New York and the diesel fuel tanks therein;

(b)    in approving and allowing the aforesaid fuel tanks to be built and located so as to contribute to the collapse of 7 World Trade Center;

(c)    in failing to build and maintain the aforesaid diesel fuel tanks under proper, reasonable and lawful control;

(d)    in causing, permitting, allowing and/or suffering the aforesaid diesel fuel tanks and other combustibles and flammables to be so negligently constructed, located, installed, operated, or maintained so as to cause, permit and/or contribute to the collapse of 7 World Trade Center, New York, New York, and seriously damage its property;

(e)    in failing to keep and maintain a proper look-out and watch;

(f)    in failing to properly and timely prevent the aforesaid diesel fuel tanks and other combustible and flammables from contributing to the collapse of 7 World Trade Center;

(g)    in failing to use and/or enforce accepted codes and procedures;

(h)    in building, maintaining, locating and installing said diesel fuel tanks;

(i)    in failing to set up proper safeguards, barriers and fire protection;

(j)    in failing to promulgate proper rules and regulations;

(k)    in failing to set up proper and adequate training programs;

(l)    in negligently and carelessly training personnel;

(m)    in failing to provide adequate, proper and necessary security to make the

premises safe for its tenant; and

(n)    in failing to design, build, maintain, update, inspect, operate and safeguard 7 World Trade Center and/or the premises as necessary and/or proper to provide its tenant with a safe premises.

29.    Defendant's negligence, carelessness, recklessness and/or breach of lease was the proximate cause of, and materially contributed to, plaintiffs' damage.

30.    By reason of the foregoing, plaintiffs have been damaged in the sum of $314,500,000.00.

31.    Accordingly, plaintiffs are entitled to recover from the defendant for all their losses.

## AS AND FOR A SECOND CAUSE OF ACTION

32.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth at length herein.

33.    The Port Authority failed to properly apply, interpret and enforce New York City and State fire and safety codes, regulations and practices.

34.    The Port Authority's failure to properly apply, interpret and enforce New York City and State fire and safety codes and regulations was negligence *per se* and in violation of its duty of care.

35.    The Port Authority's negligence per se was a direct and proximate cause of the collapse of 7 WTC and caused plaintiffs to incur damages.

WHEREFORE, plaintiffs demand judgment against the defendant for all losses, and for such other, further and different relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
      September 9, 2002

Yours, etc.

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Claimants - Aegis Insurance Services, Inc.,
Liberty International Underwriters, Inc.,
National Union Insurance Company of Pittsburgh,
Nuclear Electric Insurance Limited, and Underwriters at
Lloyds, a/s/o Consolidated Edison Company of New York,
Inc. and Consolidated Edison Company of New York, Inc.
45 Broadway Atrium - Litman Suite
New York, New York 10006
(212) 406-1919
Our File No.: 03-5514:241/1-K

By: _____
    STANLEY W. KALLMANN



In the Matter of the Claim of                                    )
                                                                 )
UNDERWRITERS AT INTEREST THAT                                    ) PORT AUTHORITY OF NY & NJ
PROVIDED SALOMON SMITH BARNEY, INC.                              ) OFFICE OF THE SECRETARY
PROPERTY INSURANCE FOR 7 WORLD TRADE                             )
CENTER, WHICH WAS IN EFFECT                                      ) 2002 JUL -8  P 4: 58
SEPTEMBER 11, 2001                                               )
                                                                 )
as subrogees of                                                  )
                                                                 )
SALOMON SMITH BARNEY, INC.                                       )
                                                                 )
-against-                                                        )
                                                                 )
THE PORT AUTHORITY OF                                            )
     NEW YORK AND NEW JERSEY;                                    )
And JOHN DOES 1 through 10.                                      )
                                                                 )

To:  Law Department of The Port Authority of New York/ New Jersey:

PLEASE TAKE NOTICE that the claimant(s) herein hereby make(s) claim and

demand against The Port Authority of New York/ New Jersey as follows:

That the claimant(s) suffered property damage due to the negligence of The Port

Authority of New York/ New Jersey, its officers and agents.

1.) Name and Post Office Address of Claimant(s) and Attorneys:

Claimant(s):    Underwriters at Interest that Provided Salomon Smith Barney
                Property Insurance for 7 World Trade Center, which was in effect
                September 11, 2001 as subrogees of

                (See attached list, "Exhibit A", for specific names and addresses)

                Salomon Smith Barney Inc.
                77 Water Street
                New York, NY 10005

# EXHIBIT C

--------------------------------------------X

In the Matter of the Claim of

AEGIS INSURANCE SERVICES, INC.; ZURICH
INSURANCE COMPANY; NATIONAL UNION
INSURANCE COMPANY OF PITTSBURGH;
LIBERTY INTERNATIONAL UNDERWRITERS,
INC.; NUCLEAR ELECTRIC INSURANCE LIMITED;
and UNDERWRITERS AT LLOYDS,
a/s/o CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC., and CONSOLIDATED EDISON
COMPANY OF NEW YORK, INC.,

Index No.

**ORIGINAL**

**NOTICE OF CLAIM**

                              Claimants,

        -against-

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY,

                        Respondent.

--------------------------------------------X

TO:    Port Authority of New York and New Jersey

        PLEASE TAKE NOTICE that the claimants herein make claim and demand against the Port

Authority of New York and New Jersey as follows:

        1.      The name and a post office address of each claimant:  Aegis Insurance Services,

Inc., 10 Exchange Place, Jersey City, NJ 07302; Zurich Insurance Company, 1400 American Lane,

Schaumburg, IL 60193; National Union Insurance Company of Pittsburgh, 70 Pine Street, New

York, NY 10270; Liberty International Underwriters, Inc., 61 Broadway, New York, NY 10006;

Nuclear Electric Insurance Limited, 1201 Market Street, Suite 1200, Wilmington, DE 19801;

Underwriters at Lloyds, Lime Street, London, England, a/s/o Consolidated Edison Company of New

York, Inc.; and Consolidated Edison Company of New York, Inc.; 4 Irving Place, New York, NY

10003; their attorneys are Gennet, Kallmann, Antin & Robinson, P.C., 45 Broadway Atrium, Litman Suite, New York, New York.

2.    The nature of the claim: This is a claim for property damage as a result of the negligence and carelessness of the Port Authority of New York and New Jersey which consisted of the following, among other things: the negligent design approval, inspection, installation, maintenance, operation, conduct and control of the diesel fuel tanks at 7 World Trade Center, New York, New York; approving and allowing aforesaid fuel tanks to be built and located so as to contribute to the collapse of 7 World Trade Center; failing to build and maintain the aforesaid diesel fuel tanks under proper, reasonable and lawful control; causing, permitting, allowing and/or suffering the aforesaid diesel fuel tanks to be so negligently constructed, located, installed, operated or maintained so as to cause and permit to contribute to the collapse 7 World Trade Center, New York, New York, and seriously damaging claimants' insured's property;   failing to keep and maintain a proper lookout and watch; failing to properly and timely prevent the aforesaid diesel fuel tanks from contributing to the collapse of 7 World Trade Center; failing to use and/or enforce accepted codes and procedures in building, maintaining, locating and installing said diesel fuel tanks; failing to set up proper safeguards, barriers and fire protection; failing to properly promulgate proper rules and regulations; failing to set up proper and adequate training programs; the negligent and careless training of the personnel of the City of New York.

3.    The time when, place where and the manner in which said claim arose: On or about September 11, 2001, at or about 5:20 p.m., 7 World Trade Center collapsed, damaging claimants' insured's property.  New York City, its officials, agents, servants and employees so negligently, recklessly and carelessly installed, located, constructed and maintained diesel fuel tanks located in 7 World Trade Center as to cause the collapse of 7 World Trade Center and damage property of claimants' insured.

4.    The items of damage or injuries claimed are:The items of damage or injuries claimed are: The items of damage or injuries claimed are: (a) two electric substations located at the 7 World Trade Center Complex (with the capacity to distribute over 400 MW of electricity) inclusive of buildings and structures housing the two substations, (b) nine 65 MVA transformers with an input voltage of 138 kilovolts stepping down to 13 kilovolts and ancillary equipment and cabling; (c) underground transmission feeder lines for the lower Manhattan Network; (d) underground distribution lines for the Lower Manhattan Network; (e) emergency reenergizing of a substation at Seaport Station to replace the substation destroyed at 7 World Trade Center and restore power to the Lower Manhattan Network at least until the destroyed substations could be rebuilt; (f) emergency response and temporary restoration of electricity expenses; and (g) ancillary equipment, together with other cables and equipment connecting to and from the substation. .

5.    Claimants' demand is hereby presented for adjustment and payment.

PLEASE TAKE FURTHER NOTICE that by reason of the foregoing in default of the Port Authority of New York and New Jersey to pay the claimants the sum of $314,500,000.00 within the time limit for compliance with this demand by the Port Authority of New York and New Jersey, by the applicable statutes, claimants intend to seek recovery with interest and costs.

Dated: April 15, 2002          Yours, etc.

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Claimants - Aegis Insurance Services, Inc.,
Zurich Insurance Company, National Union Insurance Company
of Pittsburgh, Liberty International Underwriters, Inc., Nuclear
Electric Insurance Limited, and Underwriters at Lloyds,
a/s/o Consolidated Edison Company of New York, Inc. and
Consolidated Edison Company of New York, Inc.
45 Broadway Atrium - Litman Suite
New York, New York 10006
(212) 406-1919
Our File No.: 02-5514:241/1-K


By: _____
MICHAEL L. BRAUNSTEIN

**VERIFICATION**

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

      MICHAEL L. BRAUNSTEIN, an attorney admitted to practice before the courts of this State, affirms the following under the penalties of perjury:

      1.    I am associated with the law firm of Gennet, Kallmann, Antin & Robinson, P.C., attorneys for claimants Aegis Insurance Services, Zurich Insurance Company, National Union Insurance Company of Pittsburgh, Liberty International Underwriters, Inc., Nuclear Electric Insurance Limited, Underwriters at Lloyds, Lime Street, London, England, a/s/o Consolidated Edison Company of New York, Inc.; and Consolidated Edison Company of New York, Inc.

      2.    I have read the annexed Notice of Claim and know the contents thereof, and affirm that the same are true to my knowledge, except for those matters which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.

      3.    My belief as to those matters herein not stated upon actual knowledge is based upon my review of the file maintained by our firm in connection with this matter and communications with claimants. The reason this Verification is made by the undersigned and not by the claimants is because the claimants are not present in the County where our firm maintains its office.

Dated: New York, New York
       June 10, 2002

                                MICHAEL L. BRAUNSTEIN

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x
                                                              :
AEGIS INSURANCE SERVICES, INC.;                               :
LIBERTY INSURANCE UNDERWRITERS, INC.;                         : Civil Action No.
NATIONAL UNION INSURANCE COMPANY                              : 02-CIV-7188 (JGK)
OF PITTSBURGH; NUCLEAR ELECTRIC INSURANCE                     :
LIMITED; UNDERWRITERS AT LLOYDS,                              :
a/s/o CONSOLIDATED EDISON COMPANY                             **AMENDED COMPLAINT**
OF NEW YORK, INC. and CONSOLIDATED EDISON                     :
COMPANY OF NEW YORK, INC.;                                    :
                                                              :
                                                              :
                                 Plaintiffs,                  :
                                                              :
                                                              :
               - against-                                     :
                                                              :
PORT AUTHORITY OF NEW YORK AND NEW JERSEY                     :
and THE CITY OF NEW YORK                                      :
                                                              :
                                 Defendant.                   :
--------------------------------------------------------------------------x

       Aegis Insurance Services, Inc., Liberty Insurance Underwriters, Inc., National Union

Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, Underwriters at Lloyds, a/s/o

Consolidated Edison Company of New York, Inc., and Consolidated Edison Company of New York,

Inc., by way of Amended Complaint against defendants, respectfully set forth, upon information and

belief:

                                   **THE PARTIES**

       1.      Plaintiff Aegis Insurance Services, Inc. (hereinafter referred to as "Aegis") with a

place of business at 10 Exchange Place, Jersey City, New Jersey 07302; Plaintiff Liberty Insurance

Underwriters Inc. (hereinafter referred to as "Liberty") with a  place of business at 61 Broadway,

New York, New York 10006; Plaintiff National Union Insurance Company of Pittsburgh (hereinafter

referred to as "National") with a place of business at 70 Pine Street, New York, New York 10270;

Plaintiff Nuclear Electric Insurance Limited (hereinafter referred to as "Nuclear") with a place of

business at 1201 Market Street, Suite 1200, Wilmington, DE 19801; and Plaintiff Underwriters at

Lloyds (hereinafter referred to as "Lloyds") with a place of business at Lime Street, London, England,

are business entities authorized to engage in the insurance business in the State of New York.

2.      Collectively, Aegis, Liberty, National, Nuclear, and Lloyds (hereinafter referred to

collectively as "Aegis") are suing herein as subrogee of Consolidated Edison Company of New York,

Inc.

3.      Plaintiff Consolidated Edison Company of New York, Inc. (hereinafter referred to as

"Con Edison") is a New York corporation, with its principal place of business at 4 Irving Place, New

York, New York, and was a tenant of a premises located under 7 World Trade Center.

4.      Defendant The Port Authority of New York and New Jersey (hereinafter referred to

as "The Port Authority") is a body, corporate and politic by virtue of a compact, agreement and by

law, between the states of New York and New Jersey, with an office in the City, County and State

of New York.

5.      The defendant The City of New York (hereinafter referred to as "The City") is a body,

corporate and politic, by virtue of a compact, agreement and by law, with an office in the City of New

York and State of New York.

## JURISDICTION

6.      This Court has jurisdiction of the action pursuant to 49 U.S.C. 40101 § 408(b), which

provides that the United States District Court of the Southern District of New York shall have the

original and exclusive jurisdiction over all actions brought for any claim, including property damage,

"resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."

## VENUE

7.      Venue is properly laid in this Court pursuant to 49 U.S.C. 40101 § 408(b). Venue

is also proper in that defendants reside within the Southern District of New York.

## ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

8.      Upon information and belief, The Port Authority is the owner of the property located

at Washington and Barclay Streets, New York, New York.

9.      On or about May 29, 1968, The Port Authority entered into a lease agreement with

Con Edison.

10.      Pursuant to that lease, in or about 1970, a Con Edison substation, together with cables

and equipment to and from the substation, was built at Washington and Barclay Streets and provided

electricity to the World Trade Center complex and the surrounding area.

11.      In or about 1983, 7 World Trade Center was built on top of and alongside the Con

Edison substation.

12.      In or about 1999, The City constructed, or had constructed, a command bunker on

the 23rd floor of 7 World Trade Center.

13.      The City installed, or had installed, multiple diesel fuel tanks in 7 World Trade Center

along with electrical generators for the bunker in the event of a power failure. The same posed a

hazard and were not consistent with The City's building/fire code(s) or good practice.

14.      The City did so, or allowed the same to be done, despite warning from fire

department officials.

15.      The fuel was for The City's benefit and use. The tanks were filled, either directly or

indirectly, by The City.

16.    At all relevant times, Aegis issued policies of insurance to Con Edison for its

property, operation and business. Pursuant to the aforementioned policies of insurance, Aegis insured

Con Edison for losses to real and personal property and various other coverages pursuant to the

policies of insurance issued.

17.    By common law and contract Aegis has subrogation rights against such third parties

as have caused or contributed to damages for which the insurer was required to pay their insured.

18.    Upon information and belief, The Port Authority retained final control over the design,

use and occupancy of 7 WTC, including all tenant improvements, modifications and occupancy. Such

control included the location and design of all diesel fuel storage tanks, pumps, generators and related

systems.

19.    The Port Authority and The City did not properly and adequately apply, interpret and

enforce New York City and State fire safety codes, rules, regulations and practices.

20.    The Port Authority and The City did not apply, interpret and enforce safe engineering

practices and standards commonly known and utilized in high-rise office buildings throughout the City

and State of New York.

21.    On September 11, 2001, at 8:46 a.m. and 9:03 a.m. respectively, airplanes hijacked

by a number of terrorists crashed into the World Trade Center North Tower and World Trade Center

South Tower.

22.    At approximately 9:59 a.m., the World Trade Center South Tower collapsed.  At

approximately 10:28 a.m., the World Trade Center North Tower collapsed.

23.    7 World Trade Center was set on fire and at approximately 5:20 p.m. collapsed.

24.    As a result of the collapse of 7 World Trade Center, Con Edison's substation and

other cables and equipment were destroyed and Con Edison was required to incur other expenses to

reestablish and maintain services to lower Manhattan.

25.    The substation, which included nine transformers, ancillary equipment and fire protection, was housed immediately beneath 7 World Trade Center. The substation was an enclosed space with no entrance to 7 World Trade Center and both the space and equipment were fire protected.

26.    Con Edison's substation, equipment, and other facilities would not have been damaged, or would have sustained minor damage, absent the collapse of 7 World Trade Center and Con Edison would not have incurred its other expenses absent the collapse of 7 WTC.

27.    The damage that was suffered was proximately caused by The Port Authority's negligence, recklessness and carelessness.

28.    Plaintiffs submitted a Notice of Claim to The Port Authority on June 11, 2002, incorporated herein as Exhibit "A", requesting adjustment and payment of the damage sustained by plaintiffs. The Port Authority has failed to take any action to date.

29.    Plaintiffs' Notice of Claim to The City, incorporated herein as Exhibit "B", was deemed filed and served by the Supreme Court, County of New York.

30.    Plaintiffs have appeared for a 50-h hearing.

31.    More than thirty (30) days have elapsed and The City has failed to take any action to date.

32.    Aegis undertook to make payment to Con Edison for its insured losses and has been subrogated to the rights of its insured for the recovery of the same.

33.    Con Edison sustained damage, including, but not limited to, its deductible and uninsured losses, that were not covered by insurance, and also incurred costs to re-establish and maintain services to lower Manhattan as a result of the collapse of 7 World Trade Center.

## AS AND FOR A FIRST CAUSE OF ACTION

34.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth at length herein.

35.    The collapse of 7 World Trade Center and the destruction and damage to the Con Edison substation, the equipment located therein, and equipment connecting to and from the substation, were caused by the negligence, carelessness, recklessness and breach of contract of The Port Authority and The City including their agents, servants and/or employees, which consisted of the following, without limitation:

(a)    in the negligent design, approval, inspection, installation, maintenance, operation, conduct and control of 7 World Trade Center, New York, New York and the diesel fuel tanks therein;

(b)    in approving and allowing the aforesaid fuel tanks to be built and located so as to contribute to the collapse of 7 World Trade Center;

(c)    in failing to build and maintain the aforesaid diesel fuel tanks under proper, reasonable and lawful control;

(d)    in causing, permitting, allowing and/or suffering the aforesaid diesel fuel tanks and other combustibles and flammables to be so negligently constructed, located, installed, operated, or maintained so as to cause, permit and/or contribute to the collapse of 7 World Trade Center, New York, New York, and seriously damage its property;

(e)    in failing to keep and maintain a proper look-out and watch;

(f)    in failing to properly and timely prevent the aforesaid diesel fuel tanks and other combustible and flammables from contributing to the collapse of 7 World Trade Center;

(g)    in failing to use and/or enforce accepted codes and procedures;

(h)    in building, maintaining, locating and installing said diesel fuel tanks;

(i)    in failing to set up proper safeguards, barriers and fire protection;

(j)    in failing to promulgate proper rules and regulations;

(j)     in failing to promulgate proper rules and regulations;

(k)     in failing to set up proper and adequate training programs;

(l)     in negligently and carelessly training personnel;

(m)    in failing to provide adequate, proper and necessary security to make the premises safe for its tenant; and

(n)     in failing to design, build, maintain, update, inspect, operate and safeguard 7 World Trade Center and/or the premises as necessary and/or proper to provide its tenant with a safe premises.

36.    Defendants' negligence, carelessness, recklessness and/or breach of lease was the proximate cause of, and materially contributed to, plaintiffs' damage.

37.    By reason of the foregoing, plaintiffs have been damaged.

38.    Accordingly, plaintiffs are entitled to recover from the defendant for all their losses.

## AS AND FOR A SECOND CAUSE OF ACTION

39.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth at length herein.

40.    The Port Authority and The City failed to properly apply, interpret and enforce New York City and State fire and safety codes, regulations and practices.

41.    The Port Authority and The City's failure to properly apply, interpret and enforce New York City and State fire and safety codes and regulations was negligence *per se* and in violation of its duty of care.

42.    The Port Authority and The City's negligence per se was a direct and proximate cause of the collapse of 7 WTC and caused plaintiffs to incur damages.

WHEREFORE, plaintiffs demand judgment against the defendants for all losses, and for such other, further and different relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: New York, New York
      December 9, 2003

Yours, etc.

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Claimants - Aegis Insurance Services, Inc.,
Liberty International Underwriters, Inc.,
National Union Insurance Company of Pittsburgh,
Nuclear Electric Insurance Limited, and Underwriters at
Lloyds, a/s/o Consolidated Edison Company of New York,
Inc. and Consolidated Edison Company of New York, Inc.
45 Broadway Atrium - Litman Suite
New York, New York 10006
(212) 406-1919
Our File No.: 02-5514:241/1-K

By: _____
     STANLEY W. KALLMANN (SK 5204)

**Exhibit A**

```
-------------------------------------------------------------X
```

In the Matter of the Claim of

AEGIS INSURANCE SERVICES, INC.; ZURICH
INSURANCE COMPANY; NATIONAL UNION
INSURANCE COMPANY OF PITTSBURGH;
LIBERTY INTERNATIONAL UNDERWRITERS,
INC.; NUCLEAR ELECTRIC INSURANCE LIMITED;
and UNDERWRITERS AT LLOYDS,
a/s/o CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC.,

Index No.

                   Claimants,

    -against-

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY,

                  Respondent.

**NOTICE OF CLAIM**

PORT AUTHORITY OF NY & NJ
OFFICE OF THE SECRETARY
2002 APR 25  P 1: 03

```
-------------------------------------------------------------X
```

TO:    Port Authority of New York and New Jersey

       PLEASE TAKE NOTICE that the claimants herein make claim and demand against the Port

Authority of New York and New Jersey as follows:

       1.      The name and a post office address of each claimant:  Aegis Insurance Services,

Inc., 10 Exchange Place, Jersey City, NJ 07302; Zurich Insurance Company, 1400 American Lane,

Schaumburg, IL 60193; National Union Insurance Company of Pittsburgh, 70 Pine Street, New York,

NY 10270; Liberty International Underwriters, Inc., 61 Broadway, New York, NY 10006; Nuclear

Electric Insurance Limited, 1201 Market Street, Suite 1200, Wilmington, DE 19801; Underwriters

at Lloyds, Lime Street, London, England, a/s/o Consolidated Edison Company of New York, Inc.;

their attorneys are Gennet, Kallmann, Antin & Robinson, P.C., 45 Broadway Atrium, Litman Suite,

New York, New York.

New York, New York.

2.    The nature of the claim: This is a claim for property damage as a result of the negligence and carelessness of the Port Authority of New York and New Jersey which consisted of the following, among other things: the negligent approval, inspection, installation, maintenance, operation, conduct and control of the diesel fuel tanks at 7 World Trade Center, New York, New York; approving and allowing aforesaid fuel tanks to be built and located so as to contribute to the collapse of 7 World Trade Center; failing to build and maintain the aforesaid diesel fuel tanks under proper, reasonable and lawful control; causing, permitting, allowing and/or suffering the aforesaid diesel fuel tanks to be so negligently constructed, located, installed, operated or maintained so as to cause and permit to contribute to the collapse of 7 World Trade Center, New York, New York, and seriously damaging claimants' insured's property; failing to keep and maintain a proper lookout and watch; failing to properly and timely prevent the aforesaid diesel fuel tanks from contributing to the collapse of 7 World Trade Center; failing to use and/or enforce accepted codes and procedures in building, maintaining, locating and installing said diesel fuel tanks; failing to set up proper safeguards, barriers and fire protection; failing to properly promulgate proper rules and regulations; failing to set up proper and adequate training programs; the negligent and careless training of the personnel of the City of New York.

3.    The time when, place where and the manner in which said claim arose: On or about September 11, 2001, at or about 5:20 p.m., 7 World Trade Center collapsed, damaging claimants' insured's property.  New York City, its officials, agents, servants and employees so negligently, recklessly and carelessly installed, located, constructed and maintained diesel fuel tanks located in 7 World Trade Center as to cause the collapse of 7 World Trade Center and damage property of claimants' insured.

4.      The items of damage or injuries claimed are: all the transformers and ancillary equipment belonging to claimants' insured located in the 7 World Trade Center, nine 65 MVA transformers with an input voltage of 138 kilovolts stepping down to 13 kilovolts, ancillary equipment, together with other cables and equipment connecting to and from the substation.

5.      Claimants' demand is hereby presented for adjustment and payment.

PLEASE TAKE FURTHER NOTICE that by reason of the foregoing in default of the Port Authority of New York and New Jersey to pay the claimants the sum of $250,000,000.00 within the time limit for compliance with this demand by the Port Authority of New York and New Jersey, by the applicable statutes, claimants intend to seek recovery with interest and costs.

Dated: April 15, 2002 Yours, etc.

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Claimants - Aegis Insurance Services, Inc.,
Zurich Insurance Company, National Union Insurance Company
of Pittsburgh, Liberty International Underwriters, Inc., Nuclear
Electric Insurance Limited, and Underwriters at Lloyds,
a/s/o Consolidated Edison Company of New York, Inc.
45 Broadway Atrium - Litman Suite
New York, New York 10006
(212) 406-1919
Our File No.: 02-5514:241/1-K

By: _____
        STANLEY W. KALLMANN

**Exhibit B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

In the Matter of the Claim of

                                     Index No.

AEGIS INSURANCE SERVICES, INC.; ZURICH
INSURANCE COMPANY; NATIONAL UNION
INSURANCE COMPANY OF PITTSBURGH;
LIBERTY INTERNATIONAL UNDERWRITERS,
INC.; NUCLEAR ELECTRIC INSURANCE LIMITED;
and UNDERWRITERS AT LLOYDS,
a/s/o CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC.,

                                        **NOTICE OF CLAIM**

                        Claimants,

    -against-

THE CITY OF NEW YORK,

                        Respondent.
-----------------------------------------------------------------X

TO:    Comptroller of the City of New York

       PLEASE TAKE NOTICE that the claimants herein make claim and demand against the City

of New York as follows:

       1.      The name and a post office address of each claimant: Aegis Insurance Services, Inc.,

10 Exchange Place, Jersey City, NJ 07302; Zurich Insurance Company, 1400 American Lane,

Schaumburg, IL 60193; National Union Insurance Company of Pittsburgh, 70 Pine Street, New York,

NY 10270; Liberty International Underwriters, Inc., 61 Broadway, New York, NY 10006; Nuclear

Electric Insurance Limited, 1201 Market Street, Suite 1200, Wilmington, DE 19801; Underwriters

at Lloyds, Lime Street, London, England, a/s/o Consolidated Edison Company of New York, Inc.;

their attorneys are Gennet, Kallmann, Antin & Robinson, P.C., 45 Broadway Atrium, Litman Suite,

New York, New York.

2.    The nature of the claim: This is a claim for property damage as a result of the

negligence and carelessness of the City of New York which consisted of the following, among other

things: the negligent installation, maintenance, operation, conduct and control of the diesel fuel tanks

at 7 World Trade Center, New York, New York;  failing to build and maintain the aforesaid diesel

fuel tanks under proper, reasonable and lawful control; causing, permitting, allowing and/or suffering

the aforesaid diesel fuel tanks to be so negligently constructed, located, installed, operated or

maintained so as to cause and permit to contribute to the collapse of 7 World Trade Center, New

York, New York, and seriously damaging claimants' insured's property; failing to keep and maintain

a proper lookout and watch;  failing to properly and timely prevent the aforesaid diesel fuel tanks

from contributing to the collapse of 7 World Trade Center; failing to use accepted codes and

procedures in building, maintaining, locating and installing said diesel fuel tanks; failing to set up

proper safeguards, barriers and fire protection; failing to properly promulgate proper rules and

regulations; failing to set up proper and adequate training programs; the negligent and careless

training of the personnel of the City of New York.

3.    The time when, place where and the manner in which said claim arose: On or about

September 11, 2001, at or about 5:20 p.m., 7 World Trade Center collapsed, damaging claimants'

insured's property.  New York City, its officials, agents, servants and employees so negligently,

recklessly and carelessly installed, located, constructed and maintained diesel fuel tanks located in 7

World Trade Center as to cause the collapse of 7 World Trade Center and damage property of

claimants' insured.

4.    The items of damage or injuries claimed are: all the transformers and ancillary

equipment belonging to claimants' insured located in the 7 World Trade Center, nine 65 MVA

transformers with an input voltage of 138 kilovolts stepping down to 13 kilovolts, ancillary

equipment, together with other cables and equipment connecting to and from the substation.

5.    Claimants' demand is hereby presented for adjustment and payment.

PLEASE TAKE FURTHER NOTICE that by reason of the foregoing in default of the City

of New York to pay the claimants the sum of $250,000,000.00 within the time limit for compliance

with this demand by the City of New York, by the applicable statutes, claimants intend to seek

recovery with interest and costs.

Dated: March 6, 2002          Yours, etc.

                              GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
                              Attorneys for Claimants - Aegis Insurance Services, Inc.,
                              Zurich Insurance Company, National Union Insurance Company
                              of Pittsburgh, Liberty International Underwriters, Inc., Nuclear
                              Electric Insurance Limited, and Underwriters at Lloyds,
                              a/s/o Consolidated Edison Company of New York, Inc.
                              45 Broadway Atrium - Litman Suite
                              New York, New York 10006
                              (212) 406-1919
                              Our File No.: 02-5514:241/1-K


                              By:  _____
                                   STANLEY W. KALLMANN

# AFFIRMATION OF SERVICE

STANLEY W. KALLMANN, an attorney duly admitted to practice before the courts of this State, hereby affirms the truth of the following under the penalties of perjury:

I am associated with the law firm GENNET, KALLMANN, ANTIN & ROBINSON, attorneys of record for the plaintiffs, Aegis Insurance Services, Inc., Liberty Insurance Underwriters Inc., National Union Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, Underwriters at Lloyds, a/s/o Consolidated Edison Company of New York, Inc. and Consolidated Edison Company of New York, Inc.

On December 9, 2003, I served a true and correct copy of the annexed Amended Summons and Amended Complaint by regular mail by placing same in a sealed envelope with postage prepaid thereon in a Post Office or an official depository of the US Postal Service, addressed to the last known address of the addressee set forth below:

> Schiff Hardin & Waite
> 623 Fifth Avenue, 28th Floor
> New York, NY 10022
> (Attorneys for Port Authority of New York and New Jersey)

STANLEY W. KALLMANN (SK 5204)

ALL-STATE LEGAL®
(#181-BF -1'-82-BL ,77182-0½- 77184-WH
800.222.0510  www.aslegal.com

*Index No*                    *Year 20*

AEGIS INSURANCE COMPANY; ET AL.
a/s/o CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. and
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC.

Plaintiffs,

- against -

PORT AUTHORITY OF NEW YORK AND NEW JERSEY and THE CITY OF NEW
YORK,

Defendants.

**AMENDED SUMMONS AND AMENDED COMPLAINT**

**GENNET, KALLMANN, ANTIN & ROBINSON, P.C.**

*Attorneys for*

Plaintiffs

LITMAN SUITE
45 BROADWAY ATRIUM
NEW YORK, NEW YORK 10006
(212) 406-1919

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

*Dated:* ........................................    Signature ...................................................

Print Signer's Name ...................................

*Service of a copy of the within*          STANLEY W. KALLMANN (SK-5204) *is hereby admitted.*

*Dated:*

.....................................................

*Attorney(s) for*

*PLEASE TAKE NOTICE*

☐ **NOTICE OF ENTRY**    *that the within is a (certified) true copy of a
entered in the office of the clerk of the within named Court on*                                                                 *20*

☐ **NOTICE OF SETTLEMENT**    *that an Order of which the within is a true copy will be presented for settlement to the
Hon.                                                                 one of the judges of the within named Court,
at
on*                    *20*    *, at*              *M.*

*Dated:*

**GENNET, KALLMANN, ANTIN & ROBINSON, P.C.**
*Attorneys for*

LITMAN SUITE
45 BROADWAY ATRIUM
NEW YORK, NEW YORK 10006

*To:*

# EXHIBIT
# E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

AEGIS INSURANCE SERVICES, INC., et al,                    :

                 Plaintiffs,                    :

            - against -                    :

7 WORLD TRADE CENTER COMPANY, L.P., et al,        :

              Defendants.                    :

------------------------------------------------------------------- X

04 Civ. 07272 (AKH)


**CITIGROUP INC. AND CITIGROUP GLOBAL MARKETS HOLDINGS INC.'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**


CLEARY, GOTTLIEB, STEEN & HAMILTON
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendants Citigroup Inc.,
Citigroup Global Markets Holdings Inc.,
Salomon Inc. and Salomon Smith Barney
Holdings Inc.

Of Counsel:
    Thomas J. Moloney
    Lewis J. Liman
    Karen Bekker
    R. Zachary Gelber

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ....................................................................... 1

FACTUAL BACKGROUND............................................................................ 5

ARGUMENT ................................................................................................... 8

POINT I

AEGIS'S CLAIM FOR NEGLIGENCE MUST BE DISMISSED, BECAUSE
CITIGROUP DID NOT BREACH ANY DUTY TO CON EDISON .............. 8

    A.    CITIGROUP DID NOT OWE CON EDISON ANY DUTY ..................... 9

    B.    THE EVENTS OF SEPTEMBER 11, 2001 WERE NOT
        REASONABLY FORESEEABLE............................................................ 12

    C.    CON EDISON'S RIGHT TO BRING ANY CLAIM IS BARRED
        BY ITS LEASE WITH THE PORT AUTHORITY .................................. 13

POINT II

AEGIS HAS NOT PLED A CAUSE OF ACTION FOR NEGLIGENCE PER SE.......... 17

POINT III

THE PORT AUTHORITY'S PERMIT TO OCCUPY PRECLUDES ANY CLAIM
PURPORTEDLY BASED ON THE DESIGN AND CONSTRUCTION OF
CITIGROUP'S SPACE AT 7WTC................................................................... 19

    A.    THE PORT AUTHORITY'S PERMIT TO OCCUPY PRECLUDES
        ANY CLAIM FOR NEGLIGENCE PER SE........................................... 19

    B.    COMPLIANCE WITH PORT AUTHORITY REGULATIONS
        PRECLUDES A CLAIM OF COMMON LAW NEGLIGENCE
        BASED ON ALLEGED DESIGN DEFECTS OR CONSTRUCTION
        FLAWS................................................................................................. 22

<u>Page</u>

POINT IV

AEGIS'S ALLEGED DAMAGES ARE TOO REMOTE AND SPECULATIVE
AND THEREFORE ITS CAUSES OF ACTION ARE UNSUSTAINABLE................... 25

POINT V

THE TERRORIST ATTACK ON THE WORLD TRADE CENTER AND
THE UNANTICIPATABLE ACTIONS OF THE FIRE DEPARTMENT
WERE, IN ANY EVENT, SUPERSEDING CAUSES ...................................... 27

POINT VI

AEGIS'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS............... 29

POINT VII

THE COMPLAINT FAILS TO IDENTIFY ANY BASIS FOR CLAIMS
AGAINST CITIGROUP INC., SALOMON INC. OR SALOMON
SMITH BARNEY HOLDINGS INC. ............................................................... 30

CONCLUSION ............................................................................................. 32

# TABLE OF AUTHORITIES

**Statutes**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page(s)

67 Pub. Res. 17, 42 Stat 174 (1921) .................................................. 22

<u>Administrative Code of the City of New York</u> §§ 27-234 - 27-242 (1988) ...... 23

<u>Administrative Code of the City of New York</u> § 27-551 (1988) ..................... 23

<u>Administrative Code of the City of New York</u> §§ 27-269 - 27-287 (1988) ...... 23

<u>Administrative Code of the City of New York</u> § 27-794 (1988) ..................... 23

<u>Administrative Code of the City of New York</u> § 27-289 (1988) ..................... 23

<u>Administrative Code of the City of New York</u> § 27-830 (1988) ..................... 23

<u>Administrative Code of the City of New York</u> §§ 27-323 - 27-330 (1988) ...... 23

Fed. R. Civ. P. 8(a) ........................................................................ 30

N.J. Stat. Ann. § 32.1-35.50 (West 2004) ........................................ 22

N.J. Stat. Ann. § 32.1-35.50(9) (West 2004) ................................... 21

N.J. Stat. Ann. § 32.1-35.59 (West 2004) ........................................ 21

N.J. Stat. Ann. § 32:1-35:61 (West 2004) ..................................... passim

N.Y. C.P.L.R. § 214(4) (McKinney 2004) ........................................ 30

N.Y. Exec. Law § 374(1) (McKinney 2004) ..................................... 19

N.Y. Exec. Law § 377(1) (McKinney 2004) ..................................... 19

N.Y. Exec. Law § 383(c) (McKinney 2004) ..................................... 19, 23

N.Y. Unconsol. Law § 6601 (McKinney 2004) ................................. 21, 22

N.Y. Unconsol. Law § 6610 (McKinney 2004) ................................. 21

N.Y. Unconsol. Law § 6612 (McKinney 2004) ................................ passim

New York City Charter § 28(a) ..................................................... 19

|  | Page(s) |
|---|---|
| New York City Charter § 641-645 | 19 |

**Cases**

AG Capital Funding Partners L.P. v. State St. Bank and Trust Co.,
10 A.D.3d 293, 781 N.Y.S.2d 88 (1st Dep't 2004) .......................... 15

Alamio v. Town of Rockland,
302 A.D.2d 842, 755 N.Y.S.2d 754 (3d Dep't 2003) .......................... 30

Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan,
677 F.2d 193 (2d Cir. 1981) .......................... 16

Apollo Steel Corp. v. Melco Cranes, Inc.,
202 A.D.2d 1049, 609 N.Y.S.2d 121 (4th Dep't 1994) .......................... 26-27

Associated Teachers of Huntington, Inc. v. Bd. of Educ., Union Free Sch.,
33 N.Y.2d 229, 306 N.E.2d 791, 351 N.Y.S.2d 670 (1973) .......................... 15

Brass v. Am. Film Techs., Inc.,
987 F.2d 142 (2d Cir. 1993) .......................... 3

Broadway Photoplay Co. v. World Film Corp.,
225 N.Y. 104, 121 N.E. 756 (1919) (Cardozo, J.) .......................... 26

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002) .......................... 2

Cirino v. Greek Orthodox Cmty. of Yonkers,
193 A.D.2d 576, 598 N.Y.S.2d 959 (2d Dep't 1993) .......................... 24

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991) .......................... 2

Cuyler v. Adams,
449 U.S. 433 (1981) .......................... 22-23, 24

De Angelis v. Lutheran Med. Ctr.,
58 N.Y.2d 1053, 449 N.E.2d 406, 462 N.Y.S.2d 626 (1983),
affirming De Angelis v. Lutheran Med. Ctr.,
84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981) .......................... 9, 12

Eastern Paralyzed Veterans Ass'n v. Camden,
111 N.J. 389, 545 A.2d 127 (1988) .......................... 24-25

iv

Page(s)

Elliot v. City of New York,
95 N.Y.2d 730, 747 N.E.2d 760, 724 N.Y.S.2d 397 (2001) .................................17, 17-18, 18, 19

Finch, Pruyn & Co. Inc. v. M. Wilson Control Servs. Inc.,
239 A.D.2d 814, 658 N.Y.S.2d 496 (3d Dep't 1997)...................................................... 15

Garcia v. Union Carbide Corp.,
176 A.D.2d 219, 574 N.Y.S.2d 341 (1st Dep't 1991)..................................................... 31

Garret v. Holiday Inns, Inc.,
58 N.Y.2d 253, 447 N.E.2d 717, 460 N.Y.S.2d 774 (1983) ........................................ 24

Gates v. AOL Time Warner, Inc.,
No. 604141/02, 2003 WL 21375367 (N.Y. Sup. Ct., N.Y. County May 15, 2003)........... 31

Gross v. Empire State Building Assocs.,
4 A.D.3d 45, 773 N.Y.S.2d 354 (1st Dep't 2004)....................................................... 10

Hand v. Gilbank,
300 A.D.2d 1067, 752 N.Y.S.2d 501 (4th Dep't 2002)............................................... 18

Harris v. N.Y. City Hous. Auth.,
187 A.D.2d 362, 589 N.Y.S.2d 883 (1st Dep't 1992)................................................. 29

Heathcote Assocs. v. Chittenden Trust Co.,
958 F. Supp 182 (D. Vt. 1997) ................................................................................... 2

Hochberg v. N.Y. City Off-Track Betting Corp.,
74 Misc. 2d 471, 343 N.Y.S.2d 651 (Sup. Ct., N.Y. County 1973),
aff'd, 43 A.D.2d 910, 352 N.Y.S.2d 423 (1st Dep't 1974) ........................................ 26

In re September 11 Litig.,
280 F. Supp. 2d 279 (S.D.N.Y. 2003) ...................................................................... 28

In re World Trade Center Disaster Site Litig.,
270 F. Supp. 2d 357 (Hellerstein, J.)....................................................................... 29

Kenford Co. v. County of Erie,
67 N.Y.2d 257, 493 N.E.2d 234, 502 N.Y.S.2d 131 (1986) ...................................... 26

Lerner v. Fleet Bank, N.A.,
318 F.3d 113 (2d Cir. 2003),
cert. denied, 124 S. Ct. 532 (2003).......................................................................... 9

v

Page(s)

Major v. Waverly & Ogden, Inc.,
7 N.Y.2d 332, 165 N.E.2d 181, 197 N.Y.S.2d 165 (1960) ................................. 18

Mandel v. Tiffany,
263 A.D.2d 827, 693 N.Y.S.2d 759 (3d Dep't 1999) ........................................... 30

Mark v. Eshkar,
194 A.D.2d 356, 598 N.Y.S.2d 255 (1st Dep't 1993) ......................................... 30

Martinez v. Lazaroff,
48 N.Y.2d 819, 399 N.E.2d 1148, 424 N.Y.S.2d 126 (1979) ............................. 29

Mehta v. N.Y. City Dep't of Consumer Affairs,
162 A.D.2d 236, 556 N.Y.S.2d 601 (1st Dep't 1990) ......................................... 26

Menaldi v. Pay-Per-View Network, Inc.,
No. 97 Civ. 6451 (HB), 1998 WL 230994 (S.D.N.Y. May 5, 1998),
aff'd, 182 F.3d 900 (2d Cir. 1999) .................................................................... 2

Nargi v. Parking Assocs. Corp.,
36 Misc. 2d 836, 234 N.Y.S.2d 42 (Civ. Ct., N.Y. County 1962) ...................... 20

New York v. Anderson,
45 Misc. 2d 1005, 258 N.Y.S.2d 603 (Crim. Ct., Kings County 1965) .............. 20

New York v. Rodriguez,
115 Misc. 2d 866, 454 N.Y.S.2d 796 (Crim. Ct., Queens County 1982) ........... 20, 21

Palsgraf v. Long Island Railroad Co.,
248 N.Y. 339, 162 N.E. 99 (1928) ................................................................... 11

Petty v. Tennessee-Missouri Bridge Comm'n,
359 U.S. 275 (1959) ........................................................................................ 24

Phillips v. Roux Labs., Inc.,
286 A.D. 549, 145 N.Y.S.2d 449 (1st Dep't 1955) ........................................... 24

Pink v. Am. Surety Co. of N.Y.,
283 N.Y. 290 (1940) ........................................................................................ 15

Rivera v. City of N.Y.,
11 N.Y.2d 856, 182 N.E.2d 284, 227 N.Y.S.2d 676 (1962) ............................. 29

vi

<u>Page(s)</u>

<u>R/S Assocs. v. N.Y. Job Dev. Auth.</u>,
98 N.Y.2d 29, 744 N.Y.S.2d 358 (2002)......................................................... 15

<u>Ryan Transp., Inc. v. M and G Assocs.</u>,
266 Conn. 520, 832 A.2d 1180 (2003) ........................................................ 9, 10

<u>Schumer v. Caplin</u>,
241 N.Y. 346, 150 N.E. 139 (1925) .....................................................17, 17-18

<u>Sherman v. M. Lowenstein & Sons, Inc.</u>,
28 A.D.2d 922, 282 N.Y.S.2d 142 (2d Dep't 1967)........................................ 24

<u>Silverman v. Wallander</u>,
194 Misc. 532, 87 N.Y.S.2d 151 (Sup. Ct., N.Y. County 1949) ..................... 20

<u>State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling</u>,
95 N.Y.2d 427, 741 N.E.2d 101, 718 N.Y.S.2d 256 (2000) ........................... 16

<u>Swierkiewicz v. Sorema N.A.</u>,
534 U.S. 506 (2002) ....................................................................................... 30

<u>The Lusitania</u>,
251 F. 715 (D.C.N.Y. 1918)............................................................................ 29

<u>Thomas v. Westchester County Health Care Corp.</u>,
232 F. Supp. 2d 273 (S.D.N.Y. 2002) ............................................................. 4

<u>United States v. Archer</u>,
241 U.S. 119 (1916) ......................................................................................... 4

<u>United States v. Gonzalez</u>,
442 F.2d 698 (2d Cir. 1969) ............................................................................ 4

<u>Washington v. Albany Hous. Auth.</u>,
297 A.D.2d 426, 746 N.Y.S.2d 99 (3d Dep't 2002)....................................... 24

<u>Weber v. Paduano</u>,
No. 02 CV 3392 (GEL), 2003 WL 22801777 (S.D.N.Y. Nov. 25, 2003).......... 18

**Other Authorities**

National Fire Protection Association, <u>Fire Protection Handbook</u>, Vol. I (2003) ............... 10, 22

NFPA Electric Code Art. 445 (2004) ................................................................... 23

Defendants Citigroup Inc. and Citigroup Global Markets Holdings Inc.

("CGMH", and together, "Citigroup") submit this Memorandum of Law in support of their

motion to dismiss the Complaint dated September 10, 2004 ("Complaint") of Aegis Insurance

Services Inc., et al, ("Aegis" or "plaintiff"), as subrogees of Consolidated Edison Company of

New York, Inc. ("Con Edison"), pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure

to state a claim upon which relief can be granted.

## PRELIMINARY STATEMENT

The worst terrorist attack in American history occurred on September 11, 2001,

causing the loss of over 2800 lives, countless injuries and the partial or total collapse of eight

major office buildings. 7 World Trade Center ("7WTC") was one of the buildings destroyed in

the attack and, along with it, the Con Edison power station underneath 7WTC (the "Substation").

This case is an attempt by Aegis and other casualty insurance companies to shift the insurance

loss resulting from the destruction of the Substation onto Citigroup, which was no more than a

tenant of 7WTC and, in economic terms, itself a major victim of the terrorist attack.

Fortunately, no one was injured at 7WTC and no one died there; this case is only

about money. Specifically, it concerns the issue of whether a group of insurers -- insurers who,

for years, accepted premiums to insure against exactly this type of unpredictable and unavoidable

catastrophic risk -- can now obtain a windfall recovery. In its zeal to sue every company with

any connection to the construction, design, operation or maintenance of 7WTC, the insurance

company plaintiff has created a case management monstrosity that this Court recently recognized

might not even be justiciable.

Again, fortunately, there is a way to cut through the Gordian knot of this

litigation. The common law doctrines of duty and of proximate and intervening cause are the

tools that can chisel this case down to a manageable size, if applied here at this pleading stage. The same winnowing result can be reached by simply holding the parties to their contractual agreements concerning allocation of liability and responsibility for obtaining insurance, or by applying the proper statute of limitations. Following any one of these paths achieves the result of dismissing Citigroup from this action -- a result that common sense dictates is correct.

As the purported subrogee of Con Edison, a tenant of Port Authority in the Substation beneath 7WTC, Aegis asserts two claims. The basis for one cause of action, the third cause of action in the Complaint, is an allegation that Citigroup was "negligent in the design, construction, installation and use of" its backup generator system (the "Emergency Backup System") -- a system installed to power emergency life support systems and to allow Citigroup to continue its global trading and market-making activities in the event of an electrical power failure. Complaint ¶ 90. Aegis's other cause of action, the fourth cause of action in the Complaint, is for negligence per se and is purportedly based on an alleged failure to comply with unspecified New York City and State fire and safety codes. Complaint ¶ 125.

In assessing the adequacy of the Complaint, this Court is entitled to go beyond the pleading itself and to consider documents referenced in the Complaint, documents that the plaintiff has relied on in framing the Complaint, documents that are integral to the Complaint and documents containing information of which the plaintiff had notice.[1] The Court is also entitled to consider documents attached to the Complaint as exhibits or incorporated in it by reference,

---

[1]     See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 44 (2d Cir. 1991); Menaldi v. Pay-Per-View Network, Inc., No. 97 Civ. 6451 (HB), 1998 WL 230994, at n.5 (S.D.N.Y. May 5, 1998) (considering lease on motion to dismiss action alleging owner negligently maintained property), aff'd, 182 F.3d 900 (2d Cir. 1999); Heathcote Assocs. v. Chittenden Trust Co., 958 F. Supp. 182, 185 (D. Vt. 1997) (considering lease, proposed lease, lease rider and letter repudiating lease proposal).

2

admissions made by the plaintiff in pleadings filed with this Court in other, related cases, and matters of which judicial notice may be taken.[2]

In considering these documents, the Court will learn that the only arbiter of code compliance, the Port Authority of New York and New Jersey (the "Port Authority"), has unequivocally determined that Citigroup complied with all applicable building codes. CGMH[3] retained world-class professionals to carry out this project, including the architectural firm Skidmore, Owens and Merrill ("SOM")[4], the mechanical engineering firm Flack + Kurtz Inc. ("F+K"), and the Office of Irwin G. Cantor, P.C. ("Cantor")[5] as structural engineer. The work of CGMH's professionals was reviewed and approved by Silverstein Properties, Inc.'s ("Silverstein") own team of professionals and then again by the Port Authority and its experienced team of engineers. After this extensive review process, the Port Authority issued a Permit to Occupy evidencing that its requirements had been met.[6] See Port Authority Permit to Occupy or Use, dated September 21, 1994 ("Permit to Occupy"), attached as Exhibit A.

The Court will also learn that even now, more than three years after the tragic events of September 2001, despite much study, the precise causal chain leading to the destruction of 7WTC and the Con Edison Substation remains unknown. The May 1, 2002 Federal

---

[2]    See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993).
[3]    At the time of the construction, the entity now known as CGMH was known as Salomon, Inc.
[4]    SOM has been retained in the design of the new Freedom Tower. See http://www.renewnyc.com/plan_des_dev/wtc_site/new_design_plans/freedom_tower/freedom_tower_team.asp.
[5]    Cantor designed the original 7WTC building for Silverstein Properties, Inc. ("Silverstein").
[6]    In the Three Party Agreement by and among the Port Authority of New York and New Jersey, 7 World Trade Company, and Salomon Inc., dated November 23, 1988 (the "Three Party Agreement"), which was executed simultaneously with the CGMH Lease, ground lessor Port Authority retained the right to review all building plans, including those associated with the Emergency Backup System, and to inspect the construction. See Ex. B, Three Party Agreement, §§ 5.1(a)-(b), 5.3 ("[T]he Port Authority shall be entitled to review and inspect the progress of such Initial Work at any time and to require that any of such Initial Work which does not comply with the Building Codes be modified, replaced or redone at Salomon's [Citigroup's] expense."), 6.1-6.4, Exhibit B to the Three Party Agreement ¶¶ 16, 37-38. Like Silverstein's review of the plans, the Port Authority's review was done at Citigroup's expense. See Ex. B, Three Party Agreement, §§ 5.6, 6.5. Moreover, the Permit to Occupy states that the Port Authority inspected the plans and the actual construction. Ex. A, Permit to Occupy. All references to exhibits are references to the exhibits attached to the accompanying Declaration of Karen Bekker, dated November 23, 2004.

3

Emergency Management Agency report entitled "World Trade Center Building Performance Study" (the "FEMA Report"), cited in paragraph 95 of the Complaint, does not contain any allegation that CGMH acted negligently in the construction of its Emergency Backup System, nor does it claim any failure on CGMH's part to comply with all prevailing fire and safety building codes and regulations. See FEMA Report, attached as Exhibit C.[7] The FEMA Report does not place any blame on anyone other than the terrorists for the collapse of 7WTC, and appropriately so. That the terrorists are, perhaps, outside of the Court's jurisdiction, does not change the fact that Citigroup is not guilty of any negligent or otherwise wrongful conduct.

The entirety of Aegis's Complaint with respect to Citigroup fails as an initial matter because Citigroup owed Con Edison no duty of care. Citigroup breached no duty to Con Edison and did not proximately cause the destruction of the Substation, and, in any event, Con Edison's Lease precludes any such claim. Aegis's claim for negligence per se fails as a pleading matter, because Aegis has not alleged violations of law sufficient to sustain that cause of action, and the Port Authority's approval precludes Aegis from asserting a negligence per se claim or any other negligence claim based on the design and construction of Citigroup's space or the Emergency Backup System at 7WTC. Aegis's claims are also precluded by the applicable statute of limitations and by the fact that the nature of the alleged damages is too speculative. In addition, both of Aegis's claims fail because the terrorists and the inability of the fire department to respond to the fire were, in any event, superseding causes of 7WTC's destruction. Finally, the

---

[7] The Court should take judicial notice of the contents of the FEMA Report, a published report of a government agency. See United States v. Archer, 241 U.S. 119, 132 (1916) (taking judicial notice of United States engineers' report regarding the behavior of a river); United States v. Gonzalez, 442 F.2d 698, n.10 (2d Cir. 1969) (taking judicial notice of facts stated in report of Department of Narcotics and Dangerous Substances); Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002). The FEMA Report is also not inadmissible as hearsay because it falls under the exception in Rule 803(8)(C) of the Federal Rules Evidence, which allows "factual findings resulting from an investigation made pursuant to authority granted by law . . . ."

Complaint fails to make any allegation against Citigroup Inc. (as opposed to CGMH) and for this reason as well, the claim against Citigroup Inc. should be dismissed.

## FACTUAL BACKGROUND

On the morning of September 11, 2001, terrorists hijacked four commercial passenger aircraft and deliberately flew two of them into World Trade Center towers 1 and 2 ("1WTC" and "2WTC"). Complaint ¶ 100; Ex. C, FEMA Report at p. 1. Within less than two hours, both 1 and 2WTC had collapsed, showering debris onto neighboring structures and resulting, by the end of the day, in the total or partial collapse of eight other major buildings, including 7WTC. Complaint ¶¶ 101, 103; Ex. C, FEMA Report at p. 1

Some of the larger debris falling from 1 and 2WTC struck 7WTC, a 47-story office tower across Vesey Street from the remainder of the WTC complex, id. at Table 1.1, pp. 2-27, 5-1, and started multiple fires on various floors of 7WTC. Id. at pp. 1-8, 5-16, 5-20; Complaint ¶ 103. Observers reported the first fires on approximately floors 6, 7, 8, 10, 11 and 19. Ex. C, FEMA Report at p. 5-20. While the extent of structural damage to 7WTC caused by the collapse of 1WTC and of 2WTC is unknown, photographic and eyewitness evidence indicates that there was damage to floors 8 through 20, 24, 25, and 39 through 46. Id. at pp. 5-16, 5-20.

In addition to the direct damage inflicted on 7WTC, the collapse of 1 and 2WTC destroyed several water mains, id. at p. 1-8, including the one at Vesey Street needed to fight the fires at 7WTC. Id. at p. 5-21. Because water was unavailable, and because of the damage to 7WTC caused by the collapse of 1 and 2WTC, id. at pp. 1-8, 5-21, 5-24, the fire department "made the decision . . . not to attempt to fight the fires," letting them burn uncontrolled. Id. at p. 5-21. As a result, the fires "progressed throughout the day fairly unimpeded. . . ." Id.

The Federal Emergency Management Agency ("FEMA") believes that fire was primarily responsible for the collapse, but found no clear evidence of where or on which floor the initiating structural failure occurred. Id. at p. 5-24. FEMA posits a number of possible mechanisms leading to the collapse of 7WTC, but ultimately concludes that even its best hypothesis had "a low probability of occurrence." Id. at p. 5-31 (emphasis added).

*     *     *     *     *

Well before 7WTC was designed and built, the Port Authority built an electrical Substation within the World Trade Center area, and leased the Substation to Con Edison, so that Con Edison could supply electricity to the World Trade Center complex. See Agreement of Lease dated May 29, 1968 by and between The Port of New York Authority and Consolidated Edison Company of New York, Inc. ("Con Ed Lease"), attached as Exhibit D. The Con Ed Lease allowed Port Authority to build a rental office building above the Substation, and allocated the risks and obligations associated with that building, such that, in case of damage to the Substation caused by that building, Con Edison's exclusive remedy would be against the Port Authority. See Ex. D, Con Ed Lease, §§ 8(a), 8(b), 16. In signing this agreement, Con Edison agreed to waive any claims against future inhabitants of the building that was planned to be built above the substation. Ex. D, Con Ed Lease, § 8(b).

In 1987, after the Substation was completed, 7WTC, the office building contemplated in the Con Ed Lease, was built by 7 World Trade Company pursuant to its lease of the ground rights from the Port Authority. See Agreement of Lease between the Port Authority of New York and New Jersey and 7 World Trade Company, dated December 31, 1980 (the "7 World Trade Lease"), attached as Exhibit E, Preamble, § 3, 4.5-4.11; Ex. C, FEMA Report at p. 5-2. The 7 World Trade Lease provided that "so long as title to the World Trade Center or the

6

premises remains in the Port Authority the Lessee shall not be required to submit its design, construction and building plans and specifications for approval by the City of New York," reflecting both the law and the parties' understanding that the Port Authority was the only governmental entity that could regulate those premises. Ex. E, 7 World Trade Lease, § 4.5.

CGMH leased floors 28-47 and portions of floors 1-5 from 7 World Trade Company, with Silverstein as 7 World Trade Company's management agent. See Lease between 7 World Trade Company and Salomon, Inc., dated November 23, 1988 (the "CGMH Lease") § 2.02, attached as Exhibit F. To ensure that a Con Edison power outage did not interrupt CGMH's trading and market-making activities, CGMH and 7 World Trade Company agreed that CGMH would have the right to install "diesel emergency power generators . . . together with all ancillary equipment therefor," including "fuel lines and risers as required." Ex. F, CGMH Lease at C-10-C-11. The CGMH Lease also included detailed provisions governing the size and layout of the Emergency Backup System, including the approximate amount of generating capacity allowed, the size of the associated fuel tanks, the location of the generators, and the location of the fuel lines and fuel risers. Ex. F, CGMH Lease at C-10-C-11, Exhibit A-5 of CGMH Lease. In addition, Silverstein agreed in the Lease to "facilitate" the installation of the Emergency Backup System by giving CGMH access to 12,000 gallons of diesel fuel capacity. Id. at C-10.

In the course of the build-out, CGMH hired architects SOM, mechanical and electrical engineer F+K, and structural engineer Cantor, and complied with everything that Silverstein, its engineers, and the Lease required. When construction was complete, CGMH obtained a Permit to Occupy from the Port Authority, evidencing that the Port Authority had approved the plans and inspected the construction, and evidencing the Port Authority's judgment that all applicable codes had been satisfied. See Ex. A, Permit to Occupy, ("Based upon . . . the

fact that audit of field construction and/or field records made by the World Trade Department during the progress of work . . . have not, to the best of my knowledge and belief, disclosed any evidence that the requirements of the approved Drawings and Specifications and requirements of the Port Authority have not been met, I hereby issue a Permit to Occupy or Use. . . . /s, Eugene J. Fasullo, P.E., Director of Engineering and Chief Engineer.").

The Emergency Backup System included two 6000-gallon tanks under the WTC loading docks.[8] To transport the fuel up to the fifth floor generators, Salomon installed a double-wall fuel pipe with leak detection, connected to a fuel "riser" (i.e., a vertical pipe) inside a masonry enclosure. Ex. C, FEMA Report at p. 5-14. The "critical" transfer trusses mentioned in paragraph 122 of the Complaint were located in a separate room from the fuel pipe and generators, on the other side of a concrete masonry wall several feet away from the fuel pipes. Ex. C, FEMA Report at pp. 5-14- 5-15.

## ARGUMENT

### POINT I

### AEGIS'S CLAIM FOR NEGLIGENCE MUST BE DISMISSED, BECAUSE CITIGROUP DID NOT BREACH ANY DUTY TO CON EDISON

Even if, as Aegis alleges, the placement and the design of the Emergency Backup System did somehow contribute to the destruction of 7WTC, at bottom, there can be no cause of action here because Citigroup did not violate any duty to Con Edison or proximately cause any of Con Edison's damages. First, as nothing more than distant neighbors, Citigroup did not owe Con Edison a duty of care to protect it from the consequences of criminal acts. Second, the causal link between the damages Con Edison complains of and any action by Citigroup is too

---

[8]      CGMH's fuel system and tanks were not the only ones in the building: Silverstein had a 12,000-gallon tank under the loading dock and a 275-gallon tank on the 5th floor, the New York Office of Emergency Management had a 6000-gallon tank located between floors 2 and 3, the U.S. Secret Service had a 50-100 gallon tank on the 9th floor, and American Express had a 275-gallon tank on the 8th floor. See Ex. C, FEMA Report at p. 5-14.

attenuated, and Con Edison is not a foreseeable plaintiff. Third, any claim that Con Edison could have brought against Citigroup is expressly precluded by the Con Ed Lease.

## A.  CITIGROUP DID NOT OWE CON EDISON ANY DUTY

The New York Court of Appeals has noted that "[a] line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. . . . But . . . the fixing of the 'orbit' of duty, as here, in the end is the responsibility of the courts." De Angelis v. Lutheran Med. Ctr., 58 N.Y.2d 1053, 1055, 449 N.E.2d 406, 407-08, 462 N.Y.S.2d 626, 627-28 (1983), affirming De Angelis v. Lutheran Med. Ctr., 84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981).  The determination that the courts should "fix[] the orbit of duty" is a long-standing principle of New York common law, reflecting a policy judgment against allowing juries to impose unanticipatable and potentially unlimited liability on parties having only a tenuous link in the chain of causation. Id.  The limit of the duty of care is appropriately decided on a motion to dismiss, as it was in De Angelis.  Id., see also Lerner v. Fleet Bank, N.A., 318 F.3d 113 (2d Cir. 2003), cert. denied, 124 S. Ct. 532 (2003), (affirming Rule 12(b)(6) dismissal because plaintiffs did not sufficiently allege that the defendant's conduct was the proximate cause of their injuries).

While one co-tenant owes another a duty of care to protect from his own negligence, even co-tenants do not owe each other any duty to protect against outside dangers. In Ryan Transportation, Inc. v. M and G Associates, 266 Conn. 520, 832 A.2d 1180 (2003), one co-tenant sued its neighboring co-tenant after an arsonist burned down their building.  The plaintiff alleged that the defendant had known of the threat of arson, and had not sufficiently warned plaintiff or secured its own premises.  That court found that tenants have no duty to protect each other from the criminal conduct of third parties.

9

[T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

Ryan Transp., Inc., 266 Conn. at 525, 832 A.2d at 1184 (internal quotation marks and citation omitted); cf. Gross v. Empire State Building Assocs., 4 A.D.3d 45, 46, 773 N.Y.S.2d 354, 355 (1st Dep't 2004) (granting summary judgment in landlord's favor when landlord had taken significant precautions to protect tenants and visitors); National Fire Protection Association Handbook Vol. I, 1-3 (2003) ("Any harm that occurs inside a built environment could conceivably have been prevented or mitigated, at least in some very small way, by some feasible modification to the built environment. But that definition . . . is far too sweeping to be useful.").

In the extraordinary circumstances of this case, with the background policy against unlimited liability set by the Court of Appeals, the test set forth by Connecticut's highest court is a useful one.[9] There is no allegation that any action of Citigroup caused the fire that caused 7WTC to collapse. Similarly, there is no allegation that Citigroup could or should have anticipated an attack on the Twin Towers of such a scale that would not only affect 7WTC, but that would damage surrounding water mains to the point that fully precluded ordinary firefighting measures. The attack was an outside danger, caused by criminal conduct; Citigroup had no duty to protect a party that was not even its co-tenant in 7WTC but the Port Authority's lessee, who had constructed an underground Substation beneath the building Citigroup inhabited. In constructing its Emergency Backup System, then, Citigroup cannot be said to have owed its

---

[9]   Citigroup does not suggest that this Court adopt the Ryan Transport test, but only that this case provides a useful framework for considering the issues presented.

10

underground neighbor a duty to safeguard -- not against ordinary fire -- but against a criminal

attack, that, in addition to causing a fire, made that fire unstoppable.

In the beginning of the last century, Justice Cardozo set down the now well-

established principle of duty in <u>Palsgraf v. Long Island Railroad Co.</u>, 248 N.Y. 339, 162 N.E. 99

(1928).  As far as two cases can ever resemble one another, the surreal, totally unimaginable

events of September 11, 2001, call to mind the equally (maybe almost equally) improbable set of

facts at issue in <u>Palsgraf</u>.

To remind the Court, in that case, a conductor on the Long Island Railroad, in

trying to help a passenger board a train, knocked a package out of the passenger's hands.

<u>Palsgraf</u>, 248 N.Y. at 340-41, 162 N.E. at 99.  Unbeknownst to the conductor, the package

contained fireworks, which exploded, causing tremors on the platform.  <u>Id.</u>, 248 N.Y. at 341, 162

N.E. at 99.  The tremors knocked down some scales on the other end of the platform, hitting Mrs.

Palsgraf and causing her injury.  <u>Id.</u>  Although the actions of the conductor were a cause in fact

of the injury, the chain of events was too unforeseeable, and the Court found that the Railroad

did not owe Mrs. Palsgraf any duty.  <u>Id.</u>

Here, before taking possession of its leased premises, Citigroup built an

Emergency Backup System.  This System was necessary to provide power in case of a Con

Edison power failure, both for Citigroup's emergency life support systems and to enable

Citigroup to continue the trading and market-making activities upon which pension funds and

individual investors, among others, depend.  Eleven years later, terrorists seized control of two

airplanes, turning them into missiles with which to attack the two buildings adjacent to 7WTC.

Ex. C, FEMA Report at p. 1.  That attack sent flaming debris flying onto 7WTC, the debris

started a fire.  <u>Id.</u> at pp. 5-16, 5-20, 5-21.  The fire department was unable to combat that fire due

11

to broken water mains and already severe losses in 1 and 2WTC. Id. at p. 5-21. The fire caused the collapse of 7WTC, causing damage to the Substation underneath the building, which was owned by Con Edison. Id. at pp. 5-1-5-2.

Even assuming, for the purposes of this motion to dismiss, that Citigroup's generators did, as alleged, exacerbate the fire, like the facts in Palsgraf, the situation is too attenuated and the plaintiff too remote to find liability. Like the Long Island Railroad, Citigroup took steps designed only to help its customers and employees, but the unanticipatable, illegal acts of another caused damages so far-flung as to reach a plaintiff distant in logic and in location -- a plaintiff that now, having no remedy against the actual wrongdoers, brings this action against a deep-pocket defendant who has committed no actual wrong.

Citigroup is a bank -- a bank that was a tenant in 7WTC and a victim of the September 11 attack, and that hired architects and engineers at the very top of their field who complied with all applicable codes. Aegis asks this Court for the opportunity to allow a jury to decide that this defendant can be liable to the owner of a neighboring underground substation for damages that occurred in the midst of the worst attack on American soil, by criminals, and that may or may not have been exacerbated by Citigroup's fully lawful emergency-planning action. This request asks this Court to "extend[] exposure to tort liability almost without limit," De Angelis, 58 N.Y.2d at 1055, 449 N.E.2d at 407, 462 N.Y.S.2d at 627, and should be denied.

**B.    THE EVENTS OF SEPTEMBER 11, 2001 WERE NOT REASONABLY FORESEEABLE**

Citigroup has already argued in another action before this Court that as a matter of law the events that occurred on September 11, 2001, were not reasonably foreseeable, and rather than repeat its arguments, Citigroup refers the reader to the discussions at pages 27-29 of its Memorandum of Law in Support of its Motion to Dismiss and at pages 12-14 of Citigroup's

12

Reply Memorandum in Further Support of its Motion to Dismiss in <u>Industrial Risk Insurers v.</u>

<u>Port Authority et al</u>, 02 CV 7170.  Citigroup argued in those briefs that the connection between

the alleged negligence and the injury complained of is attenuated at best and rests on speculative

assumptions: if in 1990 the Emergency Backup System -- which was found by the Port Authority

to satisfy all applicable building codes -- had been built differently, both IRI and Aegis argue,

7WTC would not have collapsed in 2001 after terrorists flew planes into the Twin Towers,

burning pieces of the Twin Towers fell and landed on 7WTC, and the fire department, having no

access to water, stood by while the raging fires burned themselves out.  In this action, where the

plaintiff is not the subrogee of the landlord but the subrogee of the owner of a power station

<u>underneath</u> the building that housed the Emergency Backup System, and the damage complained

of is not just to the building itself but to the underground tenant, the connection is even more

precarious.  Even on a motion to dismiss, where the plaintiff is given the benefit of all reasonable

inferences, this assumption cannot stand.

**C.    CON EDISON'S RIGHT TO BRING ANY CLAIM IS BARRED BY ITS
LEASE WITH THE PORT AUTHORITY**

The Lease between Con Edison and the Port Authority gives the Port Authority

the right to build a rental office building above Con Edison's Substation and the obligation to

ensure that such a building will not interfere with the Substation.  At the same time, this Lease

gives Con Edison a remedy against the Port Authority if it does not meet this obligation, and bars

any claims based on the building above the Substation other than the specified remedy against

the Port Authority.  As Citigroup is a third party beneficiary of this agreement, Con Edison's

claim against Citigroup is barred.

Con Edison and the Port Authority acknowledged the possibility that, at some

point after the agreement between them was signed, the Port Authority would construct a ·

building, to be occupied by tenants, above the Con Ed Substation. See Ex. D, Con Ed Lease, § 8(a) ("The Lessee recognizes that the Port Authority may construct . . . on, above or about the Substation Building additional stories, structures, buildings, or improvements of whatsoever design, size and purpose as the Port Authority may . . . determine."). In doing so they agreed that the Port Authority would be obligated to ensure that "no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee. . . ." Ex. D, Con Ed Lease, § 8(a).[10]

After this allocation of responsibility for the integrity of the structure to the Port Authority, the Lease goes on to say that any building above the Substation cannot be the basis of a lawsuit: "[t]he exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be . . . made the grounds of . . . any claim or demand for damages." Ex. D, Con Ed Lease, § 8(b). The Port Authority negotiated for this limitation in the context of an express acknowledgment that there would be a commercial structure that would likely have tenants and subtenants, and for which the Port Authority would ultimately be responsible. Therefore, the bar on claims in Section 8(b) should be construed to extend to such future tenants, including Citigroup.

The intent of Con Edison and the Port Authority to limit Con Edison to a remedy against the Port Authority is again made evident later in the Lease. In section 16, the Lease expressly provides that the Port Authority must bear the cost of repairing any damage to Con Edison's Substation that occurs in connection with the structure above it: "The Port Authority

---

[10]    That this provision is part of an overriding plan to have any Con Edison claim directed to the Port Authority is reflected in the 7 World Trade Lease, which provides, "[7 World Trade Company] will conduct its operations in such a manner so as not to disrupt, interfere with or interrupt the operations, property and activities of the Consolidated Edison Company . . . in and to the [Substation]. If as a result of the Lessee's [i.e., 7 World Trade Company's] acts . . . the Port Authority is obligated to reimburse Consolidated Edison for maintenance or repair costs, the Lessee upon demand, will pay such costs to the Port Authority." Ex. E, 7 World Trade Lease, § 17.2.

14

shall reimburse the Lessee for any expense incurred by the Lessee in . . . replacing or rebuilding

the Substation Building or the Lessee's Substation Equipment where such expenses are incurred

by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by

the acts or omissions of the Port Authority . . . in connection with the construction or

maintenance of the stories, structures, buildings or improvements described in Section 8 hereof."

Ex. D, Con Ed Lease, § 16.[11] The only possible interpretation of the section 8 limit on Con

Edison's ability to bring lawsuits in conjunction with an express remedy against the Port

Authority, is that the bar to lawsuits is one that protects third parties, such as the future tenants of

the future building that the Lease envisions. See R/S Assocs. v. N.Y. Job Dev. Auth., 98 N.Y.2d

29, 33, 744 N.Y.S.2d 358, 360 (2002) (granting summary judgment on basis of "unambiguous"

contract); Pink v. Am. Surety Co. of N.Y., 283 N.Y. 290, 296 (1940) (affirming the grant of

motion to dismiss); AG Capital Funding Partners L.P. v. State St. Bank and Trust Co., 10 A.D.3d

293, 295, 781 N.Y.S.2d 88, 90 (1st Dep't 2004) (reversing trial court's denial of motion to

dismiss where "[t]he parties' agreement is facially unambiguous . . . and is enforceable according

to its terms").

It is, of course, hornbook law that Citigroup can be a third party beneficiary of the

Con Ed Lease, even though Citigroup was not named explicitly in the lease. Associated

Teachers of Huntington, Inc. v. Bd. of Educ., Union Free Sch., 33 N.Y.2d 229, 234, 306 N.E.2d

791, 794, 351 N.Y.S.2d 670, 674 (1973) ("It is not necessary that third-party beneficiaries be

identified or identifiable at the time of making of a contract."); Finch, Pruyn & Co. Inc. v.

M. Wilson Control Servs. Inc., 239 A.D.2d 814, 658 N.Y.S.2d 496 (3d Dep't 1997) (affirming

---

[11]    Citigroup takes no position on whether the general allocation of damages scheme was further modified to allow the Port Authority to benefit from the fire insurance Con Edison was expressly required to maintain as explained in Port Authority's motion to dismiss Aegis's Complaint against it in Aegis Insurance Services et al v. Port Authority, 02 CV 7188.

15

lower court's finding that plaintiff was a third party beneficiary, despite not being named in the contract); Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan, 677 F.2d 193 (2d Cir. 1981) (when employee and former employer released each other, the Employee Stock Ownership Plan was a third party beneficiary of the release, though not specifically named).  As discussed above, because the lease provides Con Edison with a monetary remedy against the Port Authority for damage to the Substation caused by the structure above it, the bar on claims could only have been intended to apply to third parties inhabiting that structure, and the benefit to Citigroup is an immediate one, as protection from lawsuits is an immediate benefit, even when no lawsuit is threatened. State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling, 95 N.Y.2d 427, 435, 741 N.E.2d 101, 104, 718 N.Y.S.2d 256, 259 (2000) ("A party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'") (internal citations omitted).[12]

Assuming, arguendo, that Citigroup's Emergency Backup System had some connection to the collapse of 7WTC, the Port Authority's act of authorizing its construction and issuing the Permit to Occupy would be a but-for cause of the damage to the Substation.  The damage Con Edison complains of, then, is "damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority" and "in connection with the construction or maintenance of the . . . buildings . . . described in Section 8 hereof." Ex. D, Con Ed Lease, § 16.  Thus, the Port Authority agreed, for the benefit of the future tenants

---

[12]    The last element, i.e., "indicating the assumption by the contracting parties of a duty to compensate [the third party] if the benefit is lost" is not applicable as the benefit cannot be lost.

16

of 7WTC, to bear responsibility for any damage that the structure might cause and any claim against Citigroup is barred.

## POINT II

## AEGIS HAS NOT PLED A CAUSE OF ACTION FOR NEGLIGENCE PER SE

Aegis's cause of action against Citigroup for negligence per se, alleging violations of "New York City and State fire and safety codes and regulations," Complaint ¶ 127, must be dismissed because neither a failure to comply with New York City Building Codes nor a failure to comply with New York State Building Codes constitutes negligence per se. New York State law is clear that alleged violations of local rules, municipal ordinances, and agency regulations do not constitute a cause of action for negligence per se. Although Aegis did not cite to any specific provisions allegedly violated, it has alleged only violations of "codes and regulations," and not violations of state statutes. Therefore, Aegis has not stated a cause of action for negligence per se.

Under New York law, only the "violation of a State statute that imposes a specific duty constitutes negligence per se." Elliot v. City of New York, 95 N.Y.2d 730, 734, 747 N.E.2d 760, 762, 724 N.Y.S.2d 397, 399 (2001). "By contrast, violation of a municipal ordinance constitutes only evidence of negligence." Id.

This principle has been established in New York for over a century, see, e.g., Schumer v. Caplin, 241 N.Y. 346, 351-52, 150 N.E. 139, 140 (1925), and was reaffirmed by the Court of Appeals in Elliot, 95 N.Y.2d 730, 747 N.E.2d 760, 724 N.Y.S.2d 397. Elliot involved personal injury allegedly caused by the Board of Education and The City of New York's failure to place protective handrail guards on stadium seating, as required by the New York City Building Code. Saying that, "[t]his Court has long recognized a distinction between State statutes on the one hand, and local ordinances or administrative rules and regulations on the

17

other, for purposes of establishing negligence," that court held that violation of the New York

City Building Code did not constitute negligence per se, but was only evidence of negligence.

Id. at 734, 747 N.E.2d at 762, 724 N.Y.S.2d at 399; see also Weber v. Paduano, No. 02 CV 3392

(GEL), 2003 WL 22801777 (S.D.N.Y. Nov. 25, 2003) (under New York State law, alleged

violations of City Administrative Code in the form of absence of smoke detector and faulty

stairwell doors do not constitute negligence per se).  The Elliot court adopted the rationale for

this rule enunciated in Major v. Waverly & Ogden, Inc., 7 N.Y.2d 332, 165 N.E.2d 181, 197

N.Y.S.2d 165 (1960), that is, that because city ordinances, local rules and state regulations were

promulgated by agencies or by local governments -- and not by the State legislature -- they

cannot supplant the common law of the state.  Elliot, 95 N.Y.2d at 734, 747 N.E.2d at 762, 724

N.Y.S.2d at 399.  As is clear from the reasoning behind the holding, this principle applies to the

New York State Code as well.  See Major, 7 N.Y.2d at 336, 165 N.E.2d at 184, 197 N.Y.S.2d at

168 (stating in dicta that violation of State Building Construction Code was not grounds for

statutory liability); Hand v. Gilbank, 300 A.D.2d 1067, 1068, 752 N.Y.S.2d 501, 502 (4th Dep't

2002), ("[Defendant's] alleged violation of the State Uniform Fire Prevention and Building Code

(9 NYCRR part 600 et seq.) may be considered as some evidence of negligence.") (emphasis

added); New York Pattern Jury Instructions 2:29 ("If you find the defendant violated the

(ordinance, regulation), you may consider the violation as some evidence of negligence, along

with the other evidence in the case . . . .") (emphasis added).

     Aegis's fourth cause of action alleges only violations of "New York City and

State fire and safety codes and regulations," Complaint ¶ 127; it does not allege any violation of

any state statute.  It is not clear from the Complaint which provision, or even which code, the

plaintiff alleges was violated.  However, the New York City Building Code (which includes

18

subchapters on Fire Alarm, Detection and Extinguishing Equipment, Fire Protection

Construction Requirements, and Fire District maps) is promulgated by the New York City

Department of Buildings and adopted by the City Council. See New York City Charter §§ 28(a),

641-645; http://www.nyc.gov/html/dob/html/code.html. New York State Building and Fire

Codes are incorporated into 19 NYCRR, Chapter XXXIII, and promulgated by the Code Council

of the Department of State, an executive agency. See N.Y. Exec. Law §§ 374(1), 377(1)

(McKinney 2004); http://www.dos.state.ny.us/code/code_council.htm. Neither the New York

City Council nor the Department of State can pass any provision that has the force of a statute --

"[o]nly an enactment of the Legislature can alter the State common law of negligence." Elliot,

95 N.Y.2d at 736, 747 N.E.2d at 763, 724 N.Y.S.2d at 400. The violations of City codes or State

regulations Aegis alleges do not meet the Elliot standards for a cause of action for negligence per

se, and Aegis's fourth cause of action must be dismissed.[13]

**POINT III**

**THE PORT AUTHORITY'S PERMIT TO OCCUPY PRECLUDES ANY CLAIM**
**PURPORTEDLY BASED ON THE DESIGN AND CONSTRUCTION**
**OF CITIGROUP'S SPACE AT 7WTC**

A.     **THE PORT AUTHORITY'S PERMIT TO OCCUPY PRECLUDES ANY**
       **CLAIM FOR NEGLIGENCE PER SE**

When New York and New Jersey agreed to create the World Trade Center under

the control of the Port Authority, they agreed to remove it from the regulation of either state or

any municipalities within the states. N.Y. Unconsol. § 6612 (McKinney 2004); N.J. Stat. Ann.

§ 32:1-35.61 (West 2004) (So long as a project is "owned, controlled or operated by the Port

Authority . . . no agency, commission or municipality of either or both of the states shall have

---

[13]     Even if alleged code violations did make out a cause of action for negligence per se, and even if ordinary
Code provisions were applicable, New York State Codes are inapplicable in New York City. See N.Y. Exec. Law
§ 383(c) (McKinney 2004).

jurisdiction over such facility.").[14]  The Port Authority controlled all of Citigroup's modifications

to 7WTC, as is evidenced by the leases in question and by its issuance of a Permit to Occupy.

See Ex. A, Permit to Occupy; Ex. B, Three Party Agreement §§ 5.1-5.3, 6.1-6.3; Ex. F, CGMH

Lease. Thus, all building and construction done at the World Trade Center site is exempt from

regulation by New York City or New York State, and subject only to the jurisdiction of the Port

Authority. It is the Port Authority, therefore, that has the authority both to set the fire and safety

standards that developers must comply with, and to determine whether compliance has been

achieved. N.Y. Unconsol. § 6612 (McKinney 2004); N.J. Stat. Ann. § 32:1-35.61 (West 2004).

      This exclusive jurisdiction to regulate extends to lessees.[15]  New York Courts

have addressed this question in relation to lessees at Kennedy Airport (also under the control of

the Port Authority). In New York v. Rodriguez, 115 Misc. 2d 866, 454 N.Y.S.2d 796 (Crim. Ct.,

Queens County 1982), the manager of a hotel at Kennedy airport successfully contested a

summons served on the hotel by the New York City Fire Department. When the city argued that

even though the Port Authority was exempt from the City's fire safety regulations, the Port

Authority's lessee was still subject to them, the court disagreed, holding that "there is no

jurisdiction over [the property of the Port Authority] operated by someone in behalf of the Port

Authority so long as the use is implementing the functions of the Port Authority, and despite the

fact that such operation be pursuant to the provision of a lease with the Port Authority."

Rodriguez, 115 Misc. 2d at 869, 454 N.Y.S.2d at 798.

---

[14]    The statutes also stated that New York City regulations would apply "if so provided in any agreement between the port authority and the city and to the extent provided in any such agreement." N.Y. Unconsol. § 6612 (McKinney 2004) (emphasis added); N.J. Stat. Ann. § 32:1-35.61 (West 2004). Citigroup is unaware of any such agreement in effect at the time the Emergency Backup System was constructed.

[15]    There have been instances in which City regulations were held to apply on Port Authority property. However these cases involved heavily regulated industries such as parking lots and taxicabs, for which Port Authority had passed no regulation of its own. See, e.g., New York v. Anderson, 45 Misc. 2d 1005, 1005, 258 N.Y.S.2d 603, 604 (Crim. Ct., Kings County 1965); Silverman v. Wallander, 194 Misc. 532, 534, 87 N.Y.S.2d 151, 152 (Sup. Ct., N.Y. County 1949); Nargi v. Parking Assocs. Corp., 36 Misc. 2d 836, 840, 234 N.Y.S.2d 42, 47 (Civ. Ct., N.Y. County 1962).

The <u>Rodriguez</u> court found that "the key question [in determining jurisdiction to regulate] is whether the lessee is performing functions in behalf of the Port Authority and implementing the purposes for which the Port Authority was created." 115 Misc. 2d at 869, 454 N.Y.S.2d at 798. In the statute authorizing the Port Authority to construct the World Trade Center, the public function was defined as creating facilities and buildings to aid in and benefit world trade, commerce and prosperity. N.Y. Unconsol. Law § 6601 (McKinney 2004), N.J. Stat. Ann. § 32:1-35.50(9) (West 2004) ("the undertaking of the aforesaid unified project [encompassing financing, shipping, customs and other functions] by the port authority has the single object of preserving . . . the economic well-being of the northern New Jersey-New York metropolitan area. . . ."); N.Y. Unconsol. § 6610 (McKinney 2004); N.J. Stat. Ann. § 32:1-35.59 (West 2004) ("The effectuation of the world trade center . . . or of any of such facilities constituting a portion of the port development project, are and will be in all respects for the benefit of the people of the States of New York and New Jersey, for the increase of their commerce and prosperity and for the improvement of their health and living conditions. . . ."). Citigroup, an international bank providing financing, investment banking, trading and market-making, prime brokerage, private banking, and investment advisement services to domestic and international clients, is in the business of "world trade and commerce" -- thus its position occupying half of 7WTC.

The Port Authority and 7 World Trade Company, in the lease between them, explicitly incorporated City and State codes, but, consistent with the relevant legal framework, further provided that the Port Authority is the sole final arbiter of compliance with such provisions. N.Y. Unconsol. § 6612 (McKinney 2004); N.J. Stat. Ann. § 32:1-35.61 (West 2004); Ex. E, 7 World Trade Lease, § 4.5. The Port Authority has already decided that the design and

construction of the Emergency Backup System did comply, and Citigroup obtained from the Port

Authority certification that unequivocally states that there was full compliance on Citigroup's

part. Ex. A, Permit to Occupy. The Port Authority's judgment may not be superseded by a jury.

**B.**      **COMPLIANCE WITH PORT AUTHORITY REGULATIONS PRECLUDES A CLAIM OF COMMON LAW NEGLIGENCE BASED ON ALLEGED DESIGN DEFECTS OR CONSTRUCTION FLAWS**

> [A] building code is a law or regulation that sets forth minimum requirements for the design and construction of buildings and structures. These minimum requirements, established to protect the health and safety of society, attempt to represent society's compromise between optimum safety and economic feasibility.

National Fire Protection Association, <u>Fire Protection Handbook</u>, Vol. I, § 1 at 53.

In establishing its safety requirements, the Port Authority made a policy judgment

balancing safety with economic feasibility. This judgment was an exercise of the authority

granted to the Port Authority by Congress, the State of New York, and the State of New Jersey.

67 Pub. Res. 17, 42 Stat 174 (1921); N.Y. Unconsol. § 6612 (McKinney 2004); N.J. Stat. Ann.

§ 32:1-35.61 (West 2004). Similarly, the Port Authority's application of those requirements to

Citigroup's design and construction at 7WTC was, again, a proper exercise of the authority

granted to it by those three legislative bodies. 67 Pub. Res. 17, 42 Stat 174; N.Y. Unconsol.

§ 6612 (McKinney 2004); N.J. Stat. Ann. § 32:1-35.61 (West 2004). Having legitimately

exercised its discretion to promote public welfare, the Port Authority's judgments cannot be

supplanted by state-created negligence law.

With the consent of Congress, 67 Pub. Res. 17, 42 Stat 174 (1921), the States of

New York and New Jersey entered into an interstate compact to create the Port Authority and to

develop the World Trade Center. N.Y. Unconsol. Law § 6601 (McKinney 2004), N.J. Stat. Ann.

§ 32:1-35.50 (West 2004). This interstate compact is the equivalent of federal law. <u>Cuyler v.</u>

22

Adams, 449 U.S. 433, 438, 440 (1981) ("[T]he consent of Congress transforms the States' agreement into federal law under the Compact Clause."). The interstate compact has delegated to the Port Authority, not to either state, the exclusive authority to make the policy judgment as to the standards that are required and to determine whether they have been appropriately followed, and the Port Authority has done so. N.Y. Unconsol. Law § 6612 (McKinney 2004); N.J. Stat. Ann. § 32:1-35.61 (West 2004).

In establishing its required safety conditions, and thereby establishing the duty of care required, the Port Authority took into account all relevant pre-existing Codes. It considered not only the New York City Codes that would have been applicable had the World Trade Center not been removed from the City's jurisdiction, but also the New York State Codes and National Fire Protection Association ("NFPA") Codes that are not binding in the City of New York. See Ex. E, 7 World Trade Lease § 4.5; Ex. B, Three Party Agreement, § 5.2(a); N.Y. Exec. Law § 383(c) (McKinney 2004). The Codes that the Port Authority relied on included regulations governing all aspects of the Emergency Backup System. The New York City Building Regulations in effect at the time specified fire rating requirements, Administrative Code of the City of New York §§ 27-234 - 27-242, 27-269 - 27-287, 27-323 - 27-330 (1988), requirements for loads standards, including struts Administrative Code § 27-551 (1988), fuel tank requirements, including testing requirements and location, Administrative Code §§ 27-794, 27-829 (1988), and requirements for the installation of fuel line piping, Administrative Code § 27-830 (1988). In addition, NFPA guidelines contain specifications for generators. NFPA Electric Code Art. 445 (2004).

Beyond even the strict requirements of these codes, the Port Authority retained the ability to demand more safety assurances if the Chief Engineer of the Port Authority was not

23

satisfied with the plans, Ex. E, 7 World Trade Lease, § 4.5, and evaluated plans to ensure that they "[were] consistent with sound engineering practices applicable to office buildings located in Manhattan, the structure and design of which are similar to the structure and design of [7WTC] and to alteration, addition or improvement work similar to such Initial Work." Ex. B, Three Party Agreement, § 5.2(a); see also Ex. B, Three Party Agreement, §§ 5.2(b), 6.2(a). In evaluating plans and construction and in issuing the Permit to Occupy evidencing that Citigroup had met its requirements, the Port Authority made a well-considered policy judgment that may not now be disturbed, partially with hindsight and in light of an attack unlike anything previously seen on U.S. soil.

While there have been cases decided according to state law that have found that, where a building is under the jurisdiction of state or municipal regulators, code compliance does not preclude a state law negligence claim,[16] construction of an interstate compact is a federal question and this federal court is not bound by the state decisions to the contrary. Cuyler v. Adams, 449 U.S. 433 (1981); Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 278-280 (1959) (holding that the question of whether an interstate compact had waived 11th Amendment immunity was a question of federal, rather than state, law, and stating that "[t]he construction of a compact sanctioned by Congress . . . presents a federal question . . . . even though the matter in dispute concerns a question of state law on which the courts or other agencies of the State have spoken."). Moreover, once an interstate compact has been entered into, neither state in the compact is allowed to unilaterally change the compact. Eastern

---

[16]    See, e.g., Garret v. Holiday Inns, Inc., 58 N.Y.2d 253, 263, 447 N.E.2d 717, 722, 460 N.Y.S.2d 774, 779 (1983); Washington v. Albany Hous. Auth., 297 A.D.2d 426, 426, 746 N.Y.S.2d 99, 101 (3d Dep't 2002); Cirino v. Greek Orthodox Cmty. of Yonkers, 193 A.D.2d 576, 576, 598 N.Y.S.2d 959, 959 (2d Dep't 1993). While some New York state cases have found that compliance with provisions of federal regulations did not preclude findings of negligence, in these cases, either there was no specific approval of the item in question, Sherman v. M. Lowenstein & Sons, Inc., 28 A.D.2d 922, 282 N.Y.S.2d 142 (2d Dep't 1967) or the federal regulatory body did not have exclusive jurisdiction. Phillips v. Roux Labs., Inc., 286 A.D. 549, 145 N.Y.S.2d 449 (1st Dep't 1955).

24

<u>Paralyzed Veterans Ass'n v. Camden</u>, 111 N.J. 389, 406, 545 A.2d 127, 135 (1988) (holding that New Jersey can not unilaterally apply its disability rights accessibility law to the Delaware River Port Authority, a bi-state agency).

Importantly, we do not argue that the Port Authority's issuance of a Permit to Occupy pre-empts all state negligence law. To the extent that plaintiff could premise a claim based on ongoing maintenance issues or on some tenant improvement that was not the subject of Port Authority scrutiny and approval, such a claim would not be precluded.[17]

When Congress authorized the States of New York and New Jersey to create the Port Authority, and exempted that bi-state agency from the regulation of either state, Congress removed the Port Authority from the regulation of the states. It would make no sense to remove the ability of highly educated and trained local and state building and fire inspectors to second-guess Port Authority's approvals, but to permit such judgments to be second-guessed by lay juries. Where, as here, the Port Authority has prescribed the standards that any building on its property must meet, and certified that Citigroup met its standards, this judgment should not be allowed to be undermined by state statutory or common law.

## POINT IV

### AEGIS'S ALLEGED DAMAGES ARE TOO REMOTE AND SPECULATIVE AND THEREFORE ITS CAUSES OF ACTION ARE UNSUSTAINABLE

Where the connection between the alleged wrongdoing and the alleged damages or the calculation of the damages is based essentially on guesswork, no cause of action is

---

[17]    Much of Aegis's complaint, which was rushed through to be filed before the pending statute of limitations, appears to have been cut and pasted variously from either Aegis's prior complaint in <u>Aegis Insurance Services et al v. Port Authority</u>, 02 CV 7188 or from the Complaint in <u>Industrial Risk Insurers v. Port Authority</u>, 02 CV 7170. This Complaint has named any defendant Aegis could think of and has made any allegation Aegis could think of, including a boilerplate reference to "maintenance failures." We do not believe, however, Aegis is serious about asserting such a claim or that Aegis has any possible good faith basis under Fed.R.Civ.Pro. 11 for asserting such a claim. Rather, because of the impending 3-year limitations period, it appears that the Aegis's Complaint was cobbled together at the last minute and a number of allegations were made that are clearly inapplicable to 7WTC.

sustainable as matter of law. Here, both the connection between the damages alleged and the calculation of those damages are entirely speculative, presenting yet another reason for the Court to dismiss the Complaint against Citigroup in its entirety.

That some evidence exists from which to guess at the amount of damages is not enough to put that evidence before a jury. Mehta v. N.Y. City Dep't of Consumer Affairs, 162 A.D.2d 236, 556 N.Y.S.2d 601 (1st Dep't 1990), see also Kenford Co. v. County of Erie, 67 N.Y.2d 257, 262, 493 N.E.2d 234, 236, 502 N.Y.S.2d 131, 133 (1986) (In breach of contract case, "[q]uite simply, the multitude of assumptions required to establish [damages] . . . require speculation and conjecture, making it beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty."). There must be "a reasonable means of calculating the amount." Mehta, 162 A.D.2d at 237, 556 N.Y.S.2d at 602; see also Broadway Photoplay Co. v. World Film Corp., 225 N.Y. 104, 109, 121 N.E. 756, 758 (1919) (Cardozo, J.) (evidence from which jury calculated damages was insufficient; "plaintiff was not required to prove its damages to the dollar" but was required "to supply some basis of computation") (citations omitted). Even in cases where the amount of the damages can be calculated with certainty, the damages "must be the direct, proximate and probable result of the alleged wrong, rather than left to speculation and conjecture." Hochberg v. N.Y. City Off-Track Betting Corp., 74 Misc. 2d 471, 477, 343 N.Y.S.2d 651, 685 (Sup. Ct., N.Y. County 1973), aff'd, 43 A.D.2d 910, 352 N.Y.S.2d 423 (1st Dep't 1974) (in response to plaintiff's claim that he was blocked from betting on the winning combination of horses by track, court found that there was no way to know how plaintiff would have bet under other circumstances and dismissed the case because the damages complained of were too speculative). When the damage complained of "cannot be 'reasonably traced to the event' and was not 'independent of other

26

causes,'" as a matter of law, it is not compensable. Apollo Steel Corp. v. Melco Cranes, Inc.,
202 A.D.2d 1049, 1049-50, 609 N.Y.S.2d 121, 121 (4th Dep't 1994) (citation omitted) (where
plaintiff's damages resulted from several factors, one of which was an accident caused by
defendant, the "items of damage are, as a matter of law, too remote and speculative to be
compensable.").

The Federal Emergency Management Agency, the nation's expert in disaster
recovery, has conducted extensive study of the collapse of 7WTC and is still unable to ascertain
the cause. Yet, Aegis asks this Court for an opportunity to take nothing more than the exact
same raw evidence that FEMA considered -- perhaps digested by experts from both sides, but the
same raw data nonetheless -- and to put that evidence in front of a lay jury, who would then
decide who was at fault and apportion damages. Presumably, a jury will also be asked to guess
whether, if 7WTC had not collapsed due to fire, it ultimately would have to have been torn down
(as is now the case with the nearby Deutsche Bank building). While there may be evidence upon
which to base a guess about the answers, there could never be any reasonable basis for such an
award; this case should be dismissed on the pleadings rather than burdening the parties and this
Court with a trial that can lead nowhere.

## POINT V

### THE TERRORIST ATTACK ON THE WORLD TRADE CENTER AND THE UNANTICIPATABLE ACTIONS OF THE FIRE DEPARTMENT WERE, IN ANY EVENT, SUPERSEDING CAUSES

Citigroup cannot be held responsible for any damages to the power station built
underneath 7WTC, because the acts of terrorists causing the collapse of 1 and 2WTC and the
decision of the fire department not to fight the fires were superseding causes of the destruction of
the building. Again, Citigroup has already made these arguments in pleadings before this Court
and refers the reader to the discussions at pages 29-33 of its Memorandum of Law in Support of

27

its Motion to Dismiss and at pages 12-15 of Citigroup's Reply Memorandum in Further Support

of its Motion to Dismiss in Industrial Risk Insurers v. Port Authority et. al., 02 CV 7170.

      Citigroup repeats only the argument that the facts of this case are dramatically

different than those this Court addressed in In re September 11 Litigation, 280 F. Supp. 2d 279

(S.D.N.Y. 2003), when the Court declined to hold, at the pleading stage, that the terrorist acts on

September 11, 2001 were an "'extraordinary' intervening cause." Id. at 302 (citation omitted).

That case addressed the circumstances of 1 and 2WTC, and this Court, in assessing the duty of a

landlord to its tenants, relied on the fact that the Twin Towers had, on two prior occasions, been

targets of arson and terrorist attacks, and that the builders had been concerned about the aircraft

risk created by the size of the buildings. Also crucial to this Court's analysis were the allegations

that, despite these special concerns and knowledge that the buildings were targets, the buildings

still had inadequate evacuation plans and code violations. Citigroup, in contrast, is not alleged to

be a landlord with the overall responsibility for the safety of the buildings. 7WTC had never

been the target of at attack prior to September 11, 2001 (or, for that matter, on September 11,

2001). It did not have the height that created concern over aircraft risk in the Twin Towers. This

plaintiff, moreover, was not in privity or in any relationship with Citigroup that would give rise

to any duty of care. 7WTC, unlike 1 and 2WTC, was simply an ordinary office building across

the street from 1 and 2WTC, and Con Edison, unlike the plaintiffs in In re September 11

Litigation, was no more than a neighbor to Citigroup. The injuries here do not flow from an

alleged failure to plan for an anticipatable accident or terrorist act, but from the unanticipatable

collapse of the Twin Towers and the unanticipatable decision by the fire department under these

unprecedented circumstances not to even attempt to combat the resulting fire.

      The events that took place on September 11, 2001, were not consequences of any

negligent act on the part of Citigroup, and not, in any case, events that Citigroup could have planned for, and Citigroup is not liable as a matter of law.  See Martinez v. Lazaroff, 48 N.Y.2d 819, 820, 399 N.E.2d 1148, 1149, 424 N.Y.S.2d 126, 127-28 (1979) (dismissing when the causal connection between negligence and injury was "attenuated"); Rivera v. City of N.Y., 11 N.Y.2d 856, 857, 182 N.E.2d 284, 284, 227 N.Y.S.2d 676, 676 (1962) (dismissing complaint when defendant's negligence affected the consequences of an accident, but did not cause the accident); Harris v. N.Y. City Hous. Auth., 187 A.D.2d 362, 362, 589 N.Y.S.2d 883, 884 (1st Dep't 1992) (dismissing case where unforeseeable intervening act relieved defendant from any liability it may have had); The Lusitania, 251 F. 715, 736 (D.C.N.Y. 1918) (dismissing the case because "[t]he whole blame . . . must rest solely with those who plotted and . . . committed the crime"); In re World Trade Center Disaster Site Litig., 270 F. Supp. 2d 357, 376 (Hellerstein, J.) ("Proximate cause limits liability to the expected, natural or foreseeable consequences of allegedly negligent conduct.").  Here, no one -- not Con Edison, not Silverstein, not the Port Authority, not Citigroup, and not all of the highly trained and experienced engineers and architects employed by CGMH, Silverstein and the Port Authority -- could have foreseen the highly improbable chain of events and the superseding causes that led to the building's collapse.

## POINT VI

## AEGIS'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

The combination of events and the resulting damage to 7WTC that occurred on September 11, 2001 were clearly not foreseeable.  However, to the extent that plaintiff argues that these extraordinary events were foreseeable, plaintiff would then have to concede that its case is barred by the statute of limitations.

29

The limitations period for injury to property is three years, N.Y. C.P.L.R. § 214(4) (McKinney 2004), and in the case of negligent construction it begins to run either when the structure collapses, or when the damage from the negligent construction becomes apparent. Mark v. Eshkar, 194 A.D.2d 356, 357, 598 N.Y.S.2d 255, 256 (1st Dep't 1993). Con Edison was aware of the construction of the Emergency Backup System, including its size, at the time it was built. If Citigroup should have foreseen the terrorist attacks on 1 and 2WTC and their impact on 7WTC, then Con Edison, who supplied power to the entire World Trade Center and was acquainted with 1 and 2WTC as well as 7WTC, should have foreseen this as well. See Alamio v. Town of Rockland, 302 A.D.2d 842, 844, 755 N.Y.S.2d 754, 756 (3d Dep't 2003) ("injury must be deemed to accrue when the damage was apparent") (internal quote omitted); see also Mandel v. Tiffany, 263 A.D.2d 827, 829, 693 N.Y.S.2d 759, 761 (3d Dep't 1999) (damage to property due to landslide caused by illegal cutting of trees on plaintiff's land was barred because cause of action accrued when trees were cut). As a result, if this action is not dismissed for lack of proximate cause, then it must be dismissed as time-barred.

### POINT VII

### THE COMPLAINT FAILS TO IDENTIFY ANY BASIS FOR CLAIMS AGAINST CITIGROUP INC., SALOMON INC. OR SALOMON SMITH BARNEY HOLDINGS INC.

The Complaint does not give Citigroup Inc. any explanation of the basis on which it has been named as a co-defendant, as is required by the Federal Rules of Civil Procedure. Fed. R. Civ. P. 8(a); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002). While the factual allegations conflate Citigroup Inc. and CGMH, referring to both together as "Citigroup," no Citigroup entity at all was even affiliated with Salomon, Inc. at the time the Emergency Backup System was designed and built, and Citigroup Inc. had no involvement whatsoever in the events

30

Aegis complains of. With respect to Citigroup Inc., Aegis alleges nothing more than a parent-subsidiary relationship with CGMH. Complaint ¶ 10. As a matter of law this relationship alone is insufficient to confer liability on the parent corporation. Garcia v. Union Carbide Corp., 176 A.D.2d 219, 219-20, 574 N.Y.S.2d 341, 342 (1st Dep't 1991) ("Even complete ownership . . . will not alone render a parent corporation liable for the torts of its subsidiary."); Gates v. AOL Time Warner, Inc., No. 604141/02, 2003 WL 21375367, at *3 (N.Y. Sup. Ct., N.Y. County May 15, 2003) (dismissing case against parent corporation where alleged acts were done by subsidiary "'[a]s a general rule, a parent corporation is not liable for the acts of a subsidiary") (internal citation omitted).

Moreover, as Aegis acknowledges, Complaint ¶ 10, entities named Salomon Smith Barney Holdings Inc. and Salomon Inc. no longer exist; Salomon Inc. was merged into Salomon Smith Barney Holdings Inc., and Salomon Smith Barney Holdings Inc. was later renamed Citigroup Global Markets Holdings Inc. Liabilities of Salomon Inc. and Salomon Smith Barney Holdings Inc. have been assumed by CGMH, and naming the two Salomon entities separately is duplicative. The Complaint, if it is not dismissed outright, should be deemed amended to delete the names Salomon Inc. and Salomon Smith Barney Holdings Inc.

31

**CONCLUSION**

For the foregoing reasons, Defendants Citigroup and CGMH respectfully request that the Court grant their motion to dismiss and grant such other relief as this Court deems just and proper.

Dated: New York, New York
      November 23, 2004

                          Respectfully submitted,

                          CLEARY, GOTTLIEB, STEEN & HAMILTON

                          By:  *Thomas J. Moloney*

                                  Thomas J. Moloney (TM-9775)
                                  Lewis J. Liman (LL-9166)
                                  One Liberty Plaza
                                  New York, New York 10006
                                  (212) 225-2000

                          Attorneys for Defendants Citigroup Inc., Citigroup Global Markets Holdings Inc., Salomon Inc. and Salomon Smith Barney Holdings Inc.

Of Counsel:
    Karen Bekker
    R. Zachary Gelber

# EXHIBIT
# F

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AEGIS INSURANCE SERVICES, INC., et al.

                              Civil Action No. 02 CV 7188 (AKH)

                  Plaintiffs,

      - against-

7 WORLD TRADE CENTER COMPANY, L.P. et al.

                  Defendants.

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION BY DEFENDANTS CITIGROUP INC. AND CITIGROUP GLOBAL MARKET HOLDINGS INC. TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

---

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Plaintiffs
45 Broadway
30th Floor
New York, New York 10006
(212) 406-1919
File No.: 02-5514:241.0001-K

Stanley W. Kallmann, Esq. (SK5204)
Michael S. Leavy, Esq. (ML6150)
Of Counsel and On The Brief

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PURPOSE POINT I
CITIGROUP OWED A DUTY TO CON ED, AND PLAINTIFFS HAVE PROPERLY
     PLEADED A BREACH OF THAT DUTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    CITIGROUP AND ITS AGENTS INSTALLED THEIR BACKUP
          POWER SYSTEM IN PREMISES CANTILEVERED ABOVE CON
          ED'S, THEREBY OWING A DUTY OF CARE IN ITS DESIGN,
          CONSTRUCTION, OPERATION AND MAINTENANCE, WHICH IT
          BREACHED AS TO CON ED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    RISK OF FIRE WAS REASONABLY FORESEEABLE . . . . . . . . . . . . 6

    C.    THE CON ED LEASE NEITHER CONTEMPLATES NOR GOVERNS
          CLAIMS AGAINST A PA TENANT NOR ANY ASPECT OF DAMAGE
          TO THE SUBSTATION OTHER THAN "REIMBURSEMENT" TO
          CON ED FOR DAMAGE ARISING FROM "ACTS OR OMISSIONS"
          OF THE PA, ITS "AGENTS, SERVANTS OR EMPLOYEES" . . . . . . . 9

POINT II
NEGLIGENCE PER SE IS A VIABLE CAUSE OF ACTION . . . . . . . . . . . . . . . . . . . 16

POINT III
PA'S EXERCISE OF REGULATORY AUTHORITY DOES NOT PRECLUDE
     NEGLIGENCE CLAIMS AGAINST CITIGROUP, AND THE PERMIT TO
     OCCUPY HAS NO RELEVANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT IV
PLAINTIFFS' DAMAGES, ARISING FROM PAYMENT OF SUMS CERTAIN TO
     CON ED FOR PROPERTY DAMAGE, AND EXPENSES DULY INCURRED
     IN REPLACEMENT OF THAT TANGIBLE PROPERTY AND EQUIPMENT
     ARE NEITHER REMOTE NOR SPECULATIVE . . . . . . . . . . . . . . . . . . . . . . 18

POINT V
ISSUES AS TO FORESEEABILITY AND AS TO INTERVENING CAUSE ARE FOR
A JURY, ESPECIALLY WHERE THE FACTS ARE IN DISPUTE; THERE
ARE CLEARLY FACTUAL QUESTIONS AT THIS JUNCTURE.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT VI
PLAINTIFFS' SUIT AGAINST CITIGROUP IS TIMELY. . . . . . . . . . . . . . . . . . . . . 24

POINT VII.
CITIGROUP FAILS TO OFFER EVIDENCE AS TO WHICH DEFENDANTS ARE
PURPORTEDLY IMPROPERLY NAMED, IF ANY . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## **TABLE OF AUTHORITIES**

FEDERAL CASES

*Allen v. The Katz Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193 (2d Cir. 1981)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bonsignore v. City of New York*, 683 F.2d 635 (2nd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . 22

*Cuyler v. Adams*, 449 U.S. 433 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Del Cid v. Beloit Corp.*, 901 F. Supp. 539 (E.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 20

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Lusitania*, 251 F. 715 (S.D.N.Y. 1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Padevan v. United States*, 82 F.3d 23 (2nd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Petition of the Kinsman Transit Co.*, 338 F.2d 708 (2nd Cir. 1964), cert. denied 380 U.S. 944
(1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Petty v. Tennessee-Missouri Bridge Comm'n*, 359 U.S. 275 (1959) . . . . . . . . . . . . . . . . . . 18

*In re September 11 Litigation*, 280 F.Supp.2d 279, 300 (S.D.N.Y. 2003) . . . . . . . . . . 4, 6, 7, 18

*Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26


STATE CASES

*AG Capital Funding Partners L.P. v. State St. Bank and Trust Co.*, 10 A.D. 3d 293, 781
N.Y.S.2d 88 (1st Dep't 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Alamio v. Town of Rockland*, 302 A.D.2d 842, 755 N.Y.S.2d 754 (3rd Dep't 2003) . . . . . . . . 25

*Amedeo Hotels Ltd. Partnership v. Zwicker Elec. Co., Inc.*, 739 N.Y.S.2d 10 (1st Dep't 2002)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Apollo Steel Corp. v. Melco Cranes, Inc.*, 202 A.D.2d 1049, 609 N.Y.S.2d 121 (4th Dep't 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Assoc. Teachers of Huntington, Inc. v. Bd. Of Ed., Union Free Sch.*, 33 N.Y.2d 229, 351 N.Y.S.2d 670 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 121 N.E. 756 (1919) . . . . . . . . 19

*De Angelis v. Lutheran Med. Ctr.*, 84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315-316, 434 N.Y.S.2d 166, 414 N.E.2d 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20, 22

*Eastern Paralyzed Veterans Ass'n v. Camden*, 111 N.J. 389, 545 A.2d 127 (1988) . . . . . . . . . 18

*Elliott v. City of New York*, 724 N.Y.S.2d 397 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Finch, Pruyn & Co., Inc. v. M. Wilson Control Servs. Inc.*, 239 A.D.2d 814, 658 N.Y.S.2d 496 (3d Dep't 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Garcia v. Union Carbide Corp.*, 176 A.D.2d 219, 574 N.Y.S.2d 341 (1st Dep't 1991) . . . . . . 27

*Gates v. AOL Time Warner Inc.*, 2003 WL 21375367 (N.Y. Sup. Ct. N.Y. County May 15, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Gross v. Empire State Building Ass'n*, 4 A.D.3d 45, 773 N.Y.S.2d 354 (1st Dep't 2004) . . . . . . 5

*Harris v. New York City Housing Auth.*, 187 A.D.2d 362, 589 N.Y.S.2d 883 (1st Dep't 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hochberg v. N.Y. City Off-Track Betting Corp.*, 74 Misc.2d 471, 343 N.Y.S.2d 651 (Sup. Ct., N.Y. County 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hurst v. Titus*, 77 A.D.2d 157, 432 N.Y.S.2d 938 (4th Dep't 1980) . . . . . . . . . . . . . . . . . . . . . 9

*Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131 (1986) . . . . . . . . . . . . . . . . 19

*Lee Kin Shiu v. City of N.Y.*, 174 Misc.2d 422, 425, 666 N.Y.S.2d 872 (2nd Dep't 1997) . . . . . . 8

*Mandel v. Tiffany*, 263 A.D.2d 827, 693 N.Y.S.2d 759 (3rd Dep't 1999) . . . . . . . . . . . . . . . . . 25

*Mark v. Eshkar*, 194 A.D.2d 356, 598 N.Y.S.2d 255 (1st Dep't 1993) . . . . . . . . . . . . . . . . . . . 24

*Martinez v. Lazaroff*, 48 N.Y.2d 819, 424 N.Y.S.2d 126 (1979) . . . . . . . . . . . . . . . . . . . . . . . 23

(iv)

*Mehta v. N.Y. City Dep't of Consumer Affairs*, 162 A.D.2d 236, 556 N.Y.S.2d 601 (1st Dep't 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Miller v. Board of Education*, 291 N.Y. 25, 29, 50 N.E.2d 529 (1943) . . . . . . . . . . . . . . . . . . 8

*Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 519, 429 N.Y.S.2d 606, 613 (1980) . . . . . . . . 4

*Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928) . . . . . . . . . . . . . . . . . 5, 7

*People v. Rodriguez*, 115 Misc.2d 866, 454 N.Y.S.2d 796 (Crim. Ct. Queens County 1982) . . 17

*Pink v. Am. Surety Co. of N.Y.*, 283 N.Y. 290, 28 N.E.2d 842 (1940) . . . . . . . . . . . . . . . . . . 14

*R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 360 (2002) . . . . . . . 14

*Rivera v. City of New York*, 227 N.Y.S.2d 676 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ryan Transp., Inc. v. M and G Assoc.*, 266 Conn. 520, 832 A.2d 1180 (2003) . . . . . . . . . . . . . 5

*State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S.2d 256 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427, 746 N.Y.S.2d 99 (3rd Dep't 2002) . 7, 17

*Whitfield v. City of N.Y.*, 239 A.D.2d 492, 657 N.Y.S.2d 757 (2nd Dep't 1997) . . . . . . . . . . . . 8

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## STATE STATUTES

N.J. Stat. Ann. §§ 32:1-35.61 (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

N.Y. Unconsol. § 6612 (McKinney 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

General Obligations Law § 5-322.1 (McKinney's 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Plaintiffs, Consolidated Edison Company of New York, Inc., ("Con Ed") and its subrogee insurers, submit this brief in opposition to the motion, dated November 23, 2004, of Citigroup Inc. and Citigroup Global Market Holdings Inc. (collectively "Citigroup") pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' claims.

## PRELIMINARY STATEMENT

The motion to dismiss by Citigroup is without basis. At the very least, questions of fact preclude judgment for Citigroup at this time, given that the complaint is presumed to be true.

The risk of loss due to fire, regardless of the precise initiation mechanism, is foreseeable, and Citgroup owed, and breached, a duty to Con Ed in that regard. Moreover, for the reasons set forth in the Reports of FEMA and NIST, and the Preliminary Report of Dr. Fred Mowrer, an expert retained by plaintiffs, appended to the Declaration of Stanley W. Kallmann, it cannot be said that, as a matter of law, there was any superceding or intervening cause, in any event.

The lease between the Port Authority ("PA") and Con Ed, with its recitation that the PA could erect the 7 World Trade Center ("7WTC") building above the Con Ed Substation (the "Substation"), contemplated reimbursement by PA to Con Ed for any damage to the Substation resulting from any negligence of the PA in constructing or maintaining 7WTC. The lease in no way limits Con Ed or its insurers to proceeding **solely** against the PA for the negligence of others, including Citigroup, in causing the destruction of Con Ed's equipment at the fire and collapse site at 7WTC, and indeed is silent as to such a situation.

Citigroup fails to discharge its burden of proof, as well, as to its arguments that certain causes of action should be dismissed, or that the claim is time-barred, or that some of the

1

Citigroup defendants should be dismissed from this action. The matter should proceed to discovery at this time.

## STATEMENT OF FACTS

Bearing in mind that the plaintiffs have had no discovery in this case, the following is a matter of "record": Citigroup occupied premises in 7 WTC which were above the Substation. Thus, the extent of Citigroup's duty includes protecting Con Ed from all risks which were caused by Citigroup's on-site activities, including the backup power system for its trading floor. In supporting that commercial endeavor, Citigroup predecessor Salomon Brothers commissioned and installed a system of 9 electrical generators with capacity of 15,525 kilowatts as backup power for its computerized trading floor. The system included a fuel distribution system which pumped fuel at a rate of 75 gallons per minute, even though the needs of the generators were only 1 gallon per minute each, or 9 gallons per minute, in the aggregate, if all were running. Citigroup therefore designed and constructed a pressurized system with over 8 times the necessary fuel pumping capacity, and greatly exacerbated the risk and consequence of any fire at 7WTC. Citigroup created this excess pumping capacity through a pressurized recirculating loop, at a pressure of 50 pounds per square inch (over three atmospheres of pressure), from two 6,000 gallon underground fuel tanks.

Citigroup placed that system within 7WTC, which was cantilevered over the Substation. Citigroup placed elements of its fuel distribution system within feet of structural trusses 1 and 2, upon which 7WTC rested above the easterly portion of the Substation. There, Citigroup created a fuel distribution apparatus which became, in essence, either a 160 megawatt blowtorch pointed at, or a lake of fire beneath, those structural trusses.[1] Citigroup and its "world-class

---

[1]See, the FEMA Report as to all of the foregoing facts, particularly at pp. 5-7, 5-13 through 5-16, and 5-27 through 5-30.

2

professionals" had a duty to protect Con Ed and others commensurate with the danger inherent in the fuel distribution system they created. World-class mistakes resulted in breaches of their duties.

## ARGUMENT

### POINT I

### CITIGROUP OWED A DUTY TO CON ED, AND PLAINTIFFS HAVE PROPERLY PLEADED A BREACH OF THAT DUTY

**A.    CITIGROUP AND ITS AGENTS INSTALLED THEIR BACKUP POWER SYSTEM IN PREMISES CANTILEVERED ABOVE CON ED'S, THEREBY OWING A DUTY OF CARE IN ITS DESIGN, CONSTRUCTION, OPERATION AND MAINTENANCE, WHICH IT BREACHED AS TO CON ED.**

It is a basic principle of common law negligence in New York that one with a possessory interest in real estate, such as Citigroup's leasehold in 7WTC, has a duty to exercise due care as to foreseeable risks arising from its own conduct and activities on the property, as well as those activities of others, such as Con Ed, which concern or are potentially exacerbated by the exercise of its possessory interest.

The Second Circuit Court of Appeals, analyzing cases from New York's Court of Appeals and Supreme Court, Appellate Division, First Department, held that:

> In cases involving liability for injuries arising from conditions on property, the **existence of a duty generally depends upon "occupancy, ownership, control or a special use of [the] premises"** by the defendant. *Balsam v. Delma Eng'g Corp.*, 139 A.D.2d 292, 296, 532 N.Y.S.2d 105 (1st Dep't 1988); cf. *Dick v. Sunbright Steam Laundry Corp.*, 307 N.Y. 422, 424, 121 N.E.2d 399 (1954) (tort liability to tenant or third party "is an incident to occupation and control" of premises by landlord); Restatement (Second) of Torts §§ 328E (1964) (defining "possessor of land" generally as a person in occupation with intent to control land); Restatement §§ 343 (possessors subject to liability for certain conditions on land). [**emphasis added**]

3

*Sutera v. Go Jokir, Inc.*, 86 F.3d 298, 302 (2d Cir. 1996). Indeed, the New York Court of Appeals has discussed a duty of care for "a possessor of land, whether he be a landowner or a leaseholder . . ." *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 519, 429 N.Y.S.2d 606, 613 (1980).

   In this case, this Court, analyzing similar arguments, has already held that there exists a "duty of landowners and lessors to adopt fire-safety precautions [which] applies to fires caused by criminals . . . even in the case of a fire caused by criminals such as those who hijacked flights 11 and 175 on September 11, 2001." *In re September 11 Litigation*, 280 F.Supp.2d 279, 300 (S.D.N.Y. 2003). This is because, as a general principle of common law negligence, the risk of fire is reasonably foreseeable, even if the precise cause of the fire might not be.

   The cases cited by Citigroup in support of the novel proposition that, because it is a tenant in a building, it owes no duty to its downstairs neighbor, either are inapposite, completely irrelevant, have no precedential value, or are all of the foregoing. For example, although it is a well-settled principle that, absent legislation, the ambit of the duty of care is a common-law concept determined by the courts, the case cited by Citigroup, *De Angelis v. Lutheran Med. Ctr.*, 84 A.D.2d 17, 445 N.Y.S.2d 188 (2d Dep't 1981), *aff'd* 58 N.Y.2d 1053, 462. N.Y.S.2d 626 (1983), (child has no derivative claim for loss of consortium of parental services in bodily injury case) has no meaningful application to the present matter. Similarly, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) (RICO claim against a bank for improper management of escrow accounts did not plead compensable predicate acts under section 1962), also cited by Citigroup, is not instructive and has has nothing to do with this case, as it relies solely on RICO precedent.

   Similarly inapposite is *Ryan Transp., Inc. v. M and G Assoc.* 266 Conn. 520, 832 A.2d 1180 (2003), a Connecticut Supreme Court case which, apart from having no precedential value here, centers on the question of whether one tenant, which observed burn marks on the exterior

of the building in which both tenants resided, had a duty to warn the other tenant of the threat of arson by some unknown person. Thus, the risk complained of, fire by arson, was not, as in the instant case, one occasioned by the co-tenant's use and occupancy of its premises. Here, however, it is Citigroup which created and installed an apparatus on its premises which caused the demise of 7WTC and the Substation.

Gross v. Empire State Building Ass'n., 4 A.D.3d 45, 773 N.Y.S.2d 354 (1st Dep't 2004) concerned the particularly narrow issue of those measures a landlord must take to furnish security to visitors. Based on the facts of that case, the evidence the landlord adduced as to its security efforts demonstrated that it had discharged, and not breached, its duty. The case did not determine, as is claimed here, that there was no duty, but that there was a duty, one that the evidence showed had not been breached. Finally, Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 162 N.E. 99 (1928), concerned the scope of duty of a railroad (in loading its passengers and their baggage) to a plaintiff outside the reasonably anticipated danger zone of a dropped package. The Court held that the railroad could not reasonably anticipate that the package would explode, causing a shock wave and tipping over a scale onto plaintiff. Here, however, Citibank could reasonably anticipate that a fire might occur at or near 7WTC, which could turn its overcapacity fuel distribution apparatus into a 160 megawatt blowtorch. It is self-evident that Con Ed was within the zone of danger created by Citigroup's improperly designed and installed system.

**B.      RISK OF FIRE WAS REASONABLY FORESEEABLE**

Due to the reasonably foreseeable risk of fire, Citigroup had a duty to ensure that, in the event of fire, its backup power systems, including its fuel supply and distribution systems, would not fuel, spread or exacerbate such a fire. This includes Citigroup's duty to locate the fuel supply and distribution systems for its trading floor backup power systems in such a manner that, should they become involved in a fire, the risk of damage to neighboring tenants and the structure itself were minimized.

Chief Judge Kaye's decision in *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49 (2001), acknowledges the duty a possessor of property has concerning property damage to those nearby, as was recognized by this Court in *In re September 11 Litigation*, 280 F.Supp.2d 279, 292-293 (S.D.N.Y. 2003). In that case, involving the collapse of a scaffold, the extent of defendants' duty to nearby property owners who had suffered property damage was not at issue, and the Court acknowledged that the only issue was the extent of duty to those suffering purely economic loss.

This Court, discussing that case in *In re September 11 Litigation*, *supra at 292-293*, agreed that the duty of the airlines sued herein ran to those who suffered property damage and personal injury on the ground, stating:

> *532 Madison Avenue* involved collapses of a high-rise office building and a 48-story construction elevator tower, both in midtown Manhattan and both causing busy areas of the city to be closed for a two-week period. The lawsuits sought recovery of financial losses resulting from the closures; plaintiffs had not suffered personal injury or property damage. Applying the considerations set out above, the Court of Appeals limited the scope of defendants' duty "to those who have, as a result of these events, suffered personal injury or property damage," but held that those who suffered merely financial losses could not recover. *Id.* [532 Madison] at 1103. The Court of Appeals acknowledged that "[p]olicy-driven line-drawing is to an extent

arbitrary because, wherever the line is drawn, invariably it cuts off liability to persons who foreseeably might be plaintiffs." *Id.* If those who suffered financial losses were to be allowed to sue, the Court of Appeals held, "an indeterminate group in the affected areas" would be able to recover. *Id.* If, however, the field of plaintiffs was to be limited to those who "suffered personal injury or property damage" as a result of defendants' negligence, the limitation would "afford[ ] a principled basis for reasonably apportioning liability," and be "historically" consistent with New York precedents. *Id.*

The cases before me involve claims to recover for personal injuries, death, or property damage. They fall within the line drawn by the New York Court of Appeals in *532 Madison Avenue.* There may be more plaintiffs within the ambit of duty at issue here than those contemplated under the rule set forth in *532 Madison Avenue,* but that is not a principled basis of distinction. I therefore hold that the Aviation Defendants owed a duty of care, not only to their passengers to whom they concede they owed this duty, but also to victims on the ground.

If the operator of an airplane, which can reasonably be foreseen to fall anywhere, has a duty to anyone struck by it, cannot it also be said that the owner and occupants of 7WTC, which could only fall down or fall over nearby, have a duty to those in its shadow?

The cases cited by Citigroup do not suggest otherwise. *Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427, 746 N.Y.S.2d 99 (3rd Dep't 2002), held that plaintiff properly asserted a claim for breach of duty, notwithstanding defendant's evidence of compliance with applicable fire and building codes, and stated:

With respect to the issue of foreseeability, "**plaintiffs need not demonstrate the foreseeability of the precise manner in which the accident occurred or the precise type of harm produced** in order to establish the foreseeability component of their tort claims" (*Di Ponzio v. Riordan, supra,* at 583-584, 657 N.Y.S.2d 377, 679 N.E.2d 616, citing *Palsgraf v. Long Is. R.R. Co.,* 248 N.Y. 339, 344, 162 N.E. 99). [emphasis added]

7

Indeed, to the contrary of Citigroup's position, *see*, *Whitfield v. City of N.Y.*, 239 A.D.2d 492, 657 N.Y.S.2d 757 (2nd Dep't 1997), which held that the acts of an arsonist did not constitute an intervening superceding cause, or destroy proximate causation, in a fire claim.

In *Lee Kin Shiu v. City of N.Y.*, 174 Misc.2d 422, 425, 666 N.Y.S.2d 872 (2nd Dep't 1997), the defendant city's vacant building, which was slated for demolition and leaning over plaintiff's building, caught fire and collapsed onto plaintiff's building, destroying it.   The Court agreed that a duty was owed by the owner of the overhanging building, stating:

> In *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315-316, 434 N.Y.S.2d 166, 414 N.E.2d 666, the court stated: "To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury ... Plaintiff need not demonstrate, however, that the precise manner in which the accident happened, or the extent of injuries was foreseeable ... **An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent."**  In the case at bar, a proximate cause of the destruction of plaintiffs' building was the defendant's negligence in failing to demolish its unsafe building before a fire occurred as well as allowing it to lean over plaintiffs' building so that if it collapsed it would fall onto plaintiffs' building. In the instant matter, the building did collapse because of the fire and it fell onto plaintiffs' building causing its destruction. Defendant is therefore responsible. [emphasis added]

Similarly, the Court of Appeals addressed the implications of multiple actors in *Miller v. Board of Education*, 291 N.Y. 25, 29, 50 N.E.2d 529 (1943), noting that where two or more separate acts combine to bring about plaintiff's harm, the chain of causation is not broken.

> Where the defendant has by his conduct set in motion forces which would not have resulted in harm to another but for the failure of a third person to act or perform some duty which the law imposes upon him, the failure on the part of such third person to perform the act does not break the causal relation between the defendant's conduct and the plaintiff's damage.

Finally, in *Hurst v. Titus*, 77 A.D.2d 157, 432 N.Y.S.2d 938 (4th Dep't 1980), a fire caused by the negligence of defendant presented issues of fact which could only be resolved by the jury as to proximate cause, regardless of the possibility of another potential proximate cause, plaintiff's negligent supervision of her child.

Here, as this Court has already decided, Citigroup, in vastly overdesigning its fuel distribution system (and quite possibly its power generation and other systems – plaintiffs, after all, have not had discovery), could have and should have foreseen the risk of fire (but apparently did not, or ignored the risks in favor of its own advantage).

**C.    THE CON ED LEASE NEITHER CONTEMPLATES NOR GOVERNS CLAIMS AGAINST A PA TENANT NOR ANY ASPECT OF DAMAGE TO THE SUBSTATION OTHER THAN "REIMBURSEMENT" TO CON ED FOR DAMAGE ARISING FROM "ACTS OR OMISSIONS" OF THE PA, ITS "AGENTS, SERVANTS OR EMPLOYEES"**

Con Ed's lease with the PA, particularly sections 8(a-b) and 16, is interpreted fancifully in the Citigroup brief at pages 13-17. In actuality and reduced to its essence, the lease provides as follows. In section 8(a):

(1).    PA may build additional structures or decoration upon the Con Ed Substation building;

(2)    PA may not endanger Con Ed's Substation and its contents in connection with such construction, or subsequent repair or maintenance, and;

(3)    PA is responsible for upkeep to the additional structures and decoration of the Substation building.

In section 8(b):

(4)    PA is not liable to Con Ed for rent abatements, eviction, or consequential damages caused during construction or maintenance of the additional structures or decoration.

In section 16:

(5)    Con Ed has no obligations with respect to construction and maintenance of the additional structures or decoration, and;

(6)    PA shall reimburse Con Ed for any extra expenses caused by the acts or omissions of PA and its agents during construction and maintenance.

The full text of those provisions follows.

Section 8.        Air Space and Port Authority Construction

a.        The Lessee recognizes that the **Port Authority may construct** wholly or partially on, above or about the Substation Building **additional stories, structures, buildings or improvements** of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine. In connection therewith the Port Authority may use the roof surface of the Substation Building for the base or floor of such additional construction or for a plaza thereof or for some other purpose and may also use side wall surfaces of the Substation Building for support or for attachment thereto of additional structures or for decorative treatment thereto. The Port Authority agrees that **no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building** by the Lessee contemplated in Section 3 hereof. Without limiting the generality of the foregoing or of any other provisions of this Agreement the **Port Authority in performing such additional construction may**, upon reasonable advance written notice given to the Lessee and subject to and in accordance with the reasonable safety and operating requirements of the Lessee, **temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such construction** and the Lessee hereby consents to such entry, use and construction by the Port Authority.

b.        **The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be or be construed to be an eviction of the Lessee nor be made the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise.**

*                *                *

Section 16.        Responsibility for Other Uses of Premises

10

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the **obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors**; further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction therof is necessitated by act or fault of the Lessee. **The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements** described in Section 8 hereof. The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance. **[emphasis added]**

It is difficult to see how Citigroup concludes that the **PA's express obligation to "reimburse"** actually means a bar on claims "based on the building above the substation other than the specified remedy against the Port Authority" (Citigroup Brief at 13), or represents a "limit on Con Ed's ability to bring lawsuits" (Citigroup Brief at 15). That interpretation, while wishful thinking, is simply not supported by the contract.

The first problem with Citigroup's imaginative interpretation is that on their face, these lease provisions deal with damage which occurs "in connection with construction or maintenance" to structures above the substation. Since Citigroup has acknowledged that it

completed construction of, *inter alia*, its fuel distribution apparatus in 1990, the 2001 collapse at issue here is not "in connection with" construction or maintenance of 7WTC.

In addition, the plain meaning of the term "reimburse" and the contract provisions surrounding that obligation simply do not support such a strained interpretation. The lease neither contains nor implies the terms "bar" or "limit" or "lawsuit" which Citigroup reads into the works of the lease. The provisions concern only the "entry, use and construction by the Port Authority, or its agents, contractors or employees" on the Substation, not anticipated tenant improvement in a future structure. The lease provisions relied upon by Citigroup do not even discuss occupants or lessees in that structure. Consequently, there is no basis for Citigroup's contention that it is a third-party beneficiary of the lease. The mere recognition that a structure with tenants would be built above the Substation does not translate into an argument that a claim for improper activities by the tenant is limited or precluded.

Moreover, the provisions at issue here concern only "acts or omissions" of PA and its agents "in connection with the construction or maintenance of" the future structure. This clearly means during construction or maintenance of the building, not any premises defect case which might arise 20 years later. The contractual remedy envisioned for any construction- or maintenance-related damages to the Substation, is, as noted above, "reimburse[ment of Con Ed] for any expense incurred . . . in maintaining, repairing, replacing or rebuilding the Substation Building or . . . Equipment." While the contract is silent as to the manner of remedies Con Ed might apply to obtain this reimbursement, lawsuit for breach of contract against the PA and its employees, or in negligence against it agents or contractors, is certainly not excluded. The provision excludes, only as to a breach of contract action against the PA, claims of "eviction of the Lessee" and for "abatement of rental [or other] damages, consequential or otherwise."

12

Indeed, the interpretation urged by Citigroup has an additional flaw: it seeks to make the PA an indemnitor of any tenant, occupant, licensee, etc., on the 7WTC premises, completely apart from any negligence on its own part.  Citigroup apparently argues that even if its fuel distribution system led directly to this collapse, the negligence of it and its contractors cannot be the basis for a suit damages by Con Ed against them; only PA can be held liable.  Accordingly, they believe that the contract implies one of two absurd results: either Con Ed can only sue PA for damage to the Substation, and must "eat" any damage caused by anyone else (a lease provision that Citigroup apparently thinks the PA bargained for, without consideration), or, Con Ed can sue and hold the PA liable for damages caused to Con Ed by parties other than the PA (e.g. Citigroup and its co-defendants) and as to which the PA itself is not negligent.  Either outcome would be ridiculous, and clearly beyond the contemplation of the lease agreement; the latter would also run afoul of General Obligations Law § 5-322.1 (McKinney's 2004) which prohibits an agreement purporting to hold one harmless as a result of its own negligence pertaining to the construction, alteration, repair or maintenance of a building.

Apart from the generally specious interpretation and logic Citigroup applies to the contract, principles of contractual interpretation dictate that Citigroup's wishful interpretation be rejected.  Indeed, one need look no further than the cases cited by Citigroup to discern that the controlling legal principles dictate that Citigroup cannot add a new term to Con Ed's contract with the PA, much less benefit from it.  In *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 360 (2002), the Court of Appeals held that the term "effective cost of funds" was unambiguous, rejecting a borrower's interpretation that the cost of funds calculation should not include costs from other loan defaults.  The Court, in holding that the borrower's urged

13

interpretation would remove the term "effective" as a modifier to the term "cost of funds," and could therefore not be permitted, stated the longstanding rule:

> We have long adhered to the "sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language" (*Springsteen v. Samson,* 32 N.Y. 703, 706 [1865] [citing *Rogers v. Kneeland,* 10 Wend. 218 (1833)] ). We recently reaffirmed this principle, noting that " 'when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms' " (*Reiss v. Financial Performance Corp.,* 97 N.Y.2d 195, 198, 738 N.Y.S.2d 658, 764 N.E.2d 958 [2001] [quoting *W.W.W. Assoc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)] ).

Similarly, in *Pink v. Am. Surety Co. of N.Y.,* 283 N.Y. 290, 28 N.E.2d 842 (1940), a reinsurance agreement entitling the reinsurer to "salvage" was deemed unambiguous, and in the absence of an express provision, did not permit an offset against that salvage. And in *AG Capital Funding Partners L.P. v. State St. Bank and Trust Co.,* 10 A.D. 3d 293, 781 N.Y.S.2d 88 (1st Dep't 2004), the requirement in an indenture that, for an instrument to be effective a party must "deliver to trustee" a statement, was not satisfied by anything short of actual delivery to the trustee, and was not satisfied by leaving a copy of the statement with the underwriter at the closing. Thus, in those cases, parties to a contract were not able to add an unwritten offset provision, or vary an express delivery requirement. Here, Citigroup cannot add a bar against litigation, and create a class of third-party beneficiaries, out of whole cloth.

Citigroup's argument that it is a third-party beneficiary of its imagined term barring suit is equally without merit. Again, the cases it cites reveal the specious nature of the arguments. Citigroup does not contend that the lease obliged Con Ed to perform any work for Citigroup, *See, Finch, Pruyn & Co., Inc. v. M. Wilson Control Servs. Inc.,* 239 A.D. 7814, 658 N.Y.S.2d 496 (3d Dep't 1997) (site owner was a third-party beneficiary where of subcontract where subcontractor was

14

engaged to perform services at owner's facility, even though owner not named in contract, as facility

was identified), nor is Citigroup related to the PA in the manner of a member of an association, *See,*

*Assoc. Teachers of Huntington, Inc. v. Bd. Of Ed., Union Free Sch.*, 33 N.Y.2d 229, 351 N.Y.S.2d

670 (1973) (collective bargaining agreement between Board and Association was for the benefit of

associations members, teachers, such that they could enforce express provision entitling them to

sabbaticals), or an Employee Stock Ownership Plan to the stock-issuing company, *Allen v. The Katz*

*Agency, Inc. Employee Stock Ownership Plan*, 677 F.2d 193 (2d Cir. 1981) (release to company for

ERISA and common law fraud claims implicating purported misrepresentations prior to termination

agreement applied to Plan).

Indeed, Citigroup is not even a party in interest as to Con Ed's lease, as was Calpers

in *State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S.2d

256 (2000), where it was held that Calpers, the known intended assignee of a loan, was not in privity

with, or beneficiary of, a retainer between the original loan underwriter and its law firm at the time

of the closing, and could therefore not maintain an action in legal malpractice.

Regardless of the fact that a structure which became 7WTC was generally

contemplated at the time of the lease, Citigroup cannot be a third-party beneficiary of the lease

because the lease contained no terms which could inure to the benefit of anyone but Con Ed and the

PA.

## POINT II.

### NEGLIGENCE PER SE IS A VIABLE CAUSE OF ACTION

The case law cited by Citigroup, standing for the proposition that negligence per se

"requires a violation of a statute of statewide applicability", is hardly unfamiliar. *Elliott v. City of*

*New York*, 724 N.Y.S.2d 397 (2001) recognizes that negligence per se can be based upon a local

enactment where that enactment "might be entitled to statutory treatment in tort cases." *Elliott, supra,* at 400-401. The record on this motion does not permit such a determination at this time, one way or the other.

As set forth in the report of Dr. Fred Mowrer, attached to the Declaration of Stanley W. Kallmann, and as set forth in the FEMA Report, Citigroup's fuel storage and distribution apparatus clearly involved the storage of fuel oil in quantities vastly in excess of those permitted by City ordinance, and distributed such fuel at pressures and in volume far in excess of that required. We would ask rhetorically: **If** the theory of negligence per se, that a violation of a statute of statewide applicability constitutes, not just evidence of negligence but negligence itself, and **if** the basis for the theory is, as one supposes, that a defendant charged with negligence can be found "automatically" negligent only upon the basis of a violation of a such wide recognition that the defendant should he held automatically liable, then why should Citigroup not be held so liable? The circumstances herein, of course, are novel, but there is absolutely no reason why, pending further development of the facts, the theory of negligence per se should not be viable against Citigroup.

## POINT III.

### PA'S EXERCISE OF REGULATORY AUTHORITY DOES NOT PRECLUDE NEGLIGENCE CLAIMS AGAINST CITIGROUP, AND THE PERMIT TO OCCUPY HAS NO RELEVANCE

It is undisputed that the sole authority for regulation pertaining to fire and safety at 7WTC, resides in the PA. N.Y. Unconsol. § 6612 (McKinney 2004), N.J. Stat. Ann. §§ 32:1-35.61 (West 2004), *People v. Rodriguez*, 115 Misc.2d 866, 454 N.Y.S.2d 796 (Crim. Ct. Queens County 1982) (fire department may not issue summons to hotel on PA property at JFK Airport).

However, invoking nothing more than *ipse dixit*, and ignoring countless cases which have been adjudicated in state and federal courts over the years since the PA was created, Citigroup leaps to the conclusion that there can be **no negligence claim against a PA tenant**, as PA's "judgment may not be superceded by a jury." If that means that juries shall neither draft regulations, conduct inspections, or issue permits, violations, citations and fines, then plaintiffs agree with Citigroup. However, the exercise of administrative authority for fire and safety by any city, state, federal or corporate entity does not establish a standard of care under tort or contract for fire damage. To take Citigroup's position literally, **no tenant of the PA can ever be sued as a result of a fire;** indeed no tenant of any structure as to which city regulations were followed or permits issued could be sued. That absurd position is not the law.

Citigroup's position, of course, ignores the principle that even one complying with appropriate laws, codes, and the like, may still be in breach of its duty of care, and therefore negligent. *See, e.g., Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427, 746 N.Y.S.2d 99 (3rd Dep't 2002), which held that a "claim of compliance with the fire and building codes is not dispositive of plaintiffs' allegations based on common-law negligence principles [citations omitted]."

17

Similarly, Citigroup asserts a baseless argument that federal negligence law should apply here, notwithstanding this Court's holding that New York law applies to these claims. *In re September 11 Litigation, supra,* at 289. None of the cases cited by Citigroup regarding federal questions concerning the interpretation and extent of interstate compacts is a basis to assert that this Court should not apply New York law to negligence claims among tenants of the PA. *See, Cuyler v. Adams,* 449 U.S. 433 (1981) (Interstate Agreement on Detainers presents a federal questions); *Petty v. Tennessee-Missouri Bridge Comm'n,* 359 U.S. 275 (1959) (Tennesee-Missouri Bridge Commission subject to liability under Jones Act); *Eastern Paralyzed Veterans Ass'n v. Camden,* 111 N.J. 389, 545 A.2d 127 (1988) (New Jersey may not unilaterally regulate bi-state agency, PATCO).

Citigroup's arguments on this issue are baseless and should be rejected out of hand.

### POINT IV.

### PLAINTIFFS' DAMAGES, ARISING FROM PAYMENT OF SUMS CERTAIN TO CON ED FOR PROPERTY DAMAGE, AND EXPENSES DULY INCURRED IN REPLACEMENT OF THAT TANGIBLE PROPERTY AND EQUIPMENT ARE NEITHER REMOTE NOR SPECULATIVE

Con Ed seeks recovery from Citigroup for property damage to its Substation and equipment resulting from the fire and ensuing catastrophic collapse of 7WTC. This results from payment of sums certain to Con Ed by the subrogees, as well as costs incurred by Con Ed in restoring electrical service to Manhattan as a result of the collapse of WTC7. The damage suffered and claimed by Con Ed naturally and logically flow from the destruction of Con Ed property and the import on its business. A major fire or collapse of the building was certain to lead to the damages now sought in this action. Given that Citigroup has never seen the plaintiffs' damages or proofs thereof, it is hard to imagine that Citigroup can conclude that the damages are remote or speculative.

Con Ed's quantum of damages sought suffers from none of the metaphysical problems of plaintiffs seen in the various cases cited by Citigroup. *See, Mehta v. N.Y. City Dep't of Consumer Affairs*, 162 A.D.2d 236, 556 N.Y.S.2d 601 (1st Dep't 1990) (anticipated lost profits for new business were incapable of calculation, and therefore unrecoverable); *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131 (1986) (new business seeking 20 years' lost profits under breached contract for management of domed stadium too speculative, and not contemplated in contract); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 121 N.E. 756 (1919) (Cardozo, J.) (lost profits due to breach of contract to supply first-run movies, as opposed to second-run movies, too speculative given wide variance in movie quality and random factors, and incapable of calculation); *Hochberg v. N.Y. City Off-Track Betting Corp.*, 74 Misc.2d 471, 343 N.Y.S.2d 651 (Sup. Ct., N.Y. County 1973) *aff'd* 43 A.D.2d 910, 352 N.Y.S.2d 423 (1st Dep't 1974) (plaintiff cannot collect winnings for horses on which he did not bet); *Apollo Steel Corp. v. Melco Cranes, Inc.*, 202 A.D.2d 1049, 609 N.Y.S.2d 121 (4th Dep't 1994) (increase in insurance premiums leading to increased costs, lost bids, and lost profits too speculative).

It is certainly premature – and also wishful thinking – for Citigroup, **having neither sought nor received any discovery concerning damages**, and offering no proof of the nature of the purported speculative damages in its motion, to make conclusions about the nature of the damages, and Citigroup has not discharged its burden of proof so as to represent **anything** to this Court about the damages incurred by Con Ed.

**POINT V.**

**ISSUES AS TO FORESEEABILITY AND AS TO INTERVENING CAUSE
ARE FOR A JURY, ESPECIALLY WHERE THE FACTS ARE IN DISPUTE;
THERE ARE CLEARLY FACTUAL QUESTIONS AT THIS JUNCTURE.**

Citigroup treads lightly, in its Brief, around and away from the seminal case of

*Derdiarian v. Felix Contracting Corp.*, 434 N.Y.S.2d 166 (1980). This case, relied upon by this

Court in *In Re September 11 Litigation*, *supra*, clearly establishes that:

> Given the unique nature of the inquiry in each case, **it is for the finder of fact to
> determine legal cause,** once the Court has been satisfied that a *prima facie* case has
> been established [citations omitted]. To carry the burden of proving a *prima facie*
> case, the plaintiff must generally show that the defendant's negligence was **a
> substantial cause** of the events which produced the injury. Plaintiff need not
> demonstrate that the precise manner in which the accident happened, or the extent of
> injuries, was foreseeable. (Emphasis added.)

*Derdiarian*, *supra*, 434 N.Y.S.2d at 169. Indeed, this Court held, relying on *Derdiarian*, that

> Large-scale fire was precisely the risk against which the WTC Defendants
> had a duty to guard and which they should have reasonably foreseen. I also
> decline at this stage to find that the acts of the terrorists qualify as
> "extraordinary" intervening cause.

*In Re September 11 Litigation*, *supra* at 302.

The idea that, ordinarily, questions of causation are left to a jury is hardly startling.

*See, Parsons v. Honeywell, Inc.*, 929 F.2d 901 (2nd Cir. 1991); *Del Cid v. Beloit Corp.*, 901 F. Supp.

539 (E.D.N.Y. 1995). What **is** startling, in this case, however, is defendant's effort to secure a

dismissal of the Complaint prior to any discovery being undertaken, where defendant has not

submitted of an iota of **evidence,** by an expert or otherwise, to establish that one cause or another,

besides the alleged negligence of the defendant in designing or permitting the fuel oil systems at the

subject premises, was an intervening cause of the plaintiffs' losses. On this "record", the movant,

which bears the burden of establishing its entitlement to relief, demonstrating "beyond doubt that

20

the plaintiff can prove no set of facts in support of his claim which would entitle him to relief",

*Padevan v. United States*, 82 F.3d 23 (2nd Cir. 1996), (quoting from *Hughes v. Rowe*, 449 U.S. 5, 10

(1980)), has produced **nothing** for the Court to demonstrate an entitlement to a dismissal.

Beyond the foregoing, and as set forth in the FEMA report, the NIST report, and the

report of Dr. Fred Mowrer attached to the Declaration of Stanley W. Kallmann, there has been

demonstrated (even though plaintiffs need "prove" nothing when the defendant has failed *prima*

*facie* to establish an entitlement to relief) a good likelihood that, had the quantity of highly

pressurized fuel oil which Citigroup allowed to be in the building, at the location of the structural

trusses not been present, the building, despite catching fire, and even despite the inactivity of the fire

fighters, would nonetheless have not have collapsed, given the propensity of a fire involving

"ordinary combustibles" to burn itself out.

Unfortunately, what defendant neglects to address is the total absence of discovery

in this case, and hence the disability which the plaintiffs have in establishment of proximate cause,

defendant's fault, and other elements of their claims. What is clear, however, from the Mowrer

report, is that defendant's alleged "intervening" causes may not have been so "intervening" at all,

and that the **sole** fault for this collapse, with its consequent destruction of plaintiffs' property, may

well be laid at the hands of Citigroup and its "world-class" professionals. Buildings catch fire all

the time, and fires frequently spread. What is unusual about this case, however, as set forth in the

Mowrer report, is that a building of Type I construction **collapsed** (on top of plaintiff Con Ed's

substation), unlike other modern steel frame structures, and it appears quite likely that the

pressurized recirculating fuel oil distribution systems installed and maintained by the defendant

Citigroup were at least a substantial factor in causing that collapse.

21

Indeed, as is noted in the Mowrer report as well, as to the supposedly unique event that the Fire Department chose not to combat this fire, skyscraper fires in Los Angeles in 1988 and Philadelphia in 1991 were also not fought due to prevailing conditions. The difference, of course, is that those fires burned themselves out and did not cause collapse of the buildings. This is consistent with the fact that buildings of Type I construction which catch fire are supposed to be designed to burn themselves out without structural collapse. This building, too, might not have collapsed had Citigroup exercised reasonable and obligatory foresight. Yet, without even a scintilla of scientific **evidence** for their assertions, defendant's counsel baldly asserts that this Court should find, **as a matter of law**, that the decision of the Fire Department not to combat the fires in 7WTC did, in fact, constitute an intervening act.

*The Lusitania*, 251 F. 715 (S.D.N.Y. 1918), relied upon by Citigroup, was a trial court decision apparently rendered after a jury trial. *The Lusitania*, further, was based upon the premise that an illegal third party act is automatically a superceding cause, always barring a plaintiff from recovery. This is no longer the law. *See, e.g., Bonsignore v. City of New York*, 683 F.2d 635 (2nd Cir. 1982), in which a jury's verdict premised upon a defendant's negligence in allowing a third party to shoot the plaintiff, was affirmed, notwithstanding assertions of intervening act. *See,* contra to *The Lusitania, Petition of the Kinsman Transit Co.*, 338 F.2d 708 (2nd Cir. 1964), *cert. denied* 380 U.S. 944 (1965). Same cannot be applicable to the case at hand where, at least based upon the preliminary Mowrer report, there is a good likelihood the building would not have collapsed in the first place without the defendant's negligence.

The 1962 decision of the Court of Appeals in *Rivera v. City of New York*, 227 N.Y.S.2d 676 (1962), while interesting, is diminished to virtual extinction by the fact that *Derdiarian v. Felix Contracting Corp., supra,* with its now-seminal discussion of intervening cause,

22

followed it by some eighteen years. Beyond the foregoing, it was premised on the Court's finding

that an unforeseeable intervening act had occurred. In the present case, of course, what occurred at

7WTC, was a fire, a very foreseeable event, and just that, even though the **cause** of the fire (*i.e.*, the

fire and ultimate collapse of the twin Towers) was unusual. Thus, Citigoup's effort to find legal

comfort in the unexpected nature of the terrorist attacks is entirely unavailing. As set forth in the

Mowrer report, the fire burned for hours, much longer than expected for a fire involving ordinary

end expected combustible contents of an office building, and likely due to the presence of

pressurized fuel oil. Fires of similar type have burned themselves out, despite the inability of a fire

department to secure access for the purpose of interdiction. The collapse of 7WTC was highly

unusual, and likely the result of the fuel oil. Especially seen in that light, the *Rivera* decision is

inapposite to the present case.

Similarly, Citigroup cannot find solace in other cases it cites. This case cannot be

dismissed on the basis that there are no allegations in the complaint of a breach of duty, as in *Harris*

*v. New York City Housing Auth.*, 187 A.D.2d 362, 589 N.Y.S.2d 883 (1st Dep't 1992) (claim against

building owner for negligent security dismissed, as no allegations of breach of duty in complaint),

or because Con Ed's injuries are of an entirely different character than might be foreseen as due to

risk of fire, as in *Martinez v. Lazaroff*, 48 N.Y.2d 819, 424 N.Y.S.2d 126 (1979) (landlord's failure

to supply hot water not proximately related to infant's burns caused by dropped pot of boiling water,

where water would not have been boiled had hot water been available in apartment).

The motion, at least at this juncture, it totally without basis. No case law supports

the extraordinary relief being sought by the defendant herein, especially on a "record" as vapid as

defendant has created here. It is the movant, not the claimant, which bears the burden of establishing

its entitlement to the relief sought, demonstrating "beyond doubt" that plaintiffs cannot establish any facts to support the relief sought, but this movant has not even facially made that effort.

## POINT VI.

### PLAINTIFFS' SUIT AGAINST CITIGROUP IS TIMELY.

In a case of negligent construction, the statute of limitations accrues, as to an owner or one otherwise **in privity** with a design or construction professional, at the time the project is completed and accepted and runs for 6 years under the breach of contract statute of limitations in CPLR 213 (McKinney 2004), because the genesis of the duty lies in contract. *Amedeo Hotels Ltd. Partnership v. Zwicker Elec. Co., Inc.*, 739 N.Y.S.2d 10 (1st Dep't 2002). In that case, an action alleging faulty workmanship against an electrical contractor by a successor owner, the expiration of the statute of limitations for breach of contract was determined to be six years from the date of completion.

The statute of limitations accrues, **as to a stranger to the contract**, i.e. one who neither contracts nor is a third-party beneficiary, under the negligence statute of limitation for property damage, CPLR 214(4), accrues on the date of the occurrence, here a collapse, and the injured party has three years thereafter to sue. Indeed, this is the holding in one of the cases cited by Citigroup, *Mark v. Eshkar*, 194 A.D.2d 356, 598 N.Y.S.2d 255 (1st Dep't 1993). There, the claim was that improper support of a party wall through the use of piers rather than a foundation, installed in 1984, caused structural cracks which manifested in 1989. The defendant engineer sought to dismiss the suit, claiming that it was time-barred under the three year negligence statute, arguing that the cause of action accrued when the piers were installed. The Court agreed that, as here, the appropriate statute was the three year negligence statute, but that, as to the adjacent property owner,

24

a stranger to the contract, the cause of action accrued when the structural cracks were apparent.
Generally, the Court held,

> in actions for negligent construction, the statute begins to run when the
> structure collapses, or when the damage from the negligent construction
> otherwise becomes apparent.

Other cases cited by Citigroup are fact-specific, and have no application here.  See,
*Alamio v. Town of Rockland*, 302 A.D.2d 842, 755 N.Y.S.2d 754 (3rd Dep't 2003) (plaintiff admitted
that property damage was apparent over three years before the negligence action was commenced);
*Mandel v. Tiffany*, 263 A.D.2d 827, 693 N.Y.S.2d 759 (3rd Dep't 1999) (damage to property was
"apparent" in 1984 when trees cut down, not in 1991 when landslide occurred).  Citigroup surely
cannot say that defects in its fuel distribution system were "apparent" to anyone on the street.

The cases cited by Citigroup truly stand for the proposition that any claim **Citigroup**
might have against the design and construction defendants for breach of contract accrued upon
completion and acceptance of the installation of the backup power fuel distribution system in 1990,
and expired in 1996.  It is clear that in this case, the cause of action accrued when 7WTC collapsed,
and that this suit was timely.

25

## POINT VII.

## CITIGROUP FAILS TO OFFER EVIDENCE AS TO WHICH DEFENDANTS ARE PURPORTEDLY IMPROPERLY NAMED, IF ANY

Citigroup again neglects the nearly silent record it has created, and with which it seeks to discharge its burden of proof as movant, with respect to the various parties it asserts should be dismissed from this action. Were, for example, Citigroup Global Market Holdings Inc. to undertake, prior to the time in which a reply brief is due, to identify which corporate entities were parties to or beneficiaries of contracts concerning the design and construction of the backup power and appurtenant fuel distribution system, and the chain of succession of interest, through sworn evidence and documents, or otherwise undertake to acknowledge or deny those facts pleaded in the complaint **upon information and belief**, plaintiffs will voluntarily dismiss claims against the unnecessary parties.

Citigroup's claim that it is unaware of why it has been named in this action is belied by its lengthy brief herein and numerous submissions in the related cases. Therefore, it cannot argue that it is unclear why relief against it is sought, as was the claim in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (employment discrimination complaint "easily satisfies" rule 8(a) because it gives fair notice to the respondent of the basis for the claims). Should Citigroup need a reminder, reference is made to the Statement of Facts herein. However, should amendment of the complaint be necessary, plaintiffs seek leave accordingly.

Accordingly, Citgroup's interpretation of certain cases concerning corporate liability is not disputed. However, Citigroup must discharge its burden of proof if it seeks dismissal. *See Gates v. AOL Time Warner Inc.*, 2003 WL 21375367 (N.Y. Sup. Ct. N.Y. County May 15, 2003) (AOL Time Warner established that its only relationship to AOL was ownership through "affidavits

26

and SEC filings" submitted in support of motion to dismiss, thereby discharging burden of proof).

*Garcia v. Union Carbide Corp.*, 176 A.D.2d 219, 574 N.Y.S.2d 341 (1st Dep't 1991) (piercing the

corporate veil requires "alter ego" not just complete ownership) has no bearing on the case at hand.

## **CONCLUSION**

Defendant's motion is without basis.  Plaintiffs submit that they should be permitted to

pursue their claims, and respectfully request that the motion be denied.

Dated:  January 26, 2005
New York, New York

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Plaintiffs

By: _____
Stanley W. Kallmann (SK5204)
Michael S. Leavy (ML6150)

27

# EXHIBIT
# G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

IN RE SEPTEMBER 11 PROPERTY DAMAGE AND
BUSINESS LOSS LITIGATION                                    :        21 MC 101 (AKH)

                                                           :
-------------------------------------------------------------- :x

AEGIS INSURANCE SERVICES, INC., et al.,                    :

                        Plaintiff,                         :

        -against-                                          :        04 CV 7272 (AKH)

                                                           :
7 WORLD TRADE CENTER COMPANY, L.P., et al.,                :

                        Defendants.                        :

-------------------------------------------------------------- x


-------------------------------------------------------------- :x

AEGIS INSURANCE SERVICES, INC., et al.,                    :

                        Plaintiffs,                        :

        -against-                                          :        04 CV 7188 (AKH)

                                                           :
PORT AUTHORITY OF NEW YORK AND NEW
JERSEY                                                     :

                        Defendant.                         :

-------------------------------------------------------------- x


## SUPPLEMENTAL SUBMISSION OF
## THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
## ON MOTION TO DISMISS OF DEFENDANT CITIGROUP

Robert H. Riley (RR2337)
Beth D. Jacob (BJ6415)
Schiff Hardin LLP
623 Fifth Avenue
New York, NY 10022
(212) 753-5000

Attorneys for The Port Authority of New York
and New Jersey

## TABLE OF CONTENTS

I.   Introduction ..................................................................................................1

II.  Background ...................................................................................................2

     A. Procedural History ................................................................................2

     B. Factual Background ...............................................................................3

III. Argument .....................................................................................................6

     A. Citigroup is Not a Third-Party Beneficiary to the Con Ed Lease; Salomon's Own Agreements With The Port Authority Rebut Citigroup's Argument That It Is Not Responsible For Injury Allegedly Caused By Its Construction In WTC7...................6

     B. WTC7 Tenants Are Not Third-Party Beneficiaries To The Con Ed Lease ................11

        1. Legal Standard For Establishing Third-Party Beneficiary Status....................11

        2. The Con Ed Lease Does Not Show An Intent To Benefit Future WTC7 Tenants...............................................................................11

IV.  Conclusion .................................................................................................17

# TABLE OF AUTHORITIES

## Cases

*Associated Teachers of Huntington, Inc. v. Bd. of Educ.,*
   33 N.Y.2d 229 (1973) ....................................................................................16

*Brown v. Racquet Club of Bricktown,*
   95 N.J. 280, 471 A.2d 25 (1984).....................................................................10

*Fiduccia v. Summit Hill Construction Co.,*
   109 N.J. Super. 249, 262 A.2d 920 (Essex County Ct. 1970) ..........................10

*Grant v. Coca-Cola Bottling Co. of New York, Inc.,*
   780 F. Supp. 246, (D.N.J. 1991) .....................................................................11

*Henneberry v. Sumitomo Corp. of Am.,*
   2005 WL 991772 (S.D.N.Y. April 27, 2005) ...................................................11

*Levine v. Smouha,* 2002 WL 1967931
   (N.Y. Sup. Ct., May 10, 2002)..........................................................................9

*Solutia, Inc., v. FMC Corp.,*
   2005 WL 711971 (S.D.N.Y. March 29, 2005) .................................................11

*Taunus Corp. v. City of New York,*
   279 F. Supp. 2d 305 (S.D.N.Y. 2003)................................................................9

*Washington v. Albany Hous. Auth.,*
   297 A.D.2d 426 (3d Dep't 2002) .......................................................................9

## Statutes and Other Authorities

Air Transportation Safety and System Stabilization Act of 2001,
   Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §40101) ......10

N.Y. Gen. Oblig. Law § 5-322.1 (McKinney 2005)......................................................6

Restatement (Second) of Contracts §308, cmt. a) (1981)............................................15

NY\ 5048495.1

**SUPPLEMENTAL SUBMISSION OF
THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
ON MOTION TO DISMISS OF DEFENDANT CITIGROUP**

## I.   INTRODUCTION

The Port Authority of New York and New Jersey submits this memorandum of law to clarify the interpretation of the agreements governing the relationships and liabilities among the parties to this litigation over the property damage caused by the collapse of 7 World Trade Center on September 11, 2001.

Citigroup Inc., a tenant in 7 World Trade Center ("WTC7"), has moved to dismiss the complaint against it brought by Consolidated Edison Company of New York, Inc. and its insurers.  The Port Authority does not take a position on Citigroup's motion.  However, in the course of its motion, Citigroup has posited that the Port Authority was liable to all tenants in WTC7 as well as to Con Ed for property damage arising from the conduct, including negligence, of any tenant in WTC7 in connection with the construction and maintenance of WTC7.  The Court has inquired whether Citigroup's propositions were accepted by the other parties, including the Port Authority.  They are not.

Citigroup misreads the lease agreement between Con Ed and the Port Authority, ignores the contracts between Citigroup and the Port Authority, and seeks to create new liabilities for the Port Authority.  It is the Port Authority which is protected by the contractual commitments of its tenants, including Citigroup, to indemnify it for damages arising from a tenant's construction or other work in the building, not the reverse.  Therefore, the Port Authority appreciates this opportunity to present additional facts and arguments to the Court for its consideration.

## II.    **BACKGROUND.**

On September 11, 2001, terrorist attacks caused the collapse of the two towers of the World Trade Center.  Set on fire by that collapse, WTC7), a neighboring office building, burned for hours and itself collapsed in late afternoon.  WTC7 was built and managed by 7 World Trade Company ("Silverstein") pursuant to a lease with The Port Authority of New York and New Jersey, owner of the land.  One of the original tenants in WTC7 was Salomon Inc., now Citigroup Beneath WTC7 was a Consolidated Edison substation, which was also destroyed on September 11, 2001.

### A.    **Procedural History**

Con Ed and its insurers have sued Citigroup, among others, for damages resulting from the destruction of its substation; Con Ed claims *inter alia* that the back-up generator system installed in WTC7 by Citigroup was a cause of the collapse of the building.  *See* Amended Complaint, Aegis Ins. Services, Inc., et al. v. 7 World Trade Center Co., et al., 04 CV 7272 (AKH) dated Feb. 7, 2005 at 22; *see also* Citigroup Mem.[1]  at 2, 8.  Citigroup has moved to dismiss the Con Ed complaint against it on the grounds that the Port Authority in various lease agreements assumed all liability for any damage to Con Ed.  Citigroup's motion woefully misreads or ignores the relevant contracts.

Con Ed and its insurers also have sued the Port Authority, in a separate complaint, for permitting Citigroup to install its back-up generator system, among other allegedly negligent acts.  To date, these complaints have not been consolidated.[2]  Although not a party to the action

---

[1] Citigroup Inc. And Citigroup Global Markets Holdings, Inc.'s Memorandum In Support Of Their Motion To Dismiss dated November 23, 2004.

[2] While the Con Ed complaint against Citigroup, docket no. 04 CV 7272, is part of the property damage master docket, 21 MC 101, the Con Ed complaint against the Port Authority, docket no. 02 CV 7188, is not part of any master docket.

underlying Citigroup's motion, the Port Authority respectfully submits this memorandum of law

with the permission of the Court. *See* Order of September 12, 2005 (attached as Exhibit A to the

Declaration of John E. Becker dated September 20, 2005 ("Becker Dec.")).

**B.    Factual Background**

The Port Authority and Con Ed entered into a lease agreement in 1968 which

permitted Con Ed to build the substation and permitted the Port Authority to utilize the air space

over the substation at a later date (the "Con Ed Lease," attached as Exhibit B to the Becker

Dec.). The Port Authority and Silverstein entered into an agreement dated December 31, 1980,

under which Silverstein would build an office building over the Con Ed substation. Silverstein

and Citigroup entered into a lease dated November 23, 1988, under which Citigroup leased

approximately half of the building and was responsible for the construction of offices and related

systems in that space. All three parties – Silverstein, Citigroup, and the Port Authority – entered

into a Three-Party Agreement, also dated November 23, 1988, which covered some of the

construction Citigroup planned to undertake (attached as Exhibit C to the Becker Dec). The

Three-Party Agreement not only included provisions that permitted the Port Authority to review

tenant construction plans, but also provided explicitly that Citigroup would be responsible for

injury or damages caused by its construction and would indemnify the Port Authority for any

resulting claims or damages. These three parties also entered into a Consent Agreement on the

same date in connection with these and other leases and contracts relating to WTC7 (attached as

Exhibit D to the Becker Dec.), which also explicitly provided that Citigroup would indemnify

and hold harmless the Port Authority for all claims arising from Citigroup's operation,

maintenance, use of or work in WTC7.

Citigroup has contended in its briefs and in argument before this Court that the Con Ed Lease establishes an "overall indemnification scheme" pursuant to which, "for the benefit of future tenants, [the Port Authority was] to bear responsibility for any damage that the structure [above the substation] might cause." Citigroup Reply Mem.[3] at 17; Citigroup Mem. at 16-17. Citigroup's argument does not accurately portray the Port Authority's obligations under the relevant provisions of the Con Ed Lease. The Con Ed Lease does not include any terms providing the sweeping assumption of liability that Citigroup asserts. There was no "overall indemnification scheme" for the benefit of future tenants and there was no intent to include future WTC7 tenants as third-party beneficiaries to the Con Ed Lease.

The intentions and understanding of the Port Authority and of Citigroup, the tenant here, are set forth in the Three-Party Agreement and the Consent Agreement signed by those two parties and the landlord, Silverstein. The relevant contracts with WTC7 tenants such as Citigroup demonstrate clearly that the "overall indemnification scheme" was to protect the Port Authority from liability for damages in connection with tenant construction at WTC7. Thus, among the requirements set forth in the leases are: requirements that tenants would obtain liability insurance policies naming the Port Authority; as a beneficiary; requirements that insurers on such policies waive subrogation (so that they could not bring claims against the Port Authority)[4]; requirements that any tenant performing construction in the building indemnify the Port Authority; and provisions that any tenant performing construction in the building remain responsible for compliance with all applicable codes, rules and regulations.

---

[3] Citigroup Inc. And Citigroup Global Markets Holdings, Inc.'s Reply Mem.randum In Further Support Of Their Motion To Dismiss The Amended Complaint dated February 23, 2005.

[4] *See* Memorandum of Law In Support of Motions by Defendant The Port Authority of New York and New Jersey to Dismiss Plaintiffs' Complaint dated April 30, 2004, at 20-22.

If there were any doubt as to the meaning of the Con Ed Lease, it is clarified by the explicit language of the lease agreement signed by Citigroup's predecessor Salomon. Citigroup's assertion that the Port Authority created an "overall indemnification scheme" which would benefit Citigroup by making it an indemnitor of any tenant (Citigroup Reply Mem. at 16-17) is a flat misstatement of the clear provisions of the leases to which Citigroup is a party, which instead require Citigroup to indemnify the Port Authority.  To the extent that Citigroup's motion to dismiss is predicated on an argument involving the respective liabilities of Citigroup and the Port Authority, the place to look for a definition of those liabilities is in the agreements between those two parties.  There is no need to guess at the Port Authority's intentions by manufacturing a third-party beneficiary theory from the earlier lease between the Port Authority and Con Ed.

In any event, it is premature at this stage of the proceedings for this Court to make a finding concerning the Port Authority's liability vis-à-vis one of its tenants with respect to injury caused by that tenant's construction or alterations in the building, especially in the context of a motion in a complaint to which the Port Authority is not a party.  *See* Summary Order of December 1, 2004 (02 CV 7328 and 02 CV 7188).  Additional evidence adduced during the course of future discovery will address the allocation of liability (if any), indemnification and responsibility among the parties to the various leases and agreements concerning WTC7.[5]

---

[5] The Port Authority continues to maintain that it has no liability for the property damage in and collapse of WTC7 on September 11, 2001, and that ultimately the claims against it will be dismissed on a number of grounds, including superceding/intervening cause, both as a matter of law and as a matter of fact.

### III.    ARGUMENT

**A.    Citigroup is Not a Third-Party Beneficiary to the Con Ed Lease; Salomon's Own Agreements With The Port Authority Rebut Citigroup's Argument That It Is Not Responsible For Injury Allegedly Caused By Its Construction In WTC7.**

Citigroup's assertions to the effect that the Port Authority's procedures for review and approval of tenant construction support a finding that the WTC7 tenants are afforded third-party beneficiary rights in the Con Ed Lease, or independently created an "overall indemnification scheme" for the benefit of the WTC7 tenants, is contradicted by the express terms of Citigroup's own agreements with the Port Authority.

Attached as Exhibit E to the Three-Party Agreement is the Port Authority's standard form Tenant Construction or Alteration Application ("TAA"). All tenants of WTC7 were required to sign the TAA before construction, and this requirement was incorporated into the Three-Party Agreement. Exh. C to Becker Dec. at §7. Paragraph 5 of the TAA, as modified by Rider F, provides that Citigroup will indemnify the Port Authority against any injuries to itself or claims of third parties (such as Con Ed) arising from Citigroup's construction or improvements in WTC7, even if resulting from acts or omissions of the Port Authority:

> *The Applicant [i.e., Citigroup] shall indemnify and hold harmless the Port Authority*, its Commissioners, officers, agents and employees against and from (a) any and all claims of injuries (including wrongful death) or damage, to it or them or to its or their property, arising out of or in connection with the performance of the work, and (b) claims and demands by third persons, arising or alleged to arise out of the performance of the work, *whether such risks arise out of acts or omissions of the Applicant, its contractors, or out of acts or omissions* (to the extent the same do not constitute gross negligence or wilful misconduct) *of the Port Authority*, except where indemnity would be precluded by New York State General Obligations Law.[6]

---

[6] The extent to which the TAA's reference to New York General Obligations Law could preclude Citigroup's indemnification of the Port Authority under the TAA because of its own negligence is not currently at issue. *See* N.Y. Gen. Oblig. Law § 5-322.1 (McKinney 2005). The

Exh. C to Becker Dec. at Rider F to Exhibit E and at §7.5 (emphasis added).

Rider B to the TAA provided that Citigroup rather than its contractors would indemnify the Port Authority against any injuries to itself or claims of third parties, using language almost identical to that in Rider F.[7]

In the Consent Agreement, Citigroup even more clearly agreed to Indemnify the Port Authority for "any and all claims" arising from its occupation of the building, work done in the building or its negligent acts or omissions:[8]

> Salomon shall indemnify and hold harmless the Port Authority and its agents against and *from (a) any and all claims (i) arising from (A) the operation, maintenance or management by Salomon of the Demised Premises, or (B) any work or thing whatsoever done, or any condition created* in or about the Demised Premises during the Term by Salomon, its contractors, licensees, agents, servants, employees, subtenants, invitees or visitors, *or (ii) arising from any negligent or otherwise wrongful act or omission of Salomon* or any of its subtenants or licensees or its or their employees, agents, visitors, invitees or contractors or subcontractors of

---

relevance of the TAA to the instant discussion is that it counters Citigroup's assertion that the Port Authority's review and approval procedures resulted in an overall indemnification scheme pursuant to which the Port Authority indemnified Citigroup. As discussed, this assertion is directly contradicted by the terms of the contracts into which Citigroup's predecessor entered.

[7] "*The Applicant [i.e., Citigroup] shall indemnify and hold harmless the Port Authority,* its commissioners, officers, agents and employees, against and from (a) injuries (including wrongful death) or damage, to it or them or to its or their property, arising out of or in connection with the performance of the work, and (b) claims and demands by third persons, arising or alleged to arise out of the performance of the work, whether such risks arise out of acts or omissions of the Contractor or the owner or their Contractors or out of acts or omissions (to the extent the same do not constitute gross negligence or wilful misconduct) of the Port Authority." The second paragraph provides that "if so directed," Citigroup would "at its own expense defend any suit based upon any such claim or demand." Exh. C to Becker Dec. at Rider B to Exhibit E (as modified by §7.3 of the Three-Party Agreement).

[8] The Three-Party Agreement also provides that the indemnification clauses of the TAA shall not excuse Silverstein from its comprehensive indemnification of the Port Authority pursuant to the Agreement of Lease dated December 31, 1980, and that the TAA would be supplementary to other indemnification commitments of Citigroup pursuant to the Consent Agreement among the same parties.

any tier, and (b) all reasonable costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon. In case any action or proceeding shall be brought against the Port Authority by reason of any such claim, Salomon, upon notice from the Port Authority, shall defend such action or proceeding.

The Three-Party Agreement also provides for the Port Authority's right of review and approval (or failure to disapprove) of the construction plans and specifications. The existence of the Port Authority's right of review, however, clearly was not considered by Citigroup or the Port Authority to suggest that the Port Authority thereby was implicitly agreeing to indemnify Citigroup from third-party claims. To the contrary, the same agreement specifies both that the Port Authority would review the construction plans for compliance with its own standards, and that Citigroup would indemnify the Port Authority for "claims and demands by third persons" arising from that construction. Exh. C to Becker Dec. at §§5 and 7.

Citigroup argues that the Port Authority's right of review of construction plans and its requirement that construction in WTC7 comply with its standards and regulations, indicates that the Port Authority was assuming liability for any damages to third parties arising from the construction. This argument ignores the unambiguous provisions of the contract into which Citigroup entered and which defines the relative responsibilities of the Port Authority and Citigroup. Citigroup's claimed scheme in which the Port Authority indemnifies the WTC7 tenants cannot rationally be inferred from the existence of a review and approval process that, to the contrary, explicitly requires the tenant to indemnify the Port Authority.

Citigroup's second contention is based on the Port Authority's authority to establish its own codes and standards and its issuance of a Permit to Occupy. Citigroup argues that it is insulated from liability because an attack on its approved construction is tantamount to an attack on the Port Authority's sovereignty and that the Port Authority's review gave it control over the construction which necessarily implied an assumption of liability. Citigroup Mem. at

8

20-22. These arguments are contradicted not only by the contracts but also by the applicable case law.

First, under the contracts, the Port Authority's issuance of a Permit to Occupy was at least partially based upon Citigroup's representations of compliance with the Port Authority and local governmental standards. *See* Exh. C to Becker Dec. at §5.9. The TAA expressly provides that the tenant will continue to be responsible for compliance with all applicable building codes, rules and regulations, regardless of issuance by the Port Authority of certificates of completion (or permits to occupy). Exh. C to Becker Dec. at §12.

Second, the cases are clear that a certificate of occupancy in New York cannot be relied upon to absolve a party of liability for allegedly negligent construction. In *Levine v. Smouha*, 2002 WL 1967931 (N.Y. Sup. Ct., May 10, 2002), defendant argued that the issuance of a certificate of occupancy established as a matter of law that the construction on their property complied with all legal requirements. The Court rejected this argument and held that the issuance of a certificate of occupancy for a building did not preclude a finding that building code violations existed. *Id.* at *2; *Washington v. Albany Hous. Auth.*, 297 A.D.2d 426, 427 (3d Dep't 2002) (holding that a "claim of compliance with the fire and building codes is not dispositive of plaintiffs' allegations based on common-law negligence principles).

Similarly, as these cases indicate, a municipality does not become a guarantor or indemnitor because it enacts and enforces building codes. *See Taunus Corp. v. City of New York*, 279 F. Supp. 2d 305, 311 (S.D.N.Y. 2003) (dismissing claims of negligent inspection and control against the City, noting that plaintiffs cannot recover against municipalities for alleged negligent inspection absent a special duty of care owed to them) (citing *O'Connor v. City of New York*, 58 N.Y.2d 184, 189 (1983)). As Citigroup concedes, the Port Authority was acting in a

9

governmental capacity when it issued the permit to occupy to Citigroup.  It therefore cannot be held to be an indemnitor of Citigroup from either the issuance of the permit to occupy or the setting of building codes and standards.

Citigroup has pointed to no authority that supports its argument that the Port Authority's Permit to Occupy exceeds the legal effect of a certificate of occupancy under New York law.  Rather it merely asserts that the cases cited above should not be followed by a federal court.  New York law, however, governs here.[9]  In any event, there is no conflict between New York and New Jersey law, so Citigroup's argument that one state's law cannot preempt the other is irrelevant.  Citigroup Mem. at 25.  *See also Brown v. Racquet Club of Bricktown*, 95 N.J. 280, 471 A.2d 25 (1984) (affirming finding of negligence despite issuance of a certificate of occupancy eleven months prior to accident); *Fiduccia v. Summit Hill Construction Co.*, 109 N.J. Super. 249, 262 A.2d 920 (Essex County Ct. 1970) (in action for negligence against both builder and municipality, dismissing claims against municipality on grounds of immunity).  The issuance by the Port Authority of a qualified statement of habitability based in part on contractually required attestations of substantial completion and compliance from the tenant, should not be afforded greater legal effect than a certificate of occupancy under New York law in order to indemnify a tenant from liability arising from its own conduct.

---

[9] The Air Transportation Safety and System Stabilization Act of 2001, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §40101), passed in the aftermath of the September 11 attacks, provides that those who bring suit for damages arising out of the hijacking and subsequent crashes must bring suit in the United States District Court for the Southern District of New York. 49 U.S.C. §40101, sub§ 408(b)(3)  The Act further provides that the governing law shall "be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." 49 U.S.C. §40101, sub §408(b)(2).

**B.**    **WTC7 Tenants Are Not Third-Party Beneficiaries To The Con Ed Lease.**

1.    Legal Standard For Establishing Third-Party Beneficiary Status

"A party claiming to be an intended third-party beneficiary bears the burden of demonstrating its right to enforcement." *Solutia, Inc., v. FMC Corp.*, 2005 WL 711971, *10 (S.D.N.Y. March 29, 2005). As Citigroup has indicated, it is well settled law that "[a] party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit, and (3) that the benefit to him is sufficiently immediate rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." Citigroup Mem. at 16 (quoting *State of Cal. Public Employees' Ret. Sys. v. Shearman & Sterling*, 95 N.Y. 2d 427, 435 (2000)). The intent to benefit the third-party is the central factor in determining the existence of third-party beneficiary status. *Henneberry v. Sumitomo Corp. of Am.*, 2005 WL 991772, *12 (S.D.N.Y. April 27, 2005) (third-party beneficiary status is established "only if the parties to that contract intended to confer a benefit on him when contracting," and "[such] intent to benefit a third party must be shown on the face of the agreement") (internal quotations omitted); *see also Grant v. Coca-Cola Bottling Co. of New York, Inc.*, 780 F. Supp. 246, 249 (D.N.J. 1991) (explaining that "the intention of the parties to recognize a right of performance in the third party is the critical factor that governs the characterization of the beneficiary").

2.    The Con Ed Lease Does Not Show An Intent To Benefit Future WTC7 Tenants

There is nothing in the language of the Con Ed Lease that supports Citigroup's argument that it should be considered a third-party beneficiary of any restriction on Con Ed's right to bring a claim for damages. Section 8 of the Con Ed lease involves the construction of the building that became WTC7. It states that the Port Authority has the right to use the space

11

above the substation at its discretion, including but not restricted to construction of a building above the substation. It then commits that this additional construction will not unreasonably interfere with Con Ed's use of the substation, and limits Con Ed's claims against the Port Authority from the additional construction:

> Section 8(a) states:
>
> The Lessee [Con Ed] recognizes that the Port Authority may construct wholly or partially on, above or about the Substation building additional stories, structures, buildings or improvements of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting [of the Substation to Con Ed] determine.

Exh. B to Becker Dec. at §8(a).

There is nothing in the language of this section that contemplates any rights of any other actor, such as potential tenants 20 years later.

After permitting the Port Authority to use the structure of the substation in this construction, Section 8(a) continues that "The Port Authority agrees that no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee [Con Ed]." The section concludes with permission for the Port Authority to enter into the substation with reasonable notice, in the course of the additional construction. Exh. B to Becker Dec. at §8.

Section 8(b) similarly involves only the relationship between Con Ed and the Port Authority, in the context of the additional construction. That section states, in its entirety:

> The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be construed to be an eviction of the Lessee nor be made the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise.

Exh. B to Becker Dec. at §8(b).

There is no suggestion in this language that either the Port Authority or Con Ed was considering the rights or liabilities of third parties, and certainly not of any prospective tenants who might undertake construction and alterations of their own. To the extent that this section involves more than just the immediate effects of the additional construction above the substation described in Section 8(a), it clearly goes no further than to define the claims which Con Ed could bring against the Port Authority.

Section 16 of the Con Ed Lease does not contradict Section 8(b). Under the Con Ed Lease, Con Ed is required to maintain and repair the substation. Exh. B to Becker Dec. at §15. Section 16 clarifies that Con Ed is not, however, required to maintain or repair buildings erected by others (such as the additional construction under Section 8). Section 16 also provides that the Port Authority will reimburse Con Ed for its costs in rebuilding or repairing damage to the substation caused by the acts or omissions of the Port Authority. That Section states in part:

> The Port Authority shall reimburse the Lessee [Con Ed] for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason or damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintainence of the stories, structures, buildings or improvements described in Section 8 hereof . . . .

Exh. B to Becker Dec. at §16.

Citigroup attempts to establish the intent required to establish third-party beneficiary status in the Con Ed Lease by arguing that the only possible interpretation capable of reconciling Sections 8(b) and 16 is one that assigns third-party beneficiary status to the potential future tenants of WTC7. Citigroup Mem. at 15-17. Section 16 of the lease provides that the Port Authority must reimburse Con Ed for the costs of repair and rebuilding in connection with

13

construction or maintenance of the building permitted by Section 8(a). Section 8(b) precludes Con Ed from grounding a claim for damages against the Port Authority in the exercise of its rights set forth in Section 8(a). Citigroup concludes that in order to reconcile these provisions "the only possible interpretation of the section 8 limit on Con Ed's ability to bring lawsuits in conjunction with an express remedy against the Port Authority [in Section16], is that the bar to lawsuits is one that protects third parties, such as the future tenants of the future building that the Lease envisions." Citigroup Mem. at 15.

Citigroup's reasoning is flawed. Sections 8(b) and 16 can be easily reconciled without resort to Citigroup's strained and speculative theory of third-party beneficiary status in potential future tenants of a building that may never have come to exist. Section 8(b) of the Lease provides that any improvements that may be constructed over the substation may not be made the grounds of a claim by Con Ed for "damages." Section 16 of the Con Ed Lease provides that, despite Con Ed's obligation under Section 15 to repair and rebuild the substation, the Port Authority shall "reimburse" Con Ed for any such expenses caused by the Port Authority's acts or omissions in connection with the construction or maintenance of the building permitted by Section 8. There is nothing inconsistent with precluding damages while permitting reimbursement, where the latter is simply a repayment of the cost of repair and/or rebuilding and is thus more limited in scope than damages.[10]

A restriction in Section 8(b) on Con Ed's right to claim against the Port Authority for consequential damages, such as business interruption, does not contradict the Section 16

---

[10] Another more restrictive reading of these sections is that they apply only to the active construction of the building, and not to events decades later. Given two plausible interpretations of the lease, further discovery is needed to determine which was intended by the parties. In any event, the Court need not reach this question. Neither reading of Sections 8 and 16 looks beyond the rights and responsibilities of the contracting parties; under neither reading is there any third-party beneficiary contemplated.

obligation to reimburse Con Ed for the cost of rebuilding. In addition, Section 16 is limited to acts or omissions of the Port Authority. Citigroup's interpretation would transmute a contract which protects the Port Authority from everything except responsibility for the cost of rebuilding required by its own conduct, into one which expands the Port Authority's liability to any and all damages, regardless of cause or by whom suffered. There is nothing except Citigroup's speculative misinterpretation that can support this extreme result.

The Con Ed Lease not only fails to identify future WTC7 tenants as third-party beneficiaries, but also does not establish even that the Port Authority's right to utilize the air space above the substation would take the form of a commercial building (if exercised at all). This is additional evidence that there was no intent to create a right of performance in the WTC7 tenants under the Con Ed Lease. *See* Restatement (Second) of Contracts § 308, cmt. (a) (1981) ("The fact that a beneficiary cannot be identified when the contract is made may have a bearing on the question whether the promisee intended to . . . confer on him a right to the promised performance, and thus may determine whether he is an intended beneficiary").

Although Section 8(a) of the Con Ed Lease does in fact mention the right of the Port Authority to utilize the air space above the substation, including *inter alia* the possibility of constructing a building, it falls far short of including "an express acknowledgement that there would be a commercial structure that would likely have tenants and subtenants" as Citigroup asserts. Citigroup Mem. at 14. Rather, the actual language of Section 8(a) does not refer to future tenants, and even the existence and purpose of any future utilization of such air space is presented as a right of the Port Authority that it may exercise or refrain from exercising at its discretion. Exh. B to Becker Dec. at §8(a) ("the Port Authority *may* construct wholly or partially on, above or about the Substation Building *additional stories, structures, buildings or*

*improvements of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine.*") (emphasis added).

*Associated Teachers of Huntington, Inc. v. Bd. of Educ.*, 33 N.Y.2d 229 (1973), cited by Citigroup for the proposition that it is not necessary that third-party beneficiaries "be identified or identifiable" at the time of contract, is instructive in this regard. Citigroup Mem. at 15. In that case, the Associated Teachers of Huntington, Inc. (the "Association") entered into a collective bargaining agreement that created "contractual rights to sabbaticals for association members." *Id.* at 233. Clearly, provisions aimed at individual members of an association under a collective bargaining agreement are intended to establish rights in individual members. Thus, the court in *Associated Teachers* merely held that, where a contract provision is clearly intended on its face to establish a right of performance in a class of third parties, it is not necessary for the individual members of that class to be identifiable at contract. *Id.* at 233-34.

Here, there is no indication on the face of the lease of any intent that potential future tenants should be afforded a right of performance in the any of the lease's provisions. No association of future WTC7 tenants was a party to the lease. There is no indication on the face of the Con Ed Lease of any intent to provide a right of performance in future WTC7 tenants. It was not clearly determined at contract that the Port Authority's utilization of the air space above the substation would result in a building of any kind. Our facts are so far removed from the facts of *Associated Teachers* that a finding of third-party beneficiary rights in the instant case would require a wholesale expansion of this area of law. Any assertion of third-party beneficiary rights grounded in a party's status as a WTC7 tenant therefore must fail.

IV.    **CONCLUSION**

    Citigroup's argument that it is the beneficiary of an indemnification scheme implicit in the Con Ed Lease, under which the Port Authority agreed to accept liability and indemnify hypothetical future tenants against injury caused Con Ed by those tenants' construction, is deeply flawed.  The Con Ed Lease does not support this imaginative reading.  And, significantly, Citigroup's argument ignores the agreements it signed with the Port Authority under which Citigroup explicitly agreed to indemnify the Port Authority for harm caused by Citigroup's construction in WTC7.  The Port Authority respectfully submits that Citigroup's theories asserting third-party beneficiary status and an overall indemnification scheme under which the Port Authority stands as indemnitor for the benefit of Citigroup as a WTC7 tenant should not be credited by this Court

Dated:  September 20, 2005

        Respectfully submitted,

        Robert H. Riley (RR2337)
        Beth D. Jacob (BJ6415)
        Steven M. Bocknek (SB5935)
        John E. Becker (JB1093)
        Rebecca Griffith (RG7884)

        SCHIFF HARDIN LLP
        623 Fifth Avenue
        New York, NY 10005
        212-753-5000

        Attorneys for The Port Authority of New York and
        New Jersey

# EXHIBIT
# G.1

# COMPENDIUM

# OF

# UNREPORTED CASES

Westlaw.

2005 WL 711971                                                          Page 1
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
SOLUTIA INC., Plaintiff,
v.
FMC CORPORATION, Defendant.
**No. 04 Civ. 2842(WHP).**

March 29, 2005.

**Background:** Shareholder, which participated joint venture for production of purified phosphoric acid, brought action against its co-joint venturer based on its alleged failure to disclose the true capability of its technology, which was necessary to the profitability of a corporation formed pursuant to joint venture agreement. Co-joint venturer moved to dismiss the complaint.

**Holdings:** The District Court, Pauley, J., held that:
(1) shareholder lacked standing to assert each of its breach of contract claims with the exception of its claim that co-joint venturer breached section agreement by failing to disclose material information concerning its technology;
(2) shareholder lacked **third-party beneficiary** status, and thus lacked standing to sue on its own behalf for co-joint venturer's alleged breaches of the assignment and transfer agreements;
(3) accounting was not required prior to adjudication of shareholder's claims against co-joint venturer for failure to fully disclose the problems with the technology which co-joint venturer promised to contribute; and
(4) shareholder's breach of contract claim against co-joint venturer based on allegations that it was fraudulently induced to enter joint venture agreement because co-joint venturer had misrepresented its then-present technological capability and concealed material information did not preclude shareholder's fraud and negligent misrepresentation claims based on those same misrepresentations and omissions.
Motion granted in part and denied in part.

**[1] Limited Liability Companies** 🗝0

241Ek0 k.
New York corporate law applies in full force to limited liability companies.

**[2] Corporations** 🗝0
101k0 k.
Under New York law, an individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a deprecation or destruction of the value of his corporate stock; rule applies equally to closely held corporations as to large, publicly traded corporations.

**[3] Corporations** 🗝0
101k0 k.
Under New York law, a shareholder always has standing to sue for harm to the corporation, as long as the suit is brought derivatively, with any recovery going to the corporation. McKinney's Business Corporation Law § 626(a).

**[4] Corporations** 🗝0
101k0 k.
Under New York law, where shareholder's injury is direct, fact that corporation may also have been injured and could assert its own claims does not preclude shareholder from asserting its claim directly; such a direct injury occurs if the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged.

**[5] Corporations** 🗝0
101k0 k.
Under New York law, where a defendant breaches an independent duty to a shareholder that also harms the corporation, the conduct constitutes a wrong against the shareholder for which it can recover individually, even if the harm is only to the value of its investment.

**[6] Corporations** 🗝0
101k0 k.
Under New York law, a 50% shareholder in company formed pursuant to joint venture agreement had standing to sue on its own behalf on contract claim against co-joint venturer based on allegations that it was fraudulently induced to become a shareholder in the first place due to co-joint venturer's failure to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 711971                                                                                    Page 2
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

disclose the true capability of its technology, which was necessary to the profitability of the venture; shareholder's injury was distinct from and independent of the newly created corporate entity, and co-joint venturer owed a duty to shareholder to disclose facts not readily available to it.

**[7] Joint Adventures** 🔑0
224k0 k.
Any pre-incorporation duty which co-joint venturer owed to shareholder to contribute the requisite technology merged with co-joint venturer's duty to venture's subsequently formed corporation and was not extrinsic to the corporation; thus, shareholder lacked standing to sue co-joint venturer on its own behalf for breach of co-joint venturer's agreement to contribute the requisite technology to corporation formed pursuant to joint venture agreement.

**[8] Joint Adventures** 🔑0
224k0 k.
Co-joint venturer's duty to shareholder to fully disclose to shareholder the capabilities of the technology which co-joint venturer was contributing to corporation to be formed pursuant joint venture agreement to did not merge into the obligations it forged with new corporate entity, but rather, survived the incorporation of the joint venture and was at all times extrinsic to the corporate entity; as such, co-joint venturer's duty to shareholder remained independent of corporation, and shareholder had standing to enforce it.

**[9] Contracts** 🔑0
95k0 k.
Under New York law, promisor in a contract owes a **third-party beneficiary** a duty independent of its duty to the promisee, even if there is no separate performance to the **third-party beneficiary**.

**[10] Contracts** 🔑0
95k0 k.
Under New York law, an intended **third-party beneficiary** has standing to enforce an agreement entered into between others.

**[11] Contracts** 🔑0
95k0 k.
Under New York law, a third party seeking to recover on a contract bears the burden of establishing that a binding contract exists between other parties, that the contract was **intended** for **his benefit**, and that the benefit to him was direct rather than incidental.

**[12] Contracts** 🔑0
95k0 k.
With respect to **third-party beneficiary** status under New York law, a benefit is intended rather than incidental if it is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate the third party if the benefit is lost.

**[13] Contracts** 🔑0
95k0 k.
Although assignment and transfer agreements between co-joint venturer and corporation formed pursuant joint venture agreement intended to invest 50% shareholder, which was party to joint venture agreement, with **third-party beneficiary** status under New York law, shareholder lacked standing to sue on its own behalf for co-joint venturer's alleged breaches of the assignment and transfer agreements since those agreements did not provide for any performance to be made directly to shareholder.

**[14] Contracts** 🔑0
95k0 k.
Mere intent to confer third-party rights is insufficient to give rise to **third-party beneficiary** status under New York law; there must be a benefit that is explicit and direct.

**[15] Contracts** 🔑0
95k0 k.
Under New York law, a benefit received through corporate ownership is insufficient to establish rights as a **third-party beneficiary**.

**[16] Joint Adventures** 🔑0
224k0 k.
New York's law governing partnerships is generally extended to joint ventures.

**[17] Partnership** 🔑0
289k0 k.
Under New York law, an individual partner may vindicate a specific wrong perpetrated against him when the wrong alleged involves a partnership transaction but can be determined without an examination of the partnership accounts.

**[18] Joint Adventures** 🔑0
224k0 k.
Accounting was not required prior to adjudication of 50% shareholder's claims against co-joint venturer for failure to fully disclose the problems with the technology which co-joint venturer promised to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 711971                                                                                    Page 3
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

contribute to the venture; if co-joint venturer was found liable, court would only need to determine the book value of shareholder's interest as of the first day of the joint venture because shareholder claimed that it was wrongly induced to enter into joint venture.

**[19] Joint Adventures** ⌛0
224k0 k.
Shareholder's claims against co-joint venturer for fraud and negligent misrepresentation, which were based on representations extraneous to joint venture agreement were not precluded under New York law by agreement's merger clause; shareholder adequately pled reliance on the representations, and joint venturers had a "special relationship" requisite to give rise to a legal duty separate from the duty to perform under the agreement.

**[20] Fraud** ⌛0
184k0 k.
Under New York law, a party to a fully integrated contract can assert a claim of fraud, unless the contract specifically disclaims reliance on the representations at issue.

**[21] Fraud** ⌛0
184k0 k.
Where the alleged misrepresentations supporting a claim of fraud arise from facts within the peculiar knowledge of a party, even a specific disclaimer as to reliance on those representations does not bar a fraud claim under New York law.

**[22] Fraud** ⌛0
184k0 k.
Generally, under New York law, a separate cause of action seeking damages in fraud cannot stand when the only fraud alleged relates to a breach of contract; to maintain a claim for fraud in such a situation, a plaintiff must either: (1) demonstrate a legal duty separate from the duty to perform under the contract, or (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

**[23] Fraud** ⌛0
184k0 k.
Under New York law, a misrepresentation concerning present facts states an independent claim of fraud, even when parties' contract expressly warrants the accuracy of the defendant's representations.

**[24] Fraud** ⌛0
184k0 k.
Under New York law, a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim.

**[25] Fraud** ⌛0
184k0 k.
Under New York law, 50% shareholder's breach of contract claim against co-joint venturer based on allegations that it was fraudulently induced to enter joint venture agreement because co-joint venturer had misrepresented its then-present technological capability and concealed material information did not preclude shareholder's fraud and negligent misrepresentation claims based on those same misrepresentations and omissions.

Barbara B. Edelman, Mindy Barfield, Dinsmore & Shohl LLP, Lexington, KY, for plaintiff.

Ann B. Laupheimer, Jeremy A. Rist, Blank Rome LLP, Philadelphia, PA, for defendant.

Craig A. Damast, Rocco A. Cavaliere, Blank Rome LLP, New York, NY, for defendant.

*MEMORANDUM AND ORDER*

PAULEY, J.

*1 Solutia Inc. ("Solutia") brings this diversity action against FMC Corporation ("FMC"), alleging that shortcomings in FMC's technology undermined the parties' joint venture for production of purified phosphoric acid ("PPA"). Solutia contends that FMC knew of these deficiencies prior to the formation of the joint venture but did not disclose them. FMC moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, FMC's motion to dismiss is granted in part and denied in part.

*BACKGROUND*

Solutia and FMC are publicly traded companies that produce chemicals for industrial and consumer use. (Complaint ("Compl.") ¶ 6.) Prior to their joint venture, both companies produced PPA, which is an ingredient in many foodstuffs and also has myriad agricultural and industrial applications. (Compl.¶ 7.) While Solutia produced PPA using the traditional "thermal processed" method, FMC developed a less expensive and more efficient "wet processed" method through its Spanish subsidiary, FMC Foret. (Compl.¶

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 711971                                                                                    Page 4
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

¶ 7, 21.)

In 1998, the parties discussed the formation of a joint venture that would combine each party's phosphorous chemicals business and mass produce wet processed PPA, among other chemicals. (Compl. ¶ 8 .) Solutia alleges that throughout these discussions, "FMC claimed to have the proprietary technology and know-how necessary to permit the large scale production of wet processed PPA at a substantively competitive cost." (Compl. ¶ 9; see Compl. ¶ 22.)

On April 29, 1999, the parties entered into a Joint Venture Agreement (the "JVA"). (Compl.¶ 10.) The JVA required each party to contribute certain intellectual property and tangible assets to the joint venture. (Compl. Ex. A ("JVA") Art. 6.) For example, Solutia was to supply its research and production facilities. (JVA § 6.2.) The JVA required FMC to grant the joint venture a license to use its wet processed technology for use at a facility to be constructed in Conda, Idaho (the "Conda Facility"). (Compl. ¶ ¶ 16; JVA § 6.4.) FMC was also obligated to deliver "all necessary technology, know-how, intellectual property, and engineering drawings so that the Joint Venture can fund and construct at ... [the Conda Facility] a new plant using the PPA technology that is capable of producing up to 80,000 metric tons of food grade wet processed [PPA]" annually. (JVA § 6.4; see Compl. ¶ 16.) FMC warranted that "it ha[d] disclosed to [Solutia] all material facts and circumstances ... which could reasonably be likely to, in [FMC]'s commercially reasonable judgment, have a material adverse effect on" the joint venture. (JVA § 16.1(v).) After the Federal Trade Commission approved the joint venture, the parties formed Astaris, LLC ("Astaris") on April 1, 2000. (Compl.¶ 14.) Solutia and FMC each have a fifty-percent interest in Astaris and share equally in its profits and losses. (Compl. ¶ 14; JVA § § 5.1-5.2.)

**\*2** Both parties understood that the profitability of the venture hinged on utilizing FMC's wet processed technology to mass produce PPA. (Compl.¶ 17.) Solutia relied on FMC's representations concerning the viability of wet processing in deciding to contribute its $225 million phosphorous chemicals business to Astaris. (Compl. ¶ 23.) Solutia claims that after the execution of the JVA and up to April 1, 2000, FMC continued to represent that its PPA technology had been successfully utilized by FMC Foret and that the technology could be implemented at the Conda Facility on a much larger scale at a competitive cost. (Compl.¶ ¶ 20-21.)

The parties executed several additional contracts to effect the JVA. Two are relevant to this action. (Compl.¶ 18.) The first, the Asset Transfer Agreement (the "Transfer Agreement"), was entered into by FMC, Astaris and several of their subsidiaries on April 1, 2000. (Compl. Ex. C ("ATA") at 34.) In the Transfer Agreement, FMC represented to its knowledge that the PPA technology was capable of producing "up to 80,000 metric tons of food grade wet processed [PPA]" annually. (ATA § 3.14(c); Compl. ¶ 18.) The second contract, labeled an Assignment of PPA Technology Agreement (the "Assignment Agreement"), was also executed by FMC and an Astaris subsidiary on April 1, 2000. (Compl. Ex. D ("APTA") at 9.) In the Assignment Agreement, FMC covenanted that it would deliver to Astaris all the technology necessary to produce 80,000 metric tons of food grade PPA. (APTA § 6.2(a).) Each agreement expressly names Solutia as a **third-party beneficiary**. (APTA § 8.7; ATA § 6.5; Compl. ¶ 19.)

Solutia alleges that the Conda Facility performed well below expectations and produced only less valuable grades of phosphoric acid suitable for agricultural and industrial use. (Compl.¶ 26.) According to the Complaint, FMC's technology "failed to produce any quantity of food-grade, wet processed PPA ... result [ing] in the Conda Plant's complete inability to operate at a profitable margin." (Compl.¶ 25.) The phosphate ore in Idaho was not calcined and contained higher concentrations of metallic impurities than the Spanish ore at FMC Foret. (Compl.¶ 30.) Solutia attributes these differences in phosphate ore to the failure to transport the wet processed method from a small facility in Spain to a much larger one in Idaho. (Compl.¶ 30.) Indeed, Solutia alleges that "FMC at all times knew or should have known that converting the PPA Technology from FMC Foret's 15,000 metric ton per year operations in Huelva, Spain to the anticipated 80,000 metric ton per year operations at the Conda Plant posed serious technical problems that FMC would not be able to solve in a timely and economic way." (Compl. ¶ 27; see Compl. ¶ ¶ 28-31.) The Complaint alleges that FMC never disclosed its knowledge of the problems facing the Conda Plant (Compl.¶ ¶ 28-32, 35) and that, if it had, "Solutia would not have entered the JVA in April 1999" (Compl.¶ 33).

**\*3** Solutia filed suit against FMC in Missouri state court on October 16, 2003. Shortly thereafter, Solutia filed for bankruptcy in the Southern District of New

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 711971                                                                                    Page 5
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

York. In February 2004, Solutia filed this action in the bankruptcy court and voluntarily dismissed the Missouri action. Thereafter, on FMC's motion, this Court withdrew the reference from the bankruptcy court and assumed jurisdiction over this action. *See Solutia Inc. v. FMC Corp.*, 04 Civ. 2842(WHP), 2004 WL 1661115 (S.D.N.Y. July 27, 2004).

The Complaint asserts seven claims against FMC. Solutia claims that FMC's failure to disclose the shortcomings of its PPA technology constituted breaches of section 16.1 of the JVA, section 3.14(c) of the Transfer Agreement and FMC's fiduciary duty, as well as negligent misrepresentation and fraud in the inducement. (Compl.¶ ¶ 43-55, 62-87.) Solutia also claims that FMC failed to deliver technology capable of producing 80,000 metric tons of food grade PPA to Astaris, in breach of section 6.4 of the JVA and section 6.2(a) of the Assignment Agreement. (Compl.¶ ¶ 38-41, 57-60.)

Solutia seeks at least $322 million in compensatory damages, lost profits and punitive damages. (Compl.¶ ¶ 41, 48, 55, 60.) In the alternative, Solutia seeks rescission of the JVA and restitution for the value of the assets Solutia transferred to Astaris. (Compl.¶ ¶ 69, 77, 87.)

FMC moves to dismiss the Complaint on the grounds that (1) Solutia lacks standing to sue on its own behalf because the Complaint alleges injury borne directly by the joint venture; (2) Solutia's claims are premature until an accounting of Astaris occurs; (3) the fraud and negligent misrepresentation claims are precluded by the JVA's merger clause; (3) the fraud and negligent misrepresentation claims are barred to the extent they duplicate Solutia's breach of contract claims; and (5) the claims for breach of the Asset Transfer Agreement are time-barred.

### DISCUSSION
New York law governs Solutia's contract claims. (JVA ¶ 22; APTA ¶ 8.2; ATA ¶ 6.4.) As to the tort claims, FMC contends that the contractual choice-of-law provisions "demonstrate that the parties intended *all* possible claims between them related to the joint venture to be dealt with under the JVA, and thus governed by New York law." (Defendant's Memorandum In Support of Motion to Dismiss ("Def.Mem.") at 13.) Solutia resists taking a position concerning whether New York or Missouri supplies the governing law for its tort claims, but represents that there is no "distinction between New York law and Missouri law on those counts." (Transcript of Oral Argument, Oct. 14, 2004 ("Tr.") at 22.)

Accordingly, this Court applies New York law to all claims.

### I. Standard on a Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998); *see Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (same standard on a motion to dismiss for lack of standing). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In this limited task, the issue is not whether a plaintiff will ultimately prevail on its claim, but whether the plaintiff "is entitled to offer evidence in support of the allegations in the complaint." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 62 (2d Cir.1997).

**\*4** While the court's focus is primarily on the complaint, the court may also consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000); *see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808-09 (2d Cir.1996); *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991); *Patrick v. Allen*, 355 F.Supp.2d 704, 709 (S.D.N.Y.2005).

### II. Standing

FMC argues that Solutia lacks standing because Astaris suffered the direct injury. FMC contends that Solutia's injury is derivative in that it is the decreased value of its investment. Thus, the impact on Solutia is limited to its position as an Astaris shareholder. According to FMC, Solutia has standing to bring a derivative suit on behalf of Astaris but lacks standing to sue individually.

While the parties characterize their relationship as a joint venture, they formed a new corporation to conduct their purified phosphoric acid business. Once Astaris came into being, Solutia and FMC were not only joint venturers under the JVA but shareholders in a Delaware limited liability company.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 711971
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
(Cite as: 2005 WL 711971 (S.D.N.Y.))

[1][2][3] Under New York law, "[a]n individual shareholder has no right to bring an action in his own name and in his own behalf for a wrong committed against the corporation, even though the particular wrong may have resulted in a deprecation or destruction of the value of his corporate stock." *Fifty States Mgmt. Corp. v. Niagara Permanent Sav. & Loan Assoc.*, 58 A.D.2d 177, 179, 396 N.Y.S.2d 925, 927 (4th Dep't 1977) (citation omitted); *accord Abrams v. Donati*, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 489 N.E.2d 751 (1985) ("For a wrong against a corporation a shareholder has no individual cause of action, though he loses the value of his investment or incurs personal liability in an effort to maintain the solvency of the corporation."); *New Castle Siding Co. v. Wolfson*, 97 A.D.2d 501, 502, 468 N.Y.S.2d 20, 20 (2d Dep't 1983); *Paulson v. Margolis*, 234 A.D. 496, 498, 255 N.Y.S. 568, 571 (1st Dep't 1932). [FN1] The rule applies equally to closely held corporations as to large, publicly traded corporations. *See Wolf v. Rand*, 258 A.D.2d 401, 403, 685 N.Y.S.2d 708, 710 (1st Dep't 1999). Of course, a shareholder always has standing to sue for harm to the corporation, as long as the suit is brought derivatively, with any recovery going to the corporation. *See* N.Y. Bus. Corp. Law § 626(a). Because the harm is principally to the corporation, this rule "prevent[s] impairment of the rights of creditors of the corporation whose claims may be superior to those of the innocent shareholder." *Wolf*, 685 N.Y.S.2d at 710.

[4] However, "where the plaintiff's injury is direct, the fact that [the corporation] may also have been injured and could assert its own claims does not preclude the plaintiff from asserting its claim directly." *Excimer Assocs., Inc. v. Vision, Inc.*, 292 F.3d 134, 140 (2d Cir.2002); *see Ceribelli v. Elghanayan*, 990 F.2d 62, 63 (2d Cir.1993); *Paulson*, 255 N.Y.S. at 571; *Gen. Rubber Co. v. Benedict*, 215 N.Y. 18, 23, 109 N.E. 96 (1915) ("The wrong to the plaintiff does not cease to be remediable because it may also be a wrong to some one else."). Such a direct injury occurs, for example, if "the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged ." *Abrams*, 66 N.Y.2d at 953, 498 N.Y.S.2d 782, 489 N.E.2d 751; *see Ceribelli*, 990 F.2d at 63-64; *Benedict v. Whitman Breed Abbott & Morgan*, 282 A.D.2d 416, 418, 722 N.Y.S.2d 586, 588 (2d Dep't 2001). The duty must derive from "circumstances independent of and extrinsic to the corporate entity." *Fifty States Mgmt.*, 396 N.Y.S.2d at 927; *see Benedict*, 722 N.Y.S.2d at 588; *New Castle Siding*, 468 N.Y.S.2d at 20.

*5 FMC contends that, to have individual standing, a shareholder's injury must be different from the injury any other shareholder would suffer, and must be more than merely a decrease in the value of its investment. (Def. Mem. at 15-19.) None of the cases relied on by FMC, however, impose such an individualized injury requirement on a shareholder to whom the defendant owed a duty independent of the corporation. In *Paulson v. Margolis*, the First Department held that one shareholder could not sue another because the harm was to the corporation only *and* the plaintiff had not adequately alleged that the defendant owed him a separate duty. 255 N.Y.S. at 498-99. In fact, the court held that had plaintiff alleged such a duty, the defendant could be liable to both the corporation and the plaintiff. 255 N.Y.S. at 499; *see also Goldstein v. Consol. Edison Co. of N.Y.*, 115 A.D.2d 34, 41, 499 N.Y.S.2d 47, 50 (1st Dep't 1986) ("As Con Ed has thus breached no legal duty to the Goldsteins, it cannot be held liable for the injury."). FMC also relies on *Longo v. Butler Equities II L.P.*, in which the First Department held that a partner lacked standing to sue his partners for breach of fiduciary duty because the defendants' alleged conduct directly harmed the partnership, "impacting on plaintiff only insofar as his pro-rata share was concerned, without any direct injury to plaintiff independent of the injury caused to the partnership." 278 A.D.2d 97, 98, 718 N.Y.S.2d 30, 32 (1st Dep't 2000). The court did not find that the defendants owed the plaintiff any duty other than as partners, and thus did not rule on the type of injury the plaintiff would need to have standing in such a case. *Cf. Fifty States Mgmt.*, 396 N.Y.S.2d at 927; *Benedict*, 722 N.Y.S.2d at 588.

[5] Moreover, New York courts consistently hold that where an independent duty exists, a shareholder may sue on his own behalf even for the loss of value in his investment. *See Gen. Rubber*, 215 N.Y. at 22-23, 109 N.E. 96 (holding that a plaintiff shareholder could sue for the diminished value in its shares because the plaintiff sued "its own agent," who owed plaintiff an independent duty); *Benedict*, 722 N.Y.S.2d at 588 (plaintiffs had "standing to assert claims for diminution of the value of their stock ... since the wrongs alleged were not only wrongs to the corporations, but were violations of an independent fiduciary duty"). In other words, where a defendant breaches an independent duty to a shareholder that also harms the corporation, the conduct constitutes a wrong against the shareholder for which it can recover individually, even if the harm is only to the value of its investment. *Cf. Fifty States Mgmt.*, 396 N.Y.S.2d at 927 (absent independent duty,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shareholder must sue derivatively "for a wrong committed against the corporation").

A. *Tort Claims*

FMC argues that Solutia lacks standing to assert any of its claims because "FMC could not have injured Solutia without first injuring Astaris." (Def. Mem. at 15.) However, FMC's contention is premised on a generalization that misconstrues the nature of many of Solutia's claims, including those in tort.

**\*6** FMC contends that "each count [of the Complaint] addresses a common core of allegations: by delivering to Astaris allegedly deficient PPA Technology, FMC damaged Astaris, and thus devalued Solutia's investment therein." (Def. Mem. at 15.) In fact, Solutia's breach of fiduciary duty, fraud and negligent misrepresentation claims allege that prior to the April 2000 incorporation of Astaris, FMC failed to disclose material facts concerning the capability of its PPA technology. (Compl.¶ ¶ 61-87.) The adequacy of the technology actually delivered to Astaris is relevant only to the extent it reflects FMC's knowledge prior to April 1, 2000.

[6] To the extent that FMC's alleged failure to disclose injured Solutia, it was as a potential investor in the joint venture, not as a shareholder. *Cf. Paulson, 255 N.Y.S. at 570-71* (shareholder lacked standing to sue for diversion of corporate assets, which injures the corporation). Solutia argues that were it not for FMC's omissions and misrepresentations, it never would have entered into the joint venture agreement or invested in Astaris. (Compl.¶ 33.) While the alleged harm to Astaris lies in FMC's ultimate failure to make good on its promise to deliver the contemplated technology, Solutia claims that its entire investment relied on FMC's earlier misrepresentations concerning the true capability of its PPA technology. Thus, Solutia's injury is distinct from and independent of the corporate entity.

In this realm, courts have consistently held that a shareholder such as Solutia has standing to sue on its own behalf where it claims "that it was fraudulently induced to become a shareholder in the first place." *Lakonia Mgmt. Ltd. v. Meriwether, 106 F.Supp.2d 540, 551 n. 21 (S.D.N.Y.2000)* (internal quotation omitted); *see Glusband v. Fittin Cunningham Lauzon, Inc., 582 F.Supp. 145, 149 (S.D.N.Y.1984)* (claims of fraudulent inducement "belong solely to the limited partners"). Solutia's tort claims--although styled in terms of negligent misrepresentation and breach of fiduciary duty as well as fraud--are

fundamentally claims of fraudulent inducement. Accordingly, these claims allege a direct injury to Solutia and not corporate harm to Astaris.

Moreover, prior to the shareholder relationship in Astaris, FMC owed an independent duty arising from its joint venture relationship that also confers standing on Solutia. *See Abrams,* N.Y.2d at 953; *Benedict, 722 N.Y.S.2d at 588; Confidence Transp. Inc. v. Buck, 218 A.D.2d 837, 841, 630 N.Y.S.2d 804, 808 (3d Dep't 1995)* ("Buck has the right to bring direct claims against the RKB officers since he properly alleged a breach of an independent fiduciary duty owed to him which is independent of any duty owing to the corporation wronged."). "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty." *Meinhard v. Salmon, 249 N.Y. 458, 463-64, 164 N.E. 545 (1928); accord Gramercy Equities Corp. v. Dumont, 72 N.Y.2d 560, 567, 534 N.Y.S.2d 908, 531 N.E.2d 629 (1988).* The JVA memorialized the parties' status as joint venturers, each owing a fiduciary duty to the other. *See Finkelstein v. Warner Music Group, 14 A.D.3d 415, 416, 787 N.Y.S.2d 867, 867 (1st Dep't 2005); Daniel Perla Assocs. v. Krasdale Foods, Inc., 12 A.D.3d 555, 557, 786 N.Y.S.2d 75, 77 (2d Dep't 2004); Gover v. Escudo Constr. Corp., 288 A.D.2d 435, 436, 733 N.Y.S.2d 894, 895 (2d Dep't 2001).* Further, as the party with sole knowledge of the technology's capability, FMC owed a duty to Solutia to disclose facts "not readily available to the other party." *Ceribelli, 990 F.2d at 64* (construing New York law); *see Talansky v. Schulman, 2 A.D.3d 355, 360, 770 N.Y.S.2d 48, 53 (1st Dep't 2003).*

**\*7** FMC argues that any rights springing from a duty existing before formation of Astaris are not actionable to the extent they interfere with the rights of Astaris or its creditors. However, the Complaint alleges that FMC's failure to disclose material information caused Solutia to enter the joint venture-- an injury relevant only to Solutia and pre-dating the corporation. These duties are "independent of and extrinsic to the corporate entity," *Fifty States Mgmt., 396 N.Y.S.2d at 927; New Castle Siding, 468 N.Y.S.2d at 20,* and FMC's obligation to make full disclosure to Solutia did not merge into any obligation it subsequently owed to Astaris. *Cf. Sagamore Corp. v. Diamond W. Energy Corp., 806 F.2d 373, 378-79 (2d Cir.1986)* (holding that the rights of joint venturers survive the incorporation of the joint venture only if they do not interfere with the corporation and the parties reserve those rights). Accordingly, Solutia has standing to assert claims

2005 WL 711971                                                                      Page 8
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

against FMC for violations of these independent duties. *Cf. Dayton Monetary Assocs. v. Donaldson, Lufkin, & Jenrette Secs.,* No. 91 Civ.2050(LLS) et al., 1993 WL 410503, at *1 (S.D.N.Y. Oct.14, 1993) (dismissing claims because plaintiffs had not "supplied a basis for imposing a fiduciary duty on the ... defendants that would permit them to recover for injuries that are otherwise derivative in nature").

Because Solutia's tort claims allege a harm to Solutia distinct from any harm to Astaris and implicate an independent duty owed by FMC, Solutia has standing to assert those claims on its own behalf and need not proceed derivatively.

*B. Breach of the JVA*

Solutia claims that FMC breached two separate provisions of the JVA. First, the Complaint alleges a breach of section 6.4 in that FMC "failed to deliver the technology, know-how, intellectual property and engineering drawings necessary for the Joint Venture to construct a new plant at Conda, Idaho that is capable of producing any food-grade wet processed [PPA]." (Compl.¶ 39.) Second, the Complaint alleges that FMC breached the section 16.1 warranty by failing to disclose to Solutia "that significant technical problems existed that could prevent the successful implementation and/or adaptation of its PPA Technology to the Conda Plant operations." (Compl.¶ ¶ 44-45.)

*1. Section 6.4 of the JVA*

[7] FMC contends that Solutia lacks standing to sue FMC for failing to deliver the PPA technology promised in the JVA because such a breach, if true, harmed Astaris directly and Solutia only as a shareholder thereof.

Solutia alleges that FMC's failure to deliver the promised PPA technology required Solutia "to infuse a substantial amount of additional capital." (Compl.¶ 36.) This additional contribution, however, was contractually required. (Tr. at 30.) As such, Solutia's additional expenditures do not constitute a direct injury sufficient to give Solutia standing. *See Abrams,* 66 N.Y.2d at 953, 498 N.Y.S.2d 782, 489 N.E.2d 751 (holding that a shareholder has no individual cause of action for harm to the corporation that causes the shareholder to "incur[ ] personal liability in an effort to maintain the solvency of the corporation"); *cf. Excimer Assocs.,* 292 F.3d at 140 (holding that shareholder could have injury separate from injury to the corporation if it was required to

make payments "over and above that which it was contractually obligated to pay"). Solutia also claims that it was directly harmed by the inadequacy of the technology FMC delivered because Solutia had divested and transferred its entire phosphorous chemicals business to Astaris. (Compl.¶ 36.) However, Solutia's claimed injury is merely its investment in the joint venture. *See Fifty States Mgmt.,* 396 N.Y.S.2d at 927 (shareholder has no direct injury for "destruction of the value of his corporate stock"). To the extent Solutia alleges that it lost its entire investment as a result of FMC's failure to deliver the promised technology to the corporation, such an injury derives solely from Solutia's status as a shareholder of Astaris. In order for Solutia to have standing to sue for the loss if its investment, FMC must have violated an independent duty to Solutia. *See Gen. Rubber,* 215 N.Y. at 22-23, 109 N.E. 96; *Benedict,* 722 N.Y.S.2d at 588.

**\*8** While the JVA created independent contractual obligations running from FMC to Solutia, many of those duties folded into FMC's later undertakings to Astaris on its incorporation. New York courts have held that a pre-incorporation contractual obligation between joint venturers survives incorporation of the joint venture only to the extent that the obligation does not "conflict with the corporation's functioning" and the rights of third-party creditors are not involved. *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 300, 765 N.Y.S.2d 575, 585 (1st Dep't 2003); *Blank v. Blank,* 222 A.D.2d 851, 853, 634 N.Y.S.2d 886, 888 (3d Dep't 1995). However, FMC's failure to contribute the requisite PPA technology to Astaris is principally an injury to Astaris, which affects the corporation's functioning and the rights of its creditors. *See Wolf,* 685 N.Y.S.2d at 710 (noting that the purpose of preventing a shareholder from suing on its own behalf for corporate harm is to protect the rights of third-party creditors). Tellingly, that same FMC obligation was embodied in the corporate documents, including the Transfer and Assignment Agreements. (*See* APTA § 3.1; ATA § § 2.1-2.2, 2.4, 2.12(a),(d).) As such, FMC's JVA promise to deliver the requisite PPA technology to the joint venture was not just a side agreement. Rather, it was both "intended to be made to the corporation" and "made to the corporation." *Higgins v. Applebaum,* 186 A.D. 682, 686, 174 N.Y.S. 807, 810 (1st Dep't 1919); *see also Sagamore,* 806 F.2d at 379 (holding that a pre-incorporation agreement is enforceable if it " 'runs along side of the path of the corporation' without being merged into it" (quoting *Munacher v. Cent. Coal Co.,* 284 A.D. 380, 385, 131 N.Y.S.2d 671, 676

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 711971                                                                                    Page 9
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
(Cite as: 2005 WL 711971 (S.D.N.Y.))

(1st Dep't 1954)). Any duty FMC owed Solutia merged with FMC's duty to Astaris and was not "extrinsic to the corporation." *See Albany-Plattsburgh United Corp. v. Bell*, 307 A.D.2d 416, 420, 763 N.Y.S.2d 119, 123 (3d Dep't 2003) ("The fact that some of [plaintiff-shareholder's] allegations include references to a violation of the preincorporation agreement ... does not, in our view, convert these claims into individual causes of action.").

Accordingly, Solutia lacks standing to sue FMC on its own behalf for breach of section 6.4 of the JVA.

### 2. Section 16.1 of the JVA

[8] Through section 16.1 of the JVA, FMC warranted that, as of April 29, 1999, it had disclosed to Solutia all material facts concerning its PPA technology. (JVA § 16.1.) As discussed in connection with Solutia's tort claims, FMC's alleged failure to fully disclose to Solutia the capabilities of its PPA technology harmed Solutia directly. To this end, Solutia claims that upon entering the joint venture it divested itself of its entire phosphorous chemicals business. (Compl.¶ 36.) This divestiture occurred prior to the incorporation of Astaris, and thus was an injury that befell Solutia before it became an Astaris shareholder. Astaris itself was harmed only indirectly. *Cf. Wolf*, 685 N.Y.S.2d at 710 (shareholder can sue only derivatively for harm to corporation).

*9 Moreover, unlike section 6.4, section 16.1 of the JVA created a duty that survived the incorporation of the joint venture and was at all times extrinsic to the corporate entity. *See Wolfson*, 468 N.Y.S.2d at 20. In the JVA, FMC represented *to Solutia* that it had disclosed *to Solutia* all material information relevant to the joint venture's success, presumably including any facts bearing on the viability of its PPA technology. (JVA § 16.1(v).) By contrast, in the Transfer Agreement, FMC warranted *to Astaris* that the PPA technology would perform as anticipated. (ATA § 3.14(c) .) Although the two covenants overlap substantively, FMC's separate warranties to Solutia and Astaris created two distinct contractual obligations, each to a different legal entity. Accordingly, FMC's duty to Solutia did not merge into the obligations it forged with Astaris.

As such, FMC's duty to Solutia remains independent of Astaris, and Solutia has standing to enforce it. *See Higgins*, 174 N.Y.S. at 810 (shareholder has standing to enforce agreement "never made ... or intended to

be made to the corporation").

### C. Breach of the Assignment and Transfer Agreements

Through the Transfer Agreement, FMC covenanted to Astaris that it had technology capable of producing 80,000 metric tons of PPA annually. (ATA § 3.14(c).) In the Assignment Agreement, FMC represented to Astaris that it would deliver that technology to the corporation. (APTA § 6.2.) FMC contends that Solutia lacks standing to sue FMC for breaches of the Assignment and Transfer Agreements because the alleged injuries lie with Astaris--not Solutia, and Solutia was not a party to those contracts. (Def. Mem. at 23-24.)

A breach of contract by FMC harms Astaris first and foremost because Astaris is the contracting party. *See Goldstein*, 499 N.Y.S.2d at 50 (holding that a shareholder's "ownership interest in the ... corporation does not give him an individual right to recover for breach of the corporation's contract"). Thus, for Solutia to have standing to sue on these breaches for its own account, an independent duty must run from FMC to Solutia that bears on the claims. *See Abrams*, 66 N.Y.2d at 953, 498 N.Y.S.2d 782, 489 N.E.2d 751.

[9] Solutia maintains that it can properly sue for FMC's alleged breaches of the Assignment and Transfer Agreements because those contracts expressly identify Solutia as a **third-party beneficiary**. (Plaintiff's Memorandum in Opposition to Motion to Dismiss ("Pl.Mem.") at 13-16; *see* APTA § 8.7; ATA § 6.5.) Indeed, the promisor in a contract owes a **third-party beneficiary** a duty independent of its duty to the promisee, even if there is no separate performance to the **third-party beneficiary**. *See Genen v. Metro-North Commuter R.R.*, 261 A.D.2d 211, 211-12, 690 N.Y.S.2d 213, 215 (1st Dep't 1999) ("Hunter assumed no independent duty of care to the plaintiff solely by virtue of its snow removal contract with Metro-North; that is, plaintiff is not a **third-party beneficiary** of the snow removal contract between Hunter and Metro-North."); *see also Teachers Ins. & Annuity Assoc. v. Tedeschi*, 3 A.D.3d 671, 673, 771 N.Y.S.2d 238, 240 (3d Dep't 2004) (finding no duty to third-party because she was not an intended **third party beneficiary**).

*10 [10] Under New York law, an intended **third-party beneficiary** has standing to enforce an agreement entered into between others. *See State of*

*Calif. Pub. Employees' Ret. Sys.* ("*CalPERS*") *v. Shearman & Sterling*, 95 N.Y.2d 427, 434-35, 718 N.Y.S.2d 256, 741 N.E.2d 101 (2000); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 43-46, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985); *Binghamton Masonic Temple Inc. v. City of Binghamton*, 213 A.D.2d 742, 745, 623 N.Y.S.2d 357, 360 (3d Dep't 1995). A party claiming to be an intended **third-party beneficiary** bears the burden of demonstrating its right to enforcement. *Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 427, 469 N.Y.S.2d 948, 950 (2d Dep't 1983).

[11][12] "A third party seeking to recover on a contract must establish that a binding contract exists between other parties; that this contract was **intended for his benefit**; and that the benefit to him was direct rather than incidental." *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Trust Co.*, 261 A.D.2d 117, 123, 689 N.Y.S.2d 455, 460 (1st Dep't 1999); *see Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir.2002). A benefit is intended rather than incidental if it is "sufficiently immediate ... to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit is lost." *CalPERS*, 95 N.Y.2d at 434-35, 718 N.Y.S.2d 256, 741 N.E.2d 101 (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983)); *see Fourth Ocean Putnam*, 66 N.Y.2d at 44-45, 495 N.Y.S.2d 1, 485 N.E.2d 208; *Dubroff v. Evergreen Bank, Nat'l Ass'n*, 265 A.D.2d 644, 645, 696 N.Y.S.2d 560, 562 (3d Dep't 1999) (for **third-party beneficiary** status, contracting parties must have intended to bestow a benefit "more than merely incidental to the benefits afforded them and which evinces an intent to permit enforcement by that party"). That is, "the circumstances [must] indicate that the promisee intends to give the beneficiary the benefit of the promised performance" or that the promised performance is to be made directly to that party. *Fourth Ocean Putnam*, 66 N.Y.2d at 44, 495 N.Y.S.2d 1, 485 N.E.2d 208 (quoting *Restatement (Second) of Contracts* § 302(a)); *accord Levin*, 277 F.3d at 248. New York does not require that a **third-party beneficiary** receive a benefit different from that exchanged between the principal parties. *See Fourth Ocean Putnam*, 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208; *cf. In re Enron Corp.*, 292 B.R. 507, 514 (S.D.N.Y.2002) (holding that a **third-party beneficiary** had standing under Texas law because the benefit it stood to receive was "distinct and separate"); *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905(RWS), 1996 WL 494904, at *17 (S.D.N.Y. Aug.30, 1996) (dismissing a **third-**party beneficiary's claim under Delaware law because the plaintiff "ha[d] not alleged a special injury").

[13] Here, the Assignment and Transfer Agreements leave no doubt that the contracting parties (*i.e.*, FMC, Astaris and their subsidiaries) intended to invest Solutia with certain third-party rights and remedies. The Assignment Agreement explicitly states:

  *11 Except with respect to Solutia Inc., *which is a* **third party beneficiary** *of this Assignment Agreement*, nothing herein expressed or implied is intended or shall be construed to confer upon or give any person or entity other than the parties hereto and their respective successors, legal representatives and permitted assigns any rights or remedies under or by reason of this Agreement.

(APTA § 8.7 (emphasis added).) The Transfer Agreement contains a similar provision: "[N]othing contained herein shall be construed or deemed to confer any benefit or right upon any third party; *provided, however*, that Solutia shall be a **third party beneficiary** of this Agreement." (ATA § 6.5.) The clear implication of these provisions is that the contracting parties intended to confer rights and remedies on Solutia under the Assignment and Transfer Agreements. *See Fourth Ocean Putnam*, 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208 (third party has right to enforce a contract that "clearly evidences an intent to permit enforcement by the third party"); *Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 46, 536 N.Y.S.2d 792, 797 (2d Dep't 1988) (intent to benefit third-party satisfied when parties explicitly state such intention); *cf. Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 656, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976) (no indication that contracting parties intended to benefit third party). To read the Agreements any other way would render the **third-party beneficiary** provisions meaningless. *See Coppola v. Stroker*, 235 A.D.2d 536, 537, 653 N.Y.S.2d 134, 135 (2d Dep't 1997) ("[P]rinciples of contract construction require ... that every provision should be deemed to have some meaning."); *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 133 N.E.2d 688 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."); *accord Missionary Sisters of the Sacred Heart v. N.Y. State Div. of Hous. & Cmty. Renewal*, 283 A.D.2d 284, 288, 724 N.Y.S.2d 742, 746 (1st Dep't 2001).

[14] However, mere intent to confer third-party

rights is insufficient; there must be a benefit that is explicit and direct. *Burns Jackson,* 59 N.Y.2d at 336, 464 N.Y.S.2d 712, 451 N.E.2d 459. "Even when the contracting parties specifically intend to confer benefits on a third party, not all consequential damages which flow from a breach of the contract are recoverable by the third party. The contract must evince a discernible intent to allow recovery for the specific damages to the third party that result from a breach thereof before a cause of action is stated." *Strauss,* 469 N.Y.S.2d at 950. In determining whether a third party has standing to enforce a contract, the Court must "look at the overall purpose of the transaction." *Internationale Nederlanden,* 689 N.Y.S.2d at 460; *see McClare v. Mass. Bonding & Ins. Co.,* 266 N.Y. 371, 377, 195 N.E. 15 (1935) ("No other purpose [of the agreement] appearing than to benefit the two classes of creditors named, they are to be considered beneficiaries.").

**\*12** [15] The Assignment and Transfer Agreements did not provide for any performance to be made directly to Solutia. *Cf. Internationale Nederlanden,* 689 N.Y.S.2d at 460; *Goodman-Marks Assocs., Inc. v. Westbury Post Assocs.,* 70 A.D.2d 145, 149, 420 N.Y.S.2d 26, 29 (2d Dep't 1979) ("As a benefit to the plaintiff was thus the direct result of the promised performance, the plaintiff is deemed an intended beneficiary thereof."). Rather, under each of the Agreements, FMC promised to deliver certain assets and rights to Astaris. (APTA § 3.1; ATA § § 2.1-2.2, 2.4, 2.12(a),(d).) *See United Int'l Holdings, Inc. v. The Wharf (Holdings) Ltd.,* 988 F.Supp. 367, 373 (S.D.N.Y.1997) ("[I]f another besides the third party may recover, beneficiary status is negated." (citing *Fourth Ocean,* 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208). As a co-venturer with FMC and fifty-percent shareholder of Astaris, Solutia would benefit from FMC's satisfaction of its contractual obligations. However, a benefit received through corporate ownership is insufficient to establish rights as a **third-party beneficiary.** *United Int'l Holdings,* 988 F.Supp. at 372 ("UIH has not established ... a direct benefit to the Wharf beyond that provided to any parent corporation from assets held by its wholly owned subsidiaries, and this indirect benefit is insufficient to establish **third-party beneficiary** status."); *Dow Corning Corp. v. Chem. Design, Inc.,* 3 F.Supp.2d 361, 366 (W.D.N.Y.1998) ("[B]enefit deriving by way of [a subsidiary]'s operating at a profit and thus generating dividends to ... its parent ... is insufficient to establish **third-party beneficiary** status."). There is no indication that FMC would deliver any performance directly to Solutia, or that Astaris would transfer the benefit of any performance

it received to Solutia. "An incidental beneficiary is a third party who may derive benefit from the performance of a contract though he is neither the promisee nor the one to whom performance is to be rendered." *World Trade Knitting Mills, Inc. v. Lido Knitting Mills, Inc.,* 154 A.D.2d 99, 103, 551 N.Y.S.2d 930, 933 (2d Dep't 1990) (citing 2 Williston, Contracts (3d ed.) § 402). That is precisely Solutia's status.

Accordingly, Solutia lacks standing to sue individually on its own behalf for FMC's alleged breaches of the Assignment and Transfer Agreements. [FN2]

III. *Need for an Accounting*

FMC contends that all of Solutia's claims are premature because an accounting of Astaris has not yet been performed. Without an accounting, FMC contends, this Court cannot determine the extent to which FMC's alleged actions affected Astaris' value, Solutia's investment or third-party creditors, and whether either party has obligations to the other arising from the joint venture. (Def. Mem. at 24-28.) FMC notes that Astaris has many operations in addition to PPA processing, so that Solutia's investment in the joint venture would not have been "destroyed" by a failure of the PPA technology FMC had contributed.

**\*13** [16][17] New York's law governing partnerships is generally extended to joint ventures, *See Ebker v. Tan Jay Int'l Ltd.,* 741 F.Supp. 448, 470 (S.D.N.Y.1990). "While the general rule with respect to partnerships provides that partners cannot sue each other at law unless there is an accounting, prior settlement, or adjustment of the partnership affairs, a partner may maintain an action at law against a co-partner when no complex accounting is required or when only one transaction is involved which is fully closed but unadjusted." *Agrawal v. Razgaitis,* 149 A.D.2d 390, 391, 539 N.Y.S.2d 496, 497 (2d Dep't 1989) (citation omitted). Additionally, "an individual partner may vindicate a specific wrong perpetrated against him when the wrong alleged involves a partnership transaction but can be determined without an examination of the partnership accounts." *Roberts v. Astoria Med. Group,* 43 A.D.2d 138, 139, 350 N.Y.S.2d 159, 161 (1st Dep't 1973).

[18] The claims that Solutia has standing to bring do not depend on a prior accounting. These claims assert that Solutia would not have entered the joint venture had Astaris fully disclosed the problems with its PPA

technology. Rather than the profits Astaris may have lost, Solutia seeks the return of its contributions to the joint venture and consequential damages from the lost opportunity--amounts quantifiable without an accounting of Astaris. This is true even with respect to the alleged breach of the JVA warranty, section 16.1, because that breach would have occurred as soon as FMC signed the contract knowing that it had not disclosed all material facts to Solutia. "[W]here a joint venture agreement is breached before any business is done thereunder ..., there is no need to resort to an equitable accounting, and an action at law for damages will lie." 16 N.Y. Jur.2d Bus. Relationships § 1962; *see B.D. & F. Realty Corp. v. Lerner*, 232 A.D.2d 346, 347, 648 N.Y.S.2d 596, 597 (1st Dep't 1996); *St. James Plaza v. Notey*, 95 A.D.2d 804, 805, 463 N.Y.S.2d 523, 526 (2d Dep't 1983). If FMC is found liable, determining the amount due Solutia will not require "entering into the day to day management of the partnership." *St. James*, 463 N.Y.S.2d at 526. Instead, "the court need only determine the 'book value' of [Solutia's] interest as of the first day" of the joint venture because Solutia claims it was wrongly induced to enter into that relationship. *St. James*, 463 N.Y.S.2d at 526.

Accordingly, Solutia's surviving claims are not barred for want of a prior accounting.

### IV. *Effect of the JVA's Merger Clause*

[19] FMC contends that the JVA's merger clause precludes Solutia's claims of fraud and negligent misrepresentation. Section 23.4(a) states that the JVA "constitutes the entire agreement between the parties pertaining to the subject matter hereof, and all prior representations, discussions and negotiations between the parties ... pertaining to the subject matter of this Agreement are superseded." (JVA § 23.4(a).) That section incorporates by reference a letter agreement previously entered into by the parties. (JVA § 23.4(a).) The letter agreement provides: "Except for the matters expressly specified in th[e] letter or in any such formal written definitive contract, neither party shall be entitled to rely on any statement, promise, agreement or understanding, whether oral or written ... in connection with the Possible Transaction." (Def. Mem. Ex. A: Letter Agreement, dated Nov. 18, 1998 ¶ 4.)

*14 [20] New York courts hold a contract fully integrated by a merger clause subject to the parole evidence rule, prohibiting the introduction of extrinsic evidence. *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993). However,

even when a contract contains a merger clause, courts permit a party to introduce extrinsic evidence to establish fraud. *Mfrs. Hanover*, 7 F.3d at 315. Thus, a party to a fully integrated contract can assert a claim of fraud, unless the contract specifically disclaims reliance on the representations at issue. *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 323, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

Solutia contends that the JVA only contains a general merger clause, and therefore does not bar its claims of fraud. (Pl. Mem. at 33-35.) FMC, in contrast, argues that the Letter Agreement is sufficiently specific to preclude Solutia's claims. (Tr. at 17.)

[21] However, where the alleged misrepresentations supporting a claim of fraud arise from facts within the "peculiar knowledge" of a party, even a specific disclaimer as to reliance on those representations does not bar a fraud claim. *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir.1998); *see Danann Realty*, 5 N.Y.2d at 322, 184 N.Y.S.2d 599, 157 N.E.2d 597; *Yurish v. Sportini*, 123 A.D.2d 760, 761-62, 507 N.Y.S.2d 234, 235 (2d Dep't 1986) ("[T]his court has repeatedly noted that allegedly fraudulent [parties] may not invoke even specific disclaimer clauses in order to preclude evidence of oral misrepresentations if the facts allegedly misrepresented are peculiarly within [that party's] knowledge." (quotation omitted)). Although sophisticated parties can normally verify each other's representations or bargain for specific contractual warranties, the peculiar knowledge exception applies if "a party would face high costs in determining the truth or falsity" of representations. *Warner Theatre*, 149 F.3d at 136; *see Dimon Inc. v. Folium, Inc.*, 48 F.Supp.2d 359, 368 (S.D.N.Y.1999) (noting that the reasonableness of a party's reliance on statements correlates to the effort necessary to corroborate those statements).

Solutia has adequately pled reliance on representations that concern facts within the peculiar knowledge of FMC. For example, FMC's allegedly fraudulent misrepresentations concern the use of the PPA technology at FMC Foret, FMC's tests of the PPA technology on various ores and an internal FMC report regarding the efficacy of using the PPA technology at the Conda Facility. (Com pl.¶ ¶ 20-22, 29-31.) Unlike the cases on which FMC relies, all of the alleged misrepresentations in this action concern the capability of proprietary technology, which is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

necessarily in the peculiar knowledge of its owner. *Cf. DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 321-22 (S.D.N.Y.2002) (plaintiff who acquiesced to view only selected materials could not claim that the defendant withheld material that was within its peculiar knowledge).

*15 FMC contends that the peculiar knowledge exception does not apply to a negligent misrepresentation claim. (Tr. at 15.) On the contrary, the same reasoning has equal force when applied to Solutia's claim of negligent misrepresentation. Regardless of the cause of action, the information FMC withheld or misrepresented was within its peculiar knowledge, and Solutia can claim reasonable reliance on FMC's representations to support either a fraud or negligent misrepresentation claim. *See Dimon*, 48 F.Supp.2d at 367-72 (analyzing the reasonable reliance necessary for a fraud claim and a negligent representation claim together).

Moreover, the parties were linked in a joint venture which, as discussed *supra*, infused fiduciary duties in their relationship. *See, e.g., Meinhard*, 249 N.Y. at 464, 164 N.E. 545 ("Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."); *Finkelstein*, 787 N.Y.S.2d at 867. The attendant duty FMC owed Solutia created an independent basis for Solutia's reasonable reliance on FMC's representations. *See Prestige Foods, Inc. v. Whale Sec. Co.*, 243 A.D.2d 281, 282, 663 N.Y.S.2d 14, 15 (1st Dep't 1997) ("Nor did this conventional business relationship give rise to fiduciary duties such as might justify a claim of reliance.") Similarly, an allegation that parties are joint venturers is sufficient to demonstrate the "special relationship" requisite to sustain a negligent misrepresentation claim. *See Richbell*, 765 N.Y.S.2d at 583 (finding that pleading a joint venture establishes a fiduciary duty); *cf. Thomas v. McLaughlin*, 276 A.D.2d 440, 440, 715 N.Y.S.2d 388, 389 (1st Dep't 2000) (finding that plaintiff was barred from bringing a negligent misrepresentation claim where the pleadings failed to establish a joint venture).

Accordingly, Solutia's claims of fraud and negligent misrepresentation based on representations extraneous to the contract are not precluded by the JVA's merger clause.

*V. Duplication of Tort and Contract Claims*

Lastly, FMC challenges Solutia's fraud and negligent misrepresentation claims on the ground that they are premised on the same allegations that underlie Solutia's breach of contract claims.

As discussed above, this Court holds that Solutia lacks standing to assert each of its breach of contract claims with the exception of its claim that FMC breached section 16.1 of the JVA by failing to disclose material information concerning its PPA technology. By its terms, section 16.1 encompasses only representations and omissions occurring prior to the date of the JVA, April 29, 1999. (JVA § 16.1.) Solutia's fraud and negligent misrepresentation claims, by contrast, implicate a much broader period, culminating on Astaris' April 1, 2000 incorporation. (Compl.¶ ¶ 71, 78.) Because no breach of contract claim can be stated for events occurring between April 29, 1999 and April 1, 2000, Solutia's claims for fraud and negligent misrepresentation are cognizable to the extent they depend on representations and omissions during that time period. *See Richbell*, 765 N.Y.S.2d at 589 ("[A] fraud claim may be dismissed as duplicative only as against a defendant against whom the related contract claim is viable."). However, the issue remains as to whether Solutia's claim that FMC breached section 16.1 of the JVA by making misrepresentations and omissions prior to April 29, 1999 precludes its claims of fraud and negligent misrepresentation based on those same misrepresentations and omissions.

*16 [22][23][24] Generally, under New York law, "[a] separate cause of action seeking damages in fraud cannot stand when the only fraud alleged relates to a breach of contract." *Gizzi v. Hall*, 300 A.D.2d 879, 880, 754 N.Y.S.2d 373, 376 (3d Dep't 2002); *see McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991); *Metro. Transp. Auth. v. Triumph Adver. Prods., Inc.*, 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dep't 1986). "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citations omitted). New York courts hold that a misrepresentation regarding present facts, as opposed to one reflecting an intent to perform in the future, is collateral to the contract. *See Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) (citing *Citibank*, 66 N.Y.2d at 94, 495 N.Y.S.2d 309, 485 N.E.2d 974); *Orix Credit*

2005 WL 711971
--- F.Supp.2d ----, 2005 WL 711971 (S.D.N.Y.)
**(Cite as: 2005 WL 711971 (S.D.N.Y.))**

Page 14

*Alliance, Inc. v. R.E. Hable Co.*, 256 A.D.2d 114, 115, 682 N.Y.S.2d 160, 161 (1st Dep't 1998); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 88-89 (2d Cir.1992) ("[W]here a contract or a transaction was induced by false representations, the representations and the contract are distinct and separable." (quoting 60 N.Y. Jur.2d Fraud and Deceit § 206)); *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F.Supp.2d 419, 427-29 (S.D.N.Y.2004). *But see Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (1995) ("A false statement of intention is sufficient to support an action for fraud, even where that statement relates to an agreement between the parties."). Indeed, a misrepresentation concerning present facts states an independent claim of fraud, even when the contract expressly warrants the accuracy of the defendant's representations. *First Bank of Ams. v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) ("A warranty is not a promise of performance, but a statement of present fact. Accordingly, a fraud claim can be based on a breach of contractual warranties notwithstanding the existence of a breach of contract claim.").

[25] The gravamen of Solutia's fraud and negligent misrepresentation claims is that FMC misrepresented that it *had* technology that could be used to produce 80,000 metric tons of wet processed, food grade PPA each year and that its *current* use demonstrated the effectiveness its technology. (Compl.¶ ¶ 20-22, 71-72, 78-79.) As FMC discerns, the alleged misrepresentations may be accurately characterized as concerning "whether the PPA Technology in use in Spain could be successfully adapted to Conda *in the future.*" (Defendant's Reply Memorandum in Support of Motion to Dismiss at 7.) However, even viewed in such a light, the Complaint alleges that Solutia was fraudulently induced to enter the JVA because FMC had misrepresented its then-present technological capability and concealed material information. (Compl.¶ 32, 75, 83.) *See Great Earth*, 311 F.Supp.2d at 429 ("[T]he 'present fact' exception draws its vigor not from the nature of the misrepresentation in a vacuum, but from the fact that such a misrepresentation wrongfully induced the other party to enter into the contract."). There is no allegation that FMC misrepresented its intent to perform under the JVA. Accordingly, Solutia may sue for fraud and negligent misrepresentation based on these alleged misrepresentations even though it might also recover under its breach of contract theory. *See VTech Holdings Ltd. v. Lucent Techs. Inc.*, 172 F.Supp.2d 435, 440-41 (S.D.N.Y.2001)

(denying motion to dismiss a fraud claim because the claim was "based in large part on allegations that [plaintiff] was induced to enter into a contract and then complete the closing by a series of misrepresentations of present fact, rather than a series of false promises").

*CONCLUSION*

*17 For the reasons set forth above, FMC's motion to dismiss is granted in part and denied in part. Specifically, this Court dismisses Solutia's claims for breach of section 6.4 of the Joint Venture Agreement (Count I) and for breach of the Assignment and Transfer Agreements (Counts III and IV) with prejudice. FMC's motion to dismiss Solutia's claims for breach of section 16.1 of the Joint Venture Agreement (Count II), breach of fiduciary duty (Count V), negligent misrepresentation (Count VI) and fraud and fraud in the inducement (Count VII) is denied.

> FN1. New York corporate law applies in full force to limited liability companies such as Astaris. *Weber v. King*, 110 F.Supp.2d 124, 131-32 (E.D.N.Y.2000).

> FN2. Because this Court holds that Solutia lacks standing to sue for breach of the Transfer Agreement, it need not consider FMC's argument that those claims are time-barred under the agreement's two-year statute of limitations. (Def. Mem. at 34-35.)

**Motions, Pleadings and Filings (Back to top)**

• _____1:04cv02842_____(Docket) (Apr. 14, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# G.2

Westlaw.

Slip Copy
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
**(Cite as: 2005 WL 991772 (S.D.N.Y.))**

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William HENNEBERRY, Plaintiff,
v.
SUMITOMO CORPORATION OF AMERICA,
Robert Graustein, Sumitomo Corporation, and
John Does nos. 1-50 (fictitiously named individuals),
Defendants.
**No. 04 Civ. 2128(PKL).**

April 27, 2005.

John M. Deitch, Mendes & Mount LLP, Newark, New Jersey, for Plaintiff.

Stuart M. Riback, Siller Wilk LLP, New York, New York, Stephen D. Hoffman, Pamela L. Kleinberg, for Defendants Sumitomo Corporation of America and Robert Graustein.

*OPINION AND ORDER*

LEISURE, J.

*1 Plaintiff William Henneberry brings this action against all named defendants for: (1) detrimental reliance, including promissory estoppel and negligent misrepresentation; (2) breach of contract; (3) breach of fiduciary duty; (4) defamation, including slander *per se;* (5) injurious falsehood; and, (6) tortious interference with prospective economic advantage. Plaintiff's claims arise out of a business investment relationship between the company of which Henneberry was Chief Executive Officer ("CEO") and majority shareholder, Smartix International Corp. ("Smartix"), and defendants Sumitomo Corporation of America as investor, its Senior Vice President Robert Graustein, [FN1] and Sumitomo Corporation as the parent company of SCOA.

> FN1. Because the claims against Sumitomo Corporation of America and Graustein are indistinguishable, the Court will refer to both defendants collectively as "SCOA" or "defendants" hereinafter.

Defendants SCOA filed the instant motion to dismiss for failure to state a claim for which relief may be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), on May 24, 2004. [FN2] Defendants make a series of arguments, in effect claiming that plaintiff's suit is a "strike suit" wherein plaintiff is litigating claims that are the sole province of Smartix as a company allegedly wronged and are not properly brought by Henneberry in his personal capacity as CEO and shareholder. Defendants also allege that the alleged defamatory utterances were mere opinion. SCOA finally takes issue with plaintiff's claim for damages which allegedly do not flow directly from the tort alleged. The parties' arguments for and against the instant motion to dismiss are addressed in turn below.

> FN2. On August 16, 2004, defendant Sumitomo Corporation filed its own motion to dismiss. The Court will address the merits of that motion in a companion Opinion and Order to follow.

*BACKGROUND*

*I. The Parties*

Plaintiff William Henneberry is a Connecticut resident and a creative marketing entrepreneur specializing in developing new marketing strategies for credit cards. (Plaintiff William Henneberry's Complaint ("Compl.") ¶ ¶ 10-11.) His successes involving athletic teams and credit cards are numerous. (*Id.* ¶ ¶ 15-19.) Further, prior to the parties' involvement here, Henneberry worked as a consultant for Major League Baseball and MasterCard from December 1995 through January 2000, earning between $10,000 and $25,000 per month. (*Id.* ¶ 139.) At all times relevant to this action, Henneberry was the Chairman and a stockholder of Smartix, a non-publicly traded New York corporation. (*Id.* ¶ ¶ 12-13, 21.) As chairman, Henneberry was entitled to $150,000 per year in salary. (*Id.* ¶ 20.) As of September 9, 2003, Henneberry owned 1,740,666 shares of Smartix stock. (*Id.* ¶ 22.)

Defendant Sumitomo Corporation of America is a New York corporation and a wholly owned subsidiary of defendant Sumitomo Corporation. (*Id.* ¶ ¶ 3, 34.) Defendant Robert Graustein is a New York

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 2
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
(Cite as: 2005 WL 991772 (S.D.N.Y.))

resident and was Senior Vice President of defendant Sumitomo Corporation of America at all times relevant to this lawsuit.

## II. *The Program*

Smartix was purposed to create an electronic ticketing promotion for Major League Baseball with MasterCard which, *inter alia,* allowed season ticket holders to sell unused tickets on the internet and at designated kiosks (the "Smartfan program"). (*Id.* ¶¶ 23, 24.) The Smartfan program was tested with the Boston Red Sox and the St. Louis Cardinals baseball teams. (*Id.* ¶ 25.) Pursuant to this aim, Smartix sought and obtained investors including SCOA. (*Id.* ¶ 31.)

## III. *SCOA's Investment Activities*

### A. *Spring of 2002 Investment Agreement*

**\*2** In anticipation of its future investment agreement, SCOA conducted an economic valuation of Smartix which valued Smartix at $10,000,000, or $1.50 per share. (*Id.* ¶¶ 50, 51.) In the Spring of 2002, SCOA agreed to invest at least $3,000,000 and at most $5,000,000 in Smartix, and SCOA agreed to share in the profits and losses of Smartix. (*Id.* ¶¶ 48, 49.) Based on this agreement, Smartix engaged in the following actions: (1) filed a restated certificate of incorporation with the Secretary of State of New York as required by SCOA; (2) convinced its original investors to subordinate their class of shares to those to be issued to SCOA; (3) convinced its original investors to reduce dividend percentages, forego dividends, and invest more cash into Smartix; (4) advised potential investors of SCOA's offer and that future investment would have to wait and suffer a higher valuation; (5) agreed to allow Hank Aaron to serve as a member of Smartix's Board of Directors; and, (6) ordered special stock certificates with legends as specifically requested by SCOA. (*Id.* ¶ 53.) In addition to Smartix's actions resulting from SCOA's anticipated investment, Henneberry also personally acted in reliance, loaning Smartix $100,000. (*Id.* ¶ 54.) However, after documents memorializing this agreement were sent by SCOA to Smartix's shareholders for execution. SCOA advised Henneberry that SCOA would not continue with the investment on the present terms. (*Id.* ¶ 57.) This advisement was made on June 4, 2002. (*Id.*)

### B. *Subsequent Investment Agreement by SCOA*

SCOA ultimately invested $1,000,000 in Smartix

and agreed to share profits and losses with the other classes of Smartix stockholders. (*Id.* ¶ 60.) SCOA also stated that it was now Smartix's lead investor and would actively seek out new investments for Smartix. (*Id.* ¶ 61.) In fact, when faced with Smartix's financial troubles at a meeting in June 2003, Graustein stated that SCOA "would not let you [Smartix] fail." (*Id.* ¶¶ 63, 64.) At this meeting, SCOA also agreed to provide matching investments and to send a letter confirming this position. (*Id.* 65.) However, no letter was received. Smartix advised SCOA that Smartix would require a further $1,000,000 investment and the implementation of the Smartfan program with ten sports teams. (*Id.* ¶ 68.) Based on SCOA's expressed support for this plan, Henneberry continued to personally loan Smartix money through October 2003, consisting of nine loans (ten in total, counting the initial loan of $100,000 in the Spring of 2002): (1) $47,500; (2) $52,500; (3) $50,000; (4) $150,000; (5) $27,500; (6) $30,000; (7) $190,000; (8) $12,754.83; and (9) $2,170.54. (*Id.* ¶¶ 55, 69.) SCOA was repeatedly warned of Smartix's financial situation which was forcing Smartix to reneg on its financial obligations to the Red Sox and Cardinals. (*Id.* ¶¶ 70, 74.) Also, early on in this struggle, on June 16, 2003, Henneberry advised Graustein that Smartix may need to cease operations; however, Graustein informed him Smartix did not have the legal power to do so without shareholder approval. (*Id.* ¶¶ 71, 72.)

**\*3** Finally, on September 8, 2003, SCOA presented Smartix with a new investment proposal wherein SCOA would provide matching investments up to $500,000 and would require that Henneberry convert his personal loans into company stock. (*Id.* ¶¶ 76, 77.) Smartix and Henneberry rejected this offer because it did not provide sufficient capital and it was based on a lower valuation of the company. (*Id.* ¶¶ 78, 79.)

The next day, Henneberry was called into a meeting with Michael Dee, Executive Vice President of Business Affairs for the Boston Red Sox, regarding the continuation of the Smartfan program for the next year. (*Id.*¶¶ 45, 80.) Henneberry was forced to concede Smartix's financial difficulties and its potential instability in the coming baseball season, causing Dee to express concern about the business relationship going forward. (*Id.* ¶ 82.)

## IV. *SCOA's Meetings with the Red Sox and MasterCard and Final Dealings with Smartix*

On September 22 or 23, 2003, Graustein and other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SCOA employees met with Dee and informed him, in sum and substance, that Henneberry "lacked the necessary skill and ability to manage Smartix[,] otherwise disparaged his business acumen," and blamed Smartix's financial troubles and failure to pay monies owed to the Red Sox on Henneberry's mismanagement of the company. (*Id.* ¶ 90.) SCOA also stated that it would be taking over Smartix and removing Henneberry. (*Id.* ¶ 96.) Thereafter, Dee lost faith in Henneberry and began using Graustein as the contact for the Smartfan program. (*Id.* ¶¶ 95, 97, 139-40, Ex. B.) Dee also refused to do business with Smartix if Henneberry was involved with the company (*id.* ¶ 108), which directly contradicted Dee's earlier statement on July 2, 2003 that the Red Sox had "taken a leap of faith by aligning ourselves with Smartix, in large part due to my confidence and trust in you personally" (*id.* ¶ 109).

At some point between September 19 and 23, 2003, Graustein met with MasterCard, including, *inter alia,* John Stuart, MasterCard's Senior Vice President of Global Sponsorship and Event Marketing, and informed it, in sum and substance, that Henneberry lacked the necessary skill and ability to manage Smartix, disparaged his business acumen, and blamed Smartix's financial condition and failure to pay the Red Sox and Cardinals monies owed on Henneberry's mismanagement of the company. (*Id.* ¶¶ 99, 100, 106.) MasterCard similarly lost faith in Henneberry. (*Id.* ¶¶ 105, 139-40.)

SCOA did not notify Smartix regarding either of these meetings (*id.* ¶ 89) until after the fact, at a meeting with Henneberry on September 24, 2003 (*id.* ¶ 107). Thereafter, Henneberry sent a letter to SCOA outlining its perceived bad acts and effect on the company. (*Id.* Ex. C.)

On October 9, 2003, Smartix held a shareholder's meeting wherein it was decided that Smartix would continue to pursue the Smartfan program with the Red Sox. (*Id.* ¶ 111.) SCOA represented that it had been in contact with investors who had expressed interest in investing in Smartix. (*Id.* ¶ 112.) SCOA again reiterated that it wanted Smartix to survive and succeed. (*Id.*) Based on SCOA's representations made at this meeting, Henneberry continued to personally loan money to Smartix. (*Id.* ¶ 113.) There is no evidence SCOA invested any further monies in Smartix (*id.* ¶ 117) and Smartix's stock is presently worthless (*id.* ¶ 131).

*DISCUSSION*

*\*4* Defendants SCOA claim that plaintiff has failed

to state a claim for which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), and seek dismissal of the Complaint against them. The legal standard for this motion and plaintiff's six claims against SCOA are discussed, in turn, below.

*I. Motion to Dismiss Standard*

When determining whether plaintiff's claim should be dismissed on motion for failure to state a claim for which relief may be granted, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (quoting *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000)); *see also Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 740 (1976); *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 507 U.S. 961, *and,* 507 U.S. 972 (1993). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62-63 (2d Cir.1997). Plaintiff's Complaint should not be dismissed in this instance "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 894-95 (2d Cir.1976). However, plaintiff's Complaint "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." *Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co.,* No. 95 Civ. 10959, 1998 WL 60954, at \*3 (S.D.N.Y. Feb. 13, 1998).

Accordingly, the factual allegations set forth in the Complaint and repeated above do not constitute findings of fact by the Court, but rather are presumed to be true for the purpose of deciding the motion to dismiss. *See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 625 (S.D.N.Y.2001). When deciding a motion to dismiss, the Court may consider:

the factual allegations in [the] complaint ...., documents attached to the complaint as an exhibit or incorporated in it by reference ..., matters of which judicial notice may be taken ..., or documents ... of which plaintiff [ ] had knowledge and relied on in bringing suit.

*Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2d Cir.1993); *see also* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is part thereof for all purposes."); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir.2002); *Gregory,* 243 F.3d at 691.

The decision of whether to hold an oral hearing regarding a motion to dismiss lies in the sound discretion of the district court. *Greene v. WCI Holdings Corp.,* 136 F.3d 313, 316 (2d Cir.1998). If the district court decides to dismiss any claims, that dismissal is generally considered a judgment on the merits, unless dismissed for "curable defect." *Criales v. Am. Airlines, Inc.,* 105 F.3d 93, 98 (2d Cir.1997). The Second Circuit reviews a district court's determination of whether a motion to dismiss should be granted *de novo. Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998) (citing *Sykes v. James,* 13 F.3d 515, 518-19 (2d Cir.1993)). With this legal parameter in mind, the Court turns to plaintiff's six claims against SCOA.

## II. *Plaintiff's Claims Against SCOA*

*5 SCOA avers that plaintiff's Complaint against SCOA should be dismissed for failure to state a claim insofar as it alleges that SCOA, (1) caused plaintiff to detrimentally rely on its statements, stating alternative claims for promissory estoppel and negligent misrepresentation; (2) breached its contract with plaintiff; (3) breached its fiduciary duty to plaintiff; (4) defamed plaintiff to the Red Sox and MasterCard; (5) uttered an injurious falsehood under New York State law in its conversations with the Red Sox and MasterCard; and, (6) tortiously interfered with Henneberry's prospective economic advantage. [FN3]

> FN3. Plaintiff's claims are governed by state law, but the parties have not raised choice of law issues. Instead, the parties' briefs assumed that New York State law applies. Where the parties so assume, the Court need not address choice of law *sua sponte. See In re Chateaugay Corp.,* 139 B.R. 598, 602 n. 3 (Bankr.S.D.N.Y.1992) (citing *Deep S. Pepsi-Cola Bottling Co. v. Pepsico, Inc.,* No. 88 Civ. 6243, 1989 U.S. Dist. LEXIS 4639, at *24 (S.D.N.Y. May 2, 1989)). Therefore, the Court applies New York State law in accordance with the parties' briefs.

### A. *Detrimental Reliance*

Plaintiff claims, pursuant to two different legal

theories, that defendants improperly induced plaintiff's reliance on defendants' statements to plaintiff's detriment. (Plaintiff Henneberry's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint ("Pl.'s Opp'n") at 3-6.) First, plaintiff asserts a claim under a theory of promissory estoppel. (*Id.* at 3- 5.) Also, plaintiff claims that his detrimental reliance claim sounds in negligent misrepresentation. (*Id.* at 5-6; *see also* Compl. ¶¶ 114-19.) The Court addresses each theory in turn.

### 1. *Promissory Estoppel*

Both parties agree that in order for plaintiff to assert a claim under a theory of promissory estoppel, plaintiff must plead the following elements: (1) there was a clear and unambiguous promise; (2) plaintiff's reliance on that promise was reasonable and foreseeable to defendants; and, (3) plaintiff sustained injury due to his reliance on defendants' promise. *See Cyberchron Corp. v. Calldata Sys. Dev., Inc.,* 47 F.3d 39, 44 (2d Cir.1995); *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69, 78 (2d Cir.1984); Restatement (Second) of Contracts § 90 (1981).

#### a. *Henneberry's Standing to Assert this Argument*

Defendants first argue that SCOA's alleged promises were to Smartix, and not to Henneberry personally and, therefore, Henneberry cannot assert a claim of promissory estoppel. While defendants are correct that the majority of promissory estoppel caselaw does not deal with promissory estoppel as asserted by a third party, that does not foreclose the possibility at this preliminary stage in the litigation that plaintiff could assert a claim of promissory estoppel as a third party to the promise. The Restatement (Second) of Contracts defines promissory estoppel as:

> A promise which the promisor should reasonable expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90 (1981) (emphasis added). In addressing the availability of a claim of promissory estoppel to a third person other than the promisor or promisee, comment c of the Restatement asserts that courts have allowed this claim where the third party was a beneficiary of the promise at issue. *Id.* cmt. c. However, the Restatement also states that, in rare cases, promissory estoppel might be justifiable for third parties that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were not beneficiaries of the promise. *Id.*

*6 Caselaw from this Court also supports this position. In *von Kaulbach v. Keoseian, 783 F.Supp. 170 (S.D.N.Y.1992)*, defendants, potential trustees, asserted a promissory estoppel claim against the future decedent who was to include funding for the trust in his will. *Id. at 172, 177.* The defendants were lawyers who came out of retirement in order to set up the trust. *Id. at 177.* When it was not funded, they asserted claims for the "thousands of hours" they spent in anticipation of the will. *Id.* There, the Court held that von Kaulbach was required to fund the trust under a theory of third party promissory estoppel. *Id.* Likewise, in a much older case, the New York Court of Appeals granted a third party the power of promissory estoppel to enforce a contract. *See Mt. Vernon Trust Co. v. Bergoff, 272 N.Y. 192, 5 N.E.2d 196 (1936).* In *Mount Vernon,* the Court estopped defendant from asserting the defense of no consideration where defendant had issued a note to a bank which the bank had stipulated was unenforceable. *Id.* Despite opining that the defendant may have had no intent to deceive the public, the Court held that, in issuing the note, defendant perpetrated a continuing fraud and third parties could enforce the note against her. *Id. at 196, 5 N.E.2d at 197* ("Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.")

Defendants will protest that the cases above are readily distinguishable and that the Restatement's edict that third parties who are not intended beneficiaries of the contract can assert a promissory estoppel argument is only to be applied in the rarest of situations. While true, at this stage of the proceeding the Court must only determine whether plaintiff has stated a claim which he should be allowed to support factually. Because precedent does exist for third parties to assert promissory estoppel arguments, and plaintiff could supply further facts gained from discovery to liken his case to the ones above, the Court will allow plaintiff to proceed on this theory for the time being.

b. *The Alleged Promises and Reliance*

Defendants next argue that the statements plaintiff hinges his argument on were not clear and unambiguous promises. Plaintiff does not explicitly identify which statements allegedly constituted promises under the first count in the Complaint. However, in its opposition brief, plaintiff identified the following statements as possible "promises": (1) SCOA contracted to invest at least $3,000,000 and at most $5,000,000 ("June 2002 agreement") (Pl.'s Opp'n at 3), and to share in the profits and losses of Smartix (Compl.¶ 49); (2) SCOA stated "we won't let you fail" at a June 2003 meeting with Smartix employees including Henneberry where SCOA also represented it would "pursue a plan to match investments and agreed to provide a letter confirming its position to Smartix" (Pl.'s Opp'n at 3); and, (3) "SCOA repeatedly communicated to Mr. Henneberry that it was actively soliciting outside investment and had investors who were willing to invest" (*id.* at 4).

i. *Promise to Invest $3,000,000 to $5,000,000 and Share in Smartix's Profits and Losses*

*7 Defendants challenge plaintiff's characterization of this alleged promise, arguing that it only constituted an agreement to agree while they were negotiating with Smartix. (Defendants SCOA and Graustein's Memorandum of Law in Support of Motion to Dismiss the Complaint ("Defs.' Mot.") at 12.) Defendants claim that this argument is supported by plaintiff's Complaint because plaintiff does not point to any written document evidencing the June 2002 agreement wherein SCOA agreed to invest $3,000,000 to $5,000,000 and share in the profits and losses. Further, SCOA eventually did memorialize in writing an agreement to invest $1,000,000 on July 2, 2002 ("July 2nd agreement"). (*Id.*) Defendants further contend that the July 2nd agreement contained a merger clause which superseded any alleged promise made by SCOA to invest $3,000,000 to $5,000,000 and to share in the profits and losses. (Defendants Sumitomo Corporation of America and Graustein's Reply Memorandum of Law in Further Support of Motion to Dismiss ("Defs.' Reply") at 1-2.) Plaintiff claims that the June 2002 agreement was memorialized by SCOA and sent to Smartix shareholders for execution. (Compl.¶ 57).

In deciding the motion to dismiss, the Court can look at any document relied on by plaintiff in making his Complaint. *Brass, 987 F.2d at 150.* Plaintiff specifically mentions the July 2nd agreement in his Complaint; therefore, that agreement is properly considered by the Court at this time. (*See* Compl. ¶ 60.) The identified merger clause of the July 2nd agreement states: "This Agreement and the documents referred to herein constitute the entire agreement and understanding among the parties hereto and supercede all prior negotiations and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 6
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
**(Cite as: 2005 WL 991772 (S.D.N.Y.))**

agreements, whether oral or written." (Reply Declaration of Stuart M. Riback, Esq. ("Riback Reply Decl."), Ex. A § 8.12.) Defendants also point to § 3.15 of the July 2nd agreement, which states that,

[e]xcept for the agreements explicitly contemplated by this Agreement ... there are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which the Company [Smartix] is bound that may involve (i) obligations (contingent or otherwise) of, *or payments to,* the Company in excess of $50,000. (*Id.* § 3.15 (emphasis added).)

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide,'' *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.,* No. 01 Civ. 1047, 2002 U.S. Dist. LEXIS 18115, at *62-63 (S.D.N.Y. Sept. 25, 2002) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's,* 136 F.3d 82, 86 (2d Cir.1998)). Absent ambiguity in the contract, the Court will not look to extrinsic evidence, but rather will interpret the contract on its face, giving the words their ordinary meaning. *See Kinek v. Paramount Communications, Inc.,* 22 F.3d 503, 509 (2d Cir.1994). The question of ambiguity is a question of law to be decided by the Court. *See Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir.2002); *Readco v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996); *Fleet Capital,* 2002 U.S. Dist. LEXIS 18115, at *62-63 ("Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.'... 'Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous.'") (quoting *Alexander & Alexander,* 136 F.3d at 86). The Court should find a contract unambiguous where an examination of the "entire integrated agreement" reveals "a definite meaning" and the Court finds "no reasonable basis exists for a difference of opinion about that meaning." *Fleet Capital,* 2002 U.S. Dist. LEXIS 18115, at *63-64 (internal citations and quotations omitted).

**\*8** The merger clause is inapposite to the present analysis because, as stated in the Complaint, the relevant promise was affirmatively rescinded on June 4, 2002, almost a full month prior to the effective date of the merger clause. (*See* Compl. ¶ 57.) Therefore, the merger language to the effect that there are no other agreements to which Smartix is bound does not conflict with a claim for promissory estoppel based on a prior wrong. Further, taking the factual allegations of the Complaint as true, the June 2002 agreement to invest $3,000,000 to $5,000,000

in Smartix is clear and unambiguous; therefore, defendants' arguments go to the reasonableness of plaintiff's reliance on the promise.

The Court finds that plaintiff has failed to state a claim for reasonable and foreseeable reliance regarding what he terms the June 2002 agreement. (*See* Compl. ¶ 57.) The claimed actions in reliance on this promise are: (1) Smartix filed a re-stated Certificate of Incorporation reflecting changes required by SCOA; (2) Smartix convinced original investors to subordinate their shares to those to be issued by SCOA, reduce their dividend percentages, forego dividends, and invest additional cash in Smartix; (3) Smartix advised additional investors that future investments would be postponed until a later round at a higher valuation; (4) Smartix allowed Hank Aaron to become a Member of the Smartix Board of Directors; and, (5) Smartix ordered special stock certificates with legends that SCOA requested. (Compl.¶ 53.) Henneberry also personally loaned $100,000 to Smartix in reliance on SCOA's promised investment. (Compl.¶ 54.) Even as a **third party beneficiary,** Henneberry cannot assert injury based on Smartix's actions taken in reasonable reliance. The only action Henneberry personally took in reliance was the loan. However, plaintiff did not plead that it would be foreseeable to SCOA that Henneberry, the CEO, would make a personal loan to Smartix while waiting for a promised investment from SCOA. Nor does it appear to the Court to be an ordinary course of conduct that SCOA should have anticipated. Therefore, the Court finds that plaintiff has failed to properly plead promissory estoppel. Moreover, the Court notes that any purported reasonable and foreseeable action taken by plaintiff in reliance on this promised investment would only be reasonable up until June 4, 2002 when SCOA affirmatively disavowed their promise to invest $3,000,000 to $5,000,000. All action after that time would be neither reasonable, based on SCOA's expressed intent, nor foreseeable, based on SCOA's expressed understanding of the parties' status.

ii. *"We Won't Let You Fail," Matching Investments and Confirmation Letter*

Plaintiff claims that he continued to loan his own money to Smartix based on SCOA's guarantee, at a meeting in June 2003, that it would not allow Smartix to fail and SCOA's representation that it would pursue a plan to match investments and send a confirmation letter to that effect. (Compl.¶ ¶ 64, 69.) Defendants claim that the above only evidenced a willingness to cooperate with Smartix, but did not

constitute an enforceable oral promise. As above, the Court must determine whether this quote constituted a clear and unambiguous promise on which plaintiff reasonably and foreseeably relied to his detriment. *Cyberchron*, 47 F.3d at 44.

**\*9** The Court finds that these cannot, as a matter of law, be construed as clear and unambiguous promises. "We won't let you fail" is vague and ambiguous on its face for it could mean, as plaintiff contends, that SCOA would invest the amount necessary for Smartix to continue its Smartfan program; or it could mean, as defendants contend, any manner of things including a willingness to work with Smartix in order to come to an agreement regarding investments. It does not clearly mean that SCOA was guaranteeing Smartix's survival, but rather appears more of a policy statement akin to that in *Ward v. New York Univ.*, No. 97 Civ. 8733, 2000 U .S. Dist. LEXIS 14067, at \*10 (S.D.N.Y. Sept. 25, 2000) (finding that the University's alleged promises, "i) to provide a great learning environment for adult students; ii) to respect adult students and treat them with respect; iii) to not discriminate against adult students; iv) to provide supervision and teaching by honest and unbiased instructors; and v) to provide and to follow guidelines for student treatment," were not clear and unambiguous but rather policy statements which could not support a claim for promissory estoppel). *See also United States v. Rosario*, 237 F.Supp.2d 242, 248 (S.D.N.Y.2002) (finding no clear and unambiguous promise where the prosecutor represented to defendant that he would " 'go to bat' with the Police Department" to ensure defendant was granted transactional immunity); *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95 Civ. 3901, 1997 U.S. Dist. LEXIS 12394, at \*47-48 (S.D.N.Y. Aug. 19, 1997) (finding no clear and unambiguous promise where defendant stated that plaintiff "may proceed to act on the enclosed offer without limitation," and that defendant and plaintiff "are going to make a great team").

Plaintiff also claims that at the June 2003 meeting, SCOA represented that it would pursue a plan to match investments and send a confirmation letter to Smartix to that effect. (Compl. ¶ 69 .) These statements similarly cannot be construed as clear and unambiguous promises. A promise to pursue is nothing more than a preliminary representation that SCOA would look into whether it felt a matching investment strategy was prudent. Further, that SCOA never sent a confirmation letter evidences that it did not intend to be bound to a matching investment program. These statements do not evidence SCOA's

intent to be bound and therefore, cannot constitute promises for purposes of Henneberry's promissory estoppel argument.

*iii. SCOA's Representations That They had Located Investors Interested in Investing in Smartix*

Plaintiff asserts that SCOA's representations that they had located investors interested in investing in Smartix constituted clear and unambiguous promises on which Smartix and Henneberry relied by revising and updating documents for presentation to these investors and by Henneberry's continued provision of personal loans to Smartix. However, it is clear to the Court that these statements as pleaded in plaintiff's Complaint were not clear and unambiguous promises to obtain investors. Rather, at most, they constituted representations that SCOA had already contacted interested investors. Therefore, plaintiff cannot argue promissory estoppel as to these statements. Plaintiff's claim of negligent misrepresentation, assuming these statements constituted false representations of then-present fact, is arguably more tenable but ultimately fails, as discussed below.

*2. Negligent Misrepresentation*

**\*10** As an alternative to his promissory estoppel argument, plaintiff contends that his complaint supports a claim for negligent misrepresentation. Specifically, plaintiff argues that the statements discussed above were false and he reasonably relied on them to his detriment. Defendants argue that plaintiff's claim is meritless because the Complaint did not allege any "special relationship" between defendants and plaintiff as necessary for a claim of negligent misrepresentation.

To state a claim for negligent misrepresentation, plaintiff must allege that:
1) the defendant had a duty, as a result of a special relationship, to give correct information; 2) the defendant made a false representation that he ... should have known was incorrect; 3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; 4) the plaintiff intended to rely and act upon it; and 5) the plaintiff reasonably relied on it to his or her detriment.
(Pl.'s Opp'n at 5 (citing *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir.2000); *King v. Crossland Sav. Bank*, 111 F.3d 251, 257-58 (2d Cir.1997)).) "The particularity requirements of Rule 9(b) apply to claims for negligent misrepresentation." *Eternity Global Master Fund Ltd.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Morgan Guar. Trust Co.,* No. 02 Civ. 1312, 2003 U.S. Dist. LEXIS 12351, at * 11-12 (S.D.N.Y. June 4, 2003) (citing, *inter alia, Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4770, 2003 U.S. Dist. LEXIS 5913, at *4 (S.D.N.Y. Apr. 10, 2003), *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,* 254 F.Supp.2d 373, 380 (S.D.N.Y.2003), and *Northwestern Mut. Life Ins. Co. v. Banc of America Sec. LLC,* 254 F.Supp.2d 390, 394 (S.D.N.Y.2003)), *aff'd on relevant grounds, rev'd in part,* 375 F.3d 168 (2d Cir.2004).

Plaintiff claims that a special relationship sufficient to support a claim of negligent misrepresentation existed between himself and SCOA because SCOA, in holding themselves out as the "lead investor," also held themselves out as having special expertise, akin to an investment banker. Defendants dispute this contention, instead stating that the relationship was solely contractual and SCOA was nothing more than an investor in Smartix. In *Kimmel v. Schafer,* 89 N.Y.2d 257, 264, 675 N.E.2d 450, 454 (1996), the New York Court of Appeals set forth three factors for determining whether a special relationship existed between the parties absent privity of contract: "[ (1) ] whether the person making the representation held or appeared to hold unique or special expertise; [ (2) ] whether a special relationship of trust or confidence existed between the parties; and [ (3) ] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Id.* Because the statements plaintiff claims he relied on were made outside the context of the only written contract of which the Court is aware, the July 2nd agreement, the Court applies the *Kimmel* factors to the instant Complaint and finds that plaintiff has not sufficiently alleged a special relationship with defendants.

*11 Plaintiff relies heavily on *EBC I, Inc. v. Goldman Sachs & Co.,* 777 N.Y.S.2d 440, 7 A.D.3d 418 (App.Div.2004), wherein the court found that a relationship between a client and an investment banker is sufficiently "special" under *Kimmel,* to argue that SCOA should similarly be held to possess special skill, knowledge and expertise. (Pl.'s Opp'n at 6.) The Court first notes that plaintiff did not plead that SCOA was akin to an investment banker in his Complaint. In fact, there is absolutely no mention in the pleading of what SCOA's business actually entails. However, even if plaintiff did so plead, it is plain to the Court that SCOA was merely a common investor, despite the use of the term "lead investor." "Lead investor" is not, as plaintiff would have the Court believe, a magical term transforming SCOA

and Smartix's common contractual relationship into a special relationship sufficient to sustain a claim for negligent misrepresentation. Nor does that term endow SCOA with unique expertise on the subject of investing. Supporting this conclusion is the parties' July 2nd agreement where SCOA is termed only an investor. (Riback Reply Decl. Ex. A § 1.19).

Plaintiff does sufficiently allege that SCOA knew that plaintiff would use the information regarding SCOA's potential future investment and the investment of third parties in Smartix to float personal loans to Smartix. This is because SCOA was aware of Smartix's financial difficulty and Henneberry's past provision of personal loans. It is unclear whether SCOA supplied the information in order to induce Henneberry to provide loans to Smartix but it is certainly conceivable that SCOA wished Smartix to survive long enough for SCOA to take over its operation, as this was SCOA's goal as alleged in the Complaint. However, this pleading alone does not justify a claim for negligent misrepresentation, even at this early stage. "This Court has held that a 'sparsely pled' special relationship of trust or confidence is not fatal to a claim for negligent misrepresentation where 'the complaint emphatically alleges the other two factors enunciated in *Kimmell.*' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.,* 375 F.3d 168, 188 (2d Cir.2004) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 103 (2d Cir.2001)). "*Suez Investors* thus suggests that where, as here, a 'special relationship' is nowhere pled, and the allegations with respect to the other *Kimmell* factors are soft, a claim for negligent misrepresentation is dismissible under *Rule 12(b)(6).*" *Id.*

In *Suez Investors,* the Court found plaintiff had impliedly pled a special relationship where defendants initiated contact with plaintiff, induced plaintiff's actions in reliance on the misrepresentations, and repeatedly asserted their false statements were true. 250 F.3d at 103 ("[P]laintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction."). Conversely, here plaintiff's Complaint specifically states that plaintiff sought out SCOA as an investor (Compl.¶ ¶ 26, 31) and does not allege that SCOA encouraged Henneberry to make personal loans to Smartix. [FN4] Moreover, this is not a case wherein the parties' positions are such that SCOA would have an advantage over Henneberry. *See Lasalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.,* No. 02 Civ. 7868, 2003

Slip Copy                                                                                    Page 9
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
(Cite as: 2005 WL 991772 (S.D.N.Y.))

U.S. Dist. LEXIS 4315, at *17-18 (S.D.N.Y. Mar. 19, 2003) (citing *Fleet Bank v. Pine Knoll Corp.*, 736 N.Y.S.2d 737, 741, 290 A.D.2d 792, 795 (App.Div.2002), and distinguishing similar cases to support the Court's dismissal of plaintiff's negligent misrepresentation claim). In short, the Court finds that plaintiff has not alleged "a relationship so close as to approach that of privity" and, therefore, must dismiss plaintiff's claim for negligent misrepresentation. [FN5] *See In re Sterling Foster & Co. Inc. Sec. Litig.*, 222 F.Supp.2d 216, 284 (S.D.N.Y.2002) (citing *Parrott v. Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479, 483, 741 N.E.2d 506, 508 (2000)); *see also Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 158 (2d Cir.1995) ("Generally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care" amongst similarly sophisticated parties.); *In re Time Warner Sec. Litig.*, 9 F.3d 259, 271 (2d Cir.1993) ("New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.' ") (quoting *Ossining Union Free School District v. Anderson LaRocca Anderson*, 73 N.Y.2d 417, 419, 539 N.E.2d 91, 91 (1989)), *superseded on other grounds as stated in, In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 885 (W.D.N.C.2001).

> FN4. The Court notes that SCOA did allegedly repeat its assurances that it would seek out investors and would not allow Smartix to fail. However, those assurances are irrelevant to the present inquiry as they were not misrepresentations of present fact as required for a claim of negligent misrepresentation. *See Eternity*, 2003 U.S. Dist. LEXIS 12351, at *10 (quoting *Hydro Investors*, 227 F.3d at 21, as holding that the "negligent misrepresentation claim failed as a matter of law because the misrepresentations at issue, which related to predictions of energy output, 'were mere promises of future output as opposed to present representations of existing fact' "). The only alleged misrepresentation of then-present fact is SCOA's statement that it was in contact with interested investors. (Compl.¶ 62.) However, simply stating that SCOA was lying when they made this statement is insufficient for Rule 9(b) purposes, *see id.* at *12; and, in fact, plaintiff no where alleges that this statement was untrue.

> FN5. Because the Court finds that plaintiff failed to sufficiently plead the first element of negligent misrepresentation, the Court will not address the other four elements defined, *supra*.

### 3. Conclusion

*12 Thus, for the reasons stated above, plaintiff's claim for detrimental reliance is dismissed. Plaintiff has failed to sufficiently state a claim under either a theory of promissory estoppel or negligent misrepresentation. (*See* Com pl. ¶ ¶ 114-19 ("First Count").)

### B. Breach of Contract

Plaintiff also alleges that SCOA is liable for breach of contract stemming from the June 2002 agreement that SCOA would invest $3,000,000 to $5,000,000 in Smartix. Plaintiff claims that breach occurred on June 4, 2003 when SCOA informed plaintiff they would not invest more than $1,000,000. This claim, like that for promissory estoppel, is unaffected by the merger clause in the July 2nd agreement because the purported wrong occurred prior to that agreement. Therefore, the Court only addresses whether plaintiff has sufficiently alleged the elements for a breach of contract claim.

In order to state a claim for breach of contract, plaintiff must allege an intent to be bound demonstrated by an offer, acceptance, and supported with consideration. *Deutsche Asset Mgmt. v. Callaghan*, No. 01 Civ. 4426, 2004 U.S. Dist. LEXIS 5945, at *47 (S .D.N.Y. Apr. 7, 2004). The Court finds that, on the present record, plaintiff has sufficiently alleged that a contract for SCOA to invest $3,000,000 to $5,000,000 existed between the parties up until SCOA breached by repudiation on June 4, 2002. Plaintiff's allegations that SCOA agreed to invest and that plaintiff acted in reliance on that agreement to their detriment are sufficient. (Compl.¶ ¶ 48-54.) Defendants' point that the written memorialization of this promise remained unsigned at the time of breach is not fatal to plaintiff's claim at this time. The Second Circuit has enforced contracts against non-signatories "where the non-signing party 'has accepted [the] written agreement and has acted upon it.' " *Argo Marine Sys., Inc. v. Camar Corp.*, 755 F.2d 1006, 1011 (2d Cir.1985) (citation omitted) (alteration in original). Further, where only an informal writing was created, the Court has left it to the finder of fact to determine whether the parties

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 991772 (S.D.N.Y.)

(Cite as: 2005 WL 991772 (S.D.N.Y.))

Page 10

intended to be bound. *See Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 575 (2d Cir.1993) ("For the purposes of determining whether the parties intended to be bound absent a written agreement, ... evidence show[ing] partial performance [is] sufficient to contribute to the factual dispute over the ultimate issue of the parties' intent.").

However, defendants rightly point out that, in order to sue for breach of contract, plaintiff must be a party to the contract, which is not alleged, or an intended **third party beneficiary** to the contract. *See Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 600 (2d Cir.1991). In order to claim **third party beneficiary** status, plaintiff must allege: " '(1) the existence of a valid and binding contract between other parties, (2) that the contract was **intended for his benefit** and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." ' *State of Cal. Publ. Employees' Ret. Sys. v. Sherman & Sterling,* 95 N.Y.2d 427, 434-35, 741 N.E.2d 101, 104 (2000) (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 451 N.E.2d 459 (1983)); *Mortise v. United States,* 102 F.3d 693, 697 (2d Cir.1996). The Restatement (Second) of Contracts further guides New York courts, stating that a third party is an intended beneficiary if: "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Restatement (Second) of Contracts* § 302(b) (1981). Finally, the intention to create a **third party beneficiary** need not be expressed in the contract, *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 573 (2d Cir.1991); however, "the parties' intent to benefit a third party must be shown on the face of the agreement," *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 725 F.Supp. 712, 733 (S.D.N.Y.1989). Absent any facts to this effect, plaintiff may, at best, be deemed an incidental beneficiary with no enforceable rights under the alleged contract. *See, e.g., McPheeters v. McGinn, Smith & Co., Inc.,* 953 F.2d 771, 773 (2d Cir.1992) ("**A third-party beneficiary** exists, however, 'only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.") (quoting *Kyung Sup Ahn v. Rooney Pace, Inc.,* 624 F.Supp. 368, 371 (S.D.N.Y.1985)).

**\*13** The alleged contract at issue was one which, on its face, was only intended to benefit the signatories. SCOA, as investor, benefited from the possibility of reaping the rewards of Smartix's possible success. Smartix, as the recipient of the investment, benefited from an injection of liquidity, a sorely needed boon to the beleaguered start-up company. Plaintiff's sole argument supporting his assertion that he was an intended **third party beneficiary** of this contract is that he suffered a unique injury distinguishable from that suffered by all Smartix's shareholders. (Pl.'s Opp'n at 15-16.) Plaintiff claims that his status as employee, earning a $150,000 salary, and creditor, loaning the company $100,000, sets him apart from other shareholders and supports the contention that SCOA intended to benefit him personally through this investment contract. The Court cannot discern how Smartix's decision to employ plaintiff, and plaintiff's decision to loan money to Smartix, in any way implicates SCOA's intent to benefit plaintiff. Plaintiff points to, and the Court has discovered, no caselaw which enforced a contract on behalf of a third party in this situation. Therefore, plaintiff has not alleged a claim for breach of contract as an intended **third party beneficiary** and the Court dismisses the claim. (See Compl. ¶ ¶ 158-68 ("Fifth Count").)

*C. Breach of Fiduciary Duty*

In his Complaint, plaintiff asserts that SCOA owed and breached a fiduciary duty of utmost good faith and fair dealing owed to him by virtue of the relationship between Smartix and SCOA as joint venturers. (Compl.¶ 171.) Plaintiff asserts two further theories of fiduciary relationship in his opposition to the instant motion to dismiss: (1) SCOA was an investment banker; and, (2) SCOA was the *de facto* majority shareholder of Smartix owing a duty to all other shareholders, including Henneberry. As to the joint venturers theory, defendants argue that, at best, Henneberry does not assert a fiduciary duty between himself and SCOA, but rather only asserts a duty between Smartix and SCOA. Defendants further argue that there is no factual support for Henneberry's claim that SCOA was an investment banker nor that SCOA was the *de facto* majority shareholder. [FN6]

> FN6. Defendants also argue that plaintiff should be barred from arguing these last two theories because they were not represented in the Complaint. However, as stated above, for purposes of a motion to dismiss, the Court may properly consider all factual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
(Cite as: 2005 WL 991772 (S.D.N.Y.))

Page 11

allegations in the Complaint, attached documents, matters of judicial notice, or documents the plaintiff relied on in bringing suit. *Brass*, 987 F .2d at 150. Further, plaintiff realleged each preceding allegation in the Complaint as part of his fiduciary duty claim (Compl.¶ 169) and the Court properly makes all reasonable inferences in favor of plaintiff.

To establish a breach of fiduciary duty, plaintiff must plead that, (1) a fiduciary duty was breached; (2) defendant knowingly aided the breach; and, (3) damages resulted from the breach. *See Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir.1986).* As a predicate consideration, finding a breach of fiduciary duty requires finding that a fiduciary relationship existed between the parties. *See Flickering v. Harold C. Brown & Co., Inc., 947 F.2d 595, 599 (2d Cir.1991); Whitney, 782 F.2d at 1115.* Moreover, plaintiff must allege a relationship of trust or special confidence imposing obligations beyond the express agreements between the parties. *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir.1996).* Fiduciary relationships have been found where: defendant had unique access to material information, *Powers v. British Vita, P.L.C., 57 F.3d 176 (2d Cir.1995);* defendant was a stockbroker and plaintiff a customer, *Conway v. Icahn & Co., Inc., 16 F.3d 504 (2d Cir.1994);* defendant's status added special credibility to his representations to plaintiff, *ABKO Music v. Harrisongs Music, Inc., 508 F.Supp. 798, 803 (S.D.N.Y.1981)* (assigning fiduciary status to the former manager of the Beatles music group); the parties were joint ventures, *Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928);* and, defendant was a majority shareholder in a closely-held corporation and plaintiff was a minority shareholder, *Barbour v. Knecht, 743 N.Y.S.2d 483, 490, 296 A.D.2d 218, 227 (App.Div.2002).* In short, " '[a] fiduciary relationship involves discretionary authority and dependency' and ... 'at the heart of the fiduciary relationship lies reliance, *and defacto control and dominance.*' " *United States v. Brennan, 183 F.3d 139, 150 (2d Cir.1999)* (alterations in original) (quoting *United States v. Chestman, 947 F.2d 551, 569 (2d Cir.1991)).* Thus, the Second Circuit finds a fiduciary relationship even where the relationship is informal so long as it can be "readily seen that one party reasonably trusted another." *Brass,* 987 F.2d at 150-151 (noting that relationships such as those between priest and parishioner, bank and depositor, majority shareholder and minority shareholder, and close friends and family members, generally give rise to

fiduciary duties). However, there is generally no fiduciary relationship between sophisticated parties involved in an arm's length transaction. *Id.; Mia Shoes, Inc. v. Republic Factors Corp.,* No. 96 Civ. 7974, 1997 U.S. Dist LEXIS 12571, at *5- 6 (S.D.N.Y. Aug. 20, 1997).

*14 The Court finds as a matter of law that plaintiff has not alleged that SCOA owed him a fiduciary duty. First, plaintiff is correct that joint venturers owe each other a fiduciary duty, as conceded by defendants. (Defs.' Reply at 9, ¶ 2.) However, it is also true that, at best, plaintiff only alleges that SCOA and Smartix entered into a joint venture, specifically failing to allege that Henneberry himself and SCOA entered into any agreement, much less a joint venture. (Compl.¶ ¶ 60, 170.) Without assessing the merits of whether the relationship between SCOA and Smartix in fact constituted a joint venture, the Court finds that plaintiff has not alleged that SCOA owed him a fiduciary duty personally and, therefore, plaintiff cannot prevail on this theory as a matter of law.

Second, plaintiff's vague reference to New York courts' recognition that investment bankers have "special skill, knowledge and experience in their field" is inapposite, for, as stated above, plaintiff's Complaint does not allege any circumstances wherein SCOA could be considered an investment banker. *See supra* Discussion Part II.A.2.

Finally, plaintiff argues that SCOA was a *de facto* majority shareholder based on its power over Smartix, as stated in Smartix's Re-Stated and Amended Certificates of Incorporation (*see* Compl. ¶ 53; Declaration of John M. Deitch, Esq. ("Deitch Decl.") Exs. 3-5), to: (1) control whether Smartix could sell, convey, or dispose of its Intellectual Property license; (2) prevent Smartix from reorganizing, consolidating or merging; (3) prevent Smartix from declaring dividends; and, (4) prevent Smartix from amending its Bylaws or Articles of Incorporation. [FN7] Defendants argue that these powers were also held by Series A preferred shareholders. Further, defendants note that Henneberry was Chairman and CEO of Smartix, exerting considerable control, and owned three times as many shares as SCOA, though concededly those shares were of common, rather than preferred stock. The Court finds defendants' arguments persuasive as courts have almost exclusively found that a shareholder held a *de facto* majority where that shareholder maintained overwhelming control over the operation of the company. *See Gould v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Ruefenacht, 471 U.S. 701, 705 (1985)* ("*de facto* operational *control* may be obtained by the acquisition of less than 50%" of the company's shares) (emphasis added); *Box v. Northrop Corp.,* 459 F.Supp. 540, 547-48 (S.D.N.Y.1978). Nothing in plaintiff's complaint alleges that SCOA maintained overwhelming control over the operation of Smartix to be considered the *de facto* majority shareholder.

> FN7. Plaintiff asserts that SCOA's status as majority shareholder is further evidenced by his own e-mail communication to SCOA employees, dated September 19, 2003, wherein he refers to SCOA as a "major shareholder." (Pl.'s Opp'n at 17; Compl. Ex. A.) However, plaintiff's e-mail reference cannot supplant this Court's determination of matters of law. *See Papasan v. Allain,* 478 U.S. 265, 286 (1986). Further, the Court notes that plaintiff appears to be speaking from both sides of his mouth, as, in one breath he prays the Court disregard portions of this same e-mail that refer to a "term sheet" and in another, argues the Court should pin a finding that SCOA was a *de facto* majority shareholder on an ostensibly analogous representation made in this same e-mail. (Pl.'s Opp'n at 1, 17.)

Thus, for all these reasons, the Court dismisses plaintiff's claim for breach of fiduciary duty. (*See* Compl. ¶ ¶ 169-74 ("Sixth Count").)

**D.** *Defamation*

Plaintiff claims that defendants defamed him during meetings with both the Boston Red Sox and MasterCard held between September 19, 2003 and September 23, 2003. Plaintiff alleges that, while he was on vacation out-of-town, defendants, represented by Graustein and John Does 1-10, surreptitiously met with both the Red Sox Executive Vice President of Business Affairs, Michael Dee, and, at a separate meeting, with MasterCard Senior Vice President of Global Sponsorship and Event Marketing, John Stuart. At these meetings, defendants made statements that, in sum and substance, alleged that Henneberry "lacked the necessary skill and ability to manage Smartix and otherwise disparaged his business acumen." (Compl.¶ ¶ 90, 100.) Further SCOA "placed blame for Smartix' present financial condition, and inability to pay monies owed to the Red Sox and St. Louis Cardinals, upon the purported mis-management of Smartix by Mr. Henneberry." (*Id.*) Plaintiff argues this constituted defamation *per*

*se* and also that he suffered special damages. Defendants counter that the statements were nothing more than opinion, and, in the alternative, were protected by the privilege of common interest.

**1.** *Defamation Law*

**\*15** To plead defamation under New York law, the plaintiff must establish four elements regarding the statements at issue: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by defendants; and, (4) resulting in injury to the plaintiff. *See Dellefave v. Access Temps., Inc.,* No. 99 Civ. 6098, 2001 WL 25745, at \*3 (S.D.N.Y. Jan. 10, 2001) (citing *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61 (2d Cir.1993)). A defamatory statement is one that leaves an individual vulnerable to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... [which] induce[s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 177 (2d Cir.2000). At the pleadings stage, the Court must determine only whether the complaint "is detailed and informative enough to enable defendant to respond and to raise the defense of res judicata if appropriate." *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986); *see* Fed.R.Civ.P. 8. Plaintiff need not directly quote the defamatory statements. *Kelly,* 806 F.2d at 46.

In addition to the aforementioned elements, the plaintiff in a defamation action must also plead special damages, [FN8] unless the language at issue qualifies as defamation *per se.* Defamation *per se* is a statement that casts aspersions upon the basic character and integrity of an individual or business. Thus, a statement "which *tends* to disparage a person in the way of his office, profession or trade" is defamatory *per se* and does not require proof of special damages because injury is assumed. *Davis v. Ross,* 754 F.2d 80, 82 (2d Cir.1985) (quoting *Nichols v. Item Publishers, Inc.,* 309 N.Y. 596, 602, 132 N.E.2d 860, 862 (1956)); *see also Four Star Stage Lighting, Inc. v. Merrick,* 56 A.D.2d 767, 768, 392 N.Y.S.2d 297 (App.Div.1977) (holding that "words are libelous if they affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof").

> FN8. Special damages constitute "the loss of

something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation...." *Matherson v. Marchello*, 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (App.Div.1984) (citations and quotations omitted); Robert D. Sack, 1 *Sack on Defamation: Libel, Slander and Related Problems* § 2.8.7.1, at 2-113 (3d ed. 2004) ("Special damages refers only to pecuniary damages such as out-of-pocket loss.").

At this stage of the proceeding, where the plaintiff's allegations must be accepted as true and all reasonable inferences must be drawn in his favor, *see Conley*, 355 U.S. at 46, the Court's task is clear: Determine whether the statements at issue are "reasonably susceptible of a defamatory connotation." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380, 649 N.E.2d 825, 829 (1985); *see also Celle*, 209 F.3d at 177 (observing that whether particular words are defamatory is a legal question to be decided by the court as a threshold matter); *Kelly*, 806 F.2d at 46 ("[O]n a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction."). If the Court deems the statements to be reasonably susceptible to a defamatory interpretation, then "it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average" listener. *See James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837-38 (1976) (citation omitted).

*16 Further, because the Court accepts plaintiff's allegations as true, it assumes that defendants' statements are false and that defendants were culpable in making the statements. *See Lucking v. Maier*, No. 03 Civ. 1401, 2003 U.S. Dist. LEXIS 23060, at *8 n. 4 (S.D.N.Y. Dec. 23, 2003) ("The falsity of the accused passage and defendants' fault are both presumed at this [motion to dismiss] juncture."); *Daniels v. Provident Life & Cas. Ins. Co.*, No. 02 Civ. 0668, 2002 U.S. Dist. LEXIS 24704, at *15-16 (W.D.N.Y. Dec. 22, 2002) (denying defendant's motion to dismiss due to a dispute as to the truth of alleged facts).

In interpreting allegedly defamatory utterances, the Court must view the statements in context as the literal meaning of the words does not always coincide with their meaning in a grander setting. *See Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 226 (2d Cir.1985). The statement in question

should not be viewed in isolation, but instead should be interpreted in light of the "whole apparent scope and intent" of the statement. *November v. Time Inc.*, 13 N.Y.2d 175, 178, 194 N.E.2d 126, 128 (1963). "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed." Id.* at 178-79, 194 N.E.2d at 128 (alteration in original) (citation omitted). Finally, if the statement in question is reasonably susceptible to more than one interpretation, one of which is not defamatory, "it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Davis*, 754 F.2d at 82.

*2. Protected Speech: Opinion and Common Interest Privilege*

The New York State Constitution, unlike the Federal Constitution, provides for absolute protection of pure opinions. *See Flamm v. Am. Assoc. of Univ. Women*, 201 F.3d 144, 147-48 (2d Cir.2000); *compare Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (rejecting the argument that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment") *with Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 567 N.E.2d 1270 (1991) (Kaye, C.J.) (holding that expressions of "pure" opinion are afforded absolute protection under the New York State Constitution). In the realm of defamation, this constitutional shield requires that assertions of fact, not opinion, form the basis of a claim. *See Brian v. Richardson*, 87 N.Y.2d 46, 51, 660 N .E.2d 1126, 1129 (1995) (citations omitted). Thus, the Court must decide as a matter of law whether any of the statements at issue are protected opinion and therefore not actionable. *See Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397, 366 N.E.2d 1299, 1306 (1977) ("Whether a particular statement constitutes fact or opinion is a question of law.").

*17 The Court's "essential task" in this inquiry is to determine whether the allegedly defamatory statements "may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion," when considering the statements in the immediate context of the communication as a whole and the broader context in which the statements were published. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292, 501 N.E.2d 550, 553 (1986); *see also Brian*, 87 N.Y.2d at 51, 660 N.E.2d at 1129; *Immuno*, 77 N.Y.2d at 254, 567 N.E.2d at 1281. If one of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statements may be viewed as implying undisclosed facts, then it is not protected as opinion under the New York Constitution. *See Steinhilber,* 68 N.Y.2d at 292, 501 N.E.2d at 554. Notably, the Court should examine the material in question from the perspective of an ordinary listener. *See Mr. Chow,* 759 F.2d at 224.

The New York Court of Appeals has considered the following factors when distinguishing between assertions of fact and non-actionable expressions of opinion:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 153, 623 N.E.2d 1163, 1167 (1993) (quoting *Steinhilber,* 68 N.Y.2d at 292, 501 N.E.2d at 553) (alteration in original).

New York also recognizes a qualified privilege protecting defendants from liability for making what would otherwise be considered defamatory statements. "Statements made by a defendant to a third party on matters relating to their mutual business interests" qualify for this privilege. *Posa, Inc. v. Miller Brewing Co.,* 642 F.Supp. 1198, 1207 (E.D.N.Y.1986); *see also Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 62 (2d Cir.1993). The New York Court of Appeals explained the privilege as follows:

> A communication made *bona fide* upon any subject matter in which the party communicating has an *interest,* or in reference to which he had a *duty,* is privileged if made to a person having a corresponding *interest* or *duty,* although it contained incriminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation.

*Shapiro v. Health Ins. Plan,* 7 N.Y.2d 56, 60-61 163 N.E.2d 333, 335-36 (1959). Courts have found privilege to lie where an insurance carrier warned its client that an autobody shop was disreputable, *East Point Collision Works, Inc. v. Liberty Mut. Ins. Co.,* 706 N.Y.S.2d 700, 271 A.D.2d 471 (App.Div.2000), and where a car purchaser warned the parent company that its dealership was "deceitful, fraudulent, dishonest, disrespectful," *Leary v.*

*DiBlasi,* 674 N.Y.S.2d 749, 251 A.D.2d 550, 551 (App.Div.1998). A party's good faith communication with a party having a common interest creates a rebuttable presumption that a defamation action cannot be maintained. *See Weldy,* 985 F.2d at 62. The presumption is rebutted, however, if the statements were: (1) made for purposes beyond the scope of the privilege "where a defendant does not exercise the privilege in a reasonable manner, abuses the occasion, or makes the statement in furtherance of an improper purpose"; (2) made with common law malice, considering "defendant's personal spite or ill-will" '; or, (3) made with knowledge of falsity or reckless disregard of the truth. *Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 410 (2d Cir.2000) (internal quotations omitted).

3. *Analysis of the Statements*

**\*18** As alleged, the statements constitute defamation *per se* because they disgraced plaintiff's business aptitude, chipping away at a pillar of the reputation plaintiff had worked hard to build. (*See* Compl. ¶ ¶ 11, 14-19, 46.) This point is not contested by defendants. Instead, defendants contend the statements, even as vaguely alleged, are statements of opinion rather than fact.

The Court finds that at this stage of the proceedings, it cannot be said as a matter of law that the statements at issue were merely opinion rather than "reasonably understood as implying the assertion of undisclosed facts justifying the opinion," *Steinhilber,* 68 N.Y.2d at 292, 508 N.E.2d at 553. At the time these statements were made, Smartix was in obvious distress. That defendants assigned Henneberry responsibility for that distress does not, in itself, bring these statements out of the realm of opinion; for, assignment of blame is commonly regarded as opinion. *See, e.g., Chittenden v. Schwartz,* 653 N.Y.S.2d 375, 236 A.D.2d 503 (App.Div.1997). However, the Red Sox and MasterCard could have assumed that SCOA had unique access to undisclosed facts precipitating the demise of Smartix. *See Levin v. McPhee,* 119 F.3d 189, 197 (2d Cir.1997) ("Though some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed.") (citing *Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 154, 623 N.E.2d 1163, 1168 (1993)). SCOA had entered into an investment contract, prior to which it conducted due diligence, including an economic valuation of Smartix. (Compl.¶ 50.) Also, SCOA held itself out as Smartix's lead investor and actively

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
**(Cite as: 2005 WL 991772 (S.D.N.Y.))**

solicited outside investment on behalf of Smartix. (*Id.* ¶¶ 61, 62.) To satiate potential investors, SCOA "continually requested revised and updated documents from Smartix." (*Id.* ¶ 62.) Further, SCOA was kept abreast of Smartix's financial situation, including a June 2003 meeting where SCOA was advised that Smartix could not sustain operations absent additional funding. (*Id.* ¶ 63; *see also* ¶¶ 70-74.) It is unclear whether the Red Sox or MasterCard knew of SCOA's special relationship with Smartix but it is a reasonable inference given that, in the same meetings in which the defamatory statements were made, SCOA informed the Red Sox that SCOA would be taking over operations of Smartix and removing Henneberry. (*Id.* ¶ 96.) This analysis plainly applies to the statement blaming Henneberry for Smartix's decline. It is equally applicable to the statement regarding Henneberry's business ability because the Red Sox and MasterCard could have inferred from SCOA's many personal dealings with Henneberry that SCOA had factual knowledge regarding his abilities to which the public was not privy. That the statements are vaguely alleged is not fatal to plaintiff's claim. It is reasonable to allow plaintiff to discover the specific wording of the oral, unrecorded statements prior to determining whether SCOA's comments "otherwise disparag[ing] plaintiff's] business acumen" (*Id.* ¶ 90) identified "specific defects or derelictions" to justify a claim for defamation (Defs.' Mem. at 16 (citing *Cohen v. Feiden*, 624 N.Y.S.2d 448, 449, 213 A.D.2d 696, 697-98 (App.Div.1995); *McGill v. Parker*, 582 N.Y.S.2d 91, 98, 179 A.D.2d 98, 109-10 (App.Div.1992)).

**\*19** It is also not appropriate to dismiss plaintiff's defamation claim at this stage of the proceeding based on defendants' assertion of the qualified common interest privilege. The Court agrees with defendants that, as investors, they shared an interest in Smartix's success with both the Red Sox and MasterCard. However, plaintiff has sufficiently pleaded that defendants were acting outside the scope of the privilege when they advised the Red Sox and MasterCard that Henneberry was the cause of Smartix's demise. Plaintiff alleges that this advice was given in order to allow SCOA to take over control of Smartix. (Compl.¶ ¶ 88, 124.) In fact, plaintiff states that SCOA informed the Red Sox that SCOA "would be taking over Smartix and making changes in management so as to remove Mr. Henneberry." (Compl.¶ 96.) The Court does not find these to be conclusory allegations but rather specific statements of intent made by SCOA to third parties. *See Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997,

1004 (2d Cir.1988) ("[I]t would be unworkable and unfair to require great specificity in pleading scienter, since 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'... Nonetheless, circumstances must be pleaded that provide a factual foundation for otherwise conclusory allegations of scienter.") When coupled with the preceding allegations of SCOA's failure to cooperate regarding investments even when faced with Smartix's self-declared inability to survive absent funding, the inference is plain that SCOA's statements to the Red Sox and MasterCard may have been motivated by SCOA's own interest in acquiring the Smartfan program through Smartix and ousting Henneberry, rather than any common interest in Smartix's survival. *Compare Weldy*, 985 F.2d at 63 ("The jury could also have found an abuse of the privilege by determining that Hathaway had an improper purpose, in that he was deliberately exaggerating ... so as to use Tripodi's failure to report the incident as a device to force Tripodi's discharge.") *with Stillman v. Ford*, 22 N.Y.2d 48, 53, 238 N.E.2d 304, 306 (1968) ("As long as the statements were motivated not by ill will or personal spite but by a sincerely held desire to protect the institution, they are not actionable."). [FN9]

> FN9. Defendants also argue that plaintiff's alleged damages such as "loss of stock value, failed loans, unreimbursed expenses and loss of salary" did not directly flow from defendants' alleged defamatory statements, but rather resulted from Smartix's general decline and ultimate failure. Defendants' objection fails, however, because a plea of special damages is not a necessary element of a well-pleaded tort for slander *per se.* While the Court recognizes, *infra* Discussion Parts II.E and II.F, that damages resulting from Smartix's failure could not have stemmed from SCOA's allegedly defamatory statements as demonstrated by the timeline of the Complaint, the purpose of removing the requirement to plead special damages is to allow plaintiff to assess his damages after discovery. Therefore, plaintiff's defamation claim cannot fail simply because he went beyond the call of the caselaw and alleged inappropriate specific damages.

Thus, plaintiff's claim for defamation survives defendants' motion for dismissal on the present record. (*See* Compl. ¶ ¶ 120-43 ("Second Count").)

E. *Injurious Falsehood*

Plaintiff alleges that the statements underlying his defamation claim also give rise to a claim for injurious falsehood under New York State law. In order to recover for injurious falsehood, plaintiff must plead that (1) defendants had malicious intent, intended the statement to harm plaintiff, or uttered the statement with reckless disregard such that a reasonably prudent person would anticipate damage; (2) defendants knew of the statement's falsity or acted recklessly in disregard of the statement's veracity; (3) special damages directly resulted "in the form of lost dealings." *See Waste Distillation Tech., Inc. v. Blasland & Bouck Engineers, P.C.,* 136 A.D.2d 633, 523 N.Y.S.2d 875, 877 (App.Div.1988); *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App.Div.1959); Restatement (Second) of Torts § 623 (1981). Defendants argue that plaintiff has failed to sufficiently plead scienter and special damages. [FN10]

> FN10. In their reply papers, defendants raised for the first time the argument that plaintiff's claim fails because it failed to allege the exact words giving rise to the tort of injurious falsehood. (Defs.' Reply at 4- 5.) The Court will not address this argument because to do so would render the Court's procedural limits moot. *See Dunlop-McCullen v. Pascarella,* No. 97 Civ. 0195, 2002 U.S. Dist. LEXIS 21854, at *80 n. 43 (S.D.N.Y. Nov. 13, 2002) (Leisure, J.). "[E]ntirely new but foreseeable points relevant to a motion [may not] be presented in a reply affidavit.... Such a procedure is foreign to the spirit and objectives of the Federal Rules of Civil Procedure. Were tactics of this type permitted, a sur-reply affidavit would be necessary from the adversary, followed by a further supplemental response by the moving party, and so on ad infinitum." *Tetra Techs., Inc. v. Harter,* 823 F.Supp. 1116, 1120 (S.D.N.Y.1993) (citations omitted).

*20 Plaintiff has sufficiently pled scienter. It is clear that a reasonable person would recognize that statements disparaging a CEO's business acumen would harm his reputation. Defendants' reliance on the argument that, "[t]hough there is an allegation of reckless disregard of falsity, that is different from the kind of reckless heedlessness of consequences that the case law requires" is specious. The Court will not engage in defendants' proposed duel of semantics.

Defendants' second argument, however, is more persuasive. Special damages are those that "flow directly from the injury to reputation caused by the defamation; not from the effects of the defamation." *Matherson,* 100 A.D.2d at 235, 473 N.Y.S.2d at 1001; *see also supra* note 8 and accompanying text. For special damages to be found, "actual losses must be identified and causally related to the alleged tortious act." *L.W.C. Agency, Inc. v. St. Paul Fire & Marine Ins., Co.,* 125 A.D.2d 371, 373, N.Y.S.2d 97, 100 (App.Div.1986).

Plaintiff alleges that he suffered damages of (1) $20,000,000 for lost future business opportunities with MasterCard and Major League Baseball ("MLB"); (2) $20,000,000 for injury to his reputation; (3) at least $2,610,999 for diminution of Smartix's stock value; (4) $662,425.37 for failed loans made to Smartix; (5) $18,000 for unreimbursed costs and expenses arising from Smartix's operation; and, (6) $150,000 per year for lost salary. (Compl.¶ 151.) The claim for reputational damage is undoubtedly insufficiently alleged as it cites no basis for its amount, nor specific repercussions of the tort which gave rise to the damage. *See Korry v. Int'l Tel. & Tel. Corp.,* 444 F. Supp 193, 197 (S.D.N.Y.). Nor is the claim for lost future earnings sufficiently alleged, though that conclusion requires further elucidation. Generally, special damages must be itemized, and not pled with round figures. *See Drug Research Corp. v. Curtis Publ'g Co.,* 7 N.Y.2d 435, 441 (1960); *Matherson,* 100 A.D.2d at 235, 473 N.Y.S.2d at 1001. Plaintiff's reliance on *Sadowy v. Sony Corp. of Am.,* 496 F.Supp. 1071 (S.D.N.Y.1980), to justify his pleading the amount in round numbers is unfounded. There, the Court allowed plaintiff to so plead $500,000 as representing the loss of a $50,000 annual salary for ten years. *Id.* at 1075-76 (finding that the damages pled were "a statement of reasonably identifiable losses sustained by the plaintiff") (quoting *Bohm v. Holzberg,* 47 A.D.2d 764, 764, 365 N.Y.S.2d 262, 264 (App.Div.1975)). That case is readily distinguishable from the matter at hand. First, plaintiff alleges that he lost, at most, $25,000 per month, but he pleads no start or end date which would plausibly amount to the $20,000,000 sought. Further the *Sadowy* Court specifically noted that plaintiff alleged that he had sought employment "and, despite a successful professional record, was unable to find any." *Id.* at 1076. Plaintiff makes no such allegation here, only stating that he "is now no longer considered for consultancies with MasterCard or MLB and has lost

Slip Copy
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
(Cite as: 2005 WL 991772 (S.D.N.Y.))

Page 17

his prior position of respect and confidence with those institutions." (Compl.¶ 140.) This is a facially insufficient plea for special damages.

**\*21** Plaintiff's remaining four pleas for special damages stem from the demise of Smartix. These damages, while lamentable, do not flow from defendants' statements and, therefore, are not appropriately characterized as special damages. Plaintiff's Complaint details Smartix's hardship beginning in June 2003. Specifically, plaintiff states that, in June 2003, he told SCOA that Smartix could not continue without additional funding and advised them on June 16, 2003 that Smartix may need to cease operations. (Compl.¶ ¶ 63, 71.) On September 8, 2003, plaintiff advised SCOA that Smartix's lack of funding would prevent continuation of the Smartfan program. (Compl.¶ 78.) The next day, Henneberry advised Dee of the Boston Red Sox that Smartix's financial stability was not guaranteed for the following year. (Compl.¶ 82.) Dee responded with concern that Smartix would not satisfy its financial obligations to the Red Sox. (Compl.¶ 83.) Defendants' statements were not made until around September 19, 2003, after the occurrence of the above events. Thus, it is apparent that Smartix was plagued by financial difficulties well before those statements were made. Moreover, at least MLB was aware of this difficulty.

It is not necessary that defendants' statements be the only cause of Smartix failure, but they must be a contributing factor. Plaintiff's Complaint makes it clear that the statements did not contribute to the failure; rather they may have actually been Smartix's last ray of hope. After Henneberry made Dee aware of Smartix's woes, SCOA's statements reassured Dee that the cause of the problem, plaintiff, would be removed and Smartix would be run by new management, namely SCOA. (Compl.¶ 96.) Thereafter, Dee called SCOA directly regarding the Smartfan program, the shareholders voted to continue Smartfan, SCOA represented that investors were still interested in Smartix, and plaintiff floated Smartix loans to continue operations. (Compl.¶ ¶ 97, 111-13.) This evidences that MLB was aware of a problem prior to the statements and chose to continue its relationship with Smartix after the statements. Thus, any damages flowing from the decline of Smartix cannot be attributed to SCOA's statements regarding Henneberry. Regarding MasterCard, plaintiff does not allege what effect, if any, SCOA's statements had on MasterCard's relationship with Smartix. Again, this causes the Court to conclude that any damages flowing from Smartix's failure were not caused by statements made to MasterCard.

Because plaintiff has failed to sufficiently plead special damages flowing from the allegedly tortious statements, his claim of injurious falsehood is dismissed. (*See* Compl. ¶ ¶ 144-51 ("Third Count").)

*F. Tortious Interference with Prospective Advantage*

Plaintiff claims that defendants' tortious action in meeting with MLB and MasterCard and making the allegedly defamatory statements give rise to a claim of tortious interference with prospective economic advantage under New York law.

**\*22** To establish a claim for tortious interference with prospective business advantage, plaintiff must prove that: (1) there was a business relationship with a third party; (2) defendants "knew of that relationship and intentionally interfered with it"; (3) defendants either acted "solely out of malice" or used wrongful means; and (4) defendants' "interference caused injury to the relationship" with the third-party. *See Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003); *see also Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir.2002); *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). This cause of action has a "limited scope." *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 168 (S.D.N.Y.1998).

A properly pleaded complaint for this tort must allege relationships with specific third parties with which the respondent interfered. *See Four Finger Art Factory, Inc. v. DiNicola,* No. 99 Civ. 1259, 2000 U.S. Dist. LEXIS 1221, at \*23-24 (S.D.N.Y. Feb. 9, 2000); *Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.,* No. 96 Civ. 3839, 1997 WL 166497, at \*7 (S.D.N.Y. Apr. 9, 1997); *Winner Int'l v. Kryptonite Corp.,* No. 95 Civ. 247, 1996 U .S. Dist. LEXIS 2182, at \*4 (S.D.N.Y. Feb. 27, 1996) ("As Winner does not allege that Kryptonite's conduct interfered with its business relationship with any specific party, it cannot establish the elements necessary for this tort...."). Further, the relationship must be in existence at the time of the interference. *See Minnesota Mining,* 1997 WL 166497, at \*7 ("A claim for interference with advantageous business relationships must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior.") (citations omitted).

The Complaint must also state how defendants interfered in those relationships. *See Four Finger,*

Slip Copy
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
**(Cite as: 2005 WL 991772 (S.D.N.Y.))**

Page 18

2000 U.S. Dist. LEXIS 1221, at *24. That interference must be "direct interference with a third party, that is, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff.' " *Black Radio Network, Inc. v. NYNEX Corp.*, No. 96 Civ. 4138, 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000) (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.*, 957 F.Supp. 477, 482 (S.D.N.Y.1997)); *see also Piccoli*, 19 F.Supp.2d at 167-68. Moreover, "as a general rule, the defendant's conduct must amount to a crime or an independent tort" because "[c]onduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other non-binding economic relations." *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103 (2004); *see also Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F.Supp.2d 389, 423 (N.D.N.Y.2004) (noting that the general rule following *Carvel* is that defendant's conduct must amount to a crime or an independent tort). The only recognized exception to the rule applies where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs." *Carvel*, 3 N.Y.3d at 190, 818 N.E.2d at 1103 (quotation omitted); *see also Carvel*, 350 F.3d at 17-19 (providing that plaintiff may establish this element of the tort by showing either that defendant used "wrongful means" or acted "solely out of malice").

**\*23** As stated *supra* Discussion Part II.D, plaintiff has adequately pled that defendants engaged in the tort of defamation when meeting with MLB and MasterCard in September 2003. Thus, wrongful means were used. However, plaintiff again fails to sufficiently allege a causal link between the tort and his injury giving rise to damages. Plaintiff's allegation of damages mirrors that listed *supra* Discussion Part II.E. (*See* Compl. ¶ 157.) As stated above in the same section, the damages flowing from the decline of Smartix are not attributable to SCOA's meetings with MLB and MasterCard. Plaintiff's allegation of reputational injury is again plainly inappropriately pled as it does not relate to any plausible prospective economic advantage. Finally, plaintiff's plea for damages resulting from lost future business opportunities as a consultant for MLB and MasterCard fails because he does not allege that any such consulting relationship existed at the time of the interfering meetings. *See Huntington Dental*, 1998 U.S. Dist. LEXIS 1526, at *4. In fact, his prior consulting for those entities was done three years prior to the alleged defamation. (*See* Compl. ¶ 139

(alleging plaintiff consulted for MLB and MasterCard from December 1995 through January 2000).) Plaintiff does not claim that he interacted with MLB and MasterCard at the time of SCOA's meeting with them in any other capacity than as CEO of Smartix.

Therefore, plaintiff's claim for tortious interference with prospective advantage fails and is dismissed. (*See* Compl. ¶¶ 152-57 ("Fourth Count").)

### III. *Leave to Amend the Complaint*

Defendant asks the Court to dismiss the Complaint with prejudice, prohibiting plaintiff from repleading his claims. Plaintiff can replead as of right one time without leave of the Court prior to defendants' filing a responsive pleading under Federal Rule of Civil Procedure 15(a). However, this right extinguishes when the Court grants a motion to dismiss. *Sbrocco v. Pacific Fruit, Inc.*, No. 82 Civ. 5650, 1983 U.S. Dist. LEXIS 14825, at *6-7 (S.D.N.Y. Aug. 8, 1983) ("[W]hile the law in this circuit is that a motion to dismiss is not a responsive pleading, and therefore the complaint may be amended without leave of the court, it is equally well established that this right terminates upon the granting of the motion to dismiss.") (citing *Christophides v. Porco*, 298 F.Supp. 403 (S.D.N.Y.1968), and *Swan v. Bd. of Higher Educ. of the City of New York*, 319 F.2d 56 (2d Cir.1963)). Therefore, plaintiff must seek leave to amend his complaint. Leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "[T]his mandate is to be heeded," *Foman v. Davis*, 371 U.S. 178, 182 (1962), in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment ." *Sbrocco*, 1983 U.S. Dist. LEXIS 14825, at *7-8. Further, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (citing *Ronzani v. Sanofi S .A.*, 899 F.2d 195, 198 (2d Cir.1990), *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987), and *Pross v. Katz*, 784 F.2d 455, 459-60 (2d Cir.1986)). The Court is guided by the Supreme Court which noted that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep ... may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley*, 355 U.S. at 48.

Slip Copy                                                                          Page 19
Slip Copy, 2005 WL 991772 (S.D.N.Y.)
**(Cite as: 2005 WL 991772 (S.D.N.Y.))**

**\*24** However, if the Court finds that it would be
futile to allow plaintiff to replead because he cannot
set forth facts supporting a viable claim, leave to
amend should be denied. *See Ellis v. Chao,* 336 F.3d
114, 127 (2d Cir.2003); *Oneida Indian Nation of New
York v. City of Sherrill, New York,* 337 F.3d 139, 168
(2d Cir.2003); *Hayden v. County of Nassau,* 180 F.3d
42, 53-54 (2d Cir.1999) ("[W]here the plaintiff is
unable to demonstrate that he would be able to amend
his complaint in a manner which would survive
dismissal, opportunity to replead is rightfully
denied."). Plaintiff has not submitted any facts or
argument in his opposition papers that would
rehabilitate the claims dismissed by this Opinion.
However, given that plaintiff has yet to have an
opportunity to replead and that defendants find
protection in Federal Rules 11, 12, and 56 if plaintiff
makes allegations in bad faith, without legal support,
or without factual support, the Court grants plaintiff
twenty days from the date of this Opinion in which to
seek leave to replead. *See Highland Capital Mgmt.,
L.P. v. Schneider,* No. 02 Civ. 8098, 2004 U.S. Dist.
LEXIS 18131, at \*19 (S.D.N.Y. Sept. 9, 2004)
(Leisure, J.); *Sbrocco,* 1983 U.S. Dist. LEXIS 14825,
at \*7 ("This court delayed entry of judgment for
twenty days in order to allow plaintiffs the
opportunity to seek such permission [to replead]
without the necessity of moving for relief from the
judgment under Fed.R.Civ.P. 59(e) or 60(b).") (citing
3 *Moore's Federal Practice* § 15.07 (2d ed.1983)).

*CONCLUSION*
For the foregoing reasons, the Court hereby
GRANTS IN PART and DENIES IN PART
defendants Sumitomo Corporation of America and
Robert Graustein's motion to dismiss plaintiff's
claims pursuant to Federal Rule of Civil Procedure
12(b)(6). Only plaintiff's claim for defamation
survives. Plaintiff's claims for detrimental reliance,
breach of contract, breach of fiduciary duty, injurious
falsehood, and tortious interference with prospective
advantage are hereby DISMISSED. Plaintiff has
TWENTY DAYS from the date of this Order to seek
leave to replead. The parties are ORDERED to
appear before this Court at 500 Pearl Street,
Courtroom 18b for a status conference on May 19,
2005 at 10:00 a.m. unless a motion is pending.

SO ORDERED.

Slip Copy, 2005 WL 991772 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

•         1:04cv02128 _____(Docket)
(Mar. 17, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
CERTAIN UNDERWRITERS AT LLOYDS,       :
LONDON, et al.,                       :
            Plaintiffs,              :
                          :
    -against-                         :       02 CV  7328 (JGK)
                          :
THE PORT AUTHORITY OF NEW YORK AND    :
NEW JERSEY,                           :
                          :
            Defendant.               :
------------------------------------------------------------- x
------------------------------------------------------------- x
AEGIS INSURANCE SERVICES, INC., et al.,   :
            Plaintiffs,              :
    -against-                         :       02 CV  7188 (JGK)
                          :
PORT AUTHORITY OF NEW YORK AND NEW    :
JERSEY, et al.,                       :
            Defendants.              :
------------------------------------------------------------- x
------------------------------------------------------------- :x
INDUSTRIAL RISK INSURERS,             :
            Plaintiff,               :
    -against-                         :       02 CV 7170 (JGK)
                          :
THE PORT AUTHORITY OF NEW YORK        :
AND NEW JERSEY, et al.,               :
            Defendants.              :
------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF MOTIONS BY DEFENDANT THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY TO DISMISS PLAINTIFFS' COMPLAINTS

Beth D. Jacob (BJ6415)
Donald A. Klein (DK7821)
SCHIFF HARDIN LLP
623 Fifth Avenue
New York, New York 10022
(212) 753-5000
Attorneys for Defendant The Port
    Authority of New York and New Jersey

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

PROCEDURAL HISTORY AND STATEMENT OF FACTS ......................................... 3

    A.  The Certain Underwriters Complaint (Citigroup) ..................................... 4

    B.  The Aegis Insurance Complaint (Con Edison) .......................................... 5

    C.  The IRI Complaint (Silverstein) .................................................................. 6

ARGUMENT ...................................................................................................................... 8

    POINT ONE.     THE APPLICABLE LEGAL STANDARD ........................... 8

    POINT TWO.     AS A MATTER OF LAW, THE PORT AUTHORITY'S
                        ALLEGED NEGLIGENCE WAS NOT A PROXIMATE
                        CAUSE OF PLAINTIFFS' DAMAGES ............................... 10

        A.  There were Multiple Intervening Acts Of Such An Extraordinary
            Nature That Responsibility For Plaintiffs' Damages May Not
            Reasonably Be Attributed To The Port Authority ....................................... 13

        B.  The Intervening Acts Did Not Flow From The Port Authority's
            Alleged Negligence ...................................................................................... 16

    POINT THREE.     THE APPLICABLE LEASE AND INSURANCE
                        AGREEMENTS BAR THE CLAIMS ASSERTED BY
                        PLAINTIFFS. ......................................................................... 20

        A.  The Certain Underwriters Complaint Must Be Dismissed
            Because The Insurers' Right to Subrogation Was Waived ........................ 20

        B.  The Aegis Insurance and IRI Complaints Must Be Dismissed
            Because The Port Authority Is An Insured Under The Relevant
            Policies. ......................................................................................................... 25

i

POINT FOUR.    ANY CLAIMS ASSERTED BY PLAINTIFFS IN THEIR COMPLAINTS BUT NOT IN THEIR NOTICES OF CLAIM SHOULD BE DISMISSED. ...............................................................27

    A.    The Certain Underwriters Notice of Claim (Citigroup)............................31

    B.    The Aegis Insurance Notice of Claim (Con Edison) .................................32

    C.    The IRI Notice of Claim (Silverstein) .......................................................34

CONCLUSION.................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Atlantic Mutual Ins. Co. v. Soiefer Bros. Realty Corp.*, 281 A.D.2d 441 (2nd Dep't 2001) .................. 23

*Board of Educ. v. Valden Assoc.*, 46 N.Y.2d 653, 416 N.Y.S.2d 202 (1997) ........................................ 23

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) .............................................. 9

*Chambers v. Time Warner Inc.*, 282 F.3d 147 (2d Cir. 2002) .................................................................. 9

*CIDIS v. Net Realty Holding Trust*, 143 A.D.2d 720 (2nd Dep't 1988) ................................................. 24

*City of New York v. Port Authority of New York and New Jersey*, 284 A.D.2d 195, 726 N.Y.S.2d 261
(1st Dep't 2001) .................................................................................................................................. 29

*Continental Ins. Co. v. 115-123 West 29th Street Owners Corp.*, 275 A.D.2d 604 (1st Dep't 2000).... 24

*Continental Ins. Co. v. Borarie*, 288 N.J.Super. 347 (Law Div. 1995) ................................................ 24

*D'Alessio v. New York Exchange, Inc.*, 258 F.3d 93 (2d Cir. 2001) ....................................................... 8

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 434 N.Y.S.2d 166 (1980).................. 12, 13, 17

*Dix Mutual Ins. Co. v. LaFramboise*, 149 Ill.2d 314 (1992) ................................................................ 26

*Dyer v. Norstar Bank, N.A.*, 186 A.D. 2d 1083, 588 N.Y.S.2d 499 (4th Dep't 1992), *lv. denied*, 81
N.Y.2d 703, 594 N.Y.S.2d 717 (1993) ............................................................................................... 11

*Dyncorp v. GTE Corp.*, 215 F. Supp.2d 308 (S.D.N.Y. 2002) ............................................................... 8

*ELRAC, Inc. v. Ward*, 96 N.Y.2d 58 (2001) .................................................................................... 26, 27

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) .................................................................................... 10

*Farmington Cas. Co. v. 23rd St. Properties Corp.*, 250 F.Supp.2d 293 (S.D.N.Y. 1999).................... 24

*Forni v. Ferguson*, No. 132994/94, slip op. (N.Y. Sup. Ct., New York County, Aug. 2, 1995), *aff'd*,
232 A.D.2d 176, 648 N.Y.S.2d 73 (1st Dep't 1996) .................................................................... 14, 19

*Gaines-Tabb v. ICA Explosives, USA, Inc.*, 160 F.3d 613 (10th Cir. 1998)..................................... 8, 15

*General Accident Ins. Co. v. 80 Maiden Lane Associates*, 252 A.D.2d 391 (1st Dep't 1998).............. 23

*Giannone v. Port Authority of New York and New Jersey*, 127 A.D.2d 818, 511 N.Y.S.2d 940 (2nd
Dep't. 1987) ....................................................................................................................................... 28

*Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184 (2d Cir. 1998) ..................................................... 8

*Gross v. Empire State Bldg. Associates*, 773 N.Y.S.2d 354 (1st Dep't March 2, 2004.) ..................... 11

*Home Ins. Co. v. Pinski Bros.*, 160 Mont. 219 (1972) .......................................................... 27

*I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759 (2d Cir. 1991) .................. 9

*ICC Industries, Inc. v. GATX Terminal Corp.*, 690 F.Supp. 1282 (S.D.N.Y. 1988) ............................ 24

*In re September 11 Litigation*, 280 F. Supp.2d 279 (S.D.N.Y. 2003) ........................................ 19

*Ins. Co. of North America v. Borsdoff Services, Inc.* 225 A.D.2d 494 (1st Dep't 1996) ..................... 24

*Jewell v. City of New York*, 1995 WL 86432 (S.D.N.Y. March 1, 1995) ....................................... 30

*Kaf-Kaf Inc. v. Rodless Decorations, Inc.*, 90 N.Y.2d 654 (1997) ....................................... 22, 24

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ................................................ 10

*Kush v. City of Buffalo*, 59 N.Y.2d 26, 462 N.Y.S.2d 831 (1983) ........................................... 12

*Kyne v. Carl Bieber Bus Services*, 147 F.Supp.2d 215 (S.D.N.Y. 2001) ...................................... 28

*Leeds v. Meltz*, 85 F.3d 51 (2d Cir. 1996) ................................................................ 19

*Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99 (2d Cir. 1999) ............................... 8

*Luciano v. Fanberg Realty Co.*, 102 A.D.2d 94, 475 N.Y.S.2d 854 (1st Dep't 1984) ......................... 28

*Lyons v. Port Authority of New York and New Jersey*, 228 A.D.2d 250, 643 N.Y.S.2d 571 .......... 28, 29

*Marcroft v. Carvel Corp.*, 120 A.D.2d 651, 502 N.Y.S.2d 245 (2nd Dep't 1986) .............................. 15

*Marcus v. Frome*, 275 F. Supp.2d 496 (S.D.N.Y. 2003) ...................................................... 8

*Mulligan v. The Port Authority of New York and New Jersey*, 2002 WL 31233245 (S.D.N.Y. Oct. 4, 2002) .................................................................................................... 28

*North Star Reins. Corp. v. Continental Ins. Co.*, 82 N.Y.2d 281 (1993) .................................... 26

*Palsgraf v. The Long Island R.R. Co.*, 248 N.Y. 339 (1928) ................................................ 11

*Patel v. Port Authority of New York and New Jersey*, 184 A.D. 2d 235, 586 N.Y.S.2d 747 (1st Dep't 1992) .................................................................................................... 29

*Pennsylvania Gen. Ins. Co. v. Austin Powder Co.*, 68 N.Y.2d 465 (1986) ................................ 26, 27

*Port Authority of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305 (3d Cir. 1999) ....... 12, 15

*Richmond Steel, Inc. v. Legal and General Assur. Soc.*, 821 F.Supp. 793 (D. Puerto Rico 1993) ......... 24

*Rivera v. City of New York*, 11 N.Y.2d 856, 227 N.Y.S.2d 676 (1962) .......................................... 17, 18

*Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp.2d 1264 (D.Colo. 2002) ...................................... 15

*Serko & Simon, LLP v. The Port Authority of New York and New Jersey*, 02 Civ. 10052 (S.D.N.Y. May 6, 2003) ................................................................................................................................ passim

*Sheehan v. City of New York*, 40 N.Y.2d 496, 387 N.Y.S.2d 92 (1976) ................................................ 17

*St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 00 Civ 4634 (KMW) (S.D.N.Y. March 31, 2004) ................................................................................................................................ 22, 23

*Taunus Corp v. The City of New York*, 279 F.Supp.2d 305 (2003) ...................................................... 30

*The Lusitania*, 251 F. 715 (S.D.N.Y. 1918)................................................................................ 13, 14

*Tokio Marine & Fire Ins. Co. Ltd v. Employers Ins. of Wausau*, 786 F.2d 101 (2d Cir. 1986) ....... 23, 24

*Trippe v. Port of New York Authority*, 14 N.Y.2d 119, 249 N.Y.S.2d 409 (1964)................................ 28

*U.S. ex rel. Phipps v. Comprehensive Community Dev. Corp.*, 152 F. Supp.2d 443 (S.D.N.Y. 2001).... 8

*Van Valkenburgh v. Robinson*, 225 A.D.2d 839, 639 N.Y.S.2d. 149 (3rd Dep't 1996)................. 11, 15

*Ventricelli v. Kinney System Rent A Car, Inc.*, 45 N.Y.2d 950, 411 N.Y.S.2d 555 (1978)............. 12, 17

*VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp.2d 435 (S.D.N.Y. 2001) ................................ 9

*Yonkers Contracting Co., Inc. v. Port Authority Trans-Hudson Corp.*, 93 N.Y.2d 375, 690 N.Y.S.2d 512 (1999)................................................................................................................................ 28

### Statutes

*McCarthy v. Sturm, Ruger and Co., Inc.*, 916 F.Supp. 366 (S.D.N.Y. 1996), *aff'd sub nom., McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997), quoting *Forni v. Ferguson*, No. 132994/94, slip op. at 14 (N.Y. Sup. Ct., New York County, Aug. 2, 1995), *aff'd*, 232 A.D.2d 176, 648 N.Y.S.2d 73 (1st Dep't 1996)................................................................................................................................ 14

New York General Municipal Law §50-e ............................................................................................ 30

New York Unconsolidated Laws §§7107-7108.................................................................................... 28

The Air Transportation Safety and System Stabilization Act of 2001, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §40101) ........................................................................................ 10

### Rules

Fed. R.Civ.P. 12(b)(6)...................................................................................................................... 2, 14

## PRELIMINARY STATEMENT

On September 11, 2001, terrorists hijacked two commercial airliners and crashed them into the Twin Towers of the World Trade Center. The unprecedented death and destruction that followed was not limited to these two buildings. When the Twin Towers collapsed, neighboring property also was damaged, including Seven World Trade Center (WTC 7), an office building across the street from the Towers. WTC 7 caught fire, burned unattended throughout the day and itself collapsed in the late afternoon, causing no injuries or deaths but resulting in property losses to those who leased or owned property at WTC 7.

The first party property insurers[1] of Citigroup Inc., Consolidated Edison Company of New York, Inc. ("Con Edison") (both WTC 7 tenants) and Silverstein Properties, Inc. (WTC 7 Landlord), and Con Edison itself, have brought claims against The Port Authority of New York and New Jersey ("The Port Authority") for economic loss arising out of the terrorist attacks of September 11, 2001. Thus, this is not a case about loss of life or personal injury arising out of this horrific and tragic day. It is about money. More specifically, it is a case about who should bear the cost of property losses incurred at WTC 7.

The problem confronting the plaintiffs in these lawsuits is not showing that the terrorist acts caused their insureds' damage – Citigroup, Con Edison and Silverstein stand in a long line of those harmed that day. The problem is that these lawsuits seek recovery not from the terrorists, or those who planned or supported their attacks, but rather from a major target of the terrorism, an even more immediate victim of its carnage. Of course, being a victim of unprecedented terrorist acts does not of itself confer any special immunity from tort claims, but it

---

[1] First party property insurance is insurance which applies to coverage for the insured's own property.

does make it especially difficult to fashion a theory of recovery against that victim that comports with both the law and common sense.

Citigroup's insurers sue The Port Authority for alleged negligence in connection with the design, approval, location, construction and maintenance of diesel fuel tanks in WTC 7, specifically mentioning the tanks installed for the New York City Office of Emergency Management ("OEM") on the 23rd floor. Con Edison and its insurers sue The Port Authority and New York City on similar allegations, also mentioning specifically the OEM tanks. Silverstein's insurer, IRI, sues The Port Authority and Citigroup for alleged negligence in connection with the design, approval, location, construction and maintenance of diesel fuel tanks for Citigroup on the fifth floor of WTC 7.

Plaintiffs' complaints should be dismissed for failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6).[2]

Under New York law, which applies in these cases, a defendant is not liable for every conceivable consequence that might somehow be related to its conduct. Rather, as a matter of public policy, New York courts use the concept of proximate cause to draw judicial lines to limit liability. Here, as a matter of law, multiple intervening acts broke the chain of causation between The Port Authority's alleged negligence and plaintiffs' claimed damages.

Even if there were no such fundamental substantive flaw in the plaintiffs' legal theory, there is an immutable contractual barrier to recovery. Express provisions of the separate leases and related contracts executed by Citigroup, Con Edison and Silverstein bar these claims. The complaint filed by Citigroup's insurers must be dismissed because their right to subrogation was

---

[2] Although these three complaints are pending before this Court, to date the cases have not been consolidated. Since many of the legal issues are quite similar, The Port Authority supports its separate motions to dismiss these complaints in this consolidated memorandum of law to avoid unnecessary repetition.

waived. Both the suit filed by Con Edison's insurers and that filed by Silverstein's insurer must be dismissed because The Port Authority is an insured under the relevant policies.

Finally, each of the three complaints pleads claims outside the scope of plaintiffs' respective notices of claim, and thus fails to comply with the mandatory provisions of the pertinent suability statutes. Under controlling New York law, each of these claims is barred.

## PROCEDURAL HISTORY AND STATEMENT OF FACTS[3]

Three complaints are pending before this Court against The Port Authority. Property damage insurers as subrogees of Citigroup, a tenant in WTC 7, claim damages of at least $280 million against The Port Authority from the loss of leasehold improvements in *Certain Underwriters, et al. v. The Port Authority of New York and New Jersey,* 02 CV 7328 (JGK) (the "Certain Underwriters Complaint"). Property damage insurers as subrogees of Consolidated Edison Company of New York, Inc., and Con Edison itself, claim damages of at least $250 million against both The Port Authority and The City of New York for the destruction of its substation located under WTC 7 and for consequential damages in *Aegis Insurance Services, et al. v. Port Authority of New York and New Jersey, et al.,* 02 CV 7188 (JGK) (the "Aegis Insurance Complaint"). Property damage insurers as subrogees of Silverstein Properties, Inc., alleged to be the principal leaseholder of the building, claim damages of at least $400 million against The Port Authority and two Citigroup entities from the destruction of the building in *Industrial Risk Insurers v. The Port Authority of New York and New Jersey, et al.,* 02 CV 7170 (JGK) (the "IRI Complaint").

---

[3] Throughout this memorandum, facts are stated as alleged in the complaints for the purpose of this motion to dismiss, and are, of course, not thereby conceded in any way as true by The Port Authority.

### A.     The Certain Underwriters Complaint (Citigroup)

The Certain Underwriters Complaint was filed on September 11, 2002. Pursuant to a November 13, 2002 order by Judge Hellerstein, plaintiffs' claims were incorporated in a Master Complaint filed on December 4, 2002 on behalf of all "property plaintiffs." (Declaration of Beth D. Jacob dated April 30, 2004 ("Jacob Dec."), Ex. A, Counts II, III). Following reassignment of the matter to this Court, plaintiffs filed a second amended complaint dated April 4, 2003. (Jacob Dec., Ex. B).

According to the Certain Underwriters Complaint: In December 1980, The Port Authority leased air and land rights at WTC 7 to Silverstein Properties, Inc. and/or 7 World Trade Center Company[4] (jointly "Silverstein"). (¶10). Silverstein in turn entered into a 20-year lease in November 1988 with Salomon Inc. ("Salomon"),[5] which has since became a subsidiary of Citigroup Inc. (¶11). Citigroup spent over $280 million in improvements to the leased premises. (¶12). The Certain Underwriters plaintiffs insured Salomon against property damage and consequential loss; they "have paid and will continue to pay" Citigroup for insured loss allegedly suffered at WTC 7 on September 11, 2001. (¶1).

The Certain Underwriters Complaint alleges: The City of New York constructed a command bunker on the 23rd floor which included multiple diesel fuel tanks and emergency generators. (¶13). The Port Authority at all relevant times retained final control over the design, use and occupancy of WTC 7, including all tenant improvements, modifications and occupancy

---

[4] The lease is between The Port Authority and 7 World Trade Center Company, a limited partnership (Jacob Dec., Ex. H), although the Certain Underwriters Complaint refers to it as "7 WTC Company Inc."

[5] The lease is between Silverstein and Salomon Inc. (Jacob Dec., Ex. F), although the Complaint refers to Salomon Brothers and in other paragraphs, to Salomon Smith Barney Holdings Inc., Salomon's successor. (¶8).

and, particularly, over the location and design of all diesel fuel storage tanks, pumps, generators and related systems. (¶18). The Port Authority's determination as to the location and employment of multiple diesel fuel systems within WTC 7 was a significant factor in causing the building's damage and the collapse. (¶23). The Port Authority's alleged negligence "aggravated an existing fire, which led to and proximately caused increased fire and eventual collapse of 7 WTC." (¶27). Citigroup's claim "does not arise from the first initiation of fire in 7 WTC, but rather it is based upon aggravation of damages and ultimate building collapse." (¶15).

The Certain Underwriters plaintiffs plead negligence in, among other things, the design, approval, location, construction and maintenance of the diesel fuel tanks, specifically mentioning a tank on the 23rd floor (Count I) and negligence *per se* for failure to enforce New York City and State fire codes (Count II).

### B.    The Aegis Insurance Complaint (Con Edison)

The Aegis Insurance and Con Edison plaintiffs filed a complaint against The Port Authority on September 10, 2002. Their claims also were incorporated in the property plaintiffs' Master Complaint (Jacob Dec., Ex. A, Counts IV, V). Following reassignment of the matter to this Court, plaintiffs filed an amended complaint dated December 9, 2003, which added The City of New York ("The City") as a defendant. (Jacob Dec., Ex. C).

According to the Aegis Insurance Complaint: The Port Authority is the owner of property located at Washington and Barclay Streets in New York City. (¶8). On or about May 29, 1968, The Port Authority entered into a lease with Con Edison, pursuant to which a Con Edison substation was built at this site. (¶¶9-10). WTC 7 was built on top of and alongside the Con Edison substation in or about 1993. (¶11). The Con Edison substation was destroyed as a result of the September 11 collapse of WTC 7 and Con Edison was required to incur other

expenses to establish and maintain services to lower Manhattan. (¶¶24-25). Plaintiff insurance companies issued insurance and "undertook to make payment" to Con Edison for its insured losses at WTC 7. (¶¶2-3, 16, 32).

The Aegis Insurance Complaint alleges: In about 1999, The City constructed a command bunker on the 23rd floor and installed multiple diesel fuel tanks along with emergency electrical generators. (¶¶12-15). The Port Authority retained final control over the design, use and occupancy of WTC 7, including all tenant improvements, modifications and occupancy and, particularly, over the location and design of all diesel fuel storage tanks, pumps, generators and related systems. (¶18). Con Edison's substation "would not have been damaged, or would have sustained only minor damage," and Con Edison would not have incurred other expenses, absent the collapse of WTC 7. (¶26). The damage suffered by Con Edison was proximately caused by The Port Authority's negligence, recklessness and carelessness. (¶27).

The Aegis Insurance plaintiffs plead claims of negligence in, among other things, the design, approval, location, construction and maintenance of the diesel fuel tanks (Count I), negligence *per se* for failure to enforce New York City and State fire codes (Count II) and breach of contract under the lease (Count I).

C.    The IRI Complaint (Silverstein)

IRI filed a complaint against The Port Authority on September 9, 2002. The Complaint was served on December 30, 2003, as amended to add defendants Citigroup Inc. and Citigroup Global Markets Holdings Inc. (Jacob Dec., Ex. D).

According to the IRI Complaint: In or about November 1988, Silverstein, WTC 7's principal leaseholder, entered into a twenty-year lease with Salomon which, on September 11, 2001, was the single largest tenant in WTC 7. (¶¶2, 12). The Citigroup defendants are

6

successors-in-interest to Salomon. (¶11). IRI claims that it is the subrogee of Silverstein, having

issued and paid over $400 million in property loss damages to Silverstein as a direct result of the

September 11, 2001 destruction of WTC 7. (¶¶ 4, 23-24).

The IRI Complaint alleges: WTC 7 caught fire, burned out of control for several hours

and ultimately collapsed to the ground on September 11. (¶20). As did the property plaintiffs'

Master Complaint, the IRI Complaint expressly references and relies on the preliminary

investigative findings of the report issued May 2002 by the Federal Emergency Management

Agency, "World Trade Center Building Performance Study: Data Collection, Preliminary

Observations, and Recommendations" ("The FEMA Report") (excerpted as Jacob Dec., Ex. E).

(¶21). The Port Authority retained final control over the design, use and occupancy of WTC 7,

including all tenant improvements, modifications and occupancy and, particularly, over the

location and design of all diesel fuel storage tanks, pumps, generators and related systems,

including the Citigroup emergency generator system. (¶¶26, 29; *see also* ¶¶16-19). The Port

Authority's determination of the location and deployment of multiple diesel fuel systems within

WTC 7, including the Citigroup system, was a significant factor in causing damage and the

collapse of WTC 7. (¶33). The Port Authority's alleged negligence "led to an increase in fire

damages and the ultimate collapse of 7 WTC following a fire that was initiated by flaming debris

spewn during the collapse of the Twin Towers on September 11, 2001." (¶2). IRI's claim "does

not arise from the first initiation of fire" but "upon aggravation of damages and ultimate building

collapse" caused by defendants. (¶36).

As do the other plaintiffs, the IRI plaintiffs plead claims of negligence arising from The

Port Authority's alleged breach of its duty of care in, among other things, the design, location,

construction and maintenance of the diesel fuel tanks for Citigroup (Count I), negligence *per se*

7

for its failure to enforce New York City and State fire codes (Count II) and breach of contract
under the lease (Count III).

## ARGUMENT

### POINT ONE

### THE APPLICABLE LEGAL STANDARD

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the allegations in a
complaint are accepted as true and all reasonable inferences are drawn in favor of the non-
moving party. *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir. 1998); *Marcus
v. Frome*, 275 F. Supp.2d 496, 498 (S.D.N.Y. 2003). If it appears beyond doubt that a plaintiff
can prove no set of facts that would entitle it to relief, however, the complaint must be dismissed.
*Dyncorp v. GTE Corp.*, 215 F. Supp.2d 308, 315 (S.D.N.Y. 2002). Where, as here, recovery is
barred by the application of purely legal issues, the court must dismiss the complaint. *See, e.g.,
D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 95 (2d Cir. 2001) (affirming the
district court's grant of motion for judgment on the pleadings based on defendant's immunity
from suit); *Gaines-Tabb v. ICA Explosives, USA, Inc.*, 160 F.3d 613, 618 (10th Cir. 1998)
(affirming district court's dismissal of negligence claim because terrorist act constituted a
supervening cause as matter of law).

In deciding a motion to dismiss, the Court can consider matters of which judicial notice
may be taken. *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999);
*U.S. ex rel. Phipps v. Comprehensive Community Dev. Corp.*, 152 F. Supp.2d 443, 448
(S.D.N.Y. 2001). The Court may also consider "documents referenced in [the] complaint and
documents that are in [the] plaintiff's possession or that the plaintiff knew of and relied on in
bringing suit." *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F. Supp.2d 435, 437 (S.D.N.Y.

2001). *See also Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993);

*I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991).

*Cf. Chambers v. Time Warner Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (even where a document is

not incorporated by reference, the court may nevertheless consider it where the complaint relies

heavily upon its terms and effect so as to make it "integral" to the complaint).

The Port Authority therefore will cite to several documents that were referenced in, but

not attached to, plaintiffs' complaints. The IRI Complaint cites the FEMA Report (¶21, Jacob

Dec., Ex. E). The Citigroup and Con Edison plaintiffs cited it explicitly in the Master Complaint

(Jacob Dec., Ex. A, ¶¶98, 135, 141) and refer to its contents without citing it directly in their

current amended complaints. (*E.g.*, Certain Underwriters Cplt ¶¶13-14, 22, 24, 33; Aegis

Insurance Cplt. ¶¶12-13, 21-24, 35).

All three complaints specifically cite the relevant leases and insurance policies. IRI cites

the November 1988 lease between Salomon and Silverstein (Jacob Dec., Ex. F) (¶12), and its

insurance contracts with Silverstein (*See* Jacob Dec., Ex. K) (¶4). The Aegis Insurance

Complaint cites the 1968 lease between Con Edison and The Port Authority (Jacob Dec., Ex. G)

(¶9), and the insurance policies issued to Con Edison (¶16). Certain Underwriters similarly cite

the 1988 lease between Salomon and The Port Authority, the 1980 underlying lease between The

Port Authority and Silverstein (Jacob Dec., Ex. H), and the insurance issued to Citigroup (¶¶8,

10, 11). The IRI Complaint cites to the Notice of Claim filed by IRI (Jacob Dec., Ex. I) (¶37),

although it is not attached. The Aegis Insurance plaintiffs cite their June 11, 2002 amended

Notice of Claim (Jacob Dec., Ex. M), although only the original Notice is attached to their

complaint. All of these documents are before this Court and may be considered by it in deciding

the motions to dismiss the complaints.

9

New York law applies to plaintiffs' claims. The Air Transportation Safety and System Stabilization Act of 2001, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §40101), passed in the aftermath of the September 11 attacks, provides that those who bring suit for damages arising out of the hijacking and subsequent crashes must bring suit in the United States District Court for the Southern District of New York. Sec. 408(b)(3). The Act further provides that the governing law shall "be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law." Sec. 408(b)(2). Although the IRI Complaint mispleads the jurisdictional basis for plaintiffs' claims (¶5), it is of no moment since New York law would also apply if this were a diversity case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) (federal courts sitting in diversity cases must apply the substantive law of the forum state); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) (principle also applicable to forum state's choice of law rules).

## POINT TWO

### AS A MATTER OF LAW, THE PORT AUTHORITY'S ALLEGED NEGLIGENCE WAS NOT A PROXIMATE CAUSE OF PLAINTIFFS' DAMAGES.

It is undeniable that the September 11 terrorist attacks caused the destruction of WTC 7. Under New York law, an intervening act such as this breaks the chain of causation and relieves The Port Authority of liability for alleged negligence if: (i) the intervening act was of such an extraordinary nature that responsibility for resulting damages may not reasonably be attributed to The Port Authority or (ii) the intervening act "operates upon" but does not "flow from" The Port Authority's alleged negligence, even if the latter is claimed to have aggravated plaintiffs' damages. Both circumstances clearly apply to the unprecedented criminal acts of September 11.

10

They also apply to a second intervening act that the complaints fail to address but that is detailed in the FEMA Report (Jacob Dec., Ex. E at 1-8, 5-21, 5-24). Shortly after WTC 7 caught fire because of debris from World Trade Center One, the Fire Department of the City of New York made a decision not to combat the fires in WTC 7. As a consequence, WTC 7 burned unattended for nearly seven hours, until the building collapsed at approximately 5:20 p.m. that day. Like the terrorist attacks themselves, this intervening act not only was extraordinary, but also "operated upon" (and did not "flow from") The Port Authority's alleged negligence. Like everything else on September 11, 2001, the Fire Department's decision flowed from the unprecedented, criminal activity of the terrorists.

Under New York law, a defendant is not liable for every conceivable consequence that might somehow be causally related to its conduct. "[C]onceivability is not the equivalent of foreseeability." *Dyer v. Norstar Bank, N.A.*, 186 A.D. 2d 1083, 588 N.Y.S.2d 499 (4th Dep't 1992), *lv. denied*, 81 N.Y.2d 703, 594 N.Y.S.2d 717 (1993). As the Appellate Division noted just last month, in directing summary judgment in favor of the landlords of the Empire State Building in a case involving a shooting at the site: "We live in an uncertain and sometimes unpredictable world seemingly filled with daily reports of random acts of violence ... Obviously, with the benefit of 20-20 hindsight, everything is foreseeable." *Gross v. Empire State Bldg. Associates*, 773 N.Y.S.2d 354, 356 (1st Dep't 2004). However, "landlords are not insurers of the safety of those who use their premises... ." *Id.* at *1. *See also Van Valkenburgh v. Robinson*, 225 A.D.2d 839, 841, 639 N.Y.S.2d 149, 151 (3rd Dep't 1996) (no proximate cause where injury was possible, but not probable, result of negligence); *Palsgraf v. The Long Island R.R. Co.*, 248 N.Y. 339, 343 (1928) ("The wrongdoer ... is the man who carries the bomb, not the

one who explodes it without suspicion of the danger. Life will have to be made over, and human nature transformed, before prevision so extravagant can be accepted as the norm of conduct ...").

New York courts use proximate cause to draw judicial lines to limit liability. *Port Authority of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305, 318 (3d Cir. 1999) (applying New York law). "What we ... mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point." *Ventricelli v. Kinney System Rent A Car, Inc.*, 45 N.Y.2d 950, 952, 411 N.Y.S.2d 555, 556 (1978). *See also Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314, 434 N.Y.S.2d 166, 169 (1980) ("The concept of proximate cause, or more appropriately legal cause, ... stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct.").

Only after the Court has determined that a *prima facie* case of proximate cause has been established can the issue be presented to the trier of fact for determination. *Derdiarian*, 51 N.Y.2d at 315. "To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury... ." *Id.* As the *Derdiarian* court observed, cases "where the question of legal cause may be decided as a matter of law... generally involve independent intervening acts ... ." *Id.*

New York courts recognize two types of intervening acts. "An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature ... that responsibility for the injury may not be reasonably attributed to the defendant." *Kush v. City of Buffalo*, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835 (1983). Equally, an intervening act will relieve defendant of liability when it "operate[s] upon but do[es]

12

not flow from the original negligence." *Derdiarian*, 51 N.Y.2d at 315. This case involves

multiple intervening acts, each of which clearly satisfies these criteria.

**A.    There Were Multiple Intervening Acts Of Such An Extraordinary Nature That Responsibility For Plaintiffs' Damages May Not Reasonably Be Attributed To The Port Authority.**

It would be difficult to imagine an event more extraordinary than that which befell the

World Trade Center and its occupants on September 11, 2001 -- the unprecedented conversion of

commercial airliners into guided missiles of mass destruction. This Court must determine, as a

matter of law and common sense, whether these extraordinary acts were qualitatively so far

outside the scope of normal events that responsibility for the resulting damage, including the

collapse of an adjacent office building, is attributable to the terrorists alone and may not be

attributed to the purported negligence of others, like The Port Authority.

Nearly a century ago, in a case involving the infamous sinking of the Lusitania, this

Court established the principle that "even if negligence is shown, it cannot be the proximate

cause of the loss or damage, if an independent illegal act of a third party intervenes to cause the

loss." *The Lusitania*, 251 F. 715, 732 (S.D.N.Y. 1918). Even though the German Government

had given explicit warnings that ships like the Lusitania were subject to attack (*id.* at 719-21),

the British Admiralty had provided guidelines to the captains of such ships to take certain

precautionary measures to avoid attack by the Germans (*id.* at 720), and such guidelines were not

adhered to in their entirety by the captain of the Lusitania (*id.* at 728-32), this Court held that the

intentional act of sinking the Lusitania without further warning was so extraordinary that it

severed any causal connection between the alleged negligence of the owner of the Lusitania and

the passengers' deaths.

[T]he unexpected character of the act was best evidenced by the horror which it excited in the minds and hearts of the American people.

The fault, therefore, must be laid upon those who are responsible for the sinking of the vessel, in the legal as well as the moral sense. It is therefore not the Cunard Line, petitioner, which must be held liable for the loss of life and property. The cause of the sinking of the Lusitania was the illegal act of the Imperial German government, acting through its instrument, the submarine commander, and violating a cherished and humane rule observed, until this war, by even the bitterest antagonists. As Lord Mersey said: "The whole blame for the cruel destruction of life in this catastrophe must rest solely with those who plotted and with those who committed the crime."

*Id.* at 736. So too in this case. The cause of the collapse of WTC 7 was the criminal acts of the

terrorists who plotted and committed the crimes; as a matter of sound public policy, they should

bear the whole blame for its consequences.

Since *The Lusitania* case was decided, courts in New York and in other jurisdictions have

made similar rulings in cases involving criminal acts of far less magnitude. Thus, for example,

both state and federal courts in New York held that Colin Ferguson's murderous shooting spree

on a Long Island Railroad passenger train in 1993 "was an extraordinary act which broke the

chain of causation" in related negligence and strict liability actions. *McCarthy v. Sturm, Ruger*

*and Co., Inc.*, 916 F.Supp. 366, 372 (S.D.N.Y. 1996), *aff'd sub nom.*, *McCarthy v. Olin Corp.*,

119 F.3d 148 (2d Cir. 1997), quoting *Forni v. Ferguson*, No. 132994/94, slip op. at 14 (N.Y.

Sup. Ct., New York County, Aug. 2, 1995), *aff'd*, 232 A.D.2d 176, 648 N.Y.S.2d 73 (1st Dep't

1996).[6]

---

[6] *McCarthy* was a negligence action seeking to hold liable the manufacturer of the "Black Talon" ammunition used by Ferguson -- hollow point bullets that expanded upon impact and exposed razor-sharp edges. 916 F. Supp. at 368. Like *Forni*, which involved the manufacturers of the semi-automatic handgun, ammunition and magazine used by Ferguson, the case was dismissed on motion pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* at 372.

Indeed, The Port Authority has been required to live with this limitation on tort law recovery when it brought an action for terrorism-related losses. In *Port Authority v. Arcadian Corp.*, 189 F.3d 305 (3d Cir. 1999), the Third Circuit Court of Appeals affirmed the district court's dismissal of an action by The Port Authority seeking recovery from the manufacturers of fertilizer products used to construct the explosive device detonated under the World Trade Center in 1993:

> [T]he terrorists' actions were superseding and intervening events breaking the chain of causation. ... [T]he District Court was correct in finding the World Trade Center bombing was not proximately caused by defendants. Rather, it was caused by the terrorists' intentional acts to create an explosive device and to cause harm to the World Trade Center and its occupants.

*Id.* at 319 (applying New York law). *See also Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 621 (10th Cir. 1998) ("the criminal activities of the [Oklahoma City] bomber or bombers acted as the supervening cause of plaintiffs' injuries," precluding negligence liability on the part of ammonium nitrate manufacturer); *Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp.2d 1264, 1276 (D.Colo. 2002) (since students' "intentional violent acts" were the superseding cause of teacher's death in Columbine shootings, makers of violent video games and movies were not a proximate cause of teacher's death).

Extraordinary intervening acts do not have to be criminal acts under New York law to constitute a supervening cause. *See, e.g.*, *Van Valkenburgh v. Robinson*, 225 A.D.2d 839, 841, 639 N.Y.S.2d 149, 150 (3rd Dep't 1996) (in negligence action involving access to a handgun, "decedent's suicidal act was so extraordinary in nature that liability therefor cannot reasonably be attributed to defendants"); *Marcroft v. Carvel Corp.*, 120 A.D.2d 651, 652, 502 N.Y.S.2d 245, 246 (2nd Dep't 1986) (in personal injury action against ice cream store owner, car coming through storefront window "constituted an intervening act which was extraordinary").

In this case, there was a second extraordinary intervening act that independently relieves

The Port Authority of liability for alleged negligence -- the decision by the Fire Department not

to combat the fires in WTC 7, but instead to let the building burn unchecked throughout the day.

As recounted in the FEMA Report:

> Debris from the collapsing towers, some of it still on fire, rained
> down on surrounding buildings, causing structural damage and starting
> new fires... . Most of the fires went unattended as efforts were devoted to
> rescuing those trapped in the collapsed towers ... WTC 7... burned
> unattended for 7 hours before collapsing at 5:20 p.m. The falling debris
> also damaged water mains around the WTC site... .
>
> *          *          *
>
> It appeared that water on site was limited due to a 20-inch broken
> water main in Vesey Street. Although WTC 7 was sprinklered, it did not
> appear that there would have been a sufficient quantity of water to control
> the growth and spread of the fires on multiple floors. In addition, the
> firefighters made the decision fairly early on not to attempt to fight the
> fires, due in part to the damage to WTC 7 from the collapsing towers.
> Hence, the fire progressed throughout the day fairly unimpeded by
> automatic or manual suppression activities.
>
> *          *          *
>
> WTC 7 collapsed approximately 7 hours after the collapse of WTC
> 1. Preliminary indications were that, due to lack of water, no manual
> firefighting actions were taken by FDNY.

(Jacob Dec., Ex. E at. 1-8, 5-21, 5-24).

In short, the fires in WTC 7 were caused by an intervening act and were unmitigated

because of a second intervening act. Each of these intervening acts was extraordinary and

independently constitutes a supervening cause that breaks the chain of causation as a matter of

law between The Port Authority's alleged negligence and plaintiff's damages.

**B.    The Intervening Acts Did Not Flow From The Port Authority's Alleged
Negligence.**

Besides being of such an extraordinary nature that responsibility for plaintiffs' damages

should be attributable only to the terrorists, each of these intervening acts merely operated upon

the Port Authority's alleged negligence, and did not flow therefrom. *Derdiarian*, 51 N.Y. 2d at

16

315, 434 N.Y.S.2d at 169 (1980).  As to this category of intervening act, "liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Id.* If it is not, the intervening act severs any causal connection between the alleged negligence and the claimed damage. *Rivera v. City of New York*, 11 N.Y.2d 856, 857, 227 N.Y.S.2d 676, 677 (1962).

In *Rivera*, an infant plaintiff, standing on the edge of a bathtub, attempted to reach a light cord.  He lost his balance, fell into hot water accumulated in the tub and received serious burns. Defendant was alleged to have been negligent in failing to repair a leak in the hot water faucet and other plumbing defects that resulted in scalding hot water accumulating in the tub.  The Court of Appeals held as a matter of law that the failure to repair was not the proximate cause of the accident, but was only a condition operated upon by the intervening act of the infant losing his balance when perched on the tub:

> This court has consistently held that the negligence complained of must have caused the occurrence of the accident from which the injuries flow. It is clear in the present case that the condition of the bathtub's plumbing was not the proximate cause of the accident. The hot water created the specific injuries for which damages were sought and determined the gravity of the consequences resulting from the accident, but it did not cause the intervening act which was not foreseeable. The accident was caused by the slipping of a wet boot while the child balanced on the curved edge of the bathtub.

*Id.* at 857 (citations omitted). *See also Sheehan v. City of New York*, 40 N.Y.2d 496, 503, 387 N.Y.S.2d 92, 96 (1976) (no proximate cause as a matter of law where alleged negligent act merely furnished the condition or occasion for the occurrence of the event rather than serving as one of its causes); *Ventricelli v. Kinney System Rent A Car, Inc.* 45 N.Y.2d 950, 411 N.Y.S.2d 555 (1978) (automobile lessor who negligently supplied a car with defective trunk lid was not

liable to lessee who, while stopped to repair trunk, was injured by negligent driving of third party).

Like the hot water in the tub in *Rivera*, The Port Authority's alleged negligence merely created a condition that the terrorist attacks of September 11th "operated upon." Similarly, whether based on the fact that "efforts were devoted to rescuing those trapped in the collapsed towers" or on "the damage to WTC from the collapsing towers" or on "lack of water" because of "damaged water mains around the WTC site" (FEMA Report (Jacob Dec, Ex. E.) at 1-8, 5-21, 5-24), the decision by the Fire Department not to combat the fires in WTC 7 flowed from the terrorist attacks themselves and merely operated upon any alleged negligence by The Port Authority. The Port Authority's alleged negligence thus did not cause the occurrence from which plaintiffs' damages flowed. Rather, the terrorist acts and their devastating consequences were the cause, just as the child falling off the edge of the bathtub caused the occurrence in *Rivera*. These "supervening causes" break the chain of causation between The Port Authority's alleged negligence and plaintiffs' damages, even if The Port Authority's claimed negligence affected plaintiffs' specific damages or the gravity of the consequences. Plaintiffs' attempts to bifurcate the events of September 11, 2001,[7] emphasizing some and trivializing others, are simply unavailing.

\*       \*       \*

The September 9, 2003 opinion denying defendants' motions to dismiss in the Twin Towers cases is not controlling here. *In re September 11 Litigation*, 280 F. Supp.2d 279

---

[7] *See, e.g.,* Certain Underwriters Complaint ¶15 ("This claim does not arise from the first initiation of fire in 7 WTC, but rather it is based upon aggravation of damages and ultimate building collapse that was caused by the Port Authority's breaches alleged herein") and IRI Complaint ¶36 (plaintiff's claim "does not arise from the first initiation of fire" but "upon aggravation of damages and ultimate building collapse" caused by defendants).

(S.D.N.Y. 2003) . As to supervening cause, this case involves a markedly different set of

circumstances affecting the calculus -- most notably, the additional intervening act of the New

York City Fire Department deciding not to combat the fires in WTC 7. Significantly, WTC 7

was not the target of the terrorist attacks, but was one of many neighboring office buildings hit

with burning debris from the Twin Towers. The passing discussion of the supervening cause

issue (*id.* at 27-29), in an opinion devoted primarily to the issue of duty (*id.* at 6-21, 23-26),

failed to address the pertinent case law or undertake the analysis required under New York law.

Also, that court simply accepted plaintiffs' bald legal conclusions as to supervening cause in

denying The Port Authority's motion to dismiss: "According to plaintiffs, the terrorist acts did

not merely 'operate upon' the defendants' negligence... ." *Id.* at 302. This was error. *See, e.g.,*

*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) ("While the pleading standard is a liberal one, bald

assertions and conclusions of law will not suffice.").

     *In re September 11 Litigation In re September 11 Litigation*, 280 F. Supp.2d 279

(S.D.N.Y. 2003) did not mention, much less discuss, the New York federal and state law line of

authority defining "extraordinary" intervening acts. Nor did that decision distinguish between

the two types of intervening acts that can constitute a supervening cause under New York law,

and that court was not called upon to address the separate question of the Fire Department's

decision not to fight the WTC 7 fire and the water main break.

     This Court should declare that the unprecedented terrorist attacks of September 11, 2001

and the decision by the New York City Fire Department not to combat fires that had broken out

in WTC 7 as a result not only were intervening acts of such an extraordinary nature that

responsibility for plaintiffs' damages may not be reasonably attributed to The Port Authority, but

also were intervening acts that merely "operated upon," and did not "flow from," any alleged

negligence on the part of The Port Authority.

## POINT THREE

### THE APPLICABLE LEASE AND INSURANCE AGREEMENTS BAR THE CLAIMS ASSERTED BY THE PLAINTIFFS.

The relationships among the parties in these cases are governed in part by contract –

specifically, by lease agreements and insurance agreements. Under these contracts, all three

complaints must be dismissed.

Under the lease agreement between Silverstein and Citigroup, the right to subrogation

against the Superior Lessor as well as the Landlord was waived by the Tenant. Therefore, the

Certain Underwriters plaintiffs, as tenant Citigroup's subrogated insurer, cannot bring this claim

against The Port Authority, which is the Superior Lessor. Its rights can be no greater than

Citigroup's. Under The Port Authority's lease agreement with Con Edison, The Port Authority

was to be a named insured on the fire insurance. As a matter of law, the Aegis Insurance

plaintiffs cannot bring this claim against The Port Authority, because an insurer cannot sue its

own insured for subrogation. Similarly, under the lease agreement between The Port Authority

and Silverstein, Silverstein's insurance named The Port Authority as an additional insured. Thus

Silverstein's subrogated insurer, IRI, cannot bring this claim against The Port Authority, its

insured.

### A.    The Certain Underwriters Complaint Must Be Dismissed Because The Insurers' Right To Subrogation Was Waived.

The Certain Underwriters plaintiffs allege that "by common law and contract," they have

"subrogation rights against third parties that caused or contributed to damages for which the

INSURERS were required to pay their insured." (Certain Underwriters Cplt. ¶17). They allege

that The Port Authority is one of those third parties. (Certain Underwriters Cplt. ¶¶18-30). The subrogation rights on which the Certain Underwriters plaintiffs rely, however, have been waived. Therefore, the insurers cannot bring a subrogated action against The Port Authority.

The lease agreement between Silverstein and Citigroup is very clear on this point. Silverstein, as Landlord, and Citigroup, as Tenant, each waived their insurers' right to subrogate claims against the other party. The lease states:

> (b) Landlord and Tenant shall each include in its insurance policies covering loss, damage or destruction by fire or other peril in respect of the Building or the Demised Premises a waiver of the insurer's right of subrogation against the other party, or (a) an express agreement that such policy shall not be invalidated if the insured waives before the casualty the right of recovery against any party responsible for a casualty covered by such policy... ."

(Jacob Dec., Ex. F, §12.06(b)).

The lease is equally clear that this waiver of subrogation protects not only the Landlord Silverstein against claims by Citigroup's insurers but also The Port Authority as the Superior Lessor:

> (c) The waiver of subrogation or permission for release referred to in clause (b) of this Section 12.06 shall extend to the partners and agents of each party and its and their employees and, in the case of Landlord, shall also apply to any lessor under a Superior Lease, its agents and employees....

(Jacob Dec., Ex. F, §12.06(c)).

The "lessor under a Superior Lease" is The Port Authority. The lease agreement between Silverstein and Citigroup defines "Superior Lease" as "the Underlying Lease, all ground leases, overriding leases and underlying leases of the Land and/or the Building now or hereafter existing, and all renewals, modifications, replacements and extensions thereof." (Jacob Dec., Ex. F, §1.01). "Underlying Lease" is defined, in turn, as "the Agreement of Lease between The Port

Authority of New York and New Jersey as Lessor and Landlord as Lessee dated as of December 31, 1980, ... as amended... ." *Id.*

Finally, it is clear that the intention of the lease agreement between Silverstein and Citigroup was to protect Silverstein as Landlord and The Port Authority as Superior Lessor from liability for property damage suffered by Citigroup as Tenant in WTC 7:

> (d)  Each party hereby releases the other party with respect to any claim (including a claim for negligence) which it might otherwise have against the other party for loss, damage or destruction with respect to its real or personal property ... occurring during the Term and with respect and to the extent to which it is insured under a policy or policies containing a waiver of subrogation or permission to release liability ... as provided in clause (b) of this Section 12.06.

(Jacob Dec., Ex F, §12.06(d)).

Even if the insurance were not obtained, Citigroup still waived its claims. The lease agreement between Silverstein and Citigroup provides that the release "shall be in full force and effect to the same extent as if such required insurance (containing a waiver of subrogation) were in effect." (Jacob Dec., Ex. F, §12.06(c)).

Waivers of subrogation in commercial leases are not uncommon and are enforceable. *Kaf-Kaf Inc. v. Rodless Decorations, Inc.,* 90 N.Y.2d 654 (1997); *St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply*, 00 Civ 4634 (KMW) (S.D.N.Y. March 31, 2004) (Jacob Dec., Ex. L). In *Kaf-Kaf*, the commercial lease included both a waiver of subrogation provision and a provision that the tenant could seek reimbursement for property losses caused by the landlord's negligence. *Id.* at 657. After a fire in the building, insurers for both the landlord and the tenant paid losses, and then each insurer brought a subrogation action claiming negligence against the

other party.[8]  The Court of Appeals ruled that the waiver provision reflected the parties'

intention to look to their insurers and not to each other for recovery of losses, and to release any

right of recovery against each other. *Id.* at 660.  The lease provisions permitting the tenant to

recover for the landlord's negligence were not inconsistent with the waiver of subrogation, but

merely referred to any damages not covered by insurance. "The broad applicability of the waiver

of subrogation clause contained in the parties' lease precludes the negligence claims of both

parties' subrogated insurance carriers." 90 N.Y. 2d at 661.

      In *St. Paul Fire and Marine Ins. Co.*, a scaffolding collapsed at a Times Square

construction site.  St. Paul paid $20 million to the owner and then sued, as the owner's subrogee,

the contractor responsible for the scaffolding.  The complaint was dismissed for failure to state a

claim under controlling New York law, because the owner had "waived a right of recovery for

losses covered by the Policy, and St. Paul [had] waived subrogation rights in the Policy." Slip.

Op. at 8.  *See also Board of Educ. v. Valden Assoc.*, 46 N.Y.2d 653, 416 N.Y.S.2d 202 (1997)

(waiver of subrogation provisions are enforceable); *Tokio Marine & Fire Ins. Co. Ltd v.*

*Employers Ins. of Wausau*, 786 F.2d 101 (2d Cir. 1986) (enforcing waiver of subrogation

clause); *Atlantic Mutual Ins. Co. v. Soiefer Bros. Realty Corp.*, 281 A.D.2d 441 (2nd Dep't 2001)

(waiver of subrogation clause bars recovery against landlord by tenant's insurer); *General*

*Accident Ins. Co. v. 80 Maiden Lane Associates,* 252 A.D.2d 391 (1st Dep't 1998) (same).

      Similarly, the waiver of subrogation provisions in Citigroup's lease precludes its insurers

from bringing this subrogation action against The Port Authority, the Superior Lessor, which not

only is explicitly named in the lease agreement but also would be entitled, in any event, to the

---

    [8] That is, the landlord's insurer sued the tenant, and the tenant's insurer sued the landlord.
The landlord's insurer was IRI, who is a plaintiff bringing a subrogated action against The Port
Authority in one of these three actions.

protections provided the Landlord. *See Farmington Cas. Co. v. 23rd St. Properties Corp.*, 250 F.Supp.2d 293, 297 (S.D.N.Y. 1999) (waiver of subrogation protects managing agent as well as landlord, even if managing agent is not named in lease); *Ins. Co. of North America v. Borsdoff Services, Inc.* 225 A.D.2d 494 (1st Dep't 1996) (waiver of subrogation in lease protects management company, even if not specifically mentioned, because "reading of the lease, as a whole, demonstrates that it was the intent of the parties to the lease that both the landlord Arnow and the management company, SWA, be protected equally").

The parties to the lease agreement allocated the risk of loss between the tenant and the landlord (including the landlord's landlord, The Port Authority). They agreed that each would be protected by its own insurance, but would not be at risk for damages suffered by the other -- either directly or indirectly through the other's insurers. *See Tokio Marine & Fire Ins. Co. Ltd.*, 786 F.2d at 105. The Certain Underwriters plaintiffs "stand in the shoes of its insured" and therefore may not assert greater rights to recovery than possessed by their insured.[9] *Kaf-Kaf*, 90 N.Y.2d at 660.

---

[9] We do not have access to a copy of the insurance policy issued by the Certain Underwriters plaintiffs, although it was referenced in the complaint and thus properly can be considered by this Court on this motion. *See* Point One, *supra.* However, the lease provisions are sufficient. *Ins. Co. of North America*, 225 A.D.2d 494 (referring only to lease provision in dismissing insurer subrogation claim); *Continental Ins. Co. v. Borarie*, 288 N.J.Super. 347 (Law Div. 1995) (enforcing subrogation agreement contained in lease but not in insurance policy, since "the carrier takes only the rights of the insured"); *Richmond Steel, Inc. v. Legal and General Assur. Soc.*, 821 F.Supp. 793, 800 (D. Puerto Rico 1993). *But cf. CIDIS v. Net Realty Holding Trust*, 143 A.D.2d 720 (2nd Dep't 1988) (waiver of subrogation in lease does not bind insurer when not included in insurance policy); *ICC Industries, Inc. v. GATX Terminal Corp.*, 690 F. Supp. 1282 (S.D.N.Y. 1988) (waiver of subrogation in bailment agreement does not bar action by insurer where policy, without waiver of subrogation, was in place before bailment agreement signed); *Continental Ins. Co. v. 115-123 West 29th Street Owners Corp.*, 275 A.D.2d 604 (1st Dep't 2000) (in the absence of the lease, court looked to provisions of insurance policy to find no waiver of subrogation).

24

By bringing this complaint, Citigroup's insurers ignore the lease agreement and attempt to negate the benefits of this bargain. The law is clear, however, that they may not bring a subrogated claim which their insured already waived. The Certain Underwriters' Complaint must be dismissed.

## B.    The Aegis Insurance And IRI Complaints Must Be Dismissed Because The Port Authority Is An Insured Under The Relevant Policies.

It is well settled that an insurer may not sue its insured for recovery of amounts paid under the policy. Both the lease agreement between The Port Authority and Con Edison and the lease agreement between The Port Authority and Silverstein provide that The Port Authority is to be a named insured under applicable insurance policies. Therefore, the complaints brought by Con Edison's insurers, the Aegis Insurance plaintiffs, and by Silverstein's insurer, IRI, must be dismissed.

Specifically the lease agreement between The Port Authority and Con Edison contains a clear provision that The Port Authority not only will be a named insured on the fire insurance policy, but also will obtain the policy on behalf of Con Edison:

> All such policies of insurance and renewals thereof shall be taken out in the name of the Port Authority and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority.
>
> *        *        *
>
> The policies of insurance under this paragraph (d) and renewals thereof shall insure the Port Authority and the Lessee as their interests may appear, and shall provide that the loss, if any, shall be adjusted with and payable to The Port Authority.

(Jacob Dec., Ex. G, Section 17(a), (d)).

The lease agreement between Silverstein and The Port Authority includes a section concerning the insurance which Silverstein agreed to obtain. The section includes a requirement for fire, casualty and property damage insurance, such as the two insurance policies on which

plaintiff subrogated insurers base their lawsuits. (Jacob Dec., Ex. H, §13.1.1). With exceptions

for specified types of insurance that are not relevant here, the lease agreement states that:

> [A]ll policies of insurance required by this Section ... shall name the Port
> Authority, the Lessee and the Leasehold Mortgagee (with insurance
> clauses consistent with the provisions of this Agreement) as the insureds,
> as their respective interests may appear.

(Jacob Dec., Ex. H, Section 13.4).

It is well established in New York that "[a]n insurer has no right of subrogation against

its own insured for a claim arising from the very risk for which the insured was covered."

*Pennsylvania Gen. Ins. Co. v. Austin Powder Co.*, 68 N.Y.2d 465, 468 (1986). In *Pennsylvania*

*Gen.*, a leased truck exploded when lessee was using it to deliver explosives and caused

extensive property damage. *Id.* The New York Court of Appeals dismissed claims brought by

lessor's insurer against the lessee, because the lessee was included as an insured on the lessor's

primary insurance policy. *Id.* at 473. *See also ELRAC, Inc. v. Ward*, 96 N.Y.2d 58, 76-77

(2001) ("an insurer may not step into the shoes of its insured to sue a third-party tortfeasor -- if

that third party also qualifies as an insured under the same policy -- for damages arising from the

same risk caused by the policy"); *North Star Reins. Corp. v. Continental Ins. Co.*, 82 N.Y.2d

281 (1993) (endorsing this approach); *Dix Mutual Ins. Co. v. LaFramboise*, 149 Ill.2d 314

(1992) (landlord's insurer cannot sue tenant for fire loss caused by tenant, where tenant

implicitly became co-insured under policy through payment of rent).

The basis for this rule is two-fold. First, as a matter of public policy, to allow such an

action would "permit an insurer, in effect, to pass the incidence of the loss from itself to its own

insured and thus avoid the coverage which its insured purchased." *Pennsylvania Gen.*, 68

N.Y.2d at 471, quoting *Home Ins. Co. v. Pinski Bros.*, 160 Mont. 219, 226 (1972),[10] *ELRAC, Inc.*, 96 N.Y.2d at 76.   Second, the rule is based on the potential for conflict of interest inherent in these situations. *Pennsylvania Gen.*, 68 N.Y.2d at 472; *ELRAC, Inc.*, 96 N.Y.2d at 76.

The parties explicitly agreed that The Port Authority would be protected under Con Edison's and Silverstein's insurance policies.   A corollary is that The Port Authority cannot be sued by its insurers, to make good losses paid by those insurers under the policies.   The Aegis Insurance plaintiffs should not be permitted to circumvent either the agreement reached by the parties or its obligation to The Port Authority as its insured.   Nor should IRI.   Their complaints should be dismissed.

## POINT FOUR

### ANY CLAIMS ASSERTED BY PLAINTIFFS IN THEIR COMPLAINTS BUT NOT IN THEIR NOTICES OF CLAIM SHOULD BE DISMISSED.

Although all three groups of plaintiffs filed notices of claim against The Port Authority, their complaints include additional allegations and theories of liability.   All three assert in their complaints negligence claims beyond those preserved in their notices of claims.   The Aegis Insurance and IRI plaintiffs also plead breach of contract claims, although none were asserted in their notices of claim.   To the extent that the complaints are broader than the notices of claim, they should be dismissed because under controlling New York law, all of the additional claims asserted by plaintiffs are barred.

When first created, The Port Authority enjoyed the same sovereign immunity as the State of New York.   "Until chapter 301 of the laws of 1950 [N.Y. Unconsol. Law §7101 *et seq.*] (and

---

[10] The court in *Pennsylvania Gen.* rejected an argument that the bar against suing one's own insured should not apply because defendant-insured in the subrogation action did not pay the premium and was just an additional insured under the policy.   68 N.Y.2d at 471.

its New Jersey counterpart) came onto the statute books the Port Authority as a direct agency of

the State of New York was, in the absence of any consent by the State, completely immune from

suits of any sort... ." *Trippe v. Port of New York Authority*, 14 N.Y.2d 119, 123, 249 N.Y.S.2d

409, 410-11 (1964). *See also Yonkers Contracting Co., Inc. v. Port Authority Trans-Hudson

Corp.*, 93 N.Y.2d 375, 378-79, 690 N.Y.S.2d 512, 515 (1999).

While the New York Legislature has consented to waive sovereign immunity as to, and

permit suits against, The Port Authority, that waiver of immunity and consent to suits is

expressly predicated "upon compliance with certain conditions" that are both "mandatory" and

"jurisdictional." *Giannone v. Port Authority of New York and New Jersey*, 127 A.D.2d 818, 819,

511 N.Y.S.2d 940, 941 (2nd Dept. 1987).  *See also Luciano v. Fanberg Realty Co.*, 102 A.D.2d

94, 95, 475 N.Y.S.2d 854, 855 (1st Dep't 1984) (consent conditioned "upon compliance with

certain jurisdictional conditions precedent"); *Lyons v. Port Authority of New York and New

Jersey*, 228 A.D.2d 250, 251, 643 N.Y.S.2d 571, 571-572 (1st Dep't 1996) (failure to comply

with condition precedents in the statute results in "withdrawal of defendant's consent to suit and

compels dismissal ... for lack of subject matter jurisdiction"); *Kyne v. Carl Bieber Bus Services*,

147 F. Supp.2d 215, 218 (S.D.N.Y. 2001).  The relevant jurisdictional conditions precedent are

set forth in Sections 7107 and 7108 of the New York Unconsolidated Laws. *Mulligan v. The

Port Authority of New York and New Jersey*, 2002 WL 31233245 at*1 (S.D.N.Y. Oct. 4, 2002).

Section 7107 provides that consent to suit is granted upon the condition that "in the case

of any suit, action or proceeding for the recovery or payment of money, prosecuted or

maintained under this act, a notice of claim shall have been served upon the Port Authority by or

on behalf of the plaintiff or plaintiffs at least sixty days before such suit, action or proceeding is

commenced." Section 7108 provides that the required notice of claim "shall be in writing, sworn to by or on behalf of the claimant or claimants, and shall set forth ... (2) the nature of the claim."

Since these conditions are jurisdictional, they may not be judicially waived. *Patel v. Port Authority of New York and New Jersey*, 184 A.D. 2d 235, 236, 586 N.Y.S.2d 747, 747 (1st Dep't 1992). The conditions "must be strictly construed" and prejudice to the Port Authority need not be shown. *Lyons*, 228 A.D.2d at 251, 643 N.Y.S.2d at 572. "[S]ubstantial compliance is insufficient." *City of New York v. Port Authority of New York and New Jersey*, 284 A.D.2d 195, 726 N.Y.S.2d 261 (1st Dep't 2001).

Applying these principles, Judge Hellerstein recently concluded, in an analogous setting involving losses suffered in the Twin Towers on September 11, 2001, that breach of contract and negligence claims that had not been asserted in plaintiff's notice of claim to The Port Authority could not be asserted in plaintiff's subsequent complaint, even though other negligence claims had been asserted in the notice of claim. *Serko & Simon, LLP v. The Port Authority of New York and New Jersey*, 02 Civ. 10052 (S.D.N.Y. May 6, 2003) (Jacob Dec., Ex. J). Serko & Simon, a law firm that had rented space in the World Trade Center before September 11, filed a complaint alleging causes of action for (i) negligent design, construction, repair and maintenance of the World Trade Center, (ii) breach of contract (its lease) and (iii) negligent security of the premises. In its notice of claim, Serko & Simon had asserted only the first of these causes of action. Judge Hellerstein concluded:

> The notice of claim at issue here only gave notice with respect to negligence claims based on the design and construction of the buildings. Nothing contained therein would make the Port Authority aware that it would be sued for breach of contract and negligent security claims; these allegations involve an entirely different set of facts and theories of liability. Thus, the breach of contract and negligent security claims must be dismissed.

(Jacob Dec., Ex. J at 3-4).

Judge Hellerstein based his decision in *Serko & Simon* on New York General Municipal Law §50-e involving notices of claim against The City of New York. Although Section 50-e accords courts much more discretion in excusing defects in a notice of claim than exists under Sections 7107 and 7108, it still does not permit new theories of liability:

> Even when interpreting New York General Municipal Law §50-e, courts have held that a "theory of liability not mentioned in the notice of claim generally may not be asserted in a subsequent lawsuit." <u>Lieber v. Village of Spring Valley</u>, 40 F. Supp.2d 525, 531 (S.D.N.Y. 1999) (dismissing claim for prima facie tort where plaintiff did not plead special damages). Courts have refused to allow amendments of notices of claim to change statements of the nature of claim that substantially alter the claim by asserting a new theory of liability. <u>See Olivera v. City of N.Y.</u>, 704 N.Y.S.2d 42, 43-44 (N.Y. App. Div. 2000) (refusing to permit amendment to assert personal injury claim where claim only asserted property damage claim); <u>Steinberg v. Village of Garden City</u>, 668 N.Y.S.2d 674, 675 (N.Y. App. Div. 1998) (same); <u>Gordon v. City of N.Y.</u>, 434 N.Y.S.2d 478 (N.Y. App. Div. 1981) (refusing to permit amendment to assert allegations of assault and use of excessive force where original claim was for negligence).

(Jacob Dec., Ex. J at 2-3). *See also Taunus Corp v. The City of New York*, 279 F. Supp.2d 305, 309 (2003), where Judge Hellerstein refused to allow plaintiffs to add a claim based on WTC 7 in their complaint since "the plaintiffs are asserting a new theory of liability -- in essence, that the City's negligence in storing diesel tanks at 7 WTC led to its collapse and the resulting contamination and damage to the plaintiffs' properties." *Id.*

Thus, "[a]ny theory of liability omitted from the notice of claim may not be included in a subsequent lawsuit." *Jewell v. City of New York*, 1995 WL 86432 at *1 (S.D.N.Y. March 1, 1995) (notice of claim for "negligence" in a police brutality case did not include claims for negligent hiring, which therefore were dismissed).

Where, as here, the statutory requirements are jurisdictional and prejudice need not be shown, claims pleaded in the complaints but unasserted in the notices of claim are barred as a matter of law.

### A.    The Certain Underwriters Notice of Claim (Citigroup)

The Certain Underwriters' Notice of Claim (Certain Underwriters Cplt., Ex. A) asserts only claims for alleged negligence in the design and/or approval of certain fuel tanks in 7 WTC:

> Claimant(s)'s property loss was due to the *negligence of the Port Authority of New York and New Jersey, its officers and agents in the design and/or approval of large diesel fuel tank(s) within or under 7 WTC.* A large quantity of this diesel fuel was stored in contravention of established New York City Fire and Building Codes and New York State Department of Environmental Conservation Petroleum Bulk Storage Regulations.

(Certain Underwriters Cplt., Ex. A at 2) (emphasis added).

The Certain Underwriters' Complaint, however, asserts additional negligence claims, including claims of negligence (i) with respect to construction, installation and maintenance of the diesel fuel tanks, (ii) with respect to "related systems" inside WTC 7, (iii) with respect to fire protection in WTC 7, (iv) with respect to the design, construction and maintenance of WTC 7 generally and (v) with respect to "other combustibles and flammables":

> The Port Authority breached its duty of care and was negligent, careless and reckless when it:
>
> - Negligently ... *inspected, installed, maintained, operated and/or controlled 7 WTC* and the diesel fuel tanks inside 7 WTC.
>
>              *        *        *
>
> - Negligently caused, permitted, or allowed the diesel fuel tanks to be *defectively constructed* so as to contribute to the aggravated fire and collapse of 7 WTC.
>
> - Negligently caused, permitted or allowed the diesel fuel tanks and *other combustibles and flammables to be negligently constructed, located, installed, operated, or maintained* so as to cause, permit and or contribute

to the aggravated fire and collapse of 7 WTC and seriously damage Citigroup's property.

\*     \*     \*

- Failed *to build or maintain* the diesel fuel tanks in accordance with New York State Department of Environmental Conservation Petroleum Bulk Storage Regulations.

\*     \*     \*

- *Built, maintained and/or installed defective diesel fuel tanks and or related systems inside 7 WTC;*

- *Failed to provide adequate fire protection, safeguards or barriers so as to prevent the aggravated fire and collapse of 7 WTC.*

- *Failed to design, build, maintain, update, inspect, operate or safeguard 7 WTC necessary to provide the tenants with a safe premises.*

- Failed to prevent the diesel tanks *and other combustible and flammables* from contributing to the collapse of 7 WTC.

(Certain Underwriters Cplt. ¶35) (emphasis added).  Under controlling New York law, all of these claims are barred.

The Certain Underwriters' Notice of Claim gave notice only with respect to claims of alleged negligence in the design and/or approval of fuel tanks in WTC 7.  Nothing contained therein would give The Port Authority notice that it would be sued also for negligence with respect to these other aspects of the building.  Each of these claims involves a different theory of liability and a different set of facts.  Just like the negligent security claims in *Serko & Simon*, each of these additional negligence claims must be dismissed.

**B.**     **The Aegis Insurance Notice of Claim (Con Edison)**

The Aegis Insurance plaintiffs' Notice of Claim as amended (Jacob Dec., Ex. M) does not assert a claim for breach of contract.  Rather, it only asserts certain claims for negligence:

> 2. The nature of the claim: This is a claim for property damage *as a result of the negligence and carelessness of the Port Authority of New York and New Jersey which consisted of the following*, among other things:  the negligent design approval, inspection, installation,

32

> maintenance, operation, conduct and control of the diesel fuel tanks at 7
> World Trade Center, New York, New York; approving and allowing
> aforesaid fuel tanks to be built and located so as to contribute to the
> collapse of 7 World Trade Center, failing to build and maintain the
> aforesaid diesel fuel tanks under proper, reasonable and lawful control;
> causing, permitting, allowing and/or suffering the aforesaid diesel fuel
> tanks to be so negligently constructed, located, installed, operated or
> maintained so as to cause and permit to contribute to the collapse of 7
> World Trade Center, New York, New York, and seriously damaging
> claimants' insured's property; failing to keep and maintain a proper
> lookout and watch; failing to properly and timely prevent the aforesaid
> diesel fuel tanks from contributing to the collapse of 7 World Trade
> Center; failing to use and/or enforce accepted codes and procedures in
> building, maintaining, locating and installing said diesel fuel tanks; failing
> to set up proper safeguards, barriers and fire protection; failing to
> promulgate proper rules and regulations; failing to set up proper and
> adequate training programs; the negligent and careless training of the
> personnel of the City of New York.

(Jacob Dec., Ex. M at 2) (emphasis added).

Notwithstanding their failure to assert breach of contract claims in their Notice of Claim

(even after it was amended), the Aegis Insurance plaintiffs assert such claims in their Complaint:

> The collapse of 7 World Trade Center and the destruction and
> damage to the Con Edison substation, the equipment located therein, and
> equipment connecting to and from the substation, were caused by the
> negligence, carelessness, recklessness *and breach of contract* of the Port
> Authority... .
>
> Defendant's negligence, carelessness, recklessness *and/or breach of lease*
> was the proximate cause of, and materially contributed to, plaintiffs' damage.

(Aegis Insurance Cplt. ¶¶ 35-36) (emphasis added).

The Aegis Insurance plaintiffs also include in their complaint negligence claims that were

not asserted in their amended Notice of Claim, including claims of negligence (i) with respect to

WTC 7 generally, (ii) with respect to other combustibles and flammables and (iii) with respect to

security. More particularly, the Aegis Insurance Complaint alleges negligence:

> (a)  in the ... design, approval, inspection, installation, maintenance, operation, conduct and control of *7 World Trade Center*, New York, New York and the diesel fuel tanks therein;
>
> \*      \*      \*
>
> (d)  in causing, permitting, allowing and/or suffering the aforesaid diesel fuel tanks *and other combustibles and flammables* to be so negligently constructed, located, installed, operated, or maintained so as to cause, permit and/or contribute to the collapse of 7 World Trade Center, New York, New York, and seriously damage its property;
>
> \*      \*      \*
>
> (m)  *in failing to provide adequate, proper and necessary security to make the premises safe for its tenant;* ... .

(Aegis Insurance Cplt. ¶35) (emphasis added).  Under controlling New York law, all of these claims are barred because they exceed the relevant Notice of Claim.  Each of these claims involves an entirely different theory of liability and an entirely different set of facts.  Just like the breach of contract claims and the additional negligence claims in *Serko & Simon*, the Aegis Insurance plaintiffs' breach of contract claims and each of the Aegis Insurance plaintiffs' additional negligence claims must be dismissed.

### C.    The IRI Notice of Claim (Silverstein)

IRI's Notice of Claim (Jacob Dec., Ex. I) only asserts claims for negligence:

> 2.  The nature of the claim:  This is a claim for property damages *as a result of the negligence of the Port Authority of New York and New Jersey*, acting in its proprietary function as owner and landlord of 7 World Trade Center, New York, New York....
>
> \*      \*      \*
>
> 3.  ... The Port Authority of New York and New Jersey, its officials, agents, servants and employees so *negligently and carelessly* installed, located, constructed and maintained the Systems located in 7 World Trade Center, as well as failed to set up proper safeguards, barriers, and fire protection, as to cause or contribute to the collapse of 7 World Trade Center and damage property of Claimant's various insureds.

(Jacob Dec., Ex. I at 2-3) (emphasis added).

The IRI Complaint, however, asserts claims for breach of contract.  Count III is entitled "Breach of Contract" and alleges breaches of terms of the lease between Silverstein and The Port

34

Authority. (IRI Cplt. at ¶¶ 47-51). Under controlling New York law, IRI's breach of contract claims are barred.

IRI's Notice of Claim only gave notice with respect to claims for negligence. Nothing contained therein would give The Port Authority notice that it would be sued for breach of contract. These claims involve an entirely different theory of liability and entirely different set of facts. Just like the breach of contract claims in *Serko & Simon*, IRI's breach of contract claims must be dismissed.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the accompanying declaration, The Port Authority respectfully requests that this Court dismiss the Certain Underwriters, Aegis Insurance and IRI Complaints as to it.

Dated:  New York, New York
      April 30, 2004

                              Respectfully submitted

                              SCHIFF HARDIN LLP

                              By: _____
                                 Beth D. Jacob (BJ6415)
                               Donald A. Klein (DK7821)
                               623 Fifth Avenue
                               New York, New York 10022
                               (212) 753-5000
                               Attorneys for Defendant The Port Authority
                               of New York and New Jersey

Of Counsel:   Robert H. Riley*
             John L. Castelly (JC9992)
             James F. Conneely**

---

* Not admitted in Southern District of New York; admitted in Northern and Central Districts of Illinois and Third and Seventh Circuits.

** Not admitted in Southern District of New York; admitted in Northern District of Illinois.

# EXHIBIT
# I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AEGIS INSURANCE SERVICES, INC., LIBERTY INSURANCE, UNDERWRITERS INC., NATIONAL UNION INSURANCE COMPANY OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE LIMITED, UNDERWRITERS AT LLOYDS a/s/o CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. and CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., | : Civil Action No. 02 CV 7188 (JGK) |
| Plaintiffs, | : |
| - against - | : |
| PORT AUTHORITY OF NEW YORK AND NEW JERSEY and THE CITY OF NEW YORK, | : |
| Defendants. | : |

---

**MEMORANDUM OF LAW IN OPPOSITION TO NOTICE OF MOTION BY DEFENDANT PORT AUTHORITY OF NEW YORK AND NEW JERSEY TO DISMISS THE COMPLAINT**

---

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Plaintiffs
6 Campus Drive
Parsippany, New Jersey 07054
(973) 285-1919
File No.: 02-5514:241.0001-K

Stanley W. Kallmann, Esq. (5204)
Of Counsel and On The Brief

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES                                        ii

PRELIMINARY STATEMENT                                       1

## LEGAL ARGUMENT

POINT I.                                                    1

      ISSUES AS TO FORESEEABILITY AND AS TO INTERVENING
CAUSE ARE ORDINARILY QUESTIONS LEFT TO A JURY,
ESPECIALLY WHERE THE FACTS ARE IN DISPUTE;
THERE ARE CLEARLY FACTUAL QUESTIONS AT THIS
JUNCTURE.

POINT II.

      THERE ARE NO "RELEVANT [INSURANCE] POLICIES"
APPLICABLE TO AEGIS OR ITS INSURERS WHICH MAKE
THE PORT AUTHORITY AN ADDITIONAL INSURED.

POINT III.                                                 9

      PLAINTIFFS' NOTICE OF CLAIM SUFFICIENTLY
APPRISED THE DEFENDANT PORT AUTHORITY OF THE
FACTS UNDERLYING THE VAST MAJORITY OF PLAINTIFFS'
CLAIMS HEREIN, INCLUDING CLAIMS FOR BREACH OF
CONTRACT.

CONCLUSION                                                 17

## TABLE OF AUTHORITIES

PAGE

CASES

BICK v. CITY OF NEW YORK, 1997 WL 639236                                 11,17

BONSIGNORE v. CITY OF NEW YORK, 683 F. 2d 635
(2ND CIR. 1982)                                                     3

BROWN v. CITY OF NEW YORK, 718 N.Y.S. 2d 4 (2000)      10,13,14,15,16

CITY OF NEW YORK v. PORT AUTHORITY, 726 N.Y.S.
2d 261 (1ST DEPT. 2001)                                            12,14

DEL CID v. BELOIT CORP., 901 F SUPP. 539 (E.D.N.Y. 1995)      2

DELEONIBUS v. SCOGNAMILLO, 583 N.Y.S. 2d 285
(2ND DEPT. 1992)                                      10,12,13,14,16,17

DERDIARIAN v. FELIX CONTRACTING CORP., 434 N.Y.S. 2d
166 (1980)                                                              1,2,5

FINCHER v. COUNTY OF WESTCHESTER, 979 F. SUPP. 989
(S.D.N.Y. 1997)                                                         15

FORNI v. FERGUSON, 648 N.Y.S. 2d 73 (1ST DEPT. 1996)      4

FRAZIER v. CITY OF NEW YORK, 1997 WL214919
(S.D.N.Y. 1997)                                           10,14,15,16,17

GAINES-TABB v. ICI EXPLOSIVES, USA INC., 160 F. 3d 613
(10TH CIR. 1998) ............................................................................................ 4

GIANNONE v. PORT AUTHORITY, 511 N.Y.S. 2d 940 (2ND DEPT. 1987) ....... 14

GOLDMAN v. NEW YORK CITY HEALTH & HOSPITALS
CORPORATION, 588 N.Y.S. 2d 412 (2ND DEPT. 1992) ................... 10,11,17

GORDON v. CITY OF NEW YORK, 434 N.Y.S. 2d 478 (2ND DEPT. 1981) ... 15,16

HUGHES v. ROWE, 449 U.S. 5 (1980) .................................................................. 2

IN RE SEPTEMBER 11 LITIGATION, 280 SUPP 2d 279 (S.D.N.Y. 2003) ...... 1,5

JEWELL v. CITY OF NEW YORK, 1995 WL 86432 (S.D.N.Y. 1995) .............. 15

LAMPMAN v. CAIRO SCHOOL DISTRICT, 366 N.Y.S. 2d 237
(3RD DEPT. 1975) .................................................................................. 11,16,17

LIBER, 924 N.Y.S. 2d 742 (2ND DEPT. 1988) .............................................. 15

LIBER v. VILLAGE OF SPRING VALLEY, 40 F. SUPP. 2d 525
(S.D.N.Y. 1999) ......................................................................................... 14,15

LUCIANI v. FANBERG REALTY CO., 475 N.Y.S. 2d 854
(1ST DEPT. 1984) ............................................................................................ 14

LYONS v. PORT AUTHORITY, 643 N.Y.S. 2d 571 (1ST DEPT. 1996) ........ 14

MARCROFT v. CARVEL CORP., 502 N.YU.S. 2d 245 (2ND DEPT. 1986) .... 4

MCCARTHY v. OLIN CORP., 113 F. 3d 148 (2ND CIR. 1977) ....................... 4

MCCARTHY v. STRUM, RUGER & CO. INC., 916 F. SUPP. 366
(S.D.N.Y. 1966), aff'd sub nom ................................................ 4

OLIVERA v. CITY OF NEW YORK, 704 N.Y.S. 2d 42 (1ST DEPT. 2000) ... 15

PADEVAN v. UNITED STATES, 82 F. 3d 23 (2ND CIR. 1996) ............. 2

PARSONS v. HONEYWELL, INC., 929 F. 2d 901 (2ND CIR. 1991) ......... 2

PETITION OF THE KINSMAN TRANSIT CO., 338 F. 2d 708
(2ND CIR. 1964), cert. denied 380 U.S. 944 (1965) ...................... 3

POLO v. NEW YORK CITY HOUSING AUTHORITY,
757 N.Y.S. 2d 9 (1ST DEPT. 2003) ..................................... 10,17

PORT AUTHORITY v. ARCADIAN CORP., 189 F. 2d 305
(3RD CIR. 1999) .......................................................... 4

RIVERA v. CITY OF NEW YORK, 277 N.Y.S. 2d 676 (1962) ............. 4,5

SANDERS v. ACCLAIM ENTERTAINMENT INC.,
188 F. SUPP. 2d 1264 (D. COLO. 2002) ................................... 4

SERKO & SIMON LLP v. THE PORT AUTHORITY OF
NEW YORK AND NEW JERSEY, 02 CIV. 10052 (AKH) .............. 12,13,16

SHEEHAN v. CITY OF NEW YORK, 387 N.Y.S. 2d 92 (1976) ............. 5

STEINBERG v. VILLAGE OF GARDEN CITY,
668 N.Y.S. 2d 674 (2ND. DEPT. 1998) ................................... 15

TANUS CORP. v. CITY OF NEW YORK, 279 F. SUPP. 2d
305 (S.D.N.Y. 2003) ...................................................... 12

THE LUSITANIA, 251 F. 715 (S.D.N.Y. 1918)                    3

VAN VALKENBURG v. ROBINSON, 639 N.Y.S. 2d 149
(3RD DEPT. 1996)                                             4


OTHER

GENERAL MUNICIPAL LAW §50-E2                                 9

UNCONSOLIDATED LAWS §7108                                    9

v

## PRELIMINARY STATEMENT

The motion to dismiss by the Port Authority of New York and New Jersey ("Port Authority") is without basis.  At the very least, questions of fact preclude judgment for the Port Authority at this time.  For reasons set forth in the  Preliminary Report of Dr. Fred Mowrer, an expert retained by plaintiffs, appended to the Declaration of Stanley W. Kallmann, it cannot be said that, as a matter of law, there was any intervening cause, in any event.  Further, as to another asserted basis for the motion, the lease between the Port Authority and Consolidated Edison Company of New York, Inc. ("Con Ed"), with its requirement that the **Port Authority** secure insurance for the Con Ed occupied **building** on to which 7 World Trade Center ("7WTC") collapsed, in no way bars Con Ed or its insurers from proceeding against the Port Authority for its negligence in causing the destruction of Con Ed's **equipment** at the fire site and other losses related to the collapse of 7WTC..  The matter should proceed to discovery at this time.

## ARGUMENT

### I.

**ISSUES AS TO FORESEEABILITY AND AS TO INTERVENING CAUSE ARE ORDINARILY QUESTIONS LEFT TO A JURY, ESPECIALLY WHERE THE FACTS ARE IN DISPUTE; THERE ARE CLEARLY FACTUAL QUESTIONS AT THIS JUNCTURE.**

The Port Authority treads lightly, in its Brief, on the seminal case of *Derdiarian v. Felix Contracting Corp.*, 434 N.Y.S.2d 166 (1980).  This case, relied upon by Judge Hellerstein in *In Re September 11 Litigation*, 280 F. Supp 2d 279, 302 (S.D.N.Y. 2003), clearly establishes that:

> Given the unique nature of the inquiry in each case, **it is for the finder of fact to determine legal cause**, once the Court has been satisfied that a *prima facie* case has

1

been established [citations omitted].  To carry the burden of proving a *prima facie* case, the plaintiff must generally show that the defendant's negligence was **a substantial cause** of the events which produced the injury.  Plaintiff need not demonstrate that the precise manner in which the accident happened, or the extent of injuries, was foreseeable. (Emphasis added.)

*Derdiarian, supra,* 434 N.Y.S.2d at 169.  The idea that, ordinarily, questions of causation are left to a jury is hardly startling.  See *Parsons v. Honeywell, Inc.,* 929 F.2d 901 (2nd Cir. 1991); *Del Cid v. Beloit Corp.,* 901 F. Supp. 539 (E.D.N.Y. 1995).  What **is** startling, in this case, however, is defendant's effort to secure a dismissal of the Complaint prior to any discovery being undertaken, where defendant has not submitted of an iota of evidence, by an expert or otherwise, to establish that one cause or another, besides the alleged negligence of the defendant in designing or permitting the fuel oil systems at the subject premises, was an intervening cause of the plaintiffs' losses.  On this "record", the movant, which bears the burden of establishing its entitlement to relief, demonstrating "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief", *Padevan v. United States,* 82 F.3d 23 (2nd Cir. 1996), (quoting from *Hughes v. Rowe,* 449 U.S. 5, 10 (1980)), has produced **nothing** for the Court to demonstrate an entitlement to a dismissal.

Beyond the foregoing, and as set forth in the report of Dr. Fred Mowrer attached to the Declaration of Stanley W. Kallmann, there has been demonstrated (even though plaintiffs need "prove" nothing when the defendant has failed *prima facie* to establish an entitlement to relief) a good likelihood that, had the quantity of fuel oil which the Port Authority allegedly allowed to be in the building not been there, the building, despite catching fire, and even despite the inactivity of the fire fighters, would nonetheless have not have collapsed, given the propensity of a fire involving "ordinary combustibles" to burn itself out.

2

We of course note the Port Authority's statement that

"Only after a court has determined that a *prima facie* case of proximate cause has been established can the issue be presented to the trier of fact for determination,"

with defendant noting, further, that

"Plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury."

Defendant's Brief at page 12. Unfortunately, what defendant neglects to address is the total absence of discovery in this case, and hence the disability which the plaintiffs have in establishment of proximate cause, defendant's fault, and other elements of their claims. What is clear, however, from the Mowrer report, is that defendant's alleged "intervening" causes may not have been so "intervening" at all, and that the **sole** fault for this collapse, with its consequent destruction of plaintiffs' property, may well be laid at the hands of the Port Authority. Buildings catch fire all the time, and fires frequently spread. What is unusual about this case, however, as set forth in the Mowrer report, is that the building **collapsed** (on top of plaintiff Con Ed's substation), and it appears quite likely that the fuel oil systems countenanced by the defendant Port Authority were the reason.

Defendant evidently feels that *The Lusitania*, 251 F. 715 (S.D.N.Y. 1918) presents its "best" case. That case, however, was a trial court decision apparently rendered after a jury trial. *The Lusitania*, further, was based upon the premise that an illegal third party act is automatically a superceding cause, always barring a plaintiff from recovery. This is no longer the law. See, *e.g., Bonsignore v. City of New York*, 683 F.2d 635 (2nd Cir. 1982), in which a jury's verdict premised upon a defendant's negligence in allowing a third party to shoot the plaintiff, was affirmed, notwithstanding assertions of intervening act. See, to the contrary of *The Lusitania*, *Petition of the Kinsman Transit Co.*, 338 F.2d 708 (2nd Cir. 1964), *cert. denied* 380 U.S. 944 (1965).

3

*McCarthy v. Strum, Ruger & Co. Inc.*, 916 F.Supp.366 (S.D.N.Y. 1966), *aff'd sub nom McCarthy v. Olin Corp.*, 113 F.3d 148 (2nd Cir. 1977); *Forni v. Ferguson*, 648 N.Y.S.2d 73 (1st Dept. 1996); *Port Authority v. Arcadian Corp.*, 189 F.2d 305 (3rd Cir. 1999); *Gaines-Tabb v. ICI Explosives, USA Inc.*, 160 F.3d 613 (10th Cir. 1998); and *Sanders v. Acclaim Entertainment Inc.*, 188 F.Supp. 2d 1264 (D. Colo.202), in which intervening cause was found, were all actions against manufacturers of legal products (ammunition, hand guns, fertilizers, and video games) who were sued for the misuse of their products by third persons.  They hardly have any relevance to the case at hand. *Van Valkenburgh v. Robinson*, 639 N.Y.S.2d 149 (5th Dept. 1996), similarly, while not an action against the manufacturer of a misused legal product, was an action against a police officer from whom a "legal product", *i.e.* , a gun was taken, with the result that the plaintiff shot herself to death.  The Court did not discuss the nature of the defendants' alleged negligence, but found that, regardless, the suicidal act was

> "So extraordinary in nature that liability therefor cannot reasonably be attributed to the defendants."

639 N.Y.S.2d at 151.  Same cannot be applicable to the case at hand where, at least based upon the preliminary Mowrer report, there is a good likelihood the building would not have fallen down in the first place without the defendant's negligence. *Marcroft v. Carvel Corp.*, 502 N.Y.S.2d 245 (2nd Dept. 1986), while containing some language about intervening acts, appears to have been colored by the fact that the plaintiffs failed to support their assertion as to the flimsy construction of the ice cream store in which the plaintiff sat while an automobile veered through its front window; seen in that light, the discussion as to intervening cause appears to have been *dictum*.  The 1962 decision of the Court of Appeals in *Rivera v. City of New York*, 227 N.Y.S.2d 676 (1962), while interesting,

4

is colored by the fact that *Derdiarian v. Felix Contracting Corp., supra,* with its now-seminal discussion of intervening cause, followed it by some eighteen years. Beyond the foregoing, it was premised on the Court's finding that an unforeseeable intervening act had occurred.

In the present case, of course, what occurred at 7 WTC, was a fire, a very foreseeable event, and just that, even though the **cause** of the fire (*i.e.*, the fire and ultimate collapse of the twin Towers) was quite unusual. As set forth in the Mowrer report, the fire burned for hours, much longer than expected for a fire involving ordinary combustibles, and likely due to the presence of fuel oil. Fires of similar type have burned themselves out, despite the inability of a fire department to secure access for the purpose of interdiction. What happened here was highly unusual, and likely the result of the fuel oil. Especially seen in that light, the *Rivera* decision is inapposite to the present case. *Sheehan v. City of New York*, 387 N.Y.S.2d 92 (1976), is likewise distinguishable, in that there, where the City's bus was struck from behind by a truck which suffered a brake failure, injuring the plaintiff, the *gravamen* of the decision was that the bus driver's failure to pull into a bus stop to discharge passengers, rather than discharging them from the traffic lane of the street, was not the proximate cause of the injury incurred by the plaintiff, as the accident could just as easily have occurred seconds later, after the passenger was discharged. Although, to be sure, there was some *dictum* as to intervening cause, the essence of the decision was that the City was not liable because there was no evidence of negligence or proximate cause in the first place.

Defendant attempts to dismiss Judge Hellerstein's decision in *In Re September 11 Litigation, supra,* by citing the Fire Department's decision not to combat the fires (without, of course, providing any expert back up for **counsel's** opinion). Defendant criticizes Judge Hellerstein because, it says, he

5

"simply accepted plaintiffs' bald legal conclusions as to supervening cause in denying the Port Authority's motion to dismiss . . . ."

Defendant's Brief at page19. Yet, without even a scintilla of scientific **evidence** for their assertions, defendant's counsel baldly asserts that this Court should find, **as a matter of law**, that the decision of the Fire Department not to combat the fires in 7WTC did, in fact, constitute an intervening act.

The motion, at least at this juncture, it totally without basis. No case law supports the extraordinary relief being sought by the defendant herein, especially on a "record" as vapid as defendant has created here. It is the movant, not the claimant, which bears the burden of establishing its entitlement to the relief sought, demonstrating "beyond doubt" that plaintiffs cannot establish any facts to support the relief sought, but this movant has not even facially made that effort.

## II.

### THERE ARE NO "RELEVANT [INSURANCE] POLICIES" APPLICABLE TO AEGIS OR ITS INSURERS WHICH MAKE THE PORT AUTHORITY AN ADDITIONAL INSURED.

Whatever the situation may be as a result of the lease arrangements between Silverstein and the Port Authority, there is absolutely nothing in the lease arrangement between the Port Authority and Con Ed which would make, or was supposed to make, the Port Authority an additional insured on the Con Ed policies.

Defendant quotes selectively from the Port Authority-Con Ed lease to create an illusion that the Port Authority was supposed to be an insured on the policies procured by Con Ed, using verbiage in its Brief to inaccurately imply that it was **Con Ed** that was supposed to procure the insurance and

6

that the Port Authority was supposed to be a named insured "on **the** fire insurance policy". (See page 25 of defendant's Brief.) What defendant curiously omits, however, is that:

- The lease in question was for the structure, not the equipment of Con Ed.

- The policies issued by the subrogating carriers only insured Con Ed's equipment and had nothing to do with the building.

- The subrogating carriers herein are seeking recovery for equipment of Con Ed covered by those policies.

- The insurance policy referred to in the lease between the Port Authority and Con Ed was a policy on the **building** to be procured by the Port Authority, not Con Ed.

Defendant's purported quotation from the lease, as previously indicated, was "selective", to put it nicely. What defendant left out prior to the quoted portions,

> All such policies of insurance and renewals thereof shall be taken out in the name of the Port Authority and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority.

> The policies of insurance under this paragraph (d) and renewals thereof shall insure the Port Authority and the Lessee as their interests may appear, and shall provide that the loss, if any, shall be adjusted with and payable to The Port Authority.

was the **prefatory language**:

> 17(a)  During the term of this agreement the **Port Authority**, at the lessee's expense, shall insure and keep insured the substation building to the extent of 100% of the replacement value thereof against such hazards or risks as may now or in the future be included under the standard form of fire insurance policy in use in New York from time to time during the letting and the standard form of extended coverage endorsement prescribed as of the effective date of such insurance by the rating organization having jurisdiction. (Emphasis added.)

7

(As the attachment to the Declaration of Beth D. Jacob is rather difficult to read, at page 17, a clear copy of page 17 is attached to the Declaration of Stanley W. Kallmann, which is submitted herewith, for the Court's convenience.)

The Port Authority's inexplicably misleading implication, therefore, is that it was **Con Ed** which was supposed to procure insurance for the **building**, that the insurance was supposed to protect the Port Authority's interests, and that, therefore, it being intended that the Port Authority be an additional insured on **"Con Ed's policy"**, there is an implied waiver of subrogation, based upon what defendant describes as the "well settled" principle "that an insurer may not sue its insured for recovery of amounts paid under the policy."

As previously set forth, the Port Authority has mangled the truth of the matter. Con Ed did not agree to procure insurance for the Port Authority and there is no waiver of subrogation, implied or otherwise. The subrogating insurers have nothing to do with the Port Authority, the insurance policies in question pertain only to Con Ed's equipment, the claim of Con Ed for its extra expenses as a result of September 11th is totally separate from the subrogated claims, and there is no manner in which anyone reading the lease could conclude that there was some waiver of subrogation intended to benefit the Port Authority. Seen in that light, the statement, at page 27 of defendant's Brief that:

> "The parties explicitly agreed that The Port Authority would be protected under Con Edison's and Silverstein's insurance policies. A corollary is that The Port Authority cannot be sued by its insurers, to make good losses paid by those insurers under the policies. The Aegis Insurance plaintiffs should not be permitted to circumvent either the agreement reached by the parties or its obligation to The Port Authority as its insured. Nor should IRI. Their complaints should be dismissed",

is a patent misstatement of the factual context, and the case law cited by the defendant, while perhaps very "nice" in an appropriate case, not at all "nice" in this case.

8

III.

**PLAINTIFFS' NOTICE OF CLAIM SUFFICIENTLY APPRISED THE DEFENDANT PORT AUTHORITY OF THE FACTS UNDERLYING THE VAST MAJORITY OF PLAINTIFFS' CLAIMS HEREIN, INCLUDING CLAIMS FOR BREACH OF CONTRACT.**

Defendant complains that the Notice of Claim filed by the plaintiffs failed to utilize the word "contract", whereas, indeed, the Complaint filed herein seeks "contractual" relief under the lease. Plaintiffs submit, however, that under New York case law, notices of claim which enable a defendant to investigate the circumstances of the loss will be broadly interpreted in favor of the plaintiffs, which need not set forth in the notice of claim a particular theory of liability.

What is striking, at the outset, is the identical language contained in General Municipal Law §50-E2, entitled "Form of Notice; Contents", applicable to claims against the City of New York, and Unconsolidated Laws §7108, entitled "Contents of Notice of Claim", applicable to claims against the Port Authority. In each instance, it is required that the claimant set forth: (1) "the name and post office address of each claimant, and of his attorney, if any"; (2) "the nature of the claim"; (3) "the time when, the place where and the manner in which the claim arose"; and (4) "items of damage or injuries claimed to have been sustained so far as then practicable . . . ." While there is little case law on point as far as claims against the Port Authority are concerned, the identical verbiage of the two statutory provisions suggest that it would be appropriate, in analyzing §7108 of the Unconsolidated Laws, pertaining to the Port Authority, for the Court to look to the manner in which the courts of the State of New York have interpreted §50-E2 of the General Municipal Law.

Reference to General Municipal Law 50-E2, in turn, will indicate that, in general terms, per the New York Court of Appeals,

9

"Reasonably read, the statute does not require 'those things [items 1 through 4, previously set forth] to be stated with literal nicety or exactness.' [citations omitted] The test of the sufficiency of a Notice of Claim is merely 'whether it contains information sufficient to enable the City to investigate' [citation omitted]. 'Nothing more may be required' [citation omitted]. Thus, in determining compliance with the requirements of General Municipal Law, §50-E, courts should focus on the purpose served by a Notice of Claim: Whether based on the claimant's description municipal authorities can locate the place, fix the time and understand the nature of the accident. . . ."

*Brown v. City of New York*, 718 N.Y.S.2d 4, 6 (2000). Beyond the foregoing and in terms of the

purposes of the law, it has been stated that:

"The purpose of providing this information in a timely manner is so that the defendant can conduct a proper investigation and assess the merits of the claim while the information is still readily available [citations omitted]. We find that that opportunity was provided to the City here.

The Courts have not interpreted the statute to require that a claimant **state a precise cause of action** in *haec verba* in a Notice of Claim. [citations omitted] The legislature did not intend that the claimant have the additional burden of **pleading causes of action and legal theories**, proper for the pleadings, in the Notice of Claim, which must be filed within 90 days of the occurrence. **General Municipal Law §50-E was not meant as a sword to cut down honest claims but merely as a shield to protect municipalities against spurious ones** (see *Schwartz v. City of New York*, 250 N.Y. 332, 165 (N.E. 517).

*DeLeonibus v. Scognamillo*, 583 N.Y.S.2d 285 (2nd Dept. 1992). See also *Frazier v. City of New*

*York,* 1997 WL 214919 (S.D.N.Y. 1997):

"Defendants were put on sufficient notice regarding the false arrest claim. While plaintiff did not specifically enumerate this cause of action in his Notice of Claim, he is not required to do so. See *DeLeonibus v. Scognamillo*, 183 A.D.2d 697, 583 N.Y.S.2d 285, 286 (App. Div. 1992). Indeed, he is required only to specify the time, place and manner in which his claims arose."

1997 WL 214919, P3. See also *Polo v. New York City Housing Authority*, 757 N.Y.S.2d 9 (1st Dept.

2003); *Goldman v. New York City Health & Hospitals Corporation*, 588 N.Y.S.2d 412 (2nd Dept.

10

1992); and *Lampman v. Cairo School District*, 366 N.Y.S.2d 237 (3rd Dept. 1975).  See also *Bick*

*v. City of New York*, 1997 WL 639236:

> Similarly, they [the City and its employees] appear to argue that the absence of any reference in the claim form to the legal basis for her current claim is also fatal to its assertion here.
>
> We reject the second of these theories, since the claimant is not required to affix the appropriate legal label to her claims in the context of an administrative claim under the General Municipal Law.

1997 WL 639236 at page 2.  Plaintiffs would ask, rhetorically, why it would be that, given that

plaintiffs were not even required, in the first place, to use "negligence" or "breach of contract"

terminology in their Notice of Claim, but, rather, were only required to assert the underlying

circumstances, it can be said, therefore, that by utilizing the word "negligence", and not the word

"contract", plaintiffs are precluded from asserting breach of contract **when the facts underlying the**

**claims are the same.**

It should also be noted that the contract claim herein is premised upon the lease between the

parties and, from the standpoint of factual "back up", the claim is virtually identical to the

"negligence" claim set forth in the Notice of Claim.  Defendant, of course, has been in possession

of the lease all along and indeed attaches (although misquotes) same in its Brief.  See Exhibit G.  The

relevant portion of the lease is set forth at page 17 (see Declaration of Stanley W. Kallmann):

> "The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's substation equipment where such expenses are incurred by reason of damage to the Substation Building **or the Lessee Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof**",

11

with Section 8, indeed, being a Section entitled "Air Space in Port Authority Construction" and recognizing the right of the Port Authority to erect a building over and above the substation building (which building turned out to be WTC7). See Section 8 of the lease, also attached to the Declaration of Stanley W. Kallmann.

Thus, it should be readily apparent, the "contractual" claims asserted by the plaintiffs herein are identical, **on the facts**, to the "negligence" claims set forth in the Notice of Claim, *i.e.,* both require a showing of defendant's "wrongful" conduct; and it should be readily seen all that the defendant is endeavoring to do herein, within the meaning of *DeLeonibus v. Scognamillo,* 583 N.Y.S.2d at 286, is to utilize the statute "as a sword to cut down honest claims", rather than "as a shield to protect municipalities against spurious ones . . . ."

Defendant urges the applicability of *City of New York v. Port Authority,* 726 N.Y.S.2d 261 (1st Dept. 2001) and *Tanus Corp. V. City of New York,* 279 F. Supp.2d 305 (S.D.N.Y. 2003), but neither has any bearing on the issue before the Court. *City of New York v. Port Authority, supra,* sets forth no facts whatsoever, such that one cannot tell, from a reading of the decision, what the argument was all about. Accordingly, it hardly avails the defendant to refer to same as constituting some guidance for the Court herein. *Tanus Corp., supra,* a decision by Judge Hellerstein, involved, very simply: (a) a notice of claim alleging injury to plaintiff by virtue of the City's negligence in the "management" of WTC1 and WTC 2; and (b) a suit claiming that the City was negligent in regard to the placement of the fuel tanks in WTC7. Obviously, the suit involved facts totally different from the notice of claim and was properly dismissed. The opposite, of course, is true in the case at hand.

Finally, we note defendant's reference by the Port Authority to Judge Hellerstein's decision in *Serko & Simon LLP v. The Port Authority of New York and New Jersey,* 02 Civ. 10052 (AKH),

12

Exhibit J to the Declaration of Beth Jacob. *Serko & Simon*, however, appears to be distinguishable on the facts and we respectfully disagree with Judge Hellerstein's analysis of the law.

In that case, the plaintiff law firm provided Notice of Claim pertaining to negligent "construction and maintenance" of WTC1. The law suit then sought damages for "breach of contract", but it is not clear from Judge Hellerstein's decision exactly what contract is referred to (although it could have been the lease) or how same was deemed to have been breached. In this case, it should be clear, the only "breach of contract" referred to by the plaintiffs herein is the breach of the lease and specifically that portion of the lease which describes the Port Authority's responsibilities for reimbursing the lessee for damages caused to its substation equipment "by the acts or omissions of the Port Authority . . . ." There is accordingly no change in the underlying facts, no lack of notice to the Port Authority of those underlying facts, no change in the ability of the Port Authority to have investigated the underlying facts upon Notice being given, and accordingly absolutely no prejudice to the Port Authority. All that is different is that the complaint used the word "contract" in addition to the word "negligence", and we would again reiterate the words of the Court of Appeals in *Brown v. City of New York, supra,* that:

> "The test of the sufficiency of a Notice of Claim is merely whether 'it includes information sufficient to enable the City to investigate [citation omitted]. 'Nothing more may be required'. . . .",

and the admonition of *DeLeonibus v. Scognamillo, supra,* that:

> "The legislature did not intend that the claimant have the additional burden of pleading causes of action and legal theories, proper for the pleadings, in the Notice of Claim . . . ."

We also note Judge Hellerstein's reference to decisions indicating that the Notice of Claims requirements pertaining to the Port Authority must be strictly construed. Those cases, however, upon

13

examination, really have nothing to do with the issue of whether a claimant must use "magic words" in a notice of claim. Thus, for example, *Giannone v. Port Authority*, 511 N.Y.S.2d 940 (2nd Dept. 1987) and *Lyons v. Port Authority*, 643 N.Y.S.2d 571 (1st Dept. 1996) both involve plaintiffs who filed suit sooner than sixty days after the service of notice of claim. Clearly, the statute was violated. *City of New York v. Port Authority*, 726 N.Y.S.2d 261 (1st Dept. 2001), provides no information whatsoever as to the factual circumstances, only a statement that "substantial compliance is insufficient". Given that we do not know what the plaintiff did or did not do, same is hardly dispositive in reference to the case at hand. *Luciani v. Fanberg Realty Co.*, 475 N.Y.S.2d 854 (1st Dept. 1984) involved a plaintiff who never even served notice of claim. A line of cases which Judge Hellerstein characterized as constituting cases holding that "a theory of liability not mentioned in the Notice of Claim generally may not be asserted in a subsequent law suit", with Judge Hellerstein citing *Liber v. Village of Spring Valley*, 40 F.Supp. 2d 525 (S.D.N.Y. 1999), would be contrary to the decisions of the Court of Appeals in *Brown v. City of New York, supra, DeLeonibus v. Scognamillo, supra*, and, indeed, the decision of this Court in *Fraser v. City of New York*, 1997 WL 214919 (S.D.N.Y. 1997). The fact of the matter is that, under *Brown v. City of New York*, all that the plaintiff needed to do herein was provide sufficient information to enable the defendant to investigate and "nothing more". Plaintiffs were not even required to use the words "negligence" or "contract" in their Notice. All of the cases cited by Judge Hellerstein appear to be pre-*Brown v. City of New York* and no longer appear to be "good law", in any event.

Beyond the foregoing, an examination of the cases cited by Judge Hellerstein as upholding the principle that "a theory of liability not mentioned in the Notice of Claim generally may not be asserted in a subsequent law suit" reveals that the statement in *Liber* to that effect was based upon

14

an earlier District Court decision entitled *Jewell v. City of New York*, 1995 WL 86432 (S.D.N.Y. 1995). *Jewell*, in turn, is part of a line of cases dealing only with actions against police officers for assault, where the alleged victim, then, tried to later add additional causes of action, such as for negligent hiring (*Jewell, supra*, page 1) and libel, slander, malicious prosecution and negligent hiring (*Demorey v. City of New York*, cited in *Liber*, 924 N.Y.S.2d 742 (2nd Dept. 1988). See also *Fincher v. County of Westchester*, 979 F. Supp. 989 (S.D.N.Y. 1997) (notice of claim for civil rights violation; suit for negligent hiring, training and supervision of police officers). It should be seen, accordingly, that all of the "new" causes of actions in those cases involve different facts, not just theories of liability, and hence those cases are inapposite herein. Beyond the foregoing, even if *Liber* and *Jewell* were deemed to be of interest, they appear to have been superceded by the Court of Appeals decision in *Brown v. City of New York*, *supra*, and rejected by this Court's own decision in *Fraser v. City of New York*, *supra*.

*Olivera v. City of New York*, 704 N.Y.S.2d 42 (1st Dept. 2000), and *Steinberg v. Village of Garden City*, 668 N.Y.S.2d 674 (2nd Dept. 1998), cited by Judge Hellerstein, are clearly distinguishable from the case at hand, given the fact that the plaintiffs therein, while providing a notice of property damage, then tried to sue for personal injuries. Obviously the two claims were premised on different losses. *Gordon v. City of New York*, 434 N.Y.S.2d 478 (2nd Dept. 1981), referred to by Judge Hellerstein as refusing to allow suit for assault where the original claims were for negligence (even though, in fact, it was the other way around, *i.e.*, the claim was for assault and the suit was for negligence), is **perhaps**, although not certainly, supportive of defendant's position herein. The case, however, is rather "fact starved", and no information is provided in the Court's decision as to the nature of the information given to the City in the original Notice of Claim, and

15

whether same was sufficient to put the City on notice of the overall events. In any event, as previously set forth *Brown v. City of New York, supra*, decided by the Court of Appeals in 2000, is to the contrary and *Gordon*, it would seem, is no longer "good law".

In this case, there can be no question, the Port Authority was put on timely notice that plaintiffs are aggrieved by the defendant's "acts or omissions" (see page 17 of the lease) in connection with the maintenance of WTC7, and, in particular, in allowing large quantities of fuel oil to be stored in the building. Defendant's investigation of a "contract" claim would have been identical to its investigation of a "negligence" claim, never mind the fact that plaintiffs need not have, as recognized by Judge Baer in *Fraser v. City of New York, supra*, citing *DeLeonibus v. Scognamillo, supra*, even have set forth a legal theory of claim.

Finally, in regard to Judge Hellerstein's decision in *Serko & Simon LLP v. The Port Authority of New York and New Jersey, supra*, the Judge's distinguishment of *Lampman v. Cairo Central School District*, 366 N.Y.S.2d 237 (3rd Dept. 1975) is not understood. The case is directly on point and supports **plaintiffs'** position herein. There, Notice of Claim for "negligence" was given, but suit was then filed for negligence and "breach of warranty", obviously a contractually based claim. Defendant had the ample opportunity to investigate, no matter what the plaintiff's theory might have been. As stated by the Court in *Lampman*:

> "In these circumstances we are only concerned with whether this defendant has been prejudiced in facing what it describes as a new cause of action. We think not. **The two causes of action are closely related in both the pleading and proof of material facts.** The nature of claim is sufficient to alert the defendant as to the nature of the alleged liability which would encompass negligence and breach of warranty or both."

366 N.Y.S.2d at 238. Within the meaning of *Lampman v. Cairo, supra*, the two causes of action against the Port Authority in this matter:

16

"are closely related in both the pleading and proof of material facts. The Notice of Claim [was] sufficient to alert the defendant as to the nature of its alleged liability which would encompass negligence and breach of warranty or both."

*Lampman, supra,* 366 N.Y.S.2d at 238. *Lampman v. Cairo,* accordingly, is directly on point to and

part of the *DeLeonibus v. Scognamillo, Frazier v. City of New York, Polo v. New York City Housing*

*Authority, Goldman v. New York Heath & Hospitals Corp.,* and *Bick v. City of New York* line of

cases and should be followed, not distinguished, by this Court.

## CONCLUSION

Defendant's motion is without basis and plaintiffs should be permitted to pursue their contract claims.

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Plaintiffs

By: _____
Stanley W. Kallmann (5204)

Dated: June 11, 2004

# EXHIBIT J

1

4BU7SEPM

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ---------------------------------x

 3    IN RE:  SEPTEMBER 11TH LITIGATION        03 Civ. 7043
                                               04 Civ. 1382
 4    ---------------------------------x

 5                                             November 30, 2004
                                               2:15 p.m.
 6
      Before:
 7

 8                     HON. ALVIN K. HELLERSTEIN

 9                                             District Judge

10                          APPEARANCES

11    GENNETT KALLMANN ANTIN & ROBINSON PC
           Attorneys for Aegis, et al.
      BY:  STANLEY KALLMANN
12
13    BUCHANAN INGERSOLL
           Attorneys for City of New York
14    BY:  EUGENE SCHEIMAN
           MARK BLOOM

15    BRUCHMANN & VICTORY
           Attorneys for Certain Underwriters
16    BY:  PATRICK J. MALONEY

17    GREGORY JOSEPH
      ERIC FISHER
18         Attorneys for Industrial Risk Insurers

19    SCHIFF HARDIN
           Attorneys for The Port Authority of New York and New
20         Jersey
      BY:  BETH JACOB
21         ROBERT RILEY

22    CLEARY GOTTLIEB STEEN & HAMILTON
           Attorneys for Citigroup-Related Defendants
23    BY:  THOMAS J. MOLONEY

24

25
```

1

4BU7SEPM

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------x

 3   IN RE:  SEPTEMBER 11TH LITIGATION        03 Civ. 7043
                                              04 Civ. 1382
 4   ---------------------------------x

 5                                            November 30, 2004
                                              2:15 p.m.
 6
     Before:
 7
                          HON. ALVIN K. HELLERSTEIN
 8
                                              District Judge
 9
                             APPEARANCES
10
     GENNETT KALLMANN ANTIN & ROBINSON PC
11        Attorneys for Aegis, et al.
     BY:  STANLEY KALLMANN
12
     BUCHANAN INGERSOLL
13        Attorneys for City of New York
     BY:  EUGENE SCHEIMAN
14        MARK BLOOM

15   BRUCHMANN & VICTORY
          Attorneys for Certain Underwriters
16   BY:  PATRICK J. MALONEY

17   GREGORY JOSEPH
     ERIC FISHER
18        Attorneys for Industrial Risk Insurers

19   SCHIFF HARDIN
          Attorneys for The Port Authority of New York and New
20        Jersey
     BY:  BETH JACOB
21        ROBERT RILEY

22   CLEARY GOTTLIEB STEEN & HAMILTON
          Attorneys for Citigroup-Related Defendants
23   BY:  THOMAS J. MOLONEY

24

25
```

4BU7SEPM

1          (Case called)

2          (In open court)

3          THE COURT:  I have three motions before me, the

4    property damage cases dealing with 7 World Trade Center.  I

5    want to have the motion by the City argued first, the motion by

6    the Port Authority argued second, and the motion by Citigroup

7    argued third.

8          Two observations to begin with.  My view upon

9    reviewing all these papers is that the motions are premature.

10   Rule 12(b)(6) provides that if affidavits are introduced in

11   support of a motion to dismiss for failure to state a claim,

12   and affidavits are presented, it's discretionary on my part

13   whether to entertain those affidavits, in which case the motion

14   is converted to Rule 56 or whether to deny the motion on the

15   basis of items being introduced outside the record.

16        My feeling with regard to all or mostly all of these

17   motions is that they depend on facts that have to be introduced

18   into the record, and proper order would involve the allegations

19   of the affirmative defenses as part of an answer, limited

20   discovery perhaps, and a renewal of the motion.

21        I think there is substantial merit with respect to the

22   motions to the extent that I have read them, assuming that the

23   facts as promised are proved, but I think it's premature at

24   this point to deal with some of the very difficult issues that

25   are presented, especially because it's highly likely that the

3

4BU7SEPM

1   aggrieved party will want to appeal, and I owe it to the Court

2   of Appeals to provide a better record.

3        The second observation is that although Citigroup's

4   motion is not yet ready, it seems to me that the same issues

5   are implicated, or much the same issues are implicated, and I

6   think I can probably dispose of the issues on the

7   nonsubstantive grounds I'm suggesting and get all these cases

8   into a posture where in very short order I will be able to

9   entertain motions and rule upon them with a good record.

10        These are just preliminary views.  They are subject to

11   your arguments and my being educated by your arguments, but

12   let's proceed on this basis.  Who is going to be arguing for

13   the City?

14        MR. SCHEIMAN:  My name is Eugene Scheiman, your Honor.

15   I am a member of the firm of Buchanan Ingersoll, counsel to the

16   City of New York.

17        THE COURT:  And who is going to be arguing in

18   opposition?

19        MR. KALLMANN:  Stanley Kallmann from the firm of

20   Gennett Kallmann Antin & Robinson, representing the plaintiffs

21   Aegis.

22        THE COURT:  All right.  Mr. Scheiman, please proceed.

23        MR. SCHEIMAN:  Thank you, your Honor.  Your Honor,

24   with respect to the City, the plaintiffs bring two causes of

25   action -- negligence and negligence per se -- allegedly based

4BU7SEPM

1  on the existence of a 6,000 gallon diesel fuel tank located on

2  the first floor of 7 World Trade Center.  This tank was used to

3  fuel the emergency power generators required by the City's

4  Office of Emergency Management located on the 23rd floor of

5  that building.  According to plaintiff, the tank allegedly

6  caused or contributed to the fires that caused the collapse of

7  World Trade Center 7 and the destruction of the ConEd station

8  located below.

9       We base our motion to dismiss both causes of action on

10  statutory and common-law immunities granted to the City and on

11  plaintiff's failure to allege violation of a statute or rule of

12  statewide applicability with respect to its negligence per se

13  claim.

14       Your Honor, with respect to the City's immunity

15  claims, I start with the proposition long held in this country

16  that governments are formed and exist in great part to effect

17  the safety and security of their citizens.  In recognition of

18  that obligation, New York in 1951 passed the Defense Emergency

19  Act.  This Act, based on a similar federal act, the Civil

20  Defense Act, was designed to allow planning for, acting during

21  and acting after an enemy attack.  The Defense Emergency Act

22  focuses on civil defense and defines that term broadly as,

23  among other things, "measures to be taken in preparation for

24  anticipated attacks, including operational plans, provision of

25  suitable warning systems and the construction or preparation of

4BU7SEPM

1    shelters and control centers."

2         Because the legislature recognized the critical need

3    for the state and its municipalities to undertake civil defense

4    activities, it determined that they would be immune from

5    liability claims based on the planning and performance of civil

6    defense activities, thus the legislature granted immunity for a

7    municipality which in good faith carries out activities, among

8    other things, in preparation for anticipated attacks.

9         THE COURT:  Isn't good faith an issue?

10        MR. SCHEIMAN:  Yes.  There has been no claim to the

11   contrary, your Honor, of bad faith.

12        THE COURT:  You haven't set up the defense yet.

13        MR. SCHEIMAN:  I understand we haven't furnished

14   pleadings, your Honor, but there has been no pleading with

15   respect to bad faith.

16        THE COURT:  How do you know it will not be an issue of

17   good faith?

18        MR. SCHEIMAN:  I know the complaint does not allege

19   bad faith.

20        THE COURT:  But it doesn't have to.  The complaint

21   bases its theory on negligence.

22        MR. SCHEIMAN:  Correct.

23        THE COURT:  The issue of good faith does not come into

24   the case until you bring it into the case.

25        MR. SCHEIMAN:  Well, your Honor, when I gave you the

4BU7SEPM

1  definition that I just did, that does not bring the issue of

2  good faith into the case.  If the pleading only goes to

3  negligence, there is no issue of good or bad faith.

4          THE COURT:  Correct.  But then when you produce the

5  defense and base it on preparedness, you have other issues that

6  can be injected.  For example, is defense preparedness the only

7  purpose?  Are the City's activities in good faith?  What does

8  good faith require?  What does it entail?

9          MR. SCHEIMAN:  Again, your Honor, because the pleading

10 only guess to negligence, I don't think we have the burden of

11 proving or stating good faith in our response to the complaint.

12 That's assumed, unless the complaint brings it into the case.

13         THE COURT:  But it doesn't have to bring it into the

14 case until you raise the defense.

15         MR. SCHEIMAN:  Well, I believe, your Honor, I'm moving

16 now for a dismissal based on the face of the statute and the

17 pleadings, and since the pleadings don't go to bath faith --

18         THE COURT:  The pleadings allege a claim of

19 negligence.

20         MR. SCHEIMAN:  Correct, and no more than negligence,

21 your Honor.  There is no pleading with respect to good or bad

22 faith.

23         THE COURT:  But it doesn't have to.  Why does it have

24 to anticipate that the City will raise a defense?

25         MR. SCHEIMAN:  Because the City's immunity is well

4BU7SEPM

1    known.

2              THE COURT:  It may be well known, but the City may

3    choose not to raise the defense.

4              MR. SCHEIMAN:  I suggest, your Honor, that that is

5    something that would be rather farfetched, and counsel would

6    know that.

7              THE COURT:  Maybe, but counsel doesn't have to

8    anticipate it.

9              MR. SCHEIMAN:  I respectfully disagree, your Honor.  I

10   think it needn't be in the complaint for the motion to survive

11   a motion to dismiss.

12             THE COURT:  Mr. Kallmann?

13             MR. KALLMANN:  Well, I would certainly want to find

14   out for purposes of the common-law immunity, as well as the

15   asserted statutory immunities, what the response of the City

16   was when they were allegedly told by the fire department that

17   it was an extreme hazard to have the fuel oil system in this

18   particular building, specifically a hazard to life and

19   property, and what the City's reaction was.

20             THE COURT:  Suppose the City said this is the only

21   place, we have to have our preparedness in the heart of the

22   city, we have to put it in a place where it's accessible to the

23   Mayor and high city officials, and necessarily it has to be in

24   a dense area.  Isn't the City entitled to immunity?

25             MR. KALLMANN:  If they exercised discretion, they

8

4BU7SEPM

1    would be entitled to immunity.  The question, as we pointed out

2    in the cases, and including in particular the Court of Appeals

3    case in *Haddock*, the question is whether or not they exercised

4    discretion, not whether or not they could have exercised

5    discretion.

6            THE COURT:  Well, deciding to put an OED in a

7    particular place is a discretionary act.

8            MR. KALLMANN:  But they didn't necessarily have to

9    have the fuel oil systems in the location which they were.

10           THE COURT:  It's a matter of judgment.

11           MR. KALLMANN:  Well, it may be, or they may have

12   sloughed it off.  If your Honor reviews the cases that we cite

13   in our brief, a sloughing off by an agency which otherwise

14   could exercise its discretion will not result in that agency

15   getting the benefit of immunity.

16           THE COURT:  What do you mean sloughing off?

17           MR. KALLMANN:  Well, sloughing off is --

18           THE COURT:  You have to make a decision.  The fuel

19   generators have to be in some place accessible to where they

20   are going to be used.  You can't have pipelines going through

21   the city.

22           MR. KALLMANN:  The City was apparently warned not to

23   put the fuel systems in this building the way they were put in.

24   If the City disregarded without any kind of analysis, just

25   disregarded the actions or the recommendations of the fire

4BU7SEPM

1    department, that would be a sloughing off within the meaning of

2    the *Haddock* case and the other cases which address that

3    particular issue.  There has to be, under the cases, a reasoned

4    decision on the part of the City.  The two cases that we cite

5    in our brief, *Santiago v. The Transit Authority* and *Chase v.*

6    *the Transit Authority* illustrate that point.  They were both

7    decided in the Second Department.  They are a year apart.  And

8    the Second Department in the first case, *Santiago*, refused to

9    give immunity for the City, involving an assertion that the

10   City was improperly running its trains into train stations at

11   full speed.  The City produced nothing to show that it had made

12   a studied decision to --

13            THE COURT:  So one issue is how the City deliberated

14   in relationship to the fire department recommendation.

15            MR. KALLMANN:  Exactly.

16            THE COURT:  What other issues are there?

17            MR. KALLMANN:  As far as the common-law immunity is

18   concerned?  That's basically it.  The City --

19            THE COURT:  And no other factual issue?

20            MR. KALLMANN:  Well, the factual issues will address

21   who made the decisions, when they were made and under what

22   basis they were made.  Those are the decisions.

23            THE COURT:  And what else?

24            MR. KALLMANN:  I would say those are basically the

25   decisions.

4BU7SEPM

1    THE COURT:  So that's the only issue of fact that

2 needs to be addressed.

3    MR. KALLMANN:  I believe so, yes.

4    MR. SCHEIMAN:  May I?  Your Honor, I think that

5 question is not a question of fact that need be decided or even

6 looked at.  I think the City's exercise of discretion came

7 about when it decided to lease property at 7 World Trade Center

8 and entered into a lease which required that the architects and

9 engineers of the lease owner be used to plan the design and

10 plan the location of the 6,000 gallon tank.  That's in the

11 public record of the City of New York.  It's contained in our

12 brief, and that is the exercise of discretion which put this in

13 a good faith posture and removes any issue of fact from being

14 necessarily decided before you grant the motion.

15    THE COURT:  Mr. Kallmann, is another issue whether or

16 not the City housed any of its other agencies at the place, and

17 whether there were fuel tanks for other agencies?

18    MR. KALLMANN:  I don't know whether they housed any

19 other agencies.  Our only information is to the OEM.  It's

20 conceivable, but I don't know the issue.

21    THE COURT:  So that's another factual issue.

22    MR. KALLMANN:  Could be.

23    MR. SCHEIMAN:  The pleadings say that the OEM was

24 located at 7 World Trade Center, and if that's the only factual

25 issue, I suppose we could take very limited discovery with

4BU7SEPM

1    respect to that, but I can tell the court that that's what the

2    lease says.

3            THE COURT:  I think, Mr. Scheiman, my view is that you

4    are probably correct in your defense, but I think it's

5    premature.  I think I've got to allow Mr. Kallmann reasonably

6    to test the decision to make 7 World Trade Center the Office of

7    Preparedness in case of emergency.  I think that goes to the

8    issue of good faith perhaps, also how the City reacted in

9    response to what the fire department recommended and what

10   alternatives there were, and if the use of the fuel generators

11   was for Preparedness or other functions of government.  And

12   there may be several other issues, but I think that these are

13   narrow factually drawn issues that need not go very extensively

14   into why the City decided to do things, as long as there was

15   some reasoned decision making.  And then you will be in a

16   position to renew your motion.

17           MR. SCHEIMAN:  Well, with that in mind, I will not go

18   into the other immunity arguments that I had, but I will turn

19   to the negligence per se cause of action.

20           THE COURT:  With regard to the other immunity issues,

21   I ruled on them, and I don't know that I want to revisit that

22   ruling.

23           MR. SCHEIMAN:  Well, the other immunity issues for the

24   City are the Defense of Emergency Act, the Disaster

25   Preparedness Act and common-law immunity for governmental

4BU7SEPM

1    agencies.

2         I know you ruled with respect to the Port Authority

3    and with respect to World Trade Center 1 and 2, but the

4    situation, the factual situation at World Trade Center 7 is

5    quite different.

6         THE COURT:  It is different, and the focus of the

7    complaint is the secondary explosion that brought down the

8    building.

9         MR. SCHEIMAN:  That's correct.

10        THE COURT:  And that should be the focus of the

11   complaint, and to the extent that anything more is added by

12   common-law immunity, I think you will allege it.  I think it

13   should be alleged.  And we will go over dates later on.

14        MR. SCHEIMAN:  Your Honor, I don't want the record to

15   show that I agree that an explosion caused the building to come

16   down.  Your Honor stated that it did.  I don't believe that's

17   the fact.  We will get into that later.

18        THE COURT:  Well, that's the ground for negligence.

19        MR. SCHEIMAN:  It could be.

20        THE COURT:  Well, what else is there alleged,

21   Mr. Kallmann.

22        MR. KALLMANN:  We don't assert an explosion.  We

23   assert that the protracted fire which was allowed to burn for

24   many, many hours beyond which it would have ordinarily burned

25   with the ordinary combustibles in the building, that that

4BU7SEPM

1    protracted fire eventually weakened the structure which lead to

2    its eventual collapse.

3          THE COURT:  That's a better way to put it.

4          MR. SCHEIMAN:  Going to the negligence per se cause of

5    action, your Honor, I think the law in New York --

6          THE COURT:  How could you have a negligence per se

7    action against the City based on a city ordinance?

8          MR. KALLMANN:  It may well be in the end that we

9    don't.  On the other hand, the cases on the subject, *Elliot* in

10   particular, which is certainly favorable to the defense, the

11   *Elliot* case recognizes that there are situations in what they

12   describe as a quote appropriate case in which a negligence per

13   se could be applicable in regard to a city ordinance.

14         We have here from the report that we have submitted of

15   Doctor Fred Mauer, we have here a situation in which the fuel

16   tank in question was grossly in excess of what the city code

17   would have allowed, grossly in excess at that particular

18   location.

19         I recognize that the city code is not technically

20   applicable in the Port Authority facility because the Port

21   Authority is not subject to city code, but here, where the City

22   institutes a code and then grossly ignores the code, and

23   perhaps then ignores the advice of its own fire department that

24   there is a threat to life and safety, this might be the quote

25   appropriate case for the invocation of negligence per se, even

14

4BU7SEPM

1    within the *Elliot* case.

2            THE COURT:  You will pardon me for interrupting, but

3    there is a long calendar, and I want to make sure we cover

4    everything.

5            I think this is an incident of good faith in terms of

6    the City's entitlement to immunity and not negligence per se,

7    but I will deal with it all.  I'm not going to dismiss a part

8    of the claim today.

9            All right.  I think I know where this is, and I rule

10   that it's premature at this time.  I deny the motion without

11   prejudice to renewal upon a more complete record.  The City

12   will allege its affirmative defenses in its answer.  We will go

13   over the dates, but let's figure on a ten-day span.

14           MR. SCHEIMAN:  Just briefly, for the sake of the

15   record, with respect to your Honor's ruling that the motion is

16   premature, I do want to note that the affidavit that we

17   attached to our papers only contains public documents and was

18   for the convenience of the court, so it really added no factual

19   material to the record.

20           THE COURT:  We are not going to debate that.

21           MR. SCHEIMAN:  I understand, your Honor.

22           THE COURT:  You will amend.  I want the two of you to

23   create a narrow discovery plan that will allow Mr. Kallmann

24   reasonably to test the propositions that you alleged for your

25   affirmative defense, and I will look forward to an early

4BU7SEPM

1  renewal of the motions, and I will deal with all issues at that

2  time.

3          MR. SCHEIMAN:  Thank you.

4          THE COURT:  Okay.  Now we will deal with the Port

5  Authority.

6          Who is going to be arguing for the Port Authority?

7          MS. JACOB:  May it please the court, my name is Beth

8  Jacob of Schiff Hardin, and we represent the Port Authority of

9  New York and New Jersey.

10          THE COURT:  And who is going to be arguing in

11  opposition?

12          MR. JOSEPH:  Your Honor, Gregory Joseph.

13          THE COURT:  Good morning, Mr. Joseph.

14          MR. JOSEPH:  Fine.  I will be arguing on the issues

15  other than notice.  Mr. Kallmann will be arguing on the issue

16  of notice.

17          MR. KALLMANN:  And we will both be arguing on the

18  issue of waivers of subrogation.

19          THE COURT:  Only one.

20          MR. KALLMANN:  There are different issues as far as

21  the waiver is concerned as applicable to the two different

22  releases.  We would not be replicating what the other one says.

23          THE COURT:  Okay.

24          MR. MALONEY:  And, your Honor, Patrick Maloney for

25  plaintiff certain underwriters.  We also have a waiver of

1    subrogation argument different from the other two plaintiffs.

2             THE COURT:  Okay.

3             MS. JACOB:  And, your Honor, if I may, one

4    housekeeping matter.  When this case was pending before Judge

5    Koeltl we had moved to have Robert Riley admitted pro hac vice

6    to represent the Port Authority also in this court.  Mr. Riley

7    is a partner at Schiff Hardin, and he is out of our Chicago

8    office.  He is a member in good standing of the bars of

9    Illinois and Wisconsin, of the Central District of Illinois,

10   the Third Circuit and the Seventh Circuit, and I would ask that

11   his admission be accepted at this time.

12            THE COURT:  The motion is granted.  I take it that you

13   have filed papers.

14            MS. JACOB:  We have filed the papers and we have

15   submitted the check, your Honor.

16            THE COURT:  You might find out where it is.

17            MS. JACOB:  I will do that.

18            THE COURT:  Contact Miss Jones, and I will sign it as

19   soon as I get it.

20            MS. JACOB:  Thank you.

21            Your Honor, with respect, I did hear what the court

22   said before we started.  We do believe, however, that in large

23   part our motion is not premature.  I know that I am one of the

24   ones who submitted the declaration, but our declaration merely

25   brought to the court's attention the leases that were referred

4BU7SEPM

1    to in the complaints and, therefore, are part of the complaint

2    and are appropriately before the court on the motion to

3    dismiss.

4              If, as we argue, it is clear from the language of the

5    leases --

6              THE COURT:  But I don't have the insurance clauses

7    themselves.

8              MS. JACOB:  No, that is correct, your Honor.  But we

9    did cite case law to you which indicates that if the lease

10   provisions provide --

11             THE COURT:  They're split, right?

12             MS. JACOB:  There is I think one case going the other

13   way, that's correct, which we did cite, but I believe the

14   better law --

15             THE COURT:  It may be the better law, but there is no

16   good judicial reason that I should not allow a record to be

17   developed.  It's a simple matter to require the plaintiffs to

18   produce the insurance policies in question, including their

19   insureds' files, to see what the negotiations were in

20   connection with the antisubrogation clause, and then to renew

21   the motion on a complete record.  It makes better sense.  This

22   is going to go up, so why have an imperfect record?

23             MS. JACOB:  Your Honor, that may be appropriate with

24   respect to Aegis Insurance, because I would concede that lease

25   is perhaps the least clear, and we don't have the insurance

18

4BU7SEPM

1    policy. But with respect, for example, to the lease agreement

2    with certain underwriters and Citigroup, I think that one is

3    clear and we do not need the insurance policy for that.

4         THE COURT:  Why not?

5         MS. JACOB:  Because there is a provision in that lease

6    that says even if the insurance policy does not include a

7    waiver of subrogation, then the parties release each other.

8         THE COURT:  The problem with relying on the release

9    alone is that you have the issue of gross negligence.

10        MS. JACOB:  Not with respect to the Port Authority,

11   your Honor.

12        THE COURT:  Why is that?

13        MS. JACOB:  Because all that was pleaded against the

14   Port Authority was negligence.  There is no allegation of gross

15   negligence with respect to the Port Authority.  We are not a

16   landlord, we're a superior lessor.  So the issue with respect

17   to gross negligence which was raised against Citigroup was not

18   pleaded against us.  It was not included in the notice of

19   claims either, so thus it is just a case of simple negligence

20   and that is released in I think 12.06(d).  And I did hand the

21   portions of the leases on which we would be relying --

22        THE COURT:  Yeah, they are in your brief.

23        MS. JACOB:  They are also in the brief.

24        THE COURT:  It's 12.06(b) and (c).  C is the waiver of

25   subrogation.

4BU7SEPM

1          MS. JACOB:  And D is the release which explains the

2     scope of the waiver subrogation, and also provides this would

3     be a lease if for some reason the insurance policy doesn't

4     include it.

5          THE COURT:  That's the perfect defense, right?

6          MS. JACOB:  That's what we believe.

7          THE COURT:  Let's see what Mr. Joseph says.

8          MS. JACOB:  Although, your Honor, this is with respect

9     to certain underwriters, not to IRI.

10          THE COURT:  Who is responding to this one?

11          MR. MALONEY:  Your Honor, Patrick Maloney.  With

12     respect to the argument of waiver of subrogation and the lease,

13     the underwriters have two responses.  One, the waiver of

14     subrogation itself says that there will be a waiver with

15     respect to the building or the demised premises.  The demised

16     premises is a defined term within the lease.

17          THE COURT:  So you are excepting tenant's property.

18          MS. JACOB:  It excepts tenant's property from the

19     definition of demised premises and, therefore, it is excepted

20     from the waiver of subrogation.  With respect to the lease

21     argument --

22          THE COURT:  Which reduces the claim pretty much to

23     nuisance value.

24          MR. MALONEY:  The claim for tenant's property?  I

25     disagree, your Honor.  The tenant's property --

20

4BU7SEPM

1          THE COURT:  In relationship to other values at stake
2     here.
3          MR. MALONEY:  Well, you know, I mean the tenant's
4     property has a claim value of approximately $280 million, your
5     Honor.
6          THE COURT:  I doubt it.
7          MR. MALONEY:  And that was the subject of the
8     litigation before Judge Cedarbaum, and the Port Authority has
9     just submitted to your Honor the decision in that case.  But it
10    certainly is a --
11         THE COURT:  You have two exceptions:  Tenant's
12    property -- whatever value it has -- and use and occupancy.
13         MR. MALONEY:  And also, your Honor, with respect to
14    12.06(d), which is the release language, there is clearly
15    something missing here, which is the language that extends the
16    release to the superior lessor.  So we have to turn back to
17    12.06(c).  And it says the waiver of subrogation or the
18    permission for release, referring to clause B, applies to --
19    and if you follow the train of definitions -- applies to the
20    Port Authority.  But if we turn to clause D, which is the
21    release language, that language bringing the Port Authority
22    within the protection of the release, it isn't there.
23         THE COURT:  So all this is to say that we need the
24    insurance policies.  Ms. Jacob?
25         MS. JACOB:  Your Honor, with all due respect, I don't

4BU7SEPM

1      think so.

2              THE COURT:  It's a harder issue.  I have to work to

3      find your way.

4              MS. JACOB:  That is correct, your Honor.

5              THE COURT:  I'm against doing unnecessary work.

6              MS. JACOB:  Obviously if we're named in the insurance

7      policy -- it will definitely be easier if the insurance policy

8      names us.  I cannot argue with that one.

9              THE COURT:  Let's do an answer.

10             MS. JACOB:  Okay, your Honor.  I would like to just

11     mention -- unless you want to just move on to hearing from IRI,

12     but the argument with them is a little bit different.

13             THE COURT:  Make your argument against IRI, and then

14     we will see where we go with that.

15             MS. JACOB:  There are two points, and I will try to

16     summarize them briefly.  One is, again, if we look to the

17     provisions of the lease, the Port Authority clearly was

18     supposed to be a named insured.  This isn't a waiver of

19     subrogation now.  This is we were supposed to be a named

20     insured on that insurance policy.

21             There is also Section 17.1, and 17.1 clearly spells

22     out the relationship between Silverstein and the Port Authority

23     and says that Silverstein will indemnify the Port Authority for

24     any damages or any losses caused by acts of its tenants,

25     Citigroup.  And what is happening in this complaint is there is

4BU7SEPM

1    an allegation that Citigroup constructed an emergency backup

2    generator system with or without -- well, the complaint says of

3    course with negligence by the Port Authority -- which led to

4    the destruction of the building.  But Section 17.1 states that

5    Silverstein could not sue us for that.  And if Silverstein

6    cannot sue us, with all due respect, neither can Silverstein's

7    insurers.

8           THE COURT:  Well, does disability necessarily apply to

9    the subrogee?

10          MS. JACOB:  The subrogee stands in the shoes of the

11   subrogor.  It has no rights greater than its insured.

12          THE COURT:  It's true as a general proposition, but is

13   it necessarily true with regard to a disability of suit clause?

14          MS. JACOB:  Your Honor, I can't offhand think of a

15   particular case on point, but I think it is.  I'm not aware of

16   any authority.  I should put it the other way.  I am not aware

17   of any authority that goes the other way.

18          The second point which I wanted to bring up has to do

19   with the certificate of insurance.  I know the argument is it's

20   not worth the paper it's written on, but the certificate of

21   insurance was issued by Silverstein's broker, Silverstein's

22   agent.  And in fact that was a position taken by IRI before

23   Judge Cedarbaum, that Willis was Silverstein's agent.  If

24   that's the case, then Silverstein is bound by the acts of its

25   agent in putting the Port Authority on the insurance policy

4BU7SEPM

1    and, therefore once again IRI in this situation is bound by

2    Silverstein.

3        THE COURT:  All right.  So your argument in a nutshell

4    is that if the insured can't be sued under a subrogation

5    clause, neither can the additional insured.

6        MS. JACOB:  I think it's that if the insured cannot

7    sue us, then its subrogated insurer cannot sue us either.

8        THE COURT:  Both places.

9        MS. JACOB:  Yes.

10        THE COURT:  Mr. Joseph?

11        MR. JOSEPH:  Thank you.  First, we did put the policy

12    in.  We sent it by letter to Judge Koeltl, so it is there, a

13    letter dated July 28, 2004, and it's very clear that the Port

14    Authority is not an insured.

15        Judge Cedarbaum evaluated the certificate -- which

16    with all respect to my good friend Miss Jacob --

17        THE COURT:  Let me stop you.  This goes back to a

18    lease in 1985, is it?

19        MR. JOSEPH:  1980.

20        THE COURT:  1980.  And at that time the Port Authority

21    was not named as an additional insured?

22        MR. JOSEPH:  We were not on this risk at that time,

23    your Honor.  I cannot say what happened prior to '98.

24        MS. JACOB:  Your Honor, I believe the Port Authority

25    was clearly named as an additional insured up until maybe it

4BU7SEPM

 1   was 2000 when IRI became the insurance company.

 2            THE COURT:  How do you prove that, Ms. Jacob?

 3            MS. JACOB:  We are not relying on that fact.  That was

 4   just a response to the court's question.  That was a --

 5            THE COURT:  Well, it's a useful fact.

 6            MS. JACOB:  That was found by Judge Cedarbaum in an

 7   action which IRI was a party and, therefore, it should bind

 8   IRI.

 9            THE COURT:  So it's collateral estoppel.

10            MS. JACOB:  To the extent it's a fact relative to

11   their case, yes, and that's according to her decision.

12            MR. JOSEPH:  Your Honor --

13            THE COURT:  All of this suggests that it's premature

14   at this time to make these rulings.  I need to let the two of

15   you do again limited discovery.  I don't mean open up the whole

16   case.

17            I envision that discovery will focus on the defenses

18   and enable you to renew the motion on a complete record.  And

19   then if there are gaps, I will be able to deal with the gaps.

20   You will know better, I will know better, Mr. Joseph will know

21   better, and we can deal with the issue in a better way.

22            MR. JOSEPH:  Fine, your Honor.

23            MS. JACOB:  Your Honor, we're not totally giving up.

24   We have two more points.

25            THE COURT:  Well, you haven't lost anything.  It's

4BU7SEPM

1    just a little work, which is profitable.

2         MS. JACOB:  One has to do with the notices of claim.

3         THE COURT:  Yes, I want to deal with that issue.

4         MS. JACOB:  Those I think clearly are not premature.

5    That's a jurisdictional issue which has to be decided on the

6    pleadings and on the notices of claim.

7         THE COURT:  I agree.  And isn't New York law to the

8    effect that the plaintiff has to allege compliance with the

9    notice?  Or is it a matter of defense?  Or does anyone know?

10        MS. JACOB:  Your Honor, I am ashamed to say I can't

11   answer that, and I should be able to, but I can't.  The

12   plaintiffs --

13        THE COURT:  It shouldn't make any difference.  It's a

14   threshold issue.  I have to deal with it.

15        MS. JACOB:  The plaintiffs did at least in two of the

16   three cases submit the notices of claims with their complaints,

17   and what we are arguing is not that they failed to plead it but

18   that the notices of claim themselves are defective for the

19   scope of the complaints.

20        THE COURT:  I would like to take it up with you.  Let

21   me find the notice of claim.

22        MS. JACOB:  Your Honor, if I could just step to pull

23   the documents myself.

24        THE COURT:  Yes.

25        MS. JACOB:  Your Honor, with respect to really three

4BU7SEPM

1    of them.  The first of our claims or arguments is that all

2    three plaintiffs allege breach of contract causes.  None of

3    them mention breach of contract in the notices of claim.  And

4    we believe it is fairly clear that, therefore, they cannot

5    bring those actions.  Their response is, well, it's the same

6    facts, it all has to do with the event --

7            THE COURT:  It doesn't make any difference.

8            MS. JACOB:  It should not make any difference.  I

9    think it's clear whatever the latitude is under the municipal

10   law with respect to notices of claims again the City, it is

11   fairly clear you don't have that latitude with respect to

12   claims against the Port Authority.

13           THE COURT:  And I have so held.

14           MS. JACOB:  And you have so held, yes.

15           THE COURT:  Could you focus me, taking these notices

16   one by one, first the IRI notice.

17           MR. JOSEPH:  It's Exhibit I.

18           THE COURT:  I have it in front of me, but I want

19   Ms. Jacobs to read out the precise phraseology.

20           MS. JACOB:  The IRI notice, the relevant part of it is

21   the second paragraph where it says the nature of the claim.

22           THE COURT:  It's a claim for property damage as a

23   result of the negligence of the Port Authority.

24           MS. JACOB:  Correct.

25           THE COURT:  And that's the basis for your saying that

4BU7SEPM

 1    it doesn't include a breach of contract claim.

 2         MS. JACOB:  That's correct.  And it runs through a lot

 3    of alleged negligence, but it doesn't say anything about any

 4    contract claim.

 5         THE COURT:  What is the breach of contract claim?  Is

 6    it the status of the Port Authority as a lessor?

 7         MR. JOSEPH:  Your Honor, it's negligence.  I mean they

 8    hold themselves to a duty of negligence in the lease, so

 9    substantively it's identical.  It's true that the notice does

10    not mention the contract.  The contract --

11         THE COURT:  Are you arguing that the contract provides

12    a duty for the negligence?

13         MR. JOSEPH:  That's correct, but that is one of the

14    bases for a duty of negligence.  It changes nothing to have the

15    contract claim in the case.

16         THE COURT:  I think that's right.  I think the

17    contract is the context.  The negligence is what's actionable.

18         MS. JACOB:  With all due respect, if the breach of

19    contract claim is permitted to be made, it's not just

20    negligence -- it has perhaps negligence -- it's what the breach

21    is, but there are differences in terms of what the plaintiff

22    would have to prove and what the responsibilities would be of

23    the Port Authority under the contract.

24         THE COURT:  I would have to examine that in detail.  I

25    can understand both points.  And I don't know when would be the

4BU7SEPM

1  right time to deal with that, but as I understand the nature of

2  the complaint the complaint is for negligence of the Port

3  Authority allowing these fuel tanks to be constructed on the

4  property, and the context providing the duty is the lease.

5      Now, if there are different provisions in the lease

6  that change the duty, either ameliorating it or exacerbating

7  it, then I might have to get into these issues, but I'm not

8  sure I do, so I'm responsive to any precise claims in terms of

9  motions to strike or not strike, but I think in the large

10  Mr. Joseph is correct.

11      MS. JACOB:  Your Honor, but I think the difference is

12  that, precisely as the court said, they base their duty

13  argument on the lease, not on some other obligation the Port

14  Authority might have.  And what we are saying is that they

15  can't do that, because they did not bring up the lease in the

16  breach of contract, in the notice of claim.  They have to go on

17  a general, if there is some other basis for the negligence

18  argument.  But they just made a pure negligence claim against

19  us.  They did not make a breach of contract claim against us,

20  however much that breach of contract may have been negligence

21  and conduct under the lease.

22      THE COURT:  I hold that it's fairly described in the

23  first sentence of paragraph 2 of the IRI notice, where it

24  states the claim is for property damage as a result of the

25  negligence of the Port Authority acting in its proprietary

4BU7SEPM

1    function as owner and landlord of 7 World Trade Center, New

2    York, New York, and other sentences like that.  And I will

3    reserve decision as to whether or not the negligence has to be

4    informed by any particular duties undertaken by the contract.

5        MS. JACOB:  Your Honor, did you want to look at the

6    other notices of claim?

7        THE COURT:  Yes.

8        MS. JACOB:  Attached to my first declaration as

9    Exhibit M is the notice of claim of Aegis Insurance.  We attach

10   that because the notice of claim that they attached to their

11   amended complaint was their old notice of claim, not the one

12   that included Consolidated Edison, so this is really not

13   bringing anything in outside the record.  And again we look to

14   paragraph 2, the nature of the claim.

15       THE COURT:  Let me get hold of this for a minute.

16       All right.

17       MS. JACOB:  And this one again is very similar, but

18   what is missing from the notice of claim submitted by Aegis and

19   ConEd is the language that the court looked at with respect to

20   IRI, which was a reference to the Port Authority as owner and

21   landlord.

22       This just refers to a result of the negligence and

23   carelessness of the Port Authority, which consisted -- and it

24   then lists the alleged negligent acts in the installation,

25   approval and so on and so forth of the fuel tanks.

4BU7SEPM

1          THE COURT:  It's less clear but still sufficiently

2     clear to constitute an adequate notice.  I make the same

3     ruling.

4          MS. JACOB:  Well, your Honor, certain underwriters'

5     notice of claim is quite similar.

6          THE COURT:  It would still be the same ruling.

7          MS. JACOB:  I assume it's the same ruling.

8          THE COURT:  Thank you.  So you will also have ten days'

9     within which to answer, but again we will go over the dates

10    after we finish.

11         MS. JACOB:  Your Honor, there is one more basis, and I

12    am well aware of the court's decision.

13         THE COURT:  I am not going to change my mind.  This is

14    on a supervening cause?

15         MS. JACOB:  Yes, your Honor.

16         THE COURT:  I am not changing my mind.  The factual

17    setting is a little different.  Your argument is that the cause

18    of the fire was the airplanes crashing into 1 and 2, and you

19    are arguing that they are supervening events arising from the

20    secondary causes of the fire in 7 World Trade Center, and the

21    alleged decision of the fire department not to fight the fire

22    in 7.

23         For the reasons that informed my decision with regard

24    to the same issue arising in buildings 1 and 2, I hold that

25    these are issues of fact that need to be developed on the

4BU7SEPM

1    record, and I invite renewal of these motions at such time as

2    the record is sufficiently developed.

3         MS. JACOB:  Thank you, your Honor.

4         THE COURT:  Is there anything else on the Port

5    Authority?

6         MS. JACOB:  That does take care of the Port

7    Authority's motions, your Honor.

8         THE COURT:  Thank you.

9         MR. MOLONEY:  Good afternoon, your Honor.  Tom Moloney

10   on behalf of Citigroup.  I somewhat anticipated, your Honor,

11   that you might be concerned about deciding these motions on

12   this record.  I would point out that we cite I think the

13   definitive case in this Circuit in our brief, and it's the case

14   *Chambers v. Time Warner*, and that's a Second Circuit decision

15   on February 21, 2002, where the court discusses at great length

16   what criteria a court should use in terms of looking outside

17   the record at this stage.

18        Your Honor is completely correct in terms of your

19   willingness to consider certain documents.  That's totally a

20   matter of your Honor's discretion as to whether you want to

21   convert this to summary judgment or not, but certain documents

22   don't fall in that category and actually the court is required

23   to consider in connection with a motion to dismiss, and those

24   are documents in the words of the Second Circuit that are

25   essentially integral to the complaint.

4BU7SEPM

1    And in analyzing that, the court says these are

2    documents in which the plaintiff had to rely, and it took large

3    consideration of the fact that these are documents that the

4    plaintiff had in their position when they filed their lawsuit.

5    So it's something they had to have considered and relied upon.

6    With that in mind we put together some charts that

7    support our motion on two documents.  One is the lease which is

8    clearly a document that is integral to the complaint.  And

9    second is IRI's own insurance policy, which is something they

10    clearly had possession of.  They had to rely on it, because

11    they are suing as subrogor, and that is before your Honor, and

12    there is no dispute by our side that we put before your Honor

13    the proper policy.

14    So as to these two documents which are before your

15    Honor, there can be no question, and there would be no need to

16    take discovery to establish that both of these documents are

17    accurate.  I am sure Mr. Fisher would concede that statement

18    today, that both those documents are accurate.

19    If I might approach the bench.

20    THE COURT:  You may.

21    MR. MOLONEY:  So that the $750 we spent on this, this

22    is for your Honor's benefit, the big picture chart.

23    THE COURT:  I'm not sure we have the IRI insurance

24    policy, but go on.  I will take it from there.

25    MR. MOLONEY:  I think we attached the relevant

4BU7SEPM

1    provisions, your Honor.  I haven't.  Rather than attach a huge

2    policy, there is only one provision we actually quote, which is

3    the first document I would like to refer in my motion.

4        But before I do that, I would like to draw your

5    Honor's attention to this, if I can walk up, your Honor, to

6    this large chart.  It kind of gave us a picture overview about

7    what this case is about.  I know you spent a lot of time --

8        THE COURT:  I am looking for a better place to put it

9    so people can follow along.  How about if you go against the

10   wall?

11       MR. MOLONEY:  I know your Honor spent a lot of time

12   with 1 and 2 World Trade Center.  That's your introduction to

13   this building.

14       THE COURT:  I have been in the building.  The SEC used

15   to be in that building.

16       MR. MOLONEY:  Yeah, it turns out that a lot of people

17   were there.  I will stand over here if I can, your Honor.

18       THE COURT:  I know that my former partner Len Boxer

19   did a lot of work for Silverstein.  I don't know if he was

20   involved with 7.  I know Strook was involved in leasing of 1

21   and 2.  I don't know if I have disclosed that in connection

22   with 7, but I have disclosed that earlier.

23       Also, my knowledge of a lot of the parties goes back a

24   long time.  I can repeat those, but I have already made that

25   disclosure.

4BU7SEPM

1          MR. MOLONEY:  Yes, your Honor.  Essentially, your

2    Honor, the architecture of this arrangement was that the Port

3    Authority was the ground lessor, Silverstein was the ground

4    lessee and the space lessor.  Citigroup -- at that time it was

5    Salomon Brothers -- so this was Salomon's headquarters, now

6    they are called Citigroup Global, which is a change in our

7    lifetime and memory -- they are the space lessee.

8          Con Edison doesn't really have any relationship with

9    either 7 World Trade Center or Citigroup, even though that

10   motion is not being honored.  Essentially they have a contract

11   with the Port Authority.  I'm not going to argue that today.  I

12   understand that.  But they have a separate agreement.  And the

13   subrogee are Aegis for Con Edison and IRI as subrogee.

14         What is really critical to our motion is the consent

15   from IRI to 7 World Trade Center, which is what we would like

16   to focus on at the beginning.

17         If you look at tab 1 --

18         THE COURT:  So IRI paid Silverstein's damage claim?

19         MR. MOLONEY:  Correct.  They paid Silverstein's damage

20   claim, and they are now suing Citigroup under a subrogation

21   theory.

22         THE COURT:  Citigroup, CGMH.

23         MR. MOLONEY:  Yes.  And actually they are suing the

24   entire Citigroup family, even though --

25         THE COURT:  Well --

4BU7SEPM

1          MR. MOLONEY:  That's a separate point, but I put CGMH

2     because that's what Salomon is now known as.  That's the

3     Citigroup Global Market.

4          Essentially if you look at tab 1 in our tabs, your

5     Honor, this will give you the contractual language of the

6     lease, and you will see that on the lease there is no question

7     that Silverstein and Citigroup released each other, and they

8     provided that the release would be effective if the insurance

9     company, who Silverstein was required to obtain, as you will

10    see further on, agreed to permit the release.

11         And then if you turn the page you will see IRI's

12    insurance policy, which we quote from page 16.  And I am sure,

13    your Honor, this is part of what we submitted to the court.

14         THE COURT:  No, I accept that.

15         MR. MOLONEY:  It says, "This insurance shall not be

16    invalidated should the insurer waive by express agreement" --

17    which the release is -- "prior to a loss any or all right of

18    recovery against any party for loss or damage insured against

19    by this policy."

20         So essentially IRI consented to this.  The lease also

21    provides in 12.09 --

22         THE COURT:  That's what you mean by consent.

23         MR. MOLONEY:  Yes.

24         THE COURT:  That depiction.

25         MR. MOLONEY:  Right.  And the lease also provides in

4BU7SEPM

1    12.09, you know, essentially that the insurance which the

2    landlord is required to obtain is an operating expense, which

3    Citigroup has to pay as a tenant its proportional share, and

4    since Citigroup was the largest anchor tenant of this building

5    it paid for most of the IRI insurance.

6        So in essence, your Honor, this, as we indicated in

7    our brief, this form of waiver of subrogation --

8        THE COURT:  And the last clause deals with removables.

9        MR. MOLONEY:  The last clause --

10       THE COURT:  -- deals with the initial work and any

11   alterations.

12       MR. MOLONEY:  Right.  The initial work and alterations

13   are defined terms in the lease.  Initial work was the work in

14   connection with -- what happened was, your Honor, we moved into

15   this building.  The time line we will show you.

16       THE COURT:  It's the space configurations.

17       MR. MOLONEY:  Exactly right.  And we were basically

18   paying for the insurance as a pass-through, as an operating

19   expense under the lease.  This was subject to an approval

20   process which involved Silverstein.  And if you look at the

21   second tab, the lease kind of indicates an approval process,

22   and it's not only subject to the approval process, but also the

23   lease contemplated when we moved in that we would build a

24   generator on the fifth floor that would have access to over

25   12,000 gallons of fuel, that in fact we couldn't build it

4BU7SEPM

1    anywhere else without Silverstein agreeing to put -- for us

2    putting it anywhere else.  So what this shows you, your Honor,

3    is in terms of when we moved into this space --

4         THE COURT:  Well this doesn't say that, but it gives

5    you a specific location where you're supposed to build your

6    generator.

7         MR. MOLONEY:  Right.  And it says how much fuel.  It

8    says we shall have access to -- the only two allegations they

9    have against us --

10         THE COURT:  How do you read that?  11 1750 KDA diesel

11    emergency power generators.

12         What does that mean?

13         MR. MOLONEY:  I'm not sure I am looking at exactly the

14    same one.

15         THE COURT:  It's paragraph 2.  The top part says that

16    you are entitled to build tanks sufficient to store 12,000

17    gallons of diesel fuel.

18         MR. MOLONEY:  11.  This is what we built.  These are

19    the power generators that were built in the space.  What they

20    essentially are saying is that even though the lease provided

21    that we are supposed to build these generators in this space,

22    the lease provided we were supposed to have access to over

23    12,000 gallons of fuel.  The fact that we actually followed the

24    lease was not only negligence but gross intentional wrongdoing

25    on our part.  That's the argument they have to ultimately make

4BU7SEPM

1    to vitiate this release.

2              If you turn to tab 3 you will see that --

3              THE COURT:  I missed that.  Run that by me again.

4              MR. MOLONEY:  The gist of their argument is since it's

5    a contractual release -- the gist of his argument is that gross

6    negligence vitiates a contractual release.  He has to argue --

7    and what was our gross negligence?  We built a generator on the

8    fifth floor of the building which was too close to the trusses,

9    in his view, with the genius of hindsight; and, second, we put

10   12,000 gallons of fuel in the building.

11             THE COURT:  Well, I am going to assume he is correct.

12             MR. MOLONEY:  I assume for purposes of my argument

13   that he is correct, that we should not have put 5,000 gallons

14   of fuel in the building, we should not have built it on the

15   fifth floor.

16             THE COURT:  But merely having a lease provision that

17   allows you to do a grossly negligent act doesn't stop it from

18   being grossly negligent.

19             MR. MOLONEY:  Your Honor, a lease provision that tells

20   you that if you are Citigroup and you are moving into a

21   building and you need an emergency backup generator system

22   because the only one who can provide electricity to that

23   building is Con Edison --

24             THE COURT:  What you are really saying to me is that

25   the subrogee of the landlord can't complain about a clause that

4BU7SEPM

```
 1    the landlord has agreed to.
 2              MR. MOLONEY:  Yes, exactly.
 3              THE COURT:  It's an acquiescence issue, not a defeat
 4    of gross negligence.  If you can acquiesce in a grossly
 5    negligent act you have acquiesced.
 6              MR. MOLONEY:  Your Honor, we will go a little bit
 7    beyond simple acquiescence.  If we look to slide 3 you will see
 8    that the landlord was not only given this approval over the
 9    general placement of what we did and of how much fuel we used,
10    but we had to submit our precise plans to the landlords from
11    engineers and architects for them to review, and if they
12    thought they were in any way dangerous, their architects and
13    engineers could stop us from implementing plans.  And we
14    actually were required to pay for this.  So we actually
15    reimbursed them to have their engineers and architects look at
16    the precise construction, which we did.
17              THE COURT:  You want me to look at paragraph 14, which
18    allows the landlord to stop you from doing anything that in the
19    landlord's opinion will jeopardize the building.
20              MR. MOLONEY:  Exactly.  And also if you continue, you
21    will see that we have an obligation to actually pay for this
22    review by the landlord's architects and engineers in 14.03(d).
23              Then if you go on to point 4 of our submission, which
24    is the three-party agreement between the Port Authority, 7
25    World Trade Center and Citigroup, which indicates how the Port
```

4BU7SEPM

1    Authority -- also before your Honor, also integral to this

2    build-out and to this lawsuit, this document, your Honor,

3    indicates that in addition to Silverstein, the Port Authority

4    and their engineers and architects had to approve this precise

5    construction before we did anything.  And we had to pay for

6    them to engage in this review as well.

7            THE COURT:  And then you have Con Edison.

8            MR. MOLONEY:  We in fact obtained --

9            THE COURT:  I think I get the picture.  So who is

10   going to tell me Mr. Moloney is not correct?

11           MR. MOLONEY:  And if I --

12           THE COURT:  I think I've got the picture.

13           MR. MOLONEY:  Okay.  Thank you, your Honor.

14           THE COURT:  Mr. Joseph?

15           MR. JOSEPH:  Your Honor, we don't dispute what the

16   lease says.  We don't dispute that there are three parties that

17   are involved in the decision-making process for this system:

18   The Port Authority, Mr. Silverstein and Citigroup.  We don't

19   dispute that there is a comparative fault issue.  We do say

20   that that is an issue for a jury to decide.

21           THE COURT:  And you are representing the subrogee of

22   Silverstein --

23           MR. JOSEPH:  Of Silverstein.

24           THE COURT:  -- who approved all of this.

25           MR. JOSEPH:  He did.  As did the Port Authority.  And

4BU7SEPM

1    it was Citigroup that had the responsibility for design,

2    installation, maintenance and functioning, and it was the Port

3    Authority that had ultimate hands-on control over design,

4    installation, maintenance and function.

5          THE COURT:  But your subrogor had an intimate

6    involvement in the whole process.

7          MR. JOSEPH:  Absolutely right.  We don't deny that.

8          Their argument is ultimately assumption of risk, which

9    is what your Honor was pointing out, an acquiescence argument,

10   which CPLR 14.11 says that that is an issue for the comparative

11   fault calculus.  It may be that they can prove that

12   Mr. Silverstein was negligent.  Perhaps they can.  But, if so,

13   that doesn't exonerate them from their responsibility.

14         The exact wording of 14.11 of the CPLR is, "In any

15   action to recover damages for injury to property, the culpable

16   conduct attributable to the claimant, including contributory

17   negligence or assumption of risk shall not bar recovery."

18   Shall not bar recovery.  But the amount of damages --

19         THE COURT:  That's against a third party.

20         MR. JOSEPH:  Well, we are not suing Silverstein, so

21   it's definitely against a third party.  But any assumption of

22   risk or contributory negligence by Silverstein -- should any be

23   found by a jury -- would be something that would reduce

24   recovery.

25         THE COURT:  If I'm walking past the building when it

4BU7SEPM

1    caught fire, and I was engulfed by the flames, and my wife sued

2    all of you, you may all have to contribute to the judgment, but

3    that doesn't mean that in a lawsuit by a subrogee we're

4    entitled to recover.

5         MR. JOSEPH:  I believe it does, because we are in the

6    shoes of the claimant.  The claimant is Silverstein now suing

7    the Port Authority and Citigroup for this --

8         THE COURT:  And you think Silverstein would have had a

9    right of action?

10        MR. JOSEPH:  Oh, I believe, your Honor, in fairness, I

11   do believe it clearly would have had a right of action against

12   Citigroup.  We have to show gross negligence.  Against the Port

13   it's a negligence standard.  Against Citigroup it is a gross

14   negligence standard.  We may or may not be able to prove it.

15   We are comfortable with our experts that we will be able to.

16   But it will be for a jury to decide.  But there is not a legal

17   preclusion against that action being filed or pursued, and

18   that's what they are trying to do as they attempt to try the

19   case on the pleadings.

20        THE COURT:  I have all the papers on this, right?

21        MR. JOSEPH:  You have more papers than you need or

22   want, your Honor.

23        THE COURT:  And this is ripe for decision, I think.

24        MR. JOSEPH:  Yes, we believe that.

25        THE COURT:  All of you feel it's ripe for decision.

43

4BU7SEPM

1          MR. MOLONEY:  Yes, your Honor.  May I say one thing?

2          THE COURT:  Yes.

3          MR. MOLONEY:  Very briefly, your Honor.  If you look

4   at the decision of the Court of Appeals in 1985, which we cite,

5   in the decision which we cite it's called *Abergast v. Board of*

6   *Education.*

7          THE COURT:  I am not going to rule from the bench.

8          MR. MOLONEY:  I am just telling you to help your law

9   clerk or your Honor.  *Abergast v. Board of Education of South*

10  *New Berlin*, a Court of Appeals decision from 1985, the official

11  cite is 65 NY 2d 161.  Express assumption of risk is not

12  barred, is a complete defense, the court held.  And, therefore,

13  if your Honor finds based on the lease provisions and the

14  approval process there is express assumption of risk, then the

15  argument that you made about comparative fault is completely

16  irrelevant.

17         The second point I make, your Honor -- and it's in the

18  papers -- is that --

19         THE COURT:  Mr. Moloney, we've got the papers.  We

20  will reread the papers.  We will reread the papers.

21         MR. MOLONEY:  Thank you, your Honor.

22         THE COURT:  Anything more on that?  Okay.  Decision

23  reserved.

24         I've dealt with all the three motions.  Let's go over

25  timing.  Will the defendants file and serve answers with

4BU7SEPM

1    affirmative defenses within a ten day period?  Is that

2    satisfactory?

3              MR. MOLONEY:  Yes, your Honor.

4              THE COURT:  All right.  Then I'd like you to confer

5    and create a discovery plan and submit it to me.  I envision

6    that the discovery plan will focus only on the defenses, and

7    that in rapid time the defendants will, if they wish to, renew

8    their motions.  And I would think that a date sometime in

9    February should allow the parties to do what they need to do.

10   If that's a little bit too optimistic, you will let me know.

11   But I would like to try for this.

12              I would like all of us to know if there are viable

13   causes of action or not.  I don't do anybody any favor by

14   creating a final cause of action, because I'm willing to decide

15   the issues.  I envision that I will need to make a decision,

16   and the aggrieved party is going to wish to appeal, and the

17   sooner that's done the better.

18              So if we can't make that date, you will let me know.

19   I don't see any point to meet until we have argument of the

20   motion unless there are disagreements.  I suspect there will

21   not be disagreements.  But if there are, express your

22   disagreement in a single joint letter.  I have this formulated

23   in my chambers rule 2E, and I will try to give you a very quick

24   and responsive ruling.  Thank you very much.

25

# EXHIBIT
# K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

IN RE SEPTEMBER 11 PROPERTY DAMAGE     :     21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION     :

-----------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC., et al.,     :

            :

         Plaintiffs,     :     02 CV 7188 (AKH)

            :

            :

         -against-     :

            :

PORT AUTHORITY OF NEW YORK AND NEW     :
JERSEY and THE CITY OF NEW YORK,     :

            :

         Defendants.     :

-----------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PERMISSION TO SUPPLEMENT AMENDED
COMPLAINT TO ASSERT CAUSE OF ACTION IN BREACH OF CONTRACT**

            Gennet, Kallmann, Antin & Robinson, P.C.
            Attorneys for Plaintiffs
            45 Broadway Atrium
            Litman Suite
            New York, New York 10006
            (212) 406-1919

Mark L. Antin (MA0427)
Michael S. Leavy (ML6150)
On the Brief

            Greenbaum, Rowe, Smith & Davis, LLP
            Attorneys for Plaintiffs
            Metro Corporate Campus One
            P.O. Box 5600
            Woodbridge, New Jersey 07095-0988
            (732) 549-5600

Franklin M. Sachs (FS 6036)
On the Brief

# TABLE OF CONTENTS

PRELIMINARY STATEMENT                                          4

STATEMENT OF FACTS                                            4

PROCEDURAL HISTORY                                           6

ARGUMENT                                                     6

LEAVE TO SUPPLEMENT THE COMPLAINTS
SHOULD BE GIVEN IN THE INTERESTS OF JUSTICE                  6

CONCLUSION                                                   7

# TABLE OF AUTHORITIES

**Cases**                                                                    Pages

<u>In re September 11 Property Damage and Business Loss Litigation</u>
468 <u>F.Supp.2d</u> 508, 520-522 (S.D.N.Y. 2006)                              5

<u>Novak v. National Broadcasting Co., Inc.</u>
724 <u>F.Supp.</u> 141 (S.D.N.Y. 1989)                                          6

<u>Quaratino v. Tiffany & Co.</u>
71 <u>F.3d</u> 58 (2d. Cir. 1995)                                              6


**Rules**
<u>Fed. R. Civ. P. 15(d)</u>                                                    6

## PRELIMINARY STATEMENT

Plaintiffs Consolidated Edison Company of New York, Inc. and its subrogating insurers (collectively "Con Edison") respectfully move:

1) For permission to supplement their Amended Complaint in *AEGIS INSURANCE SERVICES, INC., et al., against PORT AUTHORITY OF NEW YORK AND NEW JERSEY, et al.,* 02 cv 7188 (AKH), pursuant to <u>Fed. R. Civ. P. 15(d)</u>, to allege new facts which occurred, and assert a cause of action for breach of contract which accrued, after the filing of the Amended Complaint, or, alternatively;

2) For such other, further and different relief as the Court may deem just and proper.

## STATEMENT OF FACTS

This action arises from the events of September 11, 2001, particularly the collapse of 7 World Trade Center ("7WTC") and the consequent destruction of the Con Edison Substation beneath. The 7 World Trade Center site is owned by the Port Authority of New York and New Jersey ("Port Authority") and was first developed in 1968 with the construction of an electrical substation by Con Edison to furnish power to the then-unbuilt World Trade Center. It was constructed pursuant to a lease between them executed May 29, 1968, which assigned the risk of loss of the Substation to the Port Authority. The lease is Exhibit "A" to the accompanying Leavy Cert.

Plaintiffs filed their Complaint in this action on September 10, 2002 against the Port Authority (Exhibit "B" to Leavy Cert.). The Complaint was amended to name the City of New York as an additional defendant on December 9, 2003 (Exhibit "C" to Leavy Cert.).

4

The Complaint and Amended Complaint discussed the May 29, 1968 lease between the Port Authority and Con Edison concerning Con Edison's substation, which eventually served as part of the foundation for 7 World Trade Center. *See* Amended Complaint, Exhibit "C" to Leavy Cert., at ¶¶ 9-10. As is reflected in the January 12, 2006 decision of this Court, In re September 11 Property Damage and Business Loss Litigation, 468 F.Supp.2d 508, 520-522 (S.D.N.Y. 2006), that lease has potential import for the assignment of the risk of loss in this litigation.

Indeed, the lease contains provisions which, regardless of the cause of the damage to the substation and its equipment, obligate the Port Authority to indemnify Con Edison for damage arising from the Port Authority's acts or omissions in connection with the construction or maintenance of 7 WTC, regardless of fault on the part of the Port Authority. *See,* sections 8 and 16 of the lease, Exhibit "C" to Leavy Cert. Further lease terms confirm that the indemnification obligation on the part of the Port Authority is regardless of fault. *See,* section 40 of the lease. Additional language requires the Port Authority to indemnify Con Edison for its debris removal expenses. *See,* section 18 of the lease.

Since the events of September 11, 2001, as is more fully set forth in the accompanying Lynch Affidavit, negotiations ensued between Con Edison and Port Authority over the Port Authority's obligation to indemnify Con Edison for the destruction of the Substation. Since the Complaint was filed and amended, those negotiations resulted in a partial payment of $20,000,000 to Con Edison. Additional negotiations ensued over several years, but to date the Port Authority has failed to make any further payments under the lease, despite due demand. *See,* accompanying Lynch Affidavit, and letter to Port Authority demanding payment pursuant to lease, Exhibit "D" to Leavy Cert.

## PROCEDURAL HISTORY

From a discovery standpoint, this case is still in its early stages. Documentary discovery has commenced and is presently continuing on a rolling basis, and the parties are still in the process of reviewing the tens of thousands of pages that each party has exchanged. Fact depositions commenced in July 2007, and are expected to continue for approximately a year or more.

The Case Management Orders entered by this Court have contained no deadline before which the Complaint was required to be amended or supplemented, as one would expect in an action in which no depositions have been taken in general discovery.

## ARGUMENT

### LEAVE TO SUPPLEMENT THE COMPLAINT
### SHOULD BE GIVEN IN THE INTERESTS OF JUSTICE

Leave should be freely permitted to supplement a pleading "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed. R. Civ. P. 15(d). "[L]eave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading." Quaratino v. Tiffany & Co., 71 F.3d 58 (2d. Cir. 1995), Novak v. National Broadcasting Co., Inc., 724 F.Supp. 141 (S.D.N.Y. 1989).

In the proposed Supplemental Complaint against the Port Authority, annexed as Exhibit "J" to the accompanying Leavy Cert., the transactions and occurrences stated therein are alleged to constitute a breach of the lease between Con Edison and the Port Authority. While that lease

6

is described in the Complaint and Amended Complaint, *see* Amended Complaint, Exhibit "B" to Leavy Cert., at ¶¶ 9-10, the failed negotiations under that lease, the Port Authority's subsequent refusal to furnish the indemnity required, and the consequent breach of the lease, have occurred during the years since the Complaint was first amended. *See,* accompanying Lynch Affidavit, and proposed Supplemental Complaint, Exhibit "E" to Leavy Cert.

It is respectfully submitted that leave to file a Supplemental Complaint should be granted.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully requests that their motion be granted in all respects.

Dated:  August 16, 2007

Respectfully submitted,

MARK L. ANTIN (MA 0427)
MICHAEL S. LEAVY (ML 6150)
GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
Attorneys for Plaintiffs
45 Broadway
30th Floor
New York, New York 10006
(212) 406-1919

FRANKLIN M. SACHS (FS 6036)
GREENBAUM, ROWE, SMITH & DAVIS, LLP
Attorneys for Plaintiffs
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988
(732) 549-5600

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

IN RE SEPTEMBER 11 PROPERTY DAMAGE    :        21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION          :

------------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC., et al.,    :
                                           :
                    Plaintiffs,            :        02 CV 7188 (AKH)
                                           :
                                           :        **DECLARATION OF**
            -against-                      :        **MICHAEL S. LEAVY**
                                           :
PORT AUTHORITY OF NEW YORK AND NEW         :
JERSEY and THE CITY OF NEW YORK,           :
                                           :
                    Defendants.            :

------------------------------------------------------------------x

   **MICHAEL S. LEAVY**, an attorney licensed in and admitted to practice before the

Courts of the State of New York, and admitted to the bar of this Court, declares the following

pursuant to 28 U.S.C. §1746:

   1.      I am associated with the law firm of Gennet, Kallmann, Antin & Robinson, P.C.,

attorneys for Consolidated Edison Company of New York, Inc. and the Aegis plaintiffs

("plaintiffs"), in connection with the above matter. I am familiar with the facts and

circumstances set forth herein based upon my personal knowledge and my review of documents

referenced herein.

   2.      I respectfully submit this Certification in support of the motion of plaintiffs to

supplement their Amended Complaint pursuant to Fed. R. Civ. P. 15(d).

   3.      The Amended Complaint, annexed hereto as Exhibit "A," makes claim for

negligence in the design, construction and modification of 7 World Trade Center, resulting in its

destruction and the destruction of the Con Edison substation beneath it.

4.      The Complaint dated September 10, 2002 in *Aegis et al. v. Port Authority, et al.*, 02 cv 7188 (AKH), is annexed hereto as Exhibit "B".

5.      The May 29, 1968 lease between Consolidated Edison Company of New York, Inc. and the Port Authority of New York and New Jersey is annexed hereto as Exhibit "C".

6.      Con Edison's letter to the Port Authority demanding payment for the remainder of amounts due under the lease for the destruction of the substation is annexed hereto as Exhibit "D." We have received no response to the letter.

7.      The proposed Supplemental Complaint is annexed hereto as Exhibit "E".

8.      No Case Management Order concerning *Aegis et al. v. Port Authority, et al.*, 02 cv 7188 (AKH) or its companion case has set a deadline by which the Amended Complaint must be amended or supplemented.

I certify under penalty of perjury that the foregoing is true and accurate.

Executed on August 16, 2007

By: _____

MICHAEL S. LEAVY

2

# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

IN RE SEPTEMBER 11 PROPERTY DAMAGE     :     21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION

-------------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC., et al.,     :
                                            :
                  Plaintiffs,               :     02 CV 7188 (AKH)
                                            :
                                            :
         -against-                          :     **AFFIDAVIT OF**
                                            :     **JOSEPH M. LYNCH**
PORT AUTHORITY OF NEW YORK AND NEW          :
JERSEY and THE CITY OF NEW YORK,            :
                                            :
                  Defendants.               :

-------------------------------------------------------------------x

STATE OF NEW YORK     )
                  ss: )
COUNTY OF NEW YORK    )

     **Joseph M. Lynch,** of full age, deposes and states under penalty of perjury, as follows:

     1.    I am the Insurance Department Manager for Consolidated Edison Company of New York, Inc. ("Con Edison"). I am familiar with the facts and circumstances set forth herein based upon my personal knowledge and my review of my files.

     2.    I was responsible for communicating with the Port Authority of New York and New Jersey ("Port Authority") regarding Con Edison's claim under the insurance the Port Authority agreed to procure that covered the damage to the substation building beneath 7 World Trade Center as a result of the events of September 11, 2001. This claim was made pursuant to the insurance obligations of the PA outlined in the May 29, 1968 lease between Con Edison and Port Authority.

     3.    On June 3, 2004, Con Edison received a check from Port Authority in the amount of $20,000,000 in partial payment under this insurance obligation.

4.      Since that time, I and others at Con Edison had discussions with, among others,

Iran Engel, the assistant treasurer of the Port Authority regarding further payments due from the

PA under this insurance obligation for damage to the substation.

5.      Those negotiations were fruitless.  No additional payment has been made to date.

6.      I am informed by our counsel that in addition to amounts due for destruction of

the substation building, there are other amounts due under the lease for damages sustained to

Con Edison's equipment and for other damages.

7.      I am also informed that our outside counsel, Gennet, Kallmann, Antin &

Robinson, has recently demanded payment of approximately $130,000,000 due under the lease.

*See*, Exhibit "D" to the Leavy Certification accompanying this affidavit.

8.      I also understand that Port Authority made no payment or other response to that

demand.

Joseph M. Lynch

Sworn to before me
this 3rd day of August, 2007

Notary Public

AUDREY LILLOO FRASER
Notary Public, State of New York
No. 41-4993984
Qualified in Queens County
Commission Expires March 30, 2010

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
IN RE SEPTEMBER 11 PROPERTY DAMAGE          :        21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION                :
--------------------------------------------------------------------x
AEGIS INSURANCE SERVICES, INC., et al.,     :
                                            :
                        Plaintiffs,         :        02 CV 7188 (AKH)
                                            :
                                            :
                        -against-           :
                                            :
PORT AUTHORITY OF NEW YORK AND NEW          :
JERSEY and THE CITY OF NEW YORK,            :
                                            :
                        Defendants.         :
--------------------------------------------------------------------x

## PLAINTIFFS' NOTICE OF MOTION FOR PERMISSION
## TO SUPPLEMENT AMENDED COMPLAINT
## TO ASSERT CAUSE OF ACTION IN BREACH OF CONTRACT

**PLEASE TAKE NOTICE** that upon the Affidavit of Joseph M. Lynch dated August 13,

2007, the Declaration of Michael S. Leavy dated August 16, 2007, and the Memorandum of Law

dated August 16, 2007, the Plaintiffs hereby move this Court:

1)      For permission to supplement their Amended Complaint in *AEGIS INSURANCE*

        *SERVICES, INC., et al., against PORT AUTHORITY OF NEW YORK AND NEW*

        *JERSEY, et al.,* 02 cv 7188 (AKH), pursuant to Fed. R. Civ. P. 15(d), to allege

        new facts which occurred, and assert a cause of action for breach of contract

        which accrued after the filing of the Amended Complaint, or, alternatively;

2)    For such other, further and different relief as the Court may deem just and proper.

Dated:        New York, New York
              August 16, 2007

              MARK L. ANTIN (MA 0427)
              MICHAEL S. LEAVY (ML 6150)
              GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
              Attorneys for Plaintiffs
              45 Broadway
              30th Floor
              New York, New York 10006
              (212) 406-1919

              FRANKLIN M. SACHS (FS 6036)
              GREENBAUM, ROWE, SMITH & DAVIS, LLP
              Attorneys for Plaintiffs
              Metro Corporate Campus One
              P.O. Box 5600
              Woodbridge, New Jersey 07095-0988
              (732) 549-5600

# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*Judge Hellerstein*

-----------------------------------------------------------------x

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC., and;
AEGIS INSURANCE SERVICES, INC.,
LIBERTY INTERNATIONAL UNDERWRITERS, INC.,
NATIONAL UNION INSURANCE COMPANY
OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE
LIMITED and CERTAIN UNDERWRITERS AT LLOYDS
(SYNDICATE 1225), all as subrogees of CONSOLIDATED
EDISON COMPANY OF NEW YORK, INC.

**'07 CIV    7969**

Civil Action No.

                                        Plaintiffs,

- against -

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

                                        Defendant.

**COMPLAINT**



-----------------------------------------------------------------x

Consolidated Edison Company of New York, Inc., and; Aegis Insurance Services, Inc.,

Liberty International Underwriters, Inc., National Union Insurance Company of Pittsburgh,

Nuclear Electric Insurance Limited and Underwriters at Lloyds as subrogees of Consolidated

Edison Company of New York, Inc., by way of Complaint against defendant The Port Authority

of New York and New Jersey, upon information and belief set forth:

<u>PARTIES</u>

1.      Plaintiff, Consolidated Edison Company of New York, Inc. (hereinafter referred

to as "Con Edison"), is a New York corporation, with its principal place of business at 4 Irving

Place, New York, New York, and was a tenant of a premises located under 7 World Trade

Center.

2.      Plaintiff, Aegis Insurance Services, Inc. (hereinafter referred to as "Aegis"), with a place of business at 10 Exchange Place, Jersey City, New Jersey 07302, is a business entity authorized to engage in the insurance business in the State of New York.

3.      Plaintiff, Liberty International Underwriters Inc. (hereinafter referred to as "Liberty"), with a place of business at 61 Broadway, New York, New York 10006, is a business entity authorized to engage in the insurance business in the State of New York.

4.      Plaintiff, National Union Insurance Company of Pittsburgh (hereinafter referred to as "National"), with a place of business at 70 Pine Street, New York, New York 10270, is a business entity authorized to engage in the insurance business in the State of New York.

5.      Plaintiff, Nuclear Electric Insurance Limited (hereinafter referred to as "Nuclear"), with a place of business at 1201 Market Street, Suite 1200, Wilmington, DE 19801, is a business entity authorized to engage in the insurance business in the State of New York.

6.      Plaintiff, Underwriters at Lloyds (hereinafter referred to as "Lloyds"), with a place of business at Lime Street, London, England, is a business entity authorized to engage in the insurance business in the State of New York.

7.      Collectively, Aegis, Liberty, National, Nuclear, and Lloyds (hereinafter referred to collectively as "Aegis") are suing herein as subrogees of Consolidated Edison Company of New York, Inc.

8.      Defendant, The Port Authority of New York and New Jersey (hereinafter referred to as "The Port Authority"), is a body, corporate and politic by virtue of a compact, agreement and by law, between the states of New York and New Jersey, with an office in the City, County and State of New York.

**JURISDICTION**

9.      This Court has jurisdiction of the action pursuant to 49 U.S.C. 40101 § 408(b),

which provides that the United States District Court of the Southern District of New York shall

have the original and exclusive jurisdiction over all actions brought for any claim, including

property damage, "resulting from or relating to the terrorist-related aircraft crashes of September

11, 2001."

**VENUE**

10.      Venue is properly laid in this Court pursuant to 49 U.S.C. 40101 § 408(b).

**GENERAL ALLEGATIONS**

11.      At all relevant times, Aegis issued policies of insurance to Con Edison for its

property, operation and business.  Pursuant to the aforementioned policies of insurance, Aegis

insured Con Edison for losses to real, personal property and various other coverages.

12.      By common law and contract Aegis has subrogation rights against such third

parties as have caused, contributed to or are obligated to pay for damages for which the insurer

was required to pay their insured.

13.      The Port Authority is the owner of the property located at Washington and

Barclay Streets, New York, New York.

14.      On or about May 29, 1968, The Port Authority entered into a lease agreement

with Con Edison.

15.      Pursuant to that lease, in or about 1970, a Con Edison substation (the

"Substation"), containing nine transformers, ancillary equipment and fire protection, was built at

Washington and Barclay Streets.  It provided electricity to the World Trade Center complex and

the surrounding area.

16.    Beginning in or about 1983, 7 World Trade Center (the "Building") was built upon and around the Substation.

17.    Thereafter, the Substation was located immediately and directly beneath the Building. The Substation was an enclosed space with no entrance to the Building and both the space and equipment were fire protected.

18.    The Port Authority retained ultimate control over all aspects of the design, construction, use and occupancy of the Building, including but not limited to its structure, modifications, power generation and fuel distribution systems, and fire protection.

19.    On September 11, 2001, at 8:46 a.m. an airliner hijacked by terrorists crashed into the One World Trade Center (North) Tower, causing fire therein.

20.    On September 11, 2001, at 9:03 a.m. another airliner hijacked by terrorists in concert with the first airliner crashed into the Two World Trade Center (South) Tower, causing fire therein.

21.    At approximately 9:59 a.m., the Two World Trade Center (South) Tower collapsed.

22.    At approximately 10:28 a.m., the One World Trade Center (North) Tower collapsed.

23.    As a result of the foregoing, one or both fires and collapses, the Building was set on fire and at approximately 5:20 p.m. suffered a progressive global collapse.

24.    The collapse of the Building completely destroyed the Substation.

## THE LEASE PROVISIONS

25.    The Port Authority's lease with Con Edison contained the following provision which permitted the Port Authority to construct the 7 WTC building upon the substation:

Section 8.    <u>Air Space and Port Authority Construction</u>

(a)    The Lessee recognizes that the Port Authority may construct wholly or partially on, above or about the Substation Building additional stories, structures, buildings or improvements of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine. In connection therewith, the Port Authority may use the roof surface of the Substation Building for the base or floor of such additional construction or for a plaza thereof or for some other purpose and may also use side wall surfaces of the Substation Building for support or for attachment thereto of additional structures or for decorative treatment thereto. The Port Authority agrees that no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee contemplated in Section 3 hereof. Without limiting the generality of the foregoing or of any other provisions of this Agreement the Port Authority in performing such additional construction may, upon reasonable advance written notice given to the Lessee and subject to and in accordance with the reasonable safety and operating requirements of the Lessee, temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such construction and the Lessee hereby consents to such entry, use and construction by the Port Authority.

(b)    The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be or be construed to be an eviction of the Lessee nor made the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise.

26.    The Port Authority's lease with Con Edison contained the following provision obligating the Port Authority to indemnify Con Edison for damage arising from the Port Authority's acts or omissions in connection with the construction or maintenance of 7 WTC, regardless of fault on the part of the Port Authority:

Section 16.    <u>Responsibility for Other Uses of Premises</u>

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the obligations assumed by the Lessee under this Agreement with respect to maintenance, repair,

rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors; further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction therof is necessitated by act or fault of the Lessee. The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof. The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance.

27.    The Port Authority's lease with Con Edison contained the following provision which applies to damage due to the negligence or other fault on the part of the Port Authority, its employees or agents. The provision states that it does not relieve the Port from the "without fault" indemnification obligations of paragraph 16:

Section 40.    <u>Premises</u>

*        *        *

(b)    The Port Authority shall not be liable to the Lessee or to any person for injury or death to any person or persons whomsoever or damage to any property whatsoever at any time in or about the premises, including but not limited to any such injury, death or damage from falling material, water, rain, hail, snow, gas, steam, dampness, explosives, smoke, radiation or electricity, whether the same may leak, issue, fall or flow from any party of the Facility or from any other place or quarter unless said damage, injury or death shall be due to the negligence of the Port Authority, its employees or

agents, provided, however, that nothing in this subparagraph (b) shall
be deemed to relieve the Port Authority of its obligations under
Section 16 hereof.

28.    The Port Authority's lease with Con Edison contained the following provision

concerning debris removal in the event of damage or destruction of the Substation:

Section 18.    Damage or Destruction of Premises

(a)    Removal of Debris – If the premises or any part thereof, shall
be damaged by fire, the elements, the public enemy or any other
casualty, the Lessee shall promptly remove all debris resulting from
such damage from the premises, and to the extent, if any, that such
removal is covered by insurance, the proceeds thereof shall thereafter
be made available to the Lessee for such purposes.

29.    The Port Authority's lease with Con Edison contained the following provision

which obligated the Port Authority to insure or procure insurance for the Substation building in

return for the payment of insurance premiums by Con Edison to the Port Authority:

Section 17.    Fire Insurance

During the term of this Agreement the Port Authority, at the
Lessee's expense, shall insure and keep insured the Substation
Building to the extent of 100% of the replacement value thereof
against such hazards or risks as may now or in the future be
included under the standard form of fire insurance policy in use in
New York from time to time during the letting and the standard
form of extended coverage endorsement prescribed as of the
effective date of such insurance by the rating organization having
jurisdiction. All such policies of insurance and renewals thereof
shall be taken out in the name of the Port Authority and shall
provide that the loss, if any, shall be adjusted with and payable to
the Port Authority. The proceeds of such insurance shall be
applied by the Port Authority in accordance with the provisions of
section 18 hereof. The Port Authority shall not be deemed to have
warranted the solvency of any insurance company and shall not be
liable for any losses resulting from such insolvency.

The Port Authority may from time to time and at any time
voluntarily elect on not less than ten days' notice to the Lessee to
become a self-insurer as to any part or all of the loss or damage
resulting from the hazards or risks that would be insured against
under the insurance policies described in paragraph (a) above; the

Port Authority shall, if and to the extent that it has elected to self-insure, make available out of its funds, in the event of such loss or damage, an amount equivalent to that which would have been paid by an insurance carrier under the same circumstances.

The Lessee shall pay the Port Authority annually an amount equal to the insurance premium or premiums paid by the Port Authority allocable to the insurance coverage provided under paragraph (a) above and if the Port Authority shall elect to self-insure as to any part or all of such coverage, the Lessee shall pay annually an amount equal to the allocable portion of such insurance premiums which would have been paid by the Port Authority if it had actually insured.

30.    Con Edison duly and fully paid all premiums due pursuant to the above provision.

## FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

31.    The Port Authority, by act and omission in the design, approval, inspection, installation, maintenance, operation, conduct and control of the building systems including but not limited to the load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems and fire protection systems within the Building, caused the destruction of the Building and Substation.

32.    Con Edison and Aegis suffered damage as a result of the destruction of the substation, have expended substantial sums to replace the Substation, its functionality and its associated equipment, and to remove debris, and they have incurred other expenses related to those activities, all in the amount of $129,341,259.00.

33.    Such expenses were incurred by reason of damage to the Substation or its related equipment which damage is compensable in accordance with the lease provisions cited above.

34.    To the extent a Notice of Claim is required for this action, Plaintiffs submitted a Notice of Claim to The Port Authority on June 11, 2002, requesting adjustment and payment of the damage sustained by plaintiffs.

35.     The Port Authority has acknowledged its obligation to make payment under the lease provisions by making partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability arising from the lease.

36.     Demand has been made to the Port Authority for the balance of payment of the amounts due under the aforesaid lease provisions.

37.     No response has been made to the demand, and no payment has been made by the Port Authority to Con Edison.

38.     Failure to make payment on the part of the Port Authority constitutes breach of contract.

39.     As a result of the breach of the lease contract by the Port Authority, Con Edison and Aegis have been damaged in the amount of $129,341,259.00, together with interest from the date the expenses were incurred.

## SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT

40.     The Port Authority was negligent, careless and reckless by act and omission in the design, approval, inspection, installation, maintenance, operation, conduct and control of the building systems including but not limited to the load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems and fire protection systems within the Building, leading to the destruction of the Building and Substation.

41.     The collapse of the Building and the destruction and damage to the Substation, the equipment located therein, and to equipment connecting to and from the Substation, were caused by the negligence, carelessness, recklessness and breach of contract of the Port Authority.

42.    Con Edison and Aegis suffered damage as a result of the destruction of the substation, have expended substantial sums to replace the Substation, its functionality and its associated equipment, and to remove debris, and they have incurred other expenses related to those activities, all in the amount of $129,341,259.00.

43.    Such expenses were incurred by reason of damage to the Substation or its related equipment which damage is compensable in accordance with the lease provisions cited above.

44.    To the extent a Notice of Claim is required for this action, Plaintiffs submitted a Notice of Claim to The Port Authority on June 11, 2002, requesting adjustment and payment of the damage sustained by plaintiffs.

45.    The Port Authority has acknowledged its obligation to make payment under the lease provisions by making partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability arising from the lease.

46.    Demand has been made to the Port Authority for the balance of payment of the amounts due under the aforesaid lease provisions.

47.    No response has been made to the demand, and no payment has been made by the Port Authority to Con Edison.

48.    Failure to make payment on the part of the Port Authority constitutes breach of contract.

49.    As a result of the breach of the lease contract by the Port Authority, Con Edison and Aegis have been damaged in the amount of $129,341,259.00, together with interest from the date the expenses were incurred.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:    New York, New York
          September 11, 2007

                        Yours, etc.

                        GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
                        Attorneys for plaintiffs Consolidated Edison Company of New
                        York, Inc., and; Aegis Insurance Services, Inc., Liberty
                        International Underwriters, Inc., National Union Insurance
                        Company of Pittsburgh, Nuclear Electric Insurance Limited,
                        and Underwriters at Lloyds, as subrogees of Consolidated
                        Edison Company of New York, Inc.
                        45 Broadway Atrium - Litman Suite
                        New York, New York 10006
                        (212) 406-1919
                        Our File No.: 02-5514:241/1-A

                        By: _____
                        MARK L. ANTIN (MA 0427)
                        MICHAEL S. LEAVY (ML 6150)

                        FRANKLIN M. SACHS (FS 6036)
                        GREENBAUM, ROWE, SMITH & DAVIS, LLP
                        Attorneys for Plaintiffs
                        Metro Corporate Campus One
                        P.O. Box 5600
                        Woodbridge, New Jersey 07095-0988
                        (732) 549-5600

                        _____
                        MICHAEL S. LEAVY (ML 6150)

# EXHIBIT N

# In The Matter Of:

## IN SEPTEMBER 11TH LITIGATION

---

### September 20, 2007

---

### CONFERENCE
### SOUTHERN DISTRICT REPORTERS
### 500 PEARL STREET
### NEW YORK., NY 10007
### 212-805-0300

Original File 79KDSEPA.txt, Pages 1-49

**Word Index included with this Min-U-Script®**

IN SEPTEMBER 11TH LITIGATION

September 20, 2007

Page 1

```
79kdsepa                          ARGUMENT
[1]  UNITED STATES DISTRICT COURT
[2]  SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
[3]  IN RE:
[4]  SEPTEMBER 11th PROPERTY DAMAGE
[5]  AND BUSINESS LOSS LITIGATION        21 MC 101 (AKH)
[6]
[7]  ------------------------------x
[8]                                September 20, 2007
                                        4:06 p.m.
[9]  Before:
[10]              HON. ALVIN K. HELLERSTEIN,
[11]                                    District Judge
[12]                   APPEARANCES
[13]
[14] GREENBAUM, ROWE, SMITH & DAVIS LLP
          Attorneys for Plaintiffs
          Con Edison Company of New York, Inc.
[15]      and AEGIS Insurers
     BY:  MICHAEL S. LEAVY
[16]      PHILIP H. ZIEGLER
               - and -
[17] GREENBAUM, ROWE, SMITH & DAVIS LLP
     BY:  FRANKLIN M. SACHS
[18]      MARK ANTIN
[19]
     BRUCKMANN & VICTORY LLP
[20]      Attorneys for Plaintiffs
          Certain Underwriters of Lloyds of London
[21] BY:  JOHN VITUCCI
[22]
     SCHIFF HARDIN LLP
[23]      Attorneys for Defendant
          Port Authority of New York and New Jersey
[24] BY:  BETH D. JACOB
          DONALD A. KLEIN
[25]
```

Page 2

```
[1]               APPEARANCES CONTINUED
[2]
[3]  SCHIFF HARDIN LLP
          Attorneys for Defendant
          Port Authority of New York and New Jersey
[4]  BY:  BETH D. JACOB
          DONALD A. KLEIN
[5]
[6]
     CLEARY GOTTLIEB STEEN & HAMILTON LLP
[7]       Attorneys for Defendant Citigroup
     BY:  THOMAS J. MOLONEY
[8]
[9]  FRIEDMAN KAPLAN SEILER & ADELMAN LLP
          Attorneys for Defendants Silverstein
[10]      Properties and 7 World Trade LLP
     BY:  KATHERINE L. PRINGLE
[11]      KENT K. ANKER
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]
```

Page 3

[1] **THE COURT:** Good afternoon, everyone. Please be
[2] seated.

[3] Mr. Sachs, since you have the front seat, you could
[4] tell me what we are doing.

[5] **MR. SACHS:** The original purpose of today was a status
[6] conference really to deal with scheduling of fact depositions.
[7] It had been something that had been discussed with the Court
[8] several months ago, and that was the original reason for this
[9] status conference. And then the Court scheduled also any
[10] hearing that there would be on our application to file a
[11] supplemental complaint.

[12] **THE COURT:** All right. So I want a report of
[13] depositions, right, and regulate the procedure with regard to
[14] whether and to what extent there should be a supplemental
[15] complaint?

[16] **MR. SACHS:** That is correct, sir.

[17] **THE COURT:** Let me do the second one first.

[18] **MR. SACHS:** OK, sir.

[19] **THE COURT:** So you have -- Mr. Moloney, I guess, do
[20] you want to tell me about the merits of the supplemental
[21] complaint.

[22] **MR. MOLONEY:** Your Honor, we are not sued in the
[23] supplemental complaint, your Honor.

[24] **THE COURT:** Who is?

[25] **MR. SACHS:** The Port Authority is, your Honor.

Page 4

[1] **THE COURT:** Ms. Jacob.

[2] **MS. JACOB:** Your Honor, Beth Jacobs for the Port
[3] Authority.

[4] **THE COURT:** Mr. Moloney is opposing you?

[5] **MS. JACOB:** Well, Mr. Moloney I think feels that he
[6] gets the benefit of whatever happens today. A favorable
[7] circumstance.

[8] Your Honor, this is an effort by Con Ed to bring a new
[9] claim, a new cause of action, much more than one year after the
[10] cause of action --

[11] **THE COURT:** You are opposing?

[12] **MS. JACOB:** We are opposing, your Honor.

[13] **THE COURT:** So who wants to do it?

[14] **MS. JACOB:** Con Ed wants to do it.

[15] **MR. SACHS:** We do. It is our supplement.

[16] **THE COURT:** Mr. Sachs, OK.

[17] **MR. SACHS:** Mr. Leavy is going to be arguing first.

[18] **THE COURT:** All right, Mr. Leavy.

[19] **MR. LEAVY:** Your Honor, the notice issue comes --

[20] **THE COURT:** Yes, of course, why don't you go to the
[21] lectern.

[22] Go ahead.

[23] **MR. LEAVY:** Your Honor, the notice issue comes from
[24] the one sentence that Ms. Jacob just managed to get out, which
[25] is when did this cause of action accrue. And this cause of

---

CONFERENCE                    Min-U-Script®                    (1) Page 1 - Page 4

**Page 5**

[1] action for a breach of contract, breach of the lease, accrued
[2] on June 7, 2007, this year, 20 days after a May 18th demand
[3] letter for payment of $129 million and change. It is black
[4] letter law going back to the time of Blackstone that the
[5] contract accrues -- I'm sorry, that a cause of action for
[6] breach of contract accrues at the time of the breach.
[7]     There is plenty of case law which I have cited that
[8] says that, that at the time that the payment is refused or at
[9] the time that the demand is made and there is a failure to meet
[10] that demand, that's when the cause of action accrues.
[11]     Now --
[12]     THE COURT: When did you give notice?
[13]     MR. LEAVY: May 18, 2007, and there was a 20-day
[14] demand in that letter.
[15]     THE COURT: Is notice alleged in your proposed
[16] supplemental complaint that is the 7th cause of action that you
[17] wish to add?
[18]     MR. LEAVY: Are you referring to the formal notice of
[19] claim, your Honor?
[20]     THE COURT: Yes, the jurisdictional requirements set
[21] out in the Unconsolidated Laws, Section, what is it, 7107.
[22]     MR. LEAVY: I hate to say that in that draft of the
[23] supplemental complaint, we did omit that reference but --
[24]     THE COURT: Isn't it jurisdictionally required?
[25]     MR. LEAVY: Given that the cause of action just

**Page 6**

[1] accrued a couple of months ago, I have the notice of claim
[2] right here. If Ms. Jacob will accept service on behalf of the
[3] court, I can then file my supplemental complaint on
[4] November 20th and everything is fine.
[5]     THE COURT: What the section number, Ms. Jacob?
[6]     MS. JACOB: It is Section 7107 and 7108 of the
[7] Unconsolidated --
[8]     THE COURT: So I have the right number. Look at that.
[9]     Is it jurisdictionally required that the complaint
[10] allege the prior notice of claim to satisfy the Unconsolidated
[11] Laws?
[12]     MR. LEAVY: I think that is correct, your Honor.
[13]     THE COURT: So this supplemental complaint is
[14] deficient.
[15]     MR. LEAVY: In that form, yes, I would have to agree.
[16]     THE COURT: So it is not accepted.
[17]     MR. LEAVY: May I submit a supplemental complaint with
[18] an additional paragraph.
[19]     THE COURT: You can do anything you want.
[20]     MR. LEAVY: Can I ask then that we adjourn this motion
[21] until such time as I can do that?
[22]     THE COURT: No, I am not going to adjourn the motion.
[23] I am going to deny the motion. You can do what you want to
[24] make it kosher, if you can.
[25]     Now, let me go to the merits more fundamentally. You

**Page 7**

[1] alleged originally a two-count complaint based on the alleged
[2] negligence, carelessness, recklessness and breach of contract
[3] of the Port Authority and the city in numbers of respects:
[4] Negligent design, allowing fuel tanks to be built by tenants;
[5] negligent construction of those tanks; and not following code,
[6] and not setting up proper safeguards, barriers and fire
[7] protection, and various other respects.
[8]     In various discussions that we have had since that
[9] date, I remember Gregory Joseph and Beth Jacob engaging in a
[10] colloquy with me having to do with whether this sounded in
[11] contract or tort, and the point was made that since at least
[12] Paragraph 40 of the Lease contained a contractual covenant that
[13] gave rise to an obligation on the Port Authority to pay damages
[14] if it or its agents was negligent, that the concepts in tort
[15] and contract began to merge.
[16]     MR. LEAVY: And I might add, Section 16 of the Lease
[17] as well.
[18]     THE COURT: Section 16 you claim is a strict liability
[19] section, don't you?
[20]     MR. LEAVY: That is correct.
[21]     THE COURT: It just says acts or omissions, without
[22] the qualifier of negligence.
[23]     MR. LEAVY: Yes. And moreover, in Section 40, where
[24] they do talk about negligence, they specific carve out Section
[25] 16 specifically.

**Page 8**

[1]     (Pause)
[2]     THE COURT: I just asked Mr. Sutherland where was
[3] causes of action 3 through 6 --
[4]     MR. LEAVY: That is my fault.
[5]     THE COURT: -- getting ready to accuse him of giving
[6] me a document --
[7]     MR. LEAVY: The accusation should be leveled at me,
[8] your Honor.
[9]     THE COURT: I understand there is no 3 through 6.
[10]     MR. LEAVY: That is correct.
[11]     THE COURT: It is 1, 2, 7.
[12]     MR. LEAVY: It should be numbered 3.
[13]     THE COURT: My five-year-old granddaughter does
[14] better. She doesn't count for all 26 letters in perfect
[15] sequence, but the numbers 1 through 10 are given to me very
[16] firmly and clearly.
[17]     All right. So we'll pass that issue.
[18]     In your breach of contract and tort claims in the
[19] first two causes of action, you go back to September 11, 2001
[20] as the date on which the cause of action arose. In Proposed
[21] Cause of Action No. 7, you allege that the claim, the contract
[22] claim arose June 7, 2007.
[23]     MR. LEAVY: Correct.
[24]     THE COURT: Aren't you inconsistent?
[25]     MR. LEAVY: I don't think there is any inconsistency

Page 9

[1] there, your Honor. In the negligence cause of action -- and I
[2] think this is borne out in the colloquy that you referred to --
[3] we're talking about the contract giving rise to the basis for
[4] the negligence dispute. I think those were your Honor's words.
[5] THE COURT: So the negligence claim arose
[6] September 11, 2001?
[7] MR. LEAVY: Correct.
[8] THE COURT: And the contract claim for reimbursement
[9] arose when the Port Authority stopped paying you. They paid
[10] you 20 million. They owe, you think, another 110 million.
[11] MR. LEAVY: 130. The 130 is net of the 20 we have
[12] already received.
[13] THE COURT: All right. Well, when we get to those
[14] numbers, why worry about $10 million?
[15] You are providing a different basis.
[16] MR. LEAVY: Right. It is a different accrual, it is a
[17] different cause of action.
[18] THE COURT: That's why you say it is either a
[19] supplemental complaint or a brand new complaint.
[20] MR. LEAVY: Right. It is a supplemental complaint
[21] because Rule 15(d) says if it alleges transactions or
[22] occurrences which have arisen since the time of the original
[23] complaint. In our view the original complaint is in 2002. The
[24] $20 million payment is in 2004, and the ultimate refusal to pay
[25] is just a few months ago.

Page 10

[1] THE COURT: Now, in your Complaint that you have just
[2] filed, 07 Civil 7969 --
[3] MR. LEAVY: Yes.
[4] THE COURT: -- in Paragraph 34, you allege that the
[5] notice of claim was filed with the Port Authority June 11,
[6] 2002.
[7] MR. LEAVY: Right.
[8] THE COURT: That was before the claim arose.
[9] MR. LEAVY: Well, we just referred back to the
[10] original notice of claim, which had that filing --
[11] THE COURT: You can't just do that. It is
[12] jurisdictional.
[13] MR. LEAVY: That complaint was really just filed out
[14] of an abundance of caution because we, frankly, didn't know
[15] exactly what the Port Authority would have served. But that
[16] complaint will be withdrawn once we file either a supplemental
[17] or a new complaint pertaining to this contract cause of action.
[18] THE COURT: So you are telling me that I shouldn't
[19] think to concern myself with 07 Civil 7969 because you will
[20] either not use it or you will amend it?
[21] MR. LEAVY: That is right.
[22] THE COURT: I should throw this away.
[23] Are you worrying about estoppel.
[24] MR. LEAVY: No, I'm not, your Honor.
[25] THE COURT: Ms. Jacob, should you worry about an

Page 11

[1] estoppel, should Mr. Leavy worry about that?
[2] MS. JACOB: Your Honor, yes, but the reason we didn't
[3] argue that in our brief is that when we did the research and
[4] I'm sort of arguing against myself here, but when we did the
[5] research --
[6] THE COURT: Don't do that, Ms. Jacob. I always love
[7] to hear your argument, and when you argue against yourself, I
[8] will think you are on Mr. Leavy's side, and you will get confused.
[9] MS. JACOB: For judicial estoppel, the Court needs to
[10] have relied specifically on the arguments raised.
[11] THE COURT: Right.
[12] MS. JACOB: And in the Court's decision it was not
[13] clear to us whether the Court had relied on it or not.
[14] THE COURT: I really didn't make a decision yet.
[15] MS. JACOB: So that's why at this point we weren't
[16] arguing that judicial estoppel --
[17] THE COURT: I'll tell you folks, Ms. Jacob, when we
[18] were wheeled into this case, the original complaint was filed
[19] in 2002. It is dated March 6, 2002. And it alleges in the
[20] Notice of Claim -- the Notice of Claim is March 6, 2002. The
[21] complaint itself is dated April 15, 2002.
[22] So we are more than five years into it. I don't think
[23] I want to retread the ground.
[24] MR. LEAVY: I don't think we are retreading any
[25] ground. The damages which are sought in this complaint are no

Page 12

[1] different than the tort damages which are already extant in
[2] this suit. The only difference is the theory under which
[3] recovery is sought, and I might add --
[4] THE COURT: The theory is a very difficult theory and
[5] I have been struggling with this theory for some time. It is
[6] very hard to understand 16(b) and 40. It is very hard to
[7] understand whether these two covenants were promulgated to deal
[8] with the construction of the building or the continued
[9] operation of the building. These contract claims are different
[10] and give rise to all kinds of different discovery than the
[11] issues that gave rise to the original complaint.
[12] MR. LEAVY: Your Honor, we have also struggled with
[13] the meaning of these complaints. We put in some arguments with
[14] respect to Mr. Moloney's theory that the contractual
[15] indemnification owed by the Port to Con Edison would somehow
[16] preclude a tort action by Con Edison against Citigroup. And
[17] part of the evolution in our thinking on this claim has been
[18] your decision of January 12, 2006, where you say, It would seem
[19] that a fair reading of the Lease, particularly Sections 8 and
[20] 16, suggest that it was intended to benefit the Port Authority
[21] and, by necessary implication, those who might in the future
[22] acquire rights. And then you say, Further parsing of the
[23] clauses and agreements in the full context of the dealings
[24] should await a properly and fully developed record.
[25] Now, we've just started depositions, including

Page 13

[1] depositions on this issue, and this really doesn't change the
[2] course of those depositions at all. It doesn't change the
[3] course of discovery at all.
[4] THE COURT: You've waited --
[5] MR. LEAVY: If anything --
[6] THE COURT: You have waited a year and nine months
[7] from that decision.
[8] MR. LEAVY: During that time, your Honor, Con Ed was
[9] continuing to negotiate with the Port Authority for these
[10] monies. So those negotiations were ongoing before your Honor
[11] rendered this decision and continued well through the year
[12] 2006.
[13] Our demand letter didn't just pop out of thin air.
[14] There were ongoing discussions between Mr. Lynch, whose
[15] affidavit I offered you in support of the motion, and Mr. Iran
[16] Engel, the Assistant Treasurer of the Port Authority,
[17] throughout this period of time. So it was the breakdown of
[18] those negotiations which prompted us to file this action.
[19] Notwithstanding that, it was your Honor's comments in your
[20] decision that led in part to the evolution of our thinking on
[21] this topic.
[22] THE COURT: What about the insurance clause? Under
[23] this document, the Port Authority is required to take out
[24] 100 percent replacement insurance, the premiums to be paid by
[25] Con Edison, so that the proceeds of insurance can be made

Page 14

[1] totally available to Con Edison to allow it to rebuild the
[2] destroyed machinery.
[3] MR. LEAVY: The building and machinery, and they
[4] should but they did not --
[5] THE COURT: I'm sorry, the building.
[6] MR. LEAVY: The building and the machinery. It is the
[7] substation structure, as well.
[8] THE COURT: I'm sorry, you are right.
[9] MR. LEAVY: That is part of the obligation. That is
[10] not the entire obligation. Yes, the obligation is to give us
[11] the courtesy of insurance plus other contractual
[12] indemnification.
[13] THE COURT: Your obligation under paragraph -- you are
[14] right under Paragraph 16(b), it seems to me coextensive with
[15] the insurance, and Paragraph 40 allows you to sue for damages
[16] if you prove negligence. "Damages" are not designed.
[17] MR. LEAVY: There are other provisions. Let me
[18] just --
[19] THE COURT: Practically speaking, have you been given
[20] the insurance proceeds?
[21] MR. LEAVY: We have been given 20 million of the
[22] insurance proceeds. We don't know how much the Port Authority
[23] got in bulk, but what the Port Authority told us was that we're
[24] going to give you an advance and then they said we're going to
[25] give you another advance. That second advance never

Page 15

[1] materialized and now they are --
[2] THE COURT: Wait. This is too fast.
[3] You are an intended beneficiary of the insured. You
[4] are an additional insured, in insurance language.
[5] MR. LEAVY: Actually, we are not named as an
[6] additional insured.
[7] THE COURT: You are not?
[8] MR. LEAVY: We're not.
[9] THE COURT: Where were your insurance people?
[10] MR. LEAVY: This was the least that was negotiated
[11] with the Port Authority in 1968. It was that the insurance
[12] will be in the Port Authority's name. The Port Authority will
[13] adjust the loss with their insurer and then they will give us
[14] the proceeds. And I should add --
[15] THE COURT: Didn't your insurance experts go over each
[16] renewal with the Port Authority?
[17] MR. LEAVY: You know, that is the subject of the
[18] expedited discovery that your Honor has ordered in connection
[19] with the Citigroup motion, and we're just getting to now
[20] interviewing the few survivors from that era that, you know,
[21] the Lease is May 29 of 1968.
[22] THE COURT: Ms. Jacob, what is the story with the
[23] insurance?
[24] MS. JACOB: Your Honor, the Port Authority is obliged
[25] under Section 17 of the Lease, and I agree with the Court that

Page 16

[1] it is coextensive with the obligations under Section 16, to
[2] obtain insurance not on the contents of the substation but on
[3] the walls, the physical structure of the substation, not the
[4] contents.
[5] THE COURT: Not on the fixtures?
[6] MS. JACOB: Not on the fixtures.
[7] Con Ed itself has the insurance on the fixtures, and
[8] it is those insurers who are suing us under the complaint that
[9] was filed in 2002.
[10] Under the insurance, the Port Authority --
[11] THE COURT: I see. You are insuring the substation
[12] building to the extent of 100 percent of the replacement value.
[13] MS. JACOB: Correct.
[14] THE COURT: But not the equipment. It doesn't say
[15] anything about equipment.
[16] MS. JACOB: Correct.
[17] THE COURT: Right, Mr. Leavy?
[18] MR. LEAVY: Yes. But the obligation to indemnify goes
[19] beyond the Section 17 --
[20] THE COURT: Look --
[21] MR. LEAVY: All I am saying is --
[22] THE COURT: Don't mix it up. If you see I am talking
[23] about something wrong, correct me.
[24] The insurance was the building, and then you are
[25] looking for Con Ed to pay you the costs of the equipment.

Page 17

[1] And, Ms. Jacob, was the $20 million the insurance
[2] proceeds?
[3]     MS. JACOB: The $20 million was an advance on the
[4] insurance proceeds. When the Port Authority adjusts or when
[5] that insurance claim is adjusted, the rest of it, if there is a
[6] rest, that we are given by our insurance carrier we will pay.
[7] over to Con Ed.
[8]     THE COURT: What is your demand, how much?
[9]     MR. LEAVY: Our demand?
[10]     THE COURT: No, sir, the Port Authority.
[11]     MS. JACOB: I am not sure what the details are of what
[12] our demand is for our insurance carrier. I know that it is
[13] under discussion, and certainly anything that we get we will
[14] pay over to them.
[15]     THE COURT: Of what proportion by order of magnitude
[16] is the $20 million to the expectation?
[17]     MS. JACOB: It's probably half to two-thirds.
[18]     THE COURT: Reflecting the replacement value of the
[19] substation building?
[20]     MS. JACOB: Correct. But I just want to caution,
[21] since this is on the record, I could be wrong on that. That is
[22] what my estimate is but --
[23]     THE COURT: I understand that.
[24]     MR. LEAVY: To date we are in the dark over how much
[25] they have already received in total. We have been told, I

Page 18

[1] believe, that they are now in litigation with that insurer.
[2]     THE COURT: Look, if this motion had been made
[3] promptly, I would clearly have granted it. I don't believe it
[4] is a new cause of action. I believe it goes back to the
[5] original claim, what was destroyed on September 11, 2001, and
[6] that has always been my conception. And I think alleging this
[7] as a brand new claim gets us involved in a new world, and I am
[8] disinclined to allow it as a supplemental complaint.
[9]     If it were made on the basis of the new complaint, I
[10] can't stop you from filing it, but I believe Ms. Jacob would
[11] promptly move against it, for various grounds. And she may
[12] feel that the suggestion I make of pleading estoppel or
[13] estoppel by pleading would be an appropriate objection in this
[14] case because we are now six years into this case, and to me
[15] that means that this case should be very close to disposition.
[16] The end date should be close, if not already coming to pass.
[17]     I am not inclined to start a new proceeding either by
[18] amendment or unless something is brand new and I would examine
[19] the defenses very, very carefully. It does seem to me that all
[20] of this had been in the case -- by discovery, by my rulings, by
[21] my observations -- for a long time, and it seems to me it is,
[22] as we say, one ball of wax. There are covenants regarding
[23] negligence. There are covenants that speak to something
[24] different from negligence. There is an interplay with
[25] insurance.

Page 19

[1] You can't understand the concept of duty without
[2] looking to the contract, and you can't understand the concept
[3] of contract without looking to the potential of tort. So they
[4] are intertwined, but this is not a brand new cause of action in
[5] my judgment.
[6]     MR. LEAVY: If I can just respond, your Honor?
[7] Years of good faith negotiations went on between the
[8] Port and Con Ed, and it's only upon the breakdown of those
[9] negotiations that, in our view, this ripened into a breach of
[10] contract cause of action, and that's all set forth in the Lynch
[11] affidavit.
[12]     THE COURT: Well, you are limiting yourself quite a
[13] lot, because your basis for damage recovery under Section 40 is
[14] narrower than your ability to obtain a recovery of
[15] indemnification reimbursement under Section 16.
[16]     MR. LEAVY: There are two other provisions, though,
[17] that provide for recovery. Even though Section 17 only talks
[18] about the building, Section 16 refers to rebuilding the
[19] substation building or the lessee substation equipment, even
[20] though the substation equipment is not part of the insurance
[21] obligation. That is part of the --
[22]     THE COURT: The Port Authority's obligation to
[23] reimburse is broader than its obligation to insure.
[24]     MR. LEAVY: That's correct. It also includes the
[25] equipment and it also includes the debris removal from Section

Page 20

[1] 18. That was my point about the indemnification on the
[2] insurance not being coextensive.
[3]     THE COURT: Yes, but I don't know what the label of
[4] $20 million was and how this goes on.
[5] I am reluctant to start a new litigation, and if I'm
[6] shown any basis to prevent you from doing it, I will go by
[7] that. But this, as I say, has been in the case for a long
[8] time. It is all part of the recovery that you seek, and that's
[9] where it should be.
[10]     MR. LEAVY: And it's our view that the breach of
[11] contract language that you mentioned in our original complaint
[12] is enough but --
[13]     THE COURT: No, it is not.
[14]     MR. LEAVY: -- but, again, this is an abundance of
[15] caution.
[16]     THE COURT: You need that abundance because you
[17] haven't been cautious to begin with and your pleadings are not
[18] very good to pick up those contract clauses. You know how to
[19] plead a contract claim, and it is done in the most indirect and
[20] allusive way because your original complaint speaks entirely in
[21] negligence and you are now talking about a claim that is
[22] broader than negligence arising from Section 40.
[23]     MR. LEAVY: Even the very first payment, though,
[24] didn't occur until June of 2004, two years after that complaint
[25] was drafted. At that point, in our view the contract had not

September 20, 2007

---

Page 21

[1] yet been breached.

[2] **THE COURT:** Your supplemental complaint is not
[3] allowed. The motion to supplement this complaint is denied.

[4] It wasn't your motion, Ms. Jacob.

[5] **MS. JACOB:** It is Con Ed's motion.

[6] **MR. SACHS:** It is our motion.

[7] **THE COURT:** So that motion is denied.

[8] If you give me a proper amendment, if you feel you
[9] need to amend, I will deal with it at that time.

[10] And one thing that Ms. Jacob could do, if she wishes,
[11] is to stipulate with you, without prejudice to her position,
[12] that you can file an amended complaint of the nature I
[13] described and allow her to raise her defenses by way of answer
[14] or motion, as she pleases.

[15] But, Ms. Jacob my observation is that this has been in
[16] the complaint for some time, and I have to consider the entire
[17] Lease agreement and the contract of the parties in relationship
[18] to the causes of action that have been in this case since the
[19] beginning.

[20] **MR. LEAVY:** Thank you, your Honor.

[21] **MR. SACHS:** Your Honor.

[22] **THE COURT:** Yes, Mr. Sachs.

[23] **MR. SACHS:** Could I just answer something you said?

[24] I have sat here and didn't want to interrupt
[25] Mr. Leavy, but I do think your Honor should be aware that

---

Page 22

[1] discovery in this case, this particular clause, Section 16, and
[2] Section 8, were the subject of your Honor's order for expedited
[3] discovery a year and a half ago. This is not --

[4] **THE COURT:** Mr. Sachs, I am well aware of it and I'm
[5] well aware of a certain frustration in my thinking about the
[6] case, because it seemed to me that the case against the Port
[7] Authority, if it were to be prosecuted, would have subsumed a
[8] lot of the other litigation that's gone on with building 7.

[9] **MR. SACHS:** In part it may, Judge. My point is this
[10] is not leading to new discovery. There is nothing new --

[11] **THE COURT:** OK.

[12] **MR. SACHS:** I just wanted to straighten that point out
[13] with you. It is not as if we're six years into the case and
[14] we're going down a new path. This path has been started. All
[15] we're doing is formalizing.

[16] **THE COURT:** OK.

[17] **MR. SACHS:** And we will file -- I could tell your
[18] Honor, we will file a complaint and whatever motion one wants
[19] to make, because this cause of action I think pretty clearly
[20] under New York law cannot accrue until the Port refuses to pay
[21] and that was in June of this year.

[22] **THE COURT:** I disagree with you.

[23] **MR. SACHS:** Well, you know, there are cases that I
[24] think are correct that I'm correct but we will argue that, your
[25] Honor. We will file.

---

Page 23

[1] **THE COURT:** OK. Let's move on.

[2] **MR. SACHS:** Thank you.

[3] **MS. JACOB:** Your Honor, the next order of business is
[4] just the discovery issues.

[5] We have had a meet and confer, the defendants and the
[6] plaintiffs. It was scheduled before Mr. Sachs' letter to the
[7] Court but it happened after it, which I guess gave us a
[8] framework. And as I tried to explain in the letter that I sent
[9] him this morning, I think the parties are pretty much in
[10] agreement that we have started discovery. It started a little
[11] more slowly than we would like but part of that is because of
[12] the summer and people's schedules.

[13] We are going to try to have between six and eight, six
[14] and seven depositions a month for the next three months, and we
[15] thought at that point it would be a good time to come back to
[16] the Court and, at least from the defendants' point of view,
[17] discuss whether we believe there should be some form of limits
[18] placed on the depositions or whether that is not necessary.
[19] From the plaintiffs' point of view, I believe they will want to
[20] discuss with the Court whether discovery is moving as rapidly
[21] as they hoped.

[22] **MR. SACHS:** That's fair.

[23] **THE COURT:** The problem I have, Ms. Jacob, is that my
[24] eyes clouded over when I saw a figure of 100 depositions that
[25] were desired.

---

Page 24

[1] **MS. JACOB:** Your Honor, that's the plaintiffs' number,
[2] it is not our number. Our eyes didn't cloud over but we
[3] disagreed. But the feeling was that perhaps the plaintiffs
[4] will recognize they don't need that many depositions as we go a
[5] little bit more into it.

[6] **THE COURT:** You are going to have a very hard time
[7] with me if you have anywhere near that number of proposed
[8] depositions in this case.

[9] **MR. SACHS:** Your Honor, I don't want to argue that
[10] issue with you right now. I don't want to take any more
[11] depositions than I have to. I tried to set forth in my letter
[12] what the --

[13] **THE COURT:** I want to tell you this, Mr. Sachs, very
[14] clearly so there is no misunderstanding. You either narrow
[15] your focus to what is necessary or I'll do it for you, and if I
[16] do it for you, I'll probably have to be quite arbitrary because
[17] I know very little about the particular facts. There is no way
[18] that you are going to make this into a 100-deposition case.
[19] This case has got to draw to a close.

[20] I want that clearly understood by everybody.

[21] **MR. SACHS:** Your Honor, what are we supposed to do?
[22] Let me be as candid as I can be with you.

[23] **THE COURT:** You know what you are supposed to do,
[24] Mr. Sachs, you are supposed to move this case so that it gets
[25] to a determination.

---

Min-U-Script®

IN SEPTEMBER 11TH LITIGATION

Page 25

[1]     MR. SACHS: I'm trying. I would like to have
[2] depositions much more rapidly than what the defendants wish,
[3] your Honor.
[4]     THE COURT: Six to seven is not going to be enough.
[5]     MR. SACHS: Fine, then let's do 14. But don't tell me
[6] that -- the defendants shouldn't tell me that I need too many
[7] depositions. We are in a situation where all the drawings in
[8] this case that would have ordinarily been available were
[9] destroyed. We are piecing those together from other parties.
[10]     They've named 86 people just as their own parties, not
[11] others not employed by them, who they say are people with
[12] knowledge. We've got about, what, Judge, you said I think
[13] there were six or seven or eight design professionals who were
[14] engaged in this who we have to depose. We have gone through
[15] all of their documents.
[16]     Now, it may be, Judge, that we will take a particular
[17] deposition of one of the design professionals or two of the
[18] design professionals and we won't need to take any more of that
[19] design professional but we don't know that now.
[20]     THE COURT: You know, both sides know a great deal
[21] about this case, maybe not enough to try it, but a great deal
[22] about it, and there is a lot of money at stake.
[23]     MR. SACHS: Yes, sir.
[24]     THE COURT: And it is not a case where you need every
[25] dollar.

Page 26

[1]     MR. SACHS: I concur.
[2]     THE COURT: You need to get to a reasonable
[3] approximation so that you can bring about a resolution.
[4]     MR. SACHS: I concur.
[5]     THE COURT: The endgame is going to be a resolution.
[6]     MR. SACHS: I concur with that, sir.
[7]     THE COURT: There are lots of mediation techniques
[8] that are available.
[9]     MR. SACHS: Yes, sir.
[10]     THE COURT: One is to get one or a panel of mediators
[11] to hear both sides. The lawyers can do a presentation. You
[12] could quickly get to numbers and you can quickly get to
[13] discounts based upon probabilities of success or loss. You
[14] could save your clients a tremendous amount of money and you
[15] could resolve the cases.
[16]     MR. SACHS: Judge, we have been in favor of that from
[17] the beginning. You are preaching to the wrong group.
[18]     THE COURT: I am preaching to the entire group.
[19]     MR. SACHS: I have been asking for that for some
[20] period of time and have specifically asked the Court. The
[21] defendants have said it was too early for mediation. They
[22] needed discovery I believe is what they said. So I don't have
[23] an argument with that. I think that's true.
[24]     THE COURT: From the defendants' point of view, their
[25] great argument is what Con Edison reasonably anticipated in

Page 27

[1] relationship to the Lease that was created with the Port
[2] Authority. If Con Edison was indifferent to the building that
[3] went up and what was inside, it has less of a basis to complain
[4] about these events. Also, the leases that were created with
[5] regard to the building were available to Con Edison and made no
[6] outcry; that's also an argument that Ms. Jacob is going to use.
[7] I'm not telling you anything you don't know. I'm not giving
[8] any secrets away in this case. Any defendant would be focused
[9] on those issues.
[10]     And the argument would run that Con Edison knew that
[11] the whole basis of the Lease to Salomon Brothers and its
[12] willingness to take on the occupancy was the idea of a 24-hour
[13] trading floor and the generator and fuel capacity that went
[14] with it and the various risks that were run because of it. And
[15] from the point of view of Con Edison, the amount of power that
[16] had to be generated with regard to such a building had to be an
[17] attractive proposition.
[18]     Again, I'm not giving away any secrets. This is
[19] evident.
[20]     In addition, when the city was looking to have a
[21] command center, I have to think that Con Edison knew about it
[22] and probably was consulted about it.
[23]     So there was a great deal of intimate knowledge that
[24] Con Edison had with regard to the Lease. That's Ms. Jacob's
[25] side.

Page 28

[1]     With regard to your side, those provisions in the
[2] Lease are powerful provisions. It's not very difficult --
[3] well, it is difficult to understand the interplay, but each
[4] clause has meaning and if you read it a few times and you have
[5] a reasonable degree of sophistication and experience with these
[6] kinds of clauses, you get to know what they mean. And you may
[7] not know the outer edges. You may not know what a judge might
[8] say or what a court of appeals might say, but you know the
[9] contentions, you know what you are. In other words, you know a
[10] great deal about the case.
[11]     What you don't know is how that case is going to be
[12] resolved. There is a tremendous area of doubt and ambiguity in
[13] terms of what a judge might do or what a jury might do in
[14] resolving this case. So we are in the area of discounts. And
[15] I don't know that 100 depositions or 200 depositions or 500
[16] depositions will give you much more clarity of thinking than
[17] you would have right now if you took the Saturday or Sunday
[18] away from all the work that goes on in a briefcase and just
[19] thought about the case from the other side's perspective. I
[20] think if you were to do that, both sides, if Ms. Jacob would
[21] look at this case from your perspective and if you would look
[22] at the case from her perspective and you got before one or a
[23] panel of mediators and you presented your arguments and immerse
[24] the mediators in your clauses and worked out the amount of
[25] money that's involved, because that's not the big unknown, you

Page 29

[1] could resolve this case in a month.

[2] MR. SACHS: Your Honor, I don't deny that the case

[3] could be resolved. I just want to point out to you, because I

[4] don't want to go into everything you said, but I do want to

[5] tell you that the depositions had nothing to do with the Lease.

[6] The depositions have to do with the design of this building and

[7] the design of the fuel system. Of that we know very little

[8] except for the fact that this building, like no other, was

[9] destroyed and collapsed and all the others are still standing.

[10] THE COURT: Maybe at the end of the day you will prove

[11] negligence.

[12] MR. SACHS: I think we will.

[13] THE COURT: And maybe you won't. But to do that will

[14] give you a mountain of headaches --

[15] MR. SACHS: I agree.

[16] THE COURT: -- to overcome.

[17] MR. SACHS: I concur.

[18] THE COURT: And it may not be worth it.

[19] MR. SACHS: I concur.

[20] And I am all for a mediation process, and I agree with

[21] your Honor as to how it can be done. I just wanted to point

[22] out to you that it is not 100 depositions on the Lease, you are

[23] absolutely right about that. It is on how this building was

[24] designed and how the fuel system was designed.

[25] THE COURT: I think, Mr. Sachs, if you really want to

Page 30

[1] settle the case, you are going to get away from the concept of

[2] damages and you get over to the concept of reimbursement for

[3] replacement value. That substation still has to work. There

[4] are buildings going up. They are going to be served by Con

[5] Edison.

[6] MR. SACHS: It is in existence, Judge. It is under

[7] World Trade Center 7 today.

[8] THE COURT: OK. So you know how much it cost you.

[9] MR. SACHS: I know how much we lost -- the number that

[10] Mr. Leavy put in his paper, that is correct, that is $130

[11] million. That is for replacement of the building and its

[12] contents.

[13] THE COURT: OK.

[14] MR. SACHS: That is a real number.

[15] THE COURT: So we have a value.

[16] MR. SACHS: That is a real number. There is nothing

[17] unusual about that.

[18] THE COURT: So we have a real value, and there is

[19] enough there to argue how much should be absorbed and how much

[20] should be paid, and the arguments of negligence in my mind are

[21] guiling the lily.

[22] MR. SACHS: I think your Honor suffers from not

[23] knowing as much about that as I do.

[24] THE COURT: No question.

[25] MR. SACHS: And I think you understand what I mean by

Page 31

[1] that and I mean it respectfully. I don't think it is gilding

[2] the lily, I think it is very real.

[3] But I do hear you. I take your point.

[4] THE COURT: Ms. Jacob is going to argue that the

[5] damage occurred not by any act or omission of the Port

[6] Authority, and you're going to argue that there was plenty of

[7] acts and plenty of omissions with relationship to all the

[8] planning that went on.

[9] MR. SACHS: That doesn't have to be negligence.

[10] THE COURT: Whether it is negligence or not, you still

[11] get to the same conclusion.

[12] MR. SACHS: OK, sir.

[13] THE COURT: Let me ask Ms. Jacob. I have painted a

[14] scenario of what can be done to resolve this case. Is it

[15] interesting to you or not?

[16] MS. JACOB: Your Honor --

[17] THE COURT: I know you have to talk to your client.

[18] MS. JACOB: That is just what I was going to say.

[19] THE COURT: Your clients are here, too. A few of your

[20] clients are seated there.

[21] MS. JACOB: Of course, there is a representative of

[22] the Port Authority here, your Honor.

[23] THE COURT: More than one.

[24] MS. JACOB: But I don't think that is something that

[25] we can do just by a hurried consultation.

Page 32

[1] We also do have a problem, not the 100 depositions of

[2] people who were working on the building, but I think there is

[3] still a serious causation question here. We haven't even

[4] started talking about moving to the expert part of the case.

[5] I'm not even sure that it will ultimately be established that

[6] the fuel tanks were the cause of the fires or the cause of the

[7] collapse. So it's not -- and I understand the Court will say

[8] that's just a question of discounting. But in order to be able

[9] to figure out how important that discount is, we need the

[10] information to explain to the plaintiffs that their entire

[11] structure is sufficiently weak; that if we do talk about

[12] settlement, it's at a substantial fraction of what they are

[13] talking about. And that's why we say sometimes perhaps we are

[14] not quite ready for mediation on this particular case. But I

[15] will certainly discuss it with my client, your Honor.

[16] THE COURT: Ms. Jacob, you know or reasonably believe

[17] right now all the things you will know or reasonably believe at

[18] the end of depositions.

[19] MS. JACOB: That is not the case with respect to

[20] causation, your Honor, because with the experts, we need to run

[21] models. We need more information about what was observed on

[22] September 11th, where the fires were, what the pattern of the

[23] burning was, whether the observations in the pattern of the

[24] burning and the fires are consistent with plaintiffs' theory

[25] that it had something to do with the fuel tanks or some other

**IN SEPTEMBER 11TH LITIGATION**

September 20, 2007

Page 33

[1] theories that perhaps it was elsewhere.  So --
[2]     THE COURT:  You know the building burnt down.
[3]     MR. SACHS:  It collapsed.
[4]     MS. JACOB:  We know the building collapsed, your
[5] Honor, yes.
[6]     THE COURT:  And we believe that the fires were ignited
[7] externally.
[8]     MS. JACOB:  That's correct.
[9]     THE COURT:  Not internally.
[10]     And we don't really know whether the diesel tanks
[11] which -- diesel is a fuel that doesn't burn too readily but at
[12] a certain flashpoint it will burn and burn for a very long
[13] time.
[14]     I remember when I was in Korea post the war.  It was
[15] my duty as a judge advocate officer to service the soldiers and
[16] officers in various detachments of the 7th Division.  One
[17] detachment was called Camp Casey, which is north of the DMZ.
[18] There was a particular road that we had to travel to get to it.
[19]     And one day I came around the bend in the Jeep I was
[20] being driven in.  Just around the bend there was one of these
[21] large fuel trucks, presumably containing diesel fuel.  It was
[22] ablaze.  That blaze had begun the previous day and was to
[23] continue for a couple of more days.  It was in no danger of
[24] exploding but it couldn't be doused.  It just stayed on the
[25] road and continued to burn and burn and burn.  And to get

Page 34

[1] around it we had to go across some rice paddies in the field,
[2] which jeeps can do so we did.
[3]     The memory of that ignited diesel fuel has stuck, and
[4] I apply it to -- because I am no engineer, I am no fireman, I
[5] don't know anything about fires, but I applied it to the
[6] allegations here and I can image what happened.  The heat that
[7] is generated was tremendous.  Even though the fuel itself may
[8] not flash, the generation of heat is enormous, and it must have
[9] affected lots of other things in the building and maybe even
[10] caused some collapse, if indeed there was a collapse.
[11]     MR. SACHS:  There was a collapse.
[12]     THE COURT:  You are both going to invest a huge amount
[13] of money in trying to recreate a condition that no one really
[14] witnessed enough to be a sophisticated observer about it.  I
[15] submit to you, that's not a fruitful task.  At the end of the
[16] day there will be controversy.  At the end of the day the
[17] encounter that will be reached will not settle anything.  At
[18] the end of the day you are going to be where you are except
[19] that you have spent an enormous amount of money and taken up a
[20] huge amount of time.
[21]     This is a case that is very much in need of a prompt
[22] and firm resolution by skilled mediators and clients invested
[23] in the process of settlement.
[24]     If you are not invested in the process, there is no
[25] way you can settle it.  But if you are invested in the process,

Page 35

[1] you will settle it.
[2]     Now, there is enough money in Con Edison or its
[3] insurers to pursue this claim and there is enough money in the
[4] Port Authority to resist this claim, and there is plenty of
[5] motivation on both sides for lawyers to keep it going.  I
[6] submit to you, this claim can now be resolved if there is a
[7] mind to do it.
[8]     I hope this is being recorded because there is public
[9] accountability that is involved here, not only in terms of the
[10] spending of huge amounts of money by a public authority, Con
[11] Edison, or insurers, or the Port Authority, but also in the
[12] facilities of the Court that are desperately needed for other
[13] things.  Included in "other things" are 9/11 cases.  One can
[14] argue that the more time that is being taken up by the failure
[15] to grasp hold of the issues here and resolve them is time taken
[16] away from other things.  That is a waste of Court resources.
[17]     I am very earnest about this.
[18]     MS. JACOB:  Your Honor, I will report back to my
[19] client and the relevant people on the defendants' side what the
[20] Court has said and --
[21]     THE COURT:  If you want my help in working out a panel
[22] of mediators -- and I think you should have a panel.  You
[23] should each have an interested mediator and then a neutral;
[24] like an arbitration panel but different in a sense.  And even
[25] invest in mediators with a power to recommend, even though you

Page 36

[1] don't have to be bound to accept it.
[2]     This case can be settled.  It should be settled.  It
[3] is time to settle it.
[4]     MS. JACOB:  Your Honor, I still think that it may be
[5] too early, that we still -- I hear the Court's comments about
[6] the diesel fuel, but I am also aware of a number of other facts
[7] such as the damage to the building from being hit by debris,
[8] such as observations which are not consistent with it being
[9] diesel fuel burning.  But I understand the Court will say this
[10] all falls just into valuing the case, and we will talk about it
[11] on the defense side and I'm sure everyone will very seriously
[12] take this into account.
[13]     THE COURT:  It is hard for me to believe that debris
[14] could have created the destruction to such a degree as to bring
[15] down a building.  Of all the factors that were involved, it
[16] seems to me that the intuitive best explanation is the heat
[17] generated by the burning diesel fuel, these three mammoth
[18] tanks.
[19]     Now, does that mean that the Port Authority should be
[20] responsible?  I don't question that conclusion.  Does that mean
[21] that Con Edison does not bear a large assumption of -- I would
[22] say assumption of risk but Judge Calabrese doesn't like me to
[23] use those words so I will leave it to you to find an
[24] equivalent.
[25]     MS. JACOB:  Your Honor, also, if it does turn out that

Page 37

[1] the cause was the Salomon Brothers, the Citigroup fuel tanks,
[2] we have another issue, which is that Citigroup is then obliged
[3] to indemnify the Port Authority. So that may be --
[4]     THE COURT: It may be, it may be not because the Port
[5] Authority as I think I have observed was aware of the leasehold
[6] as well.
[7]     MS. JACOB: Your Honor, there is -- but we don't have
[8] to argue that now -- there is a specific contractual agreement
[9] between Citigroup and the Port Authority.
[10]    THE COURT: So maybe there has to be a
[11] mediation here.
[12]    MR. SACHS: Yes, there does.
[13]    THE COURT: We have all had experience in this, and
[14] the experiences that I call to mind have been extremely
[15] helpful. They have not always resolved themselves in an
[16] immediate resolution, but the understanding that attorneys
[17] gain -- not only the lawyers but principals also -- the
[18] understanding that principals gain from directly hearing the
[19] persuasiveness of the other side, as well as the persuasiveness
[20] of their own counsel, gives a certain flexibility and brings
[21] about settlements, if not immediate, soon after.
[22]    This is a great process, this case. It is probably
[23] too complicated to try. It is too risky to try. There
[24] eventually will be a settlement and it should be done now.
[25]    OK. That exhausts the agenda. I want to tell you

Page 38

[1] that I've read Judge Calabrese's decision a few times and I'm
[2] not sure of what, if anything, is appropriate to do.
[3]    MR. MOLONEY: Can I speak about that, your Honor?
[4]    THE COURT: I would like you to, Mr. Moloney.
[5]    MR. MOLONEY: Since I was there.
[6]    THE COURT: You can stay where you are. Wherever you
[7] go, you are going to block counsel.
[8]    MR. MOLONEY: Before I do, can I just say one thing
[9] about the last discussion?
[10]    THE COURT: Yes.
[11]    MR. MOLONEY: Just in response to all of these 7 World
[12] Trade Center sites that say, you know, there was a conspiracy
[13] theory, Popular Mechanics did a study for what caused the
[14] collapse of the building, and Popular Mechanics came out and
[15] they said it is quite obvious it was the debris that fell that
[16] caused the collapse of the building. So I just say reserve
[17] judgment on that question because this homespun wisdom of
[18] Popular Mechanics said there was another cause.
[19]    So, your Honor, I am not arguing that today but that's
[20] just -- obviously, they are not evidence and I'm not trying the
[21] case, but I think we need to reserve judgment on that.
[22]    THE COURT: Maybe we will know the causes.
[23]    MR. MOLONEY: And then the other observation I make is
[24] that, being right across the street from the Deutsche Bank,
[25] which is still there, that really the best thing in the world

Page 39

[1] was that that building collapsed, and that the idea that
[2] someone would have run a substation, you know, in that kind of
[3] hazard zone, is insane.
[4]    So I think at the end of the day whether any damages
[5] were caused, there is another whole area which we haven't
[6] talked about, if this case did not get eliminated, one of the
[7] threshold issues, which we're hoping at least we believe, is
[8] because the worst thing in the world, frankly, is to be across
[9] from the Deutsche Bank building which did not collapse. And if
[10] Con Ed had a substation there now, what would they be doing?
[11] They wouldn't be operating it and the equipment wouldn't be
[12] operational --
[13]    THE COURT: So what does that prove?
[14]    MR. MOLONEY: It proves there was no damage from the
[15] falling of the building. The fact that the building was
[16] burning out of control and the Fire Department was unable to
[17] fight it because it didn't have water and it just didn't have
[18] firemen, for a full day PCBs and all of those things, and that
[19] this was a lost cause. And the argument over what caused the
[20] building to fall down is really totally irrelevant. With Con
[21] Ed, all the damage that would have occurred to Con Edison's
[22] substation was going to happen anyway.
[23]    THE COURT: Which is your client?
[24]    MR. MOLONEY: I'm sorry?
[25]    THE COURT: Who is your client?

Page 40

[1]    MR. MOLONEY: Citigroup, the poor tenant. So I'm
[2] saying, look --
[3]    THE COURT: This is an argument that when Ms. Jacob
[4] holds out her hands for contribution, you won't have anything
[5] to contribute.
[6]    MR. MOLONEY: For her, I can just say that if the
[7] problem was, as they now allege, the cumulative impact of
[8] having three sets of fuel, you know, we can't be responsible
[9] for that. We were early in. And the addition of more fuel --
[10]    THE COURT: You and Solomon were the same guys, right?
[11]    MR. MOLONEY: Yes.
[12]    Going back to the Second Circuit, at --
[13]    THE COURT: When Ms. Jacob's hand is out, I think you
[14] are going to be forthcoming.
[15]    MR. MOLONEY: With the Second Circuit argument, I
[16] think what the Court was concerned about was not really
[17] addressing the assumption of risk issue but preserving
[18] appellate rights so that issue could be looked at some
[19] appropriate time.
[20]    THE COURT: This to me is a nonsense argument, with
[21] all due respect to Judge Calabrese.
[22]    MR. MOLONEY: I thought so, too.
[23]    THE COURT: Judge Calabrese has no trouble at all in
[24] vacating a district court decision that is settled after the
[25] district court has delivered a decision in the Court of

IN SEPTEMBER 11TH LITIGATION

September 20, 2007

Page 41

[1] Appeals. It has happened to me on two different occasions.
[2] There is a notion in various places that a decision of
[3] a district court is not really res judicata, not really
[4] entitled to collateral estoppel unless it also is appealed and
[5] affirmed. So what does he care if I have a decision out there?
[6] Does he think --
[7] MR. MOLONEY: I think he doesn't think you need to
[8] vacate the 7 World Trade Center case. I think what he thinks
[9] is you don't need to vacate the decision in my case. What he
[10] didn't like was your deciding the other case involving
[11] Silverstein by instead of using the words, look, I decided it
[12] before and I'm not changing my mind, and so I'm deciding on the
[13] same basis, but by using the word "collateral estoppel," he
[14] felt that there was at least an argument -- and I think it was,
[15] you know, frankly, was an "angels on the head of a pin"
[16] argument, which I did not understand at the time. But,
[17] nevertheless, that was what the three supreme judges were
[18] worried about, that if I use the words collateral estoppel --
[19] THE COURT: And he is not even a Jesuit.
[20] MR. MOLONEY: By using the words "collateral
[21] estoppel," they effectively could not appeal the assumption of
[22] risk issue in the second case, and because there was an
[23] alternative ground which was dispositive of the first case,
[24] then they never had an appeal on that issue in which those
[25] three judges were very interested, frankly, on the merits, and

Page 42

[1] they wanted to make sure that at some point in time someone
[2] would look at this interesting assumption of risk issue. And
[3] they couldn't look at it in my case, because there was an
[4] alternative grounds for winning, and they were afraid that you
[5] would eliminate it for all time in the other case by simply
[6] saying "collateral estoppel" rather than "I didn't change my
[7] mind."
[8] THE COURT: And every other district judge and court
[9] of appeals judge in the United States of America would be
[10] influenced by my decision.
[11] MR. MOLONEY: Right. Well, they should be, your
[12] Honor.
[13] THE COURT: That's why I always liked you,
[14] Mr. Moloney.
[15] MR. MOLONEY: In any event, I think there is really a
[16] choice of two fairly simple fixes -- either you could just
[17] vacate that portion of the opinion in both cases --
[18] THE COURT: I doubt that I am going to do that.
[19] MR. MOLONEY: Or alternatively just simply vacate that
[20] portion of the opinion in the second decision just to say as to
[21] that decision, I only decide it on my alternative grounds and I
[22] don't decide the assumption of risk, or, alternatively, say I
[23] decide the assumption of risk on the second opinion but I
[24] decided it for same reasons as I said before rather than
[25] collateral estoppel.

Page 43

[1] THE COURT: Mr. Moloney, the truth is -- and sometimes
[2] it is useful to know what the truth is -- the truth is I saw
[3] this thing and I have already decided it. So why are you
[4] asking me to do it again? That is my opinion. So collateral
[5] estoppel is one way -- it is a shorthand way of saying that.
[6] MR. MOLONEY: Exactly. If you just said, look, I
[7] decided it before and I incorporate it by reference by
[8] reasoning, then the Second Circuit has no problem with that
[9] because that preserves Silverstein's appellate rights.
[10] THE COURT: We'll see what I have for breakfast on the
[11] day I have to decide.
[12] MR. MOLONEY: OK. Thank you, your Honor.
[13] MS. PRINGLE: Your Honor, if we could speak to this?
[14] I agree with Mr. Moloney that the appropriate way to
[15] deal with this in our case --
[16] THE COURT: I'm sorry, tell me your name again.
[17] MS. PRINGLE: I apologize, your Honor. It is
[18] Katherine Pringle for Silverstein Properties --
[19] THE COURT: OK.
[20] MS. PRINGLE: -- and 7 World Trade Company.
[21] I agree with Mr. Moloney that the proper way to deal
[22] with this in our case is to limit the opinion dismissing the
[23] third-party defendants to the ground of the absence of duty.
[24] That will address their concern --
[25] THE COURT: I am not going to do that.

Page 44

[1] MS. PRINGLE: Let me explain why.
[2] THE COURT: I am not going to do it. I decided the
[3] way I did, I decided because alternative grounds were presented
[4] to me and I decided those alternative grounds, and there was
[5] nothing there that said I shouldn't do it. I am not going to
[6] redo my decision, I will tell you that. I've thought about it
[7] and I'm not going to do it.
[8] If the Court of Appeals doesn't like it, they could
[9] reverse me. But they are not going to remand to me to rethink
[10] something -- I've got more to do than to rethink my decisions
[11] that I had to make.
[12] MS. PRINGLE: The difficulty, your Honor, was when you
[13] made the decision originally, it was a case in which we were
[14] not involved, and our concern has been that the decision
[15] specifically as it applies to Silverstein and Citigroup, not
[16] necessarily as a broad principle but specifically as it applies
[17] to Silverstein and Citigroup, excludes the contracts between
[18] these parties. And that is not your fault; they weren't before
[19] you in the first case.
[20] THE COURT: The insurer had every basis to argue that.
[21] MS. PRINGLE: I am not sure why they didn't but I
[22] wasn't in the case at the time.
[23] THE COURT: They did.
[24] MS. PRINGLE: 7 World Trade Center and Silverstein
[25] were not in the case at the time, and they weren't presented to

---

September 20, 2007

Page 45

[1] you I think in a way that we can present them to you now to
[2] demonstrate in fact Citigroup explicitly provided that they
[3] were not assuming the risk but, rather, that they were
[4] indemnifying Silverstein in the event there were any problems
[5] arising from Citigroup's fuel system that they built in their
[6] space, they were indemnifying Silverstein. I don't think that
[7] this is necessary to the motion to dismiss that was filed by
[8] the third-party defendants.
[9]     THE COURT: Did you write that in your papers?
[10]     MS. PRINGLE: Excuse me, your Honor.
[11]     THE COURT: Did you write that in your papers?
[12]     MS. PRINGLE: What we — they argued two bases --
[13]     THE COURT: What you are arguing now, did you file
[14] papers?
[15]     MS. PRINGLE: Yes. In the motion, two arguments were
[16] presented --
[17]     THE COURT: You've told me that in your papers?
[18]     MS. PRINGLE: We told you that both arguments were
[19] wrong. They moved to dismiss --
[20]     THE COURT: I mean now, in the papers that I have now
[21] that I just folded that I have not yet read it --
[22]     MS. PRINGLE: We have not submitted any papers in this
[23] connection. We did not feel it was our job to tell you what
[24] the Second Circuit meant.
[25]     If you would like papers on what we think you should

Page 46

[1] do, we are happy to do that. But quite the simplest way, I
[2] would suggest, and the way that causes the least mischief, is
[3] to rely simply on the ground --
[4]     THE COURT: I am not going to do it.
[5]     MS. PRINGLE: -- of the absence of duty.
[6]     THE COURT: I am not going to do it.
[7]     MS. PRINGLE: Would you accept --
[8]     THE COURT: I decided what I had decided because I
[9] thought I had to decide what I had to decide, and if the Court
[10] of Appeals doesn't like it, they can reverse me. But I'm now
[11] not, on an academic exercise, going to say I meant one thing
[12] and not another thing.
[13]     MS. PRINGLE: Just to be clear, your Honor, let me
[14] parse out some issues because there are a couple of overlapping
[15] issues and I just wanted to make sure that you are clear about
[16] what I am saying.
[17]     THE COURT: I'm clear.
[18]     MS. PRINGLE: The third-party defendants moved to
[19] dismiss on two separate independent grounds.
[20]     THE COURT: Let me stop you now because my head is not
[21] even into this and there is no point in you making this
[22] argument. It is not necessary for me to decide this particular
[23] thing right now.
[24]     Do you want to present any papers on what I have to do
[25] now?

Page 47

[1]     MS. PRINGLE: Yes, I think that will be helpful, your
[2] Honor.
[3]     THE COURT: Does anybody else want to present any
[4] papers on what I have to do now?
[5]     MR. MOLONEY: I will try to write a short letter. I
[6] will just say what I just said and I don't have to say anything
[7] more than that.
[8]     THE COURT: Why don't you do that. Ms. Pringle can do
[9] that.
[10]     And this gentleman I think wants to say something.
[11]     MR. WEBER: Your Honor --
[12]     THE COURT: What is your name?
[13]     MR. WEBER: Mark Weber with Mound Cotton, your Honor.
[14] I was counsel for AMEC who was dismissed from the case, and I
[15] submitted a letter to your Honor on this issue.
[16]     So if counsel is invited to submit papers, we would
[17] like to be able to submit as well.
[18]     Your Honor, we think it is important to preserve both
[19] grounds of your dismissal of the third-party complaints. We
[20] were the movant and we prevailed on the no duty ground and also
[21] the assumption of risk ground.
[22]     And, your Honor, I just want to remind you that our
[23] motion was not based on collateral estoppel. It was
[24] specifically based on the merits. We resubmitted essentially
[25] the leases, and the arguments that you used in IRJ so --

Page 48

[1]     THE COURT: Here are the letters I have. I have a
[2] Mound Cotton letter dated August 21. I have a Greenbaum Rowe
[3] letter of September 18. And I have --
[4]     MR. SACHS: Not on that issue, I don't think. I don't
[5] think that can be on that issue.
[6]     MR. WEBER: Your Honor, to my knowledge there was no
[7] letter --
[8]     MR. SACHS: Not on that issue. We don't have any
[9] interest in that.
[10]     MR. WEBER: To my knowledge, the August 21st letter
[11] was mine and there was not a letter in response that.
[12]     MR. MOLONEY: Their letter basically says the same
[13] thing that I just said, your Honor.
[14]     THE COURT: The only letter I have is the August 21
[15] letter.
[16]     Let's do this: By two weeks from today, anybody who
[17] wants to submit what I should do on the remand from the Court
[18] of Appeals, please submit. It is then closed. One shot.
[19]     MS. PRINGLE: Thank you, your Honor.
[20]     MR. WEBER: Your Honor, we will stand by our
[21] August 21st letter.
[22]     THE COURT: That is fine.
[23]     So I'll hear from Ms. Pringle and I'll hear from
[24] Mr. Moloney and from anyone else who wants to write me a nice
[25] note.

IN SEPTEMBER 11TH LITIGATION

Page 49

[1]        If anyone thinks I did the right thing, they can do
[2]    that too.
[3]        Anything else we got to do?
[4]        **MS. JACOB:**  Not from us, your Honor.
[5]        **THE COURT:**  All right.  For all those who share my
[6]    faith, these are very serious days, and I wish you all, of
[7]    whatever religion or background, religious or secular, a good,
[8]    healthy, prospect new year.
[9]        **ALL COUNSEL:**  Thank you, your Honor.
[10]        **THE COURT:**  This also is Brian Sutherland's last day
[11]    on this case.
[12]        **MR. SACHS:**  That's too bad.  Thank you, Brian.
[13]        **THE COURT:**  Brian is going on to clerk for Judge Raggi
[14]    in the Second Circuit, and we wish him well there.
[15]        **MR. SACHS:**  He is a lucky man.  Congratulations,
[16]    Brian.
[17]        **THE LAW CLERK:**  Thank you.
[18]        **MR. SACHS:**  We are going to miss you.
[19]        **THE COURT:**  And his successor is Michelle Parikh, who
[20]    you will meet.
[21]
[22]        - - -
[23]
[24]
[25]

# This Page Intentionally Left Blank

**$**

$10 9:14
$129 5:3
$130 30:10
$20 9:24;17:1,3,16;20:4

**0**

07 10:2,19

**1**

1 8:11,15
10 8:15
100 13:24;16:12;23:24;
28:15;29:22;32:1
100-deposition 24:18
11 8:19;9:6;10:5;18:5
110 9:10
11th 32:22
12 12:18
130 9:11,11
14 25:5
15 11:21
15d 9:21
16 7:16,18,25;12:20;16:1;
19:15,18;22:1
16b 12:6;14:14
17 15:25;16:19;19:17
18 5:13;20:1;48:3
18th 5:2
1968 15:11,21

**2**

2 8:11
20 5:2;9:10,11;14:21
200 28:15
2001 8:19;9:6;18:5
2002 9:23;10:6;11:19,19,
20,21;16:9
2004 9:24;20:24
2006 12:18;13:12
2007 5:2,13;8:22
20-day 5:13
20th 6:4
21 48:2,14
21st 48:10,21
24-hour 27:12
26 8:14
29 15:21

**3**

3 8:3,9,12
34 10:4

**4**

40 7:12,23;12:6;14:15;
19:13;20:22

**5**

500 28:15

**6**

6 8:3,9;11:19,20

**7**

7 5:2;8:11,21,22;22:8;
30:7;38:11;41:8;43:20;
44:24
7107 5:21;6:6
7108 6:6
7969 10:2,19
7th 5:16;33:16

**8**

8 12:19;22:2
86 25:10

**9**

9/11 35:13

**A**

ability 19:14
ablaze 33:22
able 32:8;47:17
absence 43:23;46:5
absolutely 29:23
absorbed 30:19
abundance 10:14;20:14,
16
academic 46:11
accept 6:2;36:1;46:7
accepted 6:16
account 36:12
accountability 35:9
accrual 9:16
accrue 4:25;22:20
accrued 5:1;6:1
accrues 5:5,6,10
accusation 8:7
accuse 8:5
acquire 12:22
across 34:1;38:24;39:8
act 31:5
action 4:9;10,25;5:1,5,10,
16,25;8:3,19,20;9:1,17;
10:17;12:16;13:18;18:4;
19:4,10;21:18;22:19
Action 8:21
acts 7:21;31:7
Actually 15:5
add 5:17;7:16;12:3;15:14
addition 27:20;40:9
additional 6:18;15:4,6
address 43:24

addressing 40:17
adjourn 6:20,22
adjust 15:13
adjusted 17:5
adjusts 17:4
advance 14:24,25,25;
17:3
advocate 33:15
affected 34:9
affidavit 13:15;19:11
affirmed 41:5
afraid 42:4
afternoon 3:1
again 10:14;43:4,16
Again 27:18
against 11:4,7;12:16;
18:11;22:6
agenda 37:25
agents 7:14
ago 3:8;6:1;9:25;22:3
agree 6:15;15:25;29:15,
20;43:14,21
agreement 21:17;23:10;
37:8
agreements 12:23
ahead 4:22
air 13:13
allegations 34:6
allege 6:10;8:21;10:4;
40:7
alleged 5:15;7:1,1
alleges 9:21;11:19
alleging 18:6
allow 14:1;18:8;21:13
allowed 21:3
allowing 7:4
allows 14:15
allusive 20:20
alternative 41:23;42:4,
21;44:3,4
alternatively 14:19,22
always 11:6;18:6;37:15;
42:13
ambiguity 28:12
AMEC 47:14
amend 10:20;21:9
amended 21:12
amendment 18:18;21:8
America 42:9
amount 26:14;27:15;
28:24;34:12,19,20
amounts 35:10
angels 41:15
anticipated 26:25
apologize 43:17
appeal 41:21,24
appealed 41:4
appeals 28:8;42:9
Appeals 41:1;44:8;46:10;
48:18
appellate 40:18;43:9
application 3:10
applied 34:5

applies 44:15,16
apply 34:4
appropriate 18:13;38:2;
40:19;43:14
approximation 26:3
April 11:21
arbitrary 24:16
arbitration 35:24
area 28:12,14;39:5
argue 11:3,7;22:24;24:9;
30:19;31:4;6;35:14;37:8;
44:20
argued 45:12
arguing 4:17;11:4,16;
38:19;45:13
argument 11:7;26:23,25;
27:6,10;39:19;40:3,15,20;
41:14,16;46:22
arguments 11:10;12:13;
28:23;30:20;45:15,18;
47:25
arisen 9:22
arising 20:22;45:5
arose 8:20,22;9:5,9;10:8
around 33:19,20;34:1
Assistant 13:16
assuming 45:3
assumption 36:21,22;
40:17;41:21;42:2,22,23;
47:21
attorneys 37:16
attractive 24:17
August 48:2,10,14,21
authority 35:10
Authority 3:25;4:3;7:3,
13;9:9;10:5,15;12:20;13:9,
16,23;14:22,23;15:11,12,
16,24;16:10;17:4,10;22:7;
27:2;31:6,22;35:4,11;
36:19;37:3,5,9
Authority's 15:12;19:22
available 14:1;25:8;26:8;
27:5
await 12:24
aware 21:25;22:4,5;36:6;
37:5
away 10:22;27:8,18;
28:18;30:1;35:16

**B**

back 5:4;8:19;10:9;18:4;
23:15;35:18;40:12
background 49:7
bad 49:12
ball 18:22
Bank 38:24;39:9
barriers 7:6
based 7:1;26:13;47:23,24
bases 45:12
basically 48:12
basis 9:3,15;18:9;19:13;
20:6;27:3,11;41:13;44:20

bear 36:21
began 7:15
begin 20:17
beginning 21:19;26:17
begun 33:22
behalf 6:2
bend 33:19,20
beneficiary 15:3
benefit 4:6;12:20
best 36:16;38:25
Beth 4:2;7:9
better 8:14
beyond 16:19
big 28:25
blt 24:5
black 5:3
Blackstone 5:4
blaze 33:22
block 38:7
borne 9:2
both 25:20;26:11;28:20;
34:12;35:5;42:17;45:18;
47:18
bound 36:1
brand 9:19;18:7,18;19:4
breach 5:1,1,6,6;7:2;8:18;
19:9;20:10
breached 21:1
breakdown 13:17;19:8
breakfast 14:10
Brian 49:10,12,13,16
brief 11:3
briefcase 28:18
bring 4:8;26:3;36:14
brings 37:20
broad 44:16
broader 19:23;20:22
Brothers 27:11;37:1
building 12:8,9;14:3,5,6;
16:12,24;17:19;19:18,19;
22:8;27:2,5,16;29:6,8,23;
30:11;32:2;33:2,4;34:9;
36:7,15;38:14,16;39:1,9,
15,15,20
buildings 30:4
built 7:4;45:5
bulk 14:23
burn 33:11,12,12,25,25,
25
burning 32:23,24;36:9,
17;39:16
burnt 33:2
business 23:3

**C**

Calabrese 36:22;40:21,
23
Calabrese's 38:1
call 37:14
called 33:17
came 33:19;38:14
Camp 33:17

an 6:3,19,21,23,24;
3:25;19:6;21:12;24:22;
6:3,11,12;29:21;31:14,25;
4:2,6,25;35:6,13;36:2;
8:6,8;40:6;45:1;46:10;
7:8;48:5;49:1
:an 6:20;38:3
:andid 24:22
apacity 27:13
are 41:5
:arefully 18:19
:arelessness 7:2
arrier 17:6,12
:arve 7:24
:ase 5:7;11:18;18:14,14,
5,20;20:7;21:18;22:1,6,6,
3;24:8,18,19,24;25:8,21,
4;27:8;28:10,11,14,19,21,
2;29:1,2;30:1;31:14;32:4,
4,19;34:21;36:2,10;37:22;
8:21;39:6;41:8,9,10,22,
3;42:3,5;43:15,22;44:13,
9,22,25;47:14;49:11
:ases 22:3;26:15;35:13;
2:17
:asey 33:17
:ausation 32:3,20
:ause 4:9,10,25,25;5:5,
0,16,25;8:20;9:1,17;
0:17;18:4;19:4,10;22:19;
2:6,6;37:1;38:18;39:19
:ause 8:21
:aused 34:10;38:13,16;
9:5,19
:auses 8:3,19;21:18;
8:22;46:2
:aution 10:14;17:20;
0:15
:autious 20:17
:enter 27:21
:enter 30:7;38:12;41:8;
4:24
:ertain 22:5;33:12;37:20
:ertainly 17:13;32:15
:hange 5:3;13:1,2;42:6
:hanging 41:12
:hoice 42:16
:ircuit 40:12,15;43:8;
5:24;49:14
:ircumstance 4:7
:ited 5:7
:itigroup 12:16;15:19;
7:1,2,9;40:1;44:15,17;
5:2
:itigroup's 45:5
:ity 7:3;27:20
:ivil 10:2,19
:laim 4:9;5:19;6:1,10;
:18;8:21,22;9:5,8;10:5,8,
0;12:17;17:5;18:5,7;
0:19,21;35:3,4,6
:laim 11:20,20
:laims 8:18;12:9

clarity 28:16
clause 13:22;22:1;28:4
clauses 12:23;20:18;
28:6,24
clear 11:13;46:13,15,17
clearly 8:16;18:3;22:19;
24:14,20
clerk 49:13
CLERK 49:17
client 31:17;32:15;35:19;
39:23,25
clients 26:14;31:19,20;
34:22
close 15:15,16;24:19
closed 48:18
cloud 24:2
clouded 23:24
code 7:5
coextensive 14:14;16:1;
20:2
collapse 32:7;34:10,10,
11;38:14,16;39:9
collapsed 29:9;33:3,4;
39:1
collateral 41:4,13,18,20;
42:6,25;43:4;47:23
colloquy 7:10;9:2
coming 18:16
command 27:21
comments 13:19;36:5
Company 43:20
complain 27:3
complaint 3:11,15,21,23;
5:16,23;6:3,9,13,17;7:1;
9:19,19,20,23,23;10:13,16,
17;11:18,21,25;12:11;16:8;
18:8,9;20:11,20,24;21:2,3,
12,16;22:18
Complaint 10:1
complaints 12:13;47:19
complicated 37:23
Con 4:8,14;12:15,16;13:8,
25;14:1;16:7,25;17:7;19:8;
21:5;26:25;27:2,5,10,15,
21,24;30:4;35:2,10;36:21;
39:10,20,21
concept 19:1,2;30:1,2
conception 18:6
concepts 7:14
concern 10:19;43:24;
44:14
concerned 40:16
conclusion 31:11;36:20
concur 26:1,4,6;29:17,19
condition 34:13
confer 23:5
conference 3:6,9
confused 11:8
Congratulations 49:15
connection 15:18;45:23
consider 21:16
consistent 32:24;36:8
conspiracy 38:12

construction 7:5;12:8
consultation 31:25
consulted 27:22
contained 7:12
containing 33:21
contentions 28:9
contents 16:2,4;30:12
context 12:23
continue 33:23
continued 12:8;13:11;
33:25
continuing 13:9
contract 5:1,5,6;7:2,11,
15;8:18,21;9:3,8;10:17;
12:9;19:2,3,10;20:11,18,
19,25;21:17
contracts 44:17
contractual 7:12;12:14;
14:11;37:8
contribute 40:5
contribution 40:4
control 39:16
controversy 34:16
cost 30:8
costs 16:25
Cotton 47:13;48:2
counsel 37:20;38:7;
47:14,16
COUNSEL 49:9
count 8:14
couple 6:1;33:23;46:14
course 4:20;13:2,3;31:21
court 6:3;28:8;40:24,25;
41:3;42:8
Court 3:7,9;11:9,13;
15:25;23:7,16,20;26:20;
32:7;35:12,16,20;36:9;
40:16,25;44:8;46:9;48:17
COURT 3:1,12,17,19,24;
4:1,4,11,13,16,18,20;5:12,
15,20,24;6:5,8,13,16,19,
22;7:18,21;8:2,5,9,11,13,
24;9:5,8,13,18;10:1,4,8,11,
18,22,25;11:6,11,14,17;
12:4;13:4,6,22;14:5,8,13,
19;15:2,7,9,15,22;16:5,11,
14,17,20,22;17:8,10,15,18,
23;18:2;19:12,22;20:3,13,
16;21:2,7,22;22:4,11,16,
22;23:1,23;24:6,13,23;
25:4,20,24;26:2,5,7,10,18,
24;29:10,13,16,18,25;30:8,
13,15,18,24;31:4,10,13,17,
19,23;32:16;33:2,6,9;
34:12;35:21;36:13;37:4,10,
13;38:4,6,10,22;39:13,23,
25;40:3,18,23,23;41:9,11,
14,17,20,22;17:8,10,15,18,
42:8,13,18;43:1,10,16,19,
25;44:2,20,23;45:9,11,13,
17,20;46:4,6,8,17,20;47:3,
8,12;48:1,14,22;49:5,10,
13,19
courtesy 14:11

Court's 11:12;36:5
covenant 7:12
covenants 12:7;18:22,23
created 27:1,4;36:14
cumulative 40:7

D

damage 19:13;31:5;36:7;
39:14,21
damages 7:13;11:25;
12:1;14:15;30:2;39:4
Damages 14:16
danger 33:23
dark 17:24
date 7:9;8:20;17:24;18:16
dated 11:19,21;48:2
day 29:10;33:19,22;34:16,
16,18;39:4,18;43:11;49:10
days 5:2;33:23;49:6
deal 3:6;12:7;21:9;25:20,
21;27:23;28:10;43:15,21
dealings 12:23
debris 19:25;36:7,13;
38:15
decide 42:21,22,23;
43:11;46:9,9,22
decided 41:11;42:24;
43:3,7;44:2,3,4;46:8,8
deciding 41:10,12
decision 11:12,14;12:18;
13:7,11,20;38:1;40:24,25;
41:2,5,9;42:10,20,21;44:6,
13,14
decisions 44:10
defendant 27:8
defendants 23:5;25:2,6;
26:21;43:23;45:8;46:18
defendants' 23:16;26:24;
35:19
defense 36:11
defenses 18:19;21:13
deficient 6:14
degree 28:5;36:14
delivered 40:25
demand 5:2,9,10,14;
13:13;17:8,9,12
demonstrate 45:2
denied 21:3,7
deny 6:23;29:2
Department 39:16
depose 25:14
deposition 25:17
depositions 3:6,13;
12:25;13:1,2;23:14,18,24;
24:4,8,11;25:2,7;28:15,15,
16;29:5,6,22;32:1,18
described 21:13
design 7:4;25:13,17,18,
19;29:6,7
designed 14:16;29:24,24
desired 23:25
desperately 35:12

destroyed 14:2;18:5;
25:9;29:9
destruction 36:14
detachment 33:17
detachments 33:16
details 17:11
determination 24:25
Deutsche 38:24;39:9
developed 12:24
diesel 33:10,11,21;34:3;
36:6,9,17
difference 12:2
different 9:15,16,17;12:1,
9,10;18:24;35:24;41:1
difficult 12:4;28:2,3
difficulty 44:12
directly 37:18
disagree 22:22
disagreed 24:3
discount 32:9
discounting 32:8
discounts 26:13;28:14
discovery 12:10;13:3;
15:18;18:20;22:1,3,10;
23:4,10,20;26:22
discuss 23:17,20;32:15
discussed 3:7
discussion 17:13;38:9
discussions 7:8;13:14
disinclined 18:8
dismiss 45:7,19;46:19
dismissal 47:19
dismissed 47:14
dismissing 43:22
disposition 18:15
dispositive 41:23
dispute 9:4
district 40:24,25;41:3;
42:8
Division 33:16
DMZ 33:17
document 8:6;13:23
documents 25:15
dollar 25:25
done 20:19;29:21;31:14;
37:24
doubt 28:12;42:18
doused 33:24
down 22:14;33:2;36:15;
39:20
draft 5:22
drafted 20:25
draw 24:19
drawings 25:7
driven 33:20
due 40:21
During 13:8
duty 19:1;33:15;43:23;
46:5;47:20

E

early 26:21;36:5;40:9

IN SEPTEMBER 11TH LITIGATION

September 20, 2007

earnest 35:17
Ed 4:8;14;13:8;16:7,25;
17:7;19:8;39:10,21
edges 28:7
Edison 12:15,16;13:25;
14:1;26:25;27:2,5,10,15,
21,24;30:5;35:2,11;36:21
Edison's 39:21
Ed's 21:5
effectively 41:21
effort 4:8
eight 23:13;25:13
either 9:18;10:16,20;
18:17;24:14;42:16
eliminate 42:5
eliminated 39:6
else 47:3;48:24;49:3
elsewhere 33:1
employed 25:11
encounter 34:17
end 18:16;29:10;32:18;
34:15,16,18;39:4
endgame 26:5
engaged 25:14
engaging 7:9
Engel 13:16
engineer 34:4
enormous 34:8,19
enough 20:12;25:4,21;
30:19;34:14;35:2,3
entire 14:10;21:16;26:18;
32:10
entirely 20:20
entitled 41:4
equipment 16:14,15,25;
19:19,20,25;39:11
equivalent 36:24
era 15:20
essentially 47:24
established 32:5
estimate 17:22
estoppel 10:23;11:1,9,16;
18:12,13;41:4,13,18,21;
42:6,25;43:5;47:23
even 19:19;32:3,5;34:9;
35:24,25;41:19;46:21
Even 19:17;20:23;34:7
event 42:15;45:4
events 27:4
eventually 37:24
everybody 24:20
everyone 3:1;36:11
evidence 38:20
evident 27:19
evolution 17:12;13:20
exactly 10:15
Exactly 43:6
examine 18:18
except 29:8;34:18
excludes 44:17
Excuse 45:10
exercise 46:11
exhausts 37:25

existence 30:6
expectation 17:16
expedited 15:18;22:2
experience 28:5;37:13
experiences 37:14
expert 32:4
experts 15:15;32:20
explain 23:8;32:10;44:1
explanation 36:16
explicitly 45:2
exploding 33:24
extant 12:1
extent 3:14;16:12
externally 33:7
extremely 37:14
eyes 23:24;24:2

### F

facilities 35:12
fact 3:6;29:8;39:15;45:2
factors 36:15
facts 24:17;36:20
failure 5:9;35:14
fair 12:19;23:22
fairly 42:16
faith 19:7;49:6
fall 39:20
falling 39:15
falls 36:10
fast 15:2
fault 8:4;44:18
favor 26:16
favorable 4:6
feel 18:12;21:8;45:23
feeling 24:3
feels 4:5
fell 38:15
felt 41:14
few 9:25;15:20;28:4;
31:19;38:1
field 34:1
fight 39:17
figure 23:24;32:9
file 3:10;6:3;10:16;13:18;
21:12;22:17,18,25;45:13
filed 10:2,5,13;11:18;16:9;
45:7
filing 10:10;18:10
find 36:23
fine 6:4;48:22
Fine 25:5
fire 7:6
Fire 39:16
fireman 34:4
firemen 39:18
fires 32:6,22,24;33:6;34:5
firm 34:22
firmly 8:16
first 3:17;4:17;8:19;20:23;
41:23;44:19
five 11:22
five-year-old 8:13

fixes 42:16
fixtures 16:5,6,7
flash 34:8
flashpoint 33:12
flexibility 37:20
floor 27:13
focus 24:15
focused 27:8
folded 45:21
folks 11:17
following 7:5
form 6:15;23:17
formal 5:18
formalizing 22:15
forth 19:10;24:11
forthcoming 40:14
fraction 32:12
framework 23:8
frankly 10:14;39:8;41:15,
25
front 3:3
fruitful 34:15
frustration 22:5
fuel 7:4;27:13;29:7,24;
32:6,25;33:11,21,21;34:3,
7;36:6,9,17;37:1;40:8,9;
45:5
full 12:23;39:18
fully 12:24
fundamentally 6:25
Further 12:22
future 12:21

### G

gain 37:17,18
gave 7:13;12:11;23:7
generated 27:16;34:7;
36:17-
generation 34:8
generator 27:13
gentleman 47:10
gets 4:6;18:7;24:24
gilding 31:1
given 8:15;14:19,21;17:6
Given 5:25
gives 37:20
giving 8:5;9:3;27:7,18
goes 16:18;18:4;20:4;
28:18
good 19:7;20:18;23:15;
49:7
Good 3:1
granddaughter 8:13
granted 18:3
grasp 35:15
great 25:20,21;26:25;
27:23;28:10;37:22
Greenbaum 48:2
Gregory 7:9
ground 11:23;25;41:23;
43:23;46:3;47:20,21
grounds 18:11;42:4,21;

44:3,4;46:19;47:19
group 26:17,18
guess 3:19;23:7
guiling 30:21
guys 40:10

### H

half 17:17;22:3
hand 40:13
hands 40:4
happen 39:22
happened 23:7;34:6;41:1
happens 4:6
happy 46:1
hard 12:6,6;24:6;36:13
hate 5:22
hazard 39:3
head 41:15;46:20
headaches 29:14
healthy 49:8
hear 11:7;26:11;31:3;
36:5;48:23,23
hearing 3:10;37:18
heat 34:6,8;36:16
help 35:21
helpful 37:15;47:1
hit 36:7
hold 35:15
holds 40:4
homespun 38:17
Honor 3:22,23,25;4:2,8,
12,19,23;5:19;6:12;8:8;
9:1;10:24;11:2;12:12;13:8,
10;15:18,24;19:6;21:20,21,
25;22:18,25;23:3;24:1,9,
21;25:3;29:2,21;30:22;
31:16,22;32:15,20;33:5;
35:18;36:4,25;37:7;38:3,
19;42:12;43:12,13,17;
44:12;45:10;46:13;47:2,11,
13,15,18,22;48:6,13,19,20;
49:4,9
Honor's 9:4;13:19;22:2
hope 35:8
hoped 23:21
hoping 39:7
huge 34:12,20;35:10
hurried 31:25

### I

idea 27:12;39:1
ignited 33:6;34:3
image 34:6
immediate 37:16,21
immerse 28:23
impact 40:7
implication 12:21
important 32:9;47:18
inclined 18:17
Included 35:13
includes 19:24,25

including 12:25
inconsistency 8:25
inconsistent 8:24
incorporate 43:7
indeed 34:10
indemnification 12:15;
14:12;19:15;22:7
indemnify 16:18;37:3
indemnifying 45:4,6
independent 46:19
indifferent 27:2
indirect 20:19
influenced 42:10
information 32:10,21
insane 39:3
inside 27:3
instead 41:11
insurance 13:22,24,25;
14:11,15,20,22;15:4,9,11,
15,23;16:2,7,10,24;17:1,4,
5,6,12;18:25;19:20;20:2
insure 19:23
insured 15:3,4,6
insurer 15:13;18:1;44:20
insurers 16:8;35:3,11
insuring 16:11
intended 12:20;15:3
interest 48:9
interested 35:23;41:25
interesting 31:15;42:2
internally 33:9
interplay 18:24;28:3
interrupt 21:24
intertwined 19:4
interviewing 15:20
intimate 27:23
into 11:18,22;18:14;19:9;
22:13;24:5,18;29:4;36:10,
12;46:21
intuitive 36:16
invest 34:12;35:25
invested 34:22,24,25
invited 47:16
involved 18:7;28:25;35:9;
36:15;44:14
involving 41:10
Iran 13:15
IRI 47:25
irrelevant 39:20
issue 4:19;23;8:17;13:1;
24:10;37:2;40:17,18;41:22,
24;42:2;47:15;48:4,5,8
issues 12:11;23:4;27:9;
35:15;39:7;46:14,15

### J

Jacob 4:1,24;6:2,5;7:9;
10:25;11:6,17;15:22;17:1;
18:10;21:4,10,15;23:23;
27:6;28:20;31:4,13;32:16;
40:3
JACOB 4:2,5,12,14;6:6;

1:2,9,12,15;15:24;16:6,
3,16;17:3,11,17,20;21:5;
23:3;24:1;31:16,18,21,24;
32:19;33:4,8;35:18;36:4,
25;37:7;49:4
Iacobs 4:2
Iacob's 27:24;40:13
Ianuary 12:18
Ieep 33:19
eeps 34:2
Iesult 41:19
ob 45:23
Ioseph 7:9
udge 28:7,13;33:15;42:8,
)
Judge 22:9;25:12,16;
26:16;30:6;36:22;38:1;
40:21,23;49:13
udges 41:17,25
udgment 19:5;38:17,21
udicata 41:3
udicial 11:9,16
June 5:2;8:22;10:5;20:24;
22:21
urisdictional 5:20;10:12
urisdictionally 5:24;6:9
ury 28:13

**K**

Katherine 43:18
keep 35:5
kind 39:2
kinds 12:10;28:6
knew 27:10,21
knowing 30:23
knowledge 25:12;27:23;
48:6,10
Korea 33:14
kosher 6:24

**L**

abel 20:3
anguage 15:4;20:11
arge 33:21;36:21
arger 37:10
ast 38:9;49:10
aw 5:4;7:22:20
LAW 49:17
aws 5:21;6:11
awyers 26:11;35:5;37:17
eading 22:10
ease 5:1
ease 7:12,16;12:19;
5:21,25;21:17;27:1,11,24;
28:2;29:5,22
easehold 37:5
eases 27:4;47:25
east 7:11;15:10;23:16;
39:7;41:14;46:2
eave 36:23
eavy 4:17,18;11:1;

16:17;21:25;30:10
LEAVY 4:19,23;5:13,18,
22,25;6:12,15,17,20;7:16,
20,23;8:4,7,10,12,23,25;
9:7,11,16,20;10:3,7,9,13,
21,24;11:24;12:12;13:5,8;
14:3,6,9,17,21;15:5,8,10,
17;16:18,21;17:9,24;19:6,
16,24;20:10,14,23;21:20
Leavy's 11:8
lectern 4:21
led 13:20
less 27:3
lessee 19:19
letter 5:3,4,14;13:13;23:6,
8;24:11;47:5,15;48:2,3,7,
10,11,12,14,15,21
letters 8:14;48:1
leveled 8:7
liability 7:18
liked 42:13
lily 30:21;31:2
limit 43:22
limiting 19:12
limits 23:17
litigation 18:1;20:5;22:8
little 23:10;24:5,17;29:7
long 18:21;20:7;33:12
look 28:21,21;40:2;41:11;
42:2,3;43:6
Look 6:8;16:20;18:2
looked 40:18
looking 16:25;19:2,3;
27:20
loss 15:13;26:13
lost 30:9;39:19
lot 19:13;22:8;25:22
lots 26:7;34:9
love 11:6
lucky 49:15
Lynch 13:14;19:10

**M**

machinery 14:2,3,6
magnitude 17:15
making 46:21
mammoth 36:17
man 49:15
managed 4:24
many 24:4;25:6
March 11:19,20
Mark 47:13
materialized 15:1
may 18:11;22:9;25:16;
28:6,7;29:18;34:7;36:4;
37:3,4,4
May 5:2,13;6:17;15:21
maybe 25:21;29:13;34:9;
37:10
Maybe 29:10;38:22
mean 28:6;30:25;31:1;
36:19,20;45:20

meaning 12:13;28:4
means 18:15
meant 45:24;46:11
Mechanics 38:13,14,18
mediation 26:7,21;29:20;
32:14;37:11
mediator 35:23
mediators 26:10;28:23,
24;34:22;35:22,25
meet 5:9;23:5;49:20
memory 34:3
mentioned 20:11
merge 7:15
merits 3:20;6:25;41:25;
47:24
Michelle 49:19
might 7:16;12:3,21;28:7,
8,13,13
million 5:3;9:10,10,14,24;
14:21;17:1,3,16;20:4;30:11
mind 30:20;35:7;37:14;
41:12;42:7
mine 48:11
mischief 46:2
miss 49:18
misunderstanding
24:14
mix 16:22
models 32:21
Moloney 3:19;4:4,5;38:4;
42:14;43:1,14,21;48:24
MOLONEY 3:22;38:3,5,8,
11,23;39:14,24;40:1,6,11,
15,22;41:7,20;42:11,15,19;
43:6,12;47:5;48:12
Moloney's 12:14
money 25:22;26:14;
28:25;34:13,19;35:2,3,10
monies 13:10
month 23:14;29:1
months 3:8;6:1;9:25;
13:6;23:14
more 4:9;6:25;11:22;
23:11;24:5,10;25:2,18;
28:16;32:21;33:23;35:14;
40:9;44:10;47:7
More 31:23
moreover 7:23
morning 23:9
most 20:19
motion 6:20,22,23;13:15;
15:19;18:2;21:3,4,5,6,7,14;
22:18;45:7,15;47:23
motivation 35:5
Mound 47:13;48:2
mountain 29:14
movant 47:20
move 18:11;23:1;24:24
moved 45:19;46:18
moving 23:20;32:4
much 4:9;14:22;17:8,24;
23:9;25:2;28:16;30:8,9,19,
19,23;34:21

must 34:8
myself 10:19;11:4

**N**

name 15:12;43:16;47:12
named 15:5;25:10
narrow 24:14
narrower 19:14
nature 21:12
near 24:7
necessarily 44:16
necessary 12:21;23:18;
24:15;45:7;46:22
need 20:16;21:9;24:4;
25:6,18,24;26:2;32:9,20,
21;34:21;38:21;41:7,9
needed 26:22;35:12
needs 11:9
negligence 7:2,22,24;
9:1,4,5;14:16;18:23,24;
20:21,22;29:11;30:20;31:9,
10
negligent 7:5,14
Negligent 7:4
negotiate 13:9
negotiated 15:10
negotiations 13:10,18;
19:7,9
net 9:11
neutral 35:23
nevertheless 41:17
new 4:8;9:9;19:10,17;
18:4,7,7,9,17,18;19:4;20:5;
22:10,10,14;49:8
New 22:20
next 23:3,14
nice 48:24
nine 13:6
nonsense 40:20
north 33:17
note 48:25
notice 4:19,23;5:12,15,
18;6:1,10;10:5,10
Notice 11:20,20
notion 41:2
Notwithstanding 13:19
November 6:4
number 6:5,8;24:1,2,7;
30:9,14,16;36:6
numbered 8:12
numbers 7:3;8:15;9:14;
26:12

**O**

objection 18:13
obligation 7:13;14:9,10,
10,13;16:18;19:21,22,23
obligations 16:1
obliged 15:24;37:2
observation 21:15;38:23
observations 18:21;

32:23;36:8
observed 32:21;37:5
observer 34:14
obtain 16:2;19:14
obvious 38:15
obviously 38:20
occasions 41:1
occupancy 27:12
occur 20:24
occurred 31:5;39:21
occurrences 9:22
offered 13:15
officer 33:15
officers 33:16
OK 3:18;4:16;22:11,16;
23:1;30:8,13;31:12;37:25;
43:12,19
omission 31:5
omissions 7:21;31:7
omit 5:23
once 10:16
one 3:17;4:9,24;18:22;
21:10;22:18;25:17;26:10;
28:22;31:23;33:9,20;
34:13;38:8;39:6;43:5;
46:11
One 26:10;33:16;35:13;
48:18
ongoing 13:10,14
only 12:2;19:8,17;35:9;
37:17;42:21;48:14
operating 39:11
operation 12:9
operational 39:12
opinion 42:17,20,23;43:4,
22
opposing 4:4,11,12
order 17:15;22:2;23:3;
32:8
ordered 15:18
ordinarily 25:8
original 3:5,8;9:22,23;
10:10;11:18;12:11;18:5;
20:11,20
originally 7:1;44:13
others 25:11;29:9
out 4:24;5:21;7:24;9:2;
10:13;13:13,23;22:12;
28:24;29:3,22;32:9;35:21;
36:25;38:14;39:16;40:4,13;
41:5;46:14
outcry 27:6
outer 28:7
over 15:15;17:7,14,24;
23:24;24:2;30:2;39:19
overcome 29:16
overlapping 46:14
owe 9:10
owed 12:15
own 25:10;37:20

**P**

paddies 34:1
paid 9:9;13:24;30:20
painted 31:13
⬤ 26:10;28:23;35:21,
⬤
paper 30:10
papers 45:9,11,14,17,20,
22,25;46:24;47:4,16
paragraph 6:18;14:13
Paragraph 7:12;10:4;
14:14,15
Parikh 49:19
parse 46:14
parsing 12:22
part 12:17;13:20;14:9;
19:20,21;20:8;22:9;23:11;
32:4
particular 22:1;24:17;
25:16;32:14;33:18;46:22
particularly 12:19
parties 21:17;23:9;25:9,
10;44:18
pass 8:17;18:16
path 22:14,14
pattern 32:22,23
Pause 8:1
pay 7:13;9:24;16:25;17:6,
14;22:20
paying 9:9
payment 5:3,8;9:24;
20:23
⬤ 39:18
⬤ 15:9;25:10,11;
32:2;35:19
people's 23:12
percent 13:24;16:12
perfect 8:14
perhaps 24:3;32:13;33:1
period 13:17;26:20
perspective 28:19,21,22
persuasiveness 37:19,
19
pertaining 10:17
physical 16:3
pick 20:18
piecing 25:9
pin 41:15
placed 23:18
places 41:2
plaintiffs 23:6;24:3;32:10
plaintiffs' 23:19;24:1;
32:24
planning 31:8
plead 20:19
pleading 18:12,13
pleadings 20:17
please 48:18
Please 3:1
pleases 21:14
plenty 5:7;31:6,7;35:4
⬤ 4:11
point 7:11;11:15;20:1,25;
22:9,12;23:15,16,19;26:24;

27:15;29:3,21;31:3;42:1;
46:21
poor 40:1
pop 13:13
Popular 38:13,14,18
Port 3:25;4:2;7:3,13;9:9;
10:5,15;12:15;20;13:9,16,
23;14:22,23;15:11,12,12,
16,24;16:10;17:4,10;19:8,
22;22:6,20;27:1;31:5,22;
35:4,11;36:19;37:3,4,9
portion 42:17,20
position 21:11
post 33:14
potential 19:3
power 27:15;35:25
powerful 28:2
Practically 14:19
preaching 26:17,18
preclude 12:16
prejudice 21:11
premiums 13:24
present 45:1;46:24;47:3
presentation 26:11
presented 28:23;44:3,25;
45:16
preserve 47:18
preserves 43:9
preserving 40:17
presumably 33:21
pretty 22:19;23:9
prevailed 44:20
prevent 20:6
previous 33:22
principals 37:17,18
principle 44:16
Pringle 43:18;47:8;48:23
PRINGLE 43:13,17,20;
44:1,12,21,24;45:10,12,15,
18,22;46:5,7,13,18;47:1;
48:19
prior 6:10
probabilities 26:13
probably 17:17;24:16;
27:22;37:22
problem 23:23;32:1;40:7;
43:8
problems 45:4
procedure 3:13
proceeding 18:17
proceeds 13:25;14:20,
22;15:14;17:2,4
process 29:20;34:23,24,
25;37:22
professional 25:19
professionals 25:13,17,
18
prompt 34:21
prompted 13:18
promptly 18:3,11
promulgated 12:7
proper 7:6;21:8;43:21
properly 12:24

Properties 43:18
proportion 17:15
proposed 5:15;24:7
Proposed 8:20
proposition 27:17
prosecuted 22:7
prospect 49:8
protection 7:7
prove 14:16;29:10;39:13
proves 39:14
provide 19:17
provided 45:2
providing 9:15
provisions 14:17;19:16;
28:1,2
public 35:8,10
purpose 3:5
pursue 35:3
put 12:13;30:10

Q

qualifier 7:22
quickly 26:12,12
quite 19:12;24:16;32:14;
38:15;46:1

R

Raggi 49:13
raise 21:13
raised 11:10
rapidly 23:20;25:2
rather 42:6,24;45:3
reached 34:17
read 28:4;38:1;45:21
readily 33:11
reading 12:19
ready 8:5;32:14
real 30:14,16,18;31:2
really 3:6;10:13;11:14;
13:1;29:25;33:10;34:13;
38:25;39:20;40:16;41:3,3;
42:15
reason 3:8;11:2
reasonable 26:2;28:5
reasonably 26:25;32:16,
17
reasoning 43:8
reasons 42:24
rebuild 14:1
rebuilding 19:18
received 9:12;17:25
recklessness 7:2
recognize 24:4
recommend 35:25
record 12:24;17:21
recorded 35:8
recovery 12:3;19:13,14,
17;20:8
recreate 34:13
redo 44:6
reference 5:23;43:7

referred 9:2;10:9
referring 5:18
refers 19:18
Reflecting 17:18
refusal 9:24
refused 5:8
refuses 22:20
regard 3:13;27:5,16,24;
28:1
regarding 18:22
regulate 3:13
reimburse 19:23
reimbursement 9:8;
19:15;30:2
relationship 21:17;27:1;
31:7
relevant 35:19
relied 11:10,13
religion 49:7
religious 49:7
reluctant 20:5
rely 46:3
remand 44:9;48:17
remember 7:9;33:14
remind 47:22
removal 19:25
rendered 13:11
renewal 15:16
replacement 13:24;
16:12;17:18;30:3,11
report 3:12;35:18
representative 31:21
required 5:24;6:9;13:23
requirements 5:20
res 41:3
research 11:3,5
reserve 38:16,21
resist 35:4
resolution 26:3,5;34:22;
37:16
resolve 26:15;29:1;31:14;
35:15
resolved 28:12;29:3;
35:6;37:15
resolving 28:14
resources 35:16
respect 12:14;32:19;
40:21
respectfully 31:1
respects 7:3,7
respond 19:6
response 38:11;48:11
responsible 36:20;40:8
rest 17:5,6
resubmitted 47:24
rethink 44:9,10
retread 11:23
retreading 11:24
reverse 44:9;46:10
rice 34:1
right 3:12,13;4:18;6:2,8;
8:17;9:13;10:21;14:8,14;
24:10;28:17;29:23;32:17;

38:24;40:10;46:23;49:1,5
Right 9:16,20;10:7;11:11;
16:17;42:11
rights 12:22;40:18;43:9
ripened 19:9
rise 7:13;9:3;12:10,11
risk 36:22;40:17;41:22;
42:2,22,23;45:3;47:21
risks 27:14
risky 37:23
road 33:18,25
Rowe 48:2
Rule 9:21
rulings 18:2
run 27:10,14;32:20;39:2

S

Sachs 3:3;4:16;21:22;
22:4;24:13,24;29:25
SACHS 3:5,16,18,25;
4:15,17;21:6,21,23;22:9,
12,17,23;23:2,22;24:9,21;
25:1,5,23;26:1,4,6,9,16,19;
29:2,12,15,17,19;30:6,9,
14,16,22,25;31:9,12;33:3;
34:11;37:12;48:4,8;49:12,
15,18
Sachs' 23:6
safeguards 7:6
Salomon 27:11;37:1
same 31:11;40:10;41:13;
42:24;48:12
sat 21:24
satisfy 6:10
Saturday 28:17
save 26:14
saw 23:24;43:2
saying 16:21;40:2;42:6;
43:5;46:16
scenario 31:14
scheduled 3:9;23:6
schedules 23:12
scheduling 3:6
seat 3:3
seated 3:2;31:20
second 3:17;14:25;41:22;
42:20,23
Second 40:12,15;43:8;
45:24;49:14
secrets 27:8,18
section 6:5;7:19
Section 5:21;6:6,7;16,18,
23,24;15:25;16:1,19;19:13,
15,17,18,25;20:22;22:1,2
Sections 12:19
secular 49:7
seek 20:8
seem 12:18;18:19
seemed 22:6
seems 14:14;18:21;36:16
sense 35:24
sent 23:8

sentence 4:24
separate 46:19
September 8:19;9:6;
18:5;32:22;48:3
sequence 8:15
serious 32:3;49:6
seriously 36:11
served 10:15;30:4
service 6:2;33:15
set 5:20;19:10;24:11
sets 40:8
setting 7:6
settle 30:1;34:17,25;35:1;
36:3
settled 36:2,2;40:24
settlement 32:12;34:23;
37:24
settlements 37:21
seven 23:14;25:4,13
several 3:8
share 49:5
short 47:5
shorthand 43:5
shot 48:18
shown 20:6
side 11:8;27:25;28:1;
35:19;36:11;37:19
sides 25:20;26:11;28:20;
35:5
side's 28:19
Silverstein 41:11;43:18;
44:15,17,24;45:4,6
Silverstein's 43:9
simple 42:16
simplest 46:1
simply 42:5;19;46:3
sites 38:12
situation 25:7
six 18:14;22:13;23:13,13;
25:13
Six 25:4
skilled 34:22
slowly 23:11
soldiers 33:15
Solomon 40:10
somehow 12:15
someone 39:2;42:1
sometimes 32:13;43:1
soon 37:21
sophisticated 34:14
sophistication 28:5
sorry 5:5;14:5,8;39:24;
43:16
sort 11:4
sought 11:25;12:3
sounded 7:10
space 45:6
speak 18:23;38:3;43:13
speaking 14:19
speaks 20:20
specific 7:24;37:8
specifically 7:25;11:10;
26:20;44:15,16;47:24

spending 35:10
spent 34:19
stake 25:22
stand 48:20
standing 29:9
start 18:17;20:5
started 12:25;22:14;
23:10,10;32:4
States 42:9
status 3:5,9
stay 38:6
stayed 33:24
still 29:9;30:3;31:10;32:3;
36:4,5;38:25
stipulate 21:11
stop 18:10;46:20
stopped 9:9
story 15:22
straighten 22:12
street 38:24
strict 7:18
structure 14:7;16:3;32:11
struggled 12:12
struggling 12:5
stuck 34:3
study 38:13
subject 15:17;22:2
submit 6:17;34:15;35:6;
47:16,17;48:17,18
submitted 45:22;47:15
substantial 32:12
substation 14:7;16:2,3,
11;17:19;19:19,19,20;30:3;
39:2,10,22
subsumed 22:7
success 26:13
successor 49:19
sue 14:15
sued 3:22
suffers 30:22
sufficiently 32:11
suggest 12:20;46:2
suggestion 18:12
suing 16:8
suit 12:2
summer 23:12
Sunday 28:17
supplement 4:15;21:3
supplemental 3:11,14,
20,23;5:16,23;6:3,13,17;
9:19,20;10:16;18:8;21:2
support 13:15
supposed 24:21,23,24
supreme 41:17
sure 17:11;32:5;36:11;
38:2;42:1;44:21;46:15
survivors 15:20
Sutherland 8:2
Sutherland's 49:10
system 29:7,24;45:5

T

talk 7:24;31:17;32:11;
36:10
talked 39:6
talking 9:3;16:22;20:21;
32:4,13
talks 19:17
tanks 7:4;5;32:6,25;
33:10;36:18;37:1
task 34:15
techniques 26:7
telling 10:18;27:7
tenant 40:1
tenants 7:4
terms 33:1
theories 33:1
theory 12:2,4,4,5,14;
32:24;38:13
thin 13:13
thinking 12:17;13:20;
22:5;28:16
third-party 43:23;45:8;
46:18;47:19
though 19:16,17,20;
20:23;34:7;35:25
thought 23:15;28:19;
40:22;44:6;46:9
three 23:14;36:17;40:8;
41:17,25
threshold 39:7
throughout 13:17
throw 10:22
times 28:4;38:1
today 3:5;4:6;30:7;38:19;
48:16
together 25:9
told 14:23;17:25;45:17,18
took 28:17
topic 13:21
tort 7:11,14;8:18;12:1,16;
19:3
total 17:25
totally 14:1;39:20
Trade 30:7;38:12;41:8;
43:20;44:24
trading 27:13
transactions 9:21
travel 33:18
Treasurer 13:16
tremendous 26:14;
28:12;34:7
tried 23:8;24:11
trouble 40:23
trucks 33:21
true 26:23
truth 43:1,2,2
try 23:13;25:21;37:23,23;
47:5
trying 25:1;34:13;38:20
turn 36:25
two 8:19;12:7;19:16;
20:24;25:17;41:1;42:16;
45:12,15;46:19;48:16
two-count 7:1

two-thirds 17:17

U

ultimate 9:24
ultimately 32:5
unable 39:16
Unconsolidated 5:21;
6:7,10
under 12:2;14:13,14;
15:25;16:1,8;17:13;19:13,
15;22:20;30:6
Under 13:22;16:10
understood 34:20
United 42:9
unknown 28:25
unless 18:18;41:4
unusual 30:17
up 7:6;16:22;20:18;27:3;
30:4;34:19;35:14
upon 19:8;26:13
use 10:20;27:6;36:23;
41:18
used 47:25
useful 43:2
using 41:11,13,20

V

vacate 41:8,9;42:17,19
vacating 40:24
value 16:12;17:18;30:3,
15,18
valuing 36:10
various 7:7,8;18:11;
27:14;33:16;41:2
view 9:23;19:9;10:25;
23:16,19;26:24;27:15

W

Wait 15:2
waited 13:4,6
walls 16:3
wants 4:13,14;22:18;
47:10;48:17,24
war 33:14
waste 35:16
water 39:17
wax 18:22
way 20:20;21:13;24:17;
34:25;43:5,5,14,21;44:3;
45:1;46:1,2
weak 32:11
Weber 47:13
WEBER 47:11,13;48:6,
10,20
weeks 48:16
weren't 11:15;44:18,25
wheeled 11:18
Wherever 38:6
whole 27:11;39:5
whose 13:14

willingness 27:12
winning 42:4
wisdom 38:17
wish 5:17;25:2;49:6;
wishes 21:10
withdrawn 10:16
without 7:21;19:1,3;21:11
witnessed 34:14
word 41:13
words 9:4;28:9;36:23;
41:11,18,20
work 28:18;30:3
worked 28:24
working 32:2;35:21
world 18:7;38:25;39:8
World 30:7;38:11;41:8;
43:20;44:24
worried 41:18
worry 9:14;10:25;11:1
worrying 10:23
worst 39:8
worth 29:18
write 45:9,11;47:5;48:24
wrong 16:23;17:21;26:17;
45:19

Y

year 4:9;5:2;13:6,11;22:3,
21;49:8
years 11:22;18:14;20:24;
22:13
Years 19:7
York 22:20

Z

zone 39:3

# EXHIBIT
# O

# GENNET, KALLMANN, ANTIN & ROBINSON, P.C.

| | | |
|---|---|---|
| Stanley W. Kallmann * † | 6 Campus Drive | William G. Hanft ◊ |
| Mark L. Antin ◊ † | Parsippany NJ 07054-4406 | Brian J. Bolan * |
| Richard S. Nichols † | | Michael S. Leavy ◊ |
| Donald G. Sweetman ○ | (973) 285-1919 | Philip H. Ziegler * |
| | FAX (973) 285-1177 | David M. Delinko |
| | gkar@gkar-law.com | |

Samuel A. Gennet
(1936-1998)

Litman Suite
45 Broadway Atrium
New York NY 10006
(212) 406-1919

Harry Robinson, III
(1973-2000)

◊ Member NY Bar
\* Member NJ & NY Bars
□ Member NJ & PA Bars
◊ Member NJ, NY & FL Bars
○ Member NJ, NY & CT Bars
† Certified by the Supreme Court of
New Jersey as a Civil Trial Attorney

101 East Lancaster Avenue  Suite 304
Wayne PA 19087
(610) 902-0150
FAX (610) 902-0152
mbridge.bridgelaw@verizon.net

PA Managing Attorney
Mark M. Bridge (Of Counsel)
Nancy E. Zangrilli

**www.gkar-law.com**

**Please Reply to Parsippany**

September 21, 2007

**_VIA REGISTERED MAIL_**
Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey
225 Park Avenue South
New York, NY 10003

Re:    Indemnity and Insurance Payments for
7 WTC Substation Building and Equipment
Damages Payable Under May 29, 1968 Lease
Our File No: 02-5514:241.0001-A

Dear Ms. Eastman:

On behalf of the claimants identified therein, I enclose and serve upon you a duly
executed Notice of Claim dated September 21, 2007.

Thank you.

Very truly yours,

GENNET, KALLMANN, ANTIN & ROBINSON, P.C.

By: _____
MARK L. ANTIN

cc:    Beth D. Jacob, Esq. Counsel for Port Authority in WTC7 Litigation
Franklin M. Sachs, Esq.

```
-----------------------------------------------------------------x
In the Matter of the Claim of:                                   :
                                                                 :
CONSOLIDATED EDISON COMPANY OF                                   :
NEW YORK, INC., and;                                             :
AEGIS INSURANCE SERVICES, INC.,                                  :
LIBERTY INTERNATIONAL UNDERWRITERS, INC.,                        :
NATIONAL UNION INSURANCE COMPANY                                 :
OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE                        :
LIMITED and CERTAIN UNDERWRITERS AT LLOYDS                       :
(SYNDICATE 1225), all as subrogees of CONSOLIDATED               :     NOTICE OF
EDISON COMPANY OF NEW YORK, INC.                                 :     CLAIM
                                                                 :
                                        Claimants,               :
                                                                 :
                  - against-                                     :
                                                                 :
THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY                    :
                                                                 :
                                        Respondent.              :
-----------------------------------------------------------------x
```

TO:     The Port Authority of New York and New Jersey

     PLEASE TAKE NOTICE that the claimants herein make claim and demand against the

Port Authority of New York and New Jersey as follows:

     1.    The name and post office address of each claimant: Consolidated Edison

Company of New York, Inc. 4 Irving Place, New York, New York, 10003, Aegis Insurance

Services, Inc. 10 Exchange Place, Jersey City, New Jersey 07302, Liberty International

Underwriters Inc. 61 Broadway, New York, New York 10006, National Union Insurance

Company of Pittsburgh,70 Pine Street, New York, New York 10270, Nuclear Electric Insurance

Limited, 1201 Market Street, Suite 1200, Wilmington, DE 19801, and Underwriters at Lloyds,

Lime Street, London, England.

Attorneys for the foregoing are: GREENBAUM, ROWE, SMITH & DAVIS, LLP, Metro Corporate Campus One, P.O. Box 5600, Woodbridge, New Jersey 07095-0988, and; GENNET, KALLMANN, ANTIN & ROBINSON, P.C., 45 Broadway, 30th Floor, New York, New York 10006.

2.    The nature of the claim is for Breach of Contract, for a portion of the damages sustained by claimants as a result of the destruction of Consolidated Edison's substation and related equipment caused by the collapse of 7 World Trade Center on September 11, 2001, and the Port Authority of New York and New Jersey's breach of the May 29, 1968 lease agreement, as more particularly set forth in a demand letter dated May 18, 2007, attached hereto as Exhibit A and incorporated herein.

3.    The time when, place where, and the manner in which said claim arose: The Port Authority of New York and New Jersey refused or failed to make payments as required under the aforesaid lease upon due demand made May 18, 2007, the time for response to which was June 7, 2007.

4.    The damages or injuries claimed are: costs arising from and related to the replacement of the Consolidated Edison Substation located at 7 World Trade Center, the equipment therein and associated therewith, and cleanup and related costs due to the collapse of 7 World Trade Center on September 11, 2001. A further description of the damages is set forth in Exhibit A.

5.    Claimants will file a legal action in the form attached hereto as Exhibit B, to enforce this claim should the Port Authority of New York and New Jersey not pay the full amount the claim, One Hundred Twenty-Nine Million Three Hundred Forty-One Thousand Two Hundred Fifty-Nine Dollars ($129,341,259.00), within sixty (60) days of the date hereof.

2

Dated: September 21, 2007

Yours, etc.

MARK L. ANTIN
GENNET, KALLMANN, ANTIN & ROBINSON
Attorneys for Plaintiffs
45 Broadway, 30th Floor
New York, New York 10006
(212) 406-1919

FRANKLIN M. SACHS
GREENBAUM, ROWE, SMITH & DAVIS, LLP
Attorneys for Plaintiffs
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988
(732) 549-5600

Sworn to before me this
21st day of September, 2007

Notary Public

DEBORAH B. BROCK
A Notary Public of New Jersey
My Commission Expires May 13, 2009

3

EXHIBIT A

# GENNET, KALLMANN, ANTIN & ROBINSON, P.C.

Stanley W. Kallmann * †
Mark L. Antin ◇ †
Richard S. Nichols †
Donald G. Sweetman ○

6 Campus Drive
Parsippany NJ  07054-4406

(973) 285-1919
FAX (973) 285-1177
gkar@gkar-law.com

William G. Hanft ◇
Brian J. Bolan *
Michael S. Leavy ✧
Brian A. Scotti *
Philip H. Ziegler *

Samuel A. Gennet
(1936-1998)

Litman Suite
45 Broadway Atrium
New York NY  10006
(212) 406-1919

Harry Robinson, III
(1973-2000)

✧ Member NY Bar
* Member NJ & NY Bars
▢ Member NJ & PA Bars
◇ Member NJ, NY & FL Bars
○ Member NJ, NY & CT Bars
† Certified by the Supreme Court of
  New Jersey as a Civil Trial Attorney

101 East Lancaster Avenue  Suite 304
Wayne PA  19087
(610) 902-0150
FAX (610) 902-0152
mbridge.bridgelaw@verizon.net

PA Managing Attorney
Mark M. Bridge (Of Counsel)
Nancy E. Zangrilli

**www.gkar-law.com**

**Please Reply to Parsippany**

May 18, 2007

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*
Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey
225 Park Avenue South
New York, NY 10003

> Re:    Indemnity and Insurance Payments for
>        7 WTC Substation Building and Equipment
>        Damages Payable Under May 29, 1968 Lease
>        Our File No: 02-5514:241.0001-A

Dear Ms. Eastman:

We write as counsel for Consolidated Edison Company of New York ("Con Edison") and its subrogating insurers to demand indemnity and insurance payments as a result of the events of September 11, 2001, pursuant to the provisions of the May 29, 1968 lease (the "Lease") between Con Edison and The Port Authority of New York and New Jersey (the "Port Authority" or "PA").

You may be aware that tort litigation is presently pending in the United States District Court for the Southern District of New York before Judge Alvin K. Hellerstein between Con Edison and the Port Authority concerning 7 World Trade Center and the Substation, and we have copied your counsel in that litigation with this correspondence. We have also copied your Assistant Treasurer, Iran Engel, with whom Con Edison personnel have been discussing this claim since the events of September 11, 2001. The claims referred to in this letter include some of the same damages sought in the tort litigation, but they are now additionally premised in contract, based on the Lease. We previously wrote to your aforementioned counsel in this regard, but were advised that she does not represent the PA concerning indemnity or insurance claims arising from the Lease. Accordingly, she suggested we communicate our clients' demands directly to you.

May 18, 2007

Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey

Page Number 2

      The Port Authority is, of course, aware of the September 11, 2001 global collapse of the Seven World Trade Center air rights tower ("7 WTC"), and the consequent complete destruction of Con Edison's Substation building and associated equipment. The events of 9/11 necessitated the complete replacement of this property. Pursuant to the provisions of the above-referenced lease agreement between the parties, PA is obligated to reimburse Con Edison and its subrogating insurers for certain expenses incurred as a result of the destruction of the Substation.

      Regarding the reconstruction costs for both the Substation Building and its related equipment, the Lease provides in pertinent part at Section 16 as follows:

> Section 16.      Responsibility for Other Uses of Premises
>
> Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors; further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction therof is necessitated by act or fault of the Lessee. **The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof.** The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance. **[emphasis added]**

May 18, 2007

Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey

Page Number 3

Section 16 concerns indemnification for damage arising from the PA's "acts or omissions . . . in connection with the construction or maintenance of 7 WTC, regardless of fault on the part of PA. This is self-evident from the language of Section 40(b) of the Lease, which deals with those circumstances in which the Port Authority is at fault (as separately alleged in the pending tort action by Con Edison and its insurers). That provision states:

> Section 40.        <u>Premises</u>
>
>        *                    *                    *
>
> (b) The Port Authority shall not be liable to the Lessee or to any person for injury or death to any person or persons whomsoever or damage to any property whatsoever at any time in or about the premises, including but not limited to any such injury, death or damage from falling material, water, rain, hail, snow, gas, steam, dampness, explosives, smoke, radiation or electricity, whether the same may leak, issue, fall or flow from any party of the Facility or from any other place or quarter unless said damage, injury or death shall be due to the negligence of the Port Authority, its employees or agents, **provided, <u>however</u>, that nothing in this subparagraph (b) shall be deemed to relieve the Port Authority of its obligations under Section 16 hereof.** [underline in original, emphasis added]

PA has already acknowledged its obligation to make payment under Section 16 of the Lease for the building damages by paying Con Edison $20,000,000 as an initial payment toward the cost of rebuilding the Substation. Demand has since been made for the additional payment by Joe Lynch, Con Edison's Insurance Department Manager, to Iran Engel, PA's Assistant Treasurer. In response, by letter dated February 24, 2006 (the "Engel letter"), Mr. Engel stated only one reason that indemnity has not been paid:

> [A]djustment of the Port Authority's claim under the policies of insurance in effect at the time of the loss, including amounts in connection with the Con Ed Substation building, is not yet complete. Accordingly, the Port Authority is presently unable to respond to your request for additional payment.

May 18, 2007

Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey

Page Number 4

We note that the Lease does not link the PA's indemnity obligation for the Substation building and equipment to its insurance arrangements, nor to any insurance payments from PA's insurers. As concerns the risk of loss to the Substation building, but not the equipment, the Lease requires, and Con Edison faithfully paid, moneys equivalent to insurance premiums so that the PA could obtain insurance against this risk of loss. Con Edison demands that the PA make good on its indemnity obligations.

In this regard we note that PA indicated in the Engel letter that it had the right to be a self-insurer for the Substation building loss risk. While we presently understand that PA was not self-insured for that risk, please confirm whether the Port Authority was a self-insurer to any extent for the Substation building risk, as permitted by Section 17(b) of the Lease. If the PA is not a self-insurer, please identify the insurers, policy numbers and furnish us with the policies of insurance and details of any claims presented, including any suit docket information. We would expect vigorous prosecution of any insurance claim on Con Edison's behalf or for its benefit. Alternatively, we demand an assignment to Con Edison of any claim PA is making on Con Edison's behalf.

Con Edison expended $64,828,269 in replacing the Substation building. Net of the aforementioned $20,000,000 advance made against this expense, $44,828,269 is due and owing. This does not include interest on the amount due, which is not waived.

Regarding the Substation equipment (which is the subject of the subrogation claim), Con Edison expended $92,607,455 to replace this equipment and remove debris (see the below paragraph concerning debris removal). Of that sum, the subrogating insurers paid $46,378,464 of the total $56,360,902 insurance reimbursement, and are contractually and equitably subrogated to that portion of the claim (the balance of $9,982,438 was paid by non-subrogating insurers and is not sought herein). Uninsured expenses of $36,500,291 (including a $4,000,000 deductible) are due directly to Con Edison. We note that the PA's obligation to indemnify Con Edison and its insurers for equipment losses is a separate obligation from the building losses.

Related to the damage to the Substation Building is the cost Con Edison incurred for debris removal in the amount of $333,257 (of which the insurers reimbursed $253,737 for a net to Con Edison of $79,520, which is included in the substation equipment subtotal above). These costs are owed Con Edison pursuant to Section 18(a) of the Lease, which provides in pertinent part:

May 18, 2007

Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey

Page Number 5

Section 18.    Damage or Destruction of Premises

(a)    Removal of Debris – If the premises or any part thereof, shall be
damaged by fire, the elements, the public enemy or any other casualty, the
Lessee shall promptly remove all debris resulting from such damage from the
premises, and to the extent, if any, that such removal is covered by insurance,
the proceeds thereof shall thereafter be made available to the Lessee for such
purposes.

Also owed are costs related to medical expenses Con Edison and its subrogating
insurers incurred as a result of post-disaster operations resulting from the destruction of the
substation, in the amount of $1,634,235.48.

The sum total of moneys owed by PA to Con Edison for the categories of damages
identified herein, as a sub-set of the total amount claimed in the WTC7 litigation, then, is as follows:

| | |
|---|---|
| Substation Building | $ 44,828,269 |
| Substation Equipment (Con Edison) | $ 36,500,291 |
| Substation Equipment and partial debris removal (Insurers) | $ 46,378,464 |
| Medical Expenses | $ 1,634,235 |
| Total Expenses | $129,341,259 |

Documentation supporting these numbers has already been produced in the pending
tort litigation. If additional information or documentation is needed concerning any of the foregoing,
please advise promptly. Con Edison reserves the right to furnish additional information, and make
claim for additional moneys, as such information becomes known and available to it.

May 18, 2007

Ms. Karen Eastman, Secretary
The Port Authority of New York and New Jersey

Page Number 6

        Demand is hereby made that the above monies be paid forthwith. Not receiving written agreement within fifteen (15) days of the date hereof that such payments will be made, we will assume that legal proceedings are our clients' only recourse.

        Very truly yours,

        GENNET, KALLMANN, ANTIN & ROBINSON, P.C.

By: _Mark L. Antin /aB_
        MARK L. ANTIN

cc:    Beth D. Jacob, Esq. Counsel for Port Authority in WTC7 Litigation
       Iran Engel, Assistant Treasurer, Port Authority
       Richard J. Giglio, Esq., Associate General Counsel, Con Edison
       Joseph Lynch, Risk Manager, Con Edison
       Franklin M. Sachs, Esq., Co-Counsel for Plaintiff Con Edison

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
CONSOLIDATED EDISON COMPANY OF        :
NEW YORK, INC., and;                  :
AEGIS INSURANCE SERVICES, INC.,       :
LIBERTY INSURANCE UNDERWRITERS, INC., :        Civil Action No.
NATIONAL UNION INSURANCE COMPANY      :
OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE :
LIMITED and UNDERWRITERS AT LLOYDS    :
as subrogees of CONSOLIDATED EDISON COMPANY :
OF NEW YORK, INC.                     :        **COMPLAINT**
                                      :
                    Plaintiffs,       :
                                      :
          - against-                  :
                                      :
THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY :
                                      :
                    Defendant.        :
-------------------------------------------------------------------------x

Consolidated Edison Company of New York, Inc., and; Aegis Insurance Services, Inc.,

Liberty Insurance Underwriters, Inc., National Union Insurance Company of Pittsburgh, Nuclear

Electric Insurance Limited and Underwriters at Lloyds as subrogees of Consolidated Edison

Company of New York, Inc., by way of Complaint against defendant The Port Authority of New

York and New Jersey, upon information and belief set forth:

**PARTIES**

1.    Plaintiff, Consolidated Edison Company of New York, Inc. (hereinafter referred

to as "Con Edison"), is a New York corporation, with its principal place of business at 4 Irving

Place, New York, New York, and was a tenant of a premises located under 7 World Trade

Center.

2.    Plaintiff, Aegis Insurance Services, Inc. (hereinafter referred to as "Aegis"), with a place of business at 10 Exchange Place, Jersey City, New Jersey 07302, is a business entity authorized to engage in the insurance business in the State of New York.

3.    Plaintiff, Liberty Insurance Underwriters Inc. (hereinafter referred to as "Liberty"), with a place of business at 61 Broadway, New York, New York 10006, is a business entity authorized to engage in the insurance business in the State of New York.

4.    Plaintiff, National Union Insurance Company of Pittsburgh (hereinafter referred to as "National"), with a place of business at 70 Pine Street, New York, New York 10270, is a business entity authorized to engage in the insurance business in the State of New York.

5.    Plaintiff, Nuclear Electric Insurance Limited (hereinafter referred to as "Nuclear"), with a place of business at 1201 Market Street, Suite 1200, Wilmington, DE 19801, is a business entity authorized to engage in the insurance business in the State of New York.

6.    Plaintiff, Underwriters at Lloyds (hereinafter referred to as "Lloyds"), with a place of business at Lime Street, London, England, is a business entity authorized to engage in the insurance business in the State of New York.

7.    Collectively, Aegis, Liberty, National, Nuclear, and Lloyds (hereinafter referred to collectively as "Aegis") are suing herein as subrogees of Consolidated Edison Company of New York, Inc.

8.    Defendant, The Port Authority of New York and New Jersey (hereinafter referred to as "The Port Authority"), is a body, corporate and politic by virtue of a compact, agreement and by law, between the states of New York and New Jersey, with an office in the City, County and State of New York.

2

## JURISDICTION

9.    This Court has jurisdiction of the action pursuant to 49 U.S.C. 40101 § 408(b), which provides that the United States District Court of the Southern District of New York shall have the original and exclusive jurisdiction over all actions brought for any claim, including property damage, "resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001."

## VENUE

10.    Venue is properly laid in this Court pursuant to 49 U.S.C. 40101 § 408(b).

## GENERAL ALLEGATIONS

11.    At all relevant times, Aegis issued policies of insurance to Con Edison for its property, operation and business.  Pursuant to the aforementioned policies of insurance, Aegis insured Con Edison for losses to real, personal property and various other coverages.

12.    By common law and contract Aegis has subrogation rights against such third parties as have caused or contributed to damages for which the insurers were required to pay their insured.

13.    The Port Authority is the owner of the property located at Washington and Barclay Streets, New York, New York.

14.    On or about May 29, 1968, The Port Authority entered into a lease agreement with Con Edison.

15.    Pursuant to that lease, in or about 1970, a Con Edison substation (the "Substation"), containing nine transformers, ancillary equipment and fire protection, was built at Washington and Barclay Streets.  It provided electricity to the World Trade Center complex and the surrounding area.

3

16.    Beginning in or about 1983, 7 World Trade Center (the "Building") was built upon and around the Substation.

17.    Thereafter, the Substation was located immediately and directly beneath the Building. The Substation was an enclosed space with no entrance to the Building and both the space and equipment were fire protected.

18.    The Port Authority retained ultimate control over all aspects of the design, construction, use and occupancy of the Building, including but not limited to its structure, modifications, power generation and fuel distribution systems, and fire protection.

19.    On September 11, 2001, at 8:46 a.m. an airliner hijacked by terrorists crashed into the One World Trade Center (North) Tower, causing a fire therein.

20.    On September 11, 2001, at 9:03 a.m. another airliner hijacked by terrorists in concert with the first airliner crashed into the Two World Trade Center (South) Tower, causing a fire therein.

21.    At approximately 9:59 a.m., the Two World Trade Center (South) Tower collapsed.

22.    At approximately 10:28 a.m., the One World Trade Center (North) Tower collapsed.

23.    As a result of the foregoing, one or both fires and collapses, the Building was set on fire and at approximately 5:20 p.m. suffered a progressive global collapse.

24.    The collapse of the Building completely destroyed the Substation.

4

## THE LEASE PROVISIONS

25.    The Port Authority's lease with Con Edison contained the following provision which permitted the Port Authority to construct the 7 WTC building upon the substation:

Section 8.    Air Space and Port Authority Construction

(a)    The Lessee recognizes that the Port Authority may construct wholly or partially on, above or about the Substation Building additional stories, structures, buildings or improvements of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine.  In connection therewith, the Port Authority may use the roof surface of the Substation Building for the base or floor of such additional construction or for a plaza thereof or for some other purpose and may also use side wall surfaces of the Substation Building for support or for attachment thereto of additional structures or for decorative treatment thereto.  The Port Authority agrees that no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee contemplated in Section 3 hereof.  Without limiting the generality of the foregoing or of any other provisions of this Agreement the Port Authority in performing such additional construction may, upon reasonable advance written notice given to the Lessee and subject to and in accordance with the reasonable safety and operating requirements of the Lessee, temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such construction and the Lessee hereby consents to such entry, use and construction by the Port Authority.

(b)    The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be or be construed to be an eviction of the Lessee nor made the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise.

26.    The Port Authority's lease with Con Edison contained the following provisions with respect to care, maintenance and repair by the Lessee:

5

Section 15.  <u>Care, Maintenance and Repair by the Lessee</u>

(a)    Except as otherwise provided in Section 16 of this Agreement, the Lessee shall throughout the term of this Agreement assume the entire responsibility and shall relieve the Port Authority from all responsibility for all care, repair, replacement, and rebuilding whatsoever in the premises whether such repair, maintenance, replacement or rebuilding be ordinary, extraordinary, partial or entire, structural or otherwise and without limiting the generality of the foregoing, the Lessee shall:

*       *       *

27.    The Port Authority's lease with Con Edison contained the following provision obligating the Port Authority to indemnify Con Edison for damage arising from the Port Authority's acts or omissions in connection with the construction or maintenance of 7 WTC, regardless of fault on the part of the Port Authority:

Section 16.    <u>Responsibility for Other Uses of Premises</u>

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors; further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction therof is necessitated by act or fault of the Lessee.  The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof.  The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural

6

members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance.

28.    The Port Authority's lease with Con Edison contained the following provision which applies to damage due to the negligence or other fault on the part of the Port Authority, its employees or agents. The provision states that it does not relieve the Port from the "without fault" indemnification obligations of paragraph 16:

Section 40.    Premises

*    *    *

(b)    The Port Authority shall not be liable to the Lessee or to any person for injury or death to any person or persons whomsoever or damage to any property whatsoever at any time in or about the premises, including but not limited to any such injury, death or damage from falling material, water, rain, hail, snow, gas, steam, dampness, explosives, smoke, radiation or electricity, whether the same may leak, issue, fall or flow from any party of the Facility or from any other place or quarter unless said damage, injury or death shall be due to the negligence of the Port Authority, its employees or agents, provided, however, that nothing in this subparagraph (b) shall be deemed to relieve the Port Authority of its obligations under Section 16 hereof.

29.    The Port Authority's lease with Con Edison contained the following provision concerning debris removal in the event of damage or destruction of the Substation:

Section 18.    Damage or Destruction of Premises

(a)    Removal of Debris – If the premises or any part thereof, shall be damaged by fire, the elements, the public enemy or any other casualty, the Lessee shall promptly remove all debris resulting from such damage from the premises, and to the extent, if any, that such removal is covered by insurance, the proceeds thereof shall thereafter be made available to the Lessee for such purposes.

7

30.    The Port Authority's lease with Con Edison contained the following provision which obligated the Port Authority to insure or procure insurance for the Substation building in return for the payment of insurance premiums by Con Edison to the Port Authority:

> Section 17.    <u>Fire Insurance</u>
>
> During the term of this Agreement the Port Authority, at the Lessee's expense, shall insure and keep insured the Substation Building to the extent of 100% of the replacement value thereof against such hazards or risks as may now or in the future be included under the standard form of fire insurance policy in use in New York from time to time during the letting and the standard form of extended coverage endorsement prescribed as of the effective date of such insurance by the rating organization having jurisdiction. All such policies of insurance and renewals thereof shall be taken out in the name of the Port Authority and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority. The proceeds of such insurance shall be applied by the Port Authority in accordance with the provisions of section 18 hereof. The Port Authority shall not be deemed to have warranted the solvency of any insurance company and shall not be liable for any losses resulting from such insolvency.
>
> The Port Authority may from time to time and at any time voluntarily elect on not less than ten days' notice to the Lessee to become a self-insurer as to any part or all of the loss or damage resulting from the hazards or risks that would be insured against under the insurance policies described in paragraph (a) above; the Port Authority shall, if and to the extent that it has elected to self-insure, make available out of its funds, in the event of such loss or damage, an amount equivalent to that which would have been paid by an insurance carrier under the same circumstances.
>
> The Lessee shall pay the Port Authority annually an amount equal to the insurance premium or premiums paid by the Port Authority allocable to the insurance coverage provided under paragraph (a) above and if the Port Authority shall elect to self-insure as to any part or all of such coverage, the Lessee shall pay annually an amount equal to the allocable portion of such insurance premiums which would have been paid by the Port Authority if it had actually insured.

8

31.    Con Edison duly and fully paid all premiums due pursuant to the above provision.

### FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT

32.    The Port Authority, by act and omission in the design, approval, inspection, installation, maintenance, operation, conduct and control of the load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems and fire protection systems within the Building, caused the destruction of the Building and Substation.

33.    Con Edison and Aegis suffered damage as a result of the destruction of the substation, have expended substantial sums to replace the Substation, its functionality and its associated equipment, and to remove debris, and have incurred other expenses related to those activities, all in the amount of $129,341,259.00.

34.    Such expenses were incurred by reason of damage to the Substation or its related equipment which damage is compensable in accordance with the lease provisions cited above.

35.    Plaintiffs submitted a Notice of Claim to The Port Authority on September 21, 2007, requesting adjustment and payment of the damage sustained by plaintiffs.

36.    The Port Authority has acknowledged its obligation to make payment under the lease provisions by making partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability arising from the lease.

37.    Demand has been made to the Port Authority for the balance of payment of the amounts due under the aforesaid lease provisions.

38.    No response has been made to the demand, and no payment has been made by the Port Authority to Con Edison.

9

39.    Failure to make payment on the part of the Port Authority constitutes breach of contract.

40.    As a result of the breach of the lease contract by the Port Authority, Con Edison and Aegis have been damaged in the amount of $129,341,259.00, together with interest from the date the expenses were incurred.

### SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT

41.    The Port Authority was negligent, careless and reckless by act and omission in the design, approval, inspection, installation, maintenance, operation, conduct and control of the load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems and fire protection systems within the Building, leading to the destruction of the Building and Substation.

42.    The collapse of the Building and the destruction and damage to the Substation, the equipment located therein, and equipment connecting to and from the Substation, were caused by the negligence, carelessness, recklessness and breach of contract of the Port Authority.

43.    Con Edison and Aegis suffered damage as a result of the destruction of the substation, have expended substantial sums to replace the Substation, its functionality and its associated equipment, and to remove debris, and have incurred other expenses related to those activities, all in the amount of $129,341,259.00.

44.    Such expenses were incurred by reason of damage to the Substation or its related equipment which damage is compensable in accordance with the lease provisions cited above.

45.    Plaintiffs submitted a Notice of Claim to The Port Authority on September 21, 2007, requesting adjustment and payment of the damage sustained by plaintiffs.

10

46.    The Port Authority has acknowledged its obligation to make payment under the lease provisions by making partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability arising from the lease.

47.    Demand has been made to the Port Authority for the balance of payment of the amounts due under the aforesaid lease provisions.

48.    No response has been made to the demand, and no payment has been made by the Port Authority to Con Edison.

49.    Failure to make payment on the part of the Port Authority constitutes breach of contract.

50.    As a result of the breach of the lease contract by the Port Authority, Con Edison and Aegis have been damaged in the amount of $129,341,259.00, together with interest from the date the expenses were incurred.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:    New York, New York
          November 20, 2007

                    Yours, etc.

                              GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
                              Attorneys for plaintiffs Consolidated Edison Company of New
                              York, Inc., and; Aegis Insurance Services, Inc., Liberty
                              International Underwriters, Inc., National Union Insurance
                              Company of Pittsburgh, Nuclear Electric Insurance Limited,
                              and Underwriters at Lloyds, as subrogees of Consolidated
                              Edison Company of New York, Inc.
                              45 Broadway Atrium - Litman Suite
                              New York, New York 10006
                              (212) 406-1919
                              Our File No.: 02-5514:241/1-A


                              By:_____
                              MARK L. ANTIN (MA 0427)
                              MICHAEL S. LEAVY (ML 6150)

                              FRANKLIN M. SACHS (FS 6036)
                              GREENBAUM, ROWE, SMITH & DAVIS, LLP
                              Attorneys for Plaintiffs
                              Metro Corporate Campus One
                              P.O. Box 5600
                              Woodbridge, New Jersey 07095-0988
                              (732) 549-5600

                                      12

# EXHIBIT
# P

CED 41668

## AGREEMENT OF LEASE

THIS AGREEMENT OF LEASE, made as of *May 29th*, 1968 by and between THE PORT OF NEW YORK AUTHORITY (hereinafter called "the Port Authority") a body corporate and politic established by Compact between the States of New Jersey and New York with the consent of the Congress of the United States of America, and having an office at 111 Eighth Avenue, New York, New York 10011, and CONSOLIDATED EDISON COMPANY OF NEW YORK, INC. (hereinafter called "the Lessee"), a corporation organized and existing under the laws of the State of New York, having its principal office at No. 4 Irving Place, New York, New York 10003.

### W I T N E S S E T H :

WHEREAS:

1.  By concurrent legislation of the State of New York, Chapter 209, Laws of New York, 1962, and the State of New Jersey, Chapter 8, Laws of New Jersey, 1962, the Port Authority was authorized to establish, develop and operate the World Trade Center, and, for such purposes is in the process of acquiring and improving certain lands in the Borough of Manhattan, City of New York.

2.  The Lessee is an electric corporation as that term is defined in the New York Public Service Law and the Transportation Corporations Law, and is engaged in supplying electricity to consumers, including the Port Authority, in the Borough of Manhattan and in other parts of the City of New York pursuant to franchises granted to it for such purposes.

3.  In order to provide for the efficient and expeditious supply of electricity to the World Trade Center, the Port Authority has agreed to construct a building and related facilities on a portion of the World Trade Center area for use by the Lessee as an electric bulk power substation, all as more particularly provided herein.

4.  Simultaneously with the execution and delivery of this Agreement, the parties hereto are entering into an Electricity Supply Contract pursuant to which the Lessee will furnish and supply the electricity requirements of the World Trade Center, from the aforesaid electric bulk power substation (hereinafter sometimes referred to as the "Substation") to be installed by the Lessee in the building to be constructed by the Port Authority all as more particularly set forth in said Contract.

NOW, THEREFORE, in consideration of the covenants and mutual agreements hereinafter contained, the Port Authority and the Lessee, each for itself, and its successors and assigns, agree with each other as follows:

PANYNJ0065869

CONFIDENTIAL

CED 41668

Section 1.  Letting

The Port Authority hereby lets to the Lessee and the Lessee hereby hires and takes from the Port Authority at the World Trade Center (hereinafter called "the Facility") in the Borough of Manhattan, City, County and State of New York, the land shown and described in stipple on the sketch annexed hereto, hereby made a part hereof and marked "Exhibit A", together with the Substation Building which is hereinafter described and which, in accordance with the provisions of this Agreement, is to be constructed and located therein or thereon by the Port Authority, said land and Substation Building being sometimes hereinafter collectively called "the premises".

Section 2.  Term

The term of the letting under this Agreement shall commence on a date thirty (30) days after certification to the Lessee by the Manager of the Port Authority World Trade Center Planning and Construction Division (hereinafter called "Manager, Planning and Construction") that the improvements described in the section of this Agreement entitled "Construction of Substation Building" have been substantially completed, provided that the Substation Building is then available to the Lessee for its use as contemplated in this Agreement. The term of the letting shall, unless sooner terminated, expire on the last day of the month in which the fiftieth (50th) anniversary of the commencement date falls.

Section 3.  Purpose

The Lessee shall use the premises for the installation, maintenance and operation of an electric bulk power substation constituting a part of Lessee's electrical system for the supply of electricity for the Facility and for Lessee's other customers. The Lessee shall not use the premises for any other purpose or purposes whatsoever.

Section 4.  Construction of Substation Building

(a)  The Port Authority shall construct on the premises a building and related facilities (including vaults and chambers below the ground level of the building) for the use of the Lessee as an electric bulk power substation, all as more specifically described in the drawings, plans and specifications referred to in the tabulation annexed hereto, hereby made a part hereof and marked "Exhibit B". Said building and facilities are hereinafter in this Agreement sometimes collectively referred to as the "Substation Building".

(b)  It has been estimated that construction of the Substation Building will be substantially completed on or before April 1, 1969 (hereinafter referred to as the "estimated completion date") and the Port Authority agrees to use its best efforts to complete construction of the same by such date. If, nevertheless, the performance of any part or all

PANYNJ0065870

CONFIDENTIAL

CED-568

of the construction of the Substation Building is delayed, interrupted
or rendered impossible due to causes or conditions beyond the control
of the Port Authority so that in the opinion of the Manager, Planning
and Construction the construction will not be completed by the estimated
completion date, the Port Authority shall have the right to postpone
the estimated completion date in accordance with such notice or notices
as the Port Authority may give to the Lessee from time to time either
before or after April 1, 1969, and the estimated completion date shall
be postponed to the date stated in such notice or notices, provided,
however, that each notice to the Lessee shall be at least a ten (10) day
notice. The Lessee shall have no right or claim for damages against
the Port Authority or any of its contractors based upon any such delay
in construction or postponement of the commencement date of the letting
and no such delay or postponement shall in any way affect the validity
of this Agreement. The parties expressly agree to coordinate their
construction plans for the Substation Building so that the Substation
can be put in operation in an efficient manner at as early a date as
possible.

(c)  Reference in Exhibit B, if any, to any building code
or other requirements of any municipality is made solely for the pur-
pose of correctly establishing engineering standards for construction
and shall not be deemed to be an admission by the Port Authority that
any such code or other requirement applies to the Port Authority or
the construction. No substantial design changes shall be made in the
drawings, plans and specifications referred to in Exhibit B without
the approval of the Manager, Planning and Construction and the Chief
Electrical Engineer of the Lessee, except that this shall not preclude
any such design changes as may be required by applicable law or which
the Port Authority may elect to make in order voluntarily to comply
with governmental requirements. The Port Authority's approval or use of
such drawings, plans or specifications or changes therein shall not be
deemed a representation or warranty as to the condition, quality or
efficiency of the improvements when completed.

(d)  In addition to the construction of the Substation
Building the Lessee has requested the Port Authority to install therein
certain Substation equipment as itemized on the schedule annexed hereto
as Exhibit C which equipment the Lessee agrees to furnish and deliver
at the time and to the place designated in advance by the Port Authority.
The Lessee has further requested that the Port Authority permit the Lessee
to deliver and cause to be installed by the Lessee at its expense in the
Substation Building certain additional Substation equipment as more par-
ticularly itemized on the aforesaid Exhibit C. Such additional equipment
shall be installed at the time and in the manner designated by the Port
Authority and the Lessee shall take all measures required to minimize any
interference with the construction work of the Port Authority and to avoid
any labor difficulty in connection therewith. The Lessee recognizes
that the construction schedule will require the prompt delivery of such
equipment and any delays due to the failure of the Lessee to so deliver
or install the equipment shall be deemed to extend time for completion
of the Substation Building.

- 3 -

PANYNJ0065871

CONFIDENTIAL

OCT-19-2001 13:12                                                    P.05

CED 41168

     (e)  Any contract entered into by the Port Authority for construction of the Substation Building may be made by negotiation or may be awarded after competitive bidding, including awards to others than the lowest bidder, or may be entered into on the basis of a combination of the foregoing or on some other basis, all within the sole discretion and control of the Port Authority.

     (f)  Title to the Substation Building shall be and remain at all times in the Port Authority.

**Section 5.**  *Installation of Substation Equipment*

     (a)  Subsequent to the commencement of the letting hereunder and during the term of the letting hereunder (including any renewal hereof), the Lessee shall, except as otherwise expressly provided in this Agreement, have possession and control of the Substation Building and adequate means of access thereto at all times. The Lessee, at its expense, shall provide and install all the electrical equipment and accessories required for the Substation, (which shall be designed to accommodate ten (10) main power transformers) together with buses, switching and associated equipment as well as electrical feeders connecting the Substation with the Lessee's electrical system in adjacent streets, and electrical feeders required to deliver electricity to the Port Authority. All such equipment, accessories, apparatus and devices so installed by the Lessee are sometimes hereinafter collectively called the "Substation Equipment".

     (b)  All of the Substation Equipment installed by the Lessee shall remain its property and may be removed or replaced by it at any time and from time to time.

     (c)  The Substation Equipment shall be installed generally in conformance with plans, specifications, standards and practices similar to those used by the Lessee in the equipment and operation of comparable substation facilities. The Lessee shall provide the Port Authority with sketches and plans showing the Substation Equipment and any changes therein during the term hereof reasonably in advance of installation. The Lessee shall make any changes in such plans as the Port Authority may request if such changes are reasonably necessary for the safety of the premises or the use by the Port Authority of the air space over the Substation Building or the land adjacent thereto, but no changes shall unreasonably interfere with the

PANYNJ0065872

CONFIDENTIAL

OCT-19-2001  13:12

CED 568

use of the Substation Building by the Lessee for its purposes in any lawful manner in accordance with recognized engineering and safety standards.

(d)   The Lessee agrees to be solely responsible for any plans and specifications used by it and for any loss or damage resulting from the use thereof notwithstanding that the same may have been approved by the Port Authority and notwithstanding the incorporation therein of the Port Authority's recommendations or requirements.

## Section 6.   Basic Rental

During the term of the letting hereunder the Lessee shall pay to the Port Authority a basic rental of One Dollar and No Cents ($1.00) per annum payable in advance on the commencement date of the letting and on the first day of each and every year thereafter throughout the term of the letting hereunder, provided, however, that if for any reason the Electricity Supply Contract is terminated or expires then, in lieu of the aforesaid basic rental, the rental payable hereunder for the balance of the term hereof, commencing when the Electricity Supply Contract terminates or expires, shall be at the rate of $130,000 per annum payable in equal monthly installments in advance on the first day of each calendar month except that the amount payable as to any period less than one (1) month shall be prorated on a daily basis.

## Section 7.   Repayment of Construction Cost

(a)   The Lessee shall pay to the Port Authority toward the costs incurred by the Port Authority in the construction of the Substation Building, (including costs incurred under Section 4(d), the sum of Three Million Three Hundred and Fifty Thousand Dollars ($3,350,000) plus such additional amounts as may be payable pursuant to subparagraph (b) of this Section 7. Payment by the Lessee to the Port Authority shall be made in installments in accordance with the following schedule:

| Amount Payable | Date Payable |
|---|---|
| $300,000 | Simultaneously with the execution of this Agreement |
| $550,000 | 60 days after the execution of this Agreement |
| $550,000 | 120 days after the execution of this Agreement |
| $300,000 | 180 days after the execution of this Agreement |
| $650,000 | 15 days after commencement of the term of the letting under this Agreement |

- 5 -

PANYNJ0065873

CONFIDENTIAL

OCT-19-2001  13:12                                                        P.07

CED 41668

(b)  In the event that prior to or during the course of construction any of the following shall occur or arise:

(i)  The Lessee shall request or authorize changes or extra work, by which is meant construction, or installation work or improvements other than as specifically described in the drawings, plans and specifications attached hereto as Exhibit B;

(ii)  subsurface or latent physical conditions shall be ascertained at the site differing from those indicated on or contemplated by said drawings, plans and specifications;

(iii)  physical conditions at the site of an unusual nature shall develop or be ascertained differing from those ordinarily encountered and generally recognized as inhering in work of the character described in said drawings, plans and specifications;

(iv)  unanticipated interference with construction shall develop due to forces of nature, acts of God, abnormal weather conditions or flooding;

then and in such event an amount equal to any increased charges necessarily incurred by the Port Authority attributable to or resulting from the above enumerated causes or conditions shall be paid by the Lessee to the Port Authority in addition to the payments described in subparagraph (a) above.  The Port Authority shall obtain from the contractor or contractors performing the construction an allocation of its or their said additional charges and there shall be payable from the Lessee to the Port Authority with respect to additional charges attributable to or resulting from the causes or conditions enumerated in subparagraph (i) above, the total of such additional charges plus 20% applied to such total and with respect to additional charges attributable to or resulting from the causes or conditions enumerated in subparagraphs (ii), (iii) or (iv) above there shall be payable from the Lessee to the Port Authority three-fourths (3/4) of the total of such charges plus 20% applied thereto, except that as to Port Authority Construction Contract No. WTC-130.029 entitled "Substation - Superstructure" there shall be payable from the Lessee to the Port Authority the total of any such additional charges plus 20% applied thereto.  Payment from the Lessee shall be due within fifteen (15) days after the Port Authority certifies in writing to the Lessee the amounts so due.  In the event the contractor or contractors cannot allocate the exact additional charges attributable to or resulting from the above enumerated causes or conditions then the said additional charges shall be deemed to be such amounts as are determined and approved by the Manager, Construction and Planning and the Chief Electrical Engineer of the Lessee; and any additional charges so determined shall be subject to the aforesaid 20% fee.

PANYNJ0065874

CONFIDENTIAL

CED 52468

(c)  Payment by the Lessee hereunder shall not be subject to abatement, suspension or set-off (other than as specified in Section 19(f) hereof) for any cause or reason whatsoever and in the event the Lessee fails to pay any installment thereof when due and provided ten (10) days' written notice has been given by the Port Authority to the Lessee of its default in paying any such installment and such default has not been cured within said ten days, then the entire total unpaid amounts scheduled to be paid under this Section 7 shall be accelerated and shall become immediately due and payable to the Port Authority.

(d)  Except as provided in subdivision (f) of Section 19 hereof, in the event that this Agreement or the letting hereunder is terminated or cancelled by reason of default of the Lessee then and in such event the entire unpaid amounts scheduled to be paid under this Section 7 shall become immediately due and payable to the Port Authority and such amounts shall be paid by the Lessee on or before the effective date of termination or cancellation.

Section 8.   Air Space and Port Authority Construction

(a)  The Lessee recognizes that the Port Authority may construct wholly or partially on, above or about the Substation Building additional stories, structures, buildings or improvements of whatsoever design, size and purpose as the Port Authority may from time to time and at any time during the letting determine.  In connection therewith the Port Authority may use the roof surface of the Substation Building for the base or floor of such additional construction or for a plaza thereof or for some other purpose and may also use side wall surfaces of the Substation Building for support or for attachment thereto of additional structures or for decorative treatment thereto.  The Port Authority agrees that no such additional construction shall unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee contemplated in Section 3 hereof.  Without limiting the generality of the foregoing or of any other provisions of this Agreement the Port Authority in performing such additional con- struction may, upon reasonable advance written notice given to the Lessee and subject to and in accordance with the reasonable safety and operating requirements of the Lessee, temporarily use portions of the Substation Building and may enter upon, over, under or through the Lessee's premises from time to time in order to perform such con- struction and the Lessee hereby consents to such entry, use and construction by the Port Authority.

(b)  The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors or agents shall not be or be construed to be an eviction of the Lessee nor be made the grounds of any abatement of rental nor any claim or demand for damages, consequential or otherwise.

- 7 -

PANYNJ0065875

CONFIDENTIAL

CED 52468

## Section 9.   Ingress and Egress

The Lessee shall have the right of ingress and egress between the premises and the city streets or public ways outside the premises over such vehicular or pedestrian ways as may be designated on the plans and specifications referred to in Exhibit B hereof and also the right-of-way over such ways elsewhere on the Facility as may be made available from time to time by the Port Authority for use by the public.  Such rights shall be exercised in common with others having rights of passage within the Facility or within the buildings or structures or improvements referred to in Section 8 hereof.  The use of any such way shall be subject to the rules and regulations of the Port Authority which may hereafter be promulgated for the safe and efficient operation of the Facility.  The Port Authority may, at any time, temporarily or permanently close any such way, road or other area within the Facility presently or hereafter used as such, so long as a reasonably equivalent means of ingress and egress remains available to the Lessee.  The exercise of any or all of the foregoing rights by the Port Authority or its authorized contractors, agents or representatives shall not be or be deemed to be an eviction of the Lessee nor be made the grounds for any abatement of rental nor any claim or demand for damages, consequential or otherwise.  The Lessee shall not do or permit anything to be done which will interfere (except temporarily and reasonably) with the free access and passage of others to space adjacent to the premises or to the building, structure or improvement referred to in said Section 8 or to any ways, streets and areas near the premises.

Anything hereinafter contained to the contrary notwithstanding, the Lessee, insofar as the Port Authority has power to grant the same, shall have the right to install, operate, alter, maintain, and replace at Lessee's expense electrical feeders and associated facilities in any portion of Barclay and Washington Streets that the Port Authority may now own or hereafter acquire, so that such feeders may be and remain connected with the Company's electrical system in the public streets.

## Section 10.   Governmental and Other Requirements

(a)  In addition to all other rentals and fees payable under this Agreement, the Lessee shall on demand pay or reimburse the Port Authority for any tax, assessment, levy or charge, general or special, ordinary or extraordinary, of whatever name, nature or kind which, during the term of the letting hereunder, may be levied, assessed, imposed or charged by a taxing or governmental authority upon the Substation Building or on any buildings, structures or improvements erected or made on the premises by the Lessee.  The foregoing provision shall include the pro rata portion applicable to the Substation Building of any assessment, levy, charge or payment arising under any present agreement with the taxing authority or municipality and the pro rata portion applicable to the Substation Building of any assessment, levy, charge or payment of general applicability to the buildings in the World Trade Center, resulting from any agreement hereafter made between the Port Authority and the taxing authority or municipality. The foregoing provision shall not be deemed to be a submission by the Port Authority or the Lessee to the application to either of them or to the Substation Building or to such additional buildings, structures or improvements of any of the foregoing taxes, assessments, levies, payments or charge

PANYNJ0065876

CONFIDENTIAL

(b)  The Lessee shall procure from all governmental authorities having jurisdiction of the operations of the Lessee hereunder all licenses, certificates, permits or other authorization which may be necessary for the conduct of such operations.

(c)  The Lessee shall promptly observe, comply with and execute the provisions of any and all present and future governmental laws, rules and regulations, requirements, orders and directions which may pertain or apply to the operations of the Lessee on the premises or its occupancy thereof and the Lessee shall in accordance with and subject to the provisions of Section 22 hereof, make any and all structural or non-structural improvements alterations or repairs of or to the premises that may be required at any time hereafter by any such present or future law, rule, regulation, requirement, order or direction.

(d)  The obligation of the Lessee to comply with governmental requirements is provided herein for the purpose of assuring proper safeguards for the protection of persons and property in or near the Facility and proper operation by the Lessee.  Such provision herein is not to be construed as a submission by the Port Authority to the application to itself of such requirements or any of them.

Section 11.  Rules and Regulations

(a)  The Lessee shall promptly observe and obey (and compel its officers, employees and others on the premises with its consent to observe and obey) the rules and regulations which the Port Authority may from time to time promulgate for reasons of safety, health or preservation of property or for the maintenance of the good and orderly appearance of the premises or for the safe or efficient operation of the Facility provided, however, that such rules and regulations shall not unreasonably impair the efficient operation of the Substation as contemplated in Section 5 hereof.

(b)  If a copy of the Rules and Regulations is not attached to this Agreement then the Port Authority as soon as practicable will notify the Lessee thereof by delivery of a copy to the Lessee or by making a copy available at the Office of the Secretary of the Port Authority.  The Port Authority agrees that except in cases of emergency, it will give notice to the Lessee of further or new rules or regulations at least ten (10) days before the Lessee shall be required to comply therewith.

- 9 -

PANYNJ0065877

CONFIDENTIAL

CED-555

(c)  No statement or provision in the said Rules and Regulations shall be deemed a representation or promise by the Port Authority that the services or privileges described shall be or remain available, or that the charges, prices, rates or fees stated therein shall be or remain in effect throughout the letting, all of the same being subject to change by the Port Authority from time to time whenever it deems a change advisable.

Section 12.  Signs

(a)  Except with the prior consent of the Port Authority, the Lessee shall not erect, maintain or display any signs, emblems or lettering or any advertising, posters or any similar devices on the exterior portions of the premises or in the premises so as to be visible from outside the premises, nor shall any such be erected, maintained or displayed elsewhere at the Facility.

(b)  Upon demand by the Port Authority, the Lessee shall remove, obliterate, or paint out any and all signs, emblems, lettering, advertising, posters and similar devices placed by the Lessee without the Port Authority's consent on the exterior of the premises or on those portions of the premises visible from outside the premises or elsewhere on the Facility; and at the expiration or earlier termination of the letting, the Lessee shall so perform, whether so visible or not, and shall restore the premises and the Facility to the same condition as prior to such placement.  In the event of a failure on the part of the Lessee so to remove, obliterate or paint out any such or so to restore the premises and the Facility, the Port Authority may perform the necessary work and the Lessee shall pay the costs thereof to the Port Authority on demand.

Section 13.  Method of Operation

(a)  The Lessee shall conduct its operations hereunder in an orderly and proper manner and so as not to annoy, disturb or be offensive to others at the Facility.  The Lessee shall take all measures necessary to (1) eliminate vibrations tending to damage any equipment, structure, building or portion of a building which now or hereafter is located on, over or under the premises or which is located elsewhere at the Facility; and (2) to keep the sound level of its operations as low as feasible.

(b)  The Lessee shall control the conduct, demeanor and appearance of its employees and others on the premises with its consent, and upon objection from the Port Authority concerning the conduct, demeanor and appearance of any such, shall immediately take all steps necessary to remove the cause of the objection.  If the Port Authority deems it advisable for security reasons, the Lessee shall provide and its employees shall wear or carry badges or other suitable means of identification.

- 10 -

PANYNJ0065878

CONFIDENTIAL

CED 41668

(c)  The Lessee shall be responsible for the removal from the premises and the Facility of all garbage, debris and other waste materials (either solid or liquid) arising out of its occupancy of the premises or out of its operations elsewhere at the Facility. The Lessee shall use extreme care when effecting removal of all such waste, shall effect such removal at such time and by such means as first approved by the Port Authority and shall in no event make use of any facilities or equipment of the Port Authority except with the prior consent thereof.  Without limiting the generality of the foregoing, the Lessee shall not dispose of nor permit anyone to dispose of any liquid or solid industrial waste materials by means of toilets, manholes, sanitary-sewers or storm sewers in the premises or elsewhere at the Facility.

(d)  The Lessee shall not commit any nuisance or permit its employees or others on the premises with its consent to commit or create or continue or tend to create any nuisance on the premises or in or near the Facility.

(e)  The Lessee shall not cause or permit to be caused or produced upon the premises, to permeate the same or to emanate therefrom any unusual, noxious or objectionable smoke, gases, vapors or odors.

(f)  The Lessee shall not do or permit to be done any act or thing at the Facility which shall or might subject the Port Authority to any liability or responsibility for injury to any person or persons or damage to any property.

(g)  The Lessee shall not overload any floor, roof, land surface or pavement at the premises or elsewhere at the Facility and shall repair, replace or rebuild any such, including but not limited to supporting members, damaged by overloading.

(h)  From time to time and as often as required by the Port Authority, the Lessee shall conduct pressure, water-flow, and other appropriate tests of the fire extinguishing system and fire fighting equipment, on the premises, whether furnished by the Port Authority or by the Lessee. The Lessee shall keep all fire-fighting and fire extinguishing equipment well supplied with a fresh stock of chemicals and with sand, water or other materials as the case may be for the use of which such equipment is designed, and shall train its employees in the use of all such equipment, including in such training periodic drills.

(i)  The Lessee shall not install, maintain or operate or permit the installation, maintenance or operation on the premises of any vending machine or device designed to dispense or sell food, beverage products or merchandise of any kind without the prior approval of the Port Authority. The Port Authority, by itself or by

- 11 -

PANYNJ0065879

CONFIDENTIAL

OCT-19-2001  13:13                                                    P.13

CED 52468

contractors, lessees or permittees, shall have the exclusive right to install, maintain and receive and retain the revenues from all coin-operated or other machines or devices for the sale of merchandise of all types, or for the rendering of services (including telephone pay stations), which may be operated on the premises, provided, however, that no such machine or device shall be installed except upon the request of the Lessee.

(j)  The Lessee shall not do or permit to be done any act or thing upon the premises or at the Facility which (1) will invalidate or conflict with any insurance policies covering the premises or any part thereof, or the Facility, or any part thereof or (2) which, in the opinion of the Port Authority, may constitute an extra hazardous condition so as to increase the risks normally attendant upon the operations permitted by this Agreement, or (3) which will increase the rate of any insurance including fire, extended coverage or rental insurance on the Facility, or any part thereof or upon the contents of any building thereon, provided, however, that the operation of Lessee's Substation as contemplated and required in accordance with this Agreement and with the plans, specifications and standards referred to in Section 5(c) hereof shall not be deemed to be the doing of any of the foregoing acts or things.  The Lessee shall promptly observe, comply with and execute the provisions of any and all present and future rules and regulations, requirements, orders and directions of the New York Fire Insurance Rating Organization or of any other board or organization exercising or which may exercise similar functions, which may pertain or apply to the operations of the Lessee on the premises, and the Lessee shall, subject to and in accordance with the Section of the Agreement entitled "Construction by the Lessee", make any and all structural and non-structural improvements, alterations or repairs of the premises that may be required at any time hereafter by any such present or future rule, regulation, requirement, order or direction.  If by reason of any failure on the part of the Lessee to comply with the provisions of this subparagraph any insurance, including fire, extended coverage or rental insurance rate on the Facility or any part thereof, shall at any time be higher than it otherwise would be, then the Lessee shall pay to the Port Authority that part of all premiums paid by the Port Authority which shall have been charged because of such violation or failure by the Lessee.  Without limitation of the foregoing the parties agree to consult together concerning any such rule, regulation, requirement, order or direction which the Lessee considers to be unreasonable and to cooperate in respect to the taking of appropriate steps to resolve the matter.

(k)  The Lessee shall not do or permit to be done anything which may interfere with the effectiveness or accessibility of the utility, mechanical, electrical or other system installed or located at the premises in accordance with this Agreement by the Port Authority, its contractors or agents or installed or located elsewhere at the Facility.

- 12 -

PANYNJ0065880

CONFIDENTIAL

OCT-19-2001  13:14                                                P.14

CED 468

Section 14.    Indemnity; Liability Insurance

(a)    The Lessee shall indemnify and hold harmless the Port Authority, its Commissioners, officers, agents and employees from (and shall reimburse the Port Authority for any cost or expense including without limitation thereto any legal expenses or costs incurred in connection with the defense of) all claims and demands of third persons including but not limited to those for death, for personal injuries or for property damages, arising out of (i) the use or occupancy of the premises by the Lessee or out of any of the acts or omissions of the Lessee, its officers, employees, agents, representatives, contractors and invitees where such acts or omissions are on the premises or (ii) any acts or omissions of the Lessee, its officers, employees, agents and representatives in connection with such use and occupancy of the premises where such acts or omissions are elsewhere at the Facility.  If so requested, the Lessee shall at its own expense defend any suit based upon any such claim or demand even if such suit, claim or demand is groundless, false or fraudulent, provided, however, that the Lessee shall not without the express prior written consent of the General Counsel of the Port Authority raise any defense involving in any way the immunity of the Port Authority or the provisions of any statutes respecting suits against the Port Authority or the jurisdiction of the tribunal with respect to the Port Authority.

(b)    The Lessee represents to the Port Authority that it maintains a policy or policies of comprehensive general liability insurance, including coverage for explosion, collapse and underground damages and automotive liability, and including full contractual liability coverage covering the obligations assumed by the Lessee under paragraph (a) above, which policy or policies cover all of the operating properties of the Lessee in amounts, in the aggregate, totalling at least $25,000,000, from which there is deductible, as to any occurrence or claim, the sum of $500,000.  The Lessee shall furnish the Port Authority with appropriate evidence of the existence of the foregoing insurance coverage promptly after the execution of this Agreement, and the Lessee, thereafter, shall provide further certification evidencing the continuance of such insurance during the term of this letting, such certification to be furnished at least ten days prior to the expiration of expiring policies.

The Lessee agrees that it will not diminish the foregoing insurance coverage without giving 30 days advance written notice to the Port Authority of the changes it proposes to make in such coverage.  If the Port Authority shall not be

- 13 -

PANYNJ0065881

CONFIDENTIAL

OCT-19-2001  13:14

CEO-568

satisfied with the proposed changes, it shall have the right, at its election, to serve a written demand upon the lessee to the effect that the Lessee shall provide and maintain, at its expense, a policy or policies of comprehensive general liability insurance, including the types of coverage hereinbefore described, specifically relating to the premises herein demised, such policy or policies to be written with limits not lower than the following:

(1)  Bodily-injury liability:
For injury or wrongful death
to one person:                          $1,000,000
For injury or wrongful death
to more than one person
from any one accident                   $1,000,000

(ii)  Property-damage liability:
For all damages arising out
of injury to or destruction of
property in any one accident:           $1,000,000

(iii)  Aggregate products liability:    $1,000,000

Upon receipt of the foregoing notice from the Port Authority, the lessee shall procure insurance conforming therewith, in lieu of the blanket type coverage hereinbefore described and shall provide the Port Authority with an appropriate certificate evidencing the existence thereof. Thereafter, the lessee shall provide the Port Authority with further certificates (or certified copies of insurance policies conforming hereto) at least ten days prior to the expiration of each expiring policy. Each such copy or certificate of insurance shall contain a valid provision or endorsement that the policy may not be cancelled, terminated, changed or modified without giving fifteen days written notice in advance to the Port Authority. If at any time any of such policy shall be or become unsatisfactory to the Port Authority as to form or substance or if any of the carriers issuing such policies shall be or become unsatisfactory to the Port Authority, the Lessee shall promptly obtain a new and satisfactory policy in replacement. If the Port Authority so requests, the Lessee shall cause the Port Authority to be named as an insured under such policies and in the event the Port Authority is so named as an insured thereunder, the Lessee shall use its best efforts to obtain an endorsement of the policy or policies providing that the insurance carrier shall not without obtaining express advance permission from the General Counsel of the Port Authority, raise any defense involving in any way the immunity of the Port Authority or the provisions of any statute respecting suits against the Port Authority or the jurisdiction of the tribunal with respect to the Port Authority.

– 14 –

PANYNJ0065882

CONFIDENTIAL

CED-568

Section 15.    Care, Maintenance and Repair by the Lessee

(a)    Except as otherwise provided in Section 16 of this Agreement, the Lessee shall throughout the term of this Agreement assume the entire responsibility and shall relieve the Port Authority from all responsibility for all care, repair, replacement and rebuilding whatsoever in the premises whether such repair, maintenance, replacement or rebuilding be ordinary, extraordinary, partial or entire, structural or otherwise and without limiting the generality of the foregoing, the Lessee shall:

(1)    Keep the premises, including the Substation Equipment, in a clean and orderly condition and appearance;

(2)    With respect to the premises and all parts thereof, including, but without limitation thereto, such of the following as are or may be during the term of the letting located in or on the premises: fences, the exterior and interior of the building walls, the exterior and interior and operating mechanisms of and attachments to windows and skylights, screens, roofs, foundations, steel work, columns, the exterior and interior and operating mechanisms of and attachments to doors, partitions, floors, ceilings, inside and outside paved and unpaved areas, glass of every kind, and the utility, mechanical, electrical and other systems installed for the benefit or use of the Lessee; take the same good care of the premises that would be taken by a reasonably prudent owner who desired to keep and maintain the same so that at the expiration or termination of the letting and at all times during the letting, the same (or a reconstruction of all or any part thereof) will be in as good condition as at the commencement thereof (or, in the case of improvements made during the letting hereunder, in as good condition as at the time of the installation or construction thereof), except for reasonable wear which does not adversely affect the watertight condition or structural integrity of the Substation Building or other structures on the premises erected by the Lessee or adversely affect the appearance and the efficient and the proper utilization of any part of the premises.  To that end, the Lessee shall make frequent periodic inspections and, from time to time as the necessity therefor arises and regardless of the cause of the condition requiring the same, the Lessee shall perform all necessary preventive maintenance including but not limited to painting (in colors which have been approved by the Port Authority), and the Lessee shall promptly make all necessary repairs and replacements and do all necessary rebuilding with respect

- 15 -

PANYNJ0065883

CONFIDENTIAL

to the premises and all parts thereof (including any total destruction) without regard to the cause thereof and whether or not caused by fire or other casualty, all of which shall be in quality equal to the original in materials and workmanship and regardless of whether such repairs and replacements are structural or non-structural, ordinary or extraordinary, foreseen or unforeseen.

(3)  The Lessee shall promptly wipe up all oil, grease, lubricants, or other inflammable liquids and substances and all liquids and substances having a corrosive or detrimental effect on the floor or other surfaces of the premises.  The Lessee shall maintain, repair and replace any curb cuts and driveways leading to its premises and shall keep the same clean and free of snow and ice.

(4)  The Lessee shall supply, replace, install, repair, maintain and keep clean all grease traps in all drainage pipes and oil separators used by it in its operations hereunder whether such pipes and oil separators are located on the premises or elsewhere at the Facility.

(b)  In the event the Lessee fails to commence so to maintain, clean, repair, replace, rebuild or paint within a period of thirty (30) days after notice from the Port Authority so to do in the event that the said notice specifies that the required work to be accomplished by the Lessee includes maintenance and/or repair other than preventive maintenance; or within a period of one hundred twenty (120) days if the said notice specifies that the work to be accomplished by the Lessee involves preventive maintenance only; or fails diligently to continue to completion the repair, replacement, rebuildin or painting of all of the premises required to be repaired, replaced, rebuilt or painted by the Lessee under the terms of this Agreement, the Port Authority may, at its option, and in addition to any other remedie which may be available to it, repair, replace, rebuild or paint all or any part of the premises included in the said notice, and the cost thereof shall be payable by the Lessee upon demand.  Nothing herein contained shall be deemed to require the Port Authority to notify the Lessee of needed repairs or replacement or of required maintenance or preventive maintenance and the Lessee shall be solely responsible for any failure to perform needed maintenance, repair or restoration, re-building or painting.

Section 16.  Responsibility for Other Uses of Premises

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors; further the

- 16 -

PANYNJ0065884

CONFIDENTIAL

OCT-19-2001  13:14                                                              P.18

CED-568

responsibility of the Lessee for the maintenance, repair or rebuild-
ing of the Substation Building shall not include any other structure
or buildings erected by others than the Lessee unless repair or re-
construction thereof is necessitated by act or fault of the Lessee.
The Port Authority shall reimburse the Lessee for any expense in-
curred by the Lessee in maintaining, repairing, replacing or re-
building the Substation Building or the Lessee's Substation Equipment
where such expenses are incurred by reason of damage to the Substation
Building or the Lessee's Substation Equipment caused by the acts or
omissions of the Port Authority or its agents, contractors or
employees in connection with the construction or maintenance of the
stories, structures, buildings or improvements described in Section 8
hereof.  The responsibility of the Lessee for major repairs or re-
building shall not extend to the portion of the foundations, bearing
columns, roof reinforcement and other structural members and facilities
incorporated in the Substation Building for the support or accom-
modation of the stories, structures, buildings or improvements
described in Section 8 hereof unless the Port Authority shall reimburse
the Lessee for the expense thereof to the extent that such expense is
not covered by insurance.

Section 17.  Fire Insurance

        (a)  During the term of this Agreement the Port Authority,
at the Lessee's expense, shall insure and keep insured the Substation
Building to the extent of 100% of the replacement value thereof against
such hazards or risks as may now or in the future be included under
the standard form of fire insurance policy in use in New York from time
to time during the letting and the standard form of extended coverage
endorsement prescribed as of the effective date of such insurance by
the rating organization having jurisdiction.  All such policies of
insurance and renewals thereof shall be taken out in the name of the
Port Authority and shall provide that the loss, if any, shall be ad-
justed with and payable to the Port Authority.  The proceeds of such
insurance shall be applied by the Port Authority in accordance with the
provisions of Section 18 hereof.  The Port Authority shall not be deemed
to have warranted the solvency of any insurance company and shall not
be liable for any losses resulting from such insolvency.

        (b)  The Port Authority may from time to time and at any
time voluntarily elect on not less than ten days' notice to the Lessee
to become a self-insurer as to any part or all of the loss or damage
resulting from the hazards or risks that would be insured against
under the insurance policies described in subparagraph (a) above; the
Port Authority shall, if and to the extent that it has elected to self-
insure, make available out of its funds, in the event of such loss or
damage, an amount equivalent to that which would have been paid by an
insurance carrier under the same circumstances.

        (c)  The Lessee shall pay the Port Authority annually
an amount equal to the insurance premium or premiums paid by the
Port Authority allocable to the insurance coverage provided under

- 17 -

PANYNJ0065885

CONFIDENTIAL

CED 468

paragraph (a) above and if the Port Authority shall elect to self-insure as to any part or all of such coverage, the Lessee shall pay annually an amount equal to the allocable portion of such insurance premiums which would have been paid by the Port Authority if it had actually insured.

(d)  Notwithstanding the provisions of subparagraph (a) above, in the event the Port Authority determines that it is no longer appropriate for it to obtain or provide the insurance referred to above, it shall give thirty (30) days' notice to the Lessee requiring the Lessee to obtain such coverage or self-insurance coverage and the Lessee shall forthwith secure the same and deliver to the Port Authority certificates or binders evidencing the same.  Any such policy shall contain an endorsement obligating the insurance company to furnish the Port Authority ten (10) days' advance notice of the cancellation of the insurance evidenced by said policy or certificate.  Renewal policies or certificates shall be delivered to the Port Authority at least fifteen (15) days before the expiration of the insurance which such policies are to renew. The policies of insurance under this paragraph (d) and renewals thereof shall insure the Port Authority and the Lessee as their interests may appear, and shall provide that the loss, if any, shall be adjusted with and payable to the Port Authority.  Regardless of the person whose interests are insured the proceeds of all such policies shall be applied by the Port Authority in accordance with the provisions of Section 18 hereof.

(e)  The word "insurance" and all other references to insurance in said Section 18 shall be construed to refer to the insurance which is the subject matter of this Section and to refer to such insurance only.

(f)  In the event the premises or any part thereof shall be damaged by any casualty against which insurance is or shall be carried pursuant to this Section, the Lessee shall promptly furnish to the Port Authority such information and data as may be necessary to enable the Port Authority to adjust the loss.

PANYNJ0065886

CONFIDENTIAL

CED-568

## Section 18.  Damage or Destruction of Premises

(a)  <u>Removal of Debris</u> - If the premises or any part thereof, shall be damaged by fire, the elements, the public enemy or other casualty, the Lessee shall promptly remove all debris resulting from such damage from the premises, and to the extent, if any, that the removal is covered by insurance, the proceeds thereof shall thereafter be made available to the Lessee for such purpose.

(b)  <u>Minor Damage</u> - If the premises or any part thereof shall be damaged by fire, the elements, the public enemy, or other casualty and rendered untenantable or unusable for a period of ninety (90) days or less the premises shall be diligently repaired or rebuilt in accordance with the plans and specifications for the premises as they existed prior to such damage by and at the expense of the Lessee and if such damage is covered by insurance the proceeds thereof shall thereafter be made available to the Lessee for that purpose.

(c)  <u>Major Damage to or Destruction of the Premises</u> - If the premises or any part thereof shall be destroyed or so damaged by fire, the elements, the public enemy or any other casualty as to be untenantable or unusable for more than ninety (90) days, then the Lessee shall proceed with due diligence to make and perform the necessary repairs, rebuilding or replacements and to restore such premises in accordance with the plans and specifications for the premises as they existed prior to such destruction or damage or with the approval in writing of the Port Authority to make such other repairs, replacements, rebuilding or changes as may be desired by the Lessee.  If such destruction or damage is covered by insurance, the proceeds thereof shall thereafter be made available to the Lessee for the foregoing purposes.  Notwithstanding the foregoing provisions, in the event of such damage or destruction the Lessee shall have the option on sixty (60) days' notice to the Port Authority given not later than sixty (60) days after such damage or destruction to elect not to rebuild in which event this Agreement and the letting hereunder shall cease and expire at the expiration of said sixty (60) day notice as fully and completely as if such date were the original expiration date of the letting under this Agreement.  In such event the Port Authority shall retain the proceeds of the insurance solely for its own account.

(d)  In the event of a partial or total destruction of the premises and any failure of the Lessee to remove therefrom all debris (or property of the Lessee after termination of the letting) the Port Authority may remove such property to a public warehouse for deposit or retain the same in its possession and sell the same at public auction the proceeds of which shall be applied first to the expenses of removal, storage and sale, second to any sums owed by the Lessee to the Port Authority, with any balance remaining to be paid to the Lessee; if the expenses of such removal, storage and sale shall exceed the proceeds of sale, the Lessee shall pay such excess to the Port Authority on demand.

- 19 -

PANYNJ0065887

CONFIDENTIAL

CED 568

(e)  The parties hereto hereby stipulate that neither the provisions of Section 227 of the Real Property Law of New York nor those of any similar statute shall extend or apply to this Agreement. The Lessee agrees that no damage or destruction of the premises shall entitle the Lessee to any abatement in the rental, fees or charges payable by it under this Agreement during the continuance of the term hereof nor affect the rates and charges payable by the Port Authority for electricity service under the Electricity Supply Contract.

Section 19.  Condemnation

(a)  Except as provided in paragraph (d) below, in any action or other proceeding by any governmental agency or agencies for the taking for a public use of any interest in all or part of the premises, or in case of any deed or other conveyance as a consequence of such action or proceeding (all of which are in this Section referred to as "taking or conveyance"), the Lessee shall not be entitled to assert any claim to any compensation, award or part thereof made or to be made therein or therefor or any claim to any consideration or rental or any part thereof paid therefor, or to institute any action or proceeding or to assert any claim against such agency or agencies or against the Port Authority for any such taking or conveyance, it being understood and agreed between the parties hereto that the Port Authority shall be entitled to all compensation or awards made or to be made or paid, and all such consideration or rental shall be free of any claim or right of the Lessee.

(b)  In the event that the taking or conveyance covers the entire premises, then this Agreement shall terminate as of the date possession is taken by such agency from the Port Authority in the same manner and with the same effect as if the said date were the original date fixed by this Agreement for the expiration of the term of the letting.  The Lessee hereby agrees to deliver possession of the premises taken or conveyed in the same condition as that required for the delivery of the premises upon the date originally fixed by this Agreement for the expiration of the terms of the letting.

(c)  In the event that the taking or conveyance covers only a part of the premises then this Agreement shall terminate as to such part as of the date possession is taken by such agency from the Port Authority in the same manner and with the same effect as if the said date were the original date fixed by this Agreement for the expiration of the term of the letting.  In the event, however, that such taking or conveyance covers a portion of the premises which is necessary for the operation of the Substation then the Lessee or the Port Authority shall each have the right by prompt written notice to terminate the letting hereunder effective as of the date possession is so taken or conveyed, such termination to be effective as if the said date were the original date fixed by this Agreement for the expiration of the term of the letting.

(d)  In the event of a taking or conveyance as defined in paragraph (a) hereof or a termination as provided in paragraph (c) hereof the Port Authority shall pay to the Lessee the unamortized capital investment, if any, of the Lessee in the improvements

PANYNJ0065888

CONFIDENTIAL

CED-568

described in Section 4 hereof for the portion of the premises so taken or conveyed, provided, however, that if the Port Authority or the Lessee shall elect to terminate the letting pursuant to subparagraph (c) hereof then in such event the Port Authority shall pay to the Lessee (subject to the limitations contained in the following sentence) the unamortized capital investment of the Lessee in the entire improvements described in Section 4 hereof.  Any sums payable to the Lessee as aforesaid shall be limited to the extent of the amounts covering the foregoing which shall have actually been paid to the Port Authority by the governmental agency or agencies, including consequential damages to the improvements described in Section 4 hereof, it being understood that the Lessee shall have no claim against the Port Authority by reason of insufficiency or claimed insufficiency of the amounts so paid to the Port Authority.

(e)  The term "unamortized capital investment" shall mean an amount determined by multiplying the total payments made by the Lessee for construction of the improvements (as said payment is described in Section 7 hereof) by a fraction, the numerator of which shall be the number of whole calendar months in the term of the letting under this Agreement subsequent to the effective date of such taking or conveyance and the denominator of which shall be six hundred (600).

(f)  No taking or conveyance pursuant to the provisions of this Section shall be or be construed to be an eviction of the Lessee or a breach of this Agreement or be made the basis for any claim by the Lessee against the Port Authority for damages consequential or otherwise or for any abatement or reduction in any rentals or fees that may be payable to the Port Authority by the Lessee, provided, however, that if said taking is effective prior to payment to the Port Authority by the Lessee of the total construction costs described in Section 7 hereof, then the Lessee shall not be required to make any further payments to the Port Authority toward the said cost of construction and, in determining the unamortized capital investment of the Lessee, the cost of construction shall mean solely the total of the payments actually made to the Port Authority by the Lessee pursuant to Section 7 hereof.

(g)  The foregoing shall have no application to the Substation Equipment, apparatus and devices, and the supporting facilities therefor, which are installed in the Substation Building by or on behalf of the Lessee, and which, under the provisions of this Agreement are and shall remain the property of the Lessee.

Section 20.  <u>Services or Utilities</u>

(a)  The Port Authority shall not be required to furnish to the premises any services or utilities.  The Lessee shall make its own arrangements for and be responsible to pay for any services or utilities it may require in connection with its use and occupancy of the premises, but the Port Authority shall permit reasonable

- 21 -

PANYNJ0065889

CONFIDENTIAL

CED-568

access to the public streets for any pipes or connecting facilities needed for the supply of such services or facilities. If the Lessee does not use its own employees for the maintenance, repair, cleaning and janitorial services at the premises, it shall advise the Port Authority in advance of the contractor retained by it to perform such services.

(b) If any federal, state, municipal or other governmental body shall assess, levy, impose or increase any rent, charge, fee, tax or assessment on the Port Authority for or in connection with any service, system, or utility supplied to the premises or the Lessee (including but not limited to any sewer rent or charge for any sewer systems), the Lessee shall at any time and from time to time, upon notice given by the Port Authority to the Lessee pay, in accordance with the said notice, such rent, charge, fee, tax or assessment, or increase thereof (or the portion of any of the same allocable to the premises or to the operations of the Lessee), either directly to the governmental body or directly to the Port Authority.

Section 21.     Assignment and Sublease

(a) The Lessee covenants and agrees that it will not sell, convey, transfer, assign, mortgage or pledge this Agreement or any part thereof, or any rights created thereby or the letting thereunder or any part thereof except with the prior written consent of the Port Authority.

(b) The Lessee shall not sublet the premises or any part thereof.

(c) If the Lessee assigns, sells, conveys, transfers, mortgages, pledges or sublets in violation of subdivisions (a) or (b) of this Section or if the premises are occupied by anybody other than the Lessee, the Port Authority may collect rent from any assignee, sublessee or anyone who claims a right to this Agreement or letting or who occupies the premises and shall apply the net amount collected to the rental herein reserved; and no such collection shall be deemed a waiver by the Port Authority of the covenants contained in subdivisions (a) and (b) of this Section nor an acceptance by the Port Authority of any such assignee, sublessee, claimant or occupant as tenant, nor a release of the Lessee by the Port Authority from the further performance by the Lessee of the covenants contained herein.

(d) The Lessee further covenants and agrees that it will not use or permit any person whatsoever to use the premises or any portion thereof for any purpose other than as provided in Section 3 of this Agreement.

- 22 -

PANYNJ0065890

CONFIDENTIAL

CED 41668

### Section 22.  Construction by the Lessee

Except as otherwise specifically authorized in Section 5 hereof, the Lessee shall not make any structural alterations or additions to or replacements of the Substation Building nor make any alterations therein which would be inconsistent with or interfere with the construction, operation, maintenance, repair or improvement of the additional construction contemplated under Section 8 hereof, unless the same shall have been approved in advance in writing by the Port Authority. Any construction, alteration, addition, repair or replacement made with or without such approval and unless the approval of the Port Authority shall expressly provide otherwise shall immediately become the property of the Port Authority and the Lessee shall have no right to remove the same either during the letting or at the expiration thereof unless the Port Authority at any time prior to the expiration of the term of the letting or any extension thereof or within sixty (60) days after expiration or earlier termination of the term of the letting shall give notice to the Lessee to remove the same in which case the Lessee agrees to remove the same or in the case of unapproved work to cause the same to be changed to the satisfaction of the Port Authority.  In case of any failure on the part of the Lessee to comply with such notice, the Port Authority may effect the removal or change and the Lessee hereby agrees to pay the cost thereof to the Port Authority upon demand.

### Section 23.  Additional Rent and Charges

(a)  If the Port Authority has paid any sum or sums or has incurred any obligations or expense which the Lessee has agreed to pay or reimburse the Port Authority for, or if the Port Authority is required or elects to pay any sum or sums or incurs any obligations or expense by reason of the failure, neglect or refusal of the Lessee to perform or fulfill any one or more of the conditions, covenants or agreements contained in this Agreement or as a result of an act or omission of the Lessee contrary to the said conditions, covenants and agreements, the Lessee shall pay to the Port Authority the sum or sums so paid or the expense so incurred, including all interest, costs, damages and penalties and the same may be added to any installment of rent thereafter due hereunder, and each and every part of the same shall be and become additional rent, recoverable by the Port Authority in the same manner and with like remedies as if it were originally a part of the rental as set forth in Section 6 hereof.

- 23 -

PANYNJ0065891

CONFIDENTIAL

OCT-19-2001  13:16                                                    P.6

CED-568

(b)  For all purposes under this Section, in any
suit, action or proceeding of any kind between the parties
hereto, any receipt showing any payment of a sum or sums by
the Port Authority for any work done or material furnished
shall be prima facie evidence against the Lessee that the
amount of such payment was necessary and reasonable.  Should
the Port Authority elect to use its operating and maintenance
staff in performing any work and to charge the Lessee with
the cost of same, any time report of any employee of the Port
Authority showing hours of labor or work allocated to such
work, or any stock requisition of the Port Authority showing
the issuance of materials for use in the performance thereof,
shall likewise be prima facie evidence against the Lessee that
the amount of such charge was necessary and reasonable.

(c)  The term "cost" in this Agreement shall mean
and include (unless otherwise defined): (1)  Payroll costs,
including but not limited to payroll taxes, contributions to
the Retirement System, the cost of participation in other
pension plans or systems, insurance costs, sick leave pay,
holiday, vacation and authorized absence pay; (2)  Cost of
materials and supplies used;  (3)  Payments to contractors;
(4)  Any other direct costs; and (5) 25% of the sum of the
foregoing.

Section 24.    Rights of Entry Reserved

(a)  The Port Authority, by its officers, employees,
agents, representatives and contractors shall have the right at
all reasonable times, upon reasonable advance notice to the Lessee
(except in cases of emergency) and subject to the Lessee's reason-
able safety requirements, to enter upon the premises for the pur-
pose of inspecting the same, for observing the performance by
the Lessee of its obligations under this Agreement, and for the
doing of any act or thing which the Port Authority may be obligate
or have the right to do under this Agreement.

(b)  Without limiting the generality of the fore-
going, the Port Authority, by its officers, employees, agents,
representatives, and contractors, and furnishers of utilities
and other services accompanied by an authorized and qualified
representative of the Lessee, shall have the right, for its
own benefit, for the benefit of the Lessee, or for the benefit
of others than the Lessee at the Facility, to maintain existing
and future utility, mechanical, electrical and other systems
and to enter upon the premises at all times to make such re-
pairs, replacements or alterations as may, in the opinion of
the Port Authority, be deemed necessary or advisable and, from

- 24 -

PANYNJ0065892

CONFIDENTIAL

OCT-19-2001 13:17

CED-52468

time to time, to construct or install over, in or under the premises new systems or parts thereof, and to use the premises for access to other parts of the Facility otherwise not conveniently accessible; provided, however, that in the exercise of such rights of access, repair, alteration or new construction the Port Authority shall not unreasonably impair, endanger or interfere with the continuous use of the Substation Building by the Lessee contemplated in Section 3 hereof.  The Lessee shall designate an office and telephone number and a substitute office and telephone number where an authorized representative of the Lessee can be contacted seven days a week, twenty-four hours a day and the Lessee agrees that a representative will respond to any call or contact from the Port Authority and arrive at the premises with all reasonable dispatch.  Nothing herein contained shall be deemed to limit or affect the provisions of Section 8 hereof.

(c)  Nothing in this Section shall or shall be construed to impose upon the Port Authority any obligations so to construct or maintain or to make repairs, replacements, alterations or additions or shall create any liability for any failure so to do.

(d)  At any time and from time to time during ordinary business hours within the three (3) months next preceding the expiration of the letting, the Port Authority, by its agents and employees, whether or not accompanied by prospective lessees, occupiers or users of the premises, shall have the right to enter on the premises for the purpose of exhibiting and viewing all parts of the same, upon reasonable advance notice to the Lessee and subject to the Lessee's safety requirements.

(e)  If, during the last month of the letting, the Lessee shall have removed all or substantially all its property from the premises, the Port Authority may immediately enter and alter, renovate and redecorate the premises.

(f)  The exercise of any or all of the foregoing rights by the Port Authority or others shall not be or be construed to be an eviction of the Lessee nor be made the grounds for any abatement of rental nor any claim or demand for damages, consequential or otherwise.

Section 25.  Limitation of Rights Granted

No greater rights or privileges with respect to the use of the premises or the Facility or any part thereof are granted or intended to be granted to the Lessee by this Agreement or by any provision hereof than the rights and privileges expressly and specifically granted.

PANYNJ0065893

CONFIDENTIAL

CED–568

## Section 26.   Termination

(a)  If any one or more of the following events shall occur, that is to say:

(1)  The Lessee shall become insolvent, or shall take the benefit of any present or future insolvency statute, or shall make a general assignment for the benefit of creditors, or file a voluntary petition in bankruptcy or a petition or answer seeking an arrangement or its reorganization or the readjustment of its indebtedness under the federal bankruptcy laws or under any other law or statute of the United States or of any State thereof, or consent to the appointment of a receiver, trustee, or liquidator of all or substantially all of its property; or

(2)  By order or decree of a court the Lessee shall be adjudged bankrupt or an order shall be made approving a petition filed by any of its creditors or, by any of its stockholders, seeking its reorganization or the readjustment of its indebtedness under the federal bankruptcy laws or under any law or statute of the United States or of any State thereof; or

(3)  A petition under any part of the federal bankruptcy laws or an action under any present or future insolvency law or statute shall be filed against the Lessee and shall not be dismissed within sixty (60) days after the filing thereof; or

(4)  By or pursuant to, or under authority of any legislative act, resolution or rule, or any order or decree of any court or governmental board, agency or officer, a receiver, trustee, or liquidator, except a temporary government administrator appointed during a war emergency, shall take possession or, control of all or substantially all of the property of the Lessee and such possession or control shall continue in effect for a period of sixty (60) days; or

(5)  The letting or the interest of the Lessee under this Agreement shall other than by merger, consolidation or similar corporate reorganization, be transferred to, pass to or devolve upon, by operation of law or otherwise, any other person, firm or corporation; or

(6)  The Lessee shall voluntarily abandon, desert or vacate the premises or permanently discontinue use of the premise for the purposes described in Section 3;

(7)  Any lien shall be filed against the premises because of any act or omission of the Lessee and shall not be discharged within thirty (30) days; or

– 26 –

PANYNJ0065894

CONFIDENTIAL

CED 468

(8)  The Lessee shall fail duly and punctually to pay the rental or to make any other payment required hereunder when due to the Port Authority; or

(9)  The Lessee shall fail to keep, perform and observe each and every other promise, covenant and agreement set forth in this agreement, on its part to be kept, performed or observed, within thirty (30) days after its receipt of notice of default thereunder from the Port Authority (except where fulfillment of its obligation requires activity over a period of time, and the Lessee shall have commenced to perform whatever may be required for fulfillment within fifteen (15) days after receipt of notice and continues such performance without interruption except for causes beyond its control);

then upon the occurrence of any such event or at any time thereafter during the continuance thereof, the Port Authority may by thirty (30) days' notice terminate the letting and the Lessee's rights hereunder, such termination to be effective upon the date specified in such notice.  Such right of termination and the exercise thereof shall be and operate as a conditional limitation.

(b)  If any of the events enumerated in paragraph (a) of this Section shall occur prior to the commencement of the letting, the Lessee shall not be entitled to enter into possession of the premises, and the Port Authority, upon the occurrence of any such event, or at any time thereafter, during the continuance thereof, by ten days notice may cancel the interest of the Lessee under this Agreement, such cancellation to be effective upon the date specified in such notice.

(c)  No acceptance by the Port Authority of rentals, fees, charges or other payments in whole or in part for any period or periods after a default of any of the terms, covenants and conditions hereof to be performed, kept or observed by the Lessee (nor any payment or performance by the Port Authority pursuant to the Electric Service Contract) shall be deemed a waiver of any right on the part of the Port Authority to terminate the letting.  No waiver by the Port Authority of any default on the part of the Lessee in performance of any of the terms covenants or conditions hereof to be performed, kept or observed by the Lessee shall be or be construed to be a waiver by the Port Authority of any other or subsequent default in performance of any of the said terms, covenants and conditions.

- 27 -

PANYNJ0065895

CONFIDENTIAL

CED 468

(d)  The rights of termination described above shall be in addition to any other rights of termination provided in this Agreement and in addition to any rights and remedies that the Port Authority would have at law or in equity consequent upon any breach of this Agreement by the Lessee, and the exercise by the Port Authority of any right of termination shall be without prejudice to any other such rights and remedies

Section 27.  Right of Re-entry

The Port Authority shall, as an additional remedy upon the giving of a notice of termination as provided in Section 26 hereof, have the right to re-enter the premises and all rights of redemption, granted fective date of termination without further notice of any kind, and may regain and resume possession either with or without the institution of summary or any other legal proceedings or otherwise. Such re-entry, or regaining or resumption of possession, however, shall not in any manner affect, alter or diminish any of the obligations of the Lessee under this Agreement, and shall in no event constitute an acceptance of surrender.

Section 28.  Waiver of Redemption

The Lessee hereby waives any and all rights to recover or regain possession of the premises and all rights of redemption, granted by or under any present or future law in the event it is evicted or dispossessed for any cause, or in the event the Port Authority obtains possession of the premises in any lawful manner.

Section 29.  Survival of the Obligations of the Lessee

(a)  In the event that the letting shall have been terminated in accordance with a notice of termination as provided in Section 26 of this Agreement or the interest of the Lessee shall have been cancelled pursuant thereto or in the event the Port Authority has re-entered, regained or resumed possession of the premises in accordance with the provisions of Section 27 of this Agreement, all of the obligations of the Lessee under this Agreement shall survive such termination or cancellation re-entry, regaining or resumption of possession and shall remain in full force and effect for the full term of the letting and the amount or amounts of damages or deficiency shall become due and payable, as more specifically described in subparagraph (b) below, to the Port Authority to the same extent and at the same time or times and in the same manner as if no termination or cancellation, re-entry, regaining or resumption of possession had taken place.

(b)  Upon any termination or cancellation pursuant to Section 26 of this Agreement or upon any re-entry, regaining or resumption of possession in accordance with Section 27 of this Agreement, there shall become due and payable by the Lessee to the Port Authority as damages the sum of the following:

PANYNJ0065896

CONFIDENTIAL

CED 568

(1) the amount of all other unfulfilled monetary obligations of the Lessee under this Agreement, including without limitation thereto, all sums constituting additional rental hereunder and the cost to and expenses of the Port Authority for fulfilling all other obligations of the Lessee which would have accrued or matured during the balance of the term or on the expiration date originally fixed or within a stated time after expiration or termination as provided in this Agreement; and

(2) an amount equal to the cost to and the expenses of the Port Authority in connection with the termination, cancellation regaining possession and restoring and reletting the premises, the Port Authority's legal expenses and cost, and the Port Authority's cost and expenses for the care and maintenance of the premises during any period of vacancy, and any brokerage fees and commissions in connection with any reletting; and

(3) Subject to the provisions of subdivision (c) below, the amount equal to the then present value of the total of all basic rentals provided for in this Agreement for the entire term as originally fixed in the Section of this Agreement entitled "Basic Rental" less the amount thereof which may have been actually paid by the Lessee.

(c) The Port Authority may maintain separate actions periodically to recover the damage or deficiency then due or at its option or at any time may bring an action to recover the full damages or deficiency for the entire unexpired term. In any such action the Lessee shall be allowed a credit against its survived damage obligation equal to the amounts which the Port Authority shall have actually received from any tenant, licensee, permittee or other occupier of the premises or a part thereof during such period and if recovery is sought for a period subsequent to the date of suit, a credit equal to the market rental value of the premises during such period (discounted to reflect the then present value thereof). If at the time of such action the Port Authority has relet the premises, the rental for the premises obtained through such reletting shall be deemed to be the market rental value of the premises or be deemed to be the basis for computing such market rental value if less than the entire premises were relet. In no event shall any credit allowed to the Lessee against its damages for any period exceed the then present value of the basic rental which would have been payable under this Agreement during such period if a termination or cancellation had not taken place. In determining present value of rental, an interest rate of four percent (4%) per annum shall be used.

Section 30. Reletting by the Port Authority

The Port Authority upon termination or cancellation pursuant to Section 26 of this Agreement, or upon any re-entry, regaining or resumption of possession pursuant to Section 27 hereof, may occupy

PANYNJ0065897

CONFIDENTIAL

CED 41668

the premises or may relet the premises and shall have the right to permit any person, firm or corporation to enter upon the premises and use the same. Such reletting may be of part only of the premises or of the premises or a part thereof together with other space, and for a period of time the same as or different from the balance of the term hereunder remaining, and on terms and conditions the same as or different from those set forth in this Agreement. The Port Authority shall also, upon termination or cancellation pursuant to Section 26 of this Agreement, or upon re-entry, regaining or resumption of possession pursuant to Section 27 hereof have the right to repair and to make structural or other changes in the premises, including changes which alter the character of the premises and the suitability thereof for the purposes of the Lessee under this Agreement, without affecting, altering or diminishing the obligations of the Lessee hereunder. In the event either of any reletting or of any actual use and occupancy by the Port Authority (the mere right to use and occupy not being sufficient however) there shall be credited to the account of the Lessee against its survived obligations hereunder any net amount remaining after deducting from the amount actually received from any lessee, licensee, permittee or other occupier in connection with the use of the said premises or portion thereof during the balance of the term of the letting as the same is originally stated in this Agreement, or from the market value of the occupancy of such portion of the premises as the Port Authority may itself during such period actually use and occupy, all expenses, costs and disbursements incurred or paid by the Port Authority in connection therewith. No such reletting or such use and occupancy shall be or be construed to be an acceptance of a surrender.

Section 31.   Remedies to Be Nonexclusive

         All remedies provided in this Agreement shall be deemed cumulative and additional and not in lieu of or exclusive of each other or of any other remedy available to the Port Authority at law or in equity, and the exercise of any remedy, or the existence herein of other remedies or indemnities shall not prevent the exercise of any other remedy.

Section 32.   Surrender

         (a)   The Lessee covenants and agrees to yield and deliver peaceably to the Port Authority possession of the premises on the date of the cessation of the letting, whether such cessation be by termination expiration or otherwise, promptly and in the same condition as at the commencement of the letting, reasonable wear arising from use of the premises to the extent permitted elsewhere in this Agreement, excepted.

         (b)   Unless required for the performance by the Lessee of obligations hereunder, the Lessee shall have the right at any time during the letting to remove, and, on or before the expiration or earlier termination of the letting, shall remove the Substation Equipment and its other equipment, removable fixtures and other personal property from the premises, repairing all damage caused by such removal. If the Lessee shall fail to remove its property on or before the termination or expiration of the letting, the Port Authority may remove such property to a public

PANYNJ0065898

CONFIDENTIAL

OCT-19-2001  13:18

CED 468

warehouse for deposit or may retain the same in its own possession and in either event may sell the same at public auction, the proceeds of which shall be applied: first, to the expenses of removal, including repair required thereby, and of storage and sale; second, to any sums owed by the Lessee to the Port Authority, with any balance remaining to be paid to the Lessee; if the expenses of such removal, repair, storage and sale shall exceed the proceeds of sale, the Lessee shall pay such excess to the Port Authority upon demand.

Section 33.   Acceptance of Surrender of Lease

No agreement of surrender or to accept a surrender shall be valid unless and until the same shall have been reduced to writing and signed by the duly authorized representatives of the Port Authority and of the Lessee.  Except as expressly provided in this Section, neither the doing of, nor any omission to do, any act or thing, by any of the officers, agents or employees of the Port Authority, shall be deemed an acceptance of a surrender of the letting or of this Agreement.

Section 34.   Notices

All notices, demands and requests given hereunder shall be in writing and shall be deemed to have been properly given if delivered personally or sent by United States Mail to the Executive Director of the Port Authority or the Secretary of the Lessee, respectively, at the principal office of the recipient party.  Each party, by written notice, may designate another office or representative to receive notices hereunder at its principal office.  Any notice given hereunder by registered mail shall be deemed delivered when deposited in a United States Post Office.

Section 35.   General

(a)   Wherever in this Agreement the Lessee agrees or is required to do or has the right to do, any act or thing, the following shall apply:

(1)   The Lessee's obligation shall be performed by it and its rights shall be exercised only by its officers and employees and the rights of user granted to the Lessee with respect to the premises shall be exercised by the Lessee only for its own account and, without limiting the generality of the foregoing, shall not be exercised as agent, representative, factor, broker, forwarder, bailee, or consignee without legal title to the subject matter of the consignment.

PANYNJ0065899

CONFIDENTIAL

OCT-19-2001  13:18

CED 568

(2)  None of the provisions of this paragraph (a) shall be taken to alter, amend or diminish any obligation of the Lessee assumed in relation to its invitees, business visitors, agents, representatives, contractors, customers, guests, or other persons, firms or corporations doing business with it or using or on or at the premises with its consent.

(b)  The Section headings are inserted only as a matter of convenience and for reference, and they in no way define or limit or describe the scope or intent of any provision hereof.

(c)  All payments required of the Lessee by this Agreement shall be made at the office of the Treasurer of the Port Authority, 111 Eighth Avenue, New York 11, New York, or to such other officer or address as may be substituted therefor.

(d)  The respective representatives of the parties hereinbefore specified in this Agreement (or such substitute as may hereafter be designated in writing), shall have full authority to act for the party concerned in connection with this Agreement and any things done or to be done hereunder.

(e)  No abatement, diminution or reduction of the rent or other charges payable by the Lessee, shall be claimed by or allowed to the Lessee for any inconvenience, interruption, cessation or loss of business or other loss caused, directly or indirectly, by any present or future laws, rules, requirements, orders, directions, ordinances or regulations of the United States of America, or of the state, county or city governments, or of any other municipal, governmental or lawful authority whatsoever, or by priorities, rationing or curtailment of labor or materials, or by war or any matter or thing resulting therefrom, or by any other cause or causes beyond the control of the Port Authority, nor shall this Agreement be affected by any such causes provided, however, that the provisions of this subparagraph (e) shall not be deemed to relieve the Port Authority of its obligations under Section 16 hereof.

(f)  "Causes or conditions beyond the control of Port Authority" shall mean and include acts of God, the elements, weather conditions, tides, earthquakes, settlements, fire, acts of governmental authority, war, shortage of labor or materials, acts of

- 32 -

PANYNJ0065900

CONFIDENTIAL

CXD 41668

third parties for which the Port Authority is not responsible, injunctions, labor troubles or disputes of every kind (including all those affecting the Port Authority, each of its contractors, suppliers or subcontractors) or any other conditions or circumstances, whether similar to or different from the foregoing (it being agreed that the foregoing enumeration shall not limit or be characteristic of such conditions or circumstances) which is beyond the control of the Port Authority or which could not be prevented or remedied by reasonable effort and at reasonable expense.

Section 36.  Brokerage

The parties agree that no broker has been concerned in the negotiation of this Agreement and that there is no broker who is or may be entitled to be paid a commission in connection therewith.

Section 37.  Non-liability of Individuals

Neither the Commissioners of the Port Authority nor the Trustees of the Lessee, nor any of them, nor any officer, agent or employee thereof shall be charged personally with any liability or held liable under any term or provision of this Agreement, or because of its execution or attempted execution, or because of any breach or attempted or alleged breach thereof.

Section 38.  Subordination

This Agreement and the letting hereunder shall be subject and subordinate to all mortgages which may hereafter affect the premises or the Facility, and to all renewals, modifications, consolidations, replacements and extensions thereof, and although the provisions of this Section shall be deemed to be self-operating and effective for all purposes without any further instrument on the part of the Lessee, the Lessee shall execute on demand and without expense to the Port Authority such further instruments confirmatory of the provisions of this Section as the Port Authority may request.

Section 39.  Quiet Enjoyment

The Port Authority covenants and agrees that as long as it remains the owner of the premises, the Lessee upon paying all rentals hereunder and performing all the covenants, conditions and provisions of this Agreement on its part to be performed shall and may peaceably and quietly have, hold and enjoy the premises free of any act or acts of the Port Authority or anyone claiming superior title to the Port Authority, except as expressly permitted in this Agreement.

- 33 -

PANYNJ0065901

CONFIDENTIAL

CED 52468

## Section 40.    Premises

(a)  The Lessee acknowledges that it has not relied upon any representation or statement of the Port Authority or its Commissioners, officers, employees or agents as to the suitability of the premises (or of the improvements to be constructed pursuant to Section 4 hereof) for the operations permitted on the premises by this Agreement.  The Lessee has thoroughly examined the area of the demised premises and is satisfied that it is suitable for its operations.

(b)  The Port Authority shall not be liable to the Lessee or to any person for injury or death to any person or persons whomsoever or damage to any property whatsoever at any time in or about the premises, including but not limited to any such injury, death or damage from falling material, water, rain, hail, snow, gas, steam, dampness, explosives, smoke, radiation or electricity, whether the same may leak, issue, fall or flow from any part of the Facility or from any other place or quarter unless said damage, injury or death shall be due to the negligence of the Port Authority, its employees or agents, provided, however, that nothing in this subparagraph (b) shall be deemed to relieve the Port Authority of its obligations under Section 16 hereof.

## Section 41.    World Trade Center

"World Trade Center" or "Facility" shall mean the building complex to be constructed by the Port Authority within the area in the Borough of Manhattan, City, County and State of New York, bounded generally by the east side of Church Street on the east, the south side of Liberty Street and the south side of Liberty Street extended, on the south, the Hudson River on the west, and on the north by a line beginning at the point of intersection of the Hudson River and the north side of Vesey Street extended, running along the north side of Vesey Street extended and the north side of Vesey Street to the west side of Washington Street, then along the west side of Washington Street to the north side of Barclay Street, then along the north side of Barclay Street to the east side of West Broadway, then along the east side of West Broadway to the north side of Vesey Street, then along the north side of Vesey Street to the east side of Church Street, together with such additional contiguous area as may be agreed upon from time to time between the Port Authority and the said City of New York.

## Section 42.    Entire Agreement

This Agreement consists of the following:  Pages 1 through 36 inclusive, plus Exhibits A, B and C.

It constitutes the entire agreement and understanding of the parties on the subject matter and may not be changed, modified, discharged or extended except by written instrument duly executed by

PANYNJ0065902

CONFIDENTIAL

CED 468

the Port Authority and the Lessee. The parties agree that no representations or warranties shall be binding upon either of them unless expressed in writing in this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed these presents as of the day and year first above written.

ATTEST:

APPROVED

FORM | TERMS

ASSISTANT SECRETARY

ATTEST:

Gen'l Secy

THE PORT OF NEW YORK AUTHORITY

By _____

(Title) Executive Director
(Seal)

CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC.

By _____

(Title) Administrative Vice President
(Corporate Seal)

PANYNJ0065903

CONFIDENTIAL

CED-568

STATE OF NEW YORK     }
COUNTY OF NEW YORK   } ss.

      On the 29th day of May , 1968, before me personally came Austin J Tobin to me known, who, being by me duly sworn, did depose and say that he resides 200 E. 66 Street, New York City, New York ;

that he is the Executive Director of The Port of New York Authority, one of the corporations described in and which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Commissioners of the said corporation; and that he signed his name thereto by like order.

                                (notarial seal and stamp)

CATHERINE A. ZAFFARANO
Notary Public, State of New York
No. 41-4376392
Qualified in Queens County
Commission Expires March 30, 1969

STATE OF New York     }
COUNTY OF New York   } ss.

      On the 29TH day of May , 1968, before me personally came W. Donham Crawford to me known, who, being by me duly sworn, did depose and say that he resides at 58 Portland Road, Summit, New Jersey ;

that he is the Administrative Vice President of Consolidated Edison Company of New York, Inc., one of the corporations described in and which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed to the said instrument is such corporate seal; that it was so affixed by order of the Board of Trustees of the said corporation; and that he signed his name thereto by like order.

                                (notarial seal and stamp)
                                JOHN MONSEES

PANYNJ0065904

CONFIDENTIAL

THE PORT OF NEW YORK AUTHORITY
THE WORLD TRADE CENTER

PANYNJ0065905

CONFIDENTIAL

CED-558

## EXHIBIT "B"

### Contract WTC 130.021 - Foundations

Drawing
Number

| | |
|---|---|
| 1 | Plan |
| 2 | Sections & details |
| 3 | Sections & details |
| 4 | Timber Piles |
| R-1 | Timber Piles |

### Contract WTC 130.028 - Structural Steel

Drawing
Number

| | |
|---|---|
| 1 | Base Plate Plan |
| 2 | Second Floor Plan Elev. 315'-5" |
| 3 | Roof Plan Elev. 335'-0" |
| 4 | Elevations |
| 5 | Details |
| 6 | Column Schedule & Details |
| 7 | Grillages |

### Contract WTC 130.029
### Electrical Substation Superstructure

Drawing
Number

| | |
|---|---|
| 001 | Index and Location Plan |

Architectural

| | |
|---|---|
| 100 | First Floor Plan - Elevations 303.0 & 306.0 |
| 101 | Second Floor Plan - Elevation 318.5 |

PANYNJ0065906

CONFIDENTIAL

CED-553

- 2 -

WTC 130.029 (Cont'd)

Drawing
Number

| | |
|---|---|
| 102 | Roof Plan |
| 103 | Elevations |
| 104 | Sections |
| 105 | Wall Sections - Sheet No. 1 |
| 106 | Wall Sections - Sheet No. 2 |
| 107 | Stair Details |
| 108 | Truck Driveway Details |
| 109 | Aluminum Louver Details |
| 110 | Miscellaneous Details |
| 111 | Door Schedule |

Structural

| | |
|---|---|
| 200 | Support of electrical ducts & manholes |
| 201 | First Floor Plan - Elevations 303 and 306 |
| 202 | Second Floor Plan - Elevation 318.5 |
| 203 | Roof Plan - Elev. 335.0 |
| 204 | First Floor Plan - Sections & Details, Sheet 1 |
| 205 | First Floor Plan - Sections & Details, Sheet 2 |
| 206 | First Floor Plan - Sections & Details, Sheet 3 |
| 207 | First Floor Plan - Sections & Details, Sheet 4 |
| 208 | Second Floor Plan & Roof - Sections & Details, Sheet 1 |
| 209 | Second Floor Plan & Roof - Sections & Details, Sheet 2 |
| 210 | Second Floor Plan & Roof - Sections & Details, Sheet 3 |

PANYNJ0065907

CONFIDENTIAL

CED-569

- 3 -

WTC 130.029 (Cont'd)

**Drawing**
**Number**

**Mechanical**

| | |
|---|---|
| 300 | Plumbing, Drainage & Misc. Piping - 1st Floor |
| 301 | Plumbing, Drainage & Misc. Piping - 2nd Floor |
| 302 | Ventilation |

**Electrical**

| | |
|---|---|
| 400 | Conduit Schedule - Sheet No. 1 |
| 401 | Conduit Schedule - Sheet No. 2 |
| 402 | Conduit Schedule - Sheet No. 3 |
| 403 | Conduit Schedule - Sheet No. 4 |
| 404 | Conduit Schedule - Sheet No. 5 |
| 405 | Conduit Schedule - Sheet No. 6 |
| 406 | Conduit Schedule - Sheet No. 7 |
| 407 | 13.8KV & 138 KV Feeder Conduits, Pipes & Manholes |
| 408 | 13.8KV & 138 KV Feeder Conduits, Pipes & Manholes - Sections & Details - Sheet No. 1 |
| 409 | 13.8KV & 138 KV Feeder Conduits, Pipes & Manholes - Sections & Details - Sheet No. 2 |
| 410 | 13.8KV Manholes & Conduits at Switchgear Units: Plans, Sections & Details |
| 411 | Location of Floor Penetrations - First Floor |
| 412 | Location of Floor Penetrations - Second Floor |
| 413 | Control Conduit - Plan & Location of Floor Penetratic |
| 414 | Control Conduit - Sections & Details |
| 415 | Station Grounding for 13.8KV & 138 KV Equipment Plan & Details |
| 416 | Manhole Details |
| 417 | Oil Piping |

PANYNJ0065908

CONFIDENTIAL

EXHIBIT C

## SCHEDULE OF EQUIPMENT TO BE FURNISHED AND DELIVERED BY LESSEE FOR INSTALLATION BY THE PORT AUTHORITY

| Approximate Quantities | Item |
|---|---|
| 1,700 LF | 5 9/16" Copper Pipe |
| 150 | Copper Pipe Couplings |
| 2,500 LF | Ground Cable |
| 860 LF | 3" Oil Piping and Fittings |
| 500 LF | 8" Steel (Fire Protection) Pipe and Fittings |
| 680 LF | 6 5/8" Steel Pulling Pipe and Fittings |
| 2,700 LF | 4" Galvanized Steel Conduit and Fittings |
| 80 LF | 8" Oil-O-Static Pipe and Fitting |

Lessee will furnish actual required amounts and any excess shall be returned to Lessee.

## SCHEDULE OF ADDITIONAL EQUIPMENT TO BE FURNISHED, DELIVERED AND INSTALLED BY LESSEE DURING CONSTRUCTION

A.C. and D.C. Control Units.

Oil Tank and Pump Unit (Pressure Maintenance Plant).

Elevator and Accessories.

PANYNJ0065909

CONFIDENTIAL

# EXHIBIT
# Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

SERKO & SIMON, LLP,

                 Plaintiff,

         -- against --

THE PORT AUTHORITY OF NEW YORK AND NEW
JERSEY,

                Defendant.

------------------------------------------------------------------X

**ORDER DISMISSING
CERTAIN CLAIMS
AGAINST THE PORT
AUTHORITY**

02 Civ. 10052 (AKH)

ALVIN K. HELLERSTEIN, UNITED STATES DISTRICT JUDGE:

       The Port Authority of New York and New Jersey ("Port Authority") has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss certain claims brought by the plaintiff based on noncompliance with sections 7107 and 7108 of the New York Unconsolidated Laws. I hereby grant its motion.

       The waiver of immunity and consent to suit by the Port Authority is predicated upon the fulfillment of enumerated conditions. Section 7107 provides that consent by the Port Authority to suit is conditioned on the filing of a suit within one year after the accrual of the cause of action, and the service of a notice of claim by the plaintiff upon the Port Authority at least sixty days before filing suit. N.Y. Unconsol. Law § 7107. Section 7108 describes the contents of the notice of claim: "The notice of claim required by section seven hereof shall be in writing, sworn by or on behalf of the claimant or claimants, and shall set forth (1) the name and post office address of each claimant or claimants and of his attorney, if any, (2) the nature of the claim, (3) the time when, the place where and the manner in which the claim arose, and (4) the items of damages or injuries claimed to have been sustained so far as then practicable." N.Y. Unconsol. Law § 7108.

1

Failure to abide by these preconditions "results in a withdrawal of consent and compels the dismissal of the action for lack of subject matter jurisdiction." Giannone v. Port Auth. of N.Y. and N.J., 511 N.Y.S.2d 940, 941 (N.Y. App. Div. 1987). Compliance with these preconditions must be "strictly construed," Lyons v. Port Auth. of N.Y. & N.J., 643 N.Y.S.2d 571 (N.Y. App. Div. 1996); "substantial compliance" is insufficient, City of N.Y. v. Port Auth. of N.Y. and N.J., 726 N.Y.S.2d 261, 262 (N.Y. App. Div. 2001).

The plaintiff, a law firm that rented space in the World Trade Center, brings three causes of action against the Port Authority: 1) negligent design, construction, repair, and maintenance of the World Trade Center; 2) breach of contract; and 3) negligent security of the premises. The Port Authority moves for dismissal of the plaintiff's claims for breach of contract and negligent security on the ground that they were not included in the notice of claim. The notice of claim described the nature of the claim as seeking to "recover damages sustained by reason of the construction and maintenance of premises One World Trade Center in Manhattan in such an inadequate, negligent and careless manner so as to cause it to be insufficiently protected from the effects of heat and fire, in turn leading to its destruction and collapse, causing the damages claimed herein."

Courts have not defined how detailed the "nature of the claim" must be for purposes of section 7108. A number of cases do examine the description of the claim required under New York General Municipal Law § 50-e to bring suit against New York municipalities. At the outset, I note that courts have much more discretion under section 50-e in excusing defects in a notice of claim than they do under section 7107 of the New York Unconsolidated Laws. See Luciano v. Fanberg Realty Co., 457 N.Y.S.2d 854, 856-57 (N.Y. App. Div. 1984). Even when interpreting New York General Municipal Law § 50-e, courts have held that a

2

"theory of liability not mentioned in the notice of claim generally may not be asserted in a subsequent lawsuit." Lieber v. Village of Spring Valley, 40 F. Supp. 2d 525, 531 (S.D.N.Y. 1999) (dismissing claim for prima facie tort where plaintiff did not plead special damages). Courts have refused to allow amendments of notices of claim to change statements of the nature of claim that substantially alter the claim by asserting a new theory of liability. See Olivera v. City of N.Y., 704 N.Y.S.2d 42, 43-44 (N.Y. App. Div. 2000) (refusing to permit amendment to assert personal injury claim where claim only asserted property damage claim); Steinberg v. Village of Garden City, 668 N.Y.S.2d 674, 675 (N.Y. App. Div. 1998) (same); Gordon v. City of N.Y., 434 N.Y.S.2d 478 (N.Y. App. Div. 1981) (refusing to permit amendment to assert allegations of assault and use of excessive force where original claims was for negligence). The complaint in this case improperly asserts two new theories of liability – breach of contract and negligent security – that were not asserted in the notice of claim.

      Plaintiff points to two cases, neither of which supports its position. In DeLeonibus v. Scognamillo, 583 N.Y.S.2d 285 (N.Y. App. Div. 1992), the court allowed the plaintiff to proceed with a negligent supervision claim when he had originally given notice of a "negligence" claim. In Lampman v. Cairo Central School District, 366 N.Y.S.2d 237 (N.Y. App. Div. 1975), the court allowed the plaintiff to include a warranty claim where only a negligence claim with respect to maintenance of a slide had been asserted, because it recognized that in the products liability context, warranty and negligence claims are largely co-extensive. The notice of claim at issue here only gave notice with respect to negligence claims based on the design and construction of the buildings. Nothing contained therein would make the Port Authority aware that it would be sued for breach of contract and negligent security claims; these

allegations involve an entirely different set of facts and theories of liability. Thus, the breach of

contract and negligent security claims must be dismissed.

SO ORDERED.

Dated:    New York, New York
          May 6, 2003

                                    ALVIN K. HELLERSTEIN
                                    United States District Judge

It is ORDERED that counsel to whom this Order
is sent is responsible for faxing a copy to all
counsel and retaining verification of such in the
case file. Do not fax such verification to
Chambers.

4