Franklin M. Sachs (FS 6036)
Greenbaum, Rowe, Smith & Davis LLP
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095
Telephone: (732) 549-5600
*Attorneys for Plaintiffs Consolidated Edison Company of New York, Inc., et al.*

UNITED STATES DISTRIC COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

IN RE: SEPTEMBER 11 PROPERTY DAMAGE
AND BUSINESS LOSS LITIGATION

-------------------------------------------------------- :

CONSOLIDATED EDISION COMPANY OF
NEW YORK, INC., et al,

                                    Plaintiffs,

        - against -

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY

                                    Defendants.

-------------------------------------------------------- x

21 MC 101 (AKH)

02 CV 7188 (AKH)
07 CV 10582 (AKH)

**DECLARATION OF FRANKLIN
M. SACHS IN OPPOSITION TO
MOTION BY DEFENDANT THE
PORT AUTHORITY OF NEW
YORK AND NEW JERSEY TO
DISMISS THE COMPLAINT
AND IN SUPPORT OF
PLAINTIFFS' MOTION TO FILE
AN AMENDED AND
SUPPLEMENTAL COMPLAINT**

Franklin M. Sachs, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am of counsel in the firm of Greenbaum, Rowe, Smith & Davis LLP, co-counsel

for plaintiffs Consolidated Edison Company of New York, Inc., et al., in this litigation.  I make

this declaration in opposition to the Port Authority of New York and New Jersey's Motion to

Dismiss the Complaint and in support of Plaintiffs' Motion to File an Amended and

Supplemental Complaint.

2.      Attached as **Exhibit 1** is a copy of the Answer of Defendant The Port Authority of New York and New Jersey to Amended Complaint dated December 20, 2004.

3.      Attached as **Exhibit 2** is a copy of the transcript of the Court conference held on February 16, 2006.

4.      Attached as **Exhibit 3** is a copy of the Declaration of Michael S. Leavy dated August 16, 2007.

5.      Attached as **Exhibit 4** is a copy of the Proposed Supplemental Complaint dated August 14, 2007.

6.      Attached as **Exhibit 5** is a copy of the transcript of the oral argument held on November

30, 2004.

7.      Attached as **Exhibit 6** is a copy of the transcript of the oral argument held on June 21, 2005.

8.      Attached as **Exhibit 7** is a copy of the transcript of the oral argument held on February 13, 2007.

9.      Attached as **Exhibit 8** is a copy of the relevant portions of the Deposition Transcript of Cornelius Lynch taken on September 26, 2007.

10.     On information and belief, the replacement Con Edison World Trade Center substation became operational in June, 2004.

11.     According to Con Edison personnel knowledgeable about the payments for replacement of the World Trade Center substation and related equipment, disputes with contractors and suppliers regarding charges for replacement of the substation and equipment are still not finally resolved.  However, even before final resolution of these claims and disputes, the

amount in controversy between Port Authority and Con Edison regarding the amount to be reimbursed from insurance proceeds under § 18 is more than $10,000,000.00

      12.      I declare under penalty of perjury that the foregoing is true and correct.


Dated:  April 1, 2008


                                                            \_\_\_S/ Franklin M. Sachs_____
                                                            Franklin M. Sachs (FS 6036)

# EXHIBIT
# 1

02- 5514· 241/01-K

Beth D. Jacob (BJ 6415)
SCHIFF HARDIN LLP
623 Fifth Avenue
New York, New York 10022
(212) 753-5000
Attorneys for Defendant The Port Authority of
    New York and New Jersey

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC., et al.,   :

              Plaintiffs,   :

   -against-   :

THE PORT AUTHORITY OF   :
NEW YORK AND NEW JERSEY, et al.,   :

             Defendants.   :

------------------------------------------------------------x

02 CV 7188 (AKH)

**ANSWER OF DEFENDANT**
**THE PORT AUTHORITY OF**
**NEW YORK AND NEW JERSEY**
**TO AMENDED COMPLAINT**

       Defendant The Port Authority of New York and New Jersey, by its attorneys Schiff

Hardin LLP, for its Answer to the Amended Complaint:

       1.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 1.

       2.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 2, except as to the allegations of conclusions of law which need not be

answered at this time.

       3.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 3, except avers that Con Edison leased premises pursuant to an

Agreement of Lease dated May 29, 1968, and refers to that document for its terms and

provisions.



4.    Denies the allegations in paragraph 4, except avers that The Port Authority is a body corporate and politic, created by compact between the States of New York and New Jersey with the consent of the Congress of the United States, with an office in the City and State of New York.

5.    Upon information and belief, admits the allegations in paragraph 5.

6.    Paragraph 6 alleges conclusions of law and therefore need not be answered at this time.

7.    Paragraph 7 alleges conclusions of law and therefore need not be answered at this time.

8.    Denies the allegations in paragraph 8, except admits that The Port Authority was the fee owner of the property that was the site of the former 7 World Trade Center in the City of New York.

9.    Admits the allegations in paragraph 9.

10.    Upon information and belief, admits the allegations in paragraph 10.

11.    Denies the allegations in paragraph 11, and admits that 7 World Trade Center was built pursuant to the Agreement of Lease between The Port Authority and 7 World Trade Company, dated December 31, 1980.

12.    Denies the allegations in paragraph 12, avers that 7 World Trade Company, L.P., and The City of New York entered into an Agreement of Lease dated March 25, 1998, pursuant to which certain construction work was performed, and refers to that document for its terms and provisions.

13.    Denies the allegations in paragraph 13, avers that 7 World Trade Company, L.P., and The City of New York entered into an Agreement of Lease dated March 25, 1998, pursuant



to which certain construction work was performed, which upon information and belief included the installation of emergency generators; and refers to that document for its terms and provisions.

14.    Denies the allegations in paragraph 14.

15.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15.

16.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16.

17.    Paragraph 17 alleges conclusions of law and therefore need not be answered at this time.

18.    Denies the allegations in paragraph 18.

19.    Denies the allegations in paragraph 19.

20.    Denies the allegations in paragraph 20.

21.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21, except admits upon information and belief that on September 11, 2001, terrorists launched a series of attacks on United States soil, including separate attacks against each of the World Trade Center 1 and 2, murdering over two thousand people and causing catastrophic destruction, injuries and damage.

22.    Admits the allegations in paragraph 22.

23.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23, except avers that on September 11, 2001, 7 World Trade Center collapsed, following terrorist attacks in which The Port Authority and many others suffered and witnessed great loss, including the deaths of many employees, friends and colleagues.

3

24. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24.

25. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25.

26. Denies the allegations in paragraph 26.

27. Denies the allegations in paragraph 27.

28. Denies the allegations in paragraph 31, and avers that a document entitled "Notice of Claim" was received by The Port Authority from Plaintiffs on or about June 11, 2002.

29. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30.

31. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31.

32. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.

33. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33.

## FIRST CAUSE OF ACTION

34. Defendant repeats and realleges its answers to the foregoing paragraphs as if fully set forth here.

35. Denies the allegations in paragraph 35.

36. Denies the allegations in paragraph 36.

4

37.   Denies the allegations in paragraph 37.

38.   Denies the allegations in paragraph 38.

## SECOND CAUSE OF ACTION

39.   Defendant repeats and realleges its answers to the foregoing paragraphs as if fully set forth here.

40.   Denies the allegations in paragraph 40.

41.   Denies the allegations in paragraph 41.

42.   Denies the allegations in paragraph 42.

## AFFIRMATIVE DEFENSES

43.   Plaintiffs' claims are barred by waiver and acquiescence.

44.   Plaintiffs' claims are barred by release.

45.   Plaintiffs' claims are barred because Con Edison (Plaintiff and Plaintiffs' subrogor) is contributorily negligent.

46.   Plaintiffs' claims are barred by the provisions of the Lease Agreement between The Port Authority and Con Edison dated May 29, 1968.

47.   Upon information and belief, Plaintiffs' claims are barred by the provisions of the insurance policies on which Plaintiffs bring this action.

48.   Upon information and belief, Plaintiffs' claims are barred because The Port Authority is a named insured on the insurance policies on which Plaintiffs bring this action.

49.   Plaintiffs' claims are barred because the negligence of Con Edison (Plaintiff and Plaintiffs' subrogor) is greater than the negligence, if any, of The Port Authority.

50.   Plaintiffs have failed to state claims upon which relief can be granted.

5

51.    Any damages sustained by Plaintiffs were caused directly, solely, and proximately by the international acts of terrorists which were not reasonably foreseeable by The Port Authority.

52.    Any damages sustained by Plaintiffs were caused solely by the actions or inactions of persons or entities for whose conduct The Port Authority is not legally responsible.

53.    Any damages sustained by Plaintiffs were caused by the unforeseeable, intervening and/or superseding acts of third parties who were not under the care, custody, control, or supervision of The Port Authority.

54.    No acts or omissions of The Port Authority, its agents, or its employees proximately caused any damages allegedly sustained by Plaintiffs.

55.    There was no defect or unsafe condition at 7 World Trade Center.

56.    The Port Authority did not create any defect and/or unsafe condition at 7 World Trade Center.

57.    The Port Authority did not have actual or constructive notice of any defect and/or unsafe condition at 7 World Trade Center.

58.    To the extent that The Port Authority is deemed to have actual or constructive knowledge of any defect and/or unsafe condition at 7 World Trade Center, which The Port Authority expressly denies, The Port Authority acted reasonably under all the circumstances with respect to any such defect and/or unsafe condition.

59.    To the extent that The Port Authority is deemed to have actual or constructive knowledge of any defect and/or unsafe condition on the property, which the Port Authority expressly denies, The Port Authority did not have sufficient time from when it allegedly gained that actual or constructive knowledge until the date that Plaintiffs suffered the claimed damages

6



to permit The Port Authority to correct, ameliorate, or otherwise rectify that alleged defect and/or unsafe condition.

60.   Plaintiffs lack the capacity, standing, or authority to bring this action, in whole or in part.

61.   Plaintiffs have failed to join as parties one or more persons or entities needed for just and complete adjudication of the matters in controversy.

62.   The Port Authority owed no duty to Plaintiffs that was breached.

63.   To the extent that the Port Authority is found to have owed a duty to Plaintiffs, which The Port Authority expressly denies, The Port Authority acted reasonably under the circumstances and complied with all statutes, regulations, codes, and industry standards applicable to it.

64.   With respect to the allegations in the complaint, The Port Authority is not, and has never been, the principal for any other defendant in this or the related actions and no other defendant in this or the related actions serves or functions, or has served or functioned, as an agent for The Port Authority.

65.   The Port Authority's liability, if any, must be limited by the operation of Article 14 of the New York Civil Practice Law and Rules.

66.   If Plaintiffs are entitled to damages against The Port Authority, which The Port Authority expressly denies, the total liability of The Port Authority for all claims arising from the terrorist-related aircraft crashes of September 11, 2001, shall not be in an amount greater than the limits of liability insurance coverage maintained by The Port Authority, as set forth in Section 408(a)(1) of the Air Transportation Safety and System Stabilization Act.

67.    To the extent that Plaintiffs' damage are speculative, uncertain and/or contingent, they have not accrued and are not recoverable.

68.    Any verdict or judgment recovered by Plaintiffs as against The Port Authority must be reduced by any past or future costs or expenses replaced or indemnified or to be replaced or indemnified in accordance with Section 4545(c) of the New York Civil Practice Law and Rules.

69.    In accordance with Section 15-108 of the New York General Obligations Law, to the extent that Plaintiffs have given an alleged tortfeasor other than The Port Authority a release or covenant not to sue or not to enforce a judgment, Plaintiffs' claims against the Port Authority must be reduced to the extent of any amount stipulated by the release or covenant, or in the amount of the consideration paid for it or in the amount of the released torteasor's equitable share of the damages, whichever is the greatest.

70.    Pursuant to Section 15-108 of the New York General Obligations Law, to the extent that Plaintiffs have given The Port Authority a release or covenant not to sue or not to enforce a judgment, The Port Authority is relieved form any liability to any other defendant, person or entity for contribution.

71.    This Court lacks subject matter jurisdiction over The Port Authority because plaintiffs failed to comply with the conditions precedent to suit against The Port Authority set forth in Section 7107 of the New York Unconsolidated Laws.

72.    Any and all actions and/or inactions of The Port Authority were undertaken in good faith and involved matters and decisions for which The Port Authority has immunity from liability pursuant to statute and the common law, including, but not limited to, New York Unconsolidated Laws §§ 9193(1) and (1-a), New York Executive Law § 25(5), the discretionary

8



acts doctrine, and the governmental function doctrine, and, therefore, Plaintiffs are not entitled to the relief sought or to recover any damages as against The Port Authority.

73.    Public Law 107-42, "The Air Transportation Safety And System Stabilization Act," as amended, provides an exclusive federal cause of action for all claims arising from the terrorist-related aircraft crashes of September 11, 2001. To the extent the complaint asserts causes of action other than that provided for by this legislation, those causes of action must be dismissed as a matter of law.

74.    The Port Authority will rely upon any and all other further defenses which become available or appear during discovery in this action and hereby specifically reserves the right to amend its answer for the purpose of asserting any such additional defenses.

75.    The Port Authority reserves its right to assert cross-claims as against the other co-defendants by the deadlines as set forth by the Court.

WHEREFORE, The Port Authority demands judgment:

a.    dismissing the complaint as against The Port Authority with prejudice;

b.    awarding The Port Authority its costs and disbursements of this action.

Dated: December 20, 2004

Respectfully submitted,

_____
Beth D. Jacob (BJ6415)
Robert H. Riley (RR 2337)
SCHIFF HARDIN LLP
623 Fifth Avenue
New York, New York 10022
(212) 753-5000

Attorneys for Defendant The Port Authority of New York and New Jersey

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC., et al.,

                  Plaintiffs,

    -against-

PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, et al.,

                 Defendants.

--------------------------------------------------------------x

02 CV 7188 (JGK)

**AFFIDAVIT OF**
**SERVICE**

       The undersigned, a non-attorney, states that on December 20, 2004, I caused to be served,

by First Class Mail, a copy of Answer of Defendant The Port Authority of New York And New

Jersey To Amended Complaint to the following counsel of record:

Mark Antin
Gennet, Kallmann, Antin & Robinson, P.C.
6 Campus Dr.
Parsippany, NJ 07054-4406

*Attorneys for Plaintiffs*

Eugene R. Scheiman
Buchanan Ingersoll P.C.
One Chase Manhattan Plaza, 35th Floor
New York, NY 10005

*Attorneys For Defendant The City of New*
*York*

Dated: New York, New York
       December 20, 2004

_____
Joel M. Elfman

SWORN to before me this
**20th** day of December, 2004.

_____
Notary Public

        BETH D. JACOB
    Notary Public, State of New York
       No. 02JA4954992
     Qualified in Bronx County
   Commission Expires August 28, 2005

2

# EXHIBIT
# 2

2.16.06_court_conference.txt

2/16/2006 Conference
page 1

```
 1
      62GLWTCCUNITED STATES DISTRICT COURT
 2    SOUTHERN DISTRICT OF NEW YORK
 3    -----------------------------x
 4
 5    IN RE:  SEPTEMBER 11TH
 6    PROPERTY DAMAGE AND
 7    BUSINESS LOSS LITIGATION              21 MC 101 (AKH)
 8
 9    -----------------------------x
10
11                                         New York, N.Y.
12                                         February 16, 2006
13                                         2:10 p.m.
14
15    Before:
16
17                    HON. ALVIN K. HELLERSTEIN,
18
19                                         District Judge
20
21                         APPEARANCES
22
23    GREENBAUM, ROWE, SMITH & DAVIS
24         Attorneys for Con Edison
25    BY:  FRANKLIN M. SACHS
26
27    GENNET, KALLMAN, ANTIN & ROBINSON, P.C.
28         Attorneys for Con Edison
29    BY:  MARK ANTIN
30         MICHAEL S. LEAVY
31
32    CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP
33         Attorneys for Citigroup
34    BY:  THOMAS MOLONEY
35
36    CONDON & FORSYTH, LLP
37         Attorneys for American Airlines
38    BY:  DESMOND T. BARRY, JR.
39
40    SHIFF, HARDIN, LLP
41         Attorneys for -
42         The Port Authority of NY & NJ
43    BY:  BETH JACOB
44         DONALD KLEIN
45
46    KATHLEEN M. COLLINS
47         Attorney for -
48         The Port Authority of NY & NJ
49
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

▯2/16/2006 Conference
page 2

```
 1
      62GLWTCCAPPEARANCES (cont.)
 2
 3    BRUCKMANN & VICTORY
 4         Attorneys for Certain Underwriters
                                Page 1
```

2.16.06_court_conference.txt
```
 5    BY:  PATRICK MALONEY
 6
 7    CLIFFORD LAW
 8         Attorneys for IRI
 9    BY:  TIM TOMASIK
10
11    FLEMMING, ZULACK, WILLIAMSON, ZAUDERER, LLP
12         Attorneys for -
13         World Trade Center Properties LLC
14    BY:  M. BRADFORD STEIN
15
16    FRIEDMAN, KAPLAN, SEILER & ADELMAN, LLP
17         Attorneys for 7 WTC Company,
18         Silverstein Properties, Inc.
19    BY:  KATHERINE L. PRINGLE
20
21    CONNELL, FOLEY, LLP
22         Attorneys for Colgan Air, Inc.
23    BY:  JONATHAN P. McHENRY
24
25
26
27
28
29
30                             CONFERENCE
31
32
33
34
35
36
             SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
□2/16/2006 Conference
page 3

```
 1
      62GLWTCC              Conference        THE COURT:  Good afternoon,
everyone.
 2               MR. SACHS:  Good afternoon, your Honor.
 3               MS. JACOB:  Good afternoon.
 4               MR. BARRY:  Good afternoon, your Honor.
 5               MR. SACHS:  Good afternoon.
 6               THE COURT:  As you see, the agenda that I distributed,
 7    although it has your ideas, there are some of my own, which
 8    perhaps may be misguided or perhaps may be appropriate.  I'd
 9    like to proceed in the order I've set out.  I trust everyone
10    has a copy of the agenda.  Reflects my having become aware of
11    various indemnity provisions in the course of the work that I
12    did in coming to the recent decision in this case.  I notice
13    that there was an indemnity given by The Port Authority in
14    Section 16 of their lease agreement providing that The Port
15    Authority was to reimburse Con Ed for any expense incurred by
16    Con Ed in maintaining, repairing, replacing or rebuilding the
17    substation building or the equipment caused by acts or
18    omissions of The Port Authority or its agents, contractors or
19    employees in connection with the construction or maintenance of
20    the stories, structures, buildings or improvements described in
21    another section of the lease.
22               That other section contemplated the construction of a
23    commercial tower above the substation.  This was all part of
24    the original construction of the World Trade Center where
```
                              Page 2

2.16.06_court_conference.txt
25    Con Ed was empowered to be the monopoly provider of power to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
⊡2/16/2006 Conference
page 4

 1
        62GLWTCC                    Conferencethe substation and all its lessees, where it
was contemplated
 2    that there would be a tower placed where 7 was ultimately
 3    constructed.  There were various exchanges and promises and
 4    restrictions.
 5            So it occurred to me that a lot of the litigation that
 6    was going on in this case may possibly be subsumed by the
 7    indemnity provisions of this lease.  In other words, Con Ed
 8    gave up its right to sue for damages, but it obtained in
 9    exchange a promise of reimbursement of its expenses incurred by
10    the manner that construction occurred in the building.
11            I don't know enough about this clause and its genesis
12    and coverage and the negotiations that occurred in connection
13    with it to become very wise in what it means.  But obviously it
14    has enough resonance of relevance that I thought it would be
15    appropriate to become educated about it because it might cut
16    short a lot of litigation.
17            I also became aware of Section 17 of the lease
18    agreement between 7 World Trade Company and The Port Authority
19    by which the lessee, Silverstein's company, agreed to indemnify
20    and hold harmless The Port Authority, its commissioners,
21    officers, agents and employees, for all claims and demands of
22    third persons, including property damage claims, arising out of
23    defaults of Silverstein in performing or observing any term or
24    provision of the agreement, or the occupancy of the premises by
25    Silverstein or others with its consent, which I presume would
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
⊡2/16/2006 Conference
page 5

 1
        62GLWTCC                    Conferencebe Silverstein's tenants, etc.  Again, I
just have the same
 2    comments.
 3            Now, I've raised these comments earlier in the context
 4    of all the motions that I was handling in this case, but I
 5    don't think the parties have really addressed these issues.  Am
 6    I off base?
 7            MR. MOLONEY:  Only slightly, your Honor.  Tom Moloney
 8    for the record.  This was, of course, the centerpiece of our
 9    motion to dismiss, your Honor, on behalf of Citigroup.  The
10    fact that this was a scheme -- not a scheme, but a carefully
11    designed set of negotiations basically between Con Ed and --
12            THE COURT:  What did I rule?
13            MR. MOLONEY:  You ruled that maybe I'm right and you
14    want to know more.
15            MR. SACHS:  You also ruled maybe you're wrong and he
16    wants to know more.
17            Franklin Sachs, your Honor, for plaintiff.
18            THE COURT:  Yes, Mr. Sachs.
19            MR. SACHS:  Mr. Moloney is correct that he is claiming
20    third party beneficiary status of what he purports to be an
21    agreement between Port Authority and Con Ed that your Honor has
22    suggested may contain some sort of indemnity agreement.  I find
23    it interesting The Port Authority doesn't make that argument,
                          Page 3

2.16.06_court_conference.txt
24    and I don't think they will, because they know that's not what
25    it meant.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page 6

1
         62GLWTCC                  Conference          And so, I simply suggest to the
Court:    Are you off
2     base?  I understand why the issue comes to you, but I think it
3     should make some sense to you that if the two parties to that
4     agreement, neither one of them are suggesting that it has any
5     such meaning, that should give you some pause.
6                    On the other hand --
7                    THE COURT:  How do you understand these clauses, from
8     the point of view of Con Ed?
9                    MR. SACHS:  The clause that you are referring to,
10    Article 8, you're catching me slightly unprepared, but I think
11    I know enough about it to tell you.
12                    THE COURT:  You're never unprepared.
13                    MR. SACHS:  Obviously I haven't been prepared enough.
14                    Article 8 has -- is a clause in which Con Ed gives
15    rights to The Port Authority to build a tower above -- and
16    using Con Ed's building as a foundation, for lack of a better
17    word, I think it's called air rights, if I recall correctly.
18    Article 16 talks about Con Ed, what happens during the actual
19    construction of that tower, not with respect to the results of
20    defects in construction.  If you'll look at it, the clause
21    talks about, if I recall correctly, it talks about no rent
22    abatement.  It talks about things of that same nature.  And --
23    with respect to anything that occurred during the construction
24    of that tower.
25                    THE COURT:  It talks about maintaining, repairing,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page 7

1
         62GLWTCC                  Conferencereplacing or rebuilding the substation
building.
2                    MR. SACHS:  It talks about Con Ed maintaining,
3     replacing.  But as a result of --
4                    THE COURT:  Mr. Sachs, I read the wrong provisions.
5     It talks about the acts or omissions of The Port Authority or
6     its agents in connection with construction or maintenance of
7     the building.
8                    MR. SACHS:  That's correct, sir.  And I think it is
9     pretty clear what that had in mind.  So I simply am saying to
10    the Court, I do not believe -- and let me go further, that the
11    action against Citigroup really has to do with their
12    installation of a backup electrical system piping, diesel fuel
13    system.  That was done several years after the building was
14    complete.  This clause refers to the construction of the tower.
15                    Citigroup, if I recall correctly, it was 1990 when
16    they installed this system, and not when the tower was built in
17    1987, so though I can understand why the Court would look at it
18    and say it might be relevant, I really do not believe it is.
19                    THE COURT:  I don't want to revisit the motion.
20    Mr. Moloney's going to tell me his different perspective.
21                    MR. SACHS:  I understand.
22                    THE COURT:  And I take it there's discovery being
                                  Page 4

2.16.06_court_conference.txt
```
23   conducted on these issues.
24              MR. SACHS:  Nothing's been conducted yet, your Honor,
25   because Citigroup for whatever reason hasn't yet filed -- well,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
2/16/2006 Conference
page 8

```
1
        62GLWTCC                ConferenceI know, for whatever reason, they haven't
filed an answer
2    because they filed a 12(b)(6) motion, so there hasn't been any
3    discovery.  The only discovery that's taken place in this case
4    at all -- that's not quite true, there was their limited
5    discovery with the City of New York regarding the issue that
6    your Honor decided on January 12th that you're aware of, the
7    immunity issue.  And then there was early document discovery
8    involving The Port Authority, but really very limited.  But
9    there haven't been answers filed by anyone except The Port
10   Authority yet in this case, and that's what we're trying to get
11   to.
12              THE COURT:  Miss Jacob?
13              MS. JACOB:  Beth Jacob for The Port Authority of
14   New York and New Jersey and World Trade 7.
15              This contract was part of the first motion to dismiss
16   that The Port Authority had brought another aspect of this
17   clause, but similar to in relationship between Con Ed and The
18   Port Authority, and at that time the Court ruled that more
19   discovery needed to be done to clarify that.  And we agreed
20   with that.  We did not have time to finish that discovery in
21   time to renew that motion, so that's something that's still in
22   the offing.
23              I think what is clear is we can't on the current
24   record determine exactly what is meant by these clauses.  What
25   The Port Authority gave up, what The Port Authority got, what
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
2/16/2006 Conference
page 9

```
1
        62GLWTCC                ConferenceCon Ed gave up, what Con Ed got, and to what
extent
2    agreement between The Port Authority and Con Ed may or may not
3    have anything to do with later tenants in the buildings.
4              So what we would -- in fact, one of the proposals we
5    might have brought up today if we'd been able to, and this is a
6    good opportunity, is that The Port Authority's belief is this
7    is a very good place to begin discovery.  That there are some
8    contract issues in this case which are somewhat focused which
9    may resolve a lot of the more complicated disputes.
10             And so we would agree with what I think the Court was
11   suggesting is that perhaps whatever happens with all the other
12   aspects, whatever happens with the rest of the case management
13   or whatever happens with the other ground defendants, that this
14   is something that the parties involved in should get started
15   with pretty much right away.  And I'd agree with that, because
16   if there is something here that defines the relationship
17   between Con Ed and The Port Authority defendant, we might as
18   well get it resolved.
19             With respect to the lease between World Trade 7, World
20   Trade Center Company and The Port Authority, that I don't think
21   will resolve anything because the Silverstein Properties and
                        Page 5
```

2.16.06_court_conference.txt
22    The Port Authority are not suing each other.  We're both
23    defendants in the action.  We have our agreements and
24    disagreements among ourselves as to what that means, but at the
25    moment, that is not an issue that implicates anybody else or
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
□2/16/2006 Conference
page 10

 1
        62GLWTCC                    Conferencewould change the direction or progress of
this litigation.  So
 2    I think that probably is not an issue that needs to be brought
 3    up at this time.
 4            THE COURT:  Mr. Moloney?  When are the pleadings going
 5    to be closed?
 6            MR. MOLONEY:  I think we've -- we're prepared to file
 7    an answer Tuesday.  And we'd be prepared quickly to serve some
 8    limited discovery dealing I think with this issue.  And there's
 9    maybe one other threshold issue, your Honor, which we raised
10    which was to the extent that we have approval from The Port
11    Authority of our construction, that is a legal matter that
12    obviates any responses we might have under New York law, and I
13    think your Honor wanted us to raise that as an affirmative
14    defense.  So if we had narrow discovery focused on those two
15    points, I think we could come back and --
16            THE COURT:  If you were to receive authority from the
17    landlord to do what you did, does that discharge your potential
18    liability, let's say from negligence to another tenant?
19            MR. MOLONEY:  We do believe so, your Honor, because --
20            THE COURT:  By operation of New York law?
21            MR. MOLONEY:  I don't think New York law would govern.
22    The Port Authority was basically given by Congress under
23    interstate compact the ability to regulate and establish
24    criteria for building this.
25            THE COURT:  So under what law do I look?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
□2/16/2006 Conference
page 11

 1
        62GLWTCC                Conference        MR. MOLONEY:  I think the
interstate -- it then
 2    becomes a question of -- I think of -- if, under New York law,
 3    you could look to the proposition that if you've complied with
 4    all building codes and you have no notice of any defect, can
 5    you be responsible for something that occurs to the building.
 6            THE COURT:  I think New York law is to the effect that
 7    if you're negligent, you possibly can.
 8            MR. MOLONEY:  Your Honor, I think we're in a little
 9    bit of a roundelay here.  You can always build a building
10    safer, particularly with the benefit of 20 years hindsight.  So
11    the negligence has to be in order for people actually to
12    populate these buildings, and we're now trying to populate the
13    new 7 World Trade Center, the idea is if you comply with
14    building codes, which is the idea of what the level of care is,
15    and you are not otherwise on notice of some really extenuating
16    circumstance, so that despite that you would have some idea
17    that this was not a smart idea to build a building this way,
18    absent some notice and compliance with the building code, that
19    ends the inquiry.  You don't then go back and decide 20 years
20    later should you have built the building some other way.
                            Page 6

2.16.06_court_conference.txt
21          THE COURT:  It's premature for me to rule at this
22   point in time.  But I will be interested in what is the source
23   of law and what is the law and how it applies.
24          MR. MOLONEY:  Okay.
25          THE COURT:  Mr. Sachs, is the limited discovery of the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
☐2/16/2006 Conference
page 12

 1
        62GLWTCC              Conferencetype Mr. Moloney proposes the right way to
proceed?
 2          MR. SACHS:  I do not think so.  I don't think this is
 3   an issue that will ever be helped by limited discovery.  We are
 4   talking about agreements between several very sophisticated
 5   parties that, though I believe they are clear, obviously there
 6   is some disagreement as to their clarity.  So we're going to be
 7   going well beyond document discovery and we're going to be
 8   going back at least to 1968 to try to find witnesses who
 9   negotiated the original agreement between The Port Authority
10   and Con Ed, because that's the date of that.
11          THE COURT:  And I'll tell you this:  That my
12   consistent ruling on all these issues is the private and
13   subjective intentions of people who negotiate are irrelevant.
14   The only thing that's relevant is that which was communicated
15   to the other side.
16          MR. SACHS:  I understand.
17          THE COURT:  And I would think, Mr. Moloney, that, so
18   modified, that would be an appropriate discovery tool.
19          MR. SACHS:  Correct.  And just a little historical
20   background:  When they originally built this building, it was
21   going to be for a firm that's no longer in existence, the
22   financial firm that failed, Drexel, Burnham.  They were looking
23   for a new tenant, and so when Citigroup came in, they said,
24   Well, for us to have the building, there's going to have to be
25   some changes made.  So it's not like we moved into the original
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
☐2/16/2006 Conference
page 13

 1
        62GLWTCC              Conferencebuilding and years later decided to make
some modification.
 2          THE COURT:  Mr. Sachs is not proposing to take
 3   Drexel's discovery.
 4          MR. MOLONEY:  But we're a de facto part of the
 5   original plan that when they decided to build the World Trade
 6   Center, they didn't anticipate that it would be empty.  They
 7   anticipated it would be built up --
 8          THE COURT:  I'm not going to give any advisory rulings
 9   on this particular point.  It seems to me that what is relevant
10   of the negotiations and the understandings between the tenant
11   in existence at the time -- and that would be your client,
12   Salomon Brothers.
13          MR. MOLONEY:  Right, then Salomon Brothers, correct.
14          THE COURT:  And The Port Authority's representatives,
15   unless Silverstein took over at that time.  Anything before
16   that, why would that be relevant?
17          MR. SACHS:  Because the -- what he is -- he's not
18   claiming that he was a direct party to this agreement.  What he
19   is claiming is that his client is a third party beneficiary,
                            Page 7

2.16.06_court_conference.txt
20    meaning standing in the shoes of The Port Authority, with
21    respect to what he claims -- and I don't think The Port
22    Authority does.
23              THE COURT:  When you go into the understanding between
24    The Port Authority and Con Ed --
25              MR. MOLONEY:  Correct, but also how they distributed
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page 14

1
      62GLWTCC                Conferencethis lease.  Did they keep it as a private
lease or did they
2     give it to prospective tenants who could look at it?
3              THE COURT:  Have fun, folks.
4              MR. MOLONEY:  Draw inferences from what it was.
5              THE COURT:  Have fun.  I require the administration of
6     a case management order on this issue, and I'll be glad to meet
7     with the three of you on this to formulate that aspect of the
8     case management order.
9              MS. JACOB:  Beth Jacob for The Port Authority.  It may
10    be four parties.  What the other two have not informed the
11    Court is there are actually separate agreements involving
12    Salomon Smith Barney, The Port Authority and Silverstein.
13    There's a three-party agreement.  There are series of two-party
14    agreements involving those parties.  And that would be
15    relevant, and Silverstein also would have to be involved in
16    this.
17              THE COURT:  I thought that they're not party.
18              MS. JACOB:  Silverstein is a party to this litigation.
19    What I said is The Port Authority and Silverstein are not
20    adverse, so any resolution of any disputes those two parties
21    might have would not affect the progress of the litigation with
22    respect to the plaintiffs.
23              MR. MOLONEY:  She's just saying for purposes of
24    discovery, the relevant universe is probably Con Ed, The Port
25    Authority, Silverstein and Citigroup.  I think she's just
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page 15

1
      62GLWTCC                Conferencesaying that they have a place at the party.
2              In answer to the comment made, I think The Port
3     Authority's view, quite understandably, is they don't want
4     anyone out unless they can be out.  And they and Silverstein
5     have more issues together in the other tower that they're going
6     to fight on in this tower, so I don't think any inference can
7     be properly drawn from the fact that the Port Authority and the
8     city are autonomous.
9              THE COURT:  Let's not get into this.  When will I see
10    a case management report?
11              MR. MOLONEY:  What about a week?
12              MR. SACHS:  We have other discovery issues going at
13    the same time.  I understand this may be important to counsel.
14    All I'm suggesting to the Court, your Honor, is:  This is not
15    going to be limited discovery.  It will be limited to that
16    issue, but I'm just simply saying, this, ordinarily, it would
17    seem to me, we would be doing document discovery first.  If
18    this is to get a faster track, which is sort of what I'm
19    hearing the Court saying, it is going to take a much more
                           Page 8

2.16.06_court_conference.txt
20  detailed sort of 26(f) conference on this issue because it's
21  going to involve more than documents.
22          And indeed, I don't know right now, and I don't think
23  anybody knows, who is around from 1968 when this agreement, the
24  agreement upon which he relies, the lease between Con Ed and
25  Port Authority, was negotiated?  That's going to take us some
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
2/16/2006 Conference
page 16

1
    62GLWTCC                    Conferencetime to find out.
2           So I just -- I can't sit down with counsel --
3           THE COURT:  You're the plaintiff?
4           MR. SACHS:  I'm the plaintiff.
5           THE COURT:  You want to move this case, right?
6           MR. SACHS:  You bet.
7           THE COURT:  You don't sound like you are.
8           MR. SACHS:  Oh, Judge, I want to move this case.
9           THE COURT:  Then do it in a week.
10          MR. MOLONEY:  Thank you, your Honor.
11          THE COURT:  Let's do the next issue, which brings up
12  the case management order.  Miss Jacob, what are the broader
13  issues?
14          MS. JACOB:  Your Honor, I stood up to address this
15  because since the submissions to the Court, all of the
16  parties -- in fact, parties in what fits under 7 ground
17  defendants, the Aegis defendants, the IRI plaintiffs, we all
18  have gotten together and we at least have an agreement which we
19  can submit to the court.  So there may not be a dispute really
20  for the Court to resolve.
21          THE COURT:  Has Mr. Moloney seen this?
22          MR. MOLONEY:  We're on board with this, your Honor.
23          MS. JACOB:  What we had -- would like to propose is
24  there be a separate track, however the Court wants to call it,
25  whether it has a separate docket number or not, a separate
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
2/16/2006 Conference
page 17

1
    62GLWTCC                    Conferencetrack to cover the World Trade 7 ground
discovery issues
2   dealing with the ground defendants, that the aviation parts of
3   the case would continue in -- I guess it's 101, and that
4   discovery would continue as it is now.
5           THE COURT:  That was my intent all along.  That's why
6   I didn't give it a separate number.
7           MS. JACOB:  And the parties will coordinate among
8   ourselves to make sure that there's not duplicative discovery,
9   and to the extent there are overlapping issues, everybody will
10  be able to participate in that discovery.
11          And all of us in World Trade Center 7, though, are
12  concerned that we do have some separation from the other part
13  of the case because we want to make sure that our separate
14  issues manage to progress without getting trapped in what's --
15          THE COURT:  Giving you a new MC number will not assure
16  that.
17          MS. JACOB:  I understand that, your Honor.  But we
18  don't care --
19          THE COURT:  Don't get fooled by the numbers, Miss
                        Page 9

                          2.16.06_court_conference.txt
20  Jacob.  My disorderly mind can jump numbers.
21          MR. MOLONEY:  I think the bigger point, your Honor, is
22  that our story starts when the building falls on us.
23  Everything that happened before that is irrelevant.  The
24  argument is we somehow exacerbated the damage that occurred
25  after the building fell down.  Why it fell down, who was
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
☐2/16/2006 Conference
page 18

1
        62GLWTCC                    Conferenceresponsible in terms of aviation defendants,
terrorists or
2   anything else, it's really pretty irrelevant to our story.
3           THE COURT:  Which leads me to my finding.
4           MR. MOLONEY:  So we don't need any of that discovery.
5   We don't need any disputes involving defense.  We don't need
6   any of that.
7           THE COURT:  Don't show up.
8           MS. JACOB:  Mr. Moloney is speaking for Citigroup.
9   Speaking for all of the World Trade Center 7 ground defendants,
10  not just as Port Authority's counsel, we do not agree with
11  Citigroup's position.
12          THE COURT:  Let me observe.  This is a very big case,
13  as one part of a much bigger case.
14          MS. JACOB:  That is true.
15          THE COURT:  And counsel have to decide what it is
16  they're going to cover and what it is they're not going to
17  cover; and if they're going to cover it, in what way will they
18  cover it.  All I can do is facilitate matters by giving you
19  firm dates, firm schedules and right announcements.  That's why
20  we publish everything on our webpage.  And I leave it to you to
21  decide what you want to cover and what you don't want to cover.
22          Right now, I want to move this case.  I've made a
23  decision.  The City is out, as you'll find out in a few
24  minutes.  I'm not intending to give a 54(b)(6).  I want the
25  case wrapped up and completed in a speedy path.  And I don't
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
☐2/16/2006 Conference
page 19

1
        62GLWTCC                    Conferenceintend to wait for different parts of the
case to move at their
2   leisurely progress.
3           MS. JACOB:  Your Honor, that is precisely our concern,
4   and that was, to some extent, why we wanted to have a separate,
5   whatever you want to call it, track, position, posture, for 7,
6   and I've reached an agreement with plaintiff's counsel in terms
7   of timing of various meetings we're going to have to work out
8   discovery plans, and I think that we are ready to progress on
9   this.
10          What we did want to make sure is that issues that
11  don't involve World Trade Center 7 do not, as unfortunately
12  they have to some extent over the years, block our case from
13  moving, and whatever you call that, a separate track or just
14  handled on separate schedules, that's fine.
15          THE COURT:  I have a serious issue in the aviation
16  cases arising from what the Transportation Security
17  Administration is doing.  All of you know that.  And all of you
18  know the frustration that I've expressed with regard to that.
                              Page 10

2.16.06_court_conference.txt
19    I don't know at what point those issues will be applied here,
20    but there's lots of things we can do apart from that, those
21    issues, independent of those issues.  And to the extent that
22    any of the discovery advances itself to the point that allows
23    me to make determinations, I propose to do that.
24            Now, Mr. Moloney is interested in his separate
25    motions, and I think I'd like to accommodate that interest.  If
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
02/16/2006 Conference
page 20

1
      62GLWTCC                Conferencehe's right, his client deserves to be out.
If he's wrong, he
2    should know it so he can take the appropriate steps in
3    connection with the rest of the case.
4            And I would understand from your expression of assent,
5    Mr. Moloney, that your needs are satisfied in the current case
6    management order that Miss Jacob has just told me about.
7            MR. MOLONEY:  Exactly, with the modification we'll
8    have a separate track to deal with our specific motion, which
9    we're going at that make quickly.
10            THE COURT:  I wouldn't call it a track.  Just do what
11    you need to do and get yourself ready.
12            MR. MOLONEY:  A separate case management order we're
13    submitting in a week to deal with that one issue.
14            THE COURT:  I would much prefer if it could be done
15    within one case management --
16            MR. MOLONEY:  We don't need a separate case management
17    order, just a separate discovery schedule that we'll submit for
18    how we'll address the issues that we think are amenable to
19    resolution for summary judgment, which are basically the
20    question as to whether -- full party approval and/or the
21    release and/or a failure to allege any defect is enough for us
22    to get out.
23            THE COURT:  I'm not going to comment on the terms
24    you're expressing, but you need a separate paragraph to
25    accommodate whatever particular discovery needs that you have.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
02/16/2006 Conference
page 21

1
      62GLWTCC                Conference        Yes, Mr. Sachs?
2            MR. SACHS:  Your Honor, I think what Ms. Jacob was
3    referring to the Court is she and I, we met before we came in
4    here, and we had agreed to have at least a preliminary meet to
5    discuss discovery issues, I believe on February 27th, and
6    that's why when your Honor said do this within a week with
7    Mr. Moloney, it seemed to me that we ought to wait until that
8    February 27th, see if we could get it done at the same time and
9    perhaps at least be on the way to giving the Court a whole
10    product rather than a piecemeal product.
11            THE COURT:  Today's February 16th.  Why do you need to
12    wait until February 27th?
13            MR. SACHS:  We don't.  The truth is that was the day
14    under the previous case management order that we were supposed
15    to have our first meeting.  And in fact, there was -- some of
16    the defendants didn't want to have it this quickly, and so I
17    acceded -- I suggested February 27th.
18            MS. JACOB:  Your Honor, I don't want to get into
                          Page 11

2.16.06_court_conference.txt
19    whether I agreed or disagreed.  February 12th was a date that
20    worked for the schedules of the counsel involved.
21             THE COURT:  All right.
22             MR. BARRY:  Your Honor?
23             THE COURT:  Mr. Barry?
24             MR. BARRY:  May I raise another slight problem?  The
25    Aegis case, the civil action number 04 CV 7272, contains claims
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
□2/16/2006 Conference
page 22

 1
        62GLWTCC                  Conferencethat are both against the ground defendants
and the aviation
 2    defendants.  It involves claims for SWT 7 and 1, 2 and 4.  One
 3    of the IRI cases has got claims just against the aviation
 4    defendants, and that properly, in our view, belongs here in
 5    21 MC 101.
 6             The other case with the claims against the aviation
 7    defendants brought in to the claims against the ground
 8    defendants I think is going to cause a lot of problems.  I
 9    wrote you a letter yesterday and made an alternative proposal
10    which basically is:  If you want to create a separate track,
11    fine.  If not, I would ask that you sever the claims against
12    the aviation defendants in that Aegis case.
13             THE COURT:  Are you worried you're not going to be
14    able to do your discovery?
15             MR. BARRY:  They're worried about being dragged down
16    by the aviation defendants; I'm worried about being dragged
17    down by what they're doing.
18             THE COURT:  I'll protect you, Mr. Barry.
19             MR. BARRY:  We've had our feet put to the fire.  I
20    think it would be a lot simpler if you just carved those claims
21    out, let us take it through discovery, and we can revisit that
22    issue down at trial and --
23             THE COURT:  Well, look, I've got enough numbers to
24    keep track of.
25             MR. BARRY:  Leave it the way it is.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
□2/16/2006 Conference
page 23

 1
        62GLWTCC                  Conference        THE COURT:  There are only a
limited number of fires
 2    to which I can put your feet.
 3             MR. BARRY:  They've been burned pretty good in the
 4    last week.
 5             THE COURT:  There are at least one that I have my
 6    thoughts focused on.  I'm not going to push you into a trial
 7    before you're ready.  And I'm not going to foreclose your
 8    discovery.  What's really going to be discovered here, I think,
 9    is defenses.
10             MR. BARRY:  I think, preliminarily, you're right.
11             THE COURT:  I have issues with regard -- let me
12    withdraw that.
13             But primarily I think it's discovery issues that have
14    to do with the defenses, and those are going to be brought
15    before me again by the way of motions.  You're not involved in
16    those.
17             MR. BARRY:  No, but we do get involved in, for
                          Page 12

2.16.06_court_conference.txt
18   example, case management orders that involve them that we have
19   to complicate by being there and making sure that they
20   coordinate it with what we do in the other tracks.
21           THE COURT:  I want you to do that anyhow, whether I
22   gave you a separate track anyhow.  And you'd want to be because
23   you want to make sure that you're not dragged in.  So I don't
24   see that there's a difference.
25           MR. BARRY:  I thought it would make it easier for you,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
□2/16/2006 Conference
page 24

1
     62GLWTCC                    Conferencetoo.
2           THE COURT:  It's possible.  I don't know how to
3    classify this.  I mean, that's a problem with all the tracks:
4    They all run into each other.
5           Let's see if we can move along.  So if you meet on
6    February 27, when will I see you again?
7           MR. MOLONEY:  Your Honor, are we still going to try to
8    get our discovery done sooner?  Or to get our sub agreement
9    done sooner?  I mean, February 27th, there's going to be a lot
10   of discussion about a lot of issues, frankly.
11          THE COURT:  I'm sympathetic.  What do Miss Jacob and
12   Mr. Sachs say, both?
13          MS. JACOB:  If we meet on the 27th, I would hope we'd
14   be able to get an order to you before the next time that
15   everybody's supposed to be before the Court, and that's
16   March 3rd.
17          THE COURT:  How about starting some discovery with
18   Mr. Moloney now?
19          MS. JACOB:  I'd have to find out exactly what he's
20   talking about, your Honor.  It's not quite as simple as he
21   says.
22          THE COURT:  I'll tell you, I can think of some things.
23   I think you probably have a file.
24          MS. JACOB:  We have already turned over all the
25   documents.  That was turned over to all the parties when
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
□2/16/2006 Conference
page 25

1
     62GLWTCC                    ConferenceMr. Sachs referred to what he calls limited
discovery.  The
2    Port Authority has already turned over, even before this case
3    came to this courtroom, all of our World Trade Center 7 files.
4    Silverstein has turned over all of its files.  A number of the
5    contractors and engineers on this building have also turned
6    over all their files.  There's been a lots of document
7    discovery already.
8           The only party, in fact, involved in this who has not
9    turned over its files is Citigroup.  So perhaps we should start
10   with Citigroup disclosing their documents to the rest of us.
11   But I don't feel that we need to, at this point, get into these
12   discussions right now that --
13          THE COURT:  Why don't you turn over your file,
14   Mr. Moloney?
15          MR. MOLONEY:  Sure.
16          THE COURT:  What else do you need?
17          MR. SACHS:  Judge, I think if we do it all on the
                          Page 13

                         2.16.06_court_conference.txt
18    27th, I don't think it's going to hold it up, and we've got one
19    date to get ready for.  We'll be back to you on March 2nd or
20    3rd.
21              THE COURT:  Mr. Moloney, why don't you turn over your
22    file?
23              MR. MOLONEY:  We'll turn over our files, and we'll
24    serve some targeted interrogatories and 30(b)(6) requests, and
25    I think that should -- if that's a problem for people, they'll
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page

 1
      62GLWTCC                    Conferencetell us.
 2              THE COURT:  Serve them, and if they can't be responded
 3    to, Mr. Sachs and Miss Jacob will let you know and you'll come
 4    in.  But let's get the show on the way.
 5              MS. JACOB:  Thank you.
 6              THE COURT:  Mr. Sachs?
 7              MR. SACHS:  Your Honor, would I be correct if you've
 8    granted Mr. Moloney an opportunity to serve targeted
 9    interrogatories, etc., that we have the same opportunity with
10    respect to his claims?
11              THE COURT:  Sure.
12              MR. SACHS:  Thank you.
13              THE COURT:  I'm just reacting to your statement to me
14    that you were too busy.  The more you can do, let's move the
15    show.  Because I do not want to give the certificates, at least
16    at this time.  I'd like to see how far along we can go.
17              The next point, Number 5, has to do with claims in the
18    pleadings that some of the issues were related to products
19    liability claims.  There were products that were in the
20    buildings that give rise to issues of product liability.  I
21    don't know if this was a Port Authority type of pleading or
22    whether it really is a belief that there can be product
23    liability.
24              Miss Jacob?
25              MS. JACOB:  Speaking now as liaison counsel for World
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page

 1
      62GLWTCC                    ConferenceTrade Center 7 ground defendants, the Court
has stated in its
 2    decision on the motions to dismiss that plaintiffs would be
 3    required to, Page 50 of the slip opinion, to set out precisely
 4    what defects in such alleged products were the proximate cause
 5    of Con Ed's damage and what we call the products liability
 6    defendants are requesting, even before they're required to
 7    answer, because they don't know exactly what they're answering.
 8    It's just an identification from the plaintiffs of what
 9    products -- not -- but what each defendant's product supposedly
10    is and what the defect is with that particular product so they
11    can move forward.
12              There are some confusions in the pleadings.  The Court
13    mentioned Rosenwach as a manufacturer of the fuel tank.
14    Rosenwach only manufactured water tanks, and in fact, they're
15    out of the case.  There's another one, an engineering defendant
16    who hasn't manufactured any products at all.  So to force those
17    defendants to proceed under the current state of the pleadings
                              Page 14

2.16.06_court_conference.txt
```
18   seems unfair, and what the dispute between the parties is is
19   when the plaintiffs have to tell us what the product is for
20   each defendant and what the defect is, and we believe, whether
21   it's an amended complaint or whether it's some other form of
22   disclosure, before the answer and before discovery, that should
23   be done.
24           THE COURT:  Mr. Sachs?
25           MR. SACHS:  Your Honor, I believe that motion was made
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
□2/16/2006 Conference
page

```
1
     62GLWTCC                Conferenceto the Court, I think the Court denied that
motion in its
2    rulings on January 12th and observed -- and I think this is
3    what Ms. Jacob is referring to.  The Court refers to -- I'm
4    reading at Page 50 of the opinion that the Court gave, not the
5    Westlaw copy.
6           THE COURT:  The paragraph starts with, "Only three of
7    the design and construction defendants are alleged to have
8    manufactured specific products."
9           MR. SACHS:  That's correct.  And as I read that, the
10   Court -- first of all, Ms. Jacob is correct, Rosenwach is out
11   of the case.  We have let them out because it turned out -- and
12   we would do this with anyone, they told us they ended up
13   manufacturing a water tank, it wasn't a fuel tank, so we let
14   them out.
15          And what the Court says at this stage, "The pleadings
16   before me, I'm constrained to deny the motions of these
17   defendants.  However, plaintiffs will be required to set out in
18   future filings precisely what defects and such alleged products
19   were the proximate cause of Con Ed's damage."
20          We will do that after we get some discovery.  And we
21   have stated everything we know right now.  We still don't have
22   any discovery, as we said, from Citigroup.  So we have stated
23   what we know, and I think the Court understands that, and we
24   will at sometime before trial -- obviously, we are going to
25   have to tell somebody what the defect is or they're going to
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300
```
□2/16/2006 Conference
page

```
1
     62GLWTCC                Conferencemove for summary judgment, and we're going
to lose.
2           THE COURT:  What's your Rule 11 basis for making your
3    allegations?
4           MR. SACHS:  The Rule 11 basis is based upon what we
5    see in the drawings.  It appears that these particular
6    defendants did put in certain items into this construction.
7           THE COURT:  What's your Rule 11 basis for saying that
8    G.C. Engineering manufactured fuel supply pipes and related
9    fuel distribution apparatus associated with the backup
10   generators for OEM, which presumably led to the fires?
11   Paragraph 46.
12          MR. SACHS:  I understand what you're asking me.  I
13   can't tell you right now the exact document that told us that
14   G.C. Engineering did that, but I can tell you that it was a --
15   I wasn't involved, but I can tell you that to the best of my
16   knowledge, it was a good faith allegation made after some basic
                          Page 15
```

2.16.06_court_conference.txt
17  kinds of discovery, the best we could do under what we had at
18  the time with the statute of limitations running.
19          THE COURT:  But you're supposed to have a Rule 11
20  basis before discovery.
21          MR. SACHS:  I believe we did.  It doesn't mean I have
22  to know the exact defect, your Honor.
23          THE COURT:  But I think you have to allege what you,
24  on information and belief, believe to be the defect.  What
25  makes me think that there was any defect?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
☐2/16/2006 Conference
page

  1
    62GLWTCC                   Conference          MR. SACHS:  The allegation that we
make in the
  2  complaint is that there is a defect, your Honor.
  3          THE COURT:  I understand that's the allegation.  I
  4  understand you know that the building burnt down.
  5          MR. SACHS:  Fell down.
  6          THE COURT:  I therefore believe you infer anything
  7  having to do with fuel supplies contributed to that.  But that
  8  may be a design problem.  It doesn't necessarily mean that
  9  these pipes and distribution apparatus were defective.
 10          MR. SACHS:  Judge, we haven't had a speck of discovery
 11  yet.  We, when we filed this complaint, took everything that we
 12  did have, which were drawings, not a tremendous amount, we did
 13  have drawings, we do know from experts that we have talked to,
 14  we know why the buildings fell down.  We know there are only
 15  certain things that could have caused it.  One of the things
 16  that could have caused it, for example, is improper -- an
 17  improper fuel pump that would have allowed this fuel to come
 18  into the building.  We know, and I think we stated, who put in
 19  this fuel pump.  Where we know it, we've stated it.  This is
 20  notice pleading.  We have made a good faith effort to make a
 21  complaint that sets forth what we know at this time.  We don't
 22  know any more than what we have said in this complaint, at this
 23  point.
 24          We haven't even gotten an answer.  We are entitled to
 25  get some discovery before what sounds to me like a motion for
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
☐2/16/2006 Conference
page

  1
    62GLWTCC                   Conferencesummary judgment is made on an allegation
that we haven't had
  2  an opportunity to do any discovery on.
  3          THE COURT:  How do you propose to get discovery of
  4  this issue?
  5          MR. SACHS:  Starting with --
  6          THE COURT:  Since all these pipes have been consumed?
  7          MR. SACHS:  I'm going to get discovery of the issue
  8  from getting the drawings of the -- of what was put in.  I'm
  9  going to get discovery of the issue from finding out from the
 10  documents, from the people who did it and who designed it, what
 11  went in, what it should have done.  I'm going to get discovery
 12  from finding out that if it had been done, this could never
 13  have happened, the pumping of all this fuel into the buildings.
 14  We know that fuel didn't go nowhere.  We know that fuel wasn't
 15  found in the ground.  We know that fuel came under these
                            Page 16

                              2.16.06_court_conference.txt
16    trusses and caused this building to collapse.
17            But your Honor's asking me before we've had --
18            THE COURT:  The question is whether the product was
19    defective or whether the design was defective.
20            MR. SACHS:  Aren't we entitled to some discovery to
21    find that out?
22            THE COURT:  All right.  In other words, you don't have
23    anymore information.
24            MR. SACHS:  That is correct, sir.
25            THE COURT:  Miss Jacob, I think you'll have to answer
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
□2/16/2006 Conference
page

1
      62GLWTCC                       Conferenceon the basis of the present pleading, unless
you can persuade
2     me that it's dismissible, and I think Mr. Sachs is correct,
3     it's not dismissible.
4            MS. JACOB:  Your Honor, Mr. Sachs has basically said
5     that he may have some evidence that a product was installed in
6     the building.
7            THE COURT:  I think he's saying something different.
8     He hopes to find it.
9            MS. JACOB:  He hopes to find out, but he doesn't have
10    any basis for thinking any of these products had any defect at
11    all.  He said --
12            THE COURT:  That's not my understanding, Miss Jacob.
13            MS. JACOB:  And, your Honor, our position would be
14    that that's not a sufficient --
15            THE COURT:  He's saying something different.  He's
16    saying from the reports post hoc that there are problems that
17    lead him to believe, as a lawyer, everything having to do with
18    the fuel supply contributed to the fire.  And he can't narrow
19    it down more narrower.  And he says that this entitles him to
20    proceed to the next step.
21            I think he's right.  It's notice pleading.  I think
22    the only discretion I have is whether on the basis of that
23    which he learned later on, there may not have been a sufficient
24    good faith belief to issue this notice pleading, in which case
25    there may be a possibility of sanctions.  I don't see any other
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
□2/16/2006 Conference
page

1
      62GLWTCC                       Conferencestep.  I don't think I can dismiss the
complaint based on what
2     we know now.  Do you think I can?
3            MS. JACOB:  Your Honor, I would believe -- yes, I
4     think first that Mr. Sachs is not correct when he says there
5     hasn't been sufficient discovery, that he can come up with some
6     answer other than:  You had something to do with the buildings;
7     the buildings wouldn't have fallen down if there wasn't a
8     defect.
9            THE COURT:  You've given him all of your maintenance
10    and repair data?
11            MS. JACOB:  We've given him -- from the Silverstein
12    defendants, not from the Port Authority.
13            THE COURT:  The question is:  Did he get all the
14    maintenance --
                              Page 17

2.16.06_court_conference.txt
```
15          MS. JACOB:  My understanding is Silverstein turned
16  over all the documents they have with respect to World Trade 7.
17  The Port Authority has done that as well.
18          THE COURT:  Including the maintenance and repair data?
19          MS. JACOB:  I can't represent that, because I just
20  don't know, as I stand here.  If they had it, I believe they
21  would have turned it over.
22          THE COURT:  Seems to me if you want to you could say
23  on its basis of all this information, there is no reason to
24  believe that these products were defective, and move for
25  summary judgment.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
☐2/16/2006 Conference
page

```
1
    62GLWTCC           Conference      MS. JACOB:  But your Honor, would
the plaintiffs at
2   least be required to identify particular products with
3   particular defendants so at least they know it's not just,
4   You're alleged to have installed pipes, but know precisely what
5   it is you're supposed to have done?
6           THE COURT:  I have to accept Mr. Sachs' representation
7   that he knows nothing more than that.  I also, based on my own
8   belief, and various positions of the Second Circuit, starting
9   with Nagler against Admiller Corp., having to do with private
10  antitrust suits in 1954 and many more since, including
11  reversals of some of my decisions, that there's been a
12  consistent view of the Second Circuit since Judge Charles Clark
13  was on the Court.  And based on notice pleading, he's alleged
14  enough.
15          So, you know the equipment and you know who
16  manufactured the equipment.  You also know what discovery
17  relates to this equipment.  You can turn over this discovery
18  and make a motion on the basis of it.  That will force
19  Mr. Sachs to come forward and do something.  And then he only
20  has -- what, he has no other discovery to go on.  He only has
21  an expert, the possibility of an expert.  You'll have your own
22  expert who will tell you that this is not a defective.  I can't
23  do anything different than that.  Based on the resolution of
24  that motion, it's possible that there could be a sanction.  I
25  don't know.  I expect not.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
☐2/16/2006 Conference
page

```
1
    62GLWTCC           Conference      MR. MOLONEY:  Your Honor, can I
just say that I think
2   that we're operating under an improper paradigm.  I think that
3   an expert 20 years later can always decide that a piece could
4   have been built differently.  An expert -- particularly with
5   the benefit of hindsight --
6           THE COURT:  Happens all the time, Mr. Moloney.
7           MR. MOLONEY:  It does not happen for buildings.
8           THE COURT:  Litigation is by definition a pathology.
9   It assigns culpability after the fact.
10          MR. MOLONEY:  But it does not, because there are
11  strong public policies, your Honor, which you're losing sight
12  of, with all due respect, which is that -- is that we want to
13  repopulate the 7 World Trade Center.  We wanted to build
```
Page 18

                        2.16.06_court_conference.txt
14   another building next to it, and we want some people to move
15   into those buildings.  Because of that, we're not going to hold
16   tenants responsible 20 years later, particularly when there's
17   judgment that the architects, the engineers and everyone else
18   who built the stuff and who knew something cannot be held
19   responsible.
20            THE COURT:  Mr. Moloney, we looked very hard for that
21   concept.  We looked in the briefs, and we did independent
22   research.  And to my surprise, the State of New York law is
23   thin on that issue.  I'm very glad to be educated.  I
24   understand the proposition that you're advancing.  I do know my
25   building, and when the tenant above me has some problem in her
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page

 1
      62GLWTCC                 Conferenceapartment and it rains in my apartment
because of that, I tell
 2   the building.  They say, Don't tell me, go tell the other
 3   tenant and the insurance company the other tenant has.  That
 4   tells me something, doesn't it?
 5            MR. MOLONEY:  Your Honor, I think that, with all due
 6   respect, again, I think you're talking -- when major commercial
 7   enterprises such as Citigroup move into New York City, Goldman,
 8   Sachs, they will go somewhere else with a more rational legal
 9   system.
10            THE COURT:  I understand your point perfectly.  I'm
11   sympathetic for your point.  I looked for the answer.  I did
12   not find an answer.
13            MR. MOLONEY:  I'd like to brief it.  As part of this
14   separate brief, I'd like to brief that narrow point.
15            THE COURT:  I'm not going to do it.  I already spent a
16   major effort on this motion.  Everything that you knew should
17   have been in the papers.
18            MR. MOLONEY:  I never got a chance, frankly, to argue
19   separately because we were in with a million people.
20            THE COURT:  Please stop.
21            MR. MOLONEY:  I'll stop, but I think that we're right
22   about this.
23            THE COURT:  Please stop.  All right.  Next time you
24   make a motion, be sure to include it.
25            MR. MOLONEY:  Okay.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
□2/16/2006 Conference
page

 1
      62GLWTCC                 Conference          THE COURT:  Miss Jacob, after you
make all this
 2   discovery, you make the motion.
 3            MS. JACOB:  Yes, your Honor.
 4            THE COURT:  If Mr. Moloney wants to tag along at that
 5   point, he can.
 6            MR. MOLONEY:  Thank you.
 7            THE COURT:  Anything more with 1 to 5?
 8            MS. JACOB:  No, your Honor.
 9            MR. SACHS:  No, Sir, I don't believe so.
10            THE COURT:  Six is a document repository.  An
11   excellent idea.
12            MS. JACOB:  Your Honor, this is really -- I think the
                            Page 19

                              2.16.06_court_conference.txt
13   parties are agreed.  We just thought that it would be of
14   assistance if we had an order from the Court that document
15   production in this case, and I'm now talking about World Trade
16   Center 7 ground discovery, should take place through a document
17   repository which all of the parties would support and
18   participate in.  Liaison counsel, meaning us, and working with
19   the plaintiffs and working with some of the others, will set it
20   up.  It's going to require obviously contributions of money
21   from other parties.  And that we'll produce through this, and
22   we can monitor the case through.
23               THE COURT:  It's an excellent idea.  I support it.
24               MR. SACHS:  We agree.
25               THE COURT:  Let me ask all of you, having lectured on
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
□2/16/2006 Conference
page

 1
     62GLWTCC                  Conferencethis subject, I've become sensitized to it:
Is your discovery
 2   going to be of paper or is it going to be electronic?
 3               MR. SACHS:  Electronic, I believe.
 4               MS. JACOB:  The idea of this repository would be it
 5   would be electronic.  A lot of documents are on paper because
 6   they're old, but we're investigating this; we're working out
 7   ways to get it all --
 8               THE COURT:  Imaged.
 9               MS. JACOB:  Yes, electronically.
10               THE COURT:  Have you worked out a protocol for
11   imaging?
12               MR. SACHS:  That's part of what we'll do on the 27th.
13               THE COURT:  Are there experts involved?
14               MR. SACHS:  I do, yes.
15               MS. JACOB:  We have identified a provider already.  We
16   have a lot of these protocols under way, your Honor.  There may
17   be some things such as the drawings which would have to be
18   hard-copied, but I'm pretty confident the parties would be able
19   to work it out.  We just need the endorsement of the Court
20   because there are so many parties.
21               THE COURT:  You have it.  With regard to records that
22   are kept electronically, I don't know if discovery's going to
23   reach that.
24               MR. SACHS:  Yes.
25               THE COURT:  There's an issue whether that should be
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
□2/16/2006 Conference
page

 1
     62GLWTCC                  Conferenceimaged first and then produced with Bates
stamp numbers or
 2   produced in a format that would allow the parties to save a
 3   couple of steps and manipulate the data through their own
 4   electronic processes.  There are issues pro and con for that
 5   issue.  People want to control the discovery by numbering them.
 6   Numbering is not consistent with production in Word Perfect or
 7   Word.  It's consistent with imaging, but imaging doesn't allow
 8   the recipients to manipulate the doc by indices and searches
 9   and the like.  My own predilection is the discovery be made in
10   the manner that the records were kept.  So if the records were
11   kept in paper form, they should be imaged and then produced.
                              Page 20

2.16.06_court_conference.txt
```
12   If records were kept in electronic format, they should be
13   produced in the same format:  Excel, spreadsheets, Word Perfect
14   or Word or whatever other program.  And they can be controlled
15   by making a disk at the same time and maintaining the disk so
16   the party producing the documents knows exactly what was
17   produced and assures oneself that there cannot be any improper
18   manipulation or redaction.
19             But I'd like you to work this out with an idea to
20   economy and efficiency, not only for the party producing but
21   also for the party receiving.
22             MR. SACHS:  That is our intent, and we do have, and I
23   believe counsel also does have some expert in this to help us.
24             THE COURT:  I'm sorry for being so acerbic today, but
25   it's a function of what I have to do today.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
02/16/2006 Conference
page

```
 1
     62GLWTCC                   Conference        MR. MOLONEY:  I apologize, too,
your Honor.
 2             THE COURT:  When's the next time we should meet?
 3             MR. SACHS:  I think you have a schedule for March 3rd
 4   as part of the larger status conference.
 5             THE COURT:  Do you need to be part of the larger
 6   conference?
 7             MR. SACHS:  Probably not, but if you have a meeting, I
 8   know one of us is going to come to hear what went on.
 9             THE COURT:  You're probably all going to come anyhow.
10             MR. SACHS:  Yeah.
11             THE COURT:  And many of you are the same people.  All
12   right.  See you March 3rd.
13             MR. SACHS:  Thanks, Judge.
14             THE COURT:  Miss Jacob, when can you get that in to
15   me, the case management?  Before March 3, so if there are any
16   issues...?
17             MS. JACOB:  Certainly before March 3.  Absolutely.
18             THE COURT:  Thanks a lot.
19             MR. SACHS:  Were you going to say anything more about
20   denying our motion for certification, your Honor?  You said we
21   would find out later that you were denying it.
22             THE COURT:  I'm denying it.
23             MR. SACHS:  Okay.
24             (Adjourned)
25                           o 0 o
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

2.16.06_court_conference.txt

□

# EXHIBIT
# 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
IN RE SEPTEMBER 11 PROPERTY DAMAGE    :    21 MC 101 (AKH)
AND BUSINESS LOSS LITIGATION    :
------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC., et al.,    :
     :
                 Plaintiffs,    :    02 CV 7188 (AKH)
     :
     :    **DECLARATION OF**
     :    **MICHAEL S. LEAVY**
        -against-    :
     :
PORT AUTHORITY OF NEW YORK AND NEW    :
JERSEY and THE CITY OF NEW YORK,    :
     :
        Defendants.    :
------------------------------------------------------------x

     **MICHAEL S. LEAVY**, an attorney licensed in and admitted to practice before the

Courts of the State of New York, and admitted to the bar of this Court, declares the following

pursuant to 28 U.S.C. §1746:

     1.     I am associated with the law firm of Gennet, Kallmann, Antin & Robinson, P.C.,

attorneys for Consolidated Edison Company of New York, Inc. and the Aegis plaintiffs

("plaintiffs"), in connection with the above matter. I am familiar with the facts and

circumstances set forth herein based upon my personal knowledge and my review of documents

referenced herein.

     2.     I respectfully submit this Certification in support of the motion of plaintiffs to

supplement their Amended Complaint pursuant to Fed. R. Civ. P. 15(d).

     3.     The Amended Complaint, annexed hereto as Exhibit "A," makes claim for

negligence in the design, construction and modification of 7 World Trade Center, resulting in its

destruction and the destruction of the Con Edison substation beneath it.

4.      The Complaint dated September 10, 2002 in *Aegis et al. v. Port Authority, et al.*,

02 cv 7188 (AKH), is annexed hereto as Exhibit "B".

5.      The May 29, 1968 lease between Consolidated Edison Company of New York,

Inc. and the Port Authority of New York and New Jersey is annexed hereto as Exhibit "C".

6.      Con Edison's letter to the Port Authority demanding payment for the remainder of

amounts due under the lease for the destruction of the substation is annexed hereto as Exhibit

"D."  We have received no response to the letter.

7.      The proposed Supplemental Complaint is annexed hereto as Exhibit "E".

8.      No Case Management Order concerning *Aegis et al. v. Port Authority, et al.*, 02

cv 7188 (AKH) or its companion case has set a deadline by which the Amended Complaint must

be amended or supplemented.

I certify under penalty of perjury that the foregoing is true and accurate.

Executed on August 16, 2007

By: _____

MICHAEL S. LEAVY

# EXHIBIT
# 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

AEGIS INSURANCE SERVICES, INC.;                          :
LIBERTY INSURANCE UNDERWRITERS, INC.;                    : Civil Action No.
NATIONAL UNION INSURANCE COMPANY                         : 02-CIV-7188 (AKH)
OF PITTSBURGH; NUCLEAR ELECTRIC INSURANCE                :
LIMITED; UNDERWRITERS AT LLOYDS,                         :     **PROPOSED**
a/s/o CONSOLIDATED EDISON COMPANY                        :     **SUPPLEMENTAL**
OF NEW YORK, INC. and CONSOLIDATED EDISON                :     **COMPLAINT**
COMPANY OF NEW YORK, INC.;                               :
                                                         :
                                        Plaintiffs,      :
                                                         :
           - against-                                    :
                                                         :
PORT AUTHORITY OF NEW YORK AND NEW JERSEY                :
and THE CITY OF NEW YORK.                                :
                                                         :
                                        Defendants.      :
-------------------------------------------------------------x

     Aegis Insurance Services, Inc., Liberty Insurance Underwriters, Inc., National Union

Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, Underwriters at Lloyds,

a/s/o Consolidated Edison Company of New York, Inc., and Consolidated Edison Company of

New York, Inc., by way of Supplemental Complaint against defendant The Port Authority of

New York and New Jersey, respectfully set forth, upon information and belief:

### AS AND FOR A SEVENTH CAUSE OF ACTION
### FOR BREACH OF CONTRACT

    1.    Plaintiffs repeat and re-allege each and every allegation contained in the

Complaint, as Amended, as if fully set forth at length herein.

    2.    The Port Authority of New York and New Jersey's ("Port Authority") lease with

Consolidated Edison Company of New York, Inc. ("Con Edison") contained the following

provision:

Section 16.    <u>Responsibility for Other Uses of Premises</u>

Anything in this Agreement to the contrary notwithstanding it is expressly understood and agreed that the obligations assumed by the Lessee under this Agreement with respect to maintenance, repair, rebuilding, restoration or indemnity shall not extend to causes or conditions arising out of the use or occupancy of the premises or of the space above or about the premises by the Port Authority, its employees, agents or contractors; further the responsibility of the Lessee for the maintenance, repair or rebuilding of the Substation Building shall not include any other structure or buildings erected by others than the Lessee unless repair or reconstruction therof is necessitated by act or fault of the Lessee.  The Port Authority shall reimburse the Lessee for any expense incurred by the Lessee in maintaining, repairing, replacing or rebuilding the Substation Building or the Lessee's Substation Equipment where such expenses are incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof.  The responsibility of the Lessee for major repairs or rebuilding shall not extend to the portion of the foundations, bearing columns, roof reinforcement and other structural members and facilities incorporated in the Substation Building for the support or accommodation of the stories, structures, buildings or improvements described in Section 8 hereof unless the Port Authority shall reimburse the Lessee for the expense thereof to the extent that such expense is not covered by insurance.

3.    The foregoing provision obligates the Port Authority to indemnify Con Edison for damage arising from the Port Authority's acts or omissions in connection with the construction or maintenance of 7 WTC, regardless of fault on the part of the Port Authority.

4.    The Port Authority's lease with Con Ed contained the following provision:

Section 40.    <u>Premises</u>

*            *            *

(b)    The Port Authority shall not be liable to the Lessee or to any

2

person for injury or death to any person or persons whomsoever or damage to any property whatsoever at any time in or about the premises, including but not limited to any such injury, death or damage from falling material, water, rain, hail, snow, gas, steam, dampness, explosives, smoke, radiation or electricity, whether the same may leak, issue, fall or flow from any part of the Facility or from any other place or quarter unless said damage, injury or death shall be due to the negligence of the Port Authority, its employees or agents, provided, however, that nothing in this subparagraph (b) shall be deemed to relieve the Port Authority of its obligations under Section 16 hereof.

5.    The foregoing provision confirms that the indemnification obligation on the part of the Port Authority is regardless of fault.

6.    The Port Authority's lease with Con Ed also contained the following provision:

> Section 18.    Damage or Destruction of Premises
>
> (a)    Removal of Debris – If the premises or any part thereof, shall be damaged by fire, the elements, the public enemy or any other casualty, the Lessee shall promptly remove all debris resulting from such damage from the premises, and to the extent, if any, that such removal is covered by insurance, the proceeds thereof shall thereafter be made available to the Lessee for such purposes.

7.    The foregoing provision obligates the Port Authority to indemnify Con Edison, to the extent of available insurance, for debris removal expenses arising from the Port Authority's acts or omissions in connection with the construction or maintenance of 7 WTC, regardless of fault on the part of the Port Authority.

8.    The Port Authority has acknowledged its obligation to make payment under the foregoing provisions by furnishing partial payment of $20,000,000 toward its obligations thereunder, and is estopped from denying liability under these provisions.

9.    Con Edison has expended substantial sums to replace the functionality of the substation building and its associated equipment, and to remove debris, and has incurred other

expenses secondary to those efforts, in the amount of $129,341,259.

10.    Such expenses were incurred by reason of damage to the Substation Building or the Lessee's Substation Equipment caused by the acts or omissions of the Port Authority or its agents, contractors or employees in connection with the construction or maintenance of the stories, structures, buildings or improvements constituting the 7WTC building.

11.    Due demand has been made for these amounts due under the lease provisions as a result of damage to the Substation building, its associated equipment, debris removal, and expenses secondary to the foregoing.

12.    No payment has been made.

13.    The failure to make payment on the part of the Port Authority constitutes breach of the aforesaid lease provisions.

14.    As a result of the breach of the lease contract by the Port Authority, Con Edison has been damaged in the amount of $129,341,259, together with interest and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:    New York, New York
          August 14, 2007

                              Yours, etc.
                              GENNET, KALLMANN, ANTIN & ROBINSON, P.C.
                              Attorneys for Plaintiffs

              By:    _____
                              MARK L. ANTIN (MA 0427)
                              45 Broadway
                              New York, New York 10006
                              (212) 406-1919
                              File No.: 02-5514:241.0001-A

4

# EXHIBIT
# 5

11.30.04_Transcript.txt

1

4BU7SEPM
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------x
2
3    IN RE:  SEPTEMBER 11TH LITIGATION        03 Civ. 7043
3                                             04 Civ. 1382
4    --------------------------------x
4
5                                             November 30, 2004
5                                             2:15 p.m.
6
6    Before:
7
7                    HON. ALVIN K. HELLERSTEIN
8
8                                             District Judge
9
9                         APPEARANCES
10
10   GENNETT KALLMANN ANTIN & ROBINSON PC
11        Attorneys for Aegis, et al.
11   BY:  STANLEY KALLMANN
12
12   BUCHANAN INGERSOLL
13        Attorneys for City of New York
13   BY:  EUGENE SCHEIMAN
14        MARK BLOOM
15   BRUCHMANN & VICTORY
15        Attorneys for Certain Underwriters
16   BY:  PATRICK J. MALONEY
16
17   GREGORY JOSEPH
17   ERIC FISHER
18        Attorneys for Industrial Risk Insurers
18
19   SCHIFF HARDIN
19        Attorneys for The Port Authority of New York and New
20        Jersey
20   BY:  BETH JACOB
21        ROBERT RILEY
21
22   CLEARY GOTTLIEB STEEN & HAMILTON
22        Attorneys for Citigroup-Related Defendants
23   BY:  THOMAS J. MOLONEY
24
25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

4BU7SEPM
1             (Case called)
2             (In open court)
3             THE COURT:  I have three motions before me, the
4    property damage cases dealing with 7 World Trade Center.  I
5    want to have the motion by the City argued first, the motion by
6    the Port Authority argued second, and the motion by Citigroup
7    argued third.
8             Two observations to begin with.  My view upon
9    reviewing all these papers is that the motions are premature.
10   Rule 12(b)(6) provides that if affidavits are introduced in
11   support of a motion to dismiss for failure to state a claim,
                         Page 1

11.30.04_Transcript.txt
12    and affidavits are presented, it's discretionary on my part
13    whether to entertain those affidavits, in which case the motion
14    is converted to Rule 56 or whether to deny the motion on the
15    basis of items being introduced outside the record.
16          My feeling with regard to all or mostly all of these
17    motions is that they depend on facts that have to be introduced
18    into the record, and proper order would involve the allegations
19    of the affirmative defenses as part of an answer, limited
20    discovery perhaps, and a renewal of the motion.
21          I think there is substantial merit with respect to the
22    motions to the extent that I have read them, assuming that the
23    facts as promised are proved, but I think it's premature at
24    this point to deal with some of the very difficult issues that
25    are presented, especially because it's highly likely that the
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                                    3

4BU7SEPM
1     aggrieved party will want to appeal, and I owe it to the Court
2     of Appeals to provide a better record.
3           The second observation is that although Citigroup's
4     motion is not yet ready, it seems to me that the same issues
5     are implicated, or much the same issues are implicated, and I
6     think I can probably dispose of the issues on the
7     nonsubstantive grounds I'm suggesting and get all these cases
8     into a posture where in very short order I will be able to
9     entertain motions and rule upon them with a good record.
10          These are just preliminary views.  They are subject to
11    your arguments and my being educated by your arguments, but
12    let's proceed on this basis.  Who is going to be arguing for
13    the City?
14          MR. SCHEIMAN:  My name is Eugene Scheiman, your Honor.
15    I am a member of the firm of Buchanan Ingersoll, counsel to the
16    City of New York.
17          THE COURT:  And who is going to be arguing in
18    opposition?
19          MR. KALLMANN:  Stanley Kallmann from the firm of
20    Gennett Kallmann Antin & Robinson, representing the plaintiffs
21    Aegis.
22          THE COURT:  All right.  Mr. Scheiman, please proceed.
23          MR. SCHEIMAN:  Thank you, your Honor.  Your Honor,
24    with respect to the City, the plaintiffs bring two causes of
25    action -- negligence and negligence per se -- allegedly based
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                                    4

4BU7SEPM
1     on the existence of a 6,000 gallon diesel fuel tank located on
2     the first floor of 7 World Trade Center.  This tank was used to
3     fuel the emergency power generators required by the City's
4     Office of Emergency Management located on the 23rd floor of
5     that building.  According to plaintiff, the tank allegedly
6     caused or contributed to the fires that caused the collapse of
7     World Trade Center 7 and the destruction of the ConEd station
8     located below.
9           We base our motion to dismiss both causes of action on
10    statutory and common-law immunities granted to the City and on
11    plaintiff's failure to allege violation of a statute or rule of
12    statewide applicability with respect to its negligence per se
13    claim.
14          Your Honor, with respect to the City's immunity
15    claims, I start with the proposition long held in this country
16    that governments are formed and exist in great part to effect
                    Page 2

11.30.04_Transcript.txt
17    the safety and security of their citizens.  In recognition of
18    that obligation, New York in 1951 passed the Defense Emergency
19    Act.  This Act, based on a similar federal act, the Civil
20    Defense Act, was designed to allow planning for, acting during
21    and acting after an enemy attack.  The Defense Emergency Act
22    focuses on civil defense and defines that term broadly as,
23    among other things, "measures to be taken in preparation for
24    anticipated attacks, including operational plans, provision of
25    suitable warning systems and the construction or preparation of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            5

4BU7SEPM
1    shelters and control centers."
2            Because the legislature recognized the critical need
3    for the state and its municipalities to undertake civil defense
4    activities, it determined that they would be immune from
5    liability claims based on the planning and performance of civil
6    defense activities, thus the legislature granted immunity for a
7    municipality which in good faith carries out activities, among
8    other things, in preparation for anticipated attacks.
9            THE COURT:  Isn't good faith an issue?
10           MR. SCHEIMAN:  Yes.  There has been no claim to the
11   contrary, your Honor, of bad faith.
12           THE COURT:  You haven't set up the defense yet.
13           MR. SCHEIMAN:  I understand we haven't furnished
14   pleadings, your Honor, but there has been no pleading with
15   respect to bad faith.
16           THE COURT:  How do you know it will not be an issue of
17   good faith?
18           MR. SCHEIMAN:  I know the complaint does not allege
19   bad faith.
20           THE COURT:  But it doesn't have to.  The complaint
21   bases its theory on negligence.
22           MR. SCHEIMAN:  Correct.
23           THE COURT:  The issue of good faith does not come into
24   the case until you bring it into the case.
25           MR. SCHEIMAN:  Well, your Honor, when I gave you the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            6

4BU7SEPM
1    definition that I just did, that does not bring the issue of
2    good faith into the case.  If the pleading only goes to
3    negligence, there is no issue of good or bad faith.
4            THE COURT:  Correct.  But then when you produce the
5    defense and base it on preparedness, you have other issues that
6    can be injected.  For example, is defense preparedness the only
7    purpose?  Are the City's activities in good faith?  What does
8    good faith require?  What does it entail?
9            MR. SCHEIMAN:  Again, your Honor, because the pleading
10   only guess to negligence, I don't think we have the burden of
11   proving or stating good faith in our response to the complaint.
12   That's assumed, unless the complaint brings it into the case.
13           THE COURT:  But it doesn't have to bring it into the
14   case until you raise the defense.
15           MR. SCHEIMAN:  Well, I believe, your Honor, I'm moving
16   now for a dismissal based on the face of the statute and the
17   pleadings, and since the pleadings just go to bath faith --
18           THE COURT:  The pleadings allege a claim of
19   negligence.
20           MR. SCHEIMAN:  Correct, and no more than negligence,
21   your Honor.  There is no pleading with respect to good or bad
                        Page 3

11.30.04_Transcript.txt
22    faith.
23              THE COURT:  But it doesn't have to.  Why does it have
24    to anticipate that the City will raise a defense?
25              MR. SCHEIMAN:  Because the City's immunity is well
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4BU7SEPM
 1    known.
 2              THE COURT:  It may be well known, but the City may
 3    choose not to raise the defense.
 4              MR. SCHEIMAN:  I suggest, your Honor, that that is
 5    something that would be rather farfetched, and counsel would
 6    know that.
 7              THE COURT:  Maybe, but counsel doesn't have to
 8    anticipate it.
 9              MR. SCHEIMAN:  I respectfully disagree, your Honor.  I
10    think it needn't be in the complaint for the motion to survive
11    a motion to dismiss.
12              THE COURT:  Mr. Kallmann?
13              MR. KALLMANN:  Well, I would certainly want to find
14    out for purposes of the common-law immunity, as well as the
15    asserted statutory immunities, what the response of the City
16    was when they were allegedly told by the fire department that
17    it was an extreme hazard to have the fuel oil system in this
18    particular building, specifically a hazard to life and
19    property, and what the City's reaction was.
20              THE COURT:  Suppose the City said this is the only
21    place, we have to have our preparedness in the heart of the
22    city, we have to put it in a place where it's accessible to the
23    Mayor and high city officials, and necessarily it has to be in
24    a dense area.  Isn't the City entitled to immunity?
25              MR. KALLMANN:  If they exercised discretion, they
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

4BU7SEPM
 1    would be entitled to immunity.  The question, as we pointed out
 2    in the cases, and including in particular the Court of Appeals
 3    case in Haddock, the question is whether or not they exercised
 4    discretion, not whether or not they could have exercised
 5    discretion.
 6              THE COURT:  Well, deciding to put an OED in a
 7    particular place is a discretionary act.
 8              MR. KALLMANN:  But they didn't necessarily have to
 9    have the fuel oil systems in the location which they were.
10              THE COURT:  It's a matter of judgment.
11              MR. KALLMANN:  Well, it may be, or they may have
12    sloughed it off.  If your Honor reviews the cases that we cite
13    in our brief, a sloughing off by an agency which otherwise
14    could exercise its discretion will not result in that agency
15    getting the benefit of immunity.
16              THE COURT:  What do you mean sloughing off?
17              MR. KALLMANN:  Well, sloughing off is --
18              THE COURT:  You have to make a decision.  The fuel
19    generators have to be in some place accessible to where they
20    are going to be used.  You can't have pipelines going through
21    the city.
22              MR. KALLMANN:  The City was apparently warned not to
23    put the fuel systems in this building the way they were put in.
24    If the City disregarded without any kind of analysis, just
25    disregarded the actions or the recommendations of the fire
                    SOUTHERN DISTRICT REPORTERS, P.C.

11.30.04_Transcript.txt
(212) 805-0300

9

4BU7SEPM
1   department, that would be a sloughing off within the meaning of
2   the Haddock case and the cases which address that
3   particular issue.  There has to be, under the cases, a reasoned
4   decision on the part of the City.  The two cases that we cite
5   in our brief, Santiago v. The Transit Authority and Chase v.
6   the Transit Authority illustrate that point.  They were both
7   decided in the Second Department.  They are a year apart.  And
8   the Second Department in the first case, Santiago, refused to
9   give immunity for the City, involving an assertion that the
10  City was improperly running its trains into train stations at
11  full speed.  The City produced nothing to show that it had made
12  a studied decision to --
13           THE COURT:  So one issue is how the City deliberated
14  in relationship to the fire department recommendation.
15           MR. KALLMANN:  Exactly.
16           THE COURT:  What other issues are there?
17           MR. KALLMANN:  As far as the common-law immunity is
18  concerned?  That's basically it.  The City --
19           THE COURT:  And no other factual issue?
20           MR. KALLMANN:  Well, the factual issues will address
21  who made the decisions, when they were made and under what
22  basis they were made.  Those are the decisions.
23           THE COURT:  And what else?
24           MR. KALLMANN:  I would say those are basically the
25  decisions.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

10

4BU7SEPM
1            THE COURT:  So that's the only issue of fact that
2   needs to be addressed.
3            MR. KALLMANN:  I believe so, yes.
4            MR. SCHEIMAN:  May I?  Your Honor, I think that
5   question is not a question of fact that need be decided or even
6   looked at.  I think the City's exercise of discretion came
7   about when it decided to lease property at 7 World Trade Center
8   and entered into a lease which required that the architects and
9   engineers of the lease owner be used to plan the design and
10  plan the location of the 6,000 gallon tank.  That's in the
11  public record of the City of New York.  It's contained in our
12  brief, and that is the exercise of discretion which put this in
13  a good faith posture and removes any issue of fact from being
14  necessarily decided before you grant the motion.
15           THE COURT:  Mr. Kallmann, is another issue whether or
16  not the City housed any of its other agencies at the place, and
17  whether there were fuel tanks for other agencies?
18           MR. KALLMANN:  I don't know whether they housed any
19  other agencies.  Our only information is to the OEM.  It's
20  conceivable, but I don't know the issue.
21           THE COURT:  So that's another factual issue.
22           MR. KALLMANN:  Could be.
23           MR. SCHEIMAN:  The pleadings say that the OEM was
24  located at 7 World Trade Center, and if that's the only factual
25  issue, I suppose we could take very limited discovery with
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

4BU7SEPM
1   respect to that, but I can tell the court that that's what the
2   lease says.
                        Page 5

11.30.04_Transcript.txt
3          THE COURT:  I think, Mr. Scheiman, my view is that you
4    are probably correct in your defense, but I think it's
5    premature.  I think I've got to allow Mr. Kallmann reasonably
6    to test the decision to make 7 World Trade Center the Office of
7    Preparedness in case of emergency.  I think that goes to the
8    issue of good faith perhaps, also how the City reacted in
9    response to what the fire department recommended and what
10   alternatives there were, and if the use of the fuel generators
11   was for Preparedness or other functions of government.  And
12   there may be several other issues, but I think that these are
13   narrow factually drawn issues that need not go very extensively
14   into why the City decided to do things, as long as there was
15   some reasoned decision making.  And then you will be in a
16   position to renew your motion.
17          MR. SCHEIMAN:  Well, with that in mind, I will not go
18   into the other immunity arguments that I had, but I will turn
19   to the negligence per se cause of action.
20          THE COURT:  With regard to the other immunity issues,
21   I ruled on them, and I don't know that I want to revisit that
22   ruling.
23          MR. SCHEIMAN:  Well, the other immunity issues for the
24   City are the Defense of Emergency Act, the Disaster
25   Preparedness Act and common-law immunity for governmental
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            12
4BU7SEPM
1    agencies.
2          I know you ruled with respect to the Port Authority
3    and with respect to World Trade Center 1 and 2, but the
4    situation, the factual situation at World Trade Center 7 is
5    quite different.
6          THE COURT:  It is different, and the focus of the
7    complaint is the secondary explosion that brought down the
8    building.
9          MR. SCHEIMAN:  That's correct.
10         THE COURT:  And that should be the focus of the
11   complaint, and to the extent that anything more is added by
12   common-law immunity, I think you will allege it.  I think it
13   should be alleged.  And we will go over dates later on.
14         MR. SCHEIMAN:  Your Honor, I don't want the record to
15   show that I agree that an explosion caused the building to come
16   down.  Your Honor stated that it did.  I don't believe that's
17   the fact.  We will get into that later.
18         THE COURT:  Well, that's the ground for negligence.
19         MR. SCHEIMAN:  It could be.
20         THE COURT:  Well, what else is there alleged,
21   Mr. Kallmann.
22         MR. KALLMANN:  We don't assert an explosion.  We
23   assert that the protracted fire which was allowed to burn for
24   many, many hours beyond which it would have ordinarily burned
25   with the ordinary combustibles in the building, that that
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            13
4BU7SEPM
1    protracted fire eventually weakened the structure which lead to
2    its eventual collapse.
3          THE COURT:  That's a better way to put it.
4          MR. SCHEIMAN:  Going to the negligence per se cause of
5    action, your Honor, I think the law in New York --
6          THE COURT:  How could you have a negligence per se
7    action against the City based on a city ordinance?
                           Page 6

11.30.04_Transcript.txt

8          MR. KALLMANN:  It may well be in the end that we
9     don't.  On the other hand, the cases on the subject, Elliot in
10    particular, which is certainly favorable to the defense, the
11    Elliot case recognizes that there are situations in what they
12    describe as a quote appropriate case in which a negligence per
13    se could be applicable in regard to a city ordinance.
14          We have here from the report that we have submitted of
15    Doctor Fred Mauer, we have here a situation in which the fuel
16    tank in question was grossly in excess of what the city code
17    would have allowed, grossly in excess at that particular
18    location.
19          I recognize that the city code is not technically
20    applicable in the Port Authority facility because the Port
21    Authority is not subject to city code, but here, where the City
22    institutes a code and then grossly ignores the code, and
23    perhaps then ignores the advice of its own fire department that
24    there is a threat to life and safety, this might be the quote
25    appropriate case for the invocation of negligence per se, even
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                14
4BU7SEPM
1     within the Elliot case.
2          THE COURT:  You will pardon me for interrupting, but
3     there is a long calendar, and I want to make sure we cover
4     everything.
5          I think this is an incident of good faith in terms of
6     the City's entitlement to immunity and not negligence per se,
7     but I will deal with it all.  I'm not going to dismiss a part
8     of the claim today.
9          All right.  I think I know where this is, and I rule
10    that it's premature at this time.  I deny the motion without
11    prejudice to renewal upon a more complete record.  The City
12    will allege its affirmative defenses in its answer.  We will go
13    over the dates, but let's figure on a ten-day span.
14          MR. SCHEIMAN:  Just briefly, for the sake of the
15    record, with respect to your Honor's ruling that the motion is
16    premature, I do want to note that the affidavit that we
17    attached to our papers only contains public documents and was
18    for the convenience of the court, so it really added no factual
19    material to the record.
20          THE COURT:  We are not going to debate that.
21          MR. SCHEIMAN:  I understand, your Honor.
22          THE COURT:  You will amend.  I want the two of you to
23    create a narrow discovery plan that will allow Mr. Kallmann
24    reasonably to test the propositions that you alleged for your
25    affirmative defense, and I will look forward to an early
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                15
4BU7SEPM
1     renewal of the motions, and I will deal with all issues at that
2     time.
3          MR. SCHEIMAN:  Thank you.
4          THE COURT:  Okay.  Now we will deal with the Port
5     Authority.
6          Who is going to be arguing for the Port Authority?
7          MS. JACOB:  May it please the court, my name is Beth
8     Jacob of Schiff Hardin, and we represent the Port Authority of
9     New York and New Jersey.
10          THE COURT:  And who is going to be arguing in
11    opposition?
12          MR. JOSEPH:  Your Honor, Gregory Joseph.
                        Page 7

11.30.04_Transcript.txt
```
13            THE COURT:  Good morning, Mr. Joseph.
14            MR. JOSEPH:  Fine.  I will be arguing on the issues
15   other than notice.  Mr. Kallmann will be arguing on the issue
16   of notice.
17            MR. KALLMANN:  And we will both be arguing on the
18   issue of waivers of subrogation.
19            THE COURT:  Only one.
20            MR. KALLMANN:  There are different issues as far as
21   the waiver is concerned as applicable to the two different
22   releases.  We would not be replicating what the other one says.
23            THE COURT:  Okay.
24            MR. MALONEY:  And, your Honor, Patrick Maloney for
25   plaintiff certain underwriters.  We also have a waiver of
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                16

4BU7SEPM
```
1    subrogation argument different from the other two plaintiffs.
2             THE COURT:  Okay.
3             MS. JACOB:  And, your Honor, if I may, one
4    housekeeping matter.  When this case was pending before Judge
5    Koeltl we had moved to have Robert Riley admitted pro hac vice
6    to represent the Port Authority also in this court.  Mr. Riley
7    is a partner at Schiff Hardin, and he is out of our Chicago
8    office.  He is a member in good standing of the bars of
9    Illinois and Wisconsin, of the Central District of Illinois,
10   the Third Circuit and the Seventh Circuit, and I would ask that
11   his admission be accepted at this time.
12            THE COURT:  The motion is granted.  I take it that you
13   have filed papers.
14            MS. JACOB:  We have filed the papers and we have
15   submitted the check, your Honor.
16            THE COURT:  You might find out where it is.
17            MS. JACOB:  I will do that.
18            THE COURT:  Contact Miss Jones, and I will sign it as
19   soon as I get it.
20            MS. JACOB:  Thank you.
21            Your Honor, with respect, I did hear what the court
22   said before we started.  We do believe, however, that in large
23   part our motion is not premature.  I know that I am one of the
24   ones who submitted the declaration, but our declaration merely
25   brought to the court's attention the leases that were referred
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                17

4BU7SEPM
```
1    to in the complaints and, therefore, are part of the complaint
2    and are appropriately before the court on the motion to
3    dismiss.
4             If, as we argue, it is clear from the language of the
5    leases --
6             THE COURT:  But I don't have the insurance clauses
7    themselves.
8             MS. JACOB:  No, that is correct, your Honor.  But we
9    did cite case law to you which indicates that if the lease
10   provisions provide --
11            THE COURT:  They're split, right?
12            MS. JACOB:  There is I think one case going the other
13   way, that's correct, which we did cite, but I believe the
14   better law --
15            THE COURT:  It may be the better law, but there is no
16   good judicial reason that I should not allow a record to be
17   developed.  It's a simple matter to require the plaintiffs to
```
                              Page 8

11.30.04_Transcript.txt
18  produce the insurance policies in question, including their
19  insureds' files, to see what the negotiations were in
20  connection with the antisubrogation clause, and then to renew
21  the motion on a complete record.  It makes better sense.  This
22  is going to go up, so why have an imperfect record?
23          MS. JACOB:  Your Honor, that may be appropriate with
24  respect to Aegis Insurance, because I would concede that lease
25  is perhaps the least clear, and we don't have the insurance
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                18
4BU7SEPM
1   policy.  But with respect, for example, to the lease agreement
2   with certain underwriters and Citigroup, I think that one is
3   clear and we do not need the insurance policy for that.
4           THE COURT:  Why not?
5           MS. JACOB:  Because there is a provision in that lease
6   that says even if the insurance policy does not include a
7   waiver of subrogation, then the parties release each other.
8           THE COURT:  The problem with relying on the release
9   alone is that you have the issue of gross negligence.
10          MS. JACOB:  Not with respect to the Port Authority,
11  your Honor.
12          THE COURT:  Why is that?
13          MS. JACOB:  Because all that was pleaded against the
14  Port Authority was negligence.  There is no allegation of gross
15  negligence with respect to the Port Authority.  We are not a
16  landlord, we're a superior lessor.  So the issue with respect
17  to gross negligence which was raised against Citigroup was not
18  pleaded against us.  It was not included in the notice of
19  claims either, so thus it is just a case of simple negligence
20  and that is released in I think 12.06(d).  And I did hand the
21  portions of the leases on which we would be relying --
22          THE COURT:  Yeah, they are in your brief.
23          MS. JACOB:  They are also in the brief.
24          THE COURT:  It's 12.06(b) and (c).  C is the waiver of
25  subrogation.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                19
4BU7SEPM
1           MS. JACOB:  And D is the release which explains the
2   scope of the waiver subrogation, and also provides this would
3   be a lease if for some reason the insurance policy doesn't
4   include it.
5           THE COURT:  That's the perfect defense, right?
6           MS. JACOB:  That's what we believe.
7           THE COURT:  Let's see what Mr. Joseph says.
8           MS. JACOB:  Although, your Honor, this is with respect
9   to certain underwriters, not to IRI.
10          THE COURT:  Who is responding to this one?
11          MR. MALONEY:  Your Honor, Patrick Maloney.  With
12  respect to the argument of waiver of subrogation and the lease,
13  the underwriters have two responses.  One, the waiver of
14  subrogation itself says that there will be a waiver with
15  respect to the building or the demised premises.  The demised
16  premises is a defined term within the lease.
17          THE COURT:  So you are excepting tenant's property.
18          MS. JACOB:  It excepts tenant's property from the
19  definition of demised premises and, therefore, it is excepted
20  from the waiver of subrogation.  With respect to the lease
21  argument --
22          THE COURT:  Which reduces the claim pretty much to
                                Page 9

                              11.30.04_Transcript.txt
23    nuisance value.
24            MR. MALONEY:  The claim for tenant's property?  I
25    disagree, your Honor.  The tenant's property --
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    20
      4BU7SEPM
 1            THE COURT:  In relationship to other values at stake
 2    here.
 3            MR. MALONEY:  Well, you know, I mean the tenant's
 4    property has a claim value of approximately $280 million, your
 5    Honor.
 6            THE COURT:  I doubt it.
 7            MR. MALONEY:  And that was the subject of the
 8    litigation before Judge Cedarbaum, and the Port Authority has
 9    just submitted to your Honor the decision in that case.  But it
10    certainly is a --
11            THE COURT:  You have two exceptions:  Tenant's
12    property -- whatever value it has -- and use and occupancy.
13            MR. MALONEY:  And also, your Honor, with respect to
14    12.06(d), which is the release language, there is clearly
15    something missing here, which is the language that extends the
16    release to the superior lessor.  So we have to turn back to
17    12.06(c).  And it says the waiver of subrogation or the
18    permission for release, referring to clause B, applies to --
19    and if you follow the train of definitions -- applies to the
20    Port Authority.  But if we turn to clause D, which is the
21    release language, that language bringing the Port Authority
22    within the protection of the release, it isn't there.
23            THE COURT:  So all this is to say that we need the
24    insurance policies.  Ms. Jacob?
25            MS. JACOB:  Your Honor, with all due respect, I don't
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    21
      4BU7SEPM
 1    think so.
 2            THE COURT:  It's a harder issue.  I have to work to
 3    find your way.
 4            MS. JACOB:  That is correct, your Honor.
 5            THE COURT:  I'm against doing unnecessary work.
 6            MS. JACOB:  Obviously if we're named in the insurance
 7    policy -- it will definitely be easier if the insurance policy
 8    names us.  I cannot argue with that one.
 9            THE COURT:  Let's do an answer.
10            MS. JACOB:  Okay, your Honor.  I would like to just
11    mention -- unless you want to just move on to hearing from IRI,
12    but the argument with them is a little bit different.
13            THE COURT:  Make your argument against IRI, and then
14    we will see where we go with that.
15            MS. JACOB:  There are two points, and I will try to
16    summarize them briefly.  One is, again, if we look to the
17    provisions of the lease, the Port Authority clearly was
18    supposed to be a named insured.  This isn't a waiver of
19    subrogation now.  This is we were supposed to be a named
20    insured on that insurance policy.
21            There is also Section 17.1, and 17.1 clearly spells
22    out the relationship between Silverstein and the Port Authority
23    and says that Silverstein will indemnify the Port Authority for
24    any damages or any losses caused by acts of its tenants,
25    Citigroup.  And what is happening in this complaint is there is
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                  Page 10

11.30.04_Transcript.txt

22

4BU7SEPM
1  an allegation that Citigroup constructed an emergency backup
2  generator system with or without -- well, the complaint says of
3  course with negligence by the Port Authority -- which led to
4  the destruction of the building.  But Section 17.1 states that
5  Silverstein could not sue us for that.  And if Silverstein
6  cannot sue us, with all due respect, neither can Silverstein's
7  insurers.
8           THE COURT:  Well, does disability necessarily apply to
9  the subrogee?
10          MS. JACOB:  The subrogee stands in the shoes of the
11 subrogor.  It has no rights greater than its insured.
12          THE COURT:  It's true as a general proposition, but is
13 it necessarily true with regard to a disability of suit clause?
14          MS. JACOB:  Your Honor, I can't offhand think of a
15 particular case on point, but I think it is.  I'm not aware of
16 any authority.  I should put it the other way.  I am not aware
17 of any authority that goes the other way.
18          The second point which I wanted to bring up has to do
19 with the certificate of insurance.  I know the argument is it's
20 not worth the paper it's written on, but the certificate of
21 insurance was issued by Silverstein's broker, Silverstein's
22 agent.  And in fact that was a position taken by IRI before
23 Judge Cedarbaum, that Willis was Silverstein's agent.  If
24 that's the case, then Silverstein is bound by the acts of its
25 agent in putting the Port Authority on the insurance policy
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

23

4BU7SEPM
1  and, therefore once again IRI in this situation is bound by
2  Silverstein.
3           THE COURT:  All right.  So your argument in a nutshell
4  is that if the insured can't be sued under a subrogation
5  clause, neither can the additional insured.
6           MS. JACOB:  I think it's that if the insured cannot
7  sue us, then its subrogated insurer cannot sue us either.
8           THE COURT:  Both places.
9           MS. JACOB:  Yes.
10          THE COURT:  Mr. Joseph?
11          MR. JOSEPH:  Thank you.  First, we did put the policy
12 in.  We sent it by letter to Judge Koeltl, so it is there, a
13 letter dated July 28, 2004, and it's very clear that the Port
14 Authority is not an insured.
15          Judge Cedarbaum evaluated the certificate -- which
16 with all respect to my good friend Miss Jacob --
17          THE COURT:  Let me stop you.  This goes back to a
18 lease in 1985, is it?
19          MR. JOSEPH:  1980.
20          THE COURT:  1980.  And at that time the Port Authority
21 was not named as an additional insured?
22          MR. JOSEPH:  We were not on this risk at that time,
23 your Honor.  I cannot say what happened prior to '98.
24          MS. JACOB:  Your Honor, I believe the Port Authority
25 was clearly named as an additional insured up until maybe it
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

24

4BU7SEPM
1  was 2000 when IRI became the insurance company.
2           THE COURT:  How do you prove that, Ms. Jacob?
3           MS. JACOB:  We are not relying on that fact.  That was
                          Page 11

11.30.04_Transcript.txt
```
 4  just a response to the court's question.  That was a --
 5            THE COURT:  Well, it's a useful fact.
 6            MS. JACOB:  That was found by Judge Cedarbaum in an
 7  action which IRI was a party and, therefore, it should bind
 8  IRI.
 9            THE COURT:  So it's collateral estoppel.
10            MS. JACOB:  To the extent it's a fact relative to
11  their case, yes, and that's according to her decision.
12            MR. JOSEPH:  Your Honor --
13            THE COURT:  All of this suggests that it's premature
14  at this time to make these rulings.  I need to let the two of
15  you do again limited discovery.  I don't mean open up the whole
16  case.
17            I envision that discovery will focus on the defenses
18  and enable you to renew the motion on a complete record.  And
19  then if there are gaps, I will be able to deal with the gaps.
20  You will know better, I will know better, Mr. Joseph will know
21  better, and we can deal with the issue in a better way.
22            MR. JOSEPH:  Fine, your Honor.
23            MS. JACOB:  Your Honor, we're not totally giving up.
24  We have two more points.
25            THE COURT:  Well, you haven't lost anything.  It's
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

4BU7SEPM
```
 1  just a little work, which is profitable.
 2            MS. JACOB:  One has to do with the notices of claim.
 3            THE COURT:  Yes, I want to deal with that issue.
 4            MS. JACOB:  Those I think clearly are not premature.
 5  That's a jurisdictional issue which has to be decided on the
 6  pleadings and on the notices of claim.
 7            THE COURT:  I agree.  And isn't New York law to the
 8  effect that the plaintiff has to allege compliance with the
 9  notice?  Or is it a matter of defense?  Or does anyone know?
10            MS. JACOB:  Your Honor, I am ashamed to say I can't
11  answer that, and I should be able to, but I can't.  The
12  plaintiffs --
13            THE COURT:  It shouldn't make any difference.  It's a
14  threshold issue.  I have to deal with it.
15            MS. JACOB:  The plaintiffs did at least in two of the
16  three cases submit the notices of claims with their complaints,
17  and what we are arguing is not that they failed to plead it but
18  that the notices of claim themselves are defective for the
19  scope of the complaints.
20            THE COURT:  I would like to take it up with you.  Let
21  me find the notice of claim.
22            MS. JACOB:  Your Honor, if I could just step to pull
23  the documents myself.
24            THE COURT:  Yes.
25            MS. JACOB:  Your Honor, with respect to really three
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

4BU7SEPM
```
 1  of them.  The first of our claims or arguments is that all
 2  three plaintiffs allege breach of contract causes.  None of
 3  them mention breach of contract in the notices of claim.  And
 4  we believe it is fairly clear that, therefore, they cannot
 5  bring those actions.  Their response is, well, it's the same
 6  facts, it all has to do with the event --
 7            THE COURT:  It doesn't make any difference.
 8            MS. JACOB:  It should not make any difference.  I
```
Page 12

11.30.04_Transcript.txt
```
 9  think it's clear whatever the latitude is under the municipal
10  law with respect to notices of claims again the City, it is
11  fairly clear you don't have that latitude with respect to
12  claims against the Port Authority.
13              THE COURT:  And I have so held.
14          MS. JACOB:  And you have so held, yes.
15              THE COURT:  Could you focus me, taking these notices
16  one by one, first the IRI notice.
17              MR. JOSEPH:  It's Exhibit I.
18              THE COURT:  I have it in front of me, but I want
19  Ms. Jacobs to read out the precise phraseology.
20          MS. JACOB:  The IRI notice, the relevant part of it is
21  the second paragraph where it says the nature of the claim.
22              THE COURT:  It's a claim for property damage as a
23  result of the negligence of the Port Authority.
24          MS. JACOB:  Correct.
25              THE COURT:  And that's the basis for your saying that
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                                    27

4BU7SEPM
```
 1  it doesn't include a breach of contract claim.
 2          MS. JACOB:  That's correct.  And it runs through a lot
 3  of alleged negligence, but it doesn't say anything about any
 4  contract claim.
 5              THE COURT:  What is the breach of contract claim?  Is
 6  it the status of the Port Authority as a lessor?
 7              MR. JOSEPH:  Your Honor, it's negligence.  I mean they
 8  hold themselves to a duty of negligence in the lease, so
 9  substantively it's identical.  It's true that the notice does
10  not mention the contract.  The contract --
11              THE COURT:  Are you arguing that the contract provides
12  a duty for the negligence?
13              MR. JOSEPH:  That's correct, but that is one of the
14  bases for a duty of negligence.  It changes nothing to have the
15  contract claim in the case.
16              THE COURT:  I think that's right.  I think the
17  contract is the context.  The negligence is what's actionable.
18          MS. JACOB:  With all due respect, if the breach of
19  contract claim is permitted to be made, it's not just
20  negligence -- it has perhaps negligence -- it's what the breach
21  is, but there are differences in terms of what the plaintiff
22  would have to prove and what the responsibilities would be of
23  the Port Authority under the contract.
24              THE COURT:  I would have to examine that in detail.  I
25  can understand both points.  And I don't know when would be the
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                                    28

4BU7SEPM
```
 1  right time to deal with that, but as I understand the nature of
 2  the complaint the complaint is for negligence of the Port
 3  Authority allowing these fuel tanks to be constructed on the
 4  property, and the context providing the duty is the lease.
 5          Now, if there are different provisions in the lease
 6  that change the duty, either ameliorating it or exacerbating
 7  it, then I might have to get into these issues, but I'm not
 8  sure I do, so I'm responsive to any precise claims in terms of
 9  motions to strike or not strike, but I think in the large
10  Mr. Joseph is correct.
11          MS. JACOB:  Your Honor, but I think the difference is
12  that, precisely as the court said, they base their duty
13  argument on the lease, not on some other obligation the Port
```
                           Page 13

11.30.04_Transcript.txt
14    Authority might have.  And what we are saying is that they
15    can't do that, because they did not bring up the lease in the
16    breach of contract, in the notice of claim.  They have to go on
17    a general, if there is some other basis for the negligence
18    argument.  But they just made a pure negligence claim against
19    us.  They did not make a breach of contract claim against us,
20    however much that breach of contract may have been negligence
21    and conduct under the lease.
22            THE COURT:  I hold that it's fairly described in the
23    first sentence of paragraph 2 of the IRI notice, where it
24    states the claim is for property damage as a result of the
25    negligence of the Port Authority acting in its proprietary
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                        29

4BU7SEPM
1    function as owner and landlord of 7 World Trade Center, New
2    York, New York, and other sentences like that.  And I will
3    reserve decision as to whether or not the negligence has to be
4    informed by any particular duties undertaken by the contract.
5            MS. JACOB:  Your Honor, did you want to look at the
6    other notices of claim?
7            THE COURT:  Yes.
8            MS. JACOB:  Attached to my first declaration as
9    Exhibit M is the notice of claim of Aegis Insurance.  We attach
10    that because the notice of claim that they attached to their
11    amended complaint was their old notice of claim, not the one
12    that included Consolidated Edison, so this is really not
13    bringing anything in outside the record.  And again we look to
14    paragraph 2, the nature of the claim.
15            THE COURT:  Let me get hold of this for a minute.
16    All right.
17            MS. JACOB:  And this one again is very similar, but
18    what is missing from the notice of claim submitted by Aegis and
19    ConEd is the language that the court looked at with respect to
20    IRI, which was a reference to the Port Authority as owner and
21    landlord.
22            This just refers to a result of the negligence and
23    carelessness of the Port Authority, which consisted -- and it
24    then lists the alleged negligent acts in the installation,
25    approval and so on and so forth of the fuel tanks.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                        30

4BU7SEPM
1            THE COURT:  It's less clear but still sufficiently
2    clear to constitute an adequate notice.  I make the same
3    ruling.
4            MS. JACOB:  Well, your Honor, certain underwriters'
5    notice of claim is quite similar.
6            THE COURT:  It would still be the same ruling.
7            MS. JACOB:  I assume it's the same ruling.
8            THE COURT:  Thank you.  So you will also have ten days
9    within which to answer, but again we will go over the dates
10    after we finish.
11            MS. JACOB:  Your Honor, there is one more basis, and I
12    am well aware of the court's decision.
13            THE COURT:  I am not going to change my mind.  This is
14    on a supervening cause?
15            MS. JACOB:  Yes, your Honor.
16            THE COURT:  I am not changing my mind.  The factual
17    setting is a little different.  Your argument is that the cause
18    of the fire was the airplanes crashing into 1 and 2, and you
                            Page 14

11.30.04_Transcript.txt
19    are arguing that they are supervening events arising from the
20    secondary causes of the fire in 7 World Trade Center, and the
21    alleged decision of the fire department not to fight the fire
22    in 7.
23              For the reasons that informed my decision with regard
24    to the same issue arising in buildings 1 and 2, I hold that
25    these are issues of fact that need to be developed on the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    31
4BU7SEPM
1    record, and I invite renewal of these motions at such time as
2    the record is sufficiently developed.
3              MS. JACOB:  Thank you, your Honor.
4              THE COURT:  Is there anything else on the Port
5    Authority?
6              MS. JACOB:  That does take care of the Port
7    Authority's motions, your Honor.
8              THE COURT:  Thank you.
9              MR. MOLONEY:  Good afternoon, your Honor.  Tom Moloney
10   on behalf of Citigroup.  I somewhat anticipated, your Honor,
11   that you might be concerned about deciding these motions on
12   this record.  I would point out that we cite I think the
13   definitive case in this Circuit in our brief, and it's the case
14   Chambers v. Time Warner, and that's a Second Circuit decision
15   on February 21, 2002, where the court discusses at great length
16   what criteria a court should use in terms of looking outside
17   the record at this stage.
18              Your Honor is completely correct in terms of your
19   willingness to consider certain documents.  That's totally a
20   matter of your Honor's discretion as to whether you want to
21   convert this to summary judgment or not, but certain documents
22   don't fall in that category and actually the court is required
23   to consider in connection with a motion to dismiss, and those
24   are documents in the words of the Second Circuit that are
25   essentially integral to the complaint.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    32
4BU7SEPM
1              And in analyzing that, the court says these are
2    documents in which the plaintiff had to rely, and it took large
3    consideration of the fact that these are documents that the
4    plaintiff had in their position when they filed their lawsuit.
5    So it's something they had to have considered and relied upon.
6              With that in mind we put together some charts that
7    support our motion on two documents.  One is the lease which is
8    clearly a document that is integral to the complaint.  And
9    second is IRI's own insurance policy, which is something they
10   clearly had possession of.  They had to rely on it, because
11   they are suing as subrogor, and that is before your Honor, and
12   there is no dispute by our side that we put before your Honor
13   the proper policy.
14              So as to these two documents which are before your
15   Honor, there can be no question, and there would be no need to
16   take discovery to establish that both of these documents are
17   accurate.  I am sure Mr. Fisher would concede that statement
18   today, that both those documents are accurate.
19              If I might approach the bench.
20              THE COURT:  You may.
21              MR. MOLONEY:  So that the $750 we spent on this, this
22   is for your Honor's benefit, the big picture chart.
23              THE COURT:  I'm not sure we have the IRI insurance
                              Page 15

```
                        11.30.04_Transcript.txt
24   policy, but go on.  I will take it from there.
25             MR. MOLONEY:  I think we attached the relevant
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                        33
```
     4BU7SEPM
1    provisions, your Honor.  I haven't.  Rather than attach a huge
2    policy, there is only one provision we actually quote, which is
3    the first document I would like to refer in my motion.
4             But before I do that, I would like to draw your
5    Honor's attention to this, if I can walk up, your Honor, to
6    this large chart.  It kind of gave us a picture overview about
7    what this case is about.  I know you spent a lot of time --
8             THE COURT:  I am looking for a better place to put it
9    so people can follow along.  How about if you go against the
10   wall?
11            MR. MOLONEY:  I know your Honor spent a lot of time
12   with 1 and 2 World Trade Center.  That's your introduction to
13   this building.
14            THE COURT:  I have been in the building.  The SEC used
15   to be in that building.
16            MR. MOLONEY:  Yeah, it turns out that a lot of people
17   were there.  I will stand over here if I can, your Honor.
18            THE COURT:  I know that my former partner Len Boxer
19   did a lot of work for Silverstein.  I don't know if he was
20   involved with 7.  I know Strook was involved in leasing of 1
21   and 2.  I don't know if I have disclosed that in connection
22   with 7, but I have disclosed that earlier.
23            Also, my knowledge of a lot of the parties goes back a
24   long time.  I can repeat those, but I have already made that
25   disclosure.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                        34
```
     4BU7SEPM
1             MR. MOLONEY:  Yes, your Honor.  Essentially, your
2    Honor, the architecture of this arrangement was that the Port
3    Authority was the ground lessor, Silverstein was the ground
4    lessee and the space lessor.  Citigroup -- at that time it was
5    Salomon Brothers -- so this was Salomon's headquarters, now
6    they are called Citigroup Global, which is a change in our
7    lifetime and memory -- they are the space lessee.
8             Con Edison doesn't really have any relationship with
9    either 7 World Trade Center or Citigroup, even though that
10   motion is not being honored.  Essentially they have a contract
11   with the Port Authority.  I'm not going to argue that today.  I
12   understand that.  But they have a separate agreement.  And the
13   subrogee are Aegis for Con Edison and IRI as subrogee.
14            What is really critical to our motion is the consent
15   from IRI to 7 World Trade Center, which is what we would like
16   to focus on at the beginning.
17            If you look at tab 1 --
18            THE COURT:  So IRI paid Silverstein's damage claim?
19            MR. MOLONEY:  Correct.  They paid Silverstein's damage
20   claim, and they are now suing Citigroup under a subrogation
21   theory.
22            THE COURT:  Citigroup, CGMH.
23            MR. MOLONEY:  Yes.  And actually they are suing the
24   entire Citigroup family, even though --
25            THE COURT:  Well --
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                        35
```
                          Page 16
```

11.30.04_Transcript.txt
4BU7SEPM
1           MR. MOLONEY:  That's a separate point, but I put CGMH
2    because that's what Salomon is now known as.  That's the
3    Citigroup Global Market.
4           Essentially if you look at tab 1 in our tabs, your
5    Honor, this will give you the contractual language of the
6    lease, and you will see that on the lease there is no question
7    that Silverstein and Citigroup released each other, and they
8    provided that the release would be effective if the insurance
9    company, who Silverstein was required to obtain, as you will
10   see further on, agreed to permit the release.
11          And then if you turn the page you will see IRI's
12   insurance policy, which we quote from page 16.  And I am sure,
13   your Honor, this is part of what we submitted to the court.
14          THE COURT:  No, I accept that.
15          MR. MOLONEY:  It says, "This insurance shall not be
16   invalidated should the insurer waive by express agreement" --
17   which the release is -- "prior to a loss any or all right of
18   recovery against any party for loss or damage insured against
19   by this policy."
20          So essentially IRI consented to this. The lease also
21   provides in 12.09 --
22          THE COURT:  That's what you mean by consent.
23          MR. MOLONEY:  Yes.
24          THE COURT:  That depiction.
25          MR. MOLONEY:  Right.  And the lease also provides in
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    36
4BU7SEPM
1    12.09, you know, essentially that the insurance which the
2    landlord is required to obtain is an operating expense, which
3    Citigroup has to pay as a tenant its proportional share, and
4    since Citigroup was the largest anchor tenant of this building
5    it paid for most of the IRI insurance.
6           So in essence, your Honor, this, as we indicated in
7    our brief, this form of waiver of subrogation --
8           THE COURT:  And the last clause deals with removables.
9           MR. MOLONEY:  The last clause --
10          THE COURT:  -- deals with the initial work and any
11   alterations.
12          MR. MOLONEY:  Right.  The initial work and alterations
13   are defined terms in the lease.  Initial work was the work in
14   connection with -- what happened was, your Honor, we moved into
15   this building.  The time line we will show you.
16          THE COURT:  It's the space configurations.
17          MR. MOLONEY:  Exactly right.  And we were basically
18   paying for the insurance as a pass-through, as an operating
19   expense under the lease.  This was subject to an approval
20   process which involved Silverstein.  And if you look at the
21   second tab, the lease kind of indicates an approval process,
22   and it's not only subject to the approval process, but also the
23   lease contemplated when we moved in that we would build a
24   generator on the fifth floor that would have access to over
25   12,000 gallons of fuel, that in fact we couldn't build it
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    37
4BU7SEPM
1    anywhere else without Silverstein agreeing to put -- for us
2    putting it anywhere else.  So what this shows you, your Honor,
3    is in terms of when we moved into this space --
4           THE COURT:  Well this doesn't say that, but it gives
                        Page 17

11.30.04_Transcript.txt
5    you a specific location where you're supposed to build your
6    generator.
7              MR. MOLONEY:  Right.  And it says how much fuel.  It
8    says we shall have access to -- the only two allegations they
9    have against us --
10             THE COURT:  How do you read that?  11 1750 KDA diesel
11   emergency power generators.
12             what does that mean?
13             MR. MOLONEY:  I'm not sure I am looking at exactly the
14   same one.
15             THE COURT:  It's paragraph 2.  The top part says that
16   you are entitled to build tanks sufficient to store 12,000
17   gallons of diesel fuel.
18             MR. MOLONEY:  11.  This is what we built.  These are
19   the power generators that were built in the space.  What they
20   essentially are saying is that even though the lease provided
21   that we are supposed to build these generators in this space,
22   the lease provided we were supposed to have access to over
23   12,000 gallons of fuel.  The fact that we actually followed the
24   lease was not only negligence but gross intentional wrongdoing
25   on our part.  That's the argument they have to ultimately make
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    38
     4BU7SEPM
1    to vitiate this release.
2              If you turn to tab 3 you will see that --
3              THE COURT:  I missed that.  Run that by me again.
4              MR. MOLONEY:  The gist of their argument is since it's
5    a contractual release -- the gist of his argument is that gross
6    negligence vitiates a contractual release.  He has to argue --
7    and what was our gross negligence?  We built a generator on the
8    fifth floor of the building which was too close to the trusses,
9    in his view, with the genius of hindsight; and, second, we put
10   12,000 gallons of fuel in the building.
11             THE COURT:  Well, I am going to assume he is correct.
12             MR. MOLONEY:  I assume for purposes of my argument
13   that he is correct, that we should not have put 5,000 gallons
14   of fuel in the building, we should not have built it on the
15   fifth floor.
16             THE COURT:  But merely having a lease provision that
17   allows you to do a grossly negligent act doesn't stop it from
18   being grossly negligent.
19             MR. MOLONEY:  Your Honor, a lease provision that tells
20   you that if you are Citigroup and you are moving into a
21   building and you need an emergency backup generator system
22   because the only one who can provide electricity to that
23   building is Con Edison --
24             THE COURT:  What you are really saying to me is that
25   the subrogee of the landlord can't complain about a clause that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    39
     4BU7SEPM
1    the landlord has agreed to.
2              MR. MOLONEY:  Yes, exactly.
3              THE COURT:  It's an acquiescence issue, not a defeat
4    of gross negligence.  If you can acquiesce in a grossly
5    negligent act you have acquiesced.
6              MR. MOLONEY:  Your Honor, we will go a little bit
7    beyond simple acquiescence.  If we look to slide 3 you will see
8    that the landlord was not only given this approval over the
9    general placement of what we did and of how much fuel we used,
                              Page 18

11.30.04_Transcript.txt

10  but we had to submit our precise plans to the landlords from
11  engineers and architects for them to review, and if they
12  thought they were in any way dangerous, their architects and
13  engineers could stop us from implementing plans.  And we
14  actually were required to pay for this.  So we actually
15  reimbursed them to have their engineers and architects look at
16  the precise construction, which we did.
17          THE COURT:  You want me to look at paragraph 14, which
18  allows the landlord to stop you from doing anything that in the
19  landlord's opinion will jeopardize the building.
20          MR. MOLONEY:  Exactly.  And also if you continue, you
21  will see that we have an obligation to actually pay for this
22  review by the landlord's architects and engineers in 14.03(d).
23          Then if you go on to point 4 of our submission, which
24  is the three-party agreement between the Port Authority, 7
25  World Trade Center and Citigroup, which indicates how the Port

40

4BU7SEPM

1   Authority -- also before your Honor, also integral to this
2   build-out and to this lawsuit, this document, your Honor,
3   indicates that in addition to Silverstein, the Port Authority
4   and their engineers and architects had to approve this precise
5   construction before we did anything.  And we had to pay for
6   them to engage in this review as well.
7           THE COURT:  And then you have Con Edison.
8           MR. MOLONEY:  We in fact obtained --
9           THE COURT:  I think I get the picture.  So who is
10  going to tell me Mr. Moloney is not correct?
11          MR. MOLONEY:  And if I --
12          THE COURT:  I think I've got the picture.
13          MR. MOLONEY:  Okay.  Thank you, your Honor.
14          THE COURT:  Mr. Joseph?
15          MR. JOSEPH:  Your Honor, we don't dispute what the
16  lease says.  We don't dispute that there are three parties that
17  are involved in the decision-making process for this system:
18  The Port Authority, Mr. Silverstein and Citigroup.  We don't
19  dispute that there is a comparative fault issue.  We do say
20  that that is an issue for a jury to decide.
21          THE COURT:  And you are representing the subrogee of
22  Silverstein --
23          MR. JOSEPH:  Of Silverstein.
24          THE COURT:  -- who approved all of this.
25          MR. JOSEPH:  He did.  As did the Port Authority.  And

41

4BU7SEPM

1   it was Citigroup that had the responsibility for design,
2   installation, maintenance and functioning, and it was the Port
3   Authority that had ultimate hands-on control over design,
4   installation, maintenance and function.
5           THE COURT:  But your subrogor had an intimate
6   involvement in the whole process.
7           MR. JOSEPH:  Absolutely right.  We don't deny that.
8           Their argument is ultimately assumption of risk, which
9   is what your Honor was pointing out, an acquiescence argument,
10  which CPLR 14.11 says that that is an issue for the comparative
11  fault calculus.  It may be that they can prove that
12  Mr. Silverstein was negligent.  Perhaps they can.  But, if so,
13  that doesn't exonerate them from their responsibility.
14          The exact wording of 14.11 of the CPLR is, "In any
Page 19

11.30.04_Transcript.txt
15   action to recover damages for injury to property, the culpable
16   conduct attributable to the claimant, including contributory
17   negligence or assumption of risk shall not bar recovery."
18   Shall not bar recovery.  But the amount of damages --
19            THE COURT:  That's against a third party.
20            MR. JOSEPH:  Well, we are not suing Silverstein, so
21   it's definitely against a third party.  But any assumption of
22   risk or contributory negligence by Silverstein -- should any be
23   found by a jury -- would be something that would reduce
24   recovery.
25            THE COURT:  If I'm walking past the building when it
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    42
4BU7SEPM
1    caught fire, and I was engulfed by the flames, and my wife sued
2    all of you, you may all have to contribute to the judgment, but
3    that doesn't mean that in a lawsuit by a subrogee we're
4    entitled to recover.
5             MR. JOSEPH:  I believe it does, because we are in the
6    shoes of the claimant.  The claimant is Silverstein now suing
7    the Port Authority and Citigroup for this --
8             THE COURT:  And you think Silverstein would have had a
9    right of action?
10            MR. JOSEPH:  Oh, I believe, your Honor, in fairness, I
11   do believe it clearly would have had a right of action against
12   Citigroup.  We have to show gross negligence.  Against the Port
13   it's a negligence standard.  Against Citigroup it is a gross
14   negligence standard.  We may or may not be able to prove it.
15   We are comfortable with our experts that we will be able to.
16   But it will be for a jury to decide.  But there is not a legal
17   preclusion against that action being filed or pursued, and
18   that's what they are trying to do as they attempt to try the
19   case on the pleadings.
20            THE COURT:  I have all the papers on this, right?
21            MR. JOSEPH:  You have more papers than you need or
22   want, your Honor.
23            THE COURT:  And this is ripe for decision, I think.
24            MR. JOSEPH:  Yes, we believe that.
25            THE COURT:  All of you feel it's ripe for decision.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    43
4BU7SEPM
1             MR. MOLONEY:  Yes, your Honor.  May I say one thing?
2             THE COURT:  Yes.
3             MR. MOLONEY:  Very briefly, your Honor.  If you look
4    at the decision of the Court of Appeals in 1985, which we cite,
5    in the decision which we cite it's called Abergast v. Board of
6    Education.
7             THE COURT:  I am not going to rule from the bench.
8             MR. MOLONEY:  I am just telling you to help your law
9    clerk or your Honor.  Abergast v. Board of Education of South
10   New Berlin, a Court of Appeals decision from 1985, the official
11   cite is 65 NY 2d 161.  Express assumption of risk is not
12   barred, is a complete defense, the court held.  And, therefore,
13   if your Honor finds based on the lease provisions and the
14   approval process there is express assumption of risk, then the
15   argument that you made about comparative fault is completely
16   irrelevant.
17            The second point I make, your Honor -- and it's in the
18   papers -- is that --
19            THE COURT:  Mr. Moloney, we've got the papers.  We
                              Page 20

11.30.04_Transcript.txt
20    will reread the papers.  We will reread the papers.
21            MR. MOLONEY:  Thank you, your Honor.
22            THE COURT:  Anything more on that?  Okay.  Decision
23    reserved.
24            I've dealt with all the three motions.  Let's go over
25    timing.  Will the defendants file and serve answers with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    44

4BU7SEPM
1     affirmative defenses within a ten day period?  Is that
2     satisfactory?
3             MR. MOLONEY:  Yes, your Honor.
4             THE COURT:  All right.  Then I'd like you to confer
5     and create a discovery plan and submit it to me.  I envision
6     that the discovery plan will focus only on the defenses, and
7     that in rapid time the defendants will, if they wish to, renew
8     their motions.  And I would think that a date sometime in
9     February should allow the parties to do what they need to do.
10    If that's a little bit too optimistic, you will let me know.
11    But I would like to try for this.
12            I would like all of us to know if there are viable
13    causes of action or not.  I don't do anybody any favor by
14    creating a final cause of action, because I'm willing to decide
15    the issues.  I envision that I will need to make a decision,
16    and the aggrieved party is going to wish to appeal, and the
17    sooner that's done the better.
18            So if we can't make that date, you will let me know.
19    I don't see any point to meet until we have argument of the
20    motion unless there are disagreements.  I suspect there will
21    not be disagreements.  But if there are, express your
22    disagreement in a single joint letter.  I have this formulated
23    in my chambers rule 2E, and I will try to give you a very quick
24    and responsive ruling.  Thank you very much.
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

# EXHIBIT
# 6

02-5514: 241/01-A¹

```
56LNWTC1
```

1   UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
2     ------------------------------x

3           In Re

4     SEPTEMBER 11 PROPERTY DAMAGE          21 MC 101 (AKH)

5     AND BUSINESS LOSS LITIGATION,

6     ------------------------------x

7                                          June 21, 2005

8                                          2:40 p.m.

9
      Before:
10
                    HON. ALVIN K. HELLERSTEIN,
11
                                          District Judge
12
                           APPEARANCES
13

14    GENNET KALLMAN ANTIN & ROBINSON
           Attorneys for Plaintiffs Aegis and Consolidated Edison
15    MARK L. ANTIN,
      FRANKLIN SACHS,
16    MICHAEL LEAVY,

17         of Counsel.

18    BRUCKMANN & VICTORY LLP
      Attorneys for Certain Underwriters
19    PATRICK MALONEY,
           of Counsel.
20

21    FLEMMING, ZULACK & WILLIAMSON, LLP,
           Attorneys for Defendants Port Authority of New York and
22    New Jersey in certain cases,
      GERALD G. PAUL
23         of Counsel.

24    CLEARY, GOTTLIEB, STEEN & HAMILTON,
           Attorneys for Defendant Citigroup,
25    THOMAS MOLONEY,
           of Counsel.

56LNWTC1

2    SCHIFF HARDIN,
          Attorneys for Defendants Port Authority of New York and
3    New Jersey (in WTC 7),
     BETH D. JACOB,
4         of Counsel.

5    L'ABBATE BALKAN COLAVITA & CONTINI
          Attorneys for Defendant Cosentini Associates
6    ERIC HECHLER,
          of Counsel.

7

     DeCICCO GIBBONS & McNAMARA
8         Attorneys for Defendant American Power Technology
     DANIEL McNAMARA,
9         of Counsel.

10   ZETLIN & DeCHIARA
          Attorneys for Defendant Flack & Kurtz
11   DAVID ABRAMOVITZ
          of Counsel.

12

     LONDON FISCHER
13        Attorneys for Defendant Electric Power Systems
     ANTHONY TAGLIAGAMBE
14        of Counsel.

15   FRIEDMAN KAPLAN SEILER & ADELMAN LLP
          Attorneys for Defendant Silvertein Properties/7 World
16        Trade Company
     KATHERINE L. PRINGLE

17

18

19

20

21

22

23

24

25

56LNWTC1

1              (In open court)

2              THE COURT:  I will hear the motion by defendant

3      Cosentini to dismiss the complaint for failure to serve the

4      summons and complaint on a timely basis and on statute of

5      limitations grounds.

6              Who is going to argue for Cosentini?

7              MR. HECHLER:  Eric Hechler, your Honor, from the law

8      firm of L'Abbate Balkan Colavita & Contini.

9              THE COURT:  Who is arguing for the plaintiff?

10             MR. SACHS:  Franklin M. Sachs, your Honor.

11             THE COURT:  Go ahead, Mr. Hechler.

12             MR. HECHLER:  First, as an initial housekeeping

13     matter, your Honor, before I start the argument, just recently,

14     on June 16, we finally received a signed affidavit to,

15     plaintiff's opposition from Joy Green.  That wasn't served with

16     the original papers.

17             The original affidavit was unsigned.  Also,

18     additionally, when we received this affidavit on the 16th,

19     although it wasn't materially changed, there were alterations

20     to that affidavit that we were not notified until we actually

21     reviewed.

22             I think that is inappropriate to be serving these

23     documents at such a late date and altering them when they were

24     not part of the original set when they were served, just as

25     initial housekeeping, your Honor.

56LNWTC1

1          THE COURT:  Go ahead.

2          MR. HECHLER:  Basically, this is a motion to dismiss

3    based on the plaintiff's failure to serve the summons and

4    complaint on defendant Cosentini.  The plaintiff never served

5    this complaint, nor did they ever request an extension of time

6    to serve.

7          It wasn't until receipt of our motion that the

8    plaintiffs moved for this extension.  The defendants' first

9    notice of this motion was on March 7 of 2005 -- I mean, first

10   notice of the action.  This is over six months after the

11   statute of limitations expired.

12         The plaintiff bears the initial responsibility of

13   establishing the validity of service when it is challenged.

14   Here the plaintiff is admitting that they never served

15   Cosentini, with full knowledge that they had Cosentini's

16   address and we never attempted to avoid service.

17         Furthermore, the plaintiffs never moved for the

18   extension within the initial 120-day period provided by Rule 4.

19   They did not even attempt to make a motion to extend until the

20   receipt of this motion in April of 2005.  Even by plaintiff's

21   own admission and taking their statements as true, the

22   plaintiffs were aware of their defect in service as of February

23   2005 and still they did nothing.

24         Case law --

25         THE COURT:  How do you know they were aware?

56LNWTC1

1        MR. HECHLER:  Their own affidavit, if you accept the

2    affidavit of Joy Green, it says that the first time they became

3    aware was in February of 2005 due to a clerical error.

4        The case law itself even -- where a party seeking the

5    extension has failed to meet their burden, dismissal is

6    appropriate where the practical effect is to bar the

7    plaintiff's claim.

8        Even discretionary extensions have been denied under

9    these circumstances.  Here the plaintiffs were not diligent in

10   their efforts to serve Cosentini, and they made no attempt to

11   remedy the situation at all.

12       The inordinate delay and the lack of effort to remedy

13   the service issues and the plaintiffs' failure to request an

14   extension is a sufficient basis to even, to deny even a

15   discretionary extension of time to serve.

16       The plaintiffs claim that their amended complaint

17   relates back to the original complaint.  This is not true if we

18   never received the original complaint.  Cosentini was never

19   placed on notice either actually or constructively of

20   plaintiff's claims until it was served with the amended

21   complaint, and that's more than six months after the original

22   filing of the complaint.

23       In the case of, I think it's Chause v. Securities

24   Litigation, which is directly on point in this matter and is

25   actually within this district, the court found that an amended

56LNWTC1

1    complaint cannot relate back to the filing of an original

2    complaint where the original complaint was never properly

3    served, which is the exact situation here.

4         The plaintiffs claim also that Cosentini was on notice

5    of the matter by service of various codefendants' answers at

6    the outset of the litigation.  In plaintiff's opposition their

7    evidentiary proof in this regard was insufficient.

8         The majority of those answers they attached had no

9    affidavits of service.  There is an affidavit attached to our

10   papers.  Our client eventually did receive two answers in

11   response to the summons and complaint, and those summons and

12   complaints don't provide our client with any notice.  They were

13   just general denials and general cross-claims.

14        THE COURT:  Who received actually the various

15   cross-claims that were served?

16        MR. HECHLER:  These were sent by mail, so it was not

17   sent by an authorized person to receive service under CPLR

18   3114(e)(2).

19        THE COURT:  Who received it?

20        MR. HECHLER:  Who received it in our office?  It would

21   have been a secretary.

22        THE COURT:  In your office?

23        MR. HECHLER:  Not our office in Cosentini's office.

24   That is also in their affidavit.

25        THE COURT:  When did you first appear?

56LNWTC1

1         MR. HECHLER:  We haven't submitted an answer yet.  Our

2     first appearance in this matter is this motion.

3         To construe the facts here as a waiver of jurisdiction

4     or waiver of service and to allow an extension would permit

5     them to -- would effectively obliterate the requirement of

6     proper service process and the due process concerns that, the

7     requirements that they safeguard.  The New York courts have

8     held even in the Schiavone v. Fortune matter that a party must

9     be on notice of the litigation before the passage of the

10    statute of limitations, although the federal courts differ in

11    that state law should apply.

12        Here, even accepting plaintiff's arguments, the

13    statute expired on September 11, 2004.  The first answer was

14    received, if accepted, in October of 2004, and therefore the

15    statute had expired and the amended complaint can't relate

16    back.

17        The plaintiffs also knew that pursuant to Federal Rule

18    of Civil Procedure 4(m) they had 120 days to serve the

19    complaint or move for an extension of time to serve, and they

20    failed to do that.  They failed to do both.

21        As a result of plaintiff's own actions, including

22    waiting for the last minute to file the claims, failing to

23    serve Cosentini with the original summons and complaint, the

24    plaintiffs are now relying on the discretion of this court to

25    give them a third bite of the apple.

56LNWTC1

```
 1              With the expiration of the statute of limitations --
 2              THE COURT:  Do I have discretion?
 3          MR. HECHLER:  Yes, your Honor, you do have discretion.
 4              But in this situation the plaintiffs never even made
 5      any attempts to serve Cosentini.  The cases have held where
 6      discretion was used the parties had at least attempted to
 7      serve, and in this case there was never any attempt to serve.
 8              THE COURT:  What harm would be caused to your client
 9      if I exercised discretion and enlarged the period to today?
10          MR. HECHLER:  First of all, the litigation has been
11      ongoing for quite a period of time.  We would have a
12      substantial amount of catching up to do.
13              The statute of limitations expired, and that in and of
14      itself is prejudice.  I think there is a very fundamental part
15      of due process that parties must be served and must be on
16      notice of the litigation, and that just wasn't done here.
17              THE COURT:  Your client knew there was a lot of
18      litigation going on because it was named in the caption and it
19      received various pleadings.  I'm sure the secretary is not
20      instructed to throw out pleadings in the wastepaper basket.
21          MR. HECHLER:  Correct.
22              Obviously, yes, there were a lot of party names.  But
23      the limited amount of pleadings that they actually received,
24      which is just two answers, it was just as easy for them to
25      assume that the plaintiff had abandoned the action against
```

56LNWTC1

1    them.  There was no basis for them to assume that this

2    plaintiff was pursuing this action.  They were never served.

3            THE COURT:  That's not reasonable.  Did you think that

4    the lawsuit was abandoned?

5            MR. HECHLER:  They weren't served with anything,

6    though.  They were never served with the complaint.  It is very

7    reasonable for them to assume when I'm served I am being sued.

8    If I'm not being served --

9            THE COURT:  Let's see what Mr. Sachs says.

10           MR. SACHS:  Thank you, your Honor.

11           Your Honor, let me start somewhere in the middle if I

12    may.  Defendant Cosentini submitted an affidavit from one

13    Vincent O'Neill --

14           THE COURT:  Tell me why you think I should exercise my

15    discretion and enlarge the period within which you should make

16    service.

17           MR. SACHS:  I believe you should do it because

18    Cosentini clearly had notice of what was going on by the

19    service of all the documents.  As I started to say --

20           THE COURT:  How many documents were served?

21           MR. SACHS:  There were 15 answers and cross-claims

22    served on the defendant Cosentini, of which this Mr. O'Neill

23    says he did not receive two.

24           I point out to the court that not a secretary was

25    receiving these but this Mr. O'Neill swears that every piece of

56LNWTC1

1    litigation that comes in comes to his attention.  That is how

2    he is able to tell you that he didn't receive two, though

3    obviously he received 13.

4            THE COURT:  What is his title?

5            MR. SACHS:  His title is controller, sir.  I submit it

6    is paragraph 3 of his most recent affidavit which is dated June

7    3, 2005.

8            THE COURT:  What's the reason that you didn't effect

9    service?

10           MR. SACHS:  Total inadvertence, your Honor.  We had 40

11   some odd complaints.  They were all on a list.  Somehow

12   Cosentini didn't get on it.

13           We had no idea whatsoever that they hadn't been served

14   until we went to serve the amended complaint which this court

15   ordered to be filed.  That was in February 2005.  At that point

16   Cosentini was served together with all the other defendants.

17           THE COURT:  You knew at that time that they had not

18   been served up to that time.

19           MR. SACHS:  We certainly knew at that time, your

20   Honor.

21           THE COURT:  Why didn't you make a motion for

22   enlargement then?

23           MR. SACHS:  We thought we were still within the time

24   to serve the amended complaint, your Honor.

25           THE COURT:  You can't serve an amended complaint until

56LNWTC1

1    you serve the original complaint.

2              MR. SACHS:  We thought, your Honor, and I still think

3    that under the --

4              THE COURT:  In any event, you have 120 days to make

5    service and time would elapse.  You are outside the 120-day

6    period.  All you had to do was ask.

7              MR. SACHS:  I think what happened, your Honor, is we

8    believed that when we found it that we were also covered by the

9    New York State savings statute, under which you get six months

10   in which to refile -- to file a complaint, to serve a complaint

11   once the complaint has been filed.  And the only reason you are

12   not given that six-months are three, four very specific

13   reasons, none of which were applicable to us.

14             THE COURT:  You're referring to CPLR 205(a)?

15             MR. SACHS:  I do, sir.  I think the answer, what we

16   have here is, 4(m) sets fourth four reasons, four things the

17   court should look at.

18             THE COURT:  I will cut it short.

19             I grant the motion.  I assume you are making one to

20   enlarge the period within which service has to be made.

21             MR. SACHS:  We did.  Thank you, sir.

22             THE COURT:  You will have until a week from today to

23   make service.  You will make service of the amended complaint

24   as if it is the original complaint.  In that way Rule 4(m) will

25   be satisfied.

56LNWTC1

1           MR. SACHS:  Thank you, sir.

2           THE COURT:  It seems to me that no prejudice has been

3    suffered by Cosentini because there has been no substantial

4    discovery in the case, because its controller knew that it was

5    a defendant in a very large lawsuit having to do with World

6    Trade Center No. 7.  To dismiss the complaint at this time to

7    allow limitations to run would be a gross disservice to

8    everyone and a miscarriage of justice.

9           Having said that, Mr. Sachs, the fact that you are

10   involved in a large case does not countenance any laxity in

11   paying attention to normal rules.

12          MR. SACHS:  I certainly understand that, sir.

13          THE COURT:  Nor should you make the lame excuse that

14   you are looking to resort to the CPLR 205(a), because that

15   would mean that you want the action dismissed and to start

16   again and try to figure out to what time there should be a

17   relation back.  That's hardly a remedy that you want.  The

18   answer is that if you make a mistake, fess up to it and get it

19   right.

20          MR. SACHS:  I did fess up to the fact we didn't do

21   anything when we learned on February 7 --

22          THE COURT:  That wasn't very smart.

23          MR. SACHS:  That was what we thought.

24          Thank you, sir.

25          THE COURT:  OK.  The next motion is the motion by --

56LNWTC1

1    let me ask you this, Mr. Hechler, before I leave you.

2           MR. HECHLER:  Yes.

3           THE COURT:  Given the fact of my ruling, do you need

4    Mr. Sachs to go through the numbers or will you accept service

5    right now and go on from there?

6           MR. HECHLER:  Yes.

7           If that is your ruling, your Honor, we will accept the

8    service of the amended complaint.

9           MR. SACHS:  Thank you.

10           THE COURT:  So you are satisfied with the ruling.  You

11    give another copy to Mr. Hechler.  He can use it to adorn his

12    walls, and we are on our way.

13           MR. SACHS:  Thank you, sir.

14           THE COURT:  Motion by defendant American Power

15    Technologies.

16           MR. McNAMARA:  Good afternoon, your Honor, Daniel

17    McNamara on behalf of American Power Technologies.

18           Your Honor, this a Rule 12 and 17 dismissal motion.

19    My client American Power Technologies in late December of 2000

20    filed a certificate of merger and hence ceased to have a legal

21    existence.  It was in December of 2004 when service was

22    effectuated upon an entity Johnson Control Services.  As of

23    that time American Power Technologies not having a legal

24    existence I submit was not capable of being served.  As a

25    result --

56LNWTC1

1      THE COURT:  A company remains amenable to service of

2  process for I forget how many years after it dissolves, doesn't

3  it under the CPLR?

4      MR. McNAMARA:  According to the certificate of merger

5  here, your Honor, Johnson Control World Services became a

6  successor corporation, if you will, and was amenable to

7  service.

8      THE COURT:  What isn't it served?

9      MR. McNAMARA:  It was served in December of 2004 on

10  behalf of American Power Technologies.

11      What the plaintiff in his opposition attempts to do is

12  seek an order allowing the court at this juncture to amend or

13  allowing the plaintiff at this juncture to amend the complaint

14  so as to name Johnson Control.

15      And they attempt to invoke the relation back doctrine,

16  which we submit is based on the New York law.  One of the

17  linchpins to that doctrine -- and Mr. Hechler made reference to

18  it a moment ago -- is that the defendant sought to be

19  substituted had notice of the claim or suit within the

20  statutory limitation period.  Here there is absolutely no issue

21  that Johnson Control did not have such notice until sometime in

22  December of 2004, which was some 90 days or so after the

23  expiration of the statutory period.

24      THE COURT:  The date of service, if it were December

25  6, 2004, would or would not be timely with regard to statute of

56LNWTC1

1  limitations?

2         MR. McNAMARA:  Since American Power Technologies no

3  longer existed at that time, it could not have been deemed

4  timely.  They were no longer an entity.  They were incapable of

5  being served.

6         THE COURT:  If they were in existence --

7         MR. McNAMARA:  If they were in existence, that would

8  be within the 120-day Rule 4 period.

9         THE COURT:  What you are saying is because the legal

10  successor --

11         MR. McNAMARA:  The legal successor has not been sued.

12  The plaintiff now attempts to amend the complaint, as I read

13  the plaintiff's opposition papers, so as to name Johnson

14  Controls.  They have not yet done so.

15         THE COURT:  The defendant that is named is American

16  Power Technologies, Inc.

17         MR. McNAMARA:  Correct, your Honor.

18         THE COURT:  The entity that was served was its legal

19  successor?

20         MR. McNAMARA:  Correct.

21         THE COURT:  Let me hear from the plaintiff.

22         MR. LEAVY:  Your Honor, Michael Leavy from Gennet

23  Kallmann Antin & Robinson.

24         I think I can boil this down very quickly.  In the

25  reply this defendant, American Power, essentially concedes that

56LNWTC1

1    if the federal rules, and in particular Rule 15(c), applied,

2    then there would be no problem.  But they claim that the first

3    notice of the complaint has to come before the statute runs in

4    New York.

5            They make an argument about a New York Court of

6    Appeals case, the Buran case, which in turn relies on the

7    Schiavone case, the U.S. Supreme Court case.  What they

8    neglect, however, is that CPLR 203(c) has been amended since

9    that to overrule the Buran case, and now reads, "in an action

10   which is commenced by filing, a claim asserted in the complaint

11   is interposed against the defendant or a codefendant united in

12   interest with such defendant when the action is commenced."

13           I think that's dispositive of this case.

14           THE COURT:  The claim that was asserted by filing was

15   the claim against American Power Technologies, Inc.?

16           MR. LEAVY:  That is right.

17           THE COURT:  Service was made upon its legal successor?

18           MR. LEAVY:  Correct.

19           THE COURT:  The argument is that since American Power

20   Technologies Inc. is no longer in being, the only party that

21   could be served is the legal successor?

22           MR. LEAVY:  Indeed, your Honor, when we served them,

23   and I believe the affidavit of service is attached to the Antin

24   certification, we served them as Johnson Controls World

25   Services, Inc., fka American Power Technologies.

56LNWTC1

1       Let me be the first to cop to a mistake, which is,

2   your Honor, we did not promptly seek to amend the caption,

3   which is all we are really seeking now.  All we are looking to

4   do is change four words.  Your Honor, I didn't bring the CPLR

5   statute to your attention.

6       THE COURT:  I don't have it before me, but as I

7   remember the law, a corporation remains amenable to being sued

8   for a period of time which I think is two years after it

9   terminates its existence.

10      I don't know that that remains the law, has been

11  changed or what.  What we have here, it seems, is an issue of

12  legal succession.  I will reserve decision.

13      MR. LEAVY:  Thank you, your Honor.

14      MR. McNAMARA:  Thank you, your Honor.

15      THE COURT:  The next motion is by the architects and

16  engineering defendants moving under CPLR 3211(h).

17      MR. PAUL:  Good afternoon, your Honor, Gerald G. Paul,

18  Flemming Zulack & Williamson --

19      THE COURT:  It's nice to see you in my courtroom,

20  Mr. Paul.

21      MR. PAUL:  It is nice to see you, your Honor.  Your

22  Honor, we represent Skidmore Owings & Merrill, one of the

23  architect engineering defendants.

24      I'm speaking on behalf of all of the design

25  professional defendants.  They are identified in the attachment

56LNWTC1

1    to the notice of motion.

2         The first issue we'd like to address is CPLR 214(d),

3    and there are two prongs to 214(d).  One is the notice of claim

4    requirement.  214(d) says that when a lawsuit is to be brought

5    against a design professional who performed services more than

6    ten years prior to when the claim arose, before commencement of

7    such an action, a notice of claim has to be served.  It has to

8    be served at least 90 days before the action is commenced.

9         Your Honor dealt with this issue explicitly in your

10   January 7 order.  Indeed, I've recently discovered that your

11   Honor actually dealt with the issue back in September 2003 when

12   in another caption in the World Trade Center litigation you

13   devised a system for the Southern District clerk's office to

14   receive 214(d) notices of claim.  Your Honor's January 7 order

15   also makes it clear that 214(d) expresses an important public

16   policy of New York.

17        How do the plaintiffs say they have satisfied 214(d)?

18   They claim that they satisfied it by filing an amended

19   complaint more than 90 days after they served their notices of

20   claim.

21        Now, the fact is they served these notices of claim in

22   the first few days of September 2004.  On September 10, about a

23   week later, they filed the action.

24        Now, it's civil procedure 101, your Honor, that

25   commencing an action is different from serving an amended

56LNWTC1

1    complaint in the same action.

2              Your Honor alerted the plaintiffs to what they had to

3    do in your January 7 order.  They didn't do it.

4              It strikes me as fairly straightforward, Judge, they

5    haven't satisfied the statute.  They haven't satisfied your

6    January 7 order.  And, therefore, the claims against the design

7    professionals and the cross-claims which 214(d) expressly

8    accomplishes should be dismissed with prejudice.

9              That's just the notice-of-claim prong of 214(d).

10   There is a second prong of 214(d), and that's the heightened

11   pleading requirement.

12             THE COURT:  Mr. Paul, before you get on to the second

13   aspect, just let me make sure of the chronology.

14             The first complaint, the original complaint was filed

15   September 10, 2004 --

16             MR. PAUL:  Correct.

17             THE COURT:  -- naming various design professionals.

18             The notices of claim are dated a few days before that,

19   between September 2 and September 7.

20             MR. PAUL:  That's correct.

21             THE COURT:  So that violates the statute.

22             MR. PAUL:  Correct.

23             THE COURT:  Or the rule.

24             MR. PAUL:  It also violates your Honor's order.

25             THE COURT:  All right.  Then in order for them to

1    comply with the statute, they have to wait 90 days.  So they

2    would have to wait, if the amended complaint is to satisfy the

3    rule, until December.

4            MR. PAUL:  Yes.

5            THE COURT:  So the first part of your motion is that

6    since they didn't wait until December and they came in early,

7    they did not comply with Section 214(d)?

8            MR. PAUL:  That's correct, your Honor.  Your Honor,

9    let me add that if the filing or the service and filing of an

10   amended complaint ought to satisfy the statute, then the plain

11   language of the statute, the plain language that your Honor

12   picks up in your January 7 order is really being disregarded.

13           There is a public policy reason for this entire

14   procedure.  There is a discovery process that 214(d) spells

15   out.  The reason is that when claims are brought against design

16   professionals more than ten years after the conduct at issue,

17   it seems fair to see if we can't get to the bottom of things

18   and not have people dragged in time and time again for this

19   kind of ancient history.

20           THE COURT:  My problem, however, is I think one that I

21   created by giving plaintiff leave to amend its complaint within

22   30 days from the date of my order.

23           MR. PAUL:  I think that leave to amend was designed to

24   cure a number of deficiencies, not necessarily limited to

25   214(d).  I am not going to steal the thunder of my colleague,

1    who is going to speak about --

2              THE COURT:  The problem is what is the plaintiff to

3    do?

4              Here the judge tells him to amend within 30 days, and

5    they amend within 30 days and then, lo and behold, the judge

6    forgot the 90-day period in the same order that was cited.

7              I don't think that 214(d) was really meant to be a

8    catch-22 satisfying the judge in one respect and violating the

9    law in a different respect.

10             But you were going on to another part of your motion.

11             MR. PAUL:  Yes, your Honor.

12             THE COURT:  To 3211(h).

13             MR. PAUL:  The heightened pleading requirement, again,

14   Mr. Abramovitz is going to argue oh behalf of all of the moving

15   defendants with respect to the absence of a duty here, but he's

16   also going to talk about the lumping of defendants, the failure

17   to specify precisely --

18             THE COURT:  Let me focus on that, because my January

19   7, 2005, order was mainly concerned with a part of the pleading

20   rule which required the notice to identify the performance,

21   conduct, or omissions complained of.

22             I am interested now, as I was interested then, in the

23   kind of specificity that the rule required.  Plainly the policy

24   that 214(d) and 3211(h) were concerned with was to avoid

25   reflexive actions against design professionals, particularly

56LNWTC1

1    those design professionals that performed their services more

2    than ten years before the date of suit or the date of claim.

3            Let's focus on that aspect.  We have a motion really

4    under 3211(h), and I would like to focus on that.

5            Is that what you are up to, or your colleague is going

6    to do that?

7            MR. PAUL:  Your Honor, again I think we're trying to

8    stick to the sequence that your Honor has asked us to, and it's

9    somewhat different from the lineup of Ms. Jacob's letter of

10   yesterday.

11           THE COURT:  I found it hard to parse Ms. Jacob's

12   letter, if Ms. Jacob will excuse me.

13           MR. PAUL:  In any event, I think there may be a need

14   to do some back and forth here with one or more of my

15   colleagues on these motions.

16           This is sort of the tail wagging the dog, Judge, but

17   if there is a failure to satisfy the pleading requirements of

18   8(a) and certainly a failure to satisfy the specific

19   requirements set forth in your Honor's January 7 order, my

20   point is under 214(d) it's a fortiori with respect to the

21   design professionals as to whom the state legislature has said

22   there is a heightened pleading requirement.

23           THE COURT:  Who is going to speak for the plaintiffs

24   on this issue?

25           MR. LEAVY:  I am, your Honor, Michael Leavy, both as

56LNWTC1

1    to the sufficiency of the complaint under 8(a) and as to this

2    point.

3            THE COURT:  All right.  Let me see what Mr. Leavy says

4    in terms of this heightened pleading requirement.

5            You are talking about 8(a) of the federal rules?

6            MR. LEAVY:  Yes, your Honor.

7            THE COURT:  I'm going to ask you to focus on 3211(h).

8            MR. LEAVY:  I will, your Honor.

9            THE COURT:  And, more importantly, this phrase.  The

10   party responding to the motion, that is, the plaintiff, must

11   demonstrate "that a substantial basis in law exists to believe

12   that the performance, conduct, or omission complained of" --

13   and I'll skip some language -- "is supported by a substantial

14   argument" -- I'm sorry.  Let me go back.  "The plaintiff was

15   negligent, and that such performance, conduct, or omission was

16   a proximate cause of the property damaged complained of."

17           MR. LEAVY:  Let me first speak to the applicability of

18   3211(h) at all.  CPLR 214(d), the scheme that the legislature

19   came up with involved three different statutes, 3211(h), 214(d)

20   and also an amendment to 3212, the summary judgment rule, at

21   subsection (i).

22           However, the federal courts have their own rules with

23   respect to a motion to dismiss, 12(b)(6), or with respect to a

24   summary judgment motion, Rule 56.  I think it's not clear at

25   all that 3211(h) would apply in a case like this.

24

56LNWTC1

1          The only federal court case that I found that dealt

2     with this issue is the Commerce & Industry v. Vulcraft case,

3     decided by Magistrate Dolinger of this court.  He questioned

4     very seriously, he didn't exactly reach the point, but

5     questioned very seriously whether anything but the notice

6     provision in CPLR 214(d) would apply in any event.

7          First, then, plaintiffs don't think that 3211(h)

8     applies.  Assuming that it were to apply, I think it's

9     important to notice not only the aspect of the motions that I

10    will argue now but the next aspects of the motions, which

11    really are tugging plaintiff in two different directions.

12         We understood your Honor's January 7 order to say you

13    need to be a little more specific -- I'm sorry.  You need to be

14    a little less specific.  With respect to some of these

15    defendants you have confusing, impossible-to-understand

16    allegations, and yet we have these other defendants asking us

17    to be extremely specific.

18         THE COURT:  I said you could be less specific?

19         MR. LEAVY:  Well, what you said was that you thought

20    that our complaint was confusing and that it lumped too many

21    things together and that it was difficult to understand.  We

22    took that as a direction to simplify.

23         THE COURT:  No.  I said there was a very important

24    policy with regard to design professionals that would require

25    you to be specific as to which design professional was

56LNWTC1

1    responsible for which aspect of your complaint.

2              MR. LEAVY:  We did that, your Honor.

3              THE COURT:  You tell me.

4              MR. LEAVY:  If I could direct your attention, your

5    Honor, to paragraphs 1 through 75 of the complaint, they are

6    substantially different from the first 30 or so paragraphs of

7    the original complaint.

8              We undertook to identify each specific defendant and

9    what they did.  What's more, when we get to -- well, the

10   original motion that brought this issue to your attention was

11   the Flack & Kurtz motion, so we will use that as an example.

12             That is the Citigroup system.  That would be the ninth

13   cause of action.  So, specifically, for example, in paragraph

14   184 of the complaint, rather than referring to people as a

15   group, we say these four defendants, Skidmore, which is who

16   counsel represents who is arguing this aspect of the motion,

17   Flak, Amek, Centrifugal and Canner, we named them specifically.

18             We also add, and I think what tripped us up and which

19   your Honor noticed was that paragraph 186, which reads that

20   Citigroup defendants breached their duty in that they designed

21   and constructed the system which was unreasonably dangerous so

22   as to pose the unreasonable risk of collapse of the building in

23   the event of fire, which I think very clearly states a claim

24   against these defendants and puts them on notice as to their

25   precise conduct.

56LNWTC1

1   I might add as well that these defendants rely very

2 heavily in their motions on the FEMA report.  Clearly the FEMA

3 report, which is in the public record and which is referred to

4 in the complaint, also puts them on notice of what it is that

5 we say they did.

6   In particular, we say that they designed a building

7 which was unreasonably dangerous, which had nonredundant

8 structural trusses which ultimately collapsed.  We also say

9 that certain of these defendants designed and installed between

10 18,000 and 30,000 gallons of fuel and that they designed these

11 fuel systems which are believed to have caused the fire and the

12 collapse, your Honor.

13   THE COURT:  Mr. Leavy, let's take any one design

14 professional.

15   MR. LEAVY:  Yes.

16   THE COURT:  You mentioned Skidmore.  Take Skidmore.

17   Is there anything in the complaint which reflects your

18 belief that a substantial basis in law exists to believe that

19 the performance, conduct, or omission of Skidmore is negligent?

20   MR. LEAVY:  Yes.

21   THE COURT:  The negligence was a proximate cause of

22 the property damage you are complaining of?

23   MR. LEAVY:  Yes, your Honor.  Let me just find

24 Skidmore in the beginning of the complaint.

25   THE COURT:  I will ask the same question as to each

56LNWTC1

1    design professional.

2            MR. LEAVY:  OK.  Paragraph 59, Skidmore was the

3    architect for the Salomon premises.  That's paragraph 60.

4            Then, returning back up to paragraph 186, we allege

5    that they breached their duty and designed a building which was

6    unreasonably dangerous so as to pose an unreasonable risk of

7    collapse.

8            THE COURT:  Just a minute.

9            MR. LEAVY:  Sure.

10           THE COURT:  Let me catch up with you.

11           MR. LEAVY:  I'm sorry.  It's 60 and then 186.

12   Thereafter I'm going to go to 188, which is pretty specific.

13           THE COURT:  Is Skidmore one of the Citigroup

14   construction defendants?

15           MR. LEAVY:  They are.  They are the architect who was

16   consulted on the installation of the Citigroup system.

17           THE COURT:  Don't you think you need to show something

18   in the architectural design that causes Skidmore to be liable?

19           MR. LEAVY:  If I can direct your attention first to

20   paragraph 188, subsection (a), we do talk about failing to

21   safely, properly, and adequately design and prepare plans.

22           In particular, your Honor --

23           THE COURT:  You think that 3211(h) allows that kind of

24   conclusory pleading?

25           MR. LEAVY:  Your Honor, if 3211(h) applies, I think

56LNWTC1

1    that this, taken in conjunction with the specific statement

2    contained in the FEMA report, which is referred to in the

3    complaint, yes, your Honor, I think they do.

4            THE COURT:  You are relying on the FEMA report to

5    satisfy this pleading obligation?

6            MR. LEAVY:  On a motion to dismiss, your Honor, we've

7    referred to the FEMA report as the basis for our belief, and

8    what's more we have referred to it.

9            THE COURT:  The FEMA report is attached.  It is a lot

10   of pages.

11           MR. LEAVY:  Your Honor, I think Skidmore gave

12   information to FEMA.

13           THE COURT:  What aspect of the FEMA report do you rely

14   on?

15           MR. LEAVY:  Your Honor, I don't have the FEMA report

16   right in front of me, but there is particular discussion in the

17   FEMA report about the decision to route the pipes through the

18   fifth floor mechanical room in the location of nonredundant

19   trusses.

20           THE COURT:  Mr. Paul, let me ask you this question,

21   please.

22           Mr. Leavy makes mention of the tension between two

23   different pleading requirements.  There's the requirement of

24   specificity in pleading of 3211(h) and 214(d) and the general

25   notice pleading in the federal rules.

1    I don't remember the name of the case, I think it's

2    Harrison and Falk, but Justice Frankfurter held that pleadings,

3    the terms of pleading are determined by the Federal Rules of

4    Civil Procedure, and time and time again the Second Circuit in

5    numerous aspects, securities law, the antitrust law and the

6    like, have struck down heightened requirements of pleading by a

7    district judge.

8        What am I to follow?

9        MR. PAUL:  Your Honor, I don't really believe that

10   there is a tension here.  The reason is one that I think your

11   Honor really understood and embodied in the January 7 order.

12   That is, there are certain circumstances where public policy,

13   including the public policy of the state, can become a basis

14   for a heightened pleading requirement, and the federal rules do

15   it in Rule 9 with respect to particularity needed to plead

16   fraud.

17       THE COURT:  There's not a fraud here.

18       MR. PAUL:  I understand.  I am just giving that as an

19   example, your Honor.

20       THE COURT:  Rule 9 has its own federal requirement.

21   The heightened requirement of pleading fraud in securities

22   cases comes from the securities law as passed by Congress.

23       MR. PAUL:  Your Honor, I don't think that there is any

24   inconsistency between the general notice pleading

25   requirements -- after all the CPLR also has general notice

56LNWTC1

1    pleading requirements.  But the state legislature has made a

2    determination that this is a special circumstance, and there is

3    no reason not to embody that special circumstance or to engraft

4    it into the pleading rules that generally apply in this court.

5            THE COURT:  My suspicion is that since 3211(h) is the

6    means of enforcing 214(d), that once a motion under 3211 of the

7    CPLR is made, it then becomes the obligation of the plaintiff

8    to set forth with specificity the reasonable belief that is set

9    out in the law.  It is at that point that the harmony can

10   occur.

11           Perhaps plaintiff can plead generally, but once the

12   motion is made, it's the obligation of the plaintiff to come

13   forward with the information that is required by 3211(h).

14           MR. PAUL:  They certainly haven't done that here, your

15   Honor.  They haven't even come close.  Indeed, just listening

16   to Mr. Leavy read the paragraphs which he's using to make his

17   argument, I was struck by the fact that those paragraphs suffer

18   from exactly the same deficiencies that your Honor commented on

19   in your January 7 order.  Indeed, I don't know that adding the

20   FEMA report really changes anything.

21           To my knowledge, the FEMA report doesn't say that

22   anybody did anything wrong.  It certainly doesn't single out

23   the conduct of any of the design professionals in this case.

24           I don't know how the FEMA report gets them off the

25   hook.  The whole point of the FEMA report is that it's a

56LNWTC1

1  working hypothesis.  It is not, your Honor, based on any

2  demonstrated fact.  Those are the words of the report itself.

3       THE COURT:  3212(i) seems to suggest that once a

4  motion for summary judgment is made, 3211 can be converted into

5  a 3212 motion.  It is up to the plaintiff to come forward to

6  demonstrate a substantial basis in fact and in law to believe

7  that the performance, conduct, or omission of the licensed

8  architect, etc., was negligent and was the proximate cause of

9  the injury.

10       I think that's your standard now, Mr. Leavy.  You

11  can't satisfy it by pointing to conclusory allegations nor to a

12  very large FEMA report without pulling it together in a way

13  that makes it specific to the particular defendant.

14       MR. LEAVY:  Your Honor, if I could refer you to page

15  5-28 of the FEMA report, it states, "From a structural

16  standpoint the most likely event would have been the collapse

17  of truss 1 and/or truss 2 located in the east end of the fifth

18  and sixth floors.  These floors are believed to have contained

19  little, if any, fuel other than the diesel fuel for the

20  emergency generators, making diesel oil a potential source of

21  fire.  As noted in Section 5.4 the fuel distribution system for

22  the emergency generators pumped oil from tanks on the lower

23  floors to the generators through a pipe distribution system.

24  The SSB fuel oil system was a more likely source of fire around

25  the transfer trusses.  The SSB pump is reported as a positive

56LNWTC1

1     displacement pump having the capacity of 75 gallons per minute

2     and 50 pounds per square inch, which is in excess of three

3     atmospheres.    Fuel oil was distributed through the fifth floor

4     in a double-walled iron pipe, a portion of the piping running

5     in close proximity to truss 1."

6             Now, if that is what counsel says should satisfy this

7     requirement, which, again, I respectfully disagree, your Honor,

8     that it would apply, either 3211 in lieu of 12(b)(6) or 3212 in

9     lieu of Rule 56, I would submit that were I to insert the next

10    10 paragraphs, 15 paragraphs from this report directly into the

11    complaint, that would clearly satisfy whatever standard he is

12    talking about.

13            THE COURT:  I am not sure you need to do it in the

14    complaint, but you need to do it in response to the motion.

15            MR. LEAVY:  Your Honor, we refer specifically to these

16    pages in response to a number of these motions.    I don't think

17    that your Honor wants us to put in five pages of block quotes

18    of this report in this motion.

19            THE COURT:  Mr. Paul?

20            MR. PAUL:  Your Honor, I would caution my friend here

21    against trying to incorporate the next 15 paragraphs into some

22    future complaint, because one of those paragraphs say although

23    the total diesel fuel on the premises contained massive

24    potential energy, the best hypothesis has only a low

25    probability of occurrence.    Further research, investigation,

56LNWTC1

1    and analyses are needed to resolve this issue.

2           That doesn't meet the standard that your Honor just

3    stated was now the plaintiff's burden.  It doesn't come close,

4    Judge.  The FEMA report is not shy about saying throughout that

5    it's hypothetical.

6           THE COURT:  This is not for me at this point to

7    resolve disputed issues.  Nothing in 3211(h) or 214(d) or

8    3212(i) requires that.  What is required is the test of

9    reasonable belief.  And if that's the plaintiff's reasonable

10   belief, that's what we need to test.

11          What about the issue of duty, Mr. Leavy?

12          MR. LEAVY:  Respectfully, your Honor, that is not in

13   my bailiwick.  I would have to refer that to Mr. Sachs or

14   Mr. Antin.

15          THE COURT:  The ball is in your --

16          MR. PAUL:  Actually, I'm going to lateral to

17   Mr. Abramovitz.  I'm sort of the tail end of that argument.  We

18   have an additional argument you all you are about to hear that

19   applies to the design professionals, so I will add my two cents

20   after he speaks.

21          MR. LEAVY:  May we have your permission for a double

22   forward lateral, your Honor?

23          THE COURT:  Why don't we let the moving parties speak

24   first.

25          MR. SACHS:  I'm the duty man for the plaintiff, your

56LNWTC1

1      Honor.

2              THE COURT:  Fine, Mr. Sachs.

3              MR. ABRAMOVITZ:  Thank you, your Honor.  Good

4      afternoon.  My name is David Abramovitz, counsel for Flack &

5      Kurtz.  I have the honor of representing the various

6      construction and design defendants who have moved to dismiss

7      these various complaints based on the absence of a duty owed by

8      them to Con Edison.

9              I think, if I may -- and I know your Honor's generally

10     familiar with this obviously, but I think we have to start by

11     putting this in context.  Seven World Trade Center is a much

12     different animal than anything that's been seen in the 9/11

13     litigation to date.

14             This is not the tallest building in the country's

15     largest city.  It is not an icon of capitalism.  It is not a

16     target, nor was it previously a target for terrorists.

17             THE COURT:  I am familiar with what happened.

18             The flaming debris from 1 and 2 ignited No. 7, and,

19     after many hours of burning, No. 7 collapsed.

20             MR. ABRAMOVITZ:  In a nutshell that's it.

21             There are two different ways to look at this, both of

22     which are long sanctioned under New York law, which applies

23     here, and under either one of which there's no duty.

24             The first one is the old foreseeability standard that

25     date back to Pfaltzgraff.  Although the courts have repeatedly

56LNWTC1

1    cautioned that foreseeability by itself doesn't create a duty,

2    the converse is true.  In the absence of foreseeability there

3    is no duty.

4         In this case, there simply is no duty to protect

5    against that which is not reasonably foreseeable to the

6    defendants.  By the way, this starts running into the 8(a)

7    problem, because the question is which defendants are we

8    talking about.  The amended complaint is rather obtuse and

9    vague about that.

10        But there has to be a duty flowing from each one of

11   these defendants to the specific plaintiff, in this case the

12   subrogor of the insurers, who are seeking to pass along their

13   insurance loss.

14        In this case, the duty that comes out of this amended

15   complaint is not the sort of vague duty to prevent collapse.

16   That is a standard so vague as to be incapable of application

17   to any context.

18        It's clear that the real duty that Con Edison's

19   insurers are arguing here is a duty to protect Con Edison by

20   creating a building or in some cases a little piece of a

21   building or a system within a building that would have been

22   capable of withstanding the extraordinary and unprecedented

23   forces that were brought to bear on 7 World Trade Center when

24   200 floors of nearby office tower collapsed and rained chunks

25   of flaming debris on the building.

56LNWTC1

1          That's really what comes out here.  There's nothing in

2     this complaint that alleges, for example, that Citigroup or

3     Salomon backup power system malfunctioned while being used in

4     its intended use and that's what brought down the building.

5          The complaint doesn't allege that there was a

6     negligent design of the structural elements of 7 World Trade

7     Center that suddenly caused catastrophic collapse.

8          We know the context here.  Towers One and Two

9     collapsed.  They rained large chunks of fiery debris that, as

10    FEMA points out, from external observation damaged at least

11    half the floors in 7 World Trade Center and set fire to at

12    least six floors, if not more.  FEMA points out we only see six

13    from the outside.  Nobody knows how many fires were set

14    internally.

15         THE COURT:  I don't know that I want to take judicial

16    notice of FEMA's findings.

17         MR. ABRAMOVITZ:  FEMA doesn't make a finding of fact.

18         This is one of the problems with the 214(d) and 8(a)

19    issues as well, is FEMA doesn't talk much about facts.  They

20    talk -- plaintiff's counsel at the last issue notably stopped

21    reading at a point in the FEMA report where FEMA goes on to say

22    all of this is hypothesis based on potentiality, not actual

23    demonstrated fact.  That is one of the fundamental failings of

24    plaintiff's reliance on the FEMA report.  It's because in their

25    complaint, rather than the --

56LNWTC1

1          THE COURT:  FEMA doesn't displace the duty of a judge

2     and jury.

3          MR. ABRAMOVITZ:  I apologize.  FEMA doesn't do much of

4     anything here.  They simply hypothesize as to what may have

5     happened, and that's one of the problems with plaintiff's case.

6          THE COURT:  How do you define the risk that may or may

7     not have been foreseeable going back to your Pfaltzgraff issue?

8          MR. ABRAMOVITZ:  I think on the foreseeability issue

9     plaintiffs have to show that it was foreseeable to this group

10    of defendants, some of whom performed their services a decade,

11    even a decade and a half before the events of 9/11, that

12    somewhere down the road the two neighboring towers were going

13    to be toppled into this building and that they had to design --

14    and what Con Ed wants is for the court to say they had a duty

15    to design in some cases the building, in some cases, with

16    respect to Flack & Kurtz or Skidmore Owings, a part of the

17    building, to withstand those forces and protect Con Edison.

18         THE COURT:  Could you define the risk as a very large

19    fire, forgetting now just what caused the very large fire?

20         Then the question is, was there a duty on the part of

21    the design professional so to design the building as not to

22    negligently to enhance the risk to one of the tenants?

23         MR. ABRAMOVITZ:  I think that defines the duty in a

24    way that takes it completely out of the context in which this

25    case appears.  We wind up discussing the issue in the realm of

56LNWTC1

1   the hypothetical.  This is not a case where there was a fire in

2   the building.  That is like referring to the tsunami in

3   Southeast Asia as a tidal pool.

4        This isn't a fire case.  This is a case where what

5   they clearly had -- what they are clearly alleging, because

6   they don't allege that the cause of the damage to them arose

7   out of 7 World Trade.  They clearly acknowledge everything

8   starts with the towers collapsing into 7 World Trade, and what

9   they are really asking is that everyone foresee that this could

10  happen and they design in a way to withstand those

11  extraordinary forces.

12       I gather from your Honor's question that we're

13  starting to get into the other analysis, along the lines of

14  what your Honor did in the Towers One and Two cases going

15  through the five policy factors that the courts in New York

16  have laid out for discussing whether a duty should be extended.

17       I would note there are some critical differences here

18  between what your Honor addressed in that case and this case.

19  The first is, with respect to this motion, I would point out

20  that the Port Authority and Silverstein don't move on this

21  ground.

22       In the other cases your Honor dealt, at least with

23  respect to the World Trade Center defendants as opposed to

24  Boeing or the airlines, with respect to what's the duty of a

25  landowner?  This motion doesn't involve a claim that a

56LNWTC1

1    landowner or a party in control of property has a duty to

2    somebody.

3              Where they are looking to extend the duty here is to a

4    couple of tenants, and, beyond those tenants, to design

5    professionals and contractors who provided services to them.

6              THE COURT:  I missed that last point.

7              Do it again.

8              MR. ABRAMOVITZ:  Your Honor in the In Re September 11

9    Litigation --

10             THE COURT:  Plaintiff is suing design professionals,

11   the people who designed the building, the architects and the

12   designers, right?

13             MR. ABRAMOVITZ:  Not just the building your Honor.  In

14   some instances they are design professionals who simply

15   designed discrete parts of the building or discrete systems

16   within the building.  The Citigroup defendants, for example,

17   designed systems for a tenant in the building --

18             THE COURT:  And the plaintiff is, we can say Con

19   Edison is the plaintiff.  They were tenants in the building.

20             MR. ABRAMOVITZ:  I would disagree with that

21   characterization.

22             THE COURT:  Well, you characterize it.

23             MR. ABRAMOVITZ:  Con Edison is a lessee of an adjacent

24   property.  They happened in this case to be vertically adjacent

25   as opposed to across the street.  But they are not in 7 World

56LNWTC1

1    Trade Center.  In fact, it's undisputed that Con Ed's property

2    existed several decades before 7 World Trade was even begun to

3    be constructed.

4              THE COURT:  So they are adjacent property.

5              MR. ABRAMOVITZ:  They are an adjacent property owner.

6              THE COURT:  The adjacent property owner is suing the

7    design professionals who designed all or parts of 7 World Trade

8    Center.

9              MR. ABRAMOVITZ:  In some cases all and in some cases

10   parts.

11             THE COURT:  So talk about whether or not there is a

12   duty to --

13             MR. ABRAMOVITZ:  Let me walk through the analysis that

14   the courts have done in terms of discussing whether as a matter

15   of policy a duty ought to be expanded here, because the courts

16   have not previously, the courts in New York have not previously

17   extended a duty to the design professionals in the building to

18   members of the public or occupants of adjacent properties.

19             We start with the fact that the New York courts have

20   cautioned against this.  They have cautioned against extending

21   duty to protect against damages arising from the acts of third

22   parties.

23             The courts have laid out, and your Honor in your prior

24   decision has laid out five elements that have to be balanced.

25   Those five elements are, one, the reasonable expectation of the

56LNWTC1

1    parties and society generally; two, concerns about the

2    proliferation of claims; three, the likelihood of unlimited or

3    insurer-like liability; four, disproportionate risk and

4    reparation allocation; and, five, public policies that bear on

5    expansion or limitation of new channels of liability.

6            Let me walk through those five steps.

7            One, I think it bears some distinguishing between this

8    case and your Honor's prior decision on Towers One and Two,

9    this case does not involve the reasonable expectation of a

10   building's occupants that the landowner will protect them

11   against harm.

12           That duty, as your Honor recognized in that decision,

13   is previously established in New York law.  It doesn't involve

14   the question whether society at large expects airlines and

15   their security securities companies to protect against

16   hijackers being able to take over planes.

17           The question here is whether entities who provide

18   services to a building owner or even a tenant are reasonably

19   expected to protect without time limit the occupants of an

20   entirely different, albeit adjacent, property against the

21   effects of another property knocking into it and creating a

22   chain of dominos.

23           Simply stated, there is no such expectation in

24   society, and there is no prior case law in New York that

25   extends these kinds of liabilities beyond the landowner.

1            The second aspect of this balancing test is a

2    proliferation of claims.  Arguably that is not an issue here

3    and doesn't weigh one way or the other because the statute of

4    limitations in large part has expired with respect to these

5    claims, although I would caution that many parties have not yet

6    answered and there may be a proliferation of cross-claims and

7    counterclaims arising from such a broad definition of duty.

8            The third aspect is the likelihood of unlimited or

9    insurer-like liability.  I would comment there's almost nothing

10   more than demonstrative of the fact that this is the kind of

11   duty plaintiffs are talking about then what the caption

12   represents.  It is a bunch of insurers looking to transfer the

13   insurance loss to other parties.

14           Likewise, the essence of the claims that they're

15   positing, is this duty unlimited in time, whether or not the

16   party had anything to do with the building's overall system,

17   whether the party had any opportunity, much less authority to

18   maintain and to maintain the building's overall system to

19   protect adjacent property owners?  It is a duty that is much

20   more akin to strict liability, to insurer liability than to a

21   simple negligence standard.

22           Four is the issue of disproportionate risk and

23   reparation allocation.  This is a critical element of the

24   analysis here because what this aspect of the analysis does is

25   look to which party is best suited to protect against the risk.

56LNWTC1

1    In this case the Waters decision out of the New York State

2    Court of Appeals is almost on fours with what happens here.

3        The Court of Appeals there, notably involving a claim

4    against a landowner, says that public policy does not warrant

5    extending liability to protect members of the public as opposed

6    to residents and lawful occupants of the defendant's building

7    against that building becoming an instrumentality of a third

8    party committing a criminal act that harms that plaintiff.

9        The court looked specifically at the fact that, were

10   the court to extend that liability, it would effectively place

11   the burden on a landowner to prevent crimes originating on the

12   streets, to prevent intentional criminal acts.

13       The court said in imposing this duty we will have

14   nothing to do with preventing crime.  Crime will happen.  There

15   is too much opportunity for crime to exist.

16       Imposing this duty on the landowner is not going to

17   affect that one whit.  Or, put another way, this defendant is

18   not the party best suited to prevent the harm that any such

19   duty would be seeking to prevent.

20       Then the final aspect of the balancing test, of

21   course, is this caution against extending new channels of

22   liability.

23       Plaintiffs notably don't point to a single case that

24   would extend liability to design professionals or contractors

25   who work in building A for damage to the occupant of building B

56LNWTC1

1    three, five, ten, fifteen years down the road, particularly

2    when that damage is not alleged to have arisen directly from

3    their activities.

4            On this the 532 Madison case is distinguishable.    That

5    case, which your Honor relied on previously, talks about claims

6    of damage arising directly from the activities that were

7    ongoing.

8            This complaint doesn't allege anywhere that the direct

9    activities of these defendants caused Con Ed's damage.    It

10   alleges rather than somehow or other they had a duty to prevent

11   the events of 9/11 from ultimately, from Con Ed being the last

12   in that chain of dominos.

13           So whether you address it from the aspect of balancing

14   these factors, four of which clearly weigh against the

15   plaintiff's claims here, one of which is at least neutral, or

16   from the aspect of foreseeability, what happened on 9/11 being

17   something that was unprecedented -- incidentally the FEMA

18   report, and bearing in mind your Honor's caution that we are

19   not going to rely the on the FEMA report for much, but the FEMA

20   report points out something prescient on the issue of

21   foreseeability, which is that there is pretty much no

22   experience prior to 9/11 of a large fireproof steel structure

23   having collapsed.

24           That is critical, I think, to the foreseeability

25   argument.    The plaintiff says you have to ignore the fact that

56LNWTC1

1    this has never happened before.  Somehow these design

2    professionals should have foreseen years in advance that that

3    would happen, and they had a duty to protect Con Ed against it.

4         I think that stretches the foreseeability to an extent

5    that it hasn't been stretched before by the New York Court of

6    Appeals.  I think, frankly, in this case these facts are almost

7    analogous to Pfaltzgraff, but certainly when the court goes

8    through the policy analysis, and what this court has

9    acknowledged before is a policy laden analysis --

10        THE COURT:  Let's suppose the architect designs the

11   building without regard to appropriate safeguards against fire

12   spreading through the building.  Could a tenant, an individual,

13   or someone working for a tenant sue the architect?

14        MR. ABRAMOVITZ:  Under New York law they would

15   probably have a claim.  There's New York cases dealing with

16   personal injury claims even absent --

17        THE COURT:  The person living next door can't?

18        MR. ABRAMOVITZ:  The Court of Appeals for policy

19   reasons has chosen to draw that line.  Although they stretched

20   it in 532 Madison, because again they have tied it to the

21   landowner's duty, and they have tied it to claims of damage

22   directly arising from that negligence, which is not the case we

23   are talking about today.

24        The plaintiffs don't allege that this building just

25   caught fire when, for example, one of the emergency backup

56LNWTC1

1    power systems kicked into operation.

2            What they allege --

3            THE COURT:  The cause of the collapse of the building

4    is something that we really don't know yet, at least we don't

5    know it juridically.  People have speculated.  The fire began

6    from debris from One and Two.  The fire raged on and on and on

7    we're told for numbers of weeks.  Among the reasons could have

8    been the diesel tanks with the fuel inside the building.

9            MR. ABRAMOVITZ:  I think, with due respect, your Honor

10   overstates the kind of general idea of what happened that comes

11   out of the FEMA report, because we don't know what happened.

12   We don't know that the falling towers didn't damage a critical

13   structural element of the building.

14           THE COURT:  In an issue of duty to accept the

15   allegations of negligence originally made by the plaintiff, I

16   have to examine whether, given those allegations of negligence,

17   there is a duty on the part of a person sued to the plaintiff.

18           MR. ABRAMOVITZ:  True, the court has to accept --

19           THE COURT:  So the question here is whether the

20   architect of 7 World Trade Center or parts of 7 World Trade

21   Center owed a duty to Con Edison, the owner and occupant of the

22   adjacent building.

23           MR. ABRAMOVITZ:  New York law to date has never held

24   such a duty to exist.

25           THE COURT:  Accept that there is no duty.  Put it

56LNWTC1

1   positively.  You say it never has.  An adventurous judge can

2   say, OK, here's the case.

3          MR. ABRAMOVITZ:  Waters says there is no such duty,

4   even if you're the landowner, even if you are the owner of 7

5   World Trade Center.

6          THE COURT:  That's the case where someone was accosted

7   on the street.  Plaintiff was walking on a public street.  She

8   was accosted by a knife-wielding assailant who forced her into

9   a building owned by defendant and she was robbed and sexually

10  assaulted.

11         It was claimed that that building was allowed to have

12  remained in disrepair with broken locks and an invitation for

13  people to be pushed into the building.

14         MR. ABRAMOVITZ:  The facts go beyond that.

15         THE COURT:  There was no nuisance alleged.  If there

16  had been an allegation of nuisance, it may be that the case

17  would have been different.  We don't have a nuisance.  We don't

18  have a nuisance here.

19         But the court held that the scope of the landowner's

20  duty in the case in Waters v. New York City Housing Authority

21  does not embrace members of the public at large with no

22  connection to the premises who might be victimized by street

23  predators.  That's a holding of the New York Court of Appeals

24  in 1987 that is binding on us.  We're dealing with New York

25  law.

56LNWTC1

1           The problem in extending that case, we're dealing with

2      an adjacent landowner, not a member of the public.  It is hard

3      to understand how narrow or broad the ruling of the New York

4      Court of Appeals was because the rule is stated in relationship

5      to a victimization by street predators in particular

6      circumstances of a passerby.

7           When an architect builds a building -- architects

8      don't build buildings.  When an architect designs a building,

9      clearly the architect has a professional obligation to the

10     party employing the architect.

11              MR. ABRAMOVITZ:  Right.

12              THE COURT:  Does the architect have a duty to the

13     adjacent landowner?

14              MR. ABRAMOVITZ:  No.

15              THE COURT:  It is convenient for you to say no

16     because --

17              MR. ABRAMOVITZ:  There are certainly no cases that say

18     they owe that duty.

19              THE COURT:  The largest difference in practice and

20     judgment is that I always knew the answer when I was a lawyer,

21     and I frequently don't know the answer as a judge.

22              MR. ABRAMOVITZ:  The reason for that, and obviously to

23     draw that line is somewhat arbitrary, but the Court of Appeals

24     points that out every time they address duty.  They point out

25     we are drawing to some extent arbitrary lines.

56LNWTC1

1          THE COURT:   There is also an analogy from the field of

2     accountants, because in a lot of cases, beginning with Ultra

3     Mares v. Touche and most recently Credit Alliance Corporation

4     v. Arthur Andersen, 65 N.Y.2d 536 (1985), the Court of Appeals

5     drew back from a previous extension and refused to hold

6     liability against the accounting firm outside of a very narrow

7     position where the accounting firm knew in advance who was

8     going to rely on the opinion of the accounting firm.

9          MR. ABRAMOVITZ:   I think, your Honor, there are two --

10         THE COURT:   I'm not sure that accounting practice and

11    design professional practice are completely analogous, but

12    there is some aspect in the issue of duty that draws from the

13    Court of Appeals' reluctance to pin liability on accountants

14    finding no duty exists.

15         MR. ABRAMOVITZ:   It carries over generally to claims

16    against design professionals.   There is a line of authority out

17    there that deals with claims that are brought against

18    architects and engineers by contractors, for example.   The

19    courts talk about the fact that architects and engineers don't

20    typically owe a duty to the contractor on their projects.

21         That is obviously an arbitrary line, and separated

22    from context you would say, well, you know, the contractors

23    kind of rely on the architect doing his job right so the

24    contractor can build.   The New York courts have said that is

25    where we draw the line.   You owe your duty to the property

1    owner who has hired you.

2         THE COURT:  The problem with the analogy is that in a

3    populated city we depend on architects not only to do a proper

4    job for their clients but perhaps also -- and I raise this not

5    as a statement but as a question -- to occupants of nearby

6    buildings as well who could be injured by an architect's

7    negligence.

8         I don't know that the law has gone that far or should

9    go that far, but it is an arguable proposition.

10        MR. ABRAMOVITZ:  I believe that in light of the Court

11   of Appeals repeated cautioning against the liability here the

12   court ought to tread very carefully.  If I could be so bold and

13   say that's what the court ought to do, in extending this

14   liability where the New York courts haven't done it, where the

15   New York courts have cautioned even about extending the

16   liability to landowners, what the plaintiffs here want to do is

17   jump that at least one if not two steps further in either

18   direction.

19        No longer is it a duty of a landowner to an occupant

20   of its building.  We are now stretching to occupants of

21   neighboring buildings.  And it's no longer the duty of

22   landowners, but the design professionals who provide the

23   services to the landowner or the tenant.

24        That's that fifth prong that the balancing analysis

25   gets to, which is the caution against creating new channels of

56LNWTC1

1    liability that haven't heretofore been recognized. Again,

2    that's that other --

3         THE COURT: I know you are arguing for all of the

4    design professionals Mr. Abramovitz, but there is a possibility

5    of drawing lines so that the design professional for an aspect

6    of a building might have lesser duty, if one exists, than the

7    design professional for the entire building.

8         MR. ABRAMOVITZ: Yes. If I may step for a moment with

9    the court's permission out of my shoes as representative of

10    this broad group, as your Honor recognizes, there are different

11    groups here. It points to a failing of plaintiffs' complaint

12    because they come back on this issue and almost point to their

13    vague conclusory complaint to satisfy elements on other issues.

14         As your Honor correctly recognized, there are several

15    dozen defendants here that provided various services.

16    Plaintiff's counsel pointed your Honor to paragraph 188 of the

17    amended complaint.

18         It is something I was going to get into on the 8(a)

19    issue, but I would point out that is a paragraph that stretches

20    over two pages and really consists of nothing but bare

21    conclusory allegations.

22         They don't point, for example, to any particular

23    architect and say this is what you did wrong, and this is how

24    what you did caused our damages.

25         THE COURT: Guilt is individual and not collective.

56LNWTC1

1       MR. ABRAMOVITZ:  That's right.  But even when they

2   point to groups, which your Honor has previously said was

3   inappropriate, part of the problem here is different groups may

4   owe different duties to different parties.

5       It is our position that none of the construction and

6   design defendants who had no ownership of the building, had no

7   management control of the building and were not in a position

8   to control what happened in that building from the day they

9   completed their services until the date of this particular

10  event -- bear in mind, for example, Flack & Kurtz, who my firm

11  represents, finished their work more than a decade before the

12  events of 9/11.

13      There are numerous things that happened after they

14  finished their services over which they had no control with

15  respect to this building.  That points to a problem in terms of

16  how plaintiff approaches the duty problem.  They just toss

17  everything up against the wall and hope some of it sticks.

18      The fact of the matter is they never alleged any

19  particular duty with respect to particular groups of defendants

20  or particular defendants within those groups.

21      THE COURT:  Let me hear from the plaintiffs.

22      Mr. Sachs.

23      MR. SACHS:  Your Honor, let me begin by reminding the

24  court of something that it probably does not need to be

25  reminded of.  Let's remember where we are in this case.  This

56LNWTC1

1    is a motion under 12(b)(6) for failure to state a claim.  There

2    has been no discovery in this case to date.  In fact, there

3    hasn't even been a document exchange except on a minor -- I

4    won't say "minor," a discrete motion between the City of New

5    York and plaintiffs.

6            THE COURT:  Which leads me to the first question.  Is

7    there a policy in New York State that requires, before a

8    lawsuit is brought, the good-faith belief that a particular

9    design professional who has done his work more than ten years

10    earlier is negligent?

11            MR. SACHS:  Yes, I think there is.

12            THE COURT:  So that we are not dependent on discovery?

13            MR. SACHS:  I think we're dependent on discovery for

14    the details.  I think we need a good-faith belief.  I think

15    that is what your Honor said.  We have a very good-faith belief

16    that these design professionals indeed committed negligence

17    which was the proximate cause of an injury that they could very

18    easily and did foresee.

19            THE COURT:  Given that concession -- at least there's

20    part of a concession there -- given that concession, aren't the

21    defendants correct in wanting to test that at the outset,

22    notwithstanding the general pleading rules of the federal

23    procedures?

24            Namely, in federal practice it is enough to have a

25    notice of claim except for certain limited circumstances and to

56LNWTC1

1    go into discovery, whereas here there is a strong state policy

2    requiring or giving an opportunity to test the reasonable

3    belief of the plaintiff before going into discovery.

4         MR. SACHS:  Your Honor, I believe you're referring to

5    the argument that was made earlier on --

6         THE COURT:  I am returning to it.

7         MR. SACHS:  -- a New York CPLR.

8         All I can say is, from what I understand of that,

9    there is a policy that giving notice gives to the plaintiff a

10   90-day period of time to take some limited discovery in order

11   to reach what is a slightly higher burden under the remainder

12   of that scheme.

13        THE COURT:  I don't think so.  There's no provision

14   for discovery in that 90-day period.

15        MR. SACHS:  I believe --

16        THE COURT:  There's no discovery to frame a complaint.

17        MR. SACHS:  I am not an expert on that.  But I believe

18   when I looked at it, and I looked at it tangentially, that

19   during that 90-day period limited discovery is permitted and

20   the whole purpose of the 90 days was so that the alleged

21   heightened requirement by the second part of that statute could

22   be met by the plaintiff.  I submit to the court that where we

23   are here in the federal court --

24        THE COURT:  Mr. Leavy, you're the expert.  Why don't

25   you just speak up to that point.

56LNWTC1

1              MR. LEAVY:  Section 4.

2              THE COURT:  Go ahead, Mr. Leavy.

3              MR. SACHS:  I am reading, your Honor:  "From and after

4     the date of service of the notice provided for in subdivision

5     (1) of this section, the claimant shall have the right to serve

6     a demand for discovery and production of documents and things

7     for inspection, testing, copying, or photographing in

8     accordance with Rule 3120 of this chapter," and then it goes

9     on.

10             So there is indeed a provision for discovery.  It is

11    that very provision that leads to what may or may not be or

12    let's say is some heightened pleading requirement.

13             That's not where we are in this case.  We are in the

14    federal court.  We are at a stage, a 12(b)(6) stage, where, as

15    this court has said, all allegations of the complaint must be

16    taken as true.  All doubts and inferences must be resolved in

17    the plaintiff's favor.  The pleading must be viewed in the

18    light most favorable to the plaintiff.

19             And, finally, in sum, this court can only dismiss if

20    it appears -- and I emphasize these words -- beyond doubt that

21    plaintiff can prove no set of facts that would entitle it to

22    relief.

23             Let me, if I may, your Honor, be I think a bit more

24    direct as to what the facts are.  It is somewhat humorous to

25    call Con Ed an adjacent landowner.

56LNWTC1

1          In 1970, the Port Authority decided it wanted to build

2     the world trade centers.  It came to Con Ed and said to Con Ed,

3     build a substation so that we can power these world trade

4     centers.

5          Con Ed built that substation in 1970.  It was

6     contemplated when that substation was built that a building,

7     which turned out to be 7 World Trade Center was going to be

8     built not adjacent to it, was going to be built directly on top

9     of it.  Con Ed is floor one of WTC 7.

10          In 1986, when WTC 7 was built, it wasn't built in

11     conformance with the plans that were designed when the

12     substation was built.  It was built to a much larger

13     specification.  This is all in the FEMA report.  This isn't

14     something that isn't known to everybody sitting in this room.

15          In order to get more office space and in order to make

16     more money, the building was designed bigger.  They couldn't

17     use the caissons or many of them that had been put in when Con

18     Edison's substation was built.

19          So what did these architects and engineers do?  They

20     had to design a new design so that they could build a bigger

21     building, and in doing that the design they built required the

22     use of three transfer trusses, nonredundant transfer trusses.

23     These trusses carry the majority -- I won't say the majority,

24     carry a very large load of this building.

25          These trusses are located -- and everybody who was

56LNWTC1

1    building this building, these engineers and architects, knew if

2    they looked at plans these trusses were located somewhere

3    between the first and fifth floors.  They run actually from the

4    first floor all the way up to the fifth floor.

5         It is axiomatic from the way this building collapsed

6    that a kink formed in the northeast corner of this building as

7    it came down.

8         If you look at it, assuming that you are looking at

9    the north end of WTC 7 as you're sitting there, your Honor --

10   this is north, this is east -- there is a penthouse on this

11   side of that building that you can see on videotape drop down

12   into the building.

13        That -- I call it a crimp, but kink, that kink goes

14   right down to those trusses.  Not only did the FEMA report in

15   2002 suggest, though they did say low probability, it was the

16   only hypothesis that they gave any probability to.

17        That is a far cry from a standard where somebody has

18   to prove beyond doubt that the plaintiff can prove no set of

19   facts that would entitle it to relief.

20        Well, as of today, your Honor, the NIST report --

21        MR. MOLONEY:  Your Honor, can we object at this point

22   to their reference to the NIST report.

23        MR. SACHS:  They used it in their own brief.

24        MR. MOLONEY:  We did not, your Honor.

25        THE COURT:  Mr. Moloney, it's argument.

56LNWTC1

1      I would like to listen, but I wanted to let you both

2   know that we are dealing with an issue of duty, not proximate

3   cause.  Proximate cause is an issue of fact.  Duty is an issue

4   of law.

5      So when I examine the issue of duty, I examine the

6   issue in the context of a legal requirement, and a legal

7   requirement does not depend on the facts.  So we are dealing

8   with an issue of law.

9      Was there a duty from the design professional to the

10  plaintiff?

11     I am interested, however, to hear Mr. Sachs.

12     MR. MOLONEY:  Your Honor, if I may be heard for one

13  second.  I rose to object simply because as a matter of federal

14  law and statute, the NIST report may not be referred to for any

15  purpose.

16     THE COURT:  What is the NIST report?

17     MR. MOLONEY:  The NIST report is a report that is

18  being prepared by the federal government and the purpose of

19  this report --

20     THE COURT:  What does necessary stand for.

21     MR. SACHS:  National Institutes of Science and

22  Testing -- Standards and Technology.  Excuse me.

23     MR. MOLONEY:  In order to encourage parties to

24  cooperate -- and all these parties are cooperating with NIST --

25  Congress has enacted legislation saying that no one can refer

56LNWTC1

1    to this report for any purpose in a court of law.

2              THE COURT:  Is this in your papers?

3              MR. SACHS:  It is, your Honor.  It is in our papers.

4    It is in our papers, and it indicates that what the NIST law

5    says has to do with conclusions.

6              THE COURT:  I'll read it in your papers.

7              MR. SACHS:  The facts of the NIST report --

8              THE COURT:  I'll read it in your papers.

9              MR. SACHS:  I would like to point out, your Honor --

10             THE COURT:  Don't mention the NIST report.

11             MR. SACHS:  Whether it is contained in the NIST report

12   or not, the facts are, your Honor, that plaintiff will prove

13   that this building collapsed because of the failure of one of

14   these two trusses, these two transfer trusses in the northeast

15   corner.  We will prove that the only way those trusses

16   failed --

17             THE COURT:  Who designed hose?

18             MR. SACHS:  Who designed those, the engineers, the

19   architects.

20             THE COURT:  Which ones?  All of them?  Some of them?

21             MR. SACHS:  For 7 World Trade Center, I believe the

22   engineer, the architect on that one is, Swankey Hayden I

23   believe is the architect on that one.  There are different

24   architects.  Swankey Hayden was certainly the architect

25   involving the installation of New York City's OEM fuel system

56LNWTC1

1    and tanks, and I believe they were the architect on the

2    building.  I believe that Skidmore was the architect that was

3    involved in the Citigroup's installation of fuel tanks and

4    diesel fuel oil into this building.

5            What I am trying to point out to the court -- and I am

6    dealing with duty -- is what we have here is a group of

7    engineers and architects and owners who introduced into a

8    building that was designed as a class one building, as counsel

9    pointed out in his argument -- and class one buildings are

10   designed to burn out and not collapse, but they are designed to

11   do that because office buildings have a limited amount of fuel

12   to burn in those buildings, and fires burn out and these

13   buildings don't collapse.

14           He's quite correct.  None had ever happened before.

15   But when you introduce 18,000 to 30,000 gallons of diesel fuel

16   into a building of this kind, you create a fuel load that that

17   building cannot stand.

18           We will prove that it was the installation of that

19   fuel load by these various defendants and their experts and the

20   piping of that fuel load that caused the fire that caused one

21   of these trusses to weaken.  As I said before, you can see by

22   the crimp in the building, the building collapsed, it implodes,

23   it collapses internally, nothing goes to the side.

24           I believe it will be quite clear through expert

25   testimony that this building collapsed from the weakening of

56LNWTC1

1    that truss, and the only thing that could have weakened that

2    truss was heat, and the only source of heat in that area was

3    the diesel fuel oil from the various defendants in this case.

4    That's what I believe we will prove against all these

5    defendants.

6            THE COURT:   What was Con Edison's status in the

7    building?

8            MR. SACHS:   Con Edison's status was they were the

9    entity upon whom this building was built.

10           THE COURT:   Who was the landowner?

11           MR. SACHS:   I guess the Port Authority is the

12   landowner, I think.

13           THE COURT:   So Con Edison was a tenant of the Port

14   Authority?

15           MR. SACHS:   Con Edison is a tenant of Port Authority.

16           THE COURT:   And the floors above Con Edison were what?

17   Port Authority owned?

18           MR. SACHS:   Port Authority owned, and then I believe

19   Silverstein has a long-term lease with the Port Authority so

20   that I think that the ultimate tenancy of some or all of those

21   tenants, and I really don't know, is with Silverstein

22   Properties and not with the Port Authority, but I'm not certain

23   of that.

24           THE COURT:   OK.

25           MR. SACHS:   But it isn't, as counsel was suggesting,

56LNWTC1

1    any stretch --

2            THE COURT:  So the design professionals who designed

3    the structure atop the Con Edison tenancy had a duty to Con

4    Edison?  That is your proposition?

5            MR. SACHS:  Absolutely.  They had a duty, Judge, this

6    is -- clearly foreseeable is where counsel started out.  I know

7    that's not the only test.

8            THE COURT:  Con Edison is not the adjacent

9    landowner --

10           MR. SACHS:  No.

11           THE COURT:  -- as I mistakenly put it?

12           MR. SACHS:  That's correct.

13           THE COURT:  It's a tenant within the same structure?

14           MR. SACHS:  That's correct.

15           In fact Con Edison is, if you look at the building, it

16   is like Penn Station is to Madison Square Garden.  That

17   building was built on top of and cantilevered over Con Edison.

18           THE COURT:  Con Ed son presumably had a contract with

19   the Port Authority, lease or contract?

20           MR. SACHS:  Con Edison had a lease with the Port

21   Authority.

22           THE COURT:  And had ample basis and ways to protect

23   itself from what would happen above it?

24           MR. SACHS:  Within reason.  I think, your Honor --

25           THE COURT:  Why isn't the duty of Con Edison the duty

56LNWTC1

1     of its landlord and not people who were employed by the

2     landlord and by others?

3          MR. SACHS:  Its landlord does have a duty to it.  But

4     that doesn't exclude the fact that other people don't also have

5     a duty to it.

6          THE COURT:  Well, I don't know.  Is there a New York

7     case that supports that proposition?

8          MR. SACHS:  I would think that 532 Madison Avenue

9     supports that proposition.  I mean, there we have an adjacent

10    landowner building a 38-story wall that collapses, and the

11    court held that anybody who sustained property damage or

12    personal injury was owed a duty.  Here you have Con Edison,

13    which is sitting on the ground, this building is built on top

14    of it.

15         THE COURT:  Who was the defendant in 532?

16         MR. SACHS:  There were a couple of them.  Tishman

17    construction was one.  A landowner was one.

18         I think there were three cases joined together, and

19    I'm not sure who all the defendants were, but I know Tishman

20    was one and I know a landowner was one.  I'm just not certain

21    who the other one was.

22         Judge, what is there in our law in the state of New

23    York that puts architects and engineers in some revered

24    position?

25         There has been no pronouncement, none from the New

56LNWTC1

1    York Court of Appeals or the Appellate Division in any manner,

2    shape, or form, that has ever suggested that engineers and

3    architects shouldn't be responsible just as general contractors

4    should be for the negligence in constructing or planning or

5    designing a building.  There is no such case.  It doesn't make

6    any sense to have such a case.

7              They can't point to such a case.

8              MR. PAUL:  Your Honor, may I be heard for 30 seconds

9    on that?

10             THE COURT:  After he finishes.

11             I think he's close to being finished.

12             MR. SACHS:  Let me go on, if I may, to the test that

13   your Honor set forth in your opinion in the September 11

14   litigation.

15             Your Honor quoted actually twice from the same quote,

16   once from Palka and then once from 532 Madison Avenue, and it

17   said it's the court's job to fix duty by balancing factors,

18   including the following.  I point out ahead of time that of the

19   factors only the first really has to do with foreseeability.

20   The other four really all have to do with economic

21   consequences.

22             Let me go through them quickly.

23             The reasonable expectation of the parties and society

24   generally.

25             Your Honor, I can't fathom that it wouldn't be the

56LNWTC1

1   reasonable expectation of anybody that if you go to build a

2   building on top of someone else's building and you introduce

3   somewhere between 18,000 and 30,000 gallons of fuel that is the

4   only thing that can make that building collapse and destroy the

5   building below it that you owe a duty to that person not to do

6   so.  I don't think that's a question that we have to think very

7   long about.

8           There is no question about the proliferation of

9   claims.

10          When we talk about proliferation of claims, that's the

11  stuff that the court was talking about in Milliken, and I think

12  it's in Strauss, which was the New York blackout case in which

13  utilities such as Con Edison -- there is an orbit that's given,

14  and they don't stretch that orbit because they are worried

15  about the proliferation of claims.

16          That's not true here.  If an architect and an engineer

17  or a contractor or a fire protection person or someone who did

18  the work on the fuel lines did it on one building, their zone

19  is going to be that building and what could happen when that

20  building falls.

21          That is a fairly narrow zone.  That would be anyone

22  who suffered property damage or personal injury, as the court

23  said in 532 Madison Avenue.  There is nothing here that is

24  making anybody an insurer.

25          The fact is we have to prove -- we know that.  We have

1    to prove that the engineers, architects, the owner of the

2    building or anyone else in fact was negligent and in fact

3    caused the damage, caused this building which should have never

4    collapsed to have collapsed.

5         There is no disproportionate risk in reparation

6    allocation.  That was the situation I think in Eaves Brooks in

7    which the court was worried in that case because the defendants

8    there were only being paid $120, if I recall correctly, to

9    inspect sprinklers and $660 to run a central station, and if

10   the court had found liability, the court was worried that would

11   expand to many, many, many people and it would change that

12   whole industry and people wouldn't be able to afford it.

13   That's not the situation here.

14        And, five, public policies affecting the expansion or

15   limitation of new channels of liability.  There's no new

16   channel your Honor.  Everybody who negligently builds a

17   building would be subject, would be liable, has a duty to the

18   party above whom they are building that building not to build a

19   building that is likely to collapse on top of them.

20        So there is no extension of liability.  We are not

21   talking about some member of the general public who happens to

22   be wandering around three or four blocks away.  We are talking

23   about the entity that is directly under this building and who

24   all of these professionals had to have directly in their mind

25   when they introduced into this building things that are in

1    violation of the New York City Building Code.

2         I mean, there's a reason that they don't want more

3    than 275 gallons in a day tank on any floor of these buildings.

4         THE COURT:  I think I got your point.

5         MR. SACHS:  Thank you, your Honor.

6         THE COURT:  Mr. Paul.

7         MR. PAUL:  Very briefly, your Honor.

8         The reason that Mr. Sachs was careful in the way he

9    worded his statement that there is no case, he said no Court of

10   Appeals or Appellate Division case that says that there's a

11   special rule for design professionals is because there is a

12   Supreme Court-level case, one that we cited and quoted

13   extensively from in our brief.  That's the McGee v. City of

14   Rensselaer case.

15        In that case, two engineering firms that were involved

16   in a project who had no privity with the plaintiff and where

17   the plaintiff was claiming only property damage were found by

18   the court not to have a negligence claim against the

19   engineering firms.

20        The court in discussing the public policy

21   considerations drew upon and cited to various Court of Appeals

22   opinions dealing with the extent to which liability should be

23   limited in cases where there are special reasons.  I would

24   respectfully suggest, your Honor, that there are some special

25   reasons here, not the least of which is the special rules that

56LNWTC1

1    New York has said apply under 214(d).  It's the same kind of

2    argument.

3         THE COURT:  I think we're past that.  Either these

4    reasons are sufficient or not.  Mr. Sachs has given me reasons.

5         Let me ask you this, Mr. Paul.  Let's suppose the

6    lawsuit were against not the design professionals but against

7    the owner, the Port Authority.

8         Wouldn't the Port Authority want to say that it had

9    received advice from design professionals?

10        MR. PAUL:  I really can't speak for the Port Authority

11   on that, your Honor.

12        THE COURT:  It would be the natural defense, wouldn't

13   it, to a claim of negligence?

14        MR. PAUL:  I just can't address that, your Honor.

15        THE COURT:  OK.

16        MR. PAUL:  Can I just say one other thing?

17        THE COURT:  Yes.  Then we will leave that.

18        MR. PAUL:  If your Honor would just indulge me again

19   just a few seconds.  If you can go back to 214 for a second.

20   Your Honor indicated earlier on that you were somewhat troubled

21   I think by the notion that in your January 7 order you directed

22   plaintiffs to serve an amended complaint, and your point was

23   isn't all they did here fulfill the mandate that I set down for

24   them rather than starting a new action.

25        In their amended complaint they purport to have

56LNWTC1

1    complied with the provisions of 214(d).  Aside from the fact

2    that that is just not the case, it is interesting to me that we

3    talked about the policy behind the discovery provision that's

4    built into 214(d), 214(d) subparagraph 4.  They made no effort

5    to take advantage of the free discovery before commencing a new

6    action.

7              THE COURT:  It's not clear how that works out on a

8    removal situation.

9              MR. PAUL:  I think, your Honor, in deciding how you

10   want to handle this 214(d) issue it's a useful indicator of

11   what their real motivation was here.

12             THE COURT:  Thank you, Mr. Paul.

13             Mr. Sachs, let me ask you this, or Mr. Leavy.  We

14   found no notice of claim having been filed against the

15   defendant Irwin G. Cantor PC.

16             Does that mean I dismiss the complaint against this

17   defendant?

18             MR. SACHS:  I didn't know that until you just

19   mentioned it.

20             MR. LEAVY:  Your Honor, I don't know the answer the

21   factual answer.

22             THE COURT:  So why don't you research it and let me

23   know.

24             All right, Mr. Leavy?

25             MR. LEAVY:  Thank you, your Honor.

56LNWTC1

1          MR. SACHS:  Judge, I just wanted to say, you may not

2     want to hear it, I can distinguish that McGee case if your

3     Honor wants me to.

4          THE COURT:  I don't think it's necessary.

5          MR. SACHS:  Thank you, sir.

6          MR. ABRAMOVITZ:  Your Honor, may I be heard very

7     briefly on this duty point -- actually, two very quick points?

8          THE COURT:  I have heard Mr. Paul, Mr. Abramovitz.

9     I'm going to read the papers.  I don't need anything further at

10    this point.

11         MR. ABRAMOVITZ:  Thank you.

12         THE COURT:  The design professional has another

13    separate point?

14         MR. PAUL:  Just on the product liability claim.

15         THE COURT:  That is going to be the next issue.

16         MR. TAGLIAGAMBE:  Your Honor, if I may just speak

17    briefly on behalf of the motion.

18         THE COURT:  Your name is?

19         MR. TAGLIAGAMBE:  Electric Power Systems.

20         THE COURT:  Your name?

21         MR. TAGLIAGAMBE:  Anthony Tagliagambe from London

22    Fischer.

23         THE COURT:  Go ahead.

24         MR. TAGLIAGAMBE:  Very briefly, your Honor, we have

25    raised the inability of the plaintiffs to establish any legal

56LNWTC1

1    duty that Electric Power Systems had.

2         Electric Power Systems was retained by a nonparty to

3    this case, a company by the name of Russ Electric, in September

4    of 1998 to do an analysis of the short circuit breaker system

5    that may or may not have ultimately been implemented in 7 World

6    Trade Center.

7         We did a report in October of 1998.  There is no work

8    or connection to 7 World Trade Center on behalf of Electric

9    Power Systems.  We have asked that our motion be converted into

10   a Rule 56 summary judgment because I think it's ultimately

11   dispositive.  There is no nexus that Electric Power System has

12   whatsoever to the events --

13        THE COURT:  Who can speak to that from the plaintiff's

14   side?

15        MR. TAGLIAGAMBE:  Thank you, your Honor.

16        THE COURT:  Mr. Leavy?

17        MR. LEAVY:  Can I do it from here?

18        THE COURT:  Yes.

19        MR. LEAVY:  Let me just briefly state --

20        THE COURT:  The problem is you block too many people.

21        MR. LEAVY:  OK.  Let me briefly pass the ball back to

22   Mr. Sachs and let me explain why.  Their motion is predicated

23   on two bases:  First, no duty, second, intervening cause.  So

24   really I would rest on our brief on those points.

25        Except to say that, your Honor --

56LNWTC1

1    THE COURT:  He's telling me that they're not involved

2    at all in Seven.

3    MR. LEAVY:  Your Honor, he annexed an affidavit, but

4    we don't know yet.  There's been no discovery.  There was no

5    affidavit about disputed fact.

6    THE COURT:  What is your reasonable belief that

7    Electric Power Systems is somehow involved in Seven?

8    MR. LEAVY:  Your Honor, we found them mentioned in the

9    contract documents and specifically pertaining to the

10   electrical system that ran the city's OEM system.

11   Now, their suggestion in several of the reports, one

12   that I can name and one that maybe I can or maybe I can't say

13   out loud in this room, that, your Honor, that there was an

14   electrical malfunction that may have caused these pumps to pump

15   oil to these fires.

16   At this early juncture I'll concede, your Honor.  That

17   is all I can say.

18   THE COURT:  What is the basis of that belief?

19   MR. LEAVY:  Again, I mean, if you want me to pull out

20   the FEMA report, I can start reading, but it's in there.

21   THE COURT:  The FEMA report?

22   MR. LEAVY:  And another report as well.

23   THE COURT:  A short reply?

24   MR. TAGLIAGAMBE:  Your Honor, this is a fascinating

25   case.  We would love to work on it, but we really don't belong

56LNWTC1

1   in it.  There is no work that my client did in that building.

2   The fact that we did a study that may or may not have been

3   implemented in 1998, I don't think that's a reasonable

4   connection to any liability or duty issues, your Honor:

5          MR. LEAVY:  What if the study was wrong and what if

6   that caused an electric fault which permitted to pump to pump

7   oil into this fire?

8          THE COURT:  Thanks very much.

9          MR. LEAVY:  May I say, your Honor --

10          THE COURT:  Decision is reserved.

11          MR. TAGLIAGAMBE:  Thank you, your Honor.

12          THE COURT:  The next issue I want to take up is Counts

13   6, 8, and 10, which allege defective design, product and

14   warning liability.

15          In light of Barnett v. City of Yonkers, 731 F.Supp.

16   594 and 601, observing that New York law is crystal clear that

17   in service-oriented contracts such as agreements to render

18   architectural services, no action in breach of implied warranty

19   or strict product liability will lie for the negligent

20   performance of professional services.  And in light of Milau

21   Associates v. North Avenue Development Corp., 185 App.Div.2d

22   562, (3d Dept. 1992), is there any argument against my

23   dismissing those three counts?

24          MR. PAUL:  I am going to sit down, your Honor, because

25   you just made my argument.

56LNWTC1

1       MR. SACHS:  Your Honor, there isn't as to anyone that

2 is clear they are pure engineers architects.  But those that

3 are in mixed services I think you can not just dismiss.

4       All I was going to say in answer to that is anyone who

5 it is clear is just -- is simply a design professional I think

6 your Honor is correct.  If it is a mixed situation where they

7 are design professionals and perhaps sell or install or do

8 something else, I think it's not clear under the cases, and I

9 think there we would -- it would be premature to dismiss those

10 on a 12(b)(6) motion.

11       THE COURT:  It is your burden to allege the basis of

12 the complaint against someone whom you sued as a design

13 professional or something different.  You have ten days to

14 specify any defendant.

15       MR. SACHS:  May I just raise a point to your Honor?

16       THE COURT:  Yes.

17       MR. SACHS:  Your Honor, again, had no discovery.  It

18 is awfully difficult --

19       THE COURT:  It's the basis of a complaint.  You have a

20 Rule 11 obligation.  You have to have a basis to sue.

21       MR. SACHS:  In good faith.

22       THE COURT:  All right.

23       So if you don't know, you don't have good faith.  If

24 you don't know, you can't say you have information and belief.

25 If you have information and belief, you may have good faith.

56LNWTC1

1  But you have to have that, and you just can't do that on the
2  basis of a possibility.
3          MR. SACHS:  It is kind of in between a rock and a hard
4  place, isn't it --
5          THE COURT:  Mr. Sachs, you have ten days.
6          MR. SACHS:  Thank you, sir.
7          THE COURT:  The next part of the discussion, which I
8  don't think there is a need for discussion, is that branch of
9  the motion to dismiss based on absence of proximate cause.  I
10  think at this point in time that fact-laden question is more
11  than I can deal with on this motion.  I would propose to deny
12  it as premature.
13          I think the very difficult issue that I need to deal
14  with is the issue of duty, which is the law issue.  I think we
15  have had ample argument on that.
16          The way that 3211 and like statutes apply to design
17  professionals requires some thought and dealing with the issue
18  of connection, also with duty, or maybe it is a separate issue.
19  I will have to deal with that.  Those are the two main issues
20  that I am reserving on.
21          Mr. Moloney, you wanted to make a motion on the basis
22  of Citigroup.  Somehow that's been lost.
23          MR. MOLONEY:  It is somewhat ironic, your Honor, in
24  that today was originally supposed to be just our motion.
25          THE COURT:  I have heard everything else but you.

56LNWTC1

1          MR. MOLONEY:  That's OK.  I think we're coming just in

2     time, because I only intended to talk about one thing today,

3     which was duty.  I only intended to talk about the duty that

4     exists to someone other than the landlord.

5          So I think I'm going to focus in on the only question

6     which I think your Honor correctly identified as a threshold

7     issue you need to grapple with and decide.  It is a difficult

8     legal issue at the threshold.

9          I have looked at the 532 Madison case, which I

10    brought.  Your Honor, I note that the Court of Appeals in that

11    case said the issue that was decided was the duty of a

12    landlord, the question is a landlord who engages -- the

13    conclusion was a landlord who engages in activities that may

14    cause injury to persons on adjoining premises surely owes those

15    persons a duty to take reasonable precautions to avoid injury.

16    So they answered that question for the Port Authority, which is

17    the ground lessor, and they answered that question for

18    Silverstein or 7 World Trade Center, which is the building

19    lessor, but they didn't answer the question for a lot of the

20    people who are in this courtroom.

21          I think to understand some of them, your Honor, we did

22    our normal charts.  I think your Honor has them in front of

23    you, including our big magnum opus chart which kind of gives a

24    time line.  That also appears on the back page if you want to

25    look at that.

56LNWTC1

1        I think there's a logical progression here which gives

2     you a few facts, which answers some questions the court had

3     earlier which I think are helpful to kind of put in context

4     some of the issues that you are going to grapple with.

5        The first is there was a lease.  It was entered into

6     on 5/29/1968 between Con Ed and the Port Authority.

7        Under that lease basically Con Ed agreed to allow the

8     Port Authority to build a building above them.

9        So the legal relationship is they are not literally a

10    tenant of Silverstein's building.  They don't have a lease, Con

11    Ed, with Silverstein who built the building, but they are a

12    tenant, ground lessor, and they actually appear in the

13    substation that is below and adjoins 7 World Trade Center.

14    Basically it juts out, but it's basically on the bottom.

15       Everyone built above them, and Con Edison understood

16    that everyone was going to build above them, and they protected

17    themselves by getting an indemnity from the Port Authority that

18    in the event that that construction was harmful, the Port

19    Authority would make them whole, and they agreed to waive any

20    claim against the authorized contractors who will actually

21    build the building for the Port Authority.  I think that's what

22    the first slide shows.  It is a quotation from the lease.  I

23    don't think it's an issue in dispute.

24       Moving forward, you end up --

25       THE COURT:  Where is the waiver language, Mr. Moloney?

56LNWTC1

1              MR. MOLONEY:  Excuse me.

2              THE COURT:  Where is the waiver language?

3              MR. MOLONEY:  The waiver language appears in paragraph

4     8(b), which is the exercise of any or all of the foregoing

5     rights by the Port Authority or its authorized contractors or

6     agents, which is basically the construction of this building,

7     shall not be made grounds of any claim or demand for damages,

8     consequential or otherwise.

9              THE COURT:  So the argument is that if Con Ed waived

10    its subrogees waived?

11             MR. MOLONEY:  The argument would be that Con Ed --

12    correct.  That's already been decided your Honor in the IRI

13    case.  That's correct.

14             THE COURT:  By a great judge.

15             MR. MOLONEY:  Yes.  Who the Second Circuit has agreed

16    with in the adjoining case, thereby mooting my appeal.

17             The Port Authority entered into a three party

18    agreement with Silverstein and with us basically in 1988.  It

19    was solvent at that time.

20             Now it's Citigroup Global Markets Holding, so the

21    names have changed, but it's the same person.  They basically

22    said in that three-party agreement the Port Authority basically

23    retained control over all of the construction that was

24    occurring.

25             Final approval required us, just as our agreement did

56LNWTC1

1    with Silverstein, which your Honor found in the prior opinion,

2    that we submit all the plans in advance, that we pay for their

3    engineers to review them and that we don't build anything

4    unless they are OK with it.

5            Interestingly enough, jumping ahead to slide 3 on

6    this --

7            THE COURT:  What is the relevance of 2?

8            MR. MOLONEY:  The relevance of 2, your Honor, is I'll

9    get to it in several respects, but essentially we lost control

10   as a tenant over this building.  We never had control over the

11   construction of this building.

12           So when you are trying to figure out in terms of what

13   is fair in terms of extending the right of a duty, to what

14   extent is a tenant doing things that the Port Authority -- it

15   answers the question your Honor asked before, what about the

16   Port Authority?  Couldn't they turn and say -- the question

17   that you asked the lawyer for Skidmore Owings, couldn't the

18   Port Authority say, Wait a second, we are relying on you?

19           In fact, they could not say that because the Port

20   Authority determined they were not going to rely on us.  They

21   were going to require us to pay for their own architects.  They

22   were going to look at it themselves, and they were going to

23   keep the last word in determining that issue.

24           It's also relevant, your Honor, if, that the criteria

25   the Port Authority applying, which is indicated in 6.2, is that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56LNWTC1

1    they are looking, they are basically -- this is a legal

2    argument I will make in a moment.

3         They are basically -- and actually even 5.2(a) on the

4    page before that, they are basically superseding the city

5    regulators in terms of imposing, and state regulators in terms

6    of deciding what standards are going to be used in building

7    this building.  They are looking at all of the relevant legal

8    codes at the time with their experts and making an expert

9    judgment as to what is a safe construction --

10        THE COURT:  They are not bound by Citi.  They are a

11   juridical entity all to themselves.

12        MR. MOLONEY:  Correct.

13        So they are wearing in effect a twin hat here.  On the

14   one hand, they are the ultimate arbiter of the construction

15   from the point of view of being the sponsor of the construction

16   and the point of view of being the ultimate ground lessor of

17   the property.

18        They are also wearing the hat of being the ultimate

19   regulator in terms of the safety of the construction and of

20   what standards will go into safe construction.

21        I think that is a complete answer to the question you

22   asked as to when the Port Authority said we're looking to

23   Skidmore Owings.  First of all, that would be both an

24   abdication of their contractual responsibility to Con Ed and to

25   the way they set up this contractually, and it would be an

56LNWTC1

1   abdication of their governmental function, which is established

2   by virtue of an interstate compact and an act of Congress, to

3   act as the ultimate regulator here.

4        So they can't pass the buck there.  Interestingly

5   enough, though, one thing they did do, and it is in paragraph

6   3, and this goes back a little bit, and maybe our third point

7   should maybe have been in the chronology before our point, is

8   that they did decide to delegate down to Silverstein in 1980

9   when they picked Silverstein to build this building for them,

10  they did decide to delegate down to Silverstein responsibility

11  to Con Ed.

12       They said, look, we've undertaken this obligation.

13  They understood that they had taken an obligation to Con Ed to

14  build a safe building, and to the extent they had picked

15  Silverstein to build the building they were going to delegate

16  down, that responsibility down to Silverstein.

17       This is quite -- it is quite clear that between Port

18  Authority and Silverstein they understood this was their

19  responsibility.  Your Honor has already decided in the case, a

20  great judge has already decided in the case that Silverstein

21  decided not to delegate that down to Citigroup, my client, in

22  our lease.

23       Nor did Port Authority delegate that obligation down

24  to us in the three-party agreement.  The way that they decided

25  to protect themselves vis-a-vis our client was not to delegate

56LNWTC1

1   down that indemnity responsibility but to preserve for

2   themselves whole control over the construction.

3          That was the business choice they made, that they

4   would keep control of the construction, Silverstein and the

5   Port Authority, these two levels, and not delegate down the

6   obligation they took on to Con Ed.

7          The fourth point is the permit to occupy which we

8   obtained --

9          THE COURT:  Before you leave it, 17.2 is a covenant by

10  Silverstein that its construction, use, and operation of the 7

11  World Trade Center tower shall not cause the Port Authority to

12  violate its obligations under the Con Edison lease.

13         So the obligation to Silverstein is a limited

14  indemnity only to the extent that Silverstein adds to those

15  potentials for liability.

16         MR. MOLONEY:  Correct, your Honor.

17         The fourth point is --

18         THE COURT:  The point that you are making clear is

19  that Con Ed has, through its various lease and contract

20  activities, the opportunity to protect itself.

21         MR. MOLONEY:  And availed itself of that opportunity.

22  That is certainly relevant as to whether the court should now

23  go, as I'll argue in a moment, expand the law of tort and

24  impose on a tenant a duty that no New York court has ever

25  imposed before.

56LNWTC1

1          Similarly, in paragraph -- in point 4 of our argument,

2     where we indicate that the Port Authority gave to Salomon or

3     Citigroup a permit to occupy, and that was from the chief

4     engineer of the Port Authority in October 5, 1994, I think

5     what's critical about this, your Honor, is that they are

6     focusing on precisely the same question that you are

7     ultimately -- if this case stays here, that you or a jury would

8     have to decide, which is whether we built a building safely,

9     and whether our particular design portion of this building is

10    safe.

11         The Port Authority, which is the regulatory authority,

12    has said in, on 9/21/1994, we've looked at it, it's fine.  You

13    have complied both in design and in construction with what is

14    required to meet all of relevant code standards, which included

15    all the ones of the city and state plus additional ones that

16    the Port Authority applied.

17              THE COURT:  Where are you drawing this from?

18              MR. MOLONEY:  I am drawing this from a combination of

19    four here, where it says, the letter that was sent to

20    Silverstein being passed on to us, which is the permit to

21    occupy, which as a matter of law replaces a certificate of

22    occupancy in the regime of Port Authority.  Then it says that

23    the demised space for Salomon Brothers, Inc., which is our

24    leased space --

25              THE COURT:  Your argument is that the permission given

56LNWTC1

1   to you by the Port Authority and by Silverstein absolves you

2   from liability potential liability to Con Edison?

3           MR. MOLONEY:  Correct.  On several grounds, your

4   Honor.

5           Basically -- I will just give you that argument

6   quickly here, but we have two different arguments.  If you give

7   this no more force and authority than a certificate of

8   occupancy from the City of New York, if you give it no more

9   force than that, and this is the document that replaces the

10  certificate of occupancy, then it negates any notice of a

11  defect on our part absent some other information we should have

12  gotten from someone that we had a defect or a dangerous

13  condition.

14          If your Honor takes it a step further, which I believe

15  as a matter of logic you should, though I will admit that there

16  is almost no law on point one way or the other on this issue,

17  but if the court takes it a step further and says that look, if

18  going in they made the rules, and going in they said you comply

19  with the rules, and you did not need to comply with New York

20  State law because by interstate compact New York State had

21  delegated that right to the Port Authority, then how do you

22  judge that construction which occurred after the fact by those

23  standards which were not relevant going in?  It is not

24  American.  It's not fair to change the rules after the game.

25          I understand that there's no law on that point, your

56LNWTC1

1    Honor, but it is an additional point we make in our brief.   I
2    don't think the court needs to get there because I think that
3    the duty argument under New York common law is a clear way to
4    limit this case.
5              THE COURT:   What you are putting to me is this kind of
6    proposition.   You have two tenants in a building.   Each tenant
7    does what is permitted by the landlord.   But it turns out that
8    one tenant's activities injure the other, and the injured
9    tenant sues the first tenant, claiming that what they did was
10   negligent.   Is there a duty in that situation from one tenant
11   to another?
12             MR. MOLONEY:   I think it is more complicated than
13   that, your Honor.
14             THE COURT:   I tried to simplify it.
15             MR. MOLONEY:   I think it's more complicated than that.
16   Just assume arguendo that Con Ed is a tenant, but they were
17   actually not a tenant of the same building as us.   They had
18   privity with the Port Authority and not with Silverstein and
19   they were below the building.   But let's assume --
20             THE COURT:   You first have privity with Port
21   Authority.
22             MR. MOLONEY:   Correct.
23             THE COURT:   And then Silverstein succeeded the Port
24   Authority?
25             MR. MOLONEY:   Assume that tenant says that, look, this

56LNWTC1

1    building fell because there was cumulative fuel in the

2    building.  Some of it was put in by tenant No. 1, some of it

3    was put in by tenant No. 2, some of it was put in by tenant No.

4    3, and some of it was put in by tenant No. 4.

5            Assume those tenants all -- as is the case here, as a

6    matter of record the city of New York came in in 1987, 1997,

7    six years after, three years after the certificate of occupancy

8    was there and now you say, look, we don't know all this fuel

9    there caused a problem.  The building collapsed.  We think it

10   was excessive fuel.  We want to hold tenant No. 1 responsible.

11           And tenant No. 1 says, Wait a second.  I didn't even

12   see the fuel.  I wouldn't have built my tank if I knew that

13   tenant 4 was happening --

14           THE COURT:  I simplified the point to make it an issue

15   of law.  Because to make it more complicated makes it an issue

16   of fact.  The issue of law I think is as I put it.  If both the

17   plaintiff and the defendant are occupying the building

18   according to permitted uses specifically permitted by the

19   common landlord --

20           MR. MOLONEY:  Right.

21           THE COURT:  -- then one tenant can sue the other.

22           MR. MOLONEY:  Let me answer what I believe is the law

23   on that.

24           I believe that tenant 1 has no duty to take special

25   precautions to tenant 2.  Just look at the Ryan case in

56LNWTC1

1    Connecticut.   There is almost no New York case on point, but we

2    think the logic of Ryan is based on basic principles of

3    restatement of law and of New York law, so we have no

4    affirmative duty to help.

5         However, I believe that if tenant 1 were to create a

6    dangerous condition that in fact caused injury to tenant 2,

7    that tenant 1 should be responsible as a matter of general tort

8    law to tenant 2.

9         THE COURT:  Even if that condition was specifically

10   permitted under the lease?

11        MR. MALONEY:  I believe that even if that condition

12   was permitted under the lease that the tenant should be liable.

13   But I think in order to reach that conclusion, your Honor,

14   here, against Citigroup, you would have to find three things.

15   You would have to find, number, one that we did something

16   wrong.  We didn't have a relationship with them.  We hired

17   world class professionals to build this building.  We delegated

18   to the Port Authority the review of those plans.

19        THE COURT:  Those are questions of fact.

20        MR. MOLONEY:  Your Honor, they haven't been challenged

21   in the complaint.  They are not questions of fact, your Honor,

22   at this stage.  They are all matter of judicial record and

23   judicial notice that the Port Authority gave us a certificate

24   of occupancy and found that our construction complied with all

25   relevant law.  We had no basis to anticipate that our

56LNWTC1

1  construction would cause danger.  If we have no reasonable

2  basis -- I went back to Pfaltzgraff last night, your Honor,

3  because I thought we would end up there.

4        THE COURT:  I learned last time that it's not a place

5  to end up.

6        MR. MOLONEY:  What Cardozo said, your Honor, is that

7  basically if a reasonable person would think that what you did

8  create a danger, could a reasonable person think --

9        THE COURT:  I don't want to go there, Mr. Moloney.

10        MR. MOLONEY:  Well, your Honor, then the second and

11  third arguments we have, which your Honor will have to grapple

12  with because they are also threshold questions, is whether we

13  are an authorized contractor in effect of the Port Authority

14  and therefore released by Con Edison; and, number three,

15  whether in fact, as I argued, that the Port Authority approval

16  effectively is preemptive, which is the logical consequence of

17  the fact that the city and state regulations did not apply to

18  our construction on the way in.

19        Your Honor, I think I understand that we've covered a

20  lot of territory, and you are going to have to think about

21  this.

22        I just want to go to my last slide if I can, which is

23  slide 5, which is that, the relevance to this is that Aegis has

24  filed the complaint, its companion case to ours.  But in the

25  companion case they have indicated that they basically have

56LNWTC1

1     agreed, when you said -- I'm not asking you to take a question

2     of fact.  This is not a question of fact.  This is a binding

3     admission by them.  This is in their complaint, the first

4     paragraph we quote there, before this court, that it was the

5     Port Authority who retained final control over all these, and

6     it is not a question of fact.  This is what they said in

7     response to the Port Authority's motion to dismiss.

8              THE COURT:  This is a doctrine of estoppel by

9     pleading, and given the right to plead all kinds of ways, I

10    don't think we go that far.  I think the point you really leave

11    with me is the Con Edison waiver on the first page.  I'll have

12    to think about it.

13             MR. MOLONEY:  OK.  Thank you, your Honor.

14             MR. ANTIN:  We may be heard on that?

15             THE COURT:  I'm looking for who is going to talk.

16             MR. ANTIN:  It's about time that I speak on behalf of

17    the plaintiff, your Honor.

18             MR. SACHS:  His colleagues agree.

19             MR. ANTIN:  Good afternoon, sir.

20             I recognize that it is late.  I'm Mark Antin,

21    appearing on behalf of Con Ed and Aegis.  We think that the

22    Citigroup motion seriously misreads the lease between Con Ed

23    and the Port Authority and takes a number of quotes from,

24    particularly from paragraph 8 --

25             THE COURT:  The lease is part of the record.

56LNWTC1

1          MR. ANTIN:  It is part of the record, sir.  It takes

2     those provisions seriously out of context and only quotes part

3     of them.

4          The particular provision that Citigroup first refers

5     to is Section 8, which interestingly is entitled Air Space and

6     Port Authority Construction.  I think any fair reading of that

7     entire provision indicates that it deals with the construction

8     that would be ongoing to build what became 7 World Trade

9     Center.

10          It speaks of the ongoing construction and should that

11     construction interfere with the continuous use of Con Ed's

12     substation that Con Ed would have certain remedies.  But it

13     certainly does not say what Citigroup claims that it says.

14          Then, even more to the point, your Honor, there's

15     reference to paragraph 8(b), which I can't read in its

16     entirety, but I do want to read one part of it because I think

17     that Citigroup again seriously misreads it.

18          THE COURT:  One minute.  Go ahead.

19          MR. ANTIN:  The bottom of the page, your Honor,

20     section B.  It says, The exercise of any or all of the

21     foregoing rights -- and parenthetically I say that those rights

22     that are referred to are the rights of the Port Authority to

23     build a structure above -- and/or its authorized contractors or

24     agents shall not be or be construed to be an eviction of the

25     lessee, meaning Con Ed.

56LNWTC1

1              So they are talking about what happens during the

2       course of construction.  And that by virtue of the construction

3       of another structure above and around the Con Ed substation it

4       will not constitute an eviction, nor shall be it be made ground

5       for any abatement of remedy.

6              What does that have to do with Citigroup, nor any

7       claim or demand for damages, consequential or otherwise?

8              Those are the rights that are exercised by the Port

9       Authority.  There is no indication there, despite claims to the

10      contrary, that those rights were ever intended to protect those

11      who would subsequently become tenants in the building and

12      perhaps install a dangerous instrumentality which ultimately

13      led to the collapse of the building.

14             That is not what that lease provision means.  It was

15      not intended to constitute a waiver of anything with the

16      exception of certain rights that Con Ed may have had against

17      the Port Authority for the construction of 7 World Trade Center

18      during the time of the construction and during the maintenance

19      of the building thereafter.

20             It certainly had nothing to do with the installation

21      of a fuel oil system by Citigroup which subsequently may have

22      caused the collapse of the building.

23             So there was no waiver, implied or otherwise, in favor

24      of Citigroup or any other occupant.  It may have extended to

25      contractors who were involved, authorized contractors who were

56LNWTC1

1    involved in building the building during the time of
2    construction.
3           But if there was a defective design, as we say and
4    believe there was, if there was a defective installation of
5    that system, then, to use Mr. Moloney's words, he agreed that
6    there would be liability on the duty issue if Citigroup, for
7    example, created a dangerous instrumentality.  That is exactly
8    what the plaintiffs allege occurred here, that a dangerous
9    instrumentality was created.
10          There is also some effort, although counsel didn't
11   refer to it, to rely upon Section 16 of the lease, which also
12   doesn't protect Citigroup.
13          It is only a provision which protects Con Ed and the
14   Port Authority "in connection with the construction or
15   maintenance of the stories, structures, and building or
16   improvements described in Section 8," the one we just read.
17          That provision, too, does not protect Citigroup.
18          If I might, I recognize the hour is late, but I just
19   want to briefly address the issue of duty first of all.
20          That's been discussed at length, but I must say that I
21   seriously disagree with counsel about the obligation of one
22   tenant to another, either a tenant or to someone in the
23   position of Con Ed.
24          There are cases, and we have cited them, in which that
25   duty is established in the law of New York.  And as a possessor

56LNWTC1

1    of land, whether by ownership or whether by tenancy, Citigroup

2    assumed the duty or an obligation to those other tenants of the

3    building or those in the immediate orbit of that building.

4         Finally, with respect to the chart, which I enjoyed

5    taking a look at this afternoon, the relationships that are

6    described there don't have anything to do really with Con Ed.

7         They have to do with the tripartite agreement

8    involving Citigroup, Silverstein, and the Port Authority.  It

9    is not the case that simply because the Port Authority may be

10   the final arbiter that Citigroup and its experts would

11   therefore be relieved from responsibility.

12        There is no reason, despite the invitation to do so,

13   there's no reason why this court should apply the law any

14   differently than the New York courts apply in Borders, in which

15   the compliance with a code or the issuance of a permit does not

16   relieve a negligent party from responsibility.

17        There may well be joint responsibility, but that

18   doesn't relieve Citigroup or its engineers if they fail to

19   follow appropriate standards from their obligation to

20   Silverstein --

21        THE COURT:  What is strange about this, that departs

22   from the normal situation, is that the Port Authority is

23   exercising what I think is almost or may be complete control

24   over all the design that's going on in its structure.

25        It is countenancing and permitting the diesel fuel

56LNWTC1

generators by Salomon, now Citigroup, and by the city, perhaps
by others, it's building on top of the substation.  It's
contracting with Con Ed to supply power to all the World Trade
Center.

It is a situation where it seems to me that Con Ed
should be looking to the Port Authority for protection.  And
the questions I raised are in that connection, which makes it
somewhat different from the normal landlord and tenant kind of
obligations.

MR. ANTIN:  The facts are certainly different than in
many of the cases we find, your Honor.  I agree.

But the fact that an engineer or an architect on
behalf of Citigroup may have defectively designed a system
which is then subsequently ratified or approved by Port
Authority or Silverstein and its engineers doesn't relieve
those parties from responsibility.  It means simply that they
have joint responsibility.

And the fact that the Port Authority was given the
authority to issue, to establish the regulations or the codes
and to issue the permits, again, just as in the state court
cases, does not necessarily mean that a party that is otherwise
negligent is then freed from responsibility for that
negligence.

THE COURT:  On the normal notion that you can't
delegate the responsibility?

56LNWTC1

1          MR. ANTIN:  On that notion.

2          THE COURT:  Thanks, everyone.

3          I will reserve decision except to the extent that I

4     have issued rulings.

5          (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT
# 7

2.13.07_Conference.txt

1

72D9WTCA
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x
2   In re:   September 11 Property Damage and Business Loss
3   Litigation
3
4
4
5                                      21 MC 101
5
6
6   --------------------------------x
7                                      New York, N.Y.
7                                      February 13, 2007
8                                      3:00 p.m.
8
9   Before:
9
10                      HON. ALVIN K. HELLERSTEIN,
10
11                                      District Judge
11
12                          APPEARANCES
12
13  GREENBAUM, ROWE, SMITH & DAVIS LLP
13       Attorney for Plaintiff Con Edison
14  BY:  FRANKLIN M. SACHS
14
15  GENNET, KALLMANN, ANTIN & ROBINSON P.C.
15       Attorney for Plaintiff Con Edison/Aeris
16  BY:  MARK L. ANTIN
16
17  BRUCKMANN & VICTORY LLP
17       Attorney for Plaintiff Certain Underwriters
18  BY:  PATRICK J. MALONEY
18
19  CLEARY GOTTLIEB STEEN & HAMILTON LLP
19       Attorney for Defendant Citigroup
20  BY:  CHRISTOPHER MOORE
20
21  L'ABBATE, BALKAN, COLAVITA & CONTINI, L.L.P.
21       Attorney for Defendant Cosentini Assoc.
22  BY:  ERIC S. HECHLER
23
24  INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
24       Attorney for Defendant Swanke Hayden Connell
25  BY:  ROBERT A. BANNER
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                2

72D9WTCA
1                      APPEARANCES CONTINUED
2   SCHIFF HARDIN LLP
2       Attorneys for Defendant Port Authority of New York and New
3   Jersey
3   BY:  BETH D. JACOB
4        STEVEN BOCKNEK
5   ZETLIN & DeCHIARA LLP
5       Attorney for Defendants Flack & Kurtz and Skidmore Owings
6   & Merrill

                            Page 1

2.13.07_Conference.txt
```
 6    BY:  DAVID ABRAMOVITZ
 7
 7    MOUND COTTON WOLLAN & GREENGRASS
 8         Attorney for Defendant AMEC Construction Management, Inc.
 8    BY:  DOUGLAS EISENSTEIN
 9
 9    FRIEDMAN KAPLAN SEILER & ADELMAN LLP
10         Attorneys for Defendants Silverstein Properties and 7
10    World Trade Co., L.P.
11    BY:  ROBERT S. LOIGMAN
11         KATHERINE PRINGLE
12         JEFFREY WANG
12
13    AHMUTY,DEMERS & MCMANUS
13         Attorney for Defendant Centrifugal Association, Inc.
14    BY:  JOHN F. GILLESPIE
14
15    GOGICK, BYRNE & O'NEILL, LLP
15         Attorney for Defendant Irwin Cantor
16    BY:  STEPHEN P. SCHRECKINGER
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

72D9WTCA
```
 1              (In open court; case called)
 2              THE COURT:  Good afternoon everyone.  Please be
 3    seated.  The agenda has been distributed.  The primary purpose
 4    of today's session is to argue various motions.
 5              Why don't we just go into those and then we'll, at the
 6    end, discuss where we stand in the case as a whole.
 7              The first motion we'll deal with is the motion to
 8    dismiss filed by the design and construction defendants for the
 9    New York City's Office of Emergency Management.
10              Who is going to argue that motion?
11              MR. HECHLER:  Good afternoon.  Eric Hechler from the
12    law firm of L'Abbate, Balkan, Colaviti & Contini for the
13    Defendant Cosentini Associates.
14              THE COURT:  You're going to have to be loud.
15              MR. HECHLER:  I'll have to try to adjust the
16    microphone for my height.
17              THE COURT:  The microphone won't work.  Your voice
18    will.
19              MR. HECHLER:  On behalf of Consentini Associates,
20    Swanke Hayden Connell Architects, Cantor Seinuk Group, and
21    Ambassador Construction, hereinafter with OEM defendants, we've
22    submitted this motion to dismiss the third party complaint of 7
23    World Trade Center and Silverstein Properties pursuant to Rule
24    12(b)(6).
25              As you're well aware, your Honor, on January 12, 2006
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

72D9WTCA

Page 2

2.13.07_Conference.txt
```
 1  your Honor issued an opinion and order granting the design and
 2  construction defendants' motion to dismiss the plaintiffs'
 3  negligence claims based on no duty owed to plaintiff.  All the
 4  OEM defendants were included in that decision.
 5          Thereafter, on June 9, 2006 Silverstein commenced a
 6  third party action.
 7          It's our position that the third party action should
 8  be dismissed as the OEM defendants are immune from liability
 9  under the SDA and pursuant your Honor's January 12, 2006
10  decision.
11          Your Honor, I know that you are very familiar with the
12  basis of this motion and the arguments therein, as there's been
13  several prior motions on similar issues.  As such, I will try
14  to limit the historical and background facts just to -- and
15  just get directly to the point.
16          The concept of the protection afforded by the SDA is
17  simple at its core.  Under the SDA, any government or private
18  entity is afforded immunity from liability based on claims of
19  property damage and personal injury if they provide their
20  respective services in good faith, carrying out, complying
21  with, or attempting to comply with any law relating to civil
22  defense.
23          Thereafter, the City of New York issued Executive
24  Order No. 30 pursuant to the SDA, stating the OEM was to
25  establish and operate an emergency center.  It's clear from the
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

5

72D9WTCA
```
 1  language that the city was required to build an OEM command
 2  center.
 3          In order to perform this task, outside contractors had
 4  to be hired to design and build a facility since they did not
 5  have the infrastructure to perform such a large project.
 6          The SDA anticipates these needs, and your Honor in
 7  your January 12, 2006 decision articulated, and I quote "As
 8  would be expected with such a specialized project, private
 9  architects and engineers were engaged to do the work.  They
10  worked in response to the City's stated needs and
11  specifications and under the ultimate direction and approval of
12  the City."
13          The contractors and design professionals took their
14  direction directly from the city in this project.  It was a
15  back-and-forth, give-and-take during the course --
16          THE COURT:  How do I deal with this under Rule 12?
17          MR. HECHLER:  Well, your Honor, you made certain
18  findings of fact in your January 12, 2006 decision which would
19  be applicable here, in our position would be res judicata on
20  this issue.  We're not asking you to address any other facts.
21  There's already been a decision that made factual
22  determinations.
23          THE COURT:  How do you establish good faith on a Rule
24  12 motion?
25          MR. HECHLER:  Based on your decision, you stated that
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

6

72D9WTCA
```
 1  the city had certain specifications, in particular, an
 2  uninterruptible power supply, and have a fuel tank above the
 3  flood plain.
 4          Thereafter, the design professionals and the
 5  contractors submitted various designs to the city.  And the
```
                              Page 3

2.13.07_Conference.txt

```
 6   city denied some and approved others.  In fact, they even
 7   refused one for safety reasons.  Everything was ultimately
 8   redesigned and approved by the city.
 9              THE COURT:  So the point is that there must be some
10   allegation that alleges something in addition to that which has
11   been considered immune in my prior decision?
12              MR. HECHLER:  Yes, your Honor.
13              THE COURT:  And there is none?
14              MR. HECHLER:  There is none at all.
15              THE COURT:  That's the basis of your motion.
16              MR. HECHLER:  There are no claims that the parties
17   acted in bad faith.
18              THE COURT:  Let he hear from the plaintiffs.  The
19   third party -- defendants who are the third party plaintiffs.
20              MR. LOIGMAN:  Good afternoon, your Honor.  My name is
21   Robert Loigman.  I'm from the firm Friedman Kaplan Seiler &
22   Adelman.  We represent the defendant and third party plaintiff
23   Silverstein Properties and 7 World Trade Company L.P. and
24   you'll be hearing from me I guess a few times today, as I
25   respond to the third party defendants' various motions.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

7

```
     72D9WTCA
 1              The key behind the liability of the contractors who
 2   work on the OEM space is that they are not subject, the way the
 3   city was, to the immunity that's afforded by the Defense
 4   Emergency Act.
 5              I would remind the court as sort of a backdrop to
 6   this, that as the New York Court of Appeals, the highest court
 7   in the state has said, "New York's policy is to reduce rather
 8   than to expand obstacles to the recovery of damages," and that
 9   if you provide immunity to each and every party that assists a
10   governmental entity acting pursuant to the DEA, that would be
11   inconsistent with the policy as set forth by the New York Court
12   of Appeals.
13              THE COURT:  But here I found immunity for the city.
14              How could I find immunity for the city and not for the
15   contractor who works according to the city's specifications?
16              MR. LOIGMAN:  I think your Honor has hit upon the key
17   question here.
18              The reason is because the city, as your Honor held in
19   your prior decision, was actively carrying out the mayor's
20   order, Executive Order 30, to build an OEM command center.
21              The city was acting pursuant to statute, pursuant to
22   order.  It was compelled to do what it did.
23              As your Honor held, that was not routine city
24   business.
25              The contractors here are in a very different position.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

8

```
     72D9WTCA
 1              THE COURT:  Why?
 2              MR. LOIGMAN:  They were not compelled by any order,
 3   any statute, to make their services available to the city to
 4   build the OEM center.
 5              THE COURT:  But the statute says, "pursuant to an
 6   arrangement, agreement or compact."  It embraces "any
 7   individual, partnership, corporation, association, trustee,
 8   receiver, or any of the agents thereof."
 9              So, why doesn't my findings, assuming they're correct,
10   apply to the individual partnerships and corporations that
```
Page 4

2.13.07_Conference.txt
11  carry out what the City's scope of immunity was?
12          MR. LOIGMAN:  Your Honor, I -- you're reading the
13  statute, obviously, is correct.  And I have no dispute that
14  private parties can be afforded protections of the statute.
15          If you read further on in the statute, though, what it
16  says is, "in good faith carrying out, complying with, or
17  attempting to comply with any law, any rule, any regulation or
18  order duly promulgated or issued."
19          And that's key distinction between the city and the
20  contractors.
21          THE COURT:  That's why the same good faith requirement
22  applies to both.
23          MR. LOIGMAN:  It's not the good faith requirement that
24  I'm focussing on so much as the complying with order of
25  statute.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                      9

72D9WTCA
1          And I think the New York Court of Appeals decision in
2  Page Airways is directly on point in this case.
3          THE COURT:  Page Airways was involving a lack of
4  immunity on the part of both the city official and the
5  helicopter company that flew over the disturbance.
6          The court held that the helicopter company was doing
7  what a helicopter company does; that is, fly over a particular
8  area.  And that was a mundane activity which did not deserve
9  immunity; neither the state official, nor the helicopter
10  company.  I don't see Page Airways as a precedent here.
11          MR. LOIGMAN:  I think it is, your Honor, and I'll tell
12  you why.  Because as the court says in Page Airways, the
13  question is what is the defendant doing?  Is it part of their
14  typical, ordinary activities, or is it not?
15          In this case, if we look at what the contractors are
16  actually doing, what they were actually doing with respect to
17  the OEM command center issue here, is that they were designing,
18  building and installing an emergency generator backup system.
19  That is what they're in the business of doing, of doing those
20  kinds of projects.
21          THE COURT:  So a city can specify the establishment of
22  a certain type of building, become immune if it does it itself,
23  but unable to confer immunity if it calls upon a private
24  corporation to do exactly that which would be immune if the
25  city had done it?  Does that make sense?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                     10

72D9WTCA
1          MR. LOIGMAN:  The reason that I don't think it flows
2  that way, it's a question of the city is establishing the
3  command center, and that's what it was required to do.
4          The actual building of the command center is something
5  that's done by contractors and that is, as was acknowledged in
6  your earlier opinion, something that the practice, the way it
7  was done, which is ordinary.
8          In this case, just like the people who built the
9  drywall, people who installed the electrical wiring and people
10  who put the television monitors, all of which were essential to
11  the operation of the command center, the people who installed
12  the backup generator system, again, essential to command
13  center, were just doing what they do in the ordinary course of
14  their business.
15          THE COURT:  So if these contractors say we're not
                              Page 5

2.13.07_Conference.txt
16    going to do this work because you can't give us immunity,
17    unless you indemnify us, that means the city, by process of the
18    necessary indemnification, becomes liable of the very activity
19    which the state says is immune.
20            MR. LOIGMAN:  But I'm not sure why the contractors
21    would be anymore worried about that, in putting a backup system
22    for the city than the contractors would putting a Salomon
23    backup --
24            THE COURT:  We'll argue Salomon later on.  We're
25    arguing the city now.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

11

72D9WTCA
1             And no contractor worth its salt, if it can get it,
2     would not try to get an indemnification for a building
3     according to a design that is handed to them and says you must
4     comply with my design.
5             MR. LOIGMAN:  Well they could seek an indemnification.
6             THE COURT:  If the city gave the indemnifications, the
7     city would be creating a liability when the state says it
8     should be immune.  What sense is that?
9             MR. LOIGMAN:  If the city gives an indemnification and
10    the contractor accepts it -- that's not the issue that I've
11    been focused on -- but if the city does that, then the
12    contractors can turn to the city and enforce their contract as
13    it may be.  But that's not the issue here.
14            THE COURT:  It is the issue here because the state
15    says that the city is immune for doing this kind of activity.
16    The city necessarily carries out its activities by contracting
17    with the private field.  So the private field is doing exactly
18    that which the city is ordered to do, is liable to suit where
19    the city is immune.  That makes no sense, makes absolutely no
20    sense.
21            MR. LOIGMAN:  The reason why I think it actually does
22    make sense, your Honor, is because if we look again at what the
23    contractors were doing here, they weren't simply being handed a
24    set of plans from the city and being told this is what we do.
25    They were actually designing the system, building the system,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

12

72D9WTCA
1     installing the system.  They were the ones who made the system.
2             So in terms of whether they need to be indemnified for
3     it --
4             THE COURT:  They did it according to city
5     instructions, and subject to city authority, and subject to
6     city satisfaction.
7             The federal contractor immunity is a precise analogy.
8     A federal contractor doing exactly that which the design
9     defendant and construction defendants are doing in this case
10    would be immune.  And there's lots of law on that.  And I
11    discussed it in the opinion I wrote in connection with the
12    respiratory plaintiffs versus the city.
13            The same policy -- although there isn't a state case I
14    could find -- the same policy should apply in state law because
15    otherwise it doesn't make sense.  If the municipal authority is
16    immune, then the parties to whom it acts must necessarily be
17    immune.  Otherwise, the law doesn't make any sense.
18            MR. LOIGMAN:  Respectfully, your Honor, again, I don't
19    think that's what was happening here.
20            What was happening here is that these third party
                           Page 6

2.13.07_Conference.txt
21  defendants were actually designing and building the system,
22  installing it into the building.  In doing such -- not that
23  they were taking designs from the city and just doing what was
24  told.  The city set certain specifications as to how much power
25  is needed, and then they designed and did it.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

72D9WTCA
1           They weren't compelled to do it.  They could have
2  walked away and not done it.  They were paid for their
3  services.  It was just like what happened in the Page Airways
4  case.  They were performing the same services they would
5  perform for any other client.  In fact, there were, in this
6  building alone, three other emergency backup systems.  And what
7  these contractors did for the city was the same thing that the
8  private contractors did for private parties.  And as a result,
9  the statute doesn't afford them the immunity because they would
10  only have that immunity if they were compelled to do it by the
11  statute, and they were not compelled to do it.
12           If your Honor has any further questions.
13           THE COURT:  No.  I hear your arguments.  I'm not
14  sympathetic to them.
15           MR. LOIGMAN:  Thank you, your Honor.
16           THE COURT:  Anything else on this argument?
17           MR. HECHLER:  No, your Honor, unless you have any
18  questions for me.
19           THE COURT:  Let's move on to the next one would be the
20  motion to dismiss filed by the Citigroup Design and
21  Construction Defendants.
22           MR. ABRAMOVITZ:  I guess I'll take the first crack at
23  this.  First, as a housekeeping matter if I may --
24           THE COURT:  Your name, sir?
25           MR. ABRAMOVITZ:  David Abramovitz from Zetlin &
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

72D9WTCA
1  DeChiara, counsel for Flack & Kurtz and for Skidmore Owings &
2  Merrill.
3           THE COURT:  Go ahead.
4           MR. ABRAMOVITZ:  With your Honor's permission, I'm
5  just going to hand up a case that I came across earlier today
6  while preparing for argument that wasn't in our brief.  The
7  case goes to a point that I think makes sense.
8           THE COURT:  What case is it?
9           MR. ABRAMOVITZ:  The case is Bouchell -- I hope I
10  pronounce this correctly -- against Bane.  I gave Silverstein's
11  counsel a copy of it earlier.
12           It goes to the issue that I think makes sense to start
13  with and that's our contention that the Silverstein entities
14  are collaterally estopped from disputing this court's previous
15  finding on assumption of the risk in the industrial risk
16  insurance action.  I think it makes sense to start with that
17  issue because, depending on how your Honor rules on it, it may
18  be determinative of the issue.
19           And I think on this one, if we look at how the Court
20  of Appeals described the application of collateral estoppel in
21  Bouchell, the 2001 New York Court of Appeals opinion.
22           It speaks about the two requirements, the identity of
23  issues and the full and fair opportunity to litigate.  But it
24  speaks explicitly in that regard to the necessity that the
25  issue and the doctrine is not applied by rigorous knee-jerk
Page 7

2.13.07_Conference.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

72D9WTCA
1   application of the exact words of the rule.  It speaks to a
2   more practical approach, particularly with respect to who is or
3   isn't in privity with one another.  And I think that's very
4   much applicable here.
5           This court previously considered the very weighty and
6   very critical issue of assumption of the risk when
7   Silverstein's insurer fully litigated the issue before this
8   court.  At the time, these actions had already been started.
9   Silverstein was certainly aware that the issue was before the
10  Court and certainly aware there was going to be an issue that
11  was going to be critical to these cases.
12          And the Court of Appeals speaks to those factors in
13  Bouchell in determining that collateral estoppel existed.  In
14  that case, it's between partners who happened to sign an
15  agreement, one of which was sued in the initial case, two of
16  which were not.
17          There is no question -- I don't think any of us can
18  legitimately dispute that if it was the other way around, if
19  Silverstein had been the party to the prior action and
20  industrial risk insurers were before the court now, the caselaw
21  in New York is crystal clear.  The insurer is bound by the
22  determination against the insured because of their indemnitor
23  or indemnity privity relation.
24          There is no logical reason why the privity
25  relationship doesn't go the other way as well.  The fact of the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

16

72D9WTCA
1   matter is, this was a critical issue that was before the court,
2   that was going to have a bearing on this case.  And it was
3   going to have a bearing in how people argue this case and how
4   people approach this case.
5           And there is no reason to believe that industrial risk
6   insurers, having presumably paid Silverstein a sum of money
7   that we're not likely to see in our lifetimes, didn't argue
8   that issue vociferously and didn't press to defeat Citigroup's
9   motion as hard as Silverstein would have done if Silverstein's
10  counsel were standing before the court.
11          Under those circumstances, there is no reason that the
12  undeniable existence of the privity relationship doesn't exist
13  and doesn't bind Silverstein to the prior determination.
14          The only question then becomes:  Is there an identity
15  of issues?  And I don't think that there's really any basis to
16  argue differently.
17          This court in its decision in IRI made very clear that
18  its finding of assumption of the risk was not party specific,
19  was not narrowed.  It's a specific finding that by virtue of
20  the express agreement contained in the lease between
21  Silverstein and Salomon, that Silverstein had assumed the risk
22  with respect to the emergency backup power system as a whole.
23          THE COURT:  That's why Salomon wanted the space.
24          MR. ABRAMOVITZ:  Correct.  And the system was
25  necessary.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

72D9WTCA
1           When you look through the lease, Silverstein argued in
Page 8

2.13.07_Conference.txt

2  their memorandum of law in opposition that this was just a
3  run-of-the-mill provision in the lease. This provision and
4  these provisions in the lease that the court looked at in IRI
5  were anything but run-of-the-mill.
6          It's very clear in looking at what actually is
7  contained in the lease that these are specific issues that had
8  to be negotiated specifically and at length and resulted in
9  very customized provisions in a lease about the size of the
10 system, where it goes, where the fuel comes from, what you do
11 if one fuel tank is not available and you need to use a
12 different one. This is very much a customized decision that
13 reflects that some very sophisticated parties specifically
14 addressed these issues.
15         The court's determination at the end of the day was
16 not that Silverstein had assumed the risk with respect to
17 Citigroup's occupancy. It was that the express agreement, and
18 the express contract reveals that Silverstein assumed the risk
19 with respect to the system. And that issue, which is the basis
20 for the claim over against Salomon's design professionals is
21 exactly the issue that's before the Court here on this motion.
22 The court previously decided it. The Court necessarily decided
23 it in order to grant Citigroup's motion. And as a result of
24 the relationship between Silverstein and IRI, there's every
25 reason to believe that Silverstein's interests on that issue
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              18

72D9WTCA
1  were fully and completely represented by its insurer,
2  notwithstanding that its insurer had already made payment.
3          Therefore, in accordance with the Court of Appeals
4  description of how to apply the doctrine of collateral
5  estoppel, I believe it should be applied here as well and the
6  prior determination should determine this issue.
7          And now I have nothing further on that point. I don't
8  know if your Honor wants to hear from Silverstein on collateral
9  estoppel, and we can address the assumption issue afterwards.
10         THE COURT: I'll take all the issues, Mr. Abramovitz.
11         MR. ABRAMOVITZ: With regard to the specific issues of
12 assumption of the risk, we believe your Honor got it dead-on in
13 the IRI decision. The rule comes down to: Is there an express
14 agreement between the parties? And does that express agreement
15 reflect that, as between the parties, one of the parties
16 assumed the risks that are here in the particular activity?
17         As I alluded to, when you look at the lease, there is
18 no question that the lease between Silverstein and Salomon is
19 an express contract. The terms of the express -- of that
20 contract are not something that we have to guess at. They are
21 very clear. They are very detailed.
22         And from that express contract and from the level of
23 detail that is in that lease, we believe that your Honor was
24 right when the court decided IRI, that it reflects that in that
25 express contract Silverstein assumed the risk of a system that
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              19

72D9WTCA
1  met those particular specifications, particularly in light of
2  the fact that the lease contains a provision that limits the
3  grounds on which Silverstein could reject the design and
4  ultimate construction of the system.
5          Unlike a run-of-the-mill standard form contract, the
6  contract in this case, the lease in paragraph 14.03(c)(1) says
                              Page 9

2.13.07_Conference.txt
 7   that Silverstein can reject the system solely upon several
 8   grounds, one of which is the exact risk that's at issue in
 9   these cases, the risk that in Silverstein's view the design of
10   the system presented by Salomon created a risk to the
11   "structural integrity of the building." This case is about
12   nothing, if not the alleged risk that those systems created to
13   the structural integrity of 7 World Trade Center.
14            So, at the end of the day when you parse the parties'
15   actual agreement, we believe that Silverstein, by those terms,
16   agreed that it was not going to rely upon the knowledge and
17   expertise of Salomon's professionals.  It was going to rely on
18   its own licensed professionals, on its own opinion based on
19   being a sophisticated player in this field.  And if it believed
20   at the end of the day that, notwithstanding the representations
21   by Skidmore Owings or Flack & Kurtz or any of the other
22   professionals that Salomon brought to the table, if Silverstein
23   believed there was a risk to the structural integrity of its
24   building, it retained the right to reject that design.  It was
25   going to rely solely on its own determination of that, on its
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              20

72D9WTCA
 1   own expert's determination of that fact.  And in doing so, it
 2   assumed the risks with respect to that system.
 3            Now, even assuming that that's not the case, this case
 4   certainly falls into the category of primary assumption.  Now,
 5   here I will concede it's a murkier area of the law because it
 6   appears to be that New York Courts have been trying to find
 7   some middle ground between an implied assumption where it is
 8   subject to the regime of Article 14, the C.P.L.R., and the
 9   comparative negligence regime and express assumption.
10            And over the years, yes, if you go back, the initial
11   cases talk about athletic activities and entertainment
12   activities.  But there is no question that the New York Courts
13   have gone beyond that and they've looked at the substance of
14   how they played out the rule.  Did a party with full
15   understanding of the risks involved voluntarily undertake a
16   particular activity?
17            And again, if you look at the lease, it's very clear
18   that Silverstein, an experienced and sophisticated real estate
19   developer, understood the risks of the system that was going to
20   be put in.  Otherwise, there is no reason to reserve for itself
21   the right to reject the system based specifically on a risk to
22   the structural integrity of the building.
23            The lease itself reveals Silverstein fully understood
24   the risks and it went ahead and entered into an agreement and
25   allowed Salomon, through its design professionals and
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              21

72D9WTCA
 1   contractors, to put in a system with the knowledge and
 2   understanding that that system presented a risk to its
 3   building, a risk to the structural integrity of the building.
 4   And having done that, at the end of the day, Silverstein should
 5   be deemed to have primarily assumed the risk, if not expressly
 6   done so.
 7            I have nothing further unless your Honor has some
 8   questions.
 9            THE COURT:  Anything else?
10            Mr. Loigman.
11            MR. LOIGMAN:  Yes, your Honor.  Thank you. I'll
              Page 10

2.13.07_Conference.txt
12    address the two points addressed by Mr. Abramovitz.
13              In the first instance I would note that the rule under
14    New York C.P.L.R. Section 1411, which is the general,
15    universally applicable rule, is one of comparative negligence.
16    And that's the basis on which the state operates.  Anything
17    else to that is an exception.  And the New York Court of
18    Appeals has said the exceptions have to be construed narrowly.
19    And here the argument is for assumption of risk.
20              THE COURT:  Didn't that apply to the IRI case too?
21              MR. LOIGMAN:  The same rule applied to the IRI case.
22              THE COURT:  How did I rule there?
23              MR. LOIGMAN:  There you ruled there had been an
24    assumption of risks.
25              THE COURT:  Why should I rule differently?
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                          22

72D9WTCA
1              MR. LOIGMAN:  I would respectfully say I believe that
2    the IRI case was wrongly decided.  And I say that because all
3    the other cases, all the backdrop cases are very different from
4    the situation --
5              THE COURT:  Assuming I'm a stubborn judge, the thought
6    that I did something with some difficulty, arriving at a
7    reasoned conclusion, and I was probably right then, and I don't
8    think that there are overpowering arguments to say that I was
9    wrong, why should I create an inconsistency when I don't
10    believe it to be a good inconsistency?
11              MR. LOIGMAN:  Your Honor, I guess I would address your
12    question in two parts.
13              One, in fairness, so that I can explain to you why I
14    think it was wrong, I have to explain to you where I think it
15    went wrong and what the differences are under the law.
16              That said, I believe that the issues are somewhat
17    different, and I can explain what the differences in the issues
18    are.
19              THE COURT:  I'll let you go on both those points.
20              MR. LOIGMAN:  With respect to the first point, every
21    single one of the cases, aside from the IRI case, that deal
22    with assumption of risk are talking about a discrete, acute,
23    identifiable, open and obvious risk over a short period of time
24    that a plaintiff necessarily acknowledged because it was open
25    and obvious and nonetheless undertook the activity.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                          23

72D9WTCA
1              There are two types of assumptions of risks.  The
2    first type is express assumption of risk.  And the key case in
3    that is the Arbegas case.  The facts of these cases alone speak
4    to how different they are.  In Arbegas, that's a plaintiff who
5    is playing basketball on the back of a donkey and was expressly
6    warned before it got on the donkey that you might be thrown off
7    the donkey and hurt.  And the plaintiff, nonetheless, agreed to
8    go on the donkey and do it.  And what the New York Court of
9    Appeals said that is that express assumption of risk results
10    from an agreement in advance that the defendant need not use
11    reasonable care for the benefit of the plaintiff.
12              Here, yes, Silverstein understood that an emergency
13    backup generator system would be installed.  It knew what the
14    elements of those systems would be.  It knew what floor it
15    would be installed on.  It knew how big the system would be.
16    And it approved all those things.  It also retained the right
                              Page 11

2.13.07_Conference.txt
17    to review the plans and whatnot.  I agree with all that.
18         But that does not mean that it assumed the risk that
19    the professionals who were carrying out the tasks of putting in
20    that system might do so negligently.
21         THE COURT:  But if it was negligence, it was just the
22    same as saying that Silverstein made his own decision.  He made
23    a decision that this is how he liked to lease the premises.  He
24    had a pretty good deal with Salomon.  He was leasing out floors
25    27 through 48 of a high-rise -- 28 through 47 of a high-rise,
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    24
72D9WTCA
1    plus additional floors.  That's a lot of space.
2         MR. LOIGMAN:  Your Honor, the issue --
3         THE COURT:  For a high prestige tenant.
4         MR. LOIGMAN:  The issue isn't how many floors were
5    leased to Salomon.  The issue is did they assume the risk or
6    not.
7         THE COURT:  And Silverstein knew exactly what Salomon
8    was going to do.
9         MR. LOIGMAN:  Silverstein knew that Salomon was going
10   to put in a backup generator system, yes.
11        THE COURT:  He knew there was going to be a large tank
12   of diesel fuel there.
13        MR. LOIGMAN:  I'll grant your Honor that it knew a lot
14   about the specifics of the system, including where it would be.
15        THE COURT:  Knew that if there was a major fire that
16   diesel fuel could burn.
17        MR. LOIGMAN:  Diesel fuel could burn.  I'm not denying
18   that.
19        THE COURT:  And knew that the pipes that brought the
20   fuel from the tank to the generator and thence to the floors
21   could also burn.
22        MR. LOIGMAN:  But it didn't know that they could be
23   installed negligently possibly and it never assumed the risk
24   that if they were installed --
25        THE COURT:  What was the negligence?
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                                    25
72D9WTCA
1         MR. LOIGMAN:  Your Honor, I will give you, as an
2    example, the court's holding in the Morgan v. State case.  That
3    was a case that involved a tennis player.  And what the court
4    said there is that if you're injured when you're playing
5    tennis, open and obvious risk, just like lots of other sports,
6    you could get injured and you assume the risk for that.  You
7    don't assume the risk that the people who are operating the
8    tennis facility will not maintain the nets between the courts
9    that divide the courts so that one will be torn so that you
10   might trip and hurt yourself on that.
11        THE COURT:  It's open and obvious that at any point in
12   the delivery or storage of fuel there are points of burning.
13   And you're dealing with highly flammable material.  These are
14   fuels, not the highest flammable material, but it's a flammable
15   material.
16        And so it's open and obvious that at every point along
17   the system that has been created to sustain a 24-hour,
18   seven-day-a-week trading floor, you're creating risk.  And the
19   building burned from the very risk that was created.
20   Silverstein was part and parcel of creating that risk.  It
21   wasn't a nearby curtain that was snarled.  It was the very
                           Page 12

2.13.07_Conference.txt
```
22  system that was installed.
23          MR. LOIGMAN:  Your Honor, respectfully, I disagree and
24  for two reasons.  The risk that we're talking about here is not
25  the risk of having a fuel system in the building.  It's the
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    26
```
    72D9WTCA
 1  nonopen and obvious risk of what would happen if the fuel
 2  system were built or designed negligently.  And that was never
 3  adopted.
 4          THE COURT:  What's the alleged negligence?  What's
 5  your Rule 11 theory of alleged negligence?
 6          MR. LOIGMAN:  In that regard, your Honor, we simply
 7  rely on what the plaintiffs' allegations of negligence are.
 8          THE COURT:  I've read them and there's nothing there
 9  other than the most general or conclusionary language.
10          MR. LOIGMAN:  If the plaintiffs don't allege
11  negligence with respect to any of the parties, then I would
12  respectfully suggest that all the parties be dismissed.
13          But I think that the issues here are:  One, did
14  Silverstein assume the risk that the system would be designed
15  or installed negligently?  I think answer is no.
16          And the second issue that I think is important here is
17  in all of these cases that do involve assumption of risk, in
18  every case cited by the plaintiffs, the issue is that it's such
19  an open and obvious thing, so risky, that in doing the activity
20  you must assume the risk.
21          And I don't think that the third party defendants who
22  installed this system or designed this system have ever said
23  that what they do is so openly and obviously dangerous that
24  anybody who would use their services to install such a system
25  is undertaking or assuming a risk.  I don't think they've ever
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                                    27
```
    72D9WTCA
 1  said that.
 2          We certainly didn't believe that at the time.  We
 3  don't believe that today.  And I think it would be a radical
 4  result to say that installing systems like this into a building
 5  amount to an assumption of risk.  There's not a single
 6  assumption of risk case, again, with the exception of the IRI
 7  decision, that talks about assumption of the risk in the
 8  construction industry.  And construction, as we know, is a very
 9  heavily litigated area of law.
10          THE COURT:  Who represented Silverstein at the time
11  IRI was argued?
12          MR. LOIGMAN:  At the time IRI was argued?
13          THE COURT:  Yes.
14          MR. LOIGMAN:  I imagine that Silverstein in terms of
15  this case would be represented by our firm, by Friedman Kaplan.
16  And I can tell you because there's been such --
17          THE COURT:  Were you present at the argument?
18          MR. LOIGMAN:  I was not personally present at the
19  argument.  I don't believe anybody from my firm was present at
20  the argument.
21          THE COURT:  Were you given notice?
22          MR. LOIGMAN:  I imagine we probably weren't given
23  notice.  I can --
24          THE COURT:  You imagine you were not?
25          MR. LOIGMAN:  Right.  I can tell you why.  It's not
                   SOUTHERN DISTRICT REPORTERS, P.C.
                              Page 13
```

2.13.07_Conference.txt
(212) 805-0300

28

72D9WTCA
1  such an unreasonable thing as the third party defendants
2  suggest.  The parties were not, as they suggest to the court,
3  in privity.  Silverstein litigated with IRI.  They weren't our
4  good friends.  We litigated with them.  And we ended getting a
5  settlement from them as to an amount of money.
6          After that point in time, when IRI went to do, to
7  collect their money, it had nothing to do with Silverstein.  It
8  wouldn't affect how much we got paid by them.  We already got
9  the money.  Whether they collected or not didn't matter to
10 Silverstein.  And we're told -- in fact, there's a case that
11 they cite --
12         THE COURT:  But you knew that IRI's claim against
13 Citibank or Salomon would be subject to defenses, the same as
14 would be applied if you sued.
15         MR. LOIGMAN:  To be honest, your Honor, I don't think
16 that we were concerned about assumption of the risk or any
17 other particular defense being raised by Citigroup as against
18 IRI because we weren't focused on the litigation between --
19         THE COURT:  I don't agree with you.  That's a side
20 point.
21         MR. LOIGMAN:  It's not a side point, your Honor.  I'll
22 tell you why.  Because it honestly didn't matter to Silverstein
23 what would happen to IRI because whatever happened to IRI --
24 one of the points that's made by the third party defendants
25 here, I think it's important to focus on, is that we did have
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

29

72D9WTCA
1  an interest in that case.  And they say the reason we had an
2  interest in that case is because it affects this case.  And
3  therefore, we would be collaterally estopped by what happens in
4  this case.
5          Well, using that logic, you have an interest in any
6  case that comes before you that's deciding is similar issues to
7  what's going to be decided in your case.  And the similarity of
8  the issues isn't enough to get you collateral estoppel.
9          And the second element, which is also of crucial
10 importance, is whether you actually litigated in that case and
11 whether you had the opportunity to litigate in that case.
12 Silverstein did not have privity with IRI.  It did not litigate
13 in that case.  It didn't know what was going on in that case.
14 In fact, when AMEC made a motion to intervene in the appeal
15 that's now going on in that case and that has not been heard by
16 the Second Circuit yet, our response -- Silverstein's response
17 was:  If AMEC is going to move to intervene, then we'll do the
18 same thing because we don't want them to be heard if we're not
19 going to be heard.  But we don't have a right to go the Court
20 and be heard.  That's why we have to make the motion.  And, in
21 fact, that motion hasn't been adjudicated yet.
22         I think if we just keep in mind the types of cases to
23 which assumption of risks applies -- and we've been told that
24 it doesn't apply in the sporting and recreational context.  The
25 cases that they cite, these are not made-up facts, to support
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

72D9WTCA
1  those points are, for example, the Goodlet case from the Second
2  Circuit was recently cited by Flack & Kurtz and Skidmore.  In
Page 14

2.13.07_Conference.txt
```
 3   that case, somebody built an airplane using a car engine and
 4   they raced it.  Two airplanes against each other at a height of
 5   30 feet or 150 feet off the ground.  Other cases involve a
 6   professional jockey who was injured.  In terms of the
 7   nonsporting ones, it's putting one ladder on top of another.
 8          THE COURT:  Mr. Loigman, my rulings in IRI were on a
 9   Rule 12 motion.  There were no fact findings I made.  It was a
10   case decided on the pleadings and the difference between an
11   assignee and an assignor and that kind of a setting.  If I
12   could think of any differences, I would have noted them.
13          It's the same situation.  It's the same lease.  Same
14   relationship.  Same basis for my findings and my conclusions.
15   Which I was right then, I should be right now.  If I was wrong
16   then, I'll be wrong now.  It's the same case.
17          MR. LOIGMAN:  Well, I've already respectfully said
18   that I disagree with the conclusion.
19          THE COURT:  I know.
20          MR. LOIGMAN:  Even if the conclusion were accurate or
21   correct, your Honor, the issues in that case were different
22   than the issues before you.
23          THE COURT:  What's the difference between this case
24   and this case?
25          MR. LOIGMAN:  I'll tell you what the differences are.
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              31
72D9WTCA
```
 1   In that case what was being litigated was whether IRI, as a
 2   subrogee of Silverstein, could recover from a tenant in the
 3   building where there was a negotiated lease between the tenant
 4   and between the tenant and the building.
 5          THE COURT:  Negotiated by your client.
 6          MR. LOIGMAN:  Yes, which is what the court based the
 7   assumption of risk holding on.  In this case, the liability is
 8   something very different.  We're talking about potential
 9   liability of third party defendants who we did not have a
10   contract directly with.  We didn't have the same business
11   rationale --
12          THE COURT:  And who built the design that Silverstein
13   approved.
14          MR. LOIGMAN:  Who did the building and designing --
15          THE COURT:  Who built the design that Silverstein
16   approved.  Its engineers were all over this, and they approved
17   it.
18          MR. LOIGMAN:  The same way that a client approves its
19   lawyer's brief that's filed with the court.  It doesn't relieve
20   the lawyer of the duty to act professionally, just like because
21   we reviewed something doesn't relieve the designer or the
22   engineer of the duty to perform professionally there.  It's the
23   same thing, and there's caselaw that says that.
24          And in this case as opposed to in the IRI case, the
25   liability would stem --
```
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              32
72D9WTCA
```
 1          THE COURT:  What is the allegation that takes this
 2   case out of IRI case?
 3          MR. LOIGMAN:  What's different about this case than
 4   the IRI case is that the liability for negligence would be
 5   because of actions actually performed by the third party
 6   defendants.
 7          THE COURT:  But if the boss of the third party is
```
                              Page 15

2.13.07_Conference.txt

8   exempt, then the party doing the bidding for that party is also
9   exempt.  It's the same analogy as we argued in the last case.
10  Unless you can allege something that makes this different and
11  makes the case of the people who designed and built for Salomon
12  different from the case against Salomon, the rule with Salomon
13  is the rule with the people who work for Salomon and that's my
14  holding or that will probably be my holding.  I'm going to
15  reserve decision and ponder some more.  But I cannot see the
16  sense logically or economically or commercially in driving a
17  distinction between a party that is exempt and other parties
18  who do the bidding of the exempt party.  I can see no
19  difference at all.
20          MR. LOIGMAN:  And the difference that we see, your
21  Honor, is in what the roles of the functions of the parties
22  were.  We had a negotiated lease with Citigroup where, as your
23  Honor held, we decided how to divvy up the liability between
24  those parties.  We didn't decide that if somebody acted
25  negligently in performing their duties for Silverstein, for
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            33
72D9WTCA
1   Citigroup, for whomever, that they would be relieved.  They
2   weren't subject to that --
3           THE COURT:  But if the act of negligence is the very
4   design and construction that Citigroup and Silverstein
5   approved, there is no difference.  And that's all that's
6   alleged at this point.
7           Thank you very much, Mr. Loigman.
8           MR. LOIGMAN:  Thank you, your Honor.
9           THE COURT:  Decision reserved.
10          Are there any other motions?
11          MR. SCHRECKINGER:  Yes, your Honor Steve Schreckinger
12  from Gogick, Byrne O'Neill for Cantor Seinuk Group and Irwin
13  Cantor.  On this motion, I'll be arguing on behalf of Irwin
14  Cantor and those design professionals arguing under the
15  C.P.L.R. Section 214(d) issue.  And I think your Honor already
16  touched upon the crux of this issue when you asked Mr. Loigman
17  what the negligence is with regard to the design professionals.
18  And he said that whatever the plaintiff pled.
19          And your Honor said well, I've looked at their
20  pleadings and I don't see anything but conclusionary
21  statements.  And C.P.L.R. 214(d) requires that the plaintiff or
22  the third party plaintiff show a substantial basis in
23  negligence and that the design professional was the proximate
24  cause of the damages or the injury if the claim is made more
25  than ten years after they completed their services.  And
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                                                            34
72D9WTCA
1   admittedly, there is not even -- not even isn't there a
2   substantial basis, there is no basis.  There is no legitimate
3   allegations of negligence or that the design professionals here
4   were the proximate cause of the injuries.
5           The main argument that Silverstein uses in their
6   opposition is that they're now faced with a Hobson's choice.
7   It's not fair that they have to deny the claims of the
8   plaintiff and then not be able to bring a claim for
9   contribution indemnity against the third party defendants.
10          Well, I say two things to that.  One, it's not really
11  a Hobson's choice because they do have a desirable option here.
12  They can rightfully deny the claims and defend the claims
                        Page 16

2.13.07_Conference.txt
13    against the plaintiff and utilize the assistance and the
14    cooperation of their consultants in defending those claims
15    rather than sue them.
16          The second thing that I say about that is -- well,
17    that the -- that they still have to show a substantial basis
18    for the claims that they're alleging.  And the public policy
19    considerations by the legislature has already decided that
20    public policy in protecting design professionals from claims in
21    perpetuity overrides the concern that Silverstein has with this
22    Hobson's choice.  214 explicitly says that the statute applies
23    to claims for contribution and indemnification, the very claims
24    that Silverstein is suing for right now, and the legislative
25    history is clear that the statute was enacted to protect design
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                35
72D9WTCA
1     professionals from being subject to claims in perpetuity
2     because they're not expected to have insurance for the rest of
3     their life, until day they die, long after they retire.
4           In my papers I cited similar types of statutes like
5     the statute proposed in New Jersey which doesn't even give the
6     plaintiff a chance to show a substantial basis.  If it's more
7     than ten years, the claim is just dismissed, no questions
8     asked.  That's all I have, your Honor.
9           THE COURT:  Who did Cantor work for?
10          MR. SCHRECKINGER:  Well, Cantor worked for Silverstein
11    on the base building design.  And they worked for, I believe,
12    Salomon Brothers on the tenant fit-out.
13          THE COURT:  What's the basis of the third party
14    liability alleged against Cantor?
15          MR. SCHRECKINGER:  Contribution indemnity.
16          THE COURT:  To whom?  What liability?
17          MR. SCHRECKINGER:  It's a broad allegation, but
18    there's two prongs.
19          THE COURT:  Suppose I grant the motions and dismiss
20    this third party complaints in relationship to OEM and in
21    relationship to Salomon, are you covered?
22          MR. SCHRECKINGER:  No.
23          I'm covered on some of them, but not on the base
24    building design.  Base building design -- there are really
25    three prongs here.  There's the OEM build-out, the Salomon
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                36
72D9WTCA
1     build-out and then there's the design professionals for the
2     base building design.
3           THE COURT:  On the base building design, if
4     Silverstein is held liable to Con Ed or the insurers of Con Ed,
5     why can't they sue over against Cantor?
6           MR. SCHRECKINGER:  If, at the end of the day, it's
7     shown that there's a substantial basis for a claim against
8     Cantor because there was something deficient with the
9     structural designs, then perhaps at some point they will be
10    able to bring a claim.
11          THE COURT:  In what way could Silverstein be liable
12    other than by some problem in design or construction?
13          MR. SCHRECKINGER:  Well, Silverstein is the owner of
14    the building.  They could be held responsible for the emergency
15    generator for the Salomon system.
16          THE COURT:  That's out.  Forget about the Salomon --
17    let's suppose I hold a motion and dismiss the third party
                            Page 17

2.13.07_Conference.txt
18  complaints.  I've already dismissed the main complaints.
19  What's left?
20          MR. SCHRECKINGER:  I understand that, your Honor, but
21  even if you dismiss the third party complaint, Silverstein is
22  still responsible for the Salomon Brothers, because they assume
23  the risk, you just said that, so they're held responsible for
24  the Salomon Brothers' design and that's what at the end of the
25  day is found to -- not that I agree with any of this, in any
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

37

72D9WTCA
1   way whatsoever, but if that, at the end of the day, is shown to
2   have caused in some fashion, the damages that plaintiff is
3   complaining of, that has absolutely nothing to do with the
4   services that Cantor Seinuk provided with the base building
5   design.
6           THE COURT:  Because of the alleged deficiencies in the
7   basic building design, Con Edison states a complaint or Con
8   Edison's assignee state a complaint against Silverstein.  That
9   still remains in the case.  If that remains in the case, why
10  can't Silverstein claim over?
11          MR. SCHRECKINGER:  They can claim over.  I'm not
12  arguing that Silverstein does not have the ability in a typical
13  scenario to make a claim over to their structural engineer that
14  they hired to design this building.
15          What I'm saying is that 214(d) was specifically
16  enacted to protect design professionals from baseless claims.
17  Why should I have to stay in this claim if at the end of the
18  day they can't even show a substantial basis there was any
19  reason to bring the case against me in the first place.
20          THE COURT:  Because they can't get summary judgment
21  against the plaintiffs or they can't get dismissal against the
22  plaintiffs.
23          MR. SCHRECKINGER:  And the legislature --
24          THE COURT:  Therefore, I held that there is basis for
25  the claim.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

38

72D9WTCA
1           MR. SCHRECKINGER:  But 214(d) shows a higher standard
2   of care against design professionals who have completed their
3   services ten years earlier.  That's the whole basis of the
4   statute.
5           I'm not saying that it's right that Silverstein has to
6   stay in this case.  Personally I don't think it's right.  I
7   think the claim is baseless.  But that's what the law is.  They
8   have to stay in it.
9           There's an exception by 214(d) that puts a higher
10  standard of care on design professionals and we fall under that
11  exception under 214(d).
12          Maybe the legislature did that for a reason.
13  Silverstein still derives a benefit from the building.  They're
14  still collecting rent.  They're still making a profit off of
15  it.  They're still involved in it.  They're maintaining the
16  systems.  They're putting improvements on the systems.
17          Irwin Cantor completed his design almost two decades
18  earlier.  Why should he now be brought into this case?
19          THE COURT:  Because Silverstein is in the case.  He
20  worked for Silverstein.  And Silverstein -- if Silverstein is
21  liable, it's because something that Cantor did.  That's the
22  allegation.
                          Page 18

2.13.07_Conference.txt
23          MR. SCHRECKINGER:  Your Honor, I understand and I hear
24   that.  And in the typical situation I agree with you.  If there
25   was no 214(d), I wouldn't be here before you.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    39
     72D9WTCA
1           THE COURT:  So what makes it atypical?  That too much
2    time has elapsed?
3           MR. SCHRECKINGER:  That's exactly what the statute
4    says.  That's exactly correct.
5           THE COURT:  That the cause of action arises when?  At
6    the time of construction or the time of events?
7           MR. SCHRECKINGER:  If the services were completed ten
8    years before the claim was brought, and our services were
9    completed I believe 1990 for the base building.
10          THE COURT:  So if I held the claim against the
11   building owner, and the building owner says, Look, all I did
12   was hire other people, more than ten years ago, then there's no
13   claim over.
14          MR. SCHRECKINGER:  There is no claim over.
15          THE COURT:  214 doesn't say that.
16          MR. SCHRECKINGER:  There is no claim over unless they
17   can show a substantial basis for the claim.
18          THE COURT:  So they've got to show something more than
19   the plaintiff shows to sustain liability or the opportunity to
20   sue?  That doesn't make sense.
21          MR. SCHRECKINGER:  It does make sense.
22          THE COURT:  If I cannot dismiss a claim by the
23   plaintiffs based on generality of pleading at this point in
24   time, which I held I couldn't, then there's got to be a right
25   on the part of the defendant to sue over because the claim
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    40
     72D9WTCA
1    against the defendant is not yet perfected.
2           MR. SCHRECKINGER:  I don't think you're taking public
3    policy consideration into effect.
4           For instance, let's look in New Jersey in their
5    statute of repose where they just say no matter what, if you
6    bring a claim ten years after that design professional
7    completes its services, you cannot sue that design
8    professional.  I don't care if you're being sued.
9           THE COURT:  Have you cited a New Jersey case that
10   arises in situations like we have now where there's an action
11   over?
12          MR. SCHRECKINGER:  I've cited the New Jersey statute
13   which explicitly says that it pertains to claims for
14   contribution and indemnity.  This very scenario was envisioned
15   when they enacted the statute of repose.
16          THE COURT:  But that's New Jersey.
17          MR. SCHRECKINGER:  That is New Jersey.
18          THE COURT:  That's not New York.
19          MR. SCHRECKINGER:  It's not New York.  But the
20   legislature was faced with the similar decision or the same
21   policy considerations here in New York.
22          So, instead of enacting a statute of repose, what they
23   did is they enacted this hybrid statute of repose.  And there
24   has to be a reason for the 214(d) statute.  It just can't be
25   enacted for no good reason.  And it specifically says that it
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                               Page 19

2.13.07_Conference.txt

41

72D9WTCA
1   pertains to third party claims for contribution indemnity.
2   It's in the first sentence of the statute.  And that's what we
3   have here.
4           Now, at this juncture, Silverstein, nor the plaintiff,
5   can show a substantial basis to hold their design professionals
6   in.  They can't show any basis more than what you just stated
7   earlier on conclusionary statements.
8           Now, I wish I could come up with some reason to say
9   why you should dismiss us with prejudice, but I'm not going to
10  say that.  Obviously, it would be without prejudice.
11          If at some point in time there can be a showing of
12  substantial basis, then, yes, then Silverstein probably will or
13  definitely will be able to bring a claim for contribution
14  indemnity against design professionals.  But I don't think
15  that's going to happen.
16          THE COURT:  Suppose I were to dismiss you now and then
17  liability arises in the course of time, by a finding of a
18  court, let's say 20 years after you've completed the building,
19  can then a lawsuit be brought against your client based on the
20  findings of the court in the underlying action?
21          MR. SCHRECKINGER:  Depends on what those findings are.
22  It's possible that a claim can be brought against my client.
23          THE COURT:  Does that make sense?
24          MR. SCHRECKINGER:  That makes sense.
25          THE COURT:  Wouldn't you rather be there in the first
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

42

72D9WTCA
1   instance to represent your client and defend it?
2           MR. SCHRECKINGER:  I'd like to have the option to make
3   that decision rather than be forced to spend my entire -- my
4   client's entire insurance policy defending this claim to the
5   end of the day when we're found out that he wasn't negligent.
6           THE COURT:  Thank you.
7           MR. ABRAMOVITZ:  Your Honor, my client is moving on
8   those grounds as well, so if your Honor will bear with me.  I
9   just want to add one point.
10          THE COURT:  Go ahead, Mr. Loigman.
11          MR. ABRAMOVITZ:  I'm sorry?
12          THE COURT:  This is a new point.  You can argue it.
13          MR. ABRAMOVITZ:  Very quickly, just to add to what
14  Mr. Schreckinger said.
15          THE COURT:  Take your time.  Make the point.  I think
16  it's a different point.  I'm anxious to hear it because what
17  Mr. Schreckinger talks about is the first sentence of Section
18  214(d)(1) which includes cross claims, third party claims and
19  the like for contribution or indemnification and creates
20  exactly the same standard as the main claim for personal jury
21  wrongful death or property damage.
22          MR. ABRAMOVITZ:  That's correct.  Your Honor may or
23  may not recall when we previously discussed C.P.L.R. 214(d)
24  back in June of '05 when we --
25          THE COURT:  I granted your motion then.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

43

72D9WTCA
1           MR. ABRAMOVITZ:  Correct.  But your Honor didn't
2   address this issue in your decision.
3           In argument, we talked about the fact that
                        Page 20

2.13.07_Conference.txt
```
 4   C.P.L.R. 3211(h), which was enacted in conjunction with 214(d),
 5   says that after the original pleading in those cases where
 6   C.P.L.R. 214 applies, the exact language in 3211(h) is in those
 7   cases where notice of claim has to be served.
 8              "In those actions, claims, cross claims,
 9   counterclaims, where there's a motion to dismiss, the party who
10   has filed a pleading has to show a substantial basis both to
11   believe there was negligence and proximate causation."
12              Your Honor raised the question to Mr. Schreckinger:
13   Well, what difference would it make?  And the difference very
14   simply is this:  Right now there are complaints that bring in
15   every design professional of every ilk, architects, mechanical
16   engineers, structural engineers, tenants' engineers, base
17   building engineers.
18              In the hypothetical your Honor tossed out there, which
19   is what happens if ultimately this case is determined and
20   somehow determined that somebody or other is negligent,
21   presumably that determination will not have been made with
22   respect to every single one of these design professionals.
23              At that point, assuming there was, in fact, negligence
24   and there is a finding of negligence, the parties involved will
25   be far narrowed.  The issues involved will be far narrowed.
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

72D9WTCA
```
 1              And the New York legislature understood that.  And
 2   they specifically said -- they made a determination in saying
 3   that this is going to apply to contribution indemnification
 4   claims.  They understood that it's going to create the exact
 5   choice that Silverstein complains about.
 6              But Silverstein is not without recourse because the
 7   statute of limitations on contribution indemnity doesn't even
 8   start running until there is that ultimate determination of
 9   liability.
10              THE COURT:  That's in any case.
11              MR. ABRAMOVITZ:  That's true that's in any case.  But
12   that's why there is no prejudice to anybody by applying what
13   the legislature wanted applied, which is the defendant third
14   party plaintiff, if --
15              THE COURT:  Mr. Loigman, I think I do not prejudice
16   anyone whether I dismiss or whether I sustain.  The problem is
17   what's the wise thing to do.  Look, I would like to see a
18   heightened standard of pleading with respect to the plaintiffs'
19   obligation.
20              MR. LOIGMAN:  Your Honor, if I may, for one minute.
21   That's Mr. Abramovitz.  I'm Mr. Loigman.
22              THE COURT:  I'm sorry.  Mr. Abramovitz.  Excuse me.
23              MR. ABRAMOVITZ:  I don't blame him for being offended.
24              THE COURT:  I'm not getting into that point.
25              MR. ABRAMOVITZ:  Your Honor, to remind your Honor,
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

72D9WTCA
```
 1   your Honor has previously decided, incidentally, that
 2   C.P.L.R. 214(d) and the statutory scheme that it embodies is a
 3   subsequent development in New York law.  It's not simply a
 4   pleading rule.
 5              When your Honor granted Flack & Kurtz's first motion
 6   to dismiss Con Ed's original complaint, your Honor explicitly
 7   held that C.P.L.R. 214(d) represents, if memory serves, I
 8   believe your exact words were an "important policy of New
```
                              Page 21

2.13.07_Conference.txt
9    York."  And the important policy of New York, as reflected in
10   the legislative memos that accompanied the enactment of the
11   statute are that the legislature said in those cases where a
12   licensed design professional -- your Honor spoke earlier about
13   contractors.  This doesn't apply to the contractors.  It
14   applies only to the license design professionals -- where they
15   are sued more than ten years after they complete their
16   services, the legislature made a policy decision in New York
17   that unless you can show whether you're a plaintiff or a third
18   party plaintiff or a codefendant, that there is a substantial
19   basis to believe there was negligence and proximate causation
20   with respect to each and every one of those license design
21   professionals, you cannot sustain your claim.  And the
22   legislative memo says the purpose of this is to create a memo
23   for quickly disposing of these cases.  And that's exactly where
24   214(d) applies in this case.
25             THE COURT:  Mr. Abramovitz, there's a point of
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              46

72D9WTCA
1    unfairness here that bothers me.  Under the rule of pleading, I
2    have to hesitate before imposing high standards on the
3    plaintiff.  So plaintiff gets into court by the most general or
4    conclusory type of pleading of negligence.
5             If I am to apply a different standard with regard to
6    the third party claim, there's a disparity that's created and
7    an opportunity for a manifest injustice.  That troubles me.
8             MR. ABRAMOVITZ:  I don't agree that there's an
9    opportunity for a manifest injustice because assuming for
10   argument's sake that Silverstein is ultimately held liable as a
11   result of the negligence of one or another or even several of
12   the design defendants, Silverstein could always then sue them
13   for contribution --
14            THE COURT:  Not so easy because the practical aspect
15   of this is the case gets settled and the adjustment of the
16   settlement amount reflects various conceptions of fault.  But
17   that is not suable.  That can't be made the basis of a lawsuit
18   on a third party basis and it becomes a problem.
19            Let's drop our advocacy here.  I have a real problem
20   here.  As a judge, I understand what the law is.  I may be
21   pushed in different ways.  But I don't want to create something
22   that is unfair and that raises the bar where it shouldn't.
23            MR. ABRAMOVITZ:  If I may, I have one quick point --
24   two quick points to make on that.  The first one is that we're
25   in an interesting situation here because of the emergency
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              47

72D9WTCA
1    legislation that Congress passed to put all the 9/11 cases in
2    the federal court.  But for that, if we were litigating with
3    one another over alleged negligence with respect to the design
4    of a building in the City of New York --
5             THE COURT:  You'd have the same problems.
6             MR. ABRAMOVITZ:  We'd be in state court.  But we
7    wouldn't have that tension between the very liberal pleading
8    rules under the Federal Rules of Civil Procedure.
9             THE COURT:  I've spent enough time with the
10   C.P.L.R. to know that it's a difference without a distinction.
11   You have bills of particular in state practice.
12            MR. ABRAMOVITZ:  With respect to your Honor's other
13   concern that if there's a settlement, it's a settlement, that
                              Page 22

2.13.07_Conference.txt
14    Silverstein may ultimately be barred, I'm not so sure New York
15    law is clear-cut that they can't then turn around and bring a
16    third party claim over --
17             THE COURT:  I believe they can bring a third party
18    claim.  But if there is a settlement in the case, that reflects
19    fault, that settlement can't be made the basis of the lawsuit.
20    And Silverstein may well face a bar of limitations.
21             MR. ABRAMOVITZ:  It doesn't face a bar of limitations
22    because the statute of limitations doesn't start to run until
23    it pays out.
24             THE COURT:  I think there is a practical reason, a
25    very important practical reason why I have to keep everyone in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                48
72D9WTCA
1     other than those who are exempt.  The exempt parties present a
2     different situation.  But if I don't have an exempt situation,
3     I don't think I can let anybody out.  I read 214(d).  I know
4     what it says.  I read 3211(h).  I know what it says.  But I've
5     got to be practical as well.  And I can't create one set of
6     liberalized standards for Mr. Sachs and his colleagues and a
7     different one to Mr. Loigman and his colleagues.
8              MR. ABRAMOVITZ:  With due respect, I don't think it's
9     the court that would be creating two different sets of rules.
10    It's the New York Legislature that enacted the --
11             THE COURT:  That's a very nice cop-out, along with the
12    sentence that since the legislature has created the problem,
13    the legislature knows how to fix the problem.  We all know
14    that's a myth.  That's not how things work.  Maybe in the U.S.
15    Supreme Court level it does.  It does not function that way in
16    my court.  I have spent too much time in your shoes to know
17    that.
18             I can't let you out.  Now, that may mean that I've got
19    to create heightened standards for the plaintiff in one way or
20    another.  Hear well, Mr. Sachs.  At this point, I can't let you
21    out.
22             MR. ABRAMOVITZ:  In that case, certainly I have
23    nothing further, your Honor.
24             THE COURT:  I'll reserve on all of this.  I want to
25    give it more thought.  These are complicated issues.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                49
72D9WTCA
1              Yes, sir.
2              MR. EISENSTEIN:  Your Honor, Doug Eisenstein, Mound
3     Cotton Wollan & Greengrass for AMEC Construction Management,
4     Inc.
5              THE COURT:  Do you have anything different to tell me
6     than your colleagues have told me?
7              MR. EISENSTEIN:  I do, your Honor.  We moved on
8     basically two issues; one being assumption of risk which that
9     has been argued and we wouldn't have much to add with respect
10    to your Honor's comments in that regard, as well.  However,
11    given the appellate review that that is likely to receive both
12    from this decision and the pending IRI appeal, we would also
13    invite and welcome the court's consideration of our second
14    basis which is that there is no duty of care owed by AMEC to
15    Silverstein as we briefed in full.  Essentially that issue
16    becomes --
17             THE COURT:  Who does AMEC stand for again?
18             MR. EISENSTEIN:  AMEC is AMEC Construction Management,
                            Page 23

2.13.07_Conference.txt
```
19    Incorporated.
20              THE COURT:  What do they do?
21              MR. EISENSTEIN:  They were formally known as Morse
22    Diesel International, Incorporated.
23              THE COURT:  What did Morse Diesel do?
24              MR. EISENSTEIN:  Morse Diesel, Inc. was the
25    construction manager of the Salomon build-out.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                    50

72D9WTCA
```
 1              THE COURT:  So why aren't you covered by the
 2    assumption of risk argument?
 3              MR. EISENSTEIN:  Your Honor, we would be covered by
 4    the assumption of risk argument.
 5              However, as a separate basis, and depending on the
 6    treatment that that issue receives on appeal, as a separate
 7    basis, we also moved on the basis that there was no duty of
 8    care owed.  They do dovetail in certain respects, but we
 9    believe it is a separate and distinct legal argument that the
10    court can and should grant AMEC's motion to dismiss on.  In
11    that regard, duty of care requires some privity between AMEC
12    and Silverstein.
13              THE COURT:  I've ruled on that, haven't I?
14              MR. EISENSTEIN:  You have ruled on that in certain
15    respects.
16              THE COURT:  So, why aren't you covered by that?
17              MR. EISENSTEIN:  We believe that we would be covered
18    by that, your Honor and would invite the court to rule in that
19    regard here as well.
20              That has not been ruled specifically -- it was ruled
21    with regard to -- for example, in our prior motion to dismiss
22    with respect to Con Edison in the direct action, it was ruled
23    that we were not in privity with Con Edison.  The same is true
24    here.  There is neither privity nor a functional equivalent of
25    privity which would be required under New York law in order to
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                    51

72D9WTCA
```
 1    find a duty of care owed by AMEC to Silverstein.  And in the
 2    same regard that your court -- that this court has decided
 3    there was no privity or functional equivalent of privity
 4    between AMEC and Con Edison, the same is true here with respect
 5    to Silverstein.
 6              There is, of course, another prong as well which we
 7    also believe that even if the court were to find some
 8    functional equivalent of privity, which we don't believe does
 9    exist, the other prong would be that the work that was done by
10    AMEC would have to have been for a particular purpose or
11    intended solely for the purposes of Silverstein.  Here it
12    certainly --
13              THE COURT:  Same argument.
14              MR. EISENSTEIN:  It's essentially the same argument.
15    Finally, your Honor --
16              THE COURT:  How do you see this argument Mr. Loigman?
17              MR. LOIGMAN:  Your Honor, just to respond to the
18    privity point that's being raised now, I think this is a very
19    different instance than the court was faced with.
20              THE COURT:  Con Edison was a tenant.
21              MR. LOIGMAN:  Con Edison was not a tenant.
22              THE COURT:  And here we're dealing with the landlord
23    of the whole premises.
```
                              Page 24

2.13.07_Conference.txt
24          MR. LOIGMAN:  Actually, it goes beyond that.  Con Ed
25     was not a tenant of the building.  Con Ed occupied space
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              52

72D9WTCA
 1     adjacent to the building.
 2          THE COURT:  I wasn't able to clarify that so I'm not
 3     going to do that now.
 4          MR. LOIGMAN:  The difference here --
 5          THE COURT:  I think there's a distinction here,
 6     Mr. Eisenstein.  It's one thing not to have a duty of care to
 7     another cotenant or an adjacent landowner.  It's another thing
 8     to build a building in relationship to the landlord of that
 9     building.  And although you may be exempt from suit because of
10     the issues arising from the lease, I'm reluctant to go beyond
11     that at this time.  So I'm not going to grant that motion
12     without prejudice.
13          MR. LOIGMAN:  Your Honor, I would also add on the
14     other issue that's before the court, the assumption of risk
15     issue, I think that we've all spoken about several times today,
16     that issue is now before the Second Circuit in the IRI case and
17     they've actually scheduled argument once.  It hasn't happened
18     yet.  But I would request, given the fact that they're
19     hopefully about to deal with that issue, that it may make sense
20     in light of that to withhold judgment until the Second Circuit
21     speaks on the issue.  Thank you, your Honor.
22          THE COURT:  What do I accomplish or what -- Mr. Sachs,
23     what happens to the case if I were to do that?
24          MR. SACHS:  I was just thinking about that as counsel
25     said it.  Anything that's going to delay the case, I would ask
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              53

72D9WTCA
 1     the court not to wait for the Second Circuit.
 2          I don't know what you accomplish, frankly.  It seems
 3     to me the court could rule and if the Second Circuit determines
 4     you were wrong on that issue --
 5          THE COURT:  I'm not going to wait.  I've got to move
 6     all these cases.  I've got a very thick calendar and I'm
 7     determined to get all these cases moving as fast as I can make
 8     them move.  Otherwise, there are so many excuses to delay
 9     things in every case that we'll never get through.  I'm not
10     going to hold back.  When I'm ready, I'll decide it.  If the
11     Second Circuit requires me to change my mind, in some fashion
12     or to reconsider, then I'll do that.  But I think the argument
13     for moving ahead overpowerful.  You don't have to answer
14     anymore, Mr. Sachs.
15          MR. SACHS:  Thank you, sir.
16          THE COURT:  Anything more on the motions?
17          MR. SCHRECKINGER:  Your Honor I never got a chance to
18     do a rebuttal on my argument on 214(d).
19          THE COURT:  I've already told you that I did not see
20     that I could do something on the third party actions that were
21     not consistent with how I'm handling the main actions.
22          MR. SCHRECKINGER:  I understand that.  I think what
23     you were focusing on, your Honor, was the settlement aspect of
24     it.  As we all know, most cases wind up settling in any event
25     and I think that's what one of the reasons -- the main reason
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              54

2.13.07_Conference.txt
72D9WTCA
1  why --
2          THE COURT:  I said that.  What more are you going to
3  do?
4          MR. SCHRECKINGER:  If that's what your concern is for
5  letting us out at this point, I think you have to recognize
6  that design professionals do not have --
7          THE COURT:  I'm not going to let you out.  You
8  represent --
9          MR. SCHRECKINGER:  I represent Irwin Cantor, your
10 Honor.
11         THE COURT:  You're not going to get out at this point.
12         MR. SCHRECKINGER:  I just want to let you know that
13 design professionals have small insurance policies in the big
14 scheme of things with eroding limits which means that every
15 dime we spend in defending this is another dime that's not
16 going towards settlement.
17         THE COURT:  Be very efficient.
18         Anything else on the arguments?
19         MR. SCHRECKINGER:  Thank you, your Honor.
20         THE COURT:  The next item on the agenda is to discuss
21 the status of discovery.  Mr. Sachs, why don't you tell me
22 where you are in the case or Ms. Jacob.
23         MR. SACHS:  We agreed she would do it.
24         MS. JACOB:  And this was --
25         THE COURT:  Ms. Jacob, thank you for putting together
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    55

72D9WTCA
1  the agenda.  I appreciate it very much.
2          MR. SACHS:  It was a joint effort.
3          THE COURT:  Listen, if you defer to Ms. Jacob, then
4  you have to allow the compliments to go where they go.
5          MR. SACHS:  You're right.  Your Honor, I withdraw.
6          MS. JACOB:  Your Honor, we just wanted to bring the
7  court up to date on the discovery.  First, on document
8  protection there had been some issues with the joint
9  repository.  It took a little longer, as we said before, to set
10 up than we thought it would.  We are hopeful that some of the
11 problems we had, have been resolved.  The parties have been
12 talking and working together with that.
13         THE COURT:  What is the remaining problem?
14         MS. JACOB:  It has to do with the coding, the vendor
15 which is coding the documents as they are produced, and that
16 vendor has been replaced.
17         The third party defendants are producing their
18 documents and I think they will do it whether they are parties
19 or not because they understand they will have to produce
20 whether they are parties or not.
21         THE COURT:  I reinforce that.
22         MS. JACOB:  We all have agreed that by April 1 we
23 expect that basically the document production will be complete,
24 everybody recognizing that given the age of some of the events
25 in these cases, additional documents may be found; and if they
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    56

72D9WTCA
1  are they, of course, will be produced.
2          In terms of depositions, there have been a handful of
3  depositions on document production.  The plaintiffs wanted to
4  begin with those.  Those are virtually complete.  We're still
                          Page 26

2.13.07_Conference.txt
5    discussing some issues, but we think we can resolve them
6    without, we hope, needing to take the Court's time.
7                And we are starting to talk about scheduling fact
8    depositions, which we expect to go forward relatively soon.
9                THE COURT:  Should I meet with you before you fix a
10   plan?
11               MS. JACOB:  We can, certainly.
12               THE COURT:  It might be a good idea because my
13   experience is that it reduces the number of deponents.
14               MS. JACOB:  Your Honor, maybe we will speak -- in
15   fact, that is also something we discussed.  Perhaps the parties
16   should get together, talk, and then get in touch with your
17   clerk about what would be a good date.
18               THE COURT:  Yes.
19               MS. JACOB:  With respect to the photograph/video
20   production, I saw that was also on the court's schedule.  The
21   parties have agreed on February 19, which is three weeks from
22   the Court's ruling for production.  The lawyer at the
23   plaintiffs who was handling this was away for a period of time
24   and that's why it's the three-week date instead of the two-week
25   date that the court had stated.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    57
     72D9WTCA
1                THE COURT:  That's all right.
2                MS. JACOB:  That's really the report.  There really
3    are no issues or disputes at this point we need to bring to the
4    court.  Things seem to be progressing.
5                THE COURT:  I recall a potential issue with regard to
6    opening up my previous decision because Con Ed discovered some
7    documents that gave rise to an argument that there was some
8    kind of special relationship with Silverstein, I think.
9                MR. SACHS:  With -- it wasn't Silverstein, Judge, it
10   was with Irwin Cantor.
11               THE COURT:  With Cantor, yes.
12               MR. SACHS:  Yes, sir that was discussed at length at
13   the August 9 status conference.
14               Those documents were never found.  We did decide after
15   reading your Honor's views that we should proceed with the
16   litigation.  And we withdrew our application without prejudice,
17   but without prejudice is -- means something very major would
18   have to happen.  And that's why we did it.  And so that is no
19   longer before the court.  The court doesn't have to deal with
20   that issue.
21               We really felt, after reading what your Honor had said
22   and after discussing it with counsel for Cantor, that we wanted
23   to get to the heart of the case and get the case moving.
24               THE COURT:  Fine.
25               MR. SACHS:  So that's what we did.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    58
     72D9WTCA
1                THE COURT:  Is there any prospect for settlement
2    talks?
3                MR. SACHS:  Your Honor, ordered us to have settlement
4    talks.  We did on June 16.  Plaintiffs made a fairly lengthy
5    and detailed PowerPoint presentation.  The defendants at that
6    point asked for a couple weeks to respond.
7                After a couple weeks Ms. Jacob called me and said they
8    weren't going to respond either to what we said or to make a
9    counteroffer because they felt that it was premature.  That's
                                Page 27

2.13.07_Conference.txt
```
10   sort of been where we are.
11              Obviously, plaintiffs always think there's a reason
12   for settlement discussions.  But I will say that in this case,
13   unlike other cases, all of the parties are fairly aware, from
14   various governmental investigations, of what this case is
15   about.  This is not a case -- even though we haven't started
16   with depositions, we have virtually all of the documents for
17   construction.  We have virtually all of the documents have been
18   exchanged on the fuel system.  We all know pretty much what the
19   issues are on what should have been in the system and what
20   shouldn't.  There are disputes about it, but we know what the
21   issues are.  There have been two government investigations that
22   are public in terms of what has been -- what they have -- kinds
23   of things they have looked at.
24              I think this case, even though it is relatively early
25   in the deposition cycle, could benefit very much from
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                      59

```
     72D9WTCA
 1   mediation.
 2              THE COURT:  Mr. Sachs, what is the basis for the
 3   plaintiffs' claim of recovery?  Is it to indemnify the expenses
 4   incurred by Con Edison?
 5              MR. SACHS:  Yes.
 6              THE COURT:  In other words, your out-of-pocket?
 7              MR. SACHS:  Yes.  260 million dollars.
 8              THE COURT:  Whatever you're out-of-pocket, bills for
 9   every piece of machinery.
10              MR. SACHS:  That's correct.  We have given that to the
11   plaintiffs -- to the defendants in this case.  We have given
12   that to the defendants in the airline and security cases.  260
13   million dollars in hard damages that I have presented to them
14   and given them backup for it.  There is no question -- there's
15   not very much question.  It's pretty hard damages.
16              THE COURT:  Ms. Jacob, is the issue more who should
17   pay than how much should be paid?
18              MS. JACOB:  Your Honor, there are a couple of issues.
19   One is -- and I think the best way, it was stated best by
20   Mr. Barry at the last conference in those cases when the court
21   brought up the possibility of property damage settlement.  And
22   what he said in distinguishing property damage settlement from
23   the personal injury wrongful death is that, "To have the
24   property cases pending against these defendants resulting from
25   an attack against the United States of America sticks in the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```
                                                                      60

```
     72D9WTCA
 1   crawl," he said, "of the insureds and insurers in those cases."
 2              THE COURT:  Poor English.
 3              MS. JACOB:  Your Honor, basically what the --
 4              THE COURT:  Just to put principle in its proper place.
 5              MS. JACOB:  The principle is that we do not believe
 6   there is any liability on our part.  Specifically, the Port
 7   Authority doesn't think it is liable for the fact that its
 8   buildings were attacked as part of the terrorist attacks on the
 9   United States.  And to a different extent, depending on the
10   role, that is very much what the feeling is of the other
11   defendants in this case and also of their insurance carriers,
12   all of whom have been obviously talked to at some length about
13   this.  That is a major block.  That the defendants --
14              THE COURT:  So I assume from what you're saying that
```
                            Page 28

2.13.07_Conference.txt
15    the airline insurance companies are taking the position that
16    they will not settle any of the property claims, neither of
17    Towers 1 or 2, nor Tower 7.  And they may not distinguish
18    between the two sets.  Or they may, I don't know.  And that
19    with the airline insurers unwilling to step up to the plate,
20    the Port Authority is unwilling to deal with what may be a
21    contract obligation under the lease with Con Edison.
22              MS. JACOB:  Well, your Honor, a couple of answers.
23              THE COURT:  Sorry to load the question, Ms. Jacob.
24              MS. JACOB:  First, it is not -- the reason I referred
25    to the aviation defendants is I had thought they had expressed
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    61

72D9WTCA
1     it well.  It is not just because the aviation carrier may or
2     may not be interested in settling, just on our part of the
3     case, just the claims against us.  We don't see any liability
4     regardless of what the aviation defendants may or may not do.
5              In terms of the contract relationship with Con Ed,
6     we've never really litigated that contract.  But that contract,
7     if anybody is responsible under that contract, it is not the
8     Port Authority, which does not, in all of the contracts in
9     which the Port Authority is involved, the contract with Con Ed,
10    the contract with Salomon, now Citigroup, the contract with
11    Silverstein --
12              THE COURT:  Who is responsible to Con Ed under that
13    contract?
14              MS. JACOB:  Your Honor, whoever is responsible -- the
15    Port Authority is indemnified by the others who were involved
16    in the construction if there is any negligence.
17              But first you have to find that there is some
18    liability and there is something wrong before you can get up to
19    whether the contract does or does not cover it.
20              We also have the subrogation issues, which I don't
21    think we need to get into.  But even -- that's a whole other
22    reason why the defendants or certainly the Port Authority
23    defendants are not at this point inclined to pay the kinds of
24    monies that the plaintiffs are asking for.
25              Your Honor, a couple of other points.  Mr. Sachs
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    62

72D9WTCA
1     referred to the government investigations.  At this point, I'm
2     not aware of a government investigation which has concluded
3     that there is liability on the part of the Port Authority, or
4     Silverstein, or the other defendants in World Trade Center 7.
5              And the second issue by Mr. Sachs referred to Con Ed
6     being out-of-pocket.  Con Ed has been reimbursed substantial
7     sums of money by various government agencies on a claim that
8     they were injured by terrorist attacks.
9              So, it is not as clear-cut that all we have here is a
10    construction case where there was negligence and the question
11    is what the contract says about who should pay for it.
12              And that is really a lot of the reason why we are more
13    active in defending these cases than we are in coming up with a
14    way to settle them.  Not saying that we would not consider it.
15    Not saying it's impossible.  But at this point, your Honor, it
16    is not likely.
17              THE COURT:  Let me see if I can understand this in
18    terms of the language.  As I wrote In re:  September 11
19    property damage and business loss litigation, Aegis Insurance
                                Page 29

2.13.07_Conference.txt
20  Services against the Port Authority, 2006 Westlaw 62019.
21  Decided January 12, 2006.  At page asterisk 11.
22          "Section 8-8 of the agreement between the Port
23  Authority and Con Edison provided that the Port Authority could
24  construct additional stories above the substation of whatsoever
25  design, size, and purpose as the Port Authority may from time
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            63
72D9WTCA
1   to time and at any time during the letting determine, but that
2   such construction 'shall not unreasonably impair, endanger, or
3   interfere with the continuous use of a substation building by
4   Con Ed, the lessee.'  Section 16 limited the remedies available
5   to Con Ed," basically for reimbursement, "and required the Port
6   Authority to reimburse the lessee for any expense incurred by
7   the lessee in maintaining, repairing, replacing or rebuilding
8   the substation building or the lessee substation equipment
9   caused by the acts or omissions of the Port Authority or its
10  agents, contractors, or employees in connection with the
11  construction or maintenance of the stories, structures,
12  buildings, or improvements described in Section 8."
13          So, I gather from what Ms. Jacob says is that the
14  position of the Port Authority is that there must be some
15  ascription of fault to some degree before the Port Authority
16  will accept any obligation under those clauses.
17          MS. JACOB:  Your Honor, with the caveat that -- I
18  don't have a copy of the lease with me -- that is certainly
19  part of it.  Part of it is there has to be some negligence on
20  the part of the Port Authority, that there has to be some
21  fault.
22          THE COURT:  I think it's a fair reading.
23          MS. JACOB:  And I would say that in the presentations
24  made -- and I don't really want to get into settlement
25  discussions here -- but they were focused on damages, not on
               SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            64
72D9WTCA
1   liability arguments.
2           MR. ANTIN:  May I just be heard briefly on that?
3           THE COURT:  Let me just finish my undertaking at the
4   moment.  Yes.
5           So what I would come to believe, I guess, is that if
6   there is a settlement, the Port Authority has to accept an
7   assignment from Con Ed so that it adds to the claim it makes
8   against the aviation defendants.  And if it's a claim based on
9   a payment based on fault to some degree, it affects the ability
10  to claim over, which probably explains the paralysis.
11          I have this issue, then I'll hear you.  I'm reluctant
12  to impose a rigorous standard of moving forward with the case
13  if it doesn't lead us to any kind of positive result.  If there
14  was a mood on the part of the aviation defendants to settle the
15  property damage claims, and there seems to be none, then there
16  would be a lot of merit in moving ahead here.  In the absence
17  of that, the question I have is:  What's our goal?
18          MR. SACHS:  Judge, our complaint in this case has been
19  primarily and continues that our claim is not against
20  particularly the aviation and security defendants.  They are
21  there, as a possibility.
22          This case is about -- I'm only going to hold one thing
23  up for your Honor -- this case --
24          THE COURT:  Has Ms. Jacob seen it?
                        Page 30

2.13.07_Conference.txt
```
25              MR. SACHS:  Well no, but it's just simply, just a site
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    65

```
    72D9WTCA
 1   plan of the World Trade Center.
 2              THE COURT:  I have that in memory.
 3              MR. SACHS:  All I'm simply pointing out to the court
 4   is that our claim is against the ground defendants of this
 5   building.  And simply highlighted in red are the three
 6   buildings that collapsed as a result of the events of
 7   September 11.  And they all have only one thing in common.
 8              Remember that Building 7 was never hit by any
 9   aircraft.  They all have an overabundance of fuel in the
10   building.  Those are the only buildings that collapsed.
11   Buildings 1 and 2 because of jet fuel.  Building 7 because of
12   diesel fuel.  There were many other buildings in the area that
13   were damaged as significantly as Building 7 that did not
14   collapse.
15              So, our case has been, we believe that the liability
16   in this case is against these ground defendants; Silverstein,
17   Citigroup, and the Port Authority.  We believe and we think we
18   can prove that the fuel system for the Salomon Brothers'
19   generator was improperly designed, that that fuel system leaked
20   diesel oil into the building.  There was no oil found in the
21   tanks underground after the event, that oil -- there was no oil
22   found in the soil.  The oil had to go in the building.  And
23   frankly, the way the building collapsed -- and we have video
24   and photographs of the way the building collapsed, that
25   building had to fail because of the overheating of two transfer
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    66

```
    72D9WTCA
 1   trusses in a particular portion of the building.
 2              That's our case against these folks.  That is the same
 3   case that has been investigated by two government agencies.  I
 4   never suggested that anybody apply liability to anyone.
 5              THE COURT:  To answer my question, your proposal is to
 6   press forward?
 7              MR. SACHS:  Yes, sir, it is.
 8              THE COURT:  To a trial?
 9              MR. SACHS:  Yes, sir, it is.
10              THE COURT:  Okay.
11              MR. ANTIN:  May I briefly be heard on the contract
12   case?
13              THE COURT:  Your name.
14              MR. ANTIN:  It's Mark Antin.
15              I don't want to argue the issue now and I don't think
16   you want us to, but the language that the court read in the
17   lease we believe is essentially strict liability language, not
18   fault language as to the Port Authority --
19              THE COURT:  I don't want to get into that now.
20              MR. ANTIN:  I would just ask you --
21              THE COURT:  I have an open mind on the issue.
22              MR. ANTIN:  There's another paragraph.
23              THE COURT:  There will be a time when I'll become
24   educated on this.  I was really pushing the point in my
25   discussion with Ms. Jacob to see if this is susceptible to
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                                    67

```
    72D9WTCA
```

Page 31

```
                          2.13.07_Conference.txt
 1    summary judgment.  I suspect it's not.  And so it has to be
 2    litigated.
 3            Look, I will hope that the joint discovery does not
 4    have a list of witnesses that will be inconsistent with a
 5    prompt trial of this case.  We'll see what the situation is.
 6    So the scope of recovery is 216 million dollars.
 7            MR. SACHS:  Plus interest, of course.  260 million.
 8            THE COURT:  260 million.
 9            MR. SACHS:  This is on the 7 case.
10            THE COURT:  Yes.  Well, that's all you'll have.
11            MR. SACHS:  Against these defendants.  But we do
12    have -- Con Ed has other damages involving the collapse of 1
13    and 2 that are not part of this case.  But we are only
14    litigating here --
15            THE COURT:  Where is that case, the other case?
16            MR. SACHS:  It's in -- we're a part of the --
17            THE COURT:  Before me?
18            MR. SACHS:  We're a part of the business interruption
19    and property damage group in the aviation and security
20    defendants.
21            THE COURT:  Those are different issues.
22            MR. SACHS:  They are.  Different damages and different
23    issues.
24            THE COURT:  When do I next see you?
25            MR. SACHS:  Judge, it looks to me -- we had a very
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

68

```
      72D9WTCA
 1    productive meeting on Friday, meet and confer.  It looks to me
 2    that most of the documents are going to be produced by April 1.
 3            I think we need a month or so, at least, to get a look
 4    at those documents.  And then we are going to meet, I believe,
 5    to try to set up some sort of schedule for depositions,
 6    understanding we want to move the case forward.
 7            And then I think at that point it might be good for us
 8    to contact the court, if the court wishes, to work with us in
 9    terms of some sort of deposition scheduling.  But I think
10    trying to do that before May 1 or so would probably not be
11    productive.
12            This vendor that we've had to replace, hasn't even
13    started on the coding, and there's probably still several
14    hundred thousand documents.
15            THE COURT:  How about May 15 at three o'clock.
16            MR. SACHS:  My calendar is downstairs with the
17    marshals.
18            THE COURT:  May 15 is a Tuesday.
19            MR. SACHS:  Thank you, sir.
20            THE COURT:  That will be the default date.  It could
21    be adjusted earlier or later.  May 15, 3:00.
22            MR. SACHS:  Thank you, sir.
23            THE COURT:  Anything else anybody wants to bring up?
24    Thank you all.  (Adjourned)
25
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

# EXHIBIT
# 8

# In The Matter Of:

*SEPTEMBER 11 PROPERTY DAMAGE and BUSINESS LOSS LITIGATION, et al*

CORNELIUS LYNCH
*September 26, 2007*

# *CONFIDENTIAL*
# *MERRILL LEGAL SOLUTIONS*
## *25 West 45th Street - Suite 900*
## *New York, NY 10036*
*PH: 212-557-7400 / FAX: 212-692-9171*

LYNCH, CORNELIUS - Vol. 1

Page 43

|          |    |                                            |
|----------|----|--------------------------------------------|
|          | 1  | CORNELIUS LYNCH - CONFIDENTIAL             |
| 23:22:30 | 2  | Q.    And when -- when -- go ahead.         |
| 23:22:31 | 3  | A.    -- it was built just six months       |
| 23:22:34 | 4  | behind Tower A.  In other words, it was -- it |
| 23:22:37 | 5  | lagged Tower A for construction marshalling |
| 23:22:41 | 6  | reasons, not for marketing reasons.         |
| 23:22:49 | 7  | Q.    So does -- does that mean that it      |
| 23:22:52 | 8  | was completed six months after Tower A was, |
| 23:22:55 | 9  | approximately?                              |
| 23:22:55 | 10 | A.    I'm not sure.                          |
| 23:22:56 | 11 | Q.    But approximately?                     |
| 23:22:56 | 12 | A.    Yes, yes, sir.                         |
| 23:22:57 | 13 | Q.    So they were being built              |
| 23:22:59 | 14 | essentially at the same time?               |
| 23:23:02 | 15 | A.    That's right.                         |
| 23:23:03 | 16 | Q.    And you were leasing space in both    |
| 23:23:06 | 17 | of them at the same time?                   |
| 23:23:07 | 18 | A.    Yes, yes, sir.                         |
| 23:23:13 | 19 | Q.    And how long after Tower B --          |
| 23:23:18 | 20 | Tower B was -- was -- was built, how long after |
| 23:23:21 | 21 | that was the -- was Tower 3 built or -- or  |
| 23:23:25 | 22 | the -- the building 3 where the hotel was?  |
| 23:23:28 | 23 | A.    I don't remember.                      |
| 23:23:30 | 24 | Q.    Years, months?                        |
| 23:23:32 | 25 | A.    A few years.                          |

Page 44

|         |    |                                                        |
|---------|----|--------------------------------------------------------|
|         | 1  | CORNELIUS LYNCH - CONFIDENTIAL                         |
| 23:23:33 | 2  | Q.     A few years.                                    |
| 23:23:39 | 3  | Who was the -- who was the                            |
| 23:23:49 | 4  | commissioner, the -- the head commissioner of         |
| 23:23:52 | 5  | the Port Authority when towers 1 and 2 were           |
| 23:23:58 | 6  | built?  Do you remember?                              |
| 23:24:03 | 7  | A.     No.  We would call him the                     |
| 23:24:08 | 8  | chairman.                                             |
| 23:24:08 | 9  | Q.     Chairman, that was the word I was              |
| 23:24:10 | 10 | looking for.                                          |
| 23:24:13 | 11 | Okay.  You became deputy director                     |
| 23:24:23 | 12 | of the World Trade Department in 1979, and you        |
| 23:24:25 | 13 | stayed in that position until when?                   |
| 23:24:28 | 14 | A.     Until I retired in February of                 |
| 23:24:32 | 15 | 1987.                                                 |
| 23:24:42 | 16 | Q.     And did your responsibilities                  |
| 23:24:44 | 17 | remain the same for that -- during that period        |
| 23:24:50 | 18 | of time?                                              |
| 23:24:50 | 19 | A.     Yes.                                           |
| 23:24:52 | 20 | Q.     And could you tell me what those               |
| 23:24:55 | 21 | responsibilities were on a -- on a slightly more      |
| 23:24:58 | 22 | specific basis than just say you rented space in      |
| 23:25:01 | 23 | the building?  What -- what were your                 |
| 23:25:03 | 24 | responsibilities in terms of -- of the rentals        |
| 23:25:06 | 25 | and development of these two towers?                  |

| | 1 | CORNELIUS LYNCH - CONFIDENTIAL |
|---|---|---|
| 23:25:13 | 2 | A.    I supervised the work of quite a |
| 23:25:19 | 3 | few renting agents.  I worked with real estate |
| 23:25:24 | 4 | brokers to have them bring their tenants to us. |
| 23:25:29 | 5 | On major transactions, I would personally get |
| 23:25:33 | 6 | involved, and I would get involved whenever I |
| 23:25:37 | 7 | saw something important starting to slip.  I was |
| 23:25:41 | 8 | a sales manager. |
| 23:25:42 | 9 | Q.    Okay.  And as such, you became |
| 23:25:54 | 10 | familiar with the state of the commercial real |
| 23:25:57 | 11 | estate market in New York City? |
| 23:25:59 | 12 | A.    Yes. |
| 23:26:00 | 13 | Q.    And particularly in the downtown |
| 23:26:02 | 14 | area? |
| 23:26:02 | 15 | A.    Um-hum, yes. |
| 23:26:04 | 16 | Q.    When did you first become involved |
| 23:26:18 | 17 | in any way with what ultimately became World |
| 23:26:22 | 18 | Trade Center 7? |
| 23:26:28 | 19 | A.    I don't remember. |
| 23:26:30 | 20 | Q.    Can you approximate for me? |
| 23:26:34 | 21 | A.    '79 or 1980, that period. |
| 23:26:39 | 22 | Q.    When did you first become aware |
| 23:26:44 | 23 | that there was a plan to construct a office |
| 23:26:50 | 24 | tower on top of the Con Ed substation? |
| 23:26:54 | 25 | A.    Well, that would go well back. |

Page 58

|  | 1 | CORNELIUS LYNCH - CONFIDENTIAL |

```
23:40:18    2    which was the last piece, the piece on the back

23:40:21    3    burner --

            4        Q.    Um-hum.

23:40:21    5        A.    -- I participated in putting

23:40:26    6    together a -- what do you call it -- request for

23:40:30    7    proposals and was run out of the general

23:40:37    8    counsel's office, Patrick Falvey.  He's alive,

23:40:47    9    anticipating your question.

23:40:49   10             There's a poem about, I feel like

23:40:51   11    one who treads alone, a banquet hall deserted.

23:40:57   12        Q.    What -- were you involved in -- in

23:41:00   13    the planning process to determine whether or not

23:41:08   14    buildings 4, 5 and 6 should be built in order to

23:41:15   15    maximize revenues?

23:41:20   16        A.    No.

23:41:23   17        Q.    Why not?

23:41:27   18        A.    Because they were part of our plan.

23:41:34   19    Number 4 -- number 4 is the United States

23:41:39   20    customs house; 5 is the northeast plaza build; 6

23:41:44   21    is the southeast -- southeast plaza building.

23:41:46   22    They were part of the plan.

23:41:48   23        Q.    The original plan?

23:41:49   24        A.    The original plan.

23:41:50   25        Q.    Okay.  And 7 was -- you had a -- an
```

Page 59

CORNELIUS LYNCH - CONFIDENTIAL

| | | |
|---|---|---|
| 23:41:54 | 2 | air -- air lease possibility, but it wasn't a |
| 23:41:56 | 3 | definite part of the plan, correct? |
| 23:41:57 | 4 | A.    Correct. |
| | 5 | Q.    Okay, thank you. |
| 23:41:59 | 6 | A.    It was on the back burner. |
| 23:42:04 | 7 | Q.    All right.  And when was the |
| 23:42:05 | 8 | decision made, if you can recall, to pursue |
| 23:42:08 | 9 | this -- to -- to start out and try to -- try to |
| 23:42:10 | 10 | get proposals for the development of -- of that |
| 23:42:12 | 11 | site? |
| 23:42:13 | 12 | A.    I don't remember. |
| 23:42:15 | 13 | Q.    Late '70s? |
| 23:42:16 | 14 | A.    Yes. |
| 23:42:18 | 15 | Q.    Were you involved in the decision |
| 23:42:20 | 16 | as to whether or not that would be done by the |
| 23:42:22 | 17 | Port Authority itself or would be done by some |
| 23:42:26 | 18 | outside entity? |
| 23:42:29 | 19 | A.    No. |
| 23:42:33 | 20 | Q.    When you -- obviously when you sent |
| 23:42:35 | 21 | out a request for proposals, you knew you were |
| 23:42:38 | 22 | sending it out to outside entities. |
| 23:42:41 | 23 | A.    Correct. |
| 23:42:41 | 24 | Q.    Correct? |
| 23:42:42 | 25 | How did you become aware that the |

6ba2b4ad-b645-4028-8a0f-0ba46318284b

Page 60

1           CORNELIUS LYNCH - CONFIDENTIAL

23:42:43    2    Port Authority was not going to do this

23:42:46    3    themselves?

23:42:46    4        A.    Well, there was a feeling in the

23:42:48    5    front office and on the commissioner level that

23:42:53    6    the Port Authority was taking a lot of

23:42:56    7    unreasonable and unfair abuse because we were in

23:43:02    8    the real estate business instead of the

23:43:04    9    transportation business, and it was felt that

23:43:11    10   the better way to do it is to let private

23:43:14    11   industry run the building, develop the building,

23:43:18    12   put up their own money for the building, and do

23:43:23    13   the best we can financially that way.

23:43:27    14       Q.    And was that decision handed down

23:43:29    15   to you or given to you in some way?

23:43:31    16       A.    Yes.

23:43:35    17       Q.    By Mr. Tozzoli, if you recall?

23:43:39    18       A.    I don't recall.

23:43:47    19       Q.    Okay.

23:43:47    20            MS. JACOB:  Frank, whenever you

23:43:48    21   come up to a good time for a break.

23:43:50    22            MR. SACHS:  Doesn't matter.  This

23:43:51    23   is fine.

23:43:52    24            MS. JACOB:  Okay, why don't we take

23:43:54    25   a short recess.

6ba2b4ad-b645-4028-8a0f-0ba46318284b

Page 61

|          |     | CORNELIUS LYNCH - CONFIDENTIAL |
|----------|-----|

1    CORNELIUS LYNCH - CONFIDENTIAL

23:43:55    2    MR. SACHS:   Sure.

23:43:56    3    THE VIDEOGRAPHER:   Time is 11:43

23:44:02    4    a.m.  Off the record.

23:44:04    5    (Recess taken.)

00:02:09    6    THE VIDEOGRAPHER:   The time is now

00:02:13    7    12:02 p.m.  Back on the record.

00:02:29    8    BY MR. SACHS:

00:02:31    9    Q.    Mr. Lynch, what was the -- do you

00:02:34    10    recall what the state of the New York commercial

00:02:37    11    real estate market was in 1979 when you were

00:02:42    12    beginning your work on -- involving World Trade

00:02:45    13    Center -- what became World Trade Center?

00:02:48    14    A.    1979, it was recovering.

00:02:51    15    Q.    Recovering from what, sir?

00:02:53    16    A.    From a slump.

00:02:55    17    Q.    How long had the slump been going

00:02:58    18    on?

00:03:02    19    A.    About five years, I guess.

00:03:04    20    Q.    Since the early '70s?

00:03:06    21    A.    Yes.

00:03:09    22    Q.    What was the vacancy rate in the

00:03:11    23    World Trade Center buildings between 1973 and

00:03:14    24    1979, if you know?

00:03:15    25    A.    I don't know.